APPEAL No. 23-35288

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RACHEL G. DAMIANO; KATIE S. MEDART,

*Plaintiffs-Appellants*,

v.

GRANTS PASS SCHOOL DISTRICT NO. 7, an Oregon public body; KIRK T. KOLB, Superintendent, Grants Pass School District 7, in his official and personal capacity; THOMAS M. BLANCHARD, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity; SCOTT NELSON; DEBBIE BROWNELL; BRIAN DELAGRANGE, in their official and personal capacities,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon
Case No. 1:21-cv-00859-CL / Hon. Mark D. Clarke

## APPELLANTS' OPENING BRIEF

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org

MATTHEW B. MCREYNOLDS
PACIFIC JUSTICE INSTITUTE
PO Box 276600
Sacramento, CA 95827
(916) 857-6900
mattmcreynolds@pji.org

TYSON C. LANGHOFER
MATHEW W. HOFFMANN
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

As natural persons, Rachel Sager née Damiano and Katie Medart have no parent corporation and no stockholders.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ....................................................vi

JURISDICTIONAL STATEMENT ...........................................1

STATEMENT OF THE ISSUES ..............................................2

PERTINENT STATUTES ......................................................4

INTRODUCTION ................................................................5

STATEMENT OF THE CASE ................................................7

I. Rachel and Katie are model educators. .........................................7

II. Rachel and Katie's religiously informed beliefs motivate them to promote each student's flourishing............................................8

III. Katie repeatedly asked Defendant Principal Blanchard about the District's gender-identity policy but received inconsistent responses. ......................................................9

IV. To protect students, staff, and parents nationally, Rachel and Katie developed "I Resolve"—gender-identity policy solutions—and shared it privately with Defendant Superintendent Kolb and Blanchard...........................................10

V. Rachel and Katie published an "I Resolve" video and website over Spring Break, and some staff objected to their views. ..........12

VI. Defendants suspended Rachel and Katie, condemned their views, and "actively solicited complaints" against them—despite the school and District operating "effectively" after Spring Break. ..............................................13

VII. Defendants investigated Rachel and Katie's speech....................15

VIII. Defendants terminated Rachel and Katie, sought to deny them unemployment benefits, and reported them to their licensing body. ................................................................... 16

IX. Defendants punished Rachel and Katie under their unconstitutional speech policy. ...................................................... 18

X. The district court granted Defendants summary judgment. ........ 20

SUMMARY OF ARGUMENT ................................................ 23

ARGUMENT ...................................................................... 25

I. Defendants unconstitutionally retaliated against Rachel and Katie. ................................................................................ 26

    A. The district court assumed and Defendants did not dispute that Rachel and Katie proved their prima facie case. ........................................................................... 27

    B. Defendants have no justification outweighing Rachel and Katie's right to speak on a matter of profound public concern. .................................................................... 29

        1. The district court ruled that whether Rachel and Katie's speech or the community reaction to it caused a disruption was "a distinction without a difference," but this Court has held the opposite. ........ 31

        2. The district court held the number and nature of complaints immaterial, but this Court has held the opposite ........................................................................ 33

        3. Defendants' and the district court's amorphous— and unfounded—concerns with student safety also defy precedent. ........................................................... 35

    C. Defendants' retaliation violated clearly established law. .... 38

    D. This Court (and the Supreme Court) should reconsider how qualified immunity applies here. ................................. 41

II.    Defendants' overbroad speech policy discriminates based on content and viewpoint, imposes a prior restraint, and compels speech. ................................................................... 42

   A.   Defendants' policy both compels and squelches speech on matters of public concern, anytime and anywhere. ........ 44

   B.   Defendants' policy epitomizes nearly every First Amendment violation and has no relationship to any legitimate government interest. ........................................... 45

      1.   Defendants' policy restricts all employee speech— anytime and anywhere—and thus fails narrow tailoring. .................................................................... 45

         a.   Defendants' policy is staggeringly overbroad ..... 46

         b.   Defendants' policy imposes a prior restraint. .... 46

         c.   Defendants' policy discriminates based on content and viewpoint ....................................... 47

         d.   Defendants' policy licenses unbridled discretion to discriminate based on viewpoint. .......................................................... 47

         e.   Defendants' policy compels speech. .................... 48

      2.   Defendants have not met their burden to show their policy serves any government interest. .............. 49

III.   The Oregon Constitution provides even more protection for Rachel and Katie's speech. ............................................. 50

   A.   Defendants' retaliation enforced their orthodoxy on a matter of public concern ....................................... 51

   B.   Defendants' overbroad speech policy violates the Oregon Constitution ......................................................... 52

IV.   Defendants discriminated against Rachel and Katie's religion ....................................................................... 53

A. Direct evidence shows Defendants' discrimination...............53

B. Circumstantial evidence shows Defendants' discrimination. .......................................................................54

V. Defendants discriminated against Rachel and Katie's religious viewpoint in violation of clearly established equal protection law. ......................................................................60

A. Defendants discriminated against Rachel and Katie's religious views. ................................................................60

B. Defendants' religious discrimination violates clearly established law. ................................................................62

VI. Neither the District nor its Defendant board members can escape liability for their unconstitutional actions. ........................63

CONCLUSION ..................................................................................65

STATEMENT OF RELATED CASES ..................................................67

CERTIFICATE OF SERVICE................................................................68

ADDENDUM ..............................................................................A.1

# TABLE OF AUTHORITIES

## Cases

*Albino v. Baca,*
    747 F.3d 1162 (9th Cir. 2014) ...................................................... 41

*Arizona Right to Life PAC v. Bayless,*
    320 F.3d 1002 (9th Cir. 2003) ..................................................... 47

*Avenue 6E Investments, LLC v. City of Yuma,*
    818 F.3d 493 (9th Cir. 2016) ....................................................... 61

*Ball v. Massanari,*
    254 F.3d 817 (9th Cir. 2001) ....................................................... 61

*Ballou v. McElvain,*
    29 F.4th 413 (9th Cir. 2022) ....................................... 54, 56, 58, 61

*Barone v. City of Springfield,*
    902 F.3d 1091 (9th Cir. 2018) ..................................... 43–44, 46–47

*Bolden-Hardge v. Office of California State Controller,*
    63 F.4th 1215 (9th Cir. 2023) ...................................................... 55

*Coszalter v. City of Salem,*
    320 F.3d 968 (9th Cir. 2003) ....................................................... 28

*Dahlia v. Rodriguez,*
    735 F.3d 1060 (9th Cir. 2013) ..................................................... 28

*Dariano v. Morgan Hill Unified School District,*
    767 F.3d 764 (9th Cir. 2014) ................................................. 25, 60

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014) ...................................................... 40

*Dodge v. Evergreen School District #114,*
    56 F.4th 767 (9th Cir. 2022) .................. 23, 26–27, 29–32, 34, 36–40

*Dominguez-Curry v. Nevada Transportation Department,*
    424 F.3d 1027 (9th Cir. 2005) ................................................. 53–54

*Eagle Point Education Association/SOBC/OEA v. Jackson County
School District No. 9,*
880 F.3d 1097 (9th Cir. 2018) ........................................................ 52

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
575 U.S. 768 (2015) ........................................................ 56

*Elliot-Park v. Manglona,*
592 F.3d 1003 (9th Cir. 2010) ........................................................ 63

*Flores v. Morgan Hill Unified School District,*
324 F.3d 1130 (9th Cir. 2003) ........................................................ 61

*Franks v. Bowman Transportation Company,*
424 U.S. 747 (1976) ........................................................ 58

*Groff v. DeJoy,*
143 S. Ct. 2279 (2023) ........................................................ 58

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ........................................................ 64

*Hawn v. Executive Jet Management, Inc.,*
615 F.3d 1151 (9th Cir. 2010) ........................................................ 57

*Hoggard v. Rhodes,*
141 S. Ct. 2421 (2021) ........................................................ 42

*Janus v. American Federation of State, County, and Municipal
Employees, Council 31,*
138 S. Ct. 2448 (2018) ........................................................ 27, 43

*Lacey v. Maricopa County,*
693 F.3d 896 (9th Cir. 2012) ........................................................ 64

*Lindsey v. Shalmy,*
29 F.3d 1382 (9th Cir. 1994) ........................................................ 62

*Lytle v. Carl,*
382 F.3d 978 (9th Cir. 2004) ........................................................ 63

*McGinest v. GTE Service Corp.*,
  360 F.3d 1103 (9th Cir. 2004) ....................................................... 53

*Melzer v. Board of Education*,
  336 F.3d 185 (2d Cir. 2003) ........................................................... 34

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ......................................................... 27

*Merrick v. Board of Higher Education*,
  841 P.2d 646 (Or. Ct. App. 1992) ................................................. 52

*Moonin v. Tice*,
  868 F.3d 853 (9th Cir. 2017) ..................... 23, 42–43, 45–46, 48, 50

*Morales v. Fry*,
  873 F.3d 817 (9th Cir. 2017) ......................................................... 39

*Moser v. Las Vegas Metropolitan Police Department*,
  984 F.3d 900 (9th Cir. 2021) ............................................. 25, 30–31

*Munroe v. Central Bucks School District*,
  805 F.3d 454 (3d Cir. 2015) ........................................................... 34

*National Institute of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) .................................................................... 48

*Navarro v. Block*,
  250 F.3d 729 (9th Cir. 2001) ......................................................... 64

*Nicholson v. Hyannis Air Service, Inc.*,
  580 F.3d 1116 (9th Cir. 2009) .................................................. 57–59

*Northeastern Pennsylvania Freethought Society v. County of
  Lackawanna Transit System*,
  938 F.3d 424 (3d Cir. 2019) ........................................................... 47

*Oregon State Police Officers Association, Inc. v. State*,
  783 P.2d 7 (Or. 1989) ...................................................................... 52

*OSU Student Alliance v. Ray*,
  699 F.3d 1053 (9th Cir. 2012) .................................................. 60–61

*Patterson v. Indiana Newspapers, Inc.*,
   589 F.3d 357 (7th Cir. 2009) ....................................................... 56

*Petersen v. Boeing Company*,
   715 F.3d 276 (9th Cir. 2013) .................................................. 44, 50

*Pickering v. Board of Education*,
   391 U.S. 563 (1968) .............................................................. 26, 65

*Raad v. Fairbanks North Star Borough School District*,
   323 F.3d 1185 (9th Cir. 2003) ............................................... 53, 59

*Riley's American Heritage Farms v. Elsasser*,
   32 F.4th 707 (9th Cir. 2022) ............................................ 29, 33–36

*Settlegoode v. Portland Public Schools*,
   371 F.3d 503 (9th Cir. 2004) ............................................ 33, 38–39

*State ex rel. Sports Management News v. Nachtigal*,
   921 P.2d 1304 (Or. 1996) ............................................................. 52

*State v. Ciancanelli*,
   121 P.3d 613 (Or. 2005) .......................................................... 51–52

*State v. Henry*,
   732 P.2d 9 (Or. 1987) .............................................................. 50–51

*Tinker v. Des Moines Independent Community School District*,
   393 U.S. 503 (1969) ...................................................................... 30

*Tucker v. State of California Department of Education*,
   97 F.3d 1204 (9th Cir. 1996) ............................................... 43, 45

*United States v. National Treasury Employees Union*,
   513 U.S. 454 (1995) ...................................................................... 43

*Wadler v. Bio-Rad Laboratories, Inc.*,
   141 F. Supp. 3d 1005 (N.D. Cal. 2015) ........................................ 64

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943) ...................................................................... 48

*Wood v. Strickland,*
　　420 U.S. 308 (1975) ................................................................. 64

*Ziglar v. Abbasi,*
　　582 U.S. 120 (2017) ................................................................. 42

## **Statutes**

28 U.S.C. § 1291 .......................................................................... 1

28 U.S.C. § 1331 .......................................................................... 1

28 U.S.C. § 1367(a) ...................................................................... 1

28 U.S.C. § 2107(a) ...................................................................... 1

42 U.S.C. § 1983 ......................................................................... 64

42 U.S.C. § 2000e(j) .................................................................... 56

42 U.S.C. § 2000e-2(a) ................................................................ 55

42 U.S.C. § 2000e–5(f)(3) .............................................................. 1

## **Other Authorities**

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111
　　CAL. L. REV. 201 (2023) ........................................................ 41–42

## **Rules**

Fed. R. Civ. P. 56(a)................................................................... 25

## JURISDICTIONAL STATEMENT

This action raises federal questions under the United States Constitution and Title VII of the Civil Rights Act of 1964, giving the district court subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e–5(f)(3). The district court had supplemental jurisdiction over the Oregon Constitution claim under 28 U.S.C. § 1367(a).

