Case No. 23-35288

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Rachel G. Damiano and Katie S. Medart,

*Plaintiffs – Appellants,*

v.

Grants Pass School Dist. No. 7 et al.,

*Defendants – Appellees.*

On Appeal from the United States District Court
for the District of Oregon, No. 1-21-CV-00859-CL (Clarke, M. J.)

## BRIEF OF AMICI CURIAE
## SOUTHEASTERN LEGAL FOUNDATION
## AND MOUNTAIN STATES LEGAL FOUNDATION IN SUPPORT OF
## PLAINTIFFS-APPELLANTS AND REVERSAL

| | |
|---|---|
| William E. Trachman<br>James L. Kerwin<br>MOUNTAIN STATES LEGAL FOUNDATION<br>2596 S. Lewis Way<br>Lakewood, CO 80227<br>(303) 292-2021<br>wtrachman@mslegal.org<br>jkerwin@mslegal.org | Kimberly S. Hermann<br>*Counsel of Record*<br>SOUTHEASTERN LEGAL FOUNDATION<br>560 W. Crossville Rd., Ste. 104<br>Roswell, GA 30075<br>(770) 977-2131<br>khermann@southeasternlegal.org<br><br>*Counsel for Amici Curiae* |

September 13, 2023

# CORPORATE DISCLOSURE STATEMENT

Case No. 23-35288,
*Damiano v. Grants Pass Sch. Dist. No. 7*

Pursuant to Fed. R. App. P. 26.1, Amicus Southeastern Legal Foundation (SLF) is a Georgia nonprofit corporation, and Amicus Mountain States Legal Foundation is a Colorado nonprofit corporation. Neither amicus has any parent companies, subsidiaries, or affiliates. Neither amicus issues shares to the public.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

IDENTITY AND INTEREST OF AMICUS CURIAE ................................................. 1

SUMMARY OF ARGUMENT ..................................................................................... 2

ARGUMENT .................................................................................................................. 4

I.    Political speech has long been protected, including from public employees ............................................................................................................ 4

    A.    The First Amendment has always protected political speech ..................................................................................................... 4

    B.    The First Amendment protects the speech of public employees, especially teachers, on and off the job ...................... 5

II.    If upheld, adverse employment actions like Defendants' will chill teachers' public and private debate on important public matters ......................... 7

    A.    An impermissible chilling effect results where the government punishes teachers' speech based on viewpoint ........................................................................................... 7

    B.    The district court erroneously elevated a heckler's veto over the teachers' free speech rights ............................................ 10

CONCLUSION ............................................................................................................ 13

CERTIFICATE OF FILING AND SERVICE ............................................................ 14

# TABLE OF AUTHORITIES

**CASE(S)**                                                                **PAGE(S)**

*303 Creative LLC v. Elenis*,
 143 S. Ct. 2298 (2023) .................................................................................. 7

*Bantam Books, Inc. v. Sullivan*,
 372 U.S. 58 (1963) ......................................................................................... 8

*Brown v. Hartlage*,
 456 U.S. 45 (1982) ......................................................................................... 5

*Burlington Northern Santa Fe Ry. v. White*,
 548 U.S. 53 (2006) ......................................................................................... 8

*Burnside v. Byars*,
 363 F.2d 744 (5th Cir. 1966) ....................................................................... 11

*Citizens United v. FEC*,
 558 U.S. 310 (2010) ............................................................................. 4, 8, 10

*Damiano v. Grants Pass School Dist. No. 7*,
 No. 1:21-cv-00859-CL, 2023 U.S. Dist. LEXIS 54384
 (D. Ore. Mar. 29, 2023) ............................................................................... 10

*Dombrowski v. Pfister*,
 380 U.S. 479 (1965) ....................................................................................... 8

*Forsyth Cty. v. Nationalist Movement*,
 505 U.S. 123 (1992) ................................................................................. 7, 11

*Garrison v. Louisiana*,
 379 U.S. 64 (1964) ......................................................................................... 5

*Good News Club v. Milford Central Sch.*,
 533 U.S. 98 (2001) ................................................................................. 10, 11

