No. 23-35288

# In the United States Court of Appeals for the Ninth Circuit

RACHEL G. DAMIANO AND KATIE S. MEDART,

PLAINTIFFS-APPELLANTS,

V.

GRANTS PASS SCHOOL DISTRICT NO. 7, *ET AL*.,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court
for the District of Oregon
Case No. 1:21-cv-00859-CL/ Hon. Mark D. Clark

**BRIEF OF *AMICI CURIAE* ETHICS AND PUBLIC POLICY
SUPPORTING PLAINTIFFS-APPELLANTS AND REVERSAL**

ERIC N. KNIFFIN
MARY RICE HASSON
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amicus Curiae

September 13, 2023

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), *amicus* Ethics and Public Policy Center states that it does not have a parent corporation and does not issue stock.

Dated: September 13, 2023          s/ Eric N. Kniffin
                                   Eric N. Kniffin
                                   *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF INTEREST OF *AMICUS CURIAE* ............................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................3

ARGUMENT .......................................................................................8

    I.  Parents' constitutional right to direct their children's upbringing and medical care includes the right to determine whether their children will undergo a social transition. .......................................................................8

    II.  Current scientific research and a growing political movement support the wisdom and prudence of Plaintiffs-Appellants' positions. ...............................................10

        A.  "Gender affirmation" can lead to permanent health problems and disabilities. .....................................11

        B.  Even leading "gender transition" advocates recognize that most children that identify as transgender will desist. .........16

        C.  In light of the above, it is reasonable for parents to explore other ways to love their children than the "affirmation" the District prefers. ......................................17

    III. Stories from Our Duty members illustrate the irreparable harm school districts cause when they interfere with parents' right to direct their children's upbringing......................20

CONCLUSION .................................................................................36

CERTIFICATE OF COMPLIANCE.....................................................37

CERTIFICATE OF SERVICE.................................................................. 38

# TABLE OF AUTHORITIES

## Cases

*Damiano v. Grants Pass Sch. Dist.*, No. 1:21-cv-859, 2023 WL 2687259 (D. Or. March 29, 2023) ........................................ 5, 11, 12, 20

*May v. Anderson,*
345 U.S. 528 (1953) ............................................................. 10

*Meyer v. Nebraska,*
262 U.S. 390 (1923) ............................................................. 9

*Pierce v. Society of Sisters,*
268 U.S. 510 (1925) ............................................................. 9

*Prince v. Commonwealth of Massachusetts,*
321 U.S. 158 (1944) ............................................................. 9

*Troxel v. Granville,*
530 U.S. 57 (2000) ............................................................. 9

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) ............................................................. 10

## Other Authorities

Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, Free Press (Oct. 4, 2021) ........................................ 17

Biggs, M., *Revisiting the effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria*, 34 J. Pediatr. Endocrin. & Metab. 937 (2021) ............................................ 16

Carmichael, P. et al., *Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK*, 16 PLOS ONE e0243894 (2021) ............................................................. 17

Cass, H., *The Cass Review: Independent review of gender identity services for children and young people: Interim report*, NHS England 2022 ................................................................... 13

Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand, (Jan. 17, 2023) ................................................... 32

CommuniCare, LGBTQ+ Care, https://communicarehc.org/lgbtq-care/ .............................................................................. 32

EPPC, *Amicus Briefs: "Gender Transition" Interventions*, https://eppc.org/amicus-briefs/#16-%E2%80%9Cgender-transition%E2%80%9D-interventions-. ............................. 3

Erlangsen, A., PhD, Jacobsen, A.L., BS, Ranning, A., PhD; et al, *Transgender Identity and Suicide Attempts and Mortality in Denmark*, JAMA. 2023; 329(24): 2145-2153 ........................ 18

Hembree, W.C., et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, The Journal of Clinical Endocrinology & Metabolism, Volume 102, Issue 11, 1 November 2017, 3869–3903 ................................................................ 19

Heneghan, C. and Jefferson, Tom, *Gender-affirming hormone in children and adolescents*, BMJ EBM Spotlight (Feb. 25, 2019) ......... 18

Jennifer Murray, et al., *Autism and transgender identity: Implications for depression and anxiety*, 69 Rsch. in Autism Spectrum Disorders 101466 (Jan. 2020) ............................. 38

Jordan Silva-Benham, *CommuniCare expands services for LGBTQ+ youth in Yolo County: ElevateYouth works with residents aged 12 to 36*, Daily Democrat (March 26, 2021) ............................. 32

Kenna Cook, *Be a Better Butt Slut*, Medium.com (Sept. 20, 2017) ........ 33

Kenna Cook, *It's not Weird to Fuck Your Friends*, Medium.com (Sept. 13, 2017) ........................................................... 33

Kenna Cook, *Spanksgiving: Impact Play 101*, Eventbrite.com (Nov. 22, 2017)................................................................................33

Kristina R. Olson, et al., *Gender Identity 5 Years After Social Transition*. Pediatrics, Aug. 2022; 150 (2): e2021056082...................16

Littman, L, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria*. PloS one vol. 13,8 e0202330. 16 Aug. 2018,................................................21

Mary Rice Hasson, *Erasing Females in Language and Law*, 11 J. OF CHRISTIAN LEGAL THOUGHT 44 (Oct. 2011)............................................2

Nat'l Inst. for Health and Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (2020)............................................16

Our Duty: About Us, https://ourduty.group/about/ ...............................24

Position Statement, The Royal Australian and New Zealand College of Psychiatrists, *Recognizing and Addressing the Mental Health Needs of People Experiencing Gender Dysphoria/Gender Incongruence* (Aug. 2021) .....................................................14