On March 29, 2023, the district court granted Defendants summary judgment on "all claims" and entered its final judgment. 1-ER-2, 25. On April 27, 2023, Plaintiffs filed their notice of appeal within the 30-day period set by 28 U.S.C. § 2107(a) and FRAP 4(a)(1)(A). 3-ER-502. This Court thus has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  This Court has repeatedly held that school districts may not retaliate against their employees because some disagree with the employees' views expressed while off campus and off duty. The record shows Defendants terminated Rachel and Katie in response to others feeling "offended" and "appalled" by such speech. Did the district court err in granting Defendants summary judgment on the retaliation claim?

2.  The First Amendment requires employee speech policies to serve a compelling state interest that cannot be achieved through significantly less restrictive means. Defendants' speech policy governs all employee speech both on and off duty, bans discussing what Defendant School District identifies as "controversial" issues on District premises, and requires employees to issue a disclaimer when talking about "controversial" issues while off campus. Did the district court err in granting Defendants summary judgment on the First Amendment claim against the policy?

3.  The Oregon Constitution's free speech guarantee provides broader protection than the First Amendment and specifically prohibits the government from enforcing a uniform vision on human sexuality. Defendants restrict "controversial" speech and retaliated against Rachel and Katie for offering their views on gender-identity education policy. Did the district court err in granting Defendants summary judgment on the Oregon free speech claim?

2

4.      Title VII protects against religious discrimination. The record shows that Defendants suspended, investigated, and terminated Rachel and Katie because they voiced their religiously informed views on gender-identity education policy and did not discipline those who opposed their views. Did the district court err in granting summary judgment on the Title VII claim?

5.      This Court has held that discriminating against a religious viewpoint violates both the Equal Protection and Free Speech Clauses. The district court granted summary judgment on the equal protection claim because it was "factually based" on the speech claim. Did the district court err?

6.      Section 1983 imposes liability on municipalities and individuals alike for their unconstitutional acts. The record reflects that Defendant District applied unconstitutional policies and that both it and its policymakers, Defendant board members, retaliated against Rachel and Katie. Did the district court err in dismissing the constitutional claims against these defendants?

## PERTINENT STATUTES

The relevant constitutional provisions and statutes are attached as an addendum to this brief.

## INTRODUCTION

Plaintiffs-Appellants Rachel Sager and Katie Medart saw a nation-wide problem with gender-identity policies for schools. Such policies—which govern the use of names and pronouns as well as parents' involvement in how a school treats their child—implicate the rights of students, teachers, and parents alike. But far too often school districts, including Rachel and Katie's, fail to adopt consistent policies, or they adopt policies that fail to balance the rights of all parties. So Rachel and Katie did what educators are uniquely qualified to do. On their own time and outside of school, they developed and posted to social media a sensible and balanced policy proposal that protects everyone's rights.

Some co-workers saw that proposal on social media and didn't like what Rachel and Katie had to say. So they complained to administrators, falsely branding Rachel and Katie's speech "anti-trans" and "bias[ed]." Instead of protecting dialogue on this matter of immense public concern, Defendant Grants Pass School District, board members, and district officials retaliated. They placed Rachel and Katie on administrative leave, investigated their speech, terminated them, and reported them to administrative bodies.

Rachel and Katie filed suit against this censorship. They brought claims against Defendants' retaliation and unconstitutional policy that both censors and compels speech on matters of public concern. But the district court granted summary judgment to Defendants on all claims.

In so doing, the district court disregarded evidence that the District received only a few complaints, that the complainants—not Rachel and Katie—brought controversy into the District, and that the complaints all expressed offense about Rachel and Katie's views. The court accepted Defendants' amorphous concerns about student safety despite Rachel and Katie's unblemished records and zero evidence of any student or parent at the school complaining about Rachel and Katie's speech. And it rejected claims that Defendants discriminated against Rachel and Katie's religious viewpoint and employed an excessively broad policy sweeping up nearly all employee speech—whether on or off-duty. Stunningly, the district court also questioned and demeaned Rachel and Katie's religious views. It objected to their purported failure to "cite to any Bible passage or scripture to support the[ir] views," while labeling those views as "anti-LGBTQ+ or anti-Trans Rights."

In sum, the district court assumed material facts against Rachel and Katie and failed to follow this Court's precedents protecting the right to free speech and against retaliation. Under those precedents, the undisputed facts here entitle Rachel and Katie to summary judgment on all claims. Accordingly, this Court should reverse and remand with instructions to enter summary judgment in Rachel and Katie's favor on all claims, or—at the very least—remand for trial.

## STATEMENT OF THE CASE

**I.      Rachel and Katie are model educators.**

Rachel and Katie have each worked with youth for over a decade. 3-ER-426. Both became educators out of a desire to serve children as they grow. 3-ER-425–26. Rachel was a high school math teacher, dean of students, and assistant principal before assuming that role at North Middle School in Grants Pass School District in July 2020. 3-ER-426. Katie has taught high school science and college-level biology, chemistry, and anatomy and physiology. 3-ER-426. She has taught science or health at North since 2019. 3-ER-426.

Defendant Principal Tommy Blanchard hired Katie at North Middle School and thought "highly of her." 2-ER-73. Katie, according to Blanchard, had "positive" "typical interactions with students." 2-ER-74. And Defendant Superintendent Kirk Kolb and Blanchard confirmed that Katie and Rachel worked well with their coworkers. 2-ER-75–76, 142–44. Neither Kolb nor Blanchard had ever received a complaint from parents, co-workers, or students about Rachel or Katie. 2-ER-77–78, 144–45. In fact, in mid-March 2021, Defendant District renewed Rachel and Katie's contracts for the next school year. 2-ER-145, 169; 3-ER-426. Rachel and Katie "were in excellent standing" with the District. 2-ER-146.

7

## II. Rachel and Katie's religiously informed beliefs motivate them to promote each student's flourishing.

Rachel and Katie are professing Christians who live out their faith daily. 3-ER-334. They try to treat every person with dignity, love, and care because they believe all people are created in God's image. 3-ER-335. They further believe that God creates each person with an immutable sex, either male or female, that rejection of biological sex is a rejection of the image of God, and that referring to a student in a manner inconsistent with his or her sex is lying to that student. 2-ER-194; 3-ER-335.

Rachel and Katie believe based on scientific evidence that there are only two sexes—male and female. 3-ER-336. They further believe that children do not have a fully developed capacity to understand the long-term consequences of their decisions. 3-ER-336. So as educators, they want to protect children from making potentially irreversible and life-changing decisions regarding gender identity. 3-ER-336.

Rachel and Katie appreciated gender-identity issues in schools raise a confluence of concerns. Students may desire to be addressed by pronouns inconsistent with their sex, but teachers, staff, and other students have rights to object based on religious and speech freedoms. *See* 2-ER-169, 194; 3-ER-336. Students may seek access to bathrooms and locker rooms inconsistent with their sex. 3-ER-336. Or schools may not inform parents of their children's asserted gender identity, despite the

parents and guardians' right to know. 2-ER-169; 3-ER-336. But schools often lack coherent gender-identity policies, disserving educators, students, and caregivers. 3-ER-335.

### III. Katie repeatedly asked Defendant Principal Blanchard about the District's gender-identity policy but received inconsistent responses.

Katie has received numerous requests from North students to use pronouns inconsistent with their sex—often without parental knowledge. 2-ER-169. She frequently contacted administrators to inform them of her religious beliefs and inquire about a policy governing these requests. 2-ER-148–49, 169. She consistently received inconsistent responses. 2-ER-148–49, 169. In January 2020, Katie received an email from Defendant District's HR director informing her that parental permission was not required for students to go by a different name or pronouns. 2-ER-148–49. But in October 2020, Defendant Blanchard told Katie that the school wouldn't "honor the name/pronoun request unless the parent is aware and on board." 2-ER-86.

The District's policy changed again in February 2021. Early that month, Defendant District's HR director presented the new policy to administrators, including Rachel. 2-ER-193. Defendant Blanchard told Katie that the new policy allowed name and pronoun changes without parental knowledge and students to use locker rooms and bathrooms inconsistent with sex. 2-ER-57–58, 170.

Rachel and Katie met to discuss their concerns with the new policy, and in early March 2021, Rachel raised those concerns to the HR director. 2-ER-171, 193–94. Rachel suggested that the District could redesignate bathrooms to match a student's chromosomes (XX or XY), an idea the director thought "intriguing" and one he could offer "to the team" of District policymakers. 2-ER-194. But the HR director told Rachel that state or federal policy would need to change before the District's policy could. 2-ER-194.

District policy "encourage[s] employees to contribute their ideas for the continuing betterment of the district." 2-ER-141. That means that "professional staff" have "opportunities . . . to recommend policies." 3-ER-413. Similarly, Defendant District has a practice of "solicit[ing] feedback from administrators and staff regarding proposed policies." 2-ER-147. Consistent with District policy and practice, Rachel told the director that she would bring him solutions. 2-ER-287–88.

## IV. To protect students, staff, and parents nationally, Rachel and Katie developed "I Resolve"—gender-identity policy solutions—and shared it privately with Defendant Superintendent Kolb and Blanchard.

On March 6, 2021, Rachel began to draft, on her own time outside of school, "I Resolve"—model gender-identity education policy for adoption by local, state, and federal leaders. 2-ER-195; 3-ER-338. "I Resolve" is a "grassroots movement" that presents "[r]easonable, loving, and tolerant solutions for education policies that respect everyone's

rights." 3-ER-375. The policy proposes use and labeling of bathrooms and locker rooms consistent with sex. 3-ER-376. But any person may request access to a private bathroom or locker room, and "I Resolve" supports state funding for such facilities in schools. 3-ER-377. "I Resolve" also allows students, with parental permission, to request to be addressed by certain pronouns and a derivative of their legal name. 3-ER-377. But consistent with free-speech rights, schools cannot mandate other students and staff use those pronouns and name. 3-ER-377.