*Groff v. DeJoy*,
 143 S. Ct. 2279 (2023) ................................................................................. 11

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston*,
 515 U.S. 557 (1995) .................................................................................. 7, 8

*Jones v. Bd. of Regents*,
   436 F.2d 618 (9th Cir. 1970) .................................................................. 12, 13

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) ............................................................................ 10, 11

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967) ....................................................................................... 11

*Lane v. Franks*,
   573 U.S. 228 (2014) ......................................................................................... 6

*Meyer v. Grant*,
   486 U.S. 414 (1988) ......................................................................................... 5

*Meyer v. Nebraska*,
   262 U.S. 390 (1923) ....................................................................................... 12

*Mills v. Alabama*,
   384 U.S 214 (1966) .......................................................................................... 5

*Missouri v. Biden*,
   --- F.4th ---, 2023 WL 5821788 (5th Cir. Sept. 8, 2023) .................................. 7

*Pickering v. Bd. of Educ.*,
   391 U. S. 563 (1968) ..................................................................................... 6, 9

*Roth v. United States*,
   354 U.S. 476 (1957) ......................................................................................... 5

*San Diego v. Roe*,
   543 U.S. 77 (2004) ........................................................................................... 6

*Shelton v. Tucker*,
   364 U.S. 479 (1960) ..................................................................................... 5, 9

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ......................................................................................... 9

*Terminiello v. Chicago*,
   337 U.S. 1 (1949) ........................................................................................... 11

*Thornhill v. Alabama*,
   310 U.S. 88 (1940) ............................................................................................. 5

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
   393 U.S. 503 (1969) ........................................................................... 6, 10, 11, 12

*Virginia v. Am. Booksellers Ass'n*,
   484 U.S. 383 (1988) ....................................................................................... 7, 8

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ...................................................................................... 7, 12

*Whitney v. California*,
   274 U.S. 357 (1927) ....................................................................................... 4, 5

*Wieman v. Updegraff*,
   344 U.S. 183 (1952) ............................................................................................ 9

**RULES**

Fed. R. App. P. 26.1 ................................................................................................ i

Fed. R. App. P. 29(a)(2) ......................................................................................... 1

Fed. R. App. P. 29(a)(4)(E) .................................................................................... 1

**OTHER AUTHORITIES**

1 John Trenchard & William Gordon, *Cato's Letters: Essays on Liberty, Civil and Religious (1724),* reprinted in Jeffrey A. Smith, Printers and Press Freedom*: The Ideology of Early American Journalism* (Oxford University Press 1988) ........................................................................................ 4

Benjamin Franklin's 1789 newspaper essay, reprinted in Jeffrey A. Smith, Printers and Press Freedom: The Ideology of Early American Journalism (Oxford University Press 1988) ......................................................... 4

Northwest Ordinance of 1787 ............................................................................... 12

The Federalist No. 10 (James Madison) (Clinton Rossiter ed., Signet Classics 2003) ........................................................................................................ 4

## IDENTITY AND INTEREST OF AMICUS CURIAE

Southeastern Legal Foundation (SLF), founded in 1976, is a national, nonprofit legal organization dedicated to defending liberty and rebuilding the American Republic. This case concerns SLF because it has an abiding interest in the protection of our constitutional freedoms and civil liberties. This is especially true when a government employer suppresses its employees' public debate on current affairs. SLF educates and advocates on behalf of public employees across our nation and is committed to defending their freedom of speech.

Mountain States Legal Foundation (MSLF) is a non-profit public interest law firm organized under the laws of the State of Colorado. MSLF is dedicated to bringing before the courts issues that are vital to the defense and preservation of individual liberties: the right to speak freely, the right to equal protection of the laws, and the need for limited and ethical government. Since its creation in 1977, MSLF attorneys have been active in litigation regarding the proper interpretation and application of statutory, regulatory, and constitutional provisions.

Pursuant to Fed. R. App. P. 29(a)(4)(E), no one other than amici and their counsel wrote any part of this brief or paid for its preparation or submission. All parties have consented to the filing of this amicus brief, pursuant to Fed. R. App. P. 29(a)(2).