Press Release, French National Academy of Medicine, *Medicine and Gender Transidentity in Children and Adolescents* (Feb. 25, 2022)................................................................................14

Rachel Morrison, *Gender Identity Policy Under the Biden Administration*, 23 FED. SOC. REV. 85 (2022).......................................2

Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland): *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors* (2020) ...............................................................................14

Socialstyrelsen, *Support, Investigation and Hormone Treatment for Gender Incongruence in Children and Adolescents* (2022) .................13

Steensma, T., et al, *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, J. of Am. Acad. of Child & Adolescent Psychiatry 52 (2013): 582-90 ............................................................. 13

Stephen B. Levine, *Ethical Concerns About Emerging Treatment Paradigms for Gender Dysphoria*, 44 J. Sex & Marital Ther. 29 (2018) ...................................................................................... 17

The Trevor Project: About Us, https://www.thetrevorproject.org/strategic-plan/ ................................ 37

Theresa Farnan, *Our World Has Lost the Catholic Understanding of Human Anthropology*, Our Sunday Visitor, June 2, 2023 ............... 3

**STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]**

The Ethics and Public Policy Center ("EPPC") is a nonprofit research institution dedicated to applying the Judeo-Christian moral tradition to critical issues of public policy, law, culture, and politics. EPPC has a strong interest in promoting the Judeo-Christian vision of the human person, protecting religious liberty, and responding to the challenges of gender ideology.

Gender ideology has permeated culture with stunning speed, influencing medicine, business, media, entertainment, government, and education. Because gender ideology is sowing confusion and undermining personal well-being, its rise has created an urgent need for clarity, education, and compassionate guidance.

---

[1] All parties received timely notice to the filing of this brief and have given their consent. No party's counsel authored any part of this brief and no person other than *amicus* made a monetary contribution to fund its preparation or submission.

To meet this need, EPPC launched the Person & Identity Project.[2]

Many EPPC Fellows also write and advocate on issues related to gender

ideology.[3]

---

[2] EPPC, Person & Identity Project, https://personandidentity.com/.

[3] Relevant publications from EPPC Fellows include:

- Ryan T. Anderson, WHEN HARRY BECAME SALLY (Encounter Books 2018);

- Andrew T. Walker, GOD AND THE TRANSGENDER DEBATE (Good Book 2017);

- Carl R. Trueman, STRANGE NEW WORLD: HOW THINKERS AND ACTIVISTS REDEFINED IDENTITY AND SPARKED THE SEXUAL REVOLUTION (Crossway 2022);

- Mary Rice Hasson, *Erasing Females in Language and Law*, 11 J. OF CHRISTIAN LEGAL THOUGHT 44, 46 (Oct. 2011), available at https://eppc.org/publication/erasing-females-in-language-and-law/.

- Rachel N. Morrison, *Gender Identity Policy Under the Biden Administration*, 23 FED. SOC. REV. 85 (2022), *available at* SSRN: https://ssrn.com/abstract=4104566;

- Theresa Farnan, *Our World Has Lost the Catholic Understanding of Human Anthropology*, Our Sunday Visitor, June 2, 2023, https://www.oursundayvisitor.com/our-world-has-lost-the-catholic-understanding-of-human-anthropology;

- Amicus briefs on gender identity authored by EPPC fellows are available at EPPC, *Amicus Briefs: "Gender Transition" Interventions*, https://eppc.org/amicus-briefs/#16-%E2%80%9Cgender-transition%E2%80%9D-interventions-.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Though Plaintiffs-Appellants' appeal focuses on how Grants Pass School District No. 7 ("the School District" or "the District") infringed on their Free Speech rights, the District justified its adverse employment actions against them—one a middle school science teacher and the other a middle school assistant principal—on the basis that the campaign they started, "I Resolve,"[4] was an "anti-trans" movement that fought "against the[] well-being" of "ultra-vulnerable" transgender-identifying students. 2-ER-214. The District Superintendent, Defendant Kirk Kolb, said "I Resolve" was in "direct conflict with the values of Grants Pass School District." 2-ER-220.

What did Plaintiffs-Appellants do to elicit such reprobation? They objected to a District's policy that advocated for socially transitioning students without parental notice or consent. The District's Gender Identity, Transgender, Name and Pronoun Guidance recommends that "employees accept a student'[s] assertion of his/her/their own gender identity" even "in situations where the parent or guardian may be

---

[4] *See* I Resolve: Reasonable, loving and tolerant solutions for education, https://www.iresolvemovement.com/.

hostile to the student's preference." ECF No. 56-1, Ps' Ex. S1 ¶¶ 3-4. The District even cautions employees to be "careful" about documenting a child's chosen "gender, name, or pronoun" under these circumstances, as written records "could be considered educational records that the parent is entitled to inspect under FERPA," the Federal Education Rights and Privacy Act. *Id.* ¶ 4.

Plaintiffs-Appellants formed "I Resolve" because they were alarmed that the District claimed the right to make such important decisions without consulting a child's parents. 2-ER-57-58, 148-49, 169, 170. They believe it is crucial that schools involve parents because parents know their children best, and because (as parents and educators know well) children do not have a fully developed capacity to understand the long-term consequences of their decisions. 3-ER-336. As such, Plaintiffs-Appellants sought to "require" that "parents be involved in a student's gender identity journey." *Damiano v. Grants Pass Sch. Dist.*, No. 1:21-cv-859, 2023 WL 2687259 *2 (D. Or. March 29, 2023).

In light of these facts, a major part of this conflict, and underlying the district court's decision to grant the School District's motion for summary judgment, is a debate over the reasonableness of the

Plaintiffs-Appellants' positions. *Do government schools have the right to "socially transition" without parental notice and permission? Could reasonable parents disagree with their child's request to "transition"?* Or, as the court below stated, is advocating against the District's policies "advocating to reduce rights of transgender students," and "expressing an anti-LGBTQ+ or anti-Trans Rights viewpoint"? *Id.* at *11, *12.