Rachel took the "I Resolve" policy proposal to the HR director. 2-ER-196. She told the director that she and Katie planned to publish a related video and social media. 2-ER-136–37, 196. The director suggested Rachel meet with Defendant Kolb. 2-ER-196. Rachel also asked Blanchard for feedback on "I Resolve" and told him about the planned video; he also recommended talking with district administrators about it. 2-ER-79–80, 135.

On March 19, Rachel met with Defendant Kolb during school hours. 2-ER-196, 213. Rachel presented "I Resolve" to Kolb (who already knew about it from the HR director) and told Kolb of her plan to create a video, social media posts, and a website. 2-ER-196. Kolb told Rachel he would give "I Resolve" to legal counsel to review and would consider bringing it to the District's board. 2-ER-196. Rachel emailed Kolb, thanking him for his "willingness to consider" the policy and giving him the link to the (then private) "I Resolve" website. 2-ER-138, 213. None of Kolb,

11

Blanchard, and the HR director warned Rachel and Katie that their work developing "I Resolve" violated any District policies. 2-ER-172, 196.

## V. Rachel and Katie published an "I Resolve" video and website over Spring Break, and some staff objected to their views.

Rachel and Katie filmed a video discussing "I Resolve" while off-duty during Spring Break. 2-ER-173, 197. They published the video on YouTube and their personal website and didn't "identify themselves with" the District. 2-ER-197, 214. On March 29, they returned to work without incident. 2-ER-197. It wasn't until the next day that the District's high school librarian, Kate Weber, emailed Defendant Blanchard and other staff, falsely labeling "I Resolve" an "anti-trans" movement and linking to Rachel and Katie's website and video. 2-ER-214. Weber accused Rachel and Katie of "fighting against the[ ] well-being" of "ultra-vulnerable" transgender-identifying students. 2-ER-214. Weber sent her email to "encourag[e]" other District employees to contact the District expressing concerns about "I Resolve." 2-ER-238.

On March 31, Kolb summoned Katie and Rachel separately to his office to discuss "I Resolve." 2-ER-198. Kolb told Rachel that five staff (three from the high school and only two from North) had expressed concerns. 2-ER-198, 216. Those staff felt "appalled," "offended," and "disgusted." 2-ER-216. Some felt "I Resolve" "target[ed] transgender

students." 2-ER-216. Kolb claimed that Rachel's exercise of "freedom of religion," at work was "tricky." 2-ER-216.

Defendant Kolb followed up the meetings with four questions about how Rachel and Katie could "continue to support [their] transgender students" and "navigate the potential challenges" with colleagues who were "offended by [their] position and efforts with the IResolve [sic] movement." 2-ER-54; *see also* 2-ER-209–10. Kolb's email to Rachel summarized the "concerns from staff" about the content of "I Resolve," which consisted primarily of direct quotes from Weber's email. *Compare* 2-ER-210, *with* 2-ER-214.

## VI. Defendants suspended Rachel and Katie, condemned their views, and "actively solicited complaints" against them— despite the school and District operating "effectively" after Spring Break.

Kolb and Blanchard conceded that both North and the District operated "effectively" after Spring Break, despite a few objections to Rachel and Katie's speech. 2-ER-81–82, 151. Throughout the District, schools functioned, teachers taught, and students learned. 2-ER-82, 151.

Even so, on April 5, Defendant Blanchard placed Rachel and Katie on administrative leave. 3-ER-384, 386. Between April 1 and April 3, Defendant Blanchard received four formal complaints against Rachel and Katie. 2-ER-199. Three of the complaints—filed by Weber and two other recipients of her March 30 email—came from staff at the high school, not North, and were substantively identical. 2-ER-94–100, 103–

13

06. They condemned "the very existence of [the "I Resolve"] website and movement" as a "bias incident" targeted to "vulnerable students" and labeled "I Resolve" as "hateful and harmful." 2-ER-96–100, 103–06. The fourth complaint came from an employee at another school and tagged "I Resolve" as "well edited hate speech." 2-ER-107. That complaint also questioned whether Rachel and Katie violated "separation of church and state" by "encroach[ing] their religious beliefs onto others." 2-ER-107. After placing Rachel and Katie on leave, Defendants received two other complaints, which similarly objected to what Rachel and Katie said. 2-ER-92–96, 101–02.

On April 6, Defendant Kolb sent an email to all District staff condemning "I Resolve" and "actively solicit[ing] complaints" from other staff about it. 2-ER-152. He wrote that "I Resolve" came into "direct conflict with the values of Grants Pass School District" and that the District did "not support or endorse this message." 2-ER-220. Kolb asked staff to "contact" him "with any additional concerns." 2-ER-220. Defendant Kolb's email made it onto Facebook, and a group called "riseandresistoregon" publicly disclosed Rachel, Katie, Kolb, and Blanchard's email addresses and requested more emails to the District "[d]emand[ing] [Rachel and Katie] resign or be fired." 2-ER-222–26.

The next day, Kolb doubled-down and sent an email to all staff, students, and parents 2-ER-200, 227. It reassured the community that Rachel and Katie were "not at work" while the District "investigat[ed]"

14

their "social media postings discussing LGBTQ policies with reference to schools." 2-ER-227.

After placing Rachel and Katie on leave, Defendant Blanchard and District officials attended two LGBTQ+ club meetings to "show . . . support" after the "recent Anti-Trans 'movement.'" 2-ER-65, 83–85. Defendant District requested one of the complainants against Katie invite students to the meeting. 2-ER-63–64. The District's equity coordinator attended, and the meetings occurred at school during school hours and pulled students from their regular classes. 2-ER-84–85, 165.

## VII. Defendants investigated Rachel and Katie's speech.

While Rachel and Katie were on leave, Defendant Blanchard began investigating their speech. 2-ER-200. During an interview of Katie, Defendant Blanchard questioned whether her "faith . . . affect[ed] [her] ability to do the job." 2-ER-134. After that, the District hired outside investigator Bill Landis. 2-ER-200. Landis's reports identified eight email complaints from "citizens" and six from students ("past and present") against Rachel, and eight from "citizens" and four from students against Katie. 2-ER-90, 200, 297. Of these emails:

- The District received all *after* placing Rachel and Katie on leave and *after* Defendant Kolb sent his April 6 email "actively soliciting complaints." 2-ER-90, 109–29, 200.

- At least eight emails to Rachel and Katie were identical. 2-ER-112–15, 117–24, 126–29.

15

- None of the student emails to Katie came from current North students and only one came from a current student in the District. 2-ER-125–29.

- No sender identified herself as a current parent of a North student or even the parent of a student in the District. 2-ER-109–24.

- At least six of the emails went only to Rachel and Katie and no other District employees. 2-ER-109–12, 116, 118, 125.

- The emails objected to Rachel and Katie's proposed policy, labeling it "disturbing," "despicable," and "disgusting." 2-ER-113–24.

Kolb reviewed Landis's reports and another official's termination recommendation and recommended to the District's board that it terminate Rachel and Katie for their "discriminatory actions" in publishing "I Resolve." 2-ER-158–59, 289–90, 292–93.

## VIII. Defendants terminated Rachel and Katie, sought to deny them unemployment benefits, and reported them to their licensing body.

Defendant District's board accepted Defendant Kolb's recommendation. On July 15, the board voted 4–3 to terminate Rachel and Katie. 2-ER-185, 202. Defendants DeLaGrange, Nelson, and Brownell and board member Cliff Kuhlman voted for termination. 2-ER-51–52. Just like Defendants Kolb and Blanchard, Defendant board

members objected to Rachel and Katie's religious views. Defendant Nelson asked Rachel the same four questions Defendant Kolb had asked her about how Rachel and Katie could "continue to support [their] transgender students" and "navigate the challenges" with colleagues who were "offended by [their] position as stated with the IResolve movement." 2-ER-202; *see also* 2-ER-209–10. Defendant DeLaGrange justified his termination vote by opining that he found it "hard" to understand how Rachel's continued employment "will not make some group of [the District's] students feel less safe in our schools, whether that is real, or their feeling." 2-ER-201–02.

The retaliation didn't stop with termination. Kolb filed to prevent Katie and Rachel from receiving unemployment benefits. 2-ER-146. He also reported them to the Oregon Teachers Standards and Practices Commission (TSPC), accusing them of "gross unfitness." 2-ER-166–67, 204, 235. The administrative agencies uniformly rejected Defendants' allegations. They upheld Rachel and Katie's unemployment benefits and their good standing as licensed educators. 2-ER-184, 186, 204. As the Oregon Employment Department put it, the District "fired" Rachel and Katie "but not for misconduct connected with work." 2-ER-60; *see also* 2-ER-231.

After public outcry in support of Rachel and Katie, the District reinstated them on November 15, 2021, by a 4–3 vote, but to inferior positions. 2-ER-186, 206. Defendants DeLaGrange, Nelson, and Brownell

voted to uphold their termination decision, while Kuhlman flipped. 2-ER-69. Defendant District assigned Katie to the District's online school, even though a science teacher position remained open at North. 2-ER-186. The District also placed Rachel at the online school and drastically limited her interactions with students. 2-ER-161–62, 206. Defendant Kolb assigned the District's equity chief (the one who attended the LGBTQ+ club meetings) to evaluate Rachel. 2-ER-163–64. According to Kolb, "equity" was "an area of concern" for Rachel. 2-ER-165. Rachel had never before received deficient ratings, yet District administrators found her deficient in all six areas. 2-ER-207. The District attempted to have Rachel agree to a plan of assistance, forcing her not to renew her contract. 2-ER-207.

## IX. Defendants punished Rachel and Katie under their unconstitutional speech policy.

Defendant District's policy GBG – Staff Participation in Political Activities (under which Defendants punished Rachel and Katie) both censors and compels speech. 2-ER-91, 300. It prohibits employees, "[w]hile on District premises or acting within the scope of employment," from "supporting one side of any political or controversial civil issue." 2-ER-229. And it requires, employees "in off duty activities, on all controversial issues" to "designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint." 2-ER-228.

The policy defines "political or civil issue" circularly as "includ[ing], but not be[ing] limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." 2-ER-228. The policy also provides a circular definition of "controversial civil issue" to "specifically include issues which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction." 2-ER-228. To make the "controversial" determination, the policy allows the District to "consider whether the speech is consistent with district policy and resolutions." 2-ER-228.

Defendants' policy regulates virtually all employee speech— whether on or off the clock. Defendant Kolb conceded that "nearly every issue of public importance [could] be an issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." 2-ER-155. According to District board member Gary Richardson, "the subject of what is controversial could itself be controversial." 2-ER-68. But as Kolb admitted, the "[D]istrict decides whether an issue is controversial or not." 2-ER-155.

The District had amended its policy in May 2021 to allow for teachers to hang "Black Lives Matter" posters in their classrooms while preserving its ability to prohibit "All Lives Matter" posters. 2-ER-156–58. Before the amendment, Defendant Kolb opined that "Black Lives

Matter" "should probably not be controversial," but had "become identified with a political/civil rights movement that has generated substantial controversy," including among District staff. 2-ER-154; 3-ER-351. According to Kolb, under the old policy, if the District had allowed those posters, it could not prohibit "All Lives Matter" posters in classrooms without "engaging in viewpoint discrimination." 2-ER-153–54. Under the new policy, Defendant District could allow "Black Lives Matter" posters *and* disallow "All Lives Matter" posters because it "deemed" "Black Lives Matter" "consistent" with its policies on "diversity, equity, and inclusion." 2-ER-157–58.