## SUMMARY OF ARGUMENT

Public school teachers and administrators have a front row seat to some of the most pressing social issues of our time. Their positions give them unique insight into the workings of institutions that have outsized influence on the future course of culture and politics for succeeding generations. The voices of school staff, like the voices of other government "insiders" with unique access to information necessary for informed democratic decision making, have deep value and should be welcomed into the public square.

Plaintiffs—a public school administrator and a public school science teacher—contributed to the debate on public policy topics such as students' sex-based rights, the interests of other students who assert that their internal gender identities do not match their sex, the fundamental rights of parents to direct their children's education, and the free speech rights of students and staff alike. They did so outside of the classroom, and in a way that was meant to speak to all individuals, regardless of their position on the underlying gender identity issues.

Far from welcoming Plaintiffs' contributions, the Defendant District bowed to the outsized and exaggerated reactions of a few hecklers who would take no quarter. The District silenced them because it disfavors Plaintiffs' viewpoints. The District's actions violated the First Amendment, which has always protected political speech, including political speech made by public employees. Because the District's adverse employment actions chilled the political speech of Plaintiffs and others who would

2

otherwise participate in the debate of an important public issue, this Court should reverse the district court's order granting summary judgment to Appellees.

## ARGUMENT

**I. Political speech has long been protected, including for public employees.**

**A. The First Amendment has always protected political speech.**

Since 1724, freedom of speech has famously been called the "great Bulwark of liberty[.]" 1 John Trenchard & William Gordon, *Cato's Letters: Essays on Liberty, Civil and Religious* 99 (1724), reprinted in Jeffrey A. Smith, *Printers and Press Freedom: The Ideology of Early American Journalism* 25 (Oxford University Press 1988). Our Founding Fathers recognized that different opinions would always accompany liberty. *See* The Federalist No. 10, at 73 (James Madison) (Clinton Rossiter ed., Signet Classics 2003). In "response to the repression of speech and the press that had existed in England" and to curb such tyranny in the future, the Founders established the First Amendment. *Citizens United v. FEC*, 558 U.S. 310, 353 (2010).

The Founders recognized that nowhere are the threats of censorship more dangerous than when a restriction prohibits public discourse on political issues. Therefore, they sought to ensure complete freedom for "discussing the propriety of public measures and political opinions." Benjamin Franklin's 1789 newspaper essay, reprinted in Smith, at 11. "Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form." *Whitney v. California*, 274 U.S. 357, 375-76 (1927) (Brandeis, J., concurring).

As the United States Supreme Court has acknowledged, "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal

agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Brown v. Hartlage*, 456 U.S. 45, 52 (1982) (quoting *Mills v. Alabama*, 384 U.S 214, 218–19 (1966)). "The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940)).

In addition to providing a check on tyranny, freedom of speech and the press ensures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957) (internal quotation marks omitted)). Speech about public affairs is thus "the essence of self-government" because citizens must be well-informed. *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). For these reasons, public discussion is not merely a right; "[it] is a political duty." *Whitney*, 274 U.S. at 375 (Brandeis, J., concurring).

**B.  The First Amendment protects the speech of public employees, especially teachers, on and off the job.**

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); ("[I]n view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers

5

brings the safeguards of those amendments vividly into operation."). That is why the Supreme Court issued the "unmistakable holding" that "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-506 (1969).

One reason that the First Amendment protects teachers' speech on political issues, or matters of public concern, is their special knowledge about certain issues important to the public. "It bears emphasis that our precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane v. Franks*, 573 U.S. 228, 240 (2014); *see also Pickering v. Bd. of Educ.*, 391 U. S. 563, 572 (1968) ("Teachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."); *San Diego v. Roe*, 543 U.S. 77, 80 (2004) (observing that public employees "are uniquely qualified to comment" on "matters concerning government policies that are of interest to the public at large").