To resolve this case, this Court ought to reexamine the District Court's justification for suppressing Plaintiffs-Appellants' speech and the lower court's reasoning upholding the District's actions. *Amicus* offers this brief to aid the Court in this task.

Part I argues that parents' constitutional right to direct the upbringing of their children includes the right to decide whether their minor children should undergo a social transition. The School District concedes that it is required to honor parents' rights, but somehow also claims it can "balance" this "requirement" against its notion of the child's best interests.

Part II surveys current social science and trends in other countries that have followed this science. This overview shows that

5

Plaintiffs-Appellants' speech, far from being "anti-Trans," is grounded in the best science about how to best care for children struggling with gender dysphoria.

Part III supplements this social science with testimony from parents who are members of Our Duty, an advocacy group of parents who have struggled to protect their children from gender ideology and from school officials who push this worldview. These stories illustrate the harm that can come from even well-meaning school officials that exclude parents from important medical and mental health decisions.

Caselaw, social science, and testimony from Our Duty's members all affirm the same truths that should be common sense: Excluding abusive behavior, parents have the fundamental right to raise their children in the manner that they see fit. Plaintiffs-Appellants were acting responsibility, as good educators and citizens should, when they advocated that the School District respect parents' rights.

For the reasons set out in Plaintiffs-Appellants' opening brief, and for the additional reasons set out below, this Court should reverse the lower court's decision. Plaintiffs-Appellants were not "fighting against the[ ] well-being" of "ultravulnerable" students. 2-ER-214. Their work

with "I Resolve" is grounded in social scientific literature social science, confirmed by parents' experiences, and entitled to First Amendment protection.

## ARGUMENT

### I. Parents' constitutional right to direct their children's upbringing and medical care includes the right to determine whether their children will undergo a social transition.

The District acknowledges that "[p]arents have a constitutional right to direct the upbringing of their children." ECF 56-1 ¶5. But if a "student wishes to change his or her gender, name or pronoun," the District claims the right to "balance" this constitutional right against its independent assessment regarding the "safety and concern for the well-being of the student." *Id*. ¶4. The District claims the right to withhold information from parents even when it believes a parent "*may* be hostile to the student's [gender] preference." *Id*. (emphasis added).

The State of Oregon's position is similar. Its Guidance to School Districts acknowledges the "requirement that parents be kept informed about their children"—but the state says this "requirement" should be "balance[d]" with "the goal of supporting the [transgender-identifying] student." ECF 56-3 at 4.

The decision below says nothing about parents' rights.

A long line of Supreme Court decisions affirms parents'
constitutional rights. None even hint that government may "balance"
the "requirement" to honor parents' rights against its own policy goals.

"[T]he interest of parents in the care, custody, and control of their
children []isdamia perhaps the oldest of the fundamental liberty
interests recognized by [the United States Supreme] Court. *Troxel v.
Granville*, 530 U.S. 57, 65 (2000). As the Supreme Court held almost
ninety years ago,

> It is cardinal with us that the custody, care and nurture of the
> child reside first in the parents, whose primary function and
> freedom include preparation for obligations the state can
> neither supply nor hinder. It is in recognition of this that
> these decisions have respected the private realm of family life
> which the state cannot enter.

*Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 166 (1944)

(cleaned up).[5]

---

[5] *See also Meyer v. Nebraska,* 262 U.S. 390, 399 (1923) (the right to
"establish and bring up children" is among the privileges "long
recognized at common law as essential to the orderly pursuit of
happiness by free men"); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)
(upholding parents' religious liberty to enroll children in religious
schools); *May v. Anderson*, 345 U.S. 528, 533 (1953) (the right to the
"care, custody, management and companionship" of one's minor
children is "far more precious . . . than property rights"; and *Wisconsin
v. Yoder*,

Government may intrude on parents' constitutional rights only under narrow and extreme circumstances. These conditions are obviously not met when a school official—*without even meeting* with a child's parents—judges that parents "*may* be hostile to the student's [gender] preference" or that informing parents would threaten the child's "safety" or well-being." ECF 56-1 ¶4.

The "balance" prescribed by the District's policy itself violates parents' constitutional rights. The District cannot purposefully keep parents in the dark about such a weighty matter, even if parents might choose a course of action that conflicts with the District's "values." 2-ER-220.[6]

## II. Current scientific research and a growing political movement support the wisdom and prudence of Plaintiffs-Appellants' positions.

Furthermore, it was unreasonable for the court below to claim that Plaintiffs-Appellants, because they advocated against the District's

---

406 U.S. 205 (1972) (upholding parents' constitutional right to complete their children's education within their community).

[6] The District Superintendent, Defendant Kirk Kolb, said that "I Resolve" and its goals were "in direct conflict with the values of Grants Pass School District." 2-ER-220.

pro-"social transition" policy, were "expressing an anti-LGBTQ+ or anti-Trans Rights viewpoint." *Damiano*, 2023 WL 2687259 at *12.

To the contrary, the caution Plaintiffs-Appellants advocate for is supported by a growing body of scientific literature over the best way to treat minors expressing treatments for gender incongruence. This research supports Plaintiffs-Appellants conviction that a well-meaning school employee's assessment is no substitute for a parent's careful discernment about how best to love a struggling child.