## X. The district court granted Defendants summary judgment.

Katie and Rachel filed suit seeking reinstatement to their rightful positions and associated relief, an injunction against Defendants' speech policy, and damages. 3-ER-366–68. They brought First Amendment and Oregon constitutional free speech retaliation claims. 3-ER-360–64. They raised overbreadth, content and viewpoint discrimination, prior restraint, and compelled speech challenges to Defendants' speech policy and its predecessor. 3-ER-361–63. And they brought Title VII and equal protection claims against Defendants' religious and viewpoint discrimination. 3-ER-364–66.

The district court granted Defendants summary judgment on "all claims." 1-ER-25. On retaliation, the court ruled that the District had a "legitimate interest in protecting the safety and wellbeing of its students

20

that outweigh [sic] Plaintiffs' right to comment on matters of public concern." 1-ER-13. The court accepted Defendants' ballpark estimation that they received 75–150 complaints about Rachel and Katie's speech. 1-ER-14–15. The Landis reports only identified at most 14 complaints, and Defendants produced only 23 documents classified as complaints. 1-ER-15. Yet, the district court held that this evidence was not sufficient to create a dispute of material fact. 1-ER-15. "[R]egardless of whether the complaints numbered in the range of 10-20 or closer to 100," the district court reasoned, "the fact that Plaintiffs' speech caused a disturbance"— such as by "offend[ing] or upset[ing]" other teachers—"is undisputed." 1-ER-15.

The court also rejected Rachel and Katie's heckler's veto argument. Whether any disruption "was 'caused' by Plaintiffs' speech or by the staff, student, and community reaction to the speech" was, according to the district court, "a distinction without a difference" 1-ER-16. Despite Rachel and Katie's unblemished records, the district court credited Defendant DeLaGrange's assertion that some group of kids might "feel less safe," 1-ER-16 n.1, regardless of whether that was "real" or just a "feeling," 2-ER-201–02. And despite recognizing it "certainly appear[ed] to be the case" that Defendants took adverse action because they "opposed the content of [Rachel and Katie's] speech," the district court granted qualified immunity. 1-ER-16 n.1. It contradicted its earlier assertion regarding content discrimination to rule that "terminating

plaintiffs for multiple policy violations," especially when they "advocat[ed] to reduce rights of transgender students," did not violate clearly established law. 1-ER-20.

The district court discarded the claims against Defendant District's speech policy in a footnote by adopting its public-employee retaliation analysis. 1-ER-17 n.2. The court also rejected the Oregon free speech claims because Rachel and Katie "were not speaking about their own sexuality or gender identity" but rather "advocat[ing]"—*i.e.*, speaking— "for the restriction students' [sic] rights to speak, express, and conduct their lives based on their . . . gender identities." *See* 1-ER-22.

On Title VII, the district court faulted Rachel and Katie for "not cit[ing] to any Bible passage or scripture to support the views expressed" as part of "I Resolve." 1-ER-23. The lower court falsely characterized Rachel and Katie's views as "anti-LGBTQ+ or anti-Trans Rights" and opined that their views were not "inherently Christian." 1-ER-24. It then rejected Rachel and Katie's comparator evidence because no other teachers "creat[ed] videos" to express their views on school policy. 1-ER-24.

The court's equal protection analysis applied the same template. It found Rachel and Katie belonged to no "protected class" and could not state an equal protection claim based on the same facts underlying their First Amendment claim—even while admitting that what

22

"distinguish[es] Plaintiffs from the others in the District" is "only" "the viewpoints they expressed." 1-ER-19.

## SUMMARY OF ARGUMENT

The district court assumed facts against Rachel and Katie and contravened this Court's precedent by holding that *any* complaints established disruption, no matter that the complaints objected to Rachel and Katie's views expressed while off campus and off duty. That violates this Court's clearly established law: "disagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that viewpoint at a public school." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 786 (9th Cir. 2022).

Nor does any evidence support Defendants' speculation—adopted by the district court—that students may feel unsafe. Rachel and Katie published "I Resolve" on their own time outside of school. They treat all students with dignity, love, and care. And they have never previously been subject to a single complaint from parents, co-workers, or students.

The district court applied its broad view of public schools' ability to squash debate to reject Rachel and Katie's challenges to Defendants' speech policy. But that ex ante speech restriction "chills potential speech before it happens," *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017), requiring Defendants to meet exacting scrutiny. They cannot. Their policy restricts speech on "controversial" topics—defined as anything from the latest news to the quality of cafeteria food—while on campus

and requires employees to utter a disclaimer when talking about those topics even off campus. The First Amendment prohibits exactly that kind of overbroad content and viewpoint discriminatory prior restraint. For similar reasons, the court erred in granting summary judgment on the Oregon free speech claims.

The district court ignored Rachel and Katie's substantial evidence of religious discrimination and instead questioned and demeaned their beliefs. Defendant Kolb condemned their religiously informed speech as in "direct conflict with the values of Grants Pass School District." 2-ER-220. Defendant DeLaGrange warned that Rachel and Katie's religious views would make some students "feel less safe." 2-ER-201–02. And Defendants did not discipline other employees who spoke out against Rachel and Katie's views. Despite all that, the district court faulted Rachel and Katie for failing to cite the Bible to support their purportedly "anti-Trans Rights" views and noted that no other staff had created a video, so their comparison was invalid. But what matters for *McDonnell Douglas* is materially similar comparators outside the protected class— *i.e.*, those teachers who disagree with Rachel and Katie's religious views on gender-identity policy. The record here shows Defendants treated those teachers more favorably.

Finally, the lower court's rejection of the equal protection claim also defies precedent. "Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and

the Equal Protection Clause." *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 779 (9th Cir. 2014). Because Defendant District has an unconstitutional policy and because both it and its final policymaker board members retaliated against Rachel and Katie based on their protected speech, Defendants are subject to liability. This Court should reverse the district court's grant of summary judgment on all First Amendment claims, the Oregon free speech claim, the Title VII claim, and the equal protection claim and should reverse the dismissal of the individual-capacity claims against Defendants DeLaGrange, Nelson, and Brownell. The record establishes Katie and Rachel will prevail on their claims as a matter of law, so this Court should remand with instructions to enter summary judgment in their favor on all claims, or—at the very least—remand for trial.

## ARGUMENT

This Court "review[s] de novo a district court's grant of summary judgment." *Moser v. Las Vegas Metropolitan Police Dep't*, 984 F.3d 900, 904 (9th Cir. 2021). Summary judgment is appropriate only "where the moving party shows no genuine issue of material fact" and it is "entitled to judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56(a). This Court "views the facts and inferences drawn from the facts in the nonmovant's favor." *Moser*, 984 F.3d at 904.

## I. Defendants unconstitutionally retaliated against Rachel and Katie.

A prima facie First Amendment retaliation claim requires the plaintiffs to show that (1) they engaged in protected speech; (2) the defendants took adverse employment action against them; and (3) their speech was a substantial or motivating factor for the adverse action. *Dodge*, 56 F.4th at 776. Once the plaintiffs have made that showing, the burdens of evidence and persuasion shift to Defendants who must show they "had a legitimate administrative interest in suppressing the speech that outweighed the plaintiff's First Amendment rights." *Id.* at 776–77 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

Defendants and the district court rightly did not dispute that Rachel and Katie met their prima facie case. But the district court erred in ruling Defendants satisfied their balancing burden. The court below ignored the nature and the number of complaints, which brought any disruption into the District by objecting to the views expressed by Rachel and Katie while at home and off duty. Nor did Defendants offer sufficient evidence to support the district court's conclusion that students may feel unsafe simply because of Rachel and Katie's speech. That violates this Court's clearly established precedent. The undisputed facts show that Defendants unconstitutionally retaliated against Rachel and Katie, so this Court should remand with instructions that summary judgment on that claim be entered in their favor.

**A.** **The district court assumed and Defendants did not dispute that Rachel and Katie proved their prima facie case.**

The district court "assume[d] without deciding" that Rachel and Katie spoke as private citizens on a matter of public concern, and that the District put them on leave and terminated them because of that speech. 1-ER-12. Defendants never argued otherwise. 2-ER-35; 3-ER-315–18. For good reason.

First, when Rachel and Katie "waded into the [gender identity] debate, [they] waded into a matter of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021). The Supreme Court has already recognized that "gender identity" is "undoubtedly [a] matter[ ] of profound value and concern to the public." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (cleaned up).

Rachel and Katie also spoke as private citizens because they "had no official duty to make the questioned statements." *Dodge*, 56 F.4th at 778 (cleaned up). Defendant District encourages staff to offer policy solutions, but District administrators certainly did not "direct" Rachel and Katie to develop "I Resolve." 2-ER-287, 298. That makes sense because "I Resolve" "is not part of the [D]istrict." 2-ER-299. Far beyond the District, "I Resolve" promotes policy solutions on federal, state, and local levels. 3-ER-338.

Second, the district court ruled—at the very least—that a "question of material fact" exists as to causation and even conceded that it "certainly appear[ed] to be the case" that Defendants terminated Rachel and Katie because they "opposed the content of Plaintiffs' speech." 1-ER-13, 16 n.1. Though the district court spilled plenty of ink on alleged policy violations, 1-ER-6–8, the evidence shows Defendants punished Rachel and Katie because of what they said. Defendant Kolb informed the community that the District was "investigat[ing]" Rachel and Katie's "social media postings discussing LGBTQ policies with reference to schools." 2-ER-227. And one board member inquired how Rachel and Katie could "navigate the challenges" with colleagues who were "offended by [their] position as stated with the IResolve movement," while another contended that Rachel's continued employment would make "students feel less safe in our schools." 2-ER-201–02; *see also* 2-ER-209–10.

Third, Defendants placed Rachel and Katie on leave, investigated them, denounced them publicly, terminated them, attempted to deny them unemployment benefits, reported them to their state licensing body, and reinstated them to inferior positions. That's all impermissible adverse action. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1079 (9th Cir. 2013) (en banc); *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003).

**B.    Defendants have no justification outweighing Rachel and Katie's right to speak on a matter of profound public concern.**

Defendants must make a "stronger showing" of their interest for two reasons. *Dodge*, 56 F.4th at 782. First, this Court has repeatedly admonished that courts must "give less weight to the government's concerns about the disruptive impact of speech outside the workplace context." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 726 (9th Cir. 2022). Rachel and Katie published "I Resolve" over Spring Break "on [a] personal [social media] account, and did not mention or reference the School District." *Riley's*, 32 F.4th at 726. District officials retaliated against them only when a single librarian viewed their social media, sent it to other staff members, and complained about them at school. 2-ER-214. Second, Rachel and Katie's speech undisputedly "occupies the highest rung of the hierarchy of First Amendment values." *Dodge*, 56 F.4th at 782 (cleaned up).

"Speech is disruptive only when there is an actual, material and substantial disruption." *Id.* (cleaned up). Even speech that "outrages or upsets co-workers . . . does *not* constitute a disruption," unless Defendants show "actual injury to school operations," such as that "students and parents have expressed concern that the plaintiff's conduct has disrupted the school's normal operations, or has eroded the public trust between the school and members of its community." *Id.* at 782 (emphasis added; cleaned up).