**II. If upheld, adverse employment actions like Defendants' will chill teachers' public and private debate on important public matters.**

**A. An impermissible chilling effect results where the government punishes teachers' speech based on viewpoint.**

When the government adopts a specific viewpoint, and then discriminates against opposing views to compel conformity, the injury is obvious. *See Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 579 (1995) ("While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government."); *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2312, 2311 (2023) ("Generally, too, the government may not compel a person to speak its own preferred messages," or "invad[e] the sphere of intellect and spirit which it is the purpose of the First Amendment . . . to reserve from all official control") (citing *Hurley*, 515 U.S. at 568-570, 576, and quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)); *Missouri v. Biden*, --- F.4th ---, 2023 WL 5821788, at *8 (5th Cir. Sept. 8, 2023) ("As the Supreme Court has recognized, this chilling of the Individual Plaintiffs' exercise of their First Amendment rights is, itself, a constitutionally sufficient injury.").

The government need not even take adverse action against a speaker for the injury of chill to exist. *See Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) ("[T]he very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court."); *Virginia v. Am. Booksellers Ass'n*, 484

7

U.S. 383, 392-93 (1988) (self-censorship can itself constitute injury in fact). Instead, courts examine the appearance of authority the government has over a speaker, asking whether the words and actions of government officials could lead a reasonable person to speak or self-censor. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) (looking "through forms to the substance" and finding that "the record amply demonstrate[d]" censorship); *Hurley*, 515 U.S. at 567 (considering all facts on the record to determine "whether a given course of conduct falls on the near or far side of the line of constitutional protection"); *Dombrowski v. Pfister*, 380 U.S. 479, 488 (1965) ("These events, together with repeated announcements by appellees that the appellant organization is a subversive or Communist-front organization, whose members must register or be prosecuted under the Louisiana statutes, have, appellants allege, frightened off potential members and contributors."). "First Amendment standards . . . must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United*, 558 U.S. at 327 (internal quotations omitted).

Here, of course, Plaintiff teachers have been punished directly, which makes fear of future harm more real for them and for other teachers who might want to speak out as private citizens about race, religion, or gender. *See Burlington Northern Santa Fe Ry. v. White*, 548 U.S. 53, 70-71 (2006) (noting that adverse employment actions, or even threats thereof, may discourage reasonable employees' exercise of First Amendment-protected rights). "Such unwarranted inhibition upon the free spirit of teachers . . . has an unmistakable tendency to chill that free play of the spirit which all teachers ought

8

especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers." *Shelton*, 364 U.S. at 487 (quoting *Wieman v. Updegraff*, 344 U.S. 183, 195 (1952) (concurring opinion)). "'Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate . . . .'" *Id.* (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)).

A government employer's interests in "the regular operation of the schools" and "the efficiency of the public services it performs through its employees," *Pickering*, 391 U.S. at 568, are surely at their strongest when a teacher is *inside* the classroom teaching students. But those same interests are at their weakest, and a teacher's speech is more protected, when the speech in question occurs *outside* the classroom in personal conversations with other teachers, or in off-campus conversations with the general public, as is the case here.

The district court's entry of summary judgment against Plaintiffs contradicts the strong constitutional interest in free speech. Teachers—who are also parents and members of the public—and who would otherwise partake in political debate, ought not be scared into self-censorship. But seeing the example made of Plaintiffs, teachers nationwide will rightly fear engaging in even personal, friendly conversations with each other, whether that is in the teacher's lounge, the grocery store, or even in Church. This Court's reversal is imperative to protecting political speech and ensuring that all Americans—especially concerned citizens looking out for the best interests of their

9

children—will continue to freely partake in the democratic process, and to address each other and their elected officials who have direct influence over the books their children read, the lessons their children are taught, and the policies their children must follow. "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence." *Citizens United*, 558 U.S. at 340.

### B. The district court erroneously elevated a heckler's veto over the teachers' free speech rights.

The district court's decision handed an impermissible heckler's veto to a limited number of other staff, students, and community members. *See Damiano v. Grants Pass Sch. Dist. No. 7*, 1:21-cv-00859-CL, 2023 U.S. Dist. LEXIS 54384, at *21 (D. Ore. Mar. 29, 2023) (holding that "'but for' the Plaintiff's conduct, there would have been no community backlash"). By treating Plaintiff's speech as the "but for" cause of all disturbances caused by listeners *reacting* to the speech, the ruling stands in stark contrast to well-established Supreme Court precedent. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2434 n.8 ("Nor under our Constitution does protected speech . . . readily give way to a 'heckler's veto.'") (quoting *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 119 (2001)).