## A. "Gender affirmation" can lead to permanent health problems and disabilities.

The School District credited complaints that "I Resolve" was "fighting against the[ ] well-being" of "ultravulnerable" transgender-identifying students. 2-ER-214. The court below credited the District's "legitimate interest in protecting the safety and wellbeing of its students." *Damiano*, 2023 WL 2687259 at *8 n.2. But neither paid any heed to solid and growing evidence indicating that gender affirmation may also result in substantial harm.

Many studies confirm that socially transitioning a child has important psycho-social and psychological consequences. Early Dutch research found that social transition can make it difficult for a child to

reverse course.[7] More recently, studies in the United Kingdom,[8]

Sweden,[9] Finland,[10] Australia and New Zealand,[11] France,[12] and

---

[7] Steensma, T., et al *Factors Associated with Desistence and Persistence of Childhood Gender Dysphoria: A Quantitative Follow-Up Study*, J. of Am. Acad. of Child & Adolescent Psychiatry 52 (2013): 582-90 https://doi.org/10.1016/j.jaac.2013.03.016 ("[C]hildhood social transitions were important predictors of persistence, especially among natal boys.")

[8] Cass, H., *The Cass Review: Independent review of gender identity services for children and young people: Interim report*, NHS England 2022, https://cass.independent-review.uk/publications/interim-report/ (study found "a spectrum of opinion about the correct clinical approach, ranging broadly between those who take a more gender-affirmative approach to those who take a more cautious, developmentally-informed approach.");

[9] Socialstyrelsen, *Support, Investigation and Hormone Treatment for Gender Incongruence in Children and Adolescents* (2022), https://web.archive.org/web/20221121222721/https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-2-7774.pdf; (study concludes "that the risks of anti-puberty and sex-confirming hormone treatment for those under 18 currently outweigh the possible benefits).

[10] Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland): *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors* (2020), *available at* https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial%20Translation.pdf (Finish Health Authority issues new guidelines prioritizing psychotherapy as the first-line treatment for gender-dysphoric minors).

[11] Position Statement, The Royal Australian and New Zealand College of Psychiatrists, *Recognizing and Addressing the Mental Health Needs of People Experiencing Gender Dysphoria/Gender Incongruence* (Aug. 2021), https://www.ranzcp.org/news-policy/policy-and-advocacy/position-

Norway[13] have retracted their endorsement of the "gender affirmation" approach. These nations have realized that psychosocial transition is not a neutral course of treatment: socially transitioning makes it harder for the child to embrace his or her biological identity and predisposes the child to pursue irreversible medical transition. A 2023 journal article studying children and adolescents found "no significant effects of social transition or name change on mental health status."[14]

---

statements/gender-dysphoria (recommending mental health treatment for gender-dysphoric minors, rather than "gender affirmation;" stressing importance of assessing the "psychological state and context in which gender dysphoria has arisen," before any treatment decisions are made).

[12] Press Release, French National Academy of Medicine, *Medicine and Gender Transidentity in Children and Adolescents* (Feb. 25, 2022) https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en (urging medical professionals exercise "great medical caution" as increase in young people seeking transitioning treatments may be due to social contagion).

[13] Summary of March 2023 report from Norwegian Healthcare Investigation Board available at: Society of Evidence-based Gender Medicine [@segm_ebm] (2023, Mar. 9, 8:24 PM), View: https://twitter.com/segm_ebm/status/1634032333618819073 (Twitter). (board restricts use of puberty blockers for gender affirmation, deeming their use "experimental" and lacking in evidence-based support)

[14] Morandini, J.S., Kelly, A., de Graaf, N.M. et al. *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*. Arch Sex Behav 52, 1045–1060 (2023). https://doi.org/10.1007/s10508-023-02588-5

Research shows that children who are socially transitioned are almost certain to proceed to puberty blockers,[15] a medical intervention no longer touted as "fully reversible." Medical studies show puberty blockers may cause negative effects on bone density, emotional maturation, and other developmental aspects.[16] Gender clinicians admit that puberty blocking may impair the child's later adult sexual function.[17] Multiple studies show that almost all children who begin puberty blockers will receive cross-sex hormones, which can lead to genital and vaginal atrophy, hair loss (or gain), voice changes, and

---

[15] Kristina R. Olson, et al., *Gender Identity 5 Years After Social Transition*. *Pediatrics,* Aug. 2022; 150 (2): e2021056082. https://doi.org/10.1542/peds.2021-056082 (98% of early-socially-transitioned children persist in their wish to undergo gender transition)

[16] Nat'l Inst. for Health and Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (2020), available from: https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_GnRH-analogues_For-upload_Final.pdf; Biggs, M., *Revisiting the effect of GnRH analogue treatment on bone mineral density in young adolescents with gender dysphoria*, 34 J. Pediatr. Endocrin. & Metab. 937 (2021), https://doi.org/10.1515/jpem-2021-0180

[17] Abigail Shrier, *Top Trans Doctors Blow the Whistle on 'Sloppy' Care*, FREE PRESS (Oct. 4, 2021), https://www.thefp.com/p/top-trans-doctors-blow-the-whistle.

infertility.[18] Cross-sex hormones can also increase cardiovascular risks and cause liver and metabolic changes.[19] Moreover, a 2023 Danish study found that transgender people attempt suicide at 7.7 times the rate and commit suicide at 3.5 times the rate of the general population.[20]

These severe and irreversible consequences of "gender affirmation" make the decision of how to love a child expressing gender incongruence more complicated than the School District or the decision below lets on. Social science and common sense indicate that minor children lack the social maturity, neurological development, life experience, and long-term perspective to weigh these risks. Children

---

[18] Carmichael, P. et al., *Short-term outcomes of pubertal suppression in a selected cohort of 12 to 15 year old young people with persistent gender dysphoria in the UK*, 16 PLOS ONE e0243894 (2021), https://doi.org/10.1371/journal.pone.0243894; Stephen B. Levine, *Ethical Concerns About Emerging Treatment Paradigms for Gender Dysphoria*, 44 J. Sex & Marital Ther. 29 (2018), https://doi.org/10.1080/0092623X.2017.1309482 .