"Whether speech disrupted the workplace is fact-specific and depends on the manner, time, and place in which the employee's speech took place." *Id.* at 781 (cleaned up). To the extent that the district court accepted Defendants' unsupported claims of disruption, that inquiry "implicate[s] factual disputes that preclude the court from resolving the test at the summary judgment stage." *Moser*, 984 F.3d at 905. But the record here shows Rachel and Katie are entitled to summary judgment on their retaliation claim.

"[T]here is no evidence that [Rachel and Katie's speech] interfered with [their] ability to perform [their] job[s] or the regular operation of the school." *Dodge*, 56 F.4th at 782 (cleaned up). After publishing their video off campus and on their own time over Spring Break, Rachel and Katie returned to work on March 29 without incident. 2-ER-197. It wasn't until staff viewed their social media and complained about their views that Defendants placed them on leave and then terminated them. But all throughout, as Defendants Kolb and Blanchard admitted, both North and the District operated "effectively." 2-ER-81–82, 151. Schools functioned, teachers taught, and students learned. 2-ER-82, 151. "There is no indication that the work of the schools or any class was disrupted." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969).

The district court gave three rationales for its disruption holding: (1) "whether the disturbance was 'caused' by Plaintiffs' speech or by the staff, student, and community reaction to the speech is a distinction

without a difference"; (2) "whether the complaints numbered in the range of 10-20 or closer to 100," Rachel and Katie's speech "caused a disturbance"; and (3) "other staff members" and some board members "believed that students would no longer feel safe" at school. 1-ER-15–16. None are availing.

> **1.** **The district court ruled that whether Rachel and Katie's speech or the community reaction to it caused a disruption was "a distinction without a difference," but this Court has held the opposite.**

"[T]hreatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech." *Moser*, 984 F.3d at 909. Defendants cannot restrict "disfavored or unpopular speech in the name of preventing disruption, when the only disruption [is] the effect controversial speech has on those who disagree with it *because they disagree with it.*" *Dodge*, 56 F.4th at 786. Defendants cannot "discriminate[ ] against [Rachel and Katie's] viewpoint simply to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* (cleaned up). So, contrary to the district court's logic, it is irrelevant whether Rachel and Katie's speech constituted the "but for" cause of the complaints because those complaints simply disagreed with their views. *See* 1-ER-16.

The four initial complaints came only *after* Weber emailed staff to "encourag[e]" them to complain about the "anti-trans" movement. 2-ER-

214, 238. Defendant Kolb then emailed District staff that "I Resolve" "direct[ly] conflict[ed] with the values of Grants Pass School District" and that the District did "not support or endorse this message." 2-ER-220. As he conceded, he "actively solicited complaints" from other staff "with any additional concerns." 2-ER-152, 220. All of the remaining 10–20 complaints occurred *after* Kolb solicited them and his solicitation was publicly posted on social media. 2-ER-90, 109–29, 200. The emails disagreed with Rachel and Katie's views, labeling them "disturbing," "despicable," and "disgusting," with one even "demand[ing] they be fired." 2-ER-113–24. The district court identified student protests, but those off-campus demonstrations occurred in response to Rachel and Katie's reinstatement—not the original publication of "I Resolve." 1-ER-15; 2-ER-160, 186. In line with the other community concerns, those protests targeted Rachel and Katie's views and sought to "[s]upport LGBTQ+ students to fight against the harm these educators have done." 2-ER-48.

Thus, a single librarian's testimony about "harm[ed]" working relationships shows—as the district court summarized—staff members "offended or upset" about Rachel and Katie's views. 1-ER-15. And that contrived disruption cannot meet Defendants' *Pickering* burden. Teachers and staff feeling "hurt," "furious," "outraged," "upset," "intimidated," "shocked," "angry," "scared," "frustrated," and unsafe all show that the "only disruption was the effect controversial speech [had] on those who disagree with it." *Dodge*, 56 F.4th at 782, 786; *Settlegoode*

*v. Portland Pub. Schs.*, 371 F.3d 503, 514 (9th Cir. 2004). Those feelings do not evince a "devastating effect on the cohesion of the [school's] teachers as the [district court] judge found" based on the bald assertion of a single librarian. *Settlegoode*, 371 F.3d at 514 (cleaned up).

> ## 2. The district court held the number and nature of complaints immaterial, but this Court has held the opposite.

Ruling that the number of complaints has no bearing on the disruption analysis so long as there were *some* complaints also defies precedent. When government claims disruption from complaints, this Court has carefully assessed the purported complaints for evidence of "actual disruption." *Riley's*, 32 F.4th at 726. The *Riley's* defendants identified "two complaints from parents" but "only one of which involved a student currently enrolled" in the district. *Id.* That parent did "NOT feel comfortable" with her son "patronizing an establishment whose owner" had the "bigoted opinion[ ]" that there are "only two genders" because the owner "might be inclined to direct" those views "towards [her] child or other vulnerable children." *Id.* at 716–17. Though a school's principal alleged "multiple parents asked" her to "excuse their children," the defendants offered "no evidence regarding the number of parents or the nature of those complaints." *Id.* at 726–27.

The *Riley's* court then distinguished as "far afield" the out-of-circuit cases the district court and Defendants here principally relied on. *Riley's*,

32 F.4th at 727; 1-ER-14; 3-ER-317–18. In those cases, "the government gave weight to hundreds of parent and student complaints." *Riley's*, 32 F.4th at 727 (citing *Melzer v. Bd. of Educ.*, 336 F.3d 185, 190–91 (2d Cir. 2003) and *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 473–74 (3d Cir. 2015)). The record in *Riley's* "show[ed] only a handful of parent requests that a child be excused from a single field trip." *Id.* Those requests "do not evidence the substantial disruption that may arise from a large number of parents threatening to remove their children from school." *Id.*

Similarly, in *Dodge*, teachers and staff "felt 'intimidated,' 'shock[ed],' 'upset,' 'angry,' 'scared,' 'frustrated,'" and unsafe after learning about the plaintiff's "Make America Great Again" hat. 56 F.4th at 782. But of approximately 60 faculty who witnessed the plaintiff's hat, "fewer than five people complained." *Id.* at 783. Even more attenuated to disruption, the complainants included the "presenter who was not a District employee" and a teacher who didn't even work at the plaintiff's school. *Id.*

The evidence here shows no "actual disruption." The district court held the number and nature of the complaints immaterial. But *Riley's* and *Dodge* held just the opposite. Rachel and Katie's evidence shows that there were—at most—23 complaints. 2-ER-205. Even more remote than in *Dodge*, the first four formal complaints came from employees at schools other than North. 2-ER-94–100, 103–08. The rest of the complaints came

34

after Defendants placed Rachel and Katie on leave. 2-ER-90, 92–93, 101–02, 109–29. Of the remaining complaints, six were sent only to Rachel and Katie while they were on leave meaning they caused *no* disruption. 2-ER-109–12, 116, 118, 125.

No evidence suggests *any* current North students or parents complained, much less "threaten[ed] to remove their children from school." *Riley's*, 32 F.4th at 727. Finally, Defendant Kolb provided no details about who submitted the alleged 75–150 complaints, when the District received those complaints, or what those complaints objected to. 2-ER-150. That again violates *Riley's* command that the "nature" of the complaints is dispositive. 32 F.4th at 727.

### 3. Defendants' and the district court's amorphous—and unfounded—concerns with student safety also defy precedent.

The district court credited Defendant DeLaGrange's speculation that Rachel and Katie's continued employment would make "students feel less safe in our schools, whether that is real, or their feeling." 1-ER-16 n.1; 2-ER-201–02. That contravenes this Court's precedent in at least two ways. First, to justify retaliation based "on the possibility of future disruption, the government must support its claim . . . by some evidence, not rank speculation or bald allegation." *Riley*'s, 32 F.4th at 725 (cleaned up). But Defendant DeLaGrange himself admitted any feelings of unsafety may not be "real." 2-ER-201–02.

No evidence supports that speculation. *Not a single North student or parent complained about purported feelings of unsafety*. Nor did Rachel and Katie ever pose any danger to any student. They treat every student with dignity, love, and care. 3-ER-335. They undisputedly had spotless personnel records. 2-ER-146. Neither Kolb nor Blanchard had ever received a complaint from parents, co-workers, or students about Rachel or Katie. 2-ER-77–78, 144–45. And Defendants have offered no evidence of any risks to student safety since Rachel and Katie's reinstatement.

Second, this Court has recognized that retaliation for speech outside the presence of students—like Rachel and Katie's—does not implicate a school's safety concerns but rather evinces impermissible viewpoint discrimination. In *Dodge*, the principal argued that the "bigot[ed]" MAGA hat "affront[ed]" the school's "interest in creating a safe place," especially given the hat's "associat[ion] with white supremacy and other anti-immigrant sentiments." 56 F.4th at 774, 786–87. Dodge disagreed, arguing that his hat conveyed the message, "let's all do it the best that we can and be the best that we can be at whatever it is that we do." *Id.* at 773–74. Dodge never wore the hat around parents or students. *Id.* at 783. *But see id.* at 775 (discussing "news agency" request regarding the MAGA hat incident); *Riley's*, 32 F.4th at 726 (no student safety concerns despite media reporting about the plaintiff's gender identity social media post when "there [were] no allegations that he interacted at all with . . . students"). Under those circumstances, "[a]ccepting" the

principal's claims of disruption, including because of alleged student safety concerns, "would be akin to picking which of their competing political viewpoints is superior." *Dodge*, 56 F.4th at 787.

The district court said the quiet part out loud: what "distinguish[es] Plaintiffs from the others in the District" is "the viewpoints they expressed." 1-ER-19. Rachel and Katie, outside the presence of any students, created "[r]easonable, loving, and tolerant solutions for education policies that respect everyone's rights." 3-ER-375. They never targeted any student. Nor did they—as the district court assumed against them—"advocat[e] to reduce rights of transgender students." 1-ER-20.

To the contrary, they created "I Resolve" out of a desire to protect children from potentially irreversible and life-changing decisions regarding gender identity. 3-ER-336. And their proposals recognize students' freedom to request to be addressed by certain pronouns and a derivative of their legal name. 3-ER-377. But Defendants disagreed. They thought Rachel and Katie's views came into "direct conflict with the values of Grants Pass School District." 2-ER-220. Any purported disruption based on the student safety rationale—like in *Dodge*—is mere pretext for viewpoint discrimination.

\* \* \*

*Pickering* balancing weighs decisively in Rachel and Katie's favor. They spoke off campus and off duty on a matter of immense public

concern—entitling them to the utmost First Amendment protection. And they spoke on what they know best. Both this Court and the Supreme Court "have long recognized the importance of allowing teachers to speak out on school matters because teachers are, as a class, the members of a community most likely to have informed and definite opinions on such matters." *Settlegoode*, 371 F.3d at 514 (cleaned up).