The Supreme Court's decision in *Tinker*, among others, explained the serious dangers of penalizing free speech based on a heckler's threatened or actual response:

> Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a

10

> disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

393 U.S. at 508-09; *see also id.* at 511 ("[S]chool officials cannot suppress 'expressions of feelings with which they do not wish to contend.'") (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)); *Forsyth Cty.*, 505 U.S. at 134-35 ("Listeners' reaction to speech is not a content-neutral basis for regulation. Speech cannot be . . . punished or banned, simply because it might offend a hostile mob.") (citations omitted); *cf. Kennedy*, 142 S. Ct. at 2427 (in religious speech case, Establishment Clause does not function as "a 'modified heckler's veto, in which . . . religious activity can be proscribed' based on 'perceptions' or 'discomfort'") (quoting *Good News Club*, 533 U.S. at 119).[1]

Instead, the District would do better to teach its students the value of the First Amendment and of the speech it protects. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Tinker*, 393 U.S. at 512 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). Our nation's leaders are formed as students "through wide exposure to that robust exchange of ideas

---

[1] *See also Groff v. DeJoy*, 143 S. Ct. 2279, 2296 (2023) (holding in a Title VII case that "a coworker's dislike of 'religious practice and expression in the workplace' or 'the mere fact [of] an accommodation' is not 'cognizable to factor into the undue hardship inquiry.'"). Likewise, here, the district court's defense of the District's restrictions on Plaintiffs' speech based on other individuals' animosity towards Plaintiffs' speech puts the First Amendment at war with itself.

11

which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Id.*; *see also id.* at 507 ("'[T]hat [public schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.'") (quoting *Barnette*, 319 U.S. at 637). Indeed, the Northwest Ordinance of 1787 provided that "schools and the means of education shall forever be encouraged" because knowledge is "necessary to good government and the happiness of mankind." *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted.").

This Circuit's own precedents also make this plain. In *Jones v. Bd. of Regents*, 436 F.2d 618 (9th Cir. 1970), a war protestor was arrested for distributing anti-war handbills on a university campus. This Circuit rejected the University's argument that the protestor's speech was not protected because disputes had arisen in response to the speech. Specifically, "two members of the crowd were moved to tear the sandwich boards from Jones' body" and "certain unidentified members of the community had threatened to remove him from the campus if the police failed to do so." *Id.* at 621. The Court held that these responses to the speech justified neither the University's regulation, nor the police action against the speaker. *Id.* In fact, "the action of the police was misdirected. It should have been exerted so as to prevent the infringement of Jones'

12

constitutional right by those bent on stifling, even by violence, the peaceful expression of ideas or views with which they disagreed." *Id.*

Likewise, in this case, the District's post-speech actions should have been exerted in defense of Plaintiffs' speech, and in educating teachers, students, and the public that Plaintiffs were not obligated to accept the District's orthodoxy, and instead were entitled to challenge that orthodoxy with their own thoughts on the matter.

## CONCLUSION

This Court should reverse and remand with instructions to enter summary judgment for Plaintiffs on all claims or remand for trial.

Respectfully submitted,

/s/ Kimberly S. Hermann

William E. Trachman
James L. Kerwin
MOUNTAIN STATES LEGAL FOUNDATION
2596 S. Lewis Way
Lakewood, CO 80227
(303) 292-2021
wtrachman@mslegal.org
jkerwin@mslegal.org

Kimberly S. Hermann
*Counsel of Record*
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Rd., Ste. 104
Roswell, GA 30075
(770) 977-2131
khermann@southeasternlegal.org

*Counsel for Amici Curiae*

September 13, 2023

## CERTIFICATE OF FILING AND SERVICE

On September 13, 2023, I filed this Brief of Amici Curiae Southeastern Legal Foundation and Mountain States Legal Foundation in Support of Plaintiffs-Appellants and Reversal using the CM/ECF System, which will send a Notice of Filing to all counsel of record.

September 13, 2023                               /s/ Kimberly S. Hermann
                                                                           Kimberly S. Hermann