[19] Heneghan, C. and Jefferson, Tom, *Gender-affirming hormone in children and adolescents*, BMJ EBM Spotlight (Feb. 25, 2019), available at: https://blogs.bmj.com/bmjebmspotlight/2019/02/25/genderaffirming-hormone-in-children-and-adolescents-evidence-review/.

[20] Erlangsen, A., PhD, Jacobsen, A.L., BS, Ranning, A., PhD; et al, *Transgender Identity and Suicide Attempts and Mortality in Denmark*, JAMA. 2023; 329(24): 2145-2153. https://doi:10.1001/jama.2023.8627

are especially incapable of appreciating the gift that sexual union and procreation entail.

**B.    Even leading "gender transition" advocates recognize that most children that identify as transgender will desist.**

Given the long-term health risks and permanent disabilities that come with "gender affirmation," it is reasonable for Plaintiffs-Appellants to advocate for policies that recognize that most children that identify as transgender will later embrace their biological sex. This high rate of desistance has been recognized by pioneering researchers in the field of pediatric gender medicine and in the Endocrine Society's treatment guidelines:

> With current knowledge, we cannot predict the psychosexual outcome for any specific child. Prospective follow-up studies show that childhood GD/gender incongruence does not invariably persist into adolescence and adulthood (so-called "desisters"). Combining all outcome studies to date, ***the GD/gender incongruence of a minority of prepubertal children appears to persist in adolescence.***[21]

---

[21] Hembree, W.C., et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, *The Journal of Clinical Endocrinology & Metabolism*, Volume 102, Issue 11, 1 November 2017, 3869–3903, 3876 https://doi.org/10.1210/jc.2017-01658 (emphasis added)

The potential if not the likelihood of desistence, and the fact that placing a child on the "gender transition" pathway make desistence less likely, shows the prudence in the caution Plaintiffs-Appellants have called for. Their "I Resolve" movement is not "anti-LGBTQ+ or anti-Trans Rights." *Damiano*, 2023 WL 2687259 at *12.

It is pro-children, pro-parents, and pro-science.

### C. In light of the above, it is reasonable for parents to explore other ways to love their children than the "affirmation" the District prefers.

The court below also erred by presuming that the School District or anyone else can confidentially or definitively identity minor children's "sexualities and gender identities." *Id*. at *11. There are manifold reasons to doubt Oregon's pronouncement that "[t]he person best situated to determine a student's gender identity is the individual student," ECF 56-3 at 4, and the District's claim that "the well-being of the student" involves honoring the "wish[] to change a "his or her gender, name, or pronoun," ECF 56-1 ¶4.

Researchers and social scientists have presented serious reasons to doubt that children can accurately diagnose themselves as transgender. One physician and scientist has found that a child's

17

expressed gender incongruence may be a "maladaptive coping

mechanisms" in response to trauma, pain, or personal difficulties.[22]

Many people have detransitioned[23] because they came to understand

that their gender dysphoria was the result of unresolved trauma or

other mental health conditions.[24] This phenomena appears to be

---

[22] Littman, L, *Parent reports of adolescents and young adults perceived to show signs of a rapid onset of gender dysphoria.* PloS one vol. 13,8 e0202330. 16 Aug. 2018, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0202330

[23] The term "detransitioned" as used in this brief indicates that a person pursued medical treatment in some fashion in furtherance of a transgender identity—e.g. puberty blockers, hormones, and/or surgeries—but then ceased such treatments and embraced his or her biological sex.

[24] *See* Littman, L., *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Arch. Sex. Behav. 3353 (2021), https://doi.org/10.1007/s10508-021-02163-w (38% of detransitioners concluded that "their gender dysphoria was caused by something specific such as trauma, abuse, or a mental health condition."); M. Evans, *Assessment and treatment of a gender-dysphoric person with a traumatic history*, J. of Child Psychotherapy, 1–16 (2023), https://doi.org/10.1080/0075417X.2023.2172741 (presenting "a composite case based on a group of female-to-male transitioners with a history of trauma due to early separation or family illness," recommending that "[e]xploring underlying psychoanalytic issues can help clinicians assess various conscious and unconscious influences, and help patients make more informed decisions on whether to pursue a medical transition")).

especially pronounced where children are encouraged to identify as transgender through online forums or school counselors, people who (unlike a parent) have little to no knowledge of a child's mental health or trauma history.[25]

As this research shows, loving parents will often have good reasons to pause before affirming their child's self-expressed gender identity. This is especially the case when parents know their child is processing trauma or has been diagnosed with a mental health condition.

There is no one-size-fits-all answer for children expressing gender dysphoria. And it is not true that minor children know themselves, and know what is good for them, better than their parents do. That is why, in countless other contexts, the law acknowledges this basic fact about the parent-child relationship and ensures that parents are included and

---

[25] *See* Baker, K., "When Students Change Gender Identity, and Parents Don't Know," NY TIMES, Jan. 22, 2023, https://www.nytimes.com/2023/01/22/us/gender-identity-students-parents.html ("But dozens of parents whose children have socially transitioned at school told The Times they felt villainized by educators who seemed to think that they—not the parents—knew what was best for their children.").

entrusted with the power to make important decisions on the child's behalf.

### III. Stories from Our Duty members illustrate the irreparable harm school districts cause when they interfere with parents' right to direct their children's upbringing.