Defendants' side of the ledger is empty. They showed "no evidence of actual or tangible disruption to school operations." *Dodge*, 56 F.4th at 783. What they did show—and what the district court recognized—is that they and some staff disagreed with Rachel and Katie's views. Disagreement with others' views is "par for the course" in public dialogue and "cannot itself be a basis for finding disruption of a kind that outweighs a speaker's First Amendment rights." *Id.*

## C. Defendants' retaliation violated clearly established law.

The district court's grant of qualified immunity was rife with errors. First, the court ruled that Defendants "would have no reason to believe that terminating plaintiffs for multiple policy violations" violated clearly established law. 1-ER-20. But the evidence shows Defendants terminated Rachel and Katie because of what they said—not because of any policy violations (and Defendants cannot punish them under their unconstitutional speech policy). *Supra* Section I.A; *see infra* Part II. The district court's newfound reliance on alleged policy violations contradicts

its own reasoning earlier in its order that it "certainly appear[ed] to be the case" that Defendants terminated Rachel and Katie because they "opposed the content of Plaintiffs' speech." 1-ER-16 n.1. It similarly assumed that Rachel and Katie "advocat[ed] to reduce rights of transgender students," thus entitling Defendants to qualified immunity. 1-ER-20. But the record reflects Rachel and Katie did no such thing. *Supra* Section I.B.3. Those facts show qualified immunity should not apply, but to the extent there are any "disputed factual issues that are necessary to a qualified immunity decision," the jury must decide before the court can rule on immunity. *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017).

Second, since at least 2004, this Court has recognized as "well-settled that a teacher's public employment cannot be conditioned on her refraining from speaking out on school matters." *Settlegoode*, 371 F.3d at 516. Defendants violated Rachel and Katie's clearly established free speech rights because "the outcome of the *Pickering* balance so clearly favor[s] [them] that it [was] patently unreasonable for the school officials to conclude that the First Amendment did not protect [their] speech." *Id.* (cleaned up). "*Pickering*, *Tinker*, and *Settlegoode*" all "clearly establish that disagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that viewpoint at a public school." *Dodge*, 56 F.4th at 786. Yet that is exactly what Defendants did.

39

"Even more troublesome, [Defendants] openly admitted and defended [their] allowance of" speech expressing the counterpoint to Rachel and Katie's views. *See id.* at 787. Defendants did not discipline the librarian who labeled Rachel and Katie's speech "anti-trans." 2-ER-237. To the contrary, they endorsed the librarian's condemnation of "I Resolve." 2-ER-220. What's more, Defendant Blanchard attended LGBTQ+ club meetings to "show . . . support" after the "recent Anti-Trans 'movement.'" 2-ER-65, 83–84. And Defendants Kolb, Nelson, and DeLaGrange questioned how Rachel and Katie could "continue to support [their] transgender students." 2-ER-202, 209–10. All that "boils down to [Defendants'] viewpoint preference." *Dodge*, 56 F.4th at 787. "[R]easonable school administrator[s] at the time of the events in this case would have known that this was improper and the perceived unpopularity of a political view is not itself justification to prohibit protected expression." *Id.*

Finally, qualified immunity has no application to declaratory and injunctive claims. *Demers v. Austin*, 746 F.3d 402, 417–18 (9th Cir. 2014). Rachel and Katie have a live declaratory claim against Defendants' retaliation and live equitable claims for reinstatement "to their respective positions at [North]" and to purge their files of any record of Defendants' retaliation. 3-ER-366–67. Defendants continued their retaliation by reinstating Rachel and Katie to inferior positions, giving

Rachel a pretextual deficient evaluation, and eventually forcing Rachel out of the District.

* * *

The record shows that Rachel and Katie prevail on their retaliation claim. This Court should reverse and remand with instructions to enter summary judgment in their favor on that claim. *See Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014) (en banc). But—at the very least—the evidence entitles them to prove their retaliation claim at trial.

## D. This Court (and the Supreme Court) should reconsider how qualified immunity applies here.

As just explained, Defendants have no qualified immunity. But this Court should not apply qualified immunity jurisprudence here anyway for at least four reasons. First, the doctrine turns on a flawed application of the derogation canon. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201, 234 (2023). That canon should have no part in interpreting immunities under § 1983. *Id.*

Second, the originally enacted version of § 1983 included a provision—"any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding"—that the Reviser of the Federal Statutes omitted from the first compilation of federal law in 1874. *Id.* at 234–41. This Court and the Supreme Court have not addressed the significance of that clause in their qualified immunity decisions. The clause, properly read, means Congress created liability for

state actors who violated federal law, "notwithstanding" any state "law," "custom, or usage"—*i.e.*, immunity. *Id.* at 235.

Third, the qualified immunity doctrine departs from the common-law immunity that existed in 1871. *See Ziglar v. Abbasi*, 582 U.S. 120, 157–60 (2017) (Thomas, J., concurring in part and concurring in the judgment).

Finally, school district officials typically confront situations that give them time to both investigate the facts and determine the constitutionality of any proposed action. This case proves the point. Defendant Blanchard placed Rachel and Katie on leave seven days after Spring Break. The District investigated for two months, then waited another month to fire them. There is no reason why those officials "who have time to make calculated choices about" disciplining employees "receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., respecting denial of cert.).

## II. Defendants' overbroad speech policy discriminates based on content and viewpoint, imposes a prior restraint, and compels speech.

Defendants must shoulder an even "heavier burden" to justify their speech policy because it is "an ex ante speech restriction." *Moonin*, 868 F.3d at 861. A prospective restriction on employee speech "chills potential speech before it happens." *Id.* Thus, "the Government must show that the

interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (cleaned up).

Defendants must meet "exacting scrutiny." *Janus*, 138 S. Ct. at 2472; *accord Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1211 (9th Cir. 1996) ("This is indeed an exacting standard."). They must show their policy "serve[s] a compelling state interest that cannot be achieved through means significantly less restrictive of [First Amendment] freedoms." *Janus*, 138 S. Ct. at 2465 (cleaned up). This Court first examines whether the speech restriction impacts speech on matters of public concern and whether it reaches outside of a public employee's official duties. *Moonin*, 868 F.3d at 861. The government then must meet its "greater" burden to show an "adequate justification" for the speech restriction. *Barone v. City of Springfield*, 902 F.3d 1091, 1104–05 (9th Cir. 2018).

Defendants' speech policy regulates District educators' "political" and "controversial" speech, *i.e.*, per se topics of public concern, anytime and anywhere. It cannot meet exacting scrutiny's demanding strictures. Though the district court erroneously thought Rachel and Katie waived their claims against the policy (they didn't, *see* 2-ER-28–29, 275–76), it "nevertheless addressed the merits of the issue," meaning it is squarely

before this Court. *Petersen v. Boeing Co.*, 715 F.3d 276, 282 n.5 (9th Cir. 2013) (per curiam). This Court should reverse and remand with instructions to enter summary judgment in Rachel and Katie's favor on this claim, or at least remand for trial.

## A.     Defendants' policy both compels and squelches speech on matters of public concern, anytime and anywhere.

Defendants' policy is gerrymandered to target employee speech as private citizens on matters of public concern. Defendants' policy applies to District employees everywhere, on or off campus, and defines "political" and "controversial" by referring to issues that "appear likely to create controversy" or for which there are "more than one reasonable interpretation or position and on which reasonable persons may disagree." 2-ER-228. As Defendant Kolb himself admitted, "[N]early every issue of public importance [could] be an issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." 2-ER-155.

The bar on "controversial" speech "suggests that, to the extent [Defendants' policy] is targeted at all, it is targeted at speech *not* made pursuant to [Rachel and Katie's] official duties." *See Barone*, 902 F.3d at 1103. The breathtaking scope of Defendants' policy shows exactly how it targets private citizen speech. It extends even to off-campus and off-duty speech, compelling a disclaimer for "speech directed to community groups, to city and state legislators, to state and federal officials, and

even to family members and friends." *Moonin*, 868 F.3d at 863. As to on-campus speech, it "prevents free expression by employees, whenever they are in the workplace, even during lunch breaks, coffee breaks, and after-hours." *Tucker*, 97 F.3d at 1217. It also explicitly exempts speech pursuant to duties from its restrictions. 2-ER-228. It allows the teaching of controversial issues in the classroom, 3-ER-397, but it does not permit teachers to discuss the same issues in the breakroom, *see* 2-ER-229.

### B. Defendants' policy epitomizes nearly every First Amendment violation and has no relationship to any legitimate government interest.

Defendants cannot meet their burden to show that their policy is tailored to any governmental interest. Defendants "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Moonin*, 868 F.3d at 865.

### 1. Defendants' policy restricts all employee speech—anytime and anywhere—and thus fails narrow tailoring.

Defendants' policy is overbroad, imposes a prior restraint, discriminates based on content and viewpoint, licenses unbridled discretion, and compels speech. That host of free-speech violations forecloses any claim to narrow tailoring.

45

### a. Defendants' policy is staggeringly overbroad.

The policy's restriction "is not limited to employment-related speech, let alone speech that reasonably could cause a disruption." *Barone*, 902 F.3d at 1106. Rather, the policy applies to educators' speech anytime and anywhere. It prohibits two educators from catching up in the teachers' lounge on the news. Co-workers can't discuss the previous night's big game because undoubtedly fans of the losing team would find the issue "likely to create controversy." What's good for on-campus is also good for off-campus, according to Defendants, because even if the teachers moved their current affairs discussion to the local café, they would both have to issue disclaimers that they were expressing their personal viewpoints. Defendants' policy "makes no distinction between speech" that "reasonably could be expected to disrupt [Defendants'] operations and speech that plainly would not, or that would do so only inasmuch as it engendered legitimate public debate." *Moonin*, 868 F.3d at 867.

### b. Defendants' policy imposes a prior restraint.

Defendants' policy also fits comfortably within this Court's invalidation of prior restraints in the public employment context. *E.g.*, *Barone*, 902 F.3d at 1105; *Moonin*, 868 F.3d at 868. The policy creates a blanket ban on discussing "political" or "controversial" issues—defined under Defendants' policy to include topics as mundane as a preference

46

for dogs over cats or the quality of the cafeteria food—in the workplace. This prior restraint, though, is "not limited to employment-related speech, let alone speech that reasonably could cause a disruption at the [District]." *Barone*, 902 F.3d at 1106. That failure is "fatal." *Id.*

### c. Defendants' policy discriminates based on content and viewpoint.

To determine what is "political" or "controversial," Defendants must examine whether the speech has "more than one reasonable interpretation," "appear[s] likely to create controversy," or "is consistent with district policy and resolutions." 2-ER-228. That—by definition—is content discrimination. *See Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1009 (9th Cir. 2003). Even more egregious, "[t]he censorship of messages *because* they are controversial is viewpoint discrimination." *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 439 (3d Cir. 2019). This case proves the point. Defendants punished Rachel and Katie for speaking out about gender identity and did not discipline but feted those who took the opposite view. *Infra* Section IV.B. Defendants' "posterchild of overt viewpoint discrimination" here is not tailored to preventing disruption. *Barone*, 902 F.3d at 1106.

### d. Defendants' policy licenses unbridled discretion to discriminate based on viewpoint.

As Defendant Kolb testified, Defendant "[D]istrict decides whether an issue is controversial or not." 2-ER-155. "Such unbounded discretion

as to substance raises the specter of arbitrary or viewpoint-discriminatory enforcement." *Moonin*, 868 F.3d at 867. Grants Pass educators did not have to wait long to see unbridled-discretion-as-viewpoint-discrimination in action. Less than a month after admitting that allowing "Black Lives Matter" signs in classrooms but not "All Lives Matter" signs would be "viewpoint discrimination," Defendant Kolb wrote that such viewpoint discrimination was now permissible under Defendants' policy. 2-ER-157–58.

### e. Defendants' policy compels speech.

Defendants' policy also compels staff to speak a disclaimer, a necessarily content-based restriction. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Compelled speech presents even more serious First Amendment concerns than compelled silence: "involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943). But compelling a disclaimer for nearly any off-campus speech bears no relationship to preventing a disruption to the District. No evidence even hints at how talking about Ukraine over coffee on a Saturday morning threatens any District business. It doesn't.