To illustrate the harm that results when schools circumvent parental input and unilaterally "affirm" a child as transgender, *Amicus* offers here testimony from members of Our Duty, an international nonprofit organization founded in 2018 to support parents eager to protect their children from the dangers of gender ideology.[26] Our Duty and its parent-members believe that parents are in the best position to know what is in their children's best interests. Moreover, they believe that as parents they have the natural duty and constitutional right to make such decisions and give their children the tools they will need to thrive and live long, healthy, independent lives.

Each of the parents whose story is shared below[27] has had to fight a school district that, like Grants Pass No. 7, has claimed the right to socially transition children without parental knowledge and consent.

---

[26] *See* Our Duty: About Us, https://ourduty.group/about/.

[27] The testimony below is based on declarations from Our Duty members in undersigned counsel's possession.

These accounts are offered here to help the Court better understand the way overzealous teachers and counselors can use their authority to pressure children into adopting a transgender identity and the lengths that parents have had to go to assert their rights to control their children's care. These stories also show that school officials, who know much less about a student than his or her parents, can be overconfident in their ability to determine whether a social transition is in a child's best interests. Finally, these stories demonstrate how drastically a child's well-being and self-understanding can change once a parent reclaims primary management over the child's care and finds the child proper mental health care.

*Amicus* hopes that these parents' struggles can help the Court better understand the critical nature of a parent's constitutional right to direct his or her child's upbringing and the devastating injuries that parents and children incur when this fundamental right is not recognized.

### A.    Sue Y, Mother of Detransitioned Female

Sue Y and her eighteen-year-old daughter, G, live in California.[28] When G started puberty at the age of twelve, Sue saw her daughter's entire demeanor change. G started to dress in dark and oversized clothes, her personality went from pleasant to agitated, and she became suicidal. Amidst all these changes, G told her mom she was transgender.

Sue promptly took G to a gender clinic where, outside her mom's presence, a clinic representative told G about hormonal treatments and surgeries she could have "to make her authentic." Afterwards, the clinic told Sue she had to choose whether to have "a dead daughter or a live son." The professionals offered no alternative treatment options.

Terrified, Sue followed the clinic's advice and placed her daughter on puberty blockers. Sue communicated with G's school about G's diagnosis and treatment plan, and the school agreed to cooperate with G's social transition.

---

[28] Due to the frequent and intense animus that is often directed at parents or children who resist the push to pursue a "gender transition," many Our Duty members use pseudoymns in this brief to protect themselves and their children from retaliation. The identity of each member whose story is told here is known to Our Duty.

For two-and-a-half-years, Sue was fully committed to G's social and medical transition. But G's "authentic" self did not, as promised, emerge. Instead, G's mental health deteriorated. G was cutting herself, suicidal, and borderline anorexic, in and out of psychiatric hospitals. Sue eventually brought G to an out-of-state psychiatrist who determined that G was not making progress because she was suffering not from gender dysphoria but from underlying mental health issues. In the psychiatrist's judgment, it was best for G to discontinue identifying as trans.

With a new diagnosis in hand, Sue contacted G's public school to provide an update and tell the staff to cease all counseling and stop referring to her daughter as a boy. G's psychiatrist sent the school a letter explaining he was now managing G's care, and that in his judgment G would be confused and her progress impeded should she receive conflicting advice from another counselor.

The school counselor was furious, refused to follow Sue's and the psychiatrist's directives, and called Child Protective Services ("CPS"). Soon thereafter, school staff ambushed G at school, pulled her into a "safe space," and told her she would be arrested if she did not speak to

23

the CPS officer. CPS investigated Sue, but she avoided the anticipated emotional abuse charges by showing the agent photos of the whole family clad in LBGTQ gear.

Sue removed G from the public school and at G's behest enrolled her in an all-girl's high school. G is now a well-adjusted young woman who enrolled in an all-girls college this fall.

### B.    Erin Friday, Mother of Desisted Female

Erin Friday's daughter, P, was just 11 when a sex-ed presentation at her California public school suggested that students "could have been born in the wrong body." Within a week, five of P's classmates had adopted labels from the LGBTQ community. P started with pansexual, then identified as a lesbian. During the COVID-19 lockdowns, P adopted a transgender identity.

Erin learned that following the sex-ed class, P had had secretly spent hours on pornography-filled websites conversing with "trans-identified" adults and older minors who advised P that her depression, anxiety, and loneliness were because she was a "transboy." The online chats were filled with young girls who were teaching even younger girls

to dissociate from their bodies and send men provocative pictures in exchange for gifts.

When online high school started in the fall of 2019, P's teachers encouraged her to share her pronouns and chosen name with the class. Like many of her female classmates, P chose a male name and male pronouns. The school adopted P's new male identity without informing Erin or seeking her permission.

When Erin found out, she was outraged. She called P's school, furious that counselors who had never met her daughter in person believed it was their prerogative to undermine Erin's parental rights and solidify P's trans identity. The administration merely insisted that the school was a "safe space."

The school then reported Erin to public authorities. First CPS and then the police knocked on her door. Not only did the school declare itself the "safe space"; it judged Erin "unsafe" because she disagreed with their zeal to declare P transgender. Fortunately, Erin was able to avoid official abuse claims.

Erin removed P from her public school, but the damage was already done: P was now solidly invested in her trans identity. Her

teachers, the second most influential group of adults in her life, had created a schism between child and parent. P was barely getting out of bed, not eating, showering, or brushing her teeth. Erin scoured her house for anything P might use to end her life, and bought a safe to lock away money, passports, and credit cards to prevent P from attempting to run away.

It took almost two years to repair the damage that P's school had done by telling her that she was transgender and that her mother was a hateful bigot. P is now happy in her female body and wishes she could forget her "trans stage."