### 2. Defendants have not met their burden to show their policy serves any government interest.

No evidence even suggests that Defendants' policy has alleviated any disruption to District functioning in a direct and material way. To the contrary, the record reflects that Defendants adopted the policy to allow for viewpoint discrimination on an issue that had already caused controversy within the District. Previously, the District had prohibited "Black Lives Matter" posters in classrooms because it did not want "All Lives Matter" posters. 2-ER-153–54. But under the new policy, Defendant District could allow "Black Lives Matter" posters *and* disallow "All Lives Matter" posters because it "deemed" "Black Lives Matter" "consistent" with its policies on "diversity, equity, and inclusion." 2-ER-157–58.

Defendants' relatively permissive treatment of teaching controversial issues also undermines any adequate justification they purport to have. Defendants recognize that teaching controversial issues is necessary to "train[ ] for effective citizenship." 3-ER-397. Students have the "right" to study controversial issues, have access to all relevant information, and study free from bias and prejudice. 3-ER-397. Why does teaching a group of minors about "All Lives Matter" not cause disruption? But two colleagues outside of school or in the teachers' lounge discussing the very same topic—or nearly any other—suddenly becomes verboten or requires a disclaimer.

The district court assumed the District's interest in "maintain[ing] classrooms that are conducive to learning" justified the breadth of Defendants' policy. 1-ER-17 n.2. But the policy applies to all speech *except* classroom speech. 2-ER-228; 3-ER-397. "In sum, [Defendants have] not shown any past disruption sufficient to justify the expansive policy announced, nor [have they] demonstrated that any harms anticipated are real, not merely conjectural." *Moonin*, 868 F.3d at 867–68 (cleaned up). Their policy cannot stand.

Prior to amending the policy to allow "Black Lives Matter" signs, Defendants' speech policy censored and compelled Rachel and Katie's speech. It also included a ban on discussing "controversial issues" and required a disclaimer when speaking "[o]n all controversial issues." 3-ER-392. It therefore also does not pass constitutional muster. *See* 3-ER-366 (requesting declaratory judgment against original speech policy).

## III. The Oregon Constitution provides even more protection for Rachel and Katie's speech.

Article I, section 8 of the Oregon Constitution "is broader" than the First Amendment's Free Speech Clause and "covers *any* expression of opinion" on "*any* subject whatever." *State v. Henry*, 732 P.2d 9, 11 (Or. 1987) (emphasis added). The district court again erroneously thought these claims were conceded (they weren't, *see* 2-ER-275–76), but it proceeded to reject them out of hand anyway, 1-ER-21–22. *See Petersen*, 715 F.3d at 282 n.5. That was error. The Oregon Constitution prohibits

Defendants' retaliation against Rachel and Katie and their content- and viewpoint-discriminatory and overbroad policy. Given the broad protection of the Oregon Constitution and the clear free speech violations here, Rachel and Katie request this Court reverse and remand with instructions to enter summary judgment in their favor on this claim, or, in the alternate, remand for trial.[1]

## A. Defendants' retaliation enforced their orthodoxy on a matter of public concern.

Government restrictions that "focus on the content of speech or writing either because that content itself is deemed socially undesirable or offensive, or because it is thought to have adverse consequences" cannot stand. *State v. Ciancanelli*, 121 P.3d 613, 630 n.26 (Or. 2005). Government may only step in when expression "caused some injury to the equally fundamental rights of other individuals." *Id.* at 630. But discussing gender-identity education policy poses no risk to others' rights: the government has no interest in promoting "a uniform vision on how human sexuality should be regarded or portrayed." *Henry*, 732 P.2d at 18. As *Henry* shows, the district court had no basis to reason that the Oregon Constitution protected only Rachel and Katie's right to speak "about their own sexuality or gender identity." 1-ER-22. Rather, the

---

[1] Rachel and Katie do not challenge the district court's grant of summary judgment on any claim to damages under the Oregon Constitution. *See* 1-ER-22.

51

Constitution appropriately limits the *government's* ability to control public debate.

Defendants retaliated against Rachel and Katie precisely *because* they offered their vision on human sexuality—one which Defendants thought socially undesirable. *Supra* Section I.B. The mere expression of that view invaded no one's rights. *Supra* Section I.B.3. *Contra* 1-ER-22. Nor did it cause any actual disruption. *Supra* Sections I.B.1–2. Instead, Defendants objected to the content of what Rachel and Katie said. But under the Oregon Constitution "speech *qua* speech cannot be punished." *Ciancanelli*, 121 P.3d at 630.

## B. Defendants' overbroad speech policy violates the Oregon Constitution.

Government policy that "establishes a content-based restriction on the free expression rights of public employees cannot be sustained under section 8." *Merrick v. Bd. of Higher Educ.*, 841 P.2d 646, 650 (Or. Ct. App. 1992); *see Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cnty. Sch. Dist. No. 9*, 880 F.3d 1097, 1108 (9th Cir. 2018); *supra* Section II.B.1.e (compelling speech necessarily discriminates based on content). Prior restraints and overbroad regulations meet the same fate. *State ex rel. Sports Mgmt. News v. Nachtigal*, 921 P.2d 1304, 1308 (Or. 1996) (prior restraints); *Or. State Police Officers Ass'n, Inc. v. State*, 783 P.2d 7, 9 (Or. 1989) (overbreadth). But Defendants' policy discriminates based on content and viewpoint, compels speech, imposes a prior restraint, and is

52

overbroad. *Supra* Section II.B.1. It cannot stand under the Oregon Constitution.

## IV. Defendants discriminated against Rachel and Katie's religion.

Rachel and Katie have both sufficient direct evidence of Defendants' religious discrimination and evidence to meet *McDonnell Douglas. See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). Either establishes a Title VII religious discrimination claim. *Id.*

The evidence necessary to withstand summary judgment on a Title VII claim "is minimal." *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003). Rachel and Katie "need only offer evidence which gives rise to an inference of unlawful discrimination." *Id.* The evidence here more than withstands summary judgment. It entitles Rachel and Katie to summary judgment for them.

### A. Direct evidence shows Defendants' discrimination.

The record is replete with direct evidence—"evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005). It "typically" constitutes "discriminatory statements or actions by the employer." *Id.* Direct evidence "creates a triable issue" even if it "is not substantial." *Id.* This Court has "repeatedly held that a single discriminatory comment by a plaintiff's supervisor or

decisionmaker is sufficient to preclude summary judgment for the employer." *Id.* at 1039.

Despite understanding Katie's religious objections to the District's gender-identity policy, Defendant Blanchard placed Rachel and Katie on leave in response to a complaint that they "encroach[ed] their religious beliefs onto others." 2-ER-72, 107. While investigating Rachel and Katie's speech, Defendant Blanchard questioned whether Katie's "faith . . . affect[ed] [her] ability to do the job." 2-ER-134. Defendant Kolb condemned their religiously informed speech as in "direct conflict with the values of Grants Pass School District." 2-ER-220. And he recommended their termination for their purportedly "discriminatory actions" in publishing "I Resolve." 2-ER-158–59. Defendant board members accepted Kolb's recommendation, again pointing to Rachel and Katie's religious views as justifying termination. 2-ER-201–02, 209–10.

## B. Circumstantial evidence shows Defendants' discrimination.

Rachel and Katie also satisfy *McDonnell Douglas*. The record reflects that they (1) are members of a protected class; (2) were qualified for their positions; (3) experienced adverse employment action; and (4) "similarly situated individuals outside [their] protected class were treated more favorably." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022). The district court correctly did not dispute that Rachel and Katie met the qualification and adverse action prongs. They had spotless

records and great reviews, and the District had just renewed their contracts before suspending, investigating, terminating, and reporting them.

But the district court faltered on protected class, dooming its entire *McDonnell Douglas* analysis. It erred by (1) questioning whether Christians were a protected class at all; (2) interrogating the reasonableness of Rachel and Katie's religious beliefs; and (3) defining the protected class far too broadly by assessing what it thought to be acceptable religious beliefs.

First, despite the statute facially prohibiting "discriminat[ion] . . . because of . . . religion," 42 U.S.C. § 2000e-2(a), the district court merely "[a]ssum[ed] that being a Christian is a protected class." 1-ER-23. That should not even have been a subject for reasonable debate.

Second, the court compounded its error by "interrogat[ing] the reasonableness" of Rachel and Katie's beliefs. *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1223 (9th Cir. 2023). The district court criticized Rachel and Katie for failing to "cite to any Bible passage or scripture to support the views expressed" by "I Resolve." 1-ER-23. But a court only has the "narrow function" of determining whether the belief "reflects an honest conviction." *Bolden-Hardge*, 63 F.4th at 1223 (cleaned up). Indeed, to avoid a First Amendment violation, the Supreme Court has "cautioned against second-guessing the reasonableness" of a religious belief. *Id.*

55

Third, the district court provided its own opinion on acceptable Christian beliefs. Without any support in the record, the court demeaned Rachel and Katie's belief as an "anti-LGBTQ+ or anti-Trans Rights viewpoint" that was not "inherently Christian." 1-ER-24. Not only is that doubly offensive for both interrogating and criticizing Rachel and Katie's religious beliefs, it defies the statutory text. Title VII defines religion to "includ[e] *all* aspects of religious observance and practice, as well as belief." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771–72 (2015) (quoting 42 U.S.C. § 2000e(j)) (emphasis added). It is not limited to stereotypes of what courts assume certain religious adherents *should* believe. The protected class inquiry focuses on "the plaintiff's specific religious beliefs." *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365 (7th Cir. 2009). A plaintiff remains in a protected class when "her supervisors, though also Christian, did not like her brand of Christianity." *Id.*

Those protected class errors corrupted the district court's analysis of the comparators evidence. Rachel and Katie need only show that Defendants treated staff "outside [their] protected class" more favorably. *Ballou*, 29 F.4th at 422. So in this case, that means evidence that Defendants treated more favorably those who did not believe in the immutability of sex and referring to students in accord with sex. 2-ER-194; 3-ER-335. Rachel and Katie have that evidence and then some.

When Weber, the high school librarian, emailed to falsely condemn "I Resolve" as "anti-trans" and "fighting against the[ ] well-being" of "ultra-vulnerable" transgender-identifying students, Defendants did not suspend, investigate, and terminate her. 2-ER-214, 237. Instead, Defendant Kolb hauled Rachel and Katie into a meeting to demand that they address Weber's concerns. 2-ER-198. Weber and other employees falsely condemned "the very existence of [the "I Resolve"] website and movement" as a "bias incident" targeted to "vulnerable students" and labeled "I Resolve" as "hateful and harmful" and "well edited hate speech." 2-ER-96–100, 103–07. But rather than disciplining those employees, Defendants used those complaints to terminate Rachel and Katie. For his part, Defendant Blanchard attended two in-school LGBTQ+ club meetings, arranged by Defendant District, to "show . . . support" after the "recent Anti-Trans 'movement.'" 2-ER-63–65, 83–85. He received no discipline.