## C. Aurora Regino, Mother of a Desisted Female

Aurora Regino lives with her twelve-year-old daughter, A.S., in California. When A.S. was in the fifth grade, she was dealt a series of tough blows: her mom was battling breast cancer, her dad remained debilitated from a terrible car accident, her beloved grandfather passed away, and she started puberty early.

A.S. turned to her public school's wellness center for solace. But instead of helping A.S. process through her grief and trauma, a school

counselor coached her to affirm a transgender identity, and introducing her to chest binding.

When Aurora finally learned what A.S.'s school had been up to, she called and demanded an explanation. The school was evasive, telling Aurora—falsely—that it was required by law to keep its actions secret from parents. Aurora had to retain a lawyer and file suit to try and pry information from her child's school.

After Aurora removed A.S. from the offending school, A.S. began to heal and embrace her sex. Today, A.S. has returned to her true self: a happy, feminine girl who loves her mom and family.

### D. Beth Bourne, Mother who Lost Custody of Female Child

Beth Bourne is the mother of S, a 17-year-old female who began identifying as a transgender boy around four years ago.

Based on her research and maternal instincts, Beth identified several factors that she believes has contributed to her daughter's decision to identify as transgender. First, Beth suspects that S believes that presenting as male will shield her from the type of terrible sexual assault her best friend experienced in sixth grade. Second, S is gifted in STEM subjects, which S sees as a stereotypically male interest. Third, S

has long-standing comorbid mental health issues that professionals have ignored in favor of a gender dysphoria diagnosis.

Finally, Beth believes S's school has been a major contributing factor in her identifying as transgender. S attends Davis Joint Unified High School, where one in twenty-five students identify as transgender, 2.8 times the national average.[29] Additionally, counseling services at S's school are provided through CommuniCare, a contracted provider that focusses on providing "affirming services for Yolo County's LGBTQ+ Community."[30]

Kenna Cook, the CommuniCare project coordinator for S's school, wants CommuniCare to serve as a "***chosen family***," where transgender "7th through 12th graders" can find a "safe pace to 'be themselves' and talk to ***trusted adults***."[31] Before Ms. Cook was hired to work with

---

[29] Colin Wright, *BREAKING: New Documents Reveal Shocking Surge in Trans-Identified Students in Davis, CA Schools*, Reality's Last Stand, (Jan. 17, 2023), https://www.realityslaststand.com/p/breaking-new-documents-reveal-shocking.

[30] CommuniCare, LGBTQ+ Care, https://communicarehc.org/lgbtq-care/.

[31] Jordan Silva-Benham, *CommuniCare expands services for LGBTQ+ youth in Yolo County: ElevateYouth works with residents aged 12 to 36*, Daily Democrat (March 26, 2021) (emphasis added), https://www.dailydemocrat.com/2021/03/25/communicare-expands-services-for-lgbtq-youth-in-yolo-county/.

minor children, she had a "sex-positive" blog where she wrote articles such as "It's Not Weird to F*** Your Friends"[32] and "Be a Better Butt Slut."[33] Ms. Cook also organized events like "Spanksgiving,"[34] where people invited to "learn about spanks before you give thanks."[35]

Beth raised concerns about whether CommuniCare and Ms. Cook should be providing confidential counseling to minors. But Beth's efforts only succeeded in getting her labeled by the district as a parent who did not have her daughter's best interests in mind.

---

[32] Kenna Cook, *It's not Weird to Fuck Your Friends*, Medium.com (Sept. 13, 2017) ("There is a grave misconception that sex is restricted only to couples in love and meaningless hookups found on Tinder," https://web.archive.org/web/20191219021805/https://medium.com/@mamacookling/its-not-weird-to-fuck-your-friends-8f3c141c3bc0.

[33] Kenna Cook, *Be a Better Butt Slut*, Medium.com (Sept. 20, 2017) ("Let's talk about the final frontier of penetrative sex. The boss level. The position of the professionals." https://web.archive.org/web/20191123092157/https://medium.com/@mamacookling/be-a-better-butt-slut-c8c123512bbc.

[34] Kenna Cook, *Spanksgiving: Impact Play 101*, Eventbrite.com (Nov. 22, 2017) ("Ever been interested in learning how to find the pleasure in a good spanking or want to know how to handle a paddle like a pro?" https://www.eventbrite.com/e/spanksgiving-impact-play-101-tickets-39629296292.

[35] Kenna Cook, Facebook (Nov. 22, 2017), https://www.facebook.com/photo.php?fbid=10159613335705483&set=pb.562380482.-2207520000.&type=3.

Custody issues have prevented Beth from moving S to another school, but fortunately S is showing signs of desistence. S is wearing makeup and dresses and is no longer wearing a chest binder. However, Beth believes that S will not be safe so long as school districts are allowed to give those like CommuniCare and Ms. Cook confidential access to minor children.

### E.    Wendell Perez, Father of Desisted Female

Wendell Perez is the father of AP, a seventh-grade female at a Florida public school. Last year, when AP was twelve years old and in sixth grade, Wendell and his wife were summoned to a meeting at AP's school.

There, they learned their daughter had just attempted suicide for the *second time* that school year. *The school had not told the Perezes about AP's first attempt.*

But that was not the only thing AP's school was hiding from her parents. At the same meeting, the Perezes learned a school counselor had been meeting with AP weekly for months. The counselor believed that AP's struggles stemmed from her issues with her gender identity—another thing the Perezes knew nothing about. The school also said that

the counselor had told the administration and AP's teachers to use her "chosen" male name in class. This public "out"-ing led to AP being bullied at school. All of this embarrassment, confusion, and stress culminated in AP's suicide attempts.