The district court's comparators analysis also missed the forest for the trees. Without any citation to authority, the district court ruled that Rachel and Katie's comparators also needed to create a video. 1-ER-24. But comparators "need not be identical; they must simply be similar in all *material* respects." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009) (cleaned up). Materiality requires a "fact-intensive inquiry" that "var[ies] depending on the case." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010). It's immaterial

57

whether Rachel and Katie spoke through a video or made social media posts. Indeed, in his email to the community condemning Rachel and Katie's speech, Defendant Kolb identified their "social media postings"— not their video. 2-ER-227. What is material is that other employees took the opposite view on gender identity and received no punishment from Defendants.

Defendants cannot meet their burden of production to show a legitimate, non-discriminatory motive. *See Ballou*, 29 F.4th at 422. Both they and the district court identified the purported disruption caused by a few staff members' reaction to Rachel and Katie's off-campus speech. 1-ER-24; 3-ER-327. That's precisely the problem. All complaints targeted Rachel and Katie's religious *viewpoint*. *Supra* Section I.B.1. To deny Title VII relief "merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it" would preclude "correcting the wrongs to which the Act is directed." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976). "If bias or hostility to a religious practice" gave a Title VII defense, the statute "would be at war with itself." *Groff v. DeJoy*, 143 S. Ct. 2279, 2296 (2023).

The record shows any neutral justification to discipline Rachel and Katie was pretextual. "When the evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, a factual question will almost always exist with respect to any claim of a nondiscriminatory reason." *Nicholson*, 580 F.3d at 1127. No disruption

occurred. *Supra* Section I.B; *see Raad*, 323 F.3d at 1196 (reversing grant of summary judgment to employer when employee offered evidence contradicting claim she threatened the school). And Defendant Kolb criticized Rachel and Katie's beliefs and then "actively solicited" complaints about those beliefs. *See Nicholson*, 580 F.3d at 1127 (reversing grant of summary judgment to employer when it "actively procured letters complaining about [the plaintiff] from other [employees]"). Defendant Kolb summed it up best: he recommended termination for their purportedly "discriminatory actions" in publishing "I Resolve." 2-ER-158–59.

\* \* \*

The overwhelming direct and circumstantial evidence of discrimination show Rachel and Katie should prevail on their Title VII claim as a matter of law. This Court should reverse and remand with instructions to enter summary judgment in their favor on that claim. But at the very least, the record reflects a dispute of material fact. In Title VII cases, this Court "require[s] very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Nicholson*, 580 F.3d at 1128. The evidence here requires reversal.

**V.    Defendants discriminated against Rachel and Katie's religious viewpoint in violation of clearly established equal protection law.**

The district court had "no authority" from this Court for its holding that "the equal protection claims' dependence on the First Amendment claims requires dismissal of the equal protection claims." *OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012). The Supreme Court has "never invoked the concept of duplicity or redundance to find preclusion of a speech-based equal protection claim." *OSU*, 699 F.3d at 1067. And this Court cannot have been clearer: "Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and the Equal Protection Clause." *Dariano*, 767 F.3d at 779. What's more, Rachel and Katie also brought an equal protection claim for religious discrimination. 2-ER-273–75; 3-ER-364–65. Defendants' viewpoint and religious discrimination violated clearly established equal protection law, so the district court erroneously granted qualified immunity. Because the record establishes a clear violation, this Court should reverse and remand with instructions to enter summary judgment in Rachel and Katie's favor on their equal protection claim. At the very least, it should reverse and remand this claim for trial.

### A.    Defendants discriminated against Rachel and Katie's religious views.

Rachel and Katie brought equal protection claims based on Defendants' discrimination against their viewpoint and religion. 3-ER-

364–65. Both are cognizable under the Fourteenth Amendment. *See OSU*, 699 F.3d at 1067, 1072 n.12. And the evidence supports both. Defendants suspended, investigated, terminated, and reported Rachel and Katie because some perceived their speech as "anti-trans." *Supra* Section I.B. They did not discipline those other employees who took the opposite view. *Supra* Section IV.B; *see also OSU*, 699 F.3d at 1067 (free speech analysis "control[s]" speech-based equal protection claim).

Defendants also discriminated against Rachel and Katie for "hold[ing] Christian . . . viewpoints." 3-ER-365. *Contra* 1-ER-18–19. Religion is a "suspect" class, meaning intentional religious discrimination triggers strict scrutiny. *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003). Direct evidence of intentional discrimination abounds. *Supra* Section IV.A.

Rachel and Katie also have more than sufficient "circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" Defendants. *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016). That inquiry follows the Title VII *McDonnell Douglas* framework. *Ballou*, 29 F.4th at 422. As discussed above, Rachel and Katie meet their burden, while Defendants cannot. *Supra* Section IV.B.

Nor can Defendants meet strict scrutiny's demands. They have no compelling interest in regulating Rachel and Katie's respectful religious

61

speech on a matter of public concern. Their speech undermined no school interest or functioning. *Supra* Section I.B. And suspending, investigating, terminating, and reporting them is not narrowly tailored to any interest. Defendants "encourage employees to contribute their ideas for the continuing betterment of the district." 2-ER-141. They cannot welcome teachers to share their views on how to best serve students, parents, and staff, but then punish those very teachers simply because some object to their views.

### B. Defendants' religious discrimination violates clearly established law.

The district court erred in granting qualified immunity on Rachel and Katie's equal protection claim. Defendants violated clearly established law by discriminating against them because of the viewpoint of their speech. *Supra* Section I.C.

Defendants also violated clearly established law by discriminating against their religion. "Well prior to [2021] the protection afforded under the Equal Protection Clause was held to proscribe *any* purposeful discrimination by state actors, be it in the workplace or elsewhere, directed at an individual solely because of the individual's membership in a protected class." *Lindsey v. Shalmy*, 29 F.3d 1382, 1386 (9th Cir. 1994). A court properly "den[ies] summary judgment on the ground of immunity" with, as here, "sufficient direct or circumstantial evidence of intent to create a genuine issue of fact." *Id.* at 1385 (cleaned up). That's

because "the non-discrimination principle is so clear." *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010). "The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Id.* at 1008–09. And this Court should reexamine its qualified immunity jurisprudence as it applies here. *Supra* Section I.D.

## VI. Neither the District nor its Defendant board members can escape liability for their unconstitutional actions.

The district court erroneously exempted Defendant District and board members from section 1983 liability. 1-ER-10–11, 21. Because it found no constitutional violation, the district court ruled the District could not be subject to liability under *Monell*. 1-ER-21. But Rachel and Katie have shown constitutional violations, so the District has *Monell* liability. It employs unconstitutional policies, *supra* Part II, and its final policymakers unconstitutionally terminated Rachel and Katie, *supra* Parts I, V. *See Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004) (*Monell* liability triggered by "expressly adopted official policy" and actions of "final policymaker[s]").

Neither can the individual board members avoid liability by hiding behind their collective termination decision. The district court ruled that, under Oregon law, the individual board members cannot be responsible for voting to terminate Rachel and Katie because a "majority of members

of the board is required to transact any business." 1-ER-11. But that ruling runs headlong into precedent. Section 1983's causation requirement imposes liability on those who "'subject[ ], or cause[ ] to be subjected,' an individual to a deprivation of his federal rights." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (en banc) (quoting 42 U.S.C. § 1983). A state official "'subjects' another to the deprivation of a constitutional right . . . [when he] participates in another's affirmative acts." *Id.* at 915. So both the Supreme Court and this Court have recognized that board members are responsible for their own conduct even when they act by way of majority vote. *E.g.*, *Wood v. Strickland*, 420 U.S. 308, 322 (1975) *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982) (recognizing "that a school board member" is subject to "liability for damages under s 1983"); *Navarro v. Block*, 250 F.3d 729, 734 (9th Cir. 2001) (denying qualified immunity to individual members of county board of supervisors for collective action). The district court's holding would create perverse results. It would make it "all too easy for individuals with supervisory authority to avoid liability simply by acting in concert." *Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005, 1018 n.6 (N.D. Cal. 2015) (cleaned up).[2]

---

[2] The district court dismissed the "School Board," 1-ER-10, but Rachel and Katie never sued the "Board" as an entity, just the individual board members. *See* 3-ER-333. Rachel and Katie also do not challenge (without conceding the correctness of) the district court's dismissal of the official capacity claims against the individual defendants and its grant of

## CONCLUSION

"Teachers," out of anyone in the community, are "most likely to have informed and definite opinions" on education policy. *Pickering*, 391 U.S. at 572. Expressing those opinions in "free and open debate is vital to informed decision-making by the electorate." *Id.* at 571–72. But Defendants short-circuited dialogue on a topic of immense public concern by retaliating against Rachel and Katie for their religiously informed viewpoint. If left unchecked, Defendants' actions and policy will deprive teachers, parents, and students of informed debate about momentous decisions and eliminate views from the marketplace of ideas entirely— just like when Defendants used their policy to promote "Black Lives Matter" while censoring "All Lives Matter." Such viewpoint-based discrimination will have a devastating impact on *both* sides of contentious debates depending on the overriding views of school officials.

For all these reasons, and the right of educators to speak freely about educational policy outside the four walls of their schools, this Court should reverse and remand with instructions to enter summary judgment for Rachel and Katie on all claims or—at the very least— remand for trial.

---

legislative immunity for enacting the challenged speech policies. *See* 1-ER-10–11.

Respectfully submitted,

Dated: September 6, 2023

By: */s/ Mathew W. Hoffmann*

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

MATTHEW B. MCREYNOLDS
PACIFIC JUSTICE INSTITUTE
PO Box 276600
Sacramento, CA 95827
(916) 857-6900
mattmcreynolds@pji.org

TYSON C. LANGHOFER
MATHEW W. HOFFMANN
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Under Ninth Circuit Local Rule 28-2.6, Plaintiffs are not aware of any related cases in this Court.

_/s/ Mathew W. Hoffmann_
Mathew W. Hoffmann
Attorney for Plaintiffs-Appellants

September 6, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2023, I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
Attorney for Plaintiffs-Appellants

September 6, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-35288

I am the attorney or self-represented party.

**This brief contains** | 13,999 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( • ) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated | | .

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Mathew W. Hoffmann | **Date** | 9/6/23
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

APPEAL No. 23-35288

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RACHEL G. DAMIANO; KATIE S. MEDART,

*Plaintiffs-Appellants*,

v.

GRANTS PASS SCHOOL DISTRICT NO. 7, an Oregon public body; KIRK T. KOLB, Superintendent, Grants Pass School District 7, in his official and personal capacity; THOMAS M. BLANCHARD, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity; SCOTT NELSON; DEBBIE BROWNELL; BRIAN DELAGRANGE, in their official and personal capacities,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Oregon
Case No. 1:21-cv-00859-CL / Hon. Mark D. Clarke

**ADDENDUM TO APPELLANTS' OPENING BRIEF**

A.1

# ADDENDUM TABLE OF CONTENTS

U.S. Const. amend. I ................................................................. A.3

U.S. Const. amend. XIV, Section 1 ...................................... A.3

Or. Const. art. I, Section 8 .................................................... A.3

42 U.S.C. Section 2000e-2 ....................................................... A.4

42 U.S.C. Section 2000e ........................................................... A.4

**U.S. CONST. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

**U.S. CONST. amend. XIV, Section 1**

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**OR. CONST. art. I, Section 8**

No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right.

**42 U.S.C. Section 2000e-2**

**(a) Employer practices**

It shall be an unlawful employment practice for an employer—

> **(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> **(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**42 U.S.C. Section 2000e**

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

A.4