A public school employee had essentially told everyone in AP's world about her gender distress, except for the two most crucial people in her life and the only two with a constitutionally protected interest in caring for her well-being: AP's parents.

AP's parents removed her from school and placed her in a mental health facility. Her inpatient treatment helped AP gain a deeper and clearer understanding of her troubles, which convinced her to drop her transgender identity. AP told her parents that she had wanted to flee girlhood because she lacked physical strength and thought that male hormones would be the best way to shield herself from male taunts. The "cool" LGBTQ posters and materials in the school counselor's office had also convinced her that her interest in sports and video games indicated that she was a boy trapped in a girl's body.

AP was just another adolescent, struggling to fit in and wanting to be "special." The school counselor's attention, prodding, and selective

31

praise turned made AP want to be a special "transboy" instead of an ordinary girl. Though AP already had loving parents, the school counselor presented herself as a caring pseudo-parent. AP's actual parents are now left to repair the damage school counselors did to their child.

### F.    Brette Smith, Mother of Desisted Female

Brette Smith's sixteen-year-old daughter Anna had a tough time during the COVID pandemic. To escape the loneliness of lockdowns, she found community in online chat groups and social media, where she quickly discovered transgender identities.

In June 2021, before Anna's freshman year of high school, Brette discovered that Anna was identifying as a transgender boy and that her peers and a handful of "trusted" teachers had been socially affirming Anna behind her mother's back.

Brette sprang into action, removing Anna's access to social media and separating her from the peers that had been pushing this new male identity. Anna was furious. Based on what she had been told at school, she thought her mom was a transphobe. Teachers at school had also drilled into her that teens whose parents will not affirm them being

their "authentic" trans self often commit suicide.[36] Anna decided that that was the best way out for her, too: she attempted suicide by swallowing a handful of Xanax. Thankfully, Anna survived.

Anna had tried to kill herself because teachers at her school had coached her into believing that she was transgender and that a parent who disagreed was a hateful parent. To the contrary, Brette saw her little girl as perfect, with no need of "fixing." Brette stood by Anna's side as she recovered and arranged for her to stay at an inpatient mental health facility. There, Anna's care team determined she had major depressive disorder and was likely on the autism spectrum. *Gender dysphoria was never diagnosed or suggested at all.*

Brette was one of the rare parents who found mental health providers willing to explore the root causes behind Anna's sudden trans pronouncement. Anna was diagnosed with autism—a predominate factor in adolescents who announce a transgender identity.[37] Anna's

---

[36] Anna's teachers participated in The Trevor Project, a pro-trans that seeks to "end[] LGBTQ youth suicide." The Trevor Project: About Us, https://www.thetrevorproject.org/strategic-plan/.

[37] *See, e.g.*, Jennifer Murray, et al., *Autism and transgender identity: Implications for depression and anxiety*, 69 Rsch. in Autism Spectrum Disorders 101466 (Jan. 2020),

care team determined that her trans identity was a maladaptive response to feeling different how she perceived other girls she knew.

Today, Anna is once again comfortable in her female body. She is courageously speaking out publicly about how she was captivated by what she calls the "trans cult," and how it is wrong and dangerous to keep secrets from parents. Her honesty about her experience now puts her on the receiving end of bullying and threats by trans-identified classmates.

### G.  Gaby Clark, Mother of Desisted Female

In 2021, Gabrielle Clark noticed that her 12-year-old daughter J and her friends were acting strangely. J had been a cheerful girl and an extrovert, but during the COVID lockdowns J became withdrawn and obsessed with TikTok and her appearance

Gabrielle learned that J's public school had, without her consent or knowledge, been calling J a boy's name and using male pronouns. Gabrielle believes, but the school has refused to confirm or deny, that

---

https://doi.org/10.1016/j.rasd.2019.101466. ("An online study of 727 individuals revealed a substantial overlap between transgender identity and autism").

school staff was meeting with J to discuss transgenderism and identity, and that this counseling pushed her daughter towards her eighth-grade announcement that she was transgender.[38]

When J told her mom she was planning on getting a double mastectomy, Gabrielle vociferously objected. This made J irate and even more rebellious. J began to self-harm by scratching, cutting, and biting herself.

Gabrielle knew that the school was undermining her parental rights and that she needed to take bold action to save her daughter. She decided to leave Las Vegas and move her family to Texas, where she was assured J's new school would not circumvent her parental rights.

After a great deal of research, Gabrielle better understood J's troubles and developed a plan on how to bring her daughter back from "the transgender cult." Once she was six months removed from her old school and off the internet, and with a great deal of parental love and compassion, J slowly returned to being comfortable in her female body.

---

[38] Like the School District in this case, J's school has a policy that promotes social gender transition plans without parental knowledge. Because of the school's intransience, Gabrielle has had to hire an attorney to help her learn the extent to what all it had been hiding from her and how it had been encouraging J to adopt a transgender identity.

## CONCLUSION

The Court should reverse the decision below.

> Respectfully submitted,
>
> s/ Eric N. Kniffin
> ERIC N. KNIFFIN
> ETHICS & PUBLIC POLICY CENTER
> 1730 M Street, N.W.
>  Suite 910
> Washington, DC 20036
> (202) 682-1200
> ekniffin@eppc.org
>
> *Counsel for* Amicus Curiae

SEPTEMBER 13, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this *amicus* brief complies with Fed. R. App.
P. 29(a)(5) and Cir. R. 32-3(2) as contains 6492 words, excluding the
portions exempted by Fed. R. App. P. 32(f). The brief's size and typeface
comply with Fed. R. App. P. 32(a)(5) and (6).

Dated: September 13, 2023

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

Dated: September 13, 2023

<div style="margin-left: 40%;">

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amicus Curiae

</div>