**SER 1**

APPEAL NO. 23-35288

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

_____

RACHEL G. DAMIANO; KATIE S. MEDART,

Plaintiff-Appellant,

v.

GRANTS PASS SCHOOL DISTRICT NO. 7, an Oregon public body;
KIRK T. KOLB, Superintendent, Grants Pass School District 7, in his
official and personal capacity; THOMAS M. BLANCHARD,
Principal, North Middle School, Grants Pass School District 7, in his
official and personal capacity; SCOTT NELSON; CLIFF KUHLMAN;
GARY RICHARDSON; DEBBIE BROWNELL; CASSIE WILKINS;
BRIAN DELAGRANGE; CASEY DURBIN, in their official and
personal capacities,

Defendant-Appellees

_____

SUPPLEMENTAL EXCERPTS OF RECORD OF

DEFENDANT-APPELLEES

_____

Beth F. Plass, OSB 122031
bplass@vickersplass.com
Karen M. Vickers, OSB 913810
kvickers@vickersplass.com
VICKERS PLASS LLC
5200 SW Meadows Road, Suite 150
Lake Oswego, OR 97035
(503) 726-5975
*Attorneys for Defendant-Appellees*

December 4, 2023

SUPPLEMENTAL EXCERPTS OF THE RECORD CONTENTS

Pages

Amended Verified Complaint & Demand for Jury Trial
Dkt. # 32 (November 18, 2021) ..................................................................SER 3-86

Defendants' Answer and Affirmative Defenses to Second Amended
Verified Complaint
Dkt #33 (December 21, 2021) ................................................................SER 87-105

Motion to Dismiss Defendants Gary Richardson, Casey Durbin
Cassie Wilkins, and Cliff Kuhlman
Dkt. #42 (May 11, 2022)......................................................................SER 106-108

Declaration of Karen M. Vickers in Support of Defendants'
Motion for Summary Judgment
Dkt #53 (August 1, 2022) ....................................................................SER 109-512

Plaintiff Damiano's Exhibit S25
Dkt #56-25 (August 22, 2022)..............................................................SER 513-515

Plaintiff Medart's Exhibit M-19
Dkt # 77 (August 22, 2022) .................................................................SER 516-518

Plaintiff Medart's Exhibit M-22
Dkt # 80 (August 22, 2022) .................................................................SER 519-520

Transcript of Motion for Summary Judgment Hearing
(November 30, 2022) ...........................................................................SER 521-563

RAY D. HACKE
OSB No. 173647
PACIFIC JUSTICE INSTITUTE
1850 45th Ave. NE, Suite 33
Salem, OR 97305
503-917-4409
rhacke@pji.org
*Lead Counsel*
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **RACHEL G. DAMIANO** and **KATIE S. MEDART**, | Case No. 1-21-CV-00859-CL |
| *Plaintiffs*, | |
| *v.* | |
| **GRANTS PASS SCHOOL DISTRICT 7**, an Oregon public body; **THE MEMBERS OF THE BOARD OF EDUCATION OF GRANTS PASS SCHOOL DISTRICT 7**[1]—Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie Wilkins, and Brian Delagrange—in their official and personal capacities; Casey Durbin, in her personal capacity; **KIRK T. KOLB**, Superintendent, Grants Pass School District 7, in his official and personal capacity; and **THOMAS M. BLANCHARD**, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity, | **AMENDED VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

---

[1] Members of the Board of Education are named as Defendants out of an abundance of caution because the law is unclear regarding whether a school district in Oregon is an entity subject to suit under Oregon law.

Plaintiffs Rachel G. Damiano and Katie S. Medart, for their Verified Complaint against Defendants and Demand for Jury Trial, state as follows:

INTRODUCTION

This action challenges the content- and viewpoint-based retaliation by Defendants against Plaintiffs, Rachel Damiano ("Damiano") and Katie Medart ("Medart," and collectively with Damiano "Plaintiffs"), for their speech on an issue that is front and center on the local, state, and national levels: How should our public schools address the many issues and the divergent and often-conflicting interests among students, parents, and educators when a student struggles with gender identity?

Plaintiffs, formerly employees of Grants Pass School District No. 7 ("GPSD" or the "District"), posted a video on YouTube proposing what they viewed as a reasonable, science-based, and loving policy that would allow local, state, and federal policymakers to address these complex issues. Plaintiffs crafted their proposal based on years of experience as educators and their deeply held philosophical and religious beliefs. Plaintiffs sought the input of GPSD officials, including the Defendant superintendent, Kirk Kolb ("Kolb"), and the Defendant North Middle School principal, Thomas Blanchard ("Blanchard").

In their video, Plaintiffs neither stated nor even implied that they were speaking on behalf of GPSD, nor did they wear any apparel that would readily identify them as District employees. Still, when community members and/or fellow GPSD staff members saw the video, recognized Plaintiffs, and began complaining to Kolb, the superintendent "threw them under the bus," so to speak: Kolb placed Plaintiffs on paid administrative leave for the final two-plus months of the school year while the District investigated their conduct. Pursuant to that investigation, Blanchard subjected Plaintiffs to questioning as to whether their religious beliefs rendered them unfit to be public educators. Ultimately, on July 15, 2021, following

a 4-3 vote by GPSD's Board of Directors, the District fired Plaintiffs. While GPSD claims that the Educators' firing was due not to the content of their speech, but their failure to abide by certain District policies concerning the use of District resources, statements from Kolb and individual board members make clear that the content of the Educators' speech is the true underlying reason for the District's actions.

### JURISDICTION & VENUE

1.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.     This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

3.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief under 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

4.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

5.     Venue is proper in this district and division under 28 U.S.C. § 1391(b) and D. Or. L.R. 3 because all Defendants reside in this district and division and all acts described in this Complaint occurred in this district and division.

### PLAINTIFFS

6.     Rachel Damiano ("Damiano") is a resident of Oregon and a former assistant principal at North Middle School ("NMS"), a school governed by Grants Pass School District No. 7 ("GPSD" or the "District").

7.     Katie Medart ("Medart," and collectively with Damiano "Plaintiffs") is a resident of Oregon and a former science teacher at NMS.

DEFENDANTS

**The District**

8.     Defendant GPSD is, and was at all times relevant to this Complaint, a public school district operated under the laws of Oregon and a public body as defined in Or. Rev. Stats. §§ 30.260(4) and 174.109.  GPSD is a body corporate under Oregon law.  Or. Rev. Stat. § 332.072.

9.     Oregon law authorizes GPSD's Board of Directors (the "Board") to transact all business coming within the jurisdiction of the District, namely to exercise control of District schools and take responsibility for educating children in the District. Or. Rev. Stat. § 332.072.

**The Board Defendants**

10.    Defendants Scott Nelson ("Nelson"), Cliff Kuhlman ("Kuhlman"), Gary Richardson ("Richardson"), Debbie Brownell ("Brownell"), Cassie Wilkins ("Wilkins"), Brian Delagrange ("Delagrange"), and Casey Durbin ("Durbin") either are or were at all times relevant to this Complaint, members of the Board of Directors (collectively, "Board Defendants") and either are or were responsible for (1) enacting, amending, and/or repealing policies that either once governed, or currently govern, the expression of GPSD employees (the "Speech Policies") [*see* Or. Rev. Stat. § 332.072], and (2) the termination of Plaintiffs' employment.[2]

**The Superintendent**

11.    At all relevant times, Defendant Kirk Kolb ("Kolb") is and was the superintendent of the School District.

_____

[2] Durbin's tenure as a member of the Board of Directors ended on June 30, 2021.  She is named as a Defendant in this case because she voted to enact one of the speech policies that Plaintiffs are challenging herein.  Todd Neville replaced Durbin on the Board of Directors on July 1, 2021. He is not named as a Defendant here because he was not a member of the Board when it adopted the Amended Speech Policy (discussed in greater detail below) and voted against terminating Plaintiffs' employment on July 15, 2021.

12.   As superintendent, Defendant Kolb is GPSD's chief executive officer.  Or. Rev. Stat. § 334.225(1).

13.   Defendant Kolb's duties include overseeing the operation and management of the District – including supervising all GPSD employees at every school in the District – and authorizing, executing, enforcing, and implementing Defendant GPSD and the Board Defendants' policies governing employee conduct.  Defendant Kolb has the authority to review, approve, or reject the decisions of other GPSD officials regarding such policies.

### The Middle School Principal

14.   Defendant Thomas Blanchard ("Blanchard") is, and was at all times relevant to this Complaint, the principal of NMS.

15.   As superintendent, Defendant Kolb directly supervises Defendant Blanchard.

16.   Defendant Blanchard possesses the authority and responsibility for governing and regulating District employees at NMS.

17.   Defendant Blanchard's duties included supervising Plaintiffs.

18.   Defendants Kolb and Blanchard each have the authority pursuant to the Speech Policies to investigate, recommend disciplinary actions, and impose discipline against GPSD employees for violating the policy in effect at the time of the violation.

19.   Plaintiffs are suing each natural-person Defendant in his or her official and personal capacities.

### FACTUAL BACKGROUND
### Plaintiffs' Beliefs

20.   Plaintiffs are professing Christians who strive to live out their faith daily. Because of their Christian faith, Plaintiffs have sincerely held religious beliefs that govern their views about human nature, marriage, gender, sexuality, politics, the

purpose and meaning of life, and ethical and moral standards that should govern human conduct.

21.   Plaintiffs also believe they cannot affirm as true those ideas and concepts that they believe are not true. Doing so, they believe, would violate biblical commands against dishonesty and lying.

22.   In accordance with biblical principles, Plaintiffs also endeavor to treat every person with dignity, love, and care, because they believe all people are created in the image of God.

23.   Plaintiffs' faith teaches them that (1) God immutably creates each person as male or female; (2) these two distinct, complementary sexes reflect the image of God; and (3) rejection of one's biological sex is a rejection of the image of God within that person.

24.   Plaintiffs are concerned about the lack of coherent policies and guidance in public schools to help students, their parents or guardians (below "parents"), and teachers address the increasing number of school children who struggle with gender identity issues. Plaintiffs believe that policies and guidance addressing the issues that accompany a student's struggle with gender identity issues often vary from school to school and district to district.

25.   Plaintiffs believe the lack of consistent and coherent policies and guidance addressing issues that arise when a student struggles with gender identity issues, as well as policies and guidance that alienate parents from assisting their children when their children struggle with those issues, disserve children, their parents, and society as a whole.

26.   Accordingly, Plaintiffs desire to promote what they believe is a reasonable, consistent, and respectful policy about how to address gender identity issues in the context of primary and secondary school.  This policy, Plaintiffs believe, contains

fair, inclusive policy recommendations to help accommodate the often-conflicting interests and sincerely held beliefs of students, parents, and educators on such issues.

27.  Plaintiffs believe, based on scientific evidence, that children do not have a fully developed capacity to understand the long-term consequences of their decisions.  Plaintiffs thus want to protect children from making potentially irreversible, life-changing decisions they may later regret.  Plaintiffs furthermore believe that responsible parents, with the assistance and support of educators, can and should – nay, must – help children understand the many and complex factors surrounding gender identity, but that current gender-identity policies and related procedures either hinder their ability or outright prevent them from doing so.

28.  Plaintiffs believe parents have a fundamental right to control the upbringing and education of their children.  Plaintiffs also believe that any gender-identity education policy and related procedures must account for this fundamental right, and any policy that does not do so disserves both children and their parents.

29.  Plaintiffs believe gender-identity education policies must protect educators', students', and community members' First Amendment-protected freedoms of speech and religion, which are often impacted by gender-identity education policy.

30.  Plaintiffs believe, based on scientific evidence and acknowledging that there are extremely rare cases of intersex, that there are only two anatomical sex presentations – i.e., male and female.  Plaintiffs also believe that scientifically demonstrable and anatomically correct designations of sex should be the basis for a redesignation of bathroom and locker room classifications and control access to shared public-school restrooms and locker rooms for minors.  For those students who are not comfortable using facilities associated with their anatomical sex, Plaintiffs support those, and all, students having access to and using a private restroom or locker space so long as they exist or can be established.

31.  To accommodate the interests of students, parents, and teachers, Plaintiffs believe that students, with parental permission, may ask to be called by a derivative of their legal name and that teachers and student peers can – but should not be required to – use that name.  Along the same lines, Plaintiffs believe that students, with parental permission, may ask to be referred to by pronouns that do not correspond to the students' biological sex and that teachers and student peers can – but should not be required to – use those pronouns.

### The "I Resolve" Movement

32.  In January 2021, S.B. 52 was introduced in the Oregon Senate.  If passed, the bill would direct the Oregon Department of Education to develop and implement statewide education for "plan students" – *i.e.*, those students enrolled in early childhood through post-secondary education who "[m]ay be lesbian, gay, bisexual, transgender, queer, two-spirit, intersex, asexual, non-binary or another minority gender identity or sexual orientation" and who, "as identified by the State Board of Education by rule," have allegedly "experienced disproportionate results in education due to historical practices."

33.  The month after, in February 2021, the U.S. House of Representatives passed the Equality Act, H.R. 5—a bill that would add "gender identity" among the protected categories under the Civil Rights Act of 1964.  If the Equality Act becomes law, it could have broad effects for public schools, including mandating that schools across the country allow students who identify as transgender to access opposite-sex restrooms, locker rooms, and showers. The Equality Act, under the ostensible aim of preventing harassment and bullying, could also compel teachers and students to use pronouns that do not correspond to a student's biological sex.

34.  Also in or about February 2021, GPSD circulated to select District employees a memorandum about guidelines relating to gender identity issues (*e.g.*, pronoun usage).

35.   Against this backdrop, Plaintiffs – based on their deeply held philosophical and religious beliefs and in the context of the local, state, and national debate about gender-identity education policy – sought to have a constructive dialogue on that topic.

36.   Thus, in March 2021, with the knowledge of GPSD personnel, Plaintiffs started "I Resolve," a grassroots movement to promote sound gender-identity educational policies at the local, state, and federal levels in a loving and tolerant way that seeks to account for the divergent and often conflicting views about gender identity while also upholding fundamental freedoms.

37.   Plaintiffs intended to promote "I Resolve" online, including through a website and social media, and through in-person contact.

38.   While school was not in session and while away from school, Plaintiffs created the "I Resolve" website, available at https://www.iresolvemovement.com/ (last viewed June 2, 2021).  A true, accurate, and complete copy of the homepage of the website as of June 2, 2021 is attached hereto as **Exhibit A.**

39.   The "I Resolve" website presents Plaintiffs' deeply held philosophical and religious beliefs and proposes model resolutions for adoption by local, state, and federal leaders.  The "I Resolve" website also proposes that bathrooms and locker rooms currently designated by sex (*e.g.*, as either "boys" or "girls" bathrooms and locker rooms) should be "re-designated as 'anatomically-male' or 'anatomically-female' spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built."  Ex. A at 2.  The "I Resolve" website furthermore proposes that any person not comfortable using anatomically correct spaces can request access to a private, gender-neutral bathroom or locker room so long as such a space exists or can be established.  *Id.* at 3.

40.   The "I Resolve" website proposes two other resolutions to provide "caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey":

a. A student, with parental permission, may request to be called by a derivative of the student's legal name, but other students or staff are not mandated to use that name; and

b. A student, with parental permission, may request to be referred to by pronouns that do not correspond to the student's biological sex, but other students and staff are not required to use those pronouns. Ex. A at 2–3.

41.   When created, the "I Resolve" website allowed visitors to electronically sign the resolutions to show their support.

42.   As part of the "I Resolve" movement, Plaintiffs created a video while off duty during spring break 2021.  They did so with personal property at a local church. The video presents Plaintiffs alone discussing their deeply held beliefs and their proposed "I Resolve" resolutions.

43.   While developing the website and video, Damiano met with Defendants Kolb and Blanchard separately at school and informed them about the "I Resolve" movement and the proposed website and video. Damiano provided Defendants Kolb and Blanchard with drafts of the "I Resolve" resolutions, and Plaintiffs later provided a link to the webpage to both Defendants.  Defendant Kolb, in fact, received his link before the webpage even went public.  Defendant Blanchard, meanwhile, received his link via text from Medart after the webpage went public.During the development stage, Defendants Kolb and Blanchard never expressed disapproval of Plaintiffs' work on "I Resolve," nor did they ever inform Plaintiffs that their work on "I Resolve" was interfering with Plaintiffs' relationships with colleagues and supervisors.

44.   Defendants Kolb and Blanchard also never warned Plaintiffs that they were violating any District policy by working on "I Resolve."  In fact, Defendant Kolb said he would consider bringing the "I Resolve" resolutions to the Board Defendants to consider whether the Board should adopt the resolutions as District policy.

45.   Defendant Blanchard even gave Plaintiffs feedback on their drafts of the "I Resolve" resolutions. Specifically, Defendant Blanchard asked Plaintiffs -- in person with Damiano, via text message with Medart -- clarifying questions about mandating that staff or students use preferred names and/or pronouns only when parents approve.  Plaintiffs both responded that such a mandate would violate their constitutionally protected right of free speech.  The ruling issued by the United States Court of Appeals for the Sixth Circuit in *Merriwether v. Shawnee State University* confirms that such a mandate violates teachers' right of free speech.

46.   Neither on the "I Resolve" website nor in any "I Resolve" video has either Plaintiff identified herself as an employee of GPSD or NMS or worn any gear featuring district or school emblems, logos, or insignia.

47.   Plaintiffs never reference any District employee or board member in their speech related to "I Resolve."

48.   "I Resolve" never interfered with Damiano's duties as an assistant principal or Medart's duties as a science teacher.

49.   Plaintiffs never approached students about "I Resolve" or discussed "I Resolve" during class time.

50.   "I Resolve" was not part of Plaintiffs' official duties assigned to them by Defendants.

51.   On March 25, 2021, Plaintiffs made their video publicly available for viewing on YouTube.

**Defendant Kolb Backtracks in Response to Backlash**

52.   On March 31, 2021, approximately a week after the website's public launch, Defendant Kolb met with Plaintiffs separately.  Defendant Kolb informed Plaintiffs that GPSD staff had raised concerns about "I Resolve," about "I Resolve," telling Plaintiffs that the complainants were "appalled," "offended," and "disgusted" by Plaintiffs' views.

53.   According to Defendant Kolb, at least one complainant claimed Plaintiffs were "targeting transgender students."  Defendant Kolb also told Plaintiffs that some GPSD staff members perceived the "I Resolve" video to be "anti-transgender."

54.   Defendant Kolb told Plaintiffs that legal counsel was examining the lawfulness of their speech in the "I Resolve" video and recommended that Plaintiffs remove the "I Resolve" video and website from public view.

55.   During Defendant Kolb's meeting with Medart, he told her that because of the views she expressed as part of "I Resolve," he had prevented her from attending a meeting of the LGBTQ+ student club earlier that day, March 31 – even though the club's student membership had voted to allow Medart to attend.  Medart had sought to attend the club meeting to better understand student perspectives on LGBTQ+ issues and better support those students.  Even so, Defendant Kolb overrode the students' decision.

56.   Defendant Kolb threatened that if "disruption" to the functioning of GPSD continued – i.e., if the District continued receiving complaints – he would pursue disciplinary action against Plaintiffs, including terminating their employment. However, on information and belief, apart from the complaints received by Defendants from GPSD staff, no other "disruption" occurred as a result of the "I Resolve" website, and GPSD's ability to function was not impaired in any way.

57.   Furthermore, Defendant Kolb stated in an e-mail to Medart, "Although I do not anticipate any disciplinary action, this is a very sensitive and emotive topic and is having an impact on your colleagues."

### Defendants Place Plaintiffs on Administrative Leave

58.   Between April 1 and 3, 2021, Defendant Blanchard received formal complaints from five GPSD employees about Plaintiffs' "I Resolve" speech.  At least three employee complainants claimed Plaintiffs' speech violated the District's policy governing employee speech at the time (the "Original Speech Policy") because Plaintiffs did not comply with the policy's disclaimer requirement.  Another employee complainant alleged that "separation of church and state" prohibited Plaintiffs from sharing "I Resolve" resolutions at work since the resolutions are influenced by Plaintiffs' Christian faith.

59.   Upon information and belief, Defendant Blanchard has not told any of the five complainants that he met with Damiano during the development stage of "I Resolve" and provided feedback on the "I Resolve" resolutions.

60.   On April 5, 2021, a school administrator entered Medart's classroom right before she started class and directed her – in the presence of her students – to take her belongings and report to Defendant Blanchard.

61.   When Medart reported to Defendant Blanchard, he handed her a notice he had written and signed.  The notice placed Medart on administrative leave, effective immediately, and informed her that she was under investigation for "inappropriate behavior." A true, accurate, and complete copy of the notice is attached hereto as **Exhibit B.**

62.   Damiano met with Defendant Blanchard that same day. During the meeting, he provided her with a notice he had written and signed.  Like Medart's notice, Damiano's notice placed her on administrative leave, effective immediately, and

informed her that she was under investigation for "inappropriate behavior." A true, accurate, and complete copy of the notice is attached hereto as **Exhibit C.**

63.  Defendants placed Plaintiffs on administrative leave based on the aforementioned five complaints from GPSD employees, which focused on the content of Plaintiffs' "I Resolve" -related speech.

64.  While they were on administrative leave, Plaintiffs lost opportunities to develop their skills as an administrator (in Damiano's case) and educator (in Medart's case) as well as to mentor their students.

65.  Upon information and belief, the outcome of Defendants' formal investigation into Plaintiffs may include employer discipline up to and including termination.

   **A. Defendant Kolb emails District staff, parents, and students to condemn I Resolve.**

66.  On April 6, 2021, Defendant Kolb emailed the entire District staff under the subject line: "We are [Grants Pass]; We ALL belong." A true, accurate, and complete copy of the e-mail is attached as **Exhibit D.**

67.  In that e-mail, Defendant Kolb declared that the "I Resolve" movement was purportedly "in direct conflict with the values of Grants Pass School District 7" and that GPSD "do[es] not support or endorse this message." Ex. D at 1.  Defendant Kolb further wrote that "District 7 is unequivocally committed to providing welcoming and safe learning environments for **all** students, including our LGBTQ students. In Grants Pass schools, we **ALL** belong, regardless of race, religion, gender, sex, or ability." *Id.*

68.  Defendant Kolb furthermore stated in the e-mail, "Please contact me or our Human Resources Director, Danny Huber-Kantola, with any additional concerns or needed support." Ex. "D."  In other words, Defendant Kolb actively solicited

complaints from GPSD staff, thereby causing the very disruption he accused Plaintiffs of creating.

69.    After Defendant Kolb sent the e-mail, Plaintiffs received many harassing, intimidating, and menacing communications from third parties and District staff. These e-mails accused Plaintiffs of transphobia, hatred, and bigotry. One claimed Plaintiffs were not fit to work with children because of their work on "I Resolve."

70.    On April 7, 2021, Defendant Kolb sent out another e-mail, this time to all District staff, students, and families. A true, accurate, and complete copy of the email is attached as **Exhibit E.**

71.    In the April 7 e-mail Defendant Kolb wrote that there were complaints against "two staff members" over "social media postings discussing LGBTQ policies with reference to schools." Ex. E at 1. The "staff members" Defendant Kolb referred to in his e-mail are Plaintiffs.

72.    Defendant Kolb reiterated in the April 7 e-mail that "District 7 is committed to providing welcoming and safe learning environments for all students, including our LGBTQ students. In Grants Pass schools, we ALL belong, regardless of race, religion, gender, sex, sexual orientation or ability." Ex. E at 1. Defendant Kolb further assured the GPSD community that Plaintiffs were being "investigat[ed]" and were "not at work." *Id.*

73.    Defendant Kolb did not mention in either his April 6 or 7 e-mails that he and Defendant Blanchard met with Damiano during the development stage of "I Resolve," that Defendant Blanchard gave feedback to Damiano on her drafts of "I Resolve" resolutions, or that Defendant Kolb reviewed the "I Resolve" resolutions and considered bringing them to the Board Defendants for a vote on making the resolutions District policy.

74.    On April 13, Defendant Kolb attended the regular virtual meeting of the Board Defendants. At that meeting, a member of the public criticized the "I

Resolve" movement for, in the commenter's perspective, being harmful to students struggling with gender identity issues. Defendant Kolb responded in the meeting's chat that the commenter was "[w]ell spoken" and that a GPSD official would reach out to the commenter regarding how the commenter could assist the District.

**B. Defendant Blanchard questions Plaintiffs about their religious beliefs as part of the School District's investigation.**

75. Defendant Blanchard, along with Danny Huber-Kantola, GPSD's Human Resources Director, led the District's investigation of the formal complaints against Plaintiffs.

76. As part of the investigation, Defendant Blanchard separately questioned Plaintiffs about their "I Resolve"-related speech and their deeply held philosophical and religious beliefs purportedly interfering with their ability to do their respective jobs. Almost all of the questions raised during Defendants' interviews of Plaintiffs focused on Plaintiffs' speech related to "I Resolve."

77. Defendant Blanchard expressed "concern" that Medart's religious faith would prevent her from complying with District guidelines or policies, if adopted, that would compel teachers to use pronouns that do not correspond to a transgender student's biological sex, thereby making her unfit for her job. The other interviewer questioned whether Medart had attempted to "push" her religious views on people in the District through "I Resolve."

78. Defendants then subjected Plaintiffs to another round of questioning, this time conducted by an outside investigator, about their speech related to I Resolve.

**C. The School District's "Speech Policies"**

**1. The Original Speech Policy**

79. In February 2004, the School district adopted a policy governing employee speech titled, "Staff Participation in Political Activities." That policy — the Original

Speech Policy — remained in effect until April 27, 2021. A true, accurate, and complete copy of the Original Speech Policy is attached hereto as **Exhibit F.**

80. The Original Speech Policy provided: "Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level ***on the same basis as <u>any</u> citizen*** in a comparable position in public or private employment and within the law." Ex. F at 1 (emphasis added). The policy also provided: "All district employees are privileged within the limitations imposed by state and federal laws and regulations ***to choose either side of a particular issue and to support their viewpoints as they desire*** by vote, ***discussion or the persuasion of others***." *Id.* (emphasis added).

81. However, the Original Speech Policy prohibited "[s]uch discussion and persuasion ... during the performance of district duties, except in open discussion during classroom lessons that center on a consideration of all candidates for a particular office or various sides of a particular political or civil issue." Ex. F at 1.

82. The Original Speech Policy also included a disclaimer requirement, which reads: "On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint." Ex. F at 1.

83. The Original Speech Policy did not define the terms, "political or civil issue" or "controversial issues."

84. By failing to define "controversial issues," the Original Speech Policy gave GPSD staff – including Plaintiffs – no notice as to what constituted a controversial issue or how to avoid charges that staff violated the policy.

85. Given that stances on nearly every issue of public importance generate "controversy," the Original Speech Policy gave Defendants limitless authority to regulate, suppress, and censor employee speech made while the policy was in effect.

86.   For employee speech made while the Original Speech Policy was in effect, Defendants could discipline any employee for speech on an issue that Defendants subjectively deemed "controversial" that did not include the required disclaimer.

87.   In placing Plaintiffs on administrative leave, Defendants enforced the Original Speech Policy against Plaintiffs for their "I Resolve"-related speech that occurred before April 27, 2021.

### 2.  The Amended Speech Policy

88.   On April 27, 2021, the Board Defendants adopted, and have since enforced, an amended "Staff Participation in Political Activities" policy that governs employee expression. A true, accurate, and complete copy of that policy — the Amended Speech Policy — is **Exhibit G.**

89.   Like the Original Speech Policy, the Amended Speech Policy provides: (a) "Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level ***on the same basis as any citizen*** in a comparable position in public or private employment and within the law"; and (b) "[a]ll district employees are privileged within the limitations imposed by state and federal laws and regulations ***to choose either side of a particular issue and to support their viewpoints as they desire*** by vote, ***discussion or the persuasion of others***." Ex. G at 1 (emphasis added).

90.   The Amended Speech Policy defines "political or civil issue" and "controversial civil issue" using such elusive, subjective, and circular terminology that the policy gives staff no notice as to what constitutes a "political or civil issue" or "controversial civil issue" or how to avoid charges that staff violate the policy:

a.   The Amended Speech Policy defines "political or civil issue" circularly as "includ[ing], but not be[ing] limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." Ex. G at 1.

b. The Amended Speech Policy likewise defines "controversial civil issue" circularly to "specifically include issues which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction." Ex. G at 1. As part of its definition of "controversial civil issue," the Amended Speech Policy also directs: "In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions." *Id.*

91. The Amended Speech Policy, like the Original Speech Policy, also includes a disclaimer requirement, which reads: "When engaged in off duty activities, on all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint." Ex. G at 1. The policy gives staff no notice as to what off-duty speech triggers the required disclosure. *Id.* So, in effect, the policy compels staff to issue the disclaimer nearly every time they speak on any topic.

92. Given that nearly every issue of public importance is (a) an issue "for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree" (*i.e.*, a "political or civil issue") and (b) an "issue[ ] which appear[s] likely to create controversy among students, employees or the public" (*i.e.*, a "controversial civil issue"), the Amended Speech Policy gives Defendants limitless authority to regulate, suppress, and censor employees' speech on and off District property, during and after school hours, and on and off duty. The Amended Speech Policy's "controversial civil issue" provision thus gives Defendants limitless power to regulate, suppress, and censor any GPSD staff member's speech on an issue that Defendants subjectively deem controversial – especially speech expressing viewpoints with which District officials disagree.

93.   District employees must follow all Board policies and are subject to discipline, including termination of employment, if they do not.

94.   Defendants have exercised their power under the Amended Speech Policy to regulate, censor, and suppress speech on "political or civil issues" and "controversial civil issue[s]," including against Plaintiffs.

### 3. The classroom exception to censorship under the Speech Policies

95.   On the same day that the School District adopted the Original Speech Policy in February 2004, the District also adopted a policy on "Studying Controversial Issues." A true, accurate, and complete copy of that policy is attached hereto as **Exhibit H.**

96.   That policy, which has not been amended since February 2004 and was in effect at all times relevant to this Complaint, emphasizes the need to "teach[ ] about our American heritage, the rights and privileges we enjoy as citizens and the citizenship responsibilities that must be assumed in maintaining our American way of life." Ex. H at 1.  The policy recognizes that "[i]n training for effective citizenship, it is frequently necessary for students to study issues that are controversial." *Id.*

97.   The policy adds: "In considering such issues, it shall be the purpose of our schools to recognize the student's right and/or obligation to: 1. Study any controversial issue concerning which (at his/her level) the student should begin to have an opinion; 2. Have free access to all relevant information, including the materials that circulate freely in the community; 3. Study under competent instruction *in an atmosphere of freedom from bias and prejudice*; 4. Form and express his/her own judgment on controversial issues without thereby jeopardizing his/her relations with teachers or the school; 5. Recognize that reasonable compromise is often an important facet in the decision making in our society; 6. *Respect minority opinion*." Ex. H at 1 (emphasis added).

98.  As for addressing controversial issues with captive audiences in K–12 classrooms, Defendants entrust District educators with the discretion "to carefully weigh the risks against the significance and educational merit of the issues, methods, materials and personnel involved and, when doubt remains, . . . to seek the counsel of their supervisors." Ex. H at 1.

99.  The only exception the Amended Speech Policy allows for discussion of "political or controversial civil issue[s]" during the performance of district duties is pursuant to the "Studying Controversial Issues" policy. Ex. G at 1.  District officials, including Defendants, do not entrust GPSD staff with the same discretion when speaking outside the classroom on controversial issues.

100. Defendants have instead given themselves unrestrained, post hoc discretion under the Speech Policies to regulate, suppress, and censor staff expression on such issues.

101. Defendants seek to respect minority opinions in the classroom.

102. But Defendants seek to silence minority opinions held by District staff if they express those opinions outside the classroom.

103. Defendants have no adequate justification for allowing employees such discretion to teach on controversial issues but then prohibiting them from discussing those same issues outside of class or for requiring a disclaimer anytime employees speak off campus.

### D. Defendants' subjective and inconsistent enforcement of the Speech Policies

#### 1. Defendant's viewpoint-based enforcement—or non-enforcement—of the Original Speech Policy

104. District employees – including Defendants – have regularly made statements on "controversial issues" under the Original Speech Policy and without including the required disclaimer:

a. On March 30, 2021, Defendant Kolb sent an e-mail during school hours to all District staff under the subject line: "Posters and other items that may be considered controversial political or civil issues." A true, accurate, and complete copy of the email is **Exhibit I.** In that e-mail, Defendant Kolb expressed: "[T]he phrase ['Black Lives Matter'] should probably not be controversial, [but] it nonetheless has created controversy, including in our community." *Id.* at 3. Defendant Kolb did not include with his opinion that "the phrase ['Black Lives Matter'] should probably not be controversial" – the required disclaimer that the viewpoint was his and should not be interpreted as the District's official viewpoint. Upon information and belief, Defendant Board Members have not subjected Defendant Kolb to the disciplinary process.

b. During school hours the next day, March 31, a GPSD teacher using the District email system replied to Defendant Kolb's e-mail and copied all GPSD staff. Ex. I at 1. In the e-mail, the teacher expressed support for the Black Lives Matter movement, writing, "Black Lives Matter is an uplifting and wholesome message and way of thinking that is perfectly appropriate for our classrooms." *Id.* The teacher added, "there is no other side, Black Lives Matter or they don't." *Id.*

c. That same day, also during school hours, another GPSD educator replied to all using the District email system, writing, "First off Black Lives Matters is on its face a racist statement." Ex. I at 1. Neither the educator who expressed opposition to Black Lives Matter nor the teacher who expressed support for the organization complied with the Original Speech Policy's disclaimer requirement. Upon information and belief, Defendants have not subjected either educator to the

disciplinary process for speaking on a "controversial issue" and/or violating the disclaimer requirement.

d.   Yet another example: On April 27, 2021, an NMS teacher made a public social media post during school hours criticizing those who advocated for looser pandemic restrictions.  The speaker did not comply with the Original Speech Policy's disclaimer requirement.  Upon information and belief, Defendants have not subjected that teacher to the disciplinary process for speaking on a "controversial issue" and/or violating the disclaimer requirement.

105. Defendants have also not subjected to the disciplinary process those GPSD staff members who have expressed viewpoints different from those of Plaintiffs on issues relating to "I Resolve."

106. On April 15, 2021, the staff member who serves as club advisor to NMS' LGBTQ+ club sent a message to the club during school hours, while on campus, discussing an upcoming meeting between the club and "school district members." The April 15 message referred to the "recent Anti-Trans 'movement' that has unfortunately spread on our campus" and the availability of GPSD members to show support for members of the LGBTQ+ club.  The April 15 message's reference to a so-called "Anti-Trans 'movement'" was to "I Resolve."

107. The staff member/club advisor did not include a disclaimer that her viewpoint was her own and not GPSD's. Upon information and belief, Defendants have not subjected that staff member to discipline for speaking on a "controversial issue" and/or violating the Original Speech Policy's disclaimer requirement.

108. On April 16, 2021, a different teacher – while on District premises, during school hours, and wearing a District-provided shirt – posted a photo of herself on social media objecting to "I Resolve."  That teacher did not comply with the Original

Speech Policy's disclaimer requirement. Upon information and belief, Defendants have not subjected that teacher to the disciplinary process.

109. The teacher mentioned above would be required to utter a disclaimer under the Amended Speech Policy if her speech had occurred off campus. The Amended Speech Policy prohibits GPSD personnel from speaking on controversial topics on campus at all unless the classroom exception applies. Because GPSD had deemed "I Resolve" to be controversial, the teacher engaged in controversial speech by discussing it in a social media post while on campus, and under the Amended Speech Policy, the teacher should have been disciplined.

110. But for the content and viewpoint of Plaintiffs' "I Resolve"-related speech, Defendants would not have taken adverse action against Plaintiffs. Any other purported justification by Defendants to take adverse action against Plaintiffs is pretextual.

### 2. Defendant's viewpoint-based enforcement — or non-enforcement — of the Amended Speech Policy

111. On April 28, 2021, the day after Board Defendants adopted the Amended Speech Policy, an NMS teacher made public social media posts during school hours and on school property criticizing those who advocated for looser pandemic restrictions. There is "more than one reasonable interpretation or position" about pandemic restrictions "on which reasonable persons may disagree," making the subject an issue that is "likely to create controversy among students, employees or the public." Ex. G at 1. Upon information and belief, Defendants have not subjected that teacher to the disciplinary process for engaging in speech supporting one side of a political or controversial civil issue "[w]hile on District premises or acting within the scope of employment." *Id.* at 2.

112. Another example of Defendants' viewpoint discrimination under the Amended Speech Policies involves the controversy over Black Lives Matter posters in classrooms:

    a. Before the Board Defendants adopted the Amended Speech Policy, Defendant Kolb sent an email on March 30, 2021 stating, in part:

> I am sending this message regarding a very difficult and emotive topic. I have had a few people express a desire to put up "Black Lives Matter" posters in their classrooms and have had legal counsel review and consult with the Board.
>
>           \* \* \*
>
> While it is a fact that black lives do matter and discrimination against black students, or students of any color, is absolutely prohibited, the issue with the phrase "Black Lives Matter", is that it has become identified with a political/civil rights movement that has generated substantial controversy throughout Oregon and the country, including spawning ***counter-movements such as the "Blue Lives Matter" and "All Lives Matter"***. These movements and related posters and signs would also be considered controversial civil issues as related and should not be displayed in classrooms or on school property. The concern is that once "Black Lives Matter" posters are posted, then it becomes difficult for the District, under the First Amendment, to object to other posters which may be similar or responsive to "Black Lives Matter" or which cover controversial or disputed subjects of a civil or political nature without engaging in ***viewpoint discrimination***.

Ex. I at 2 (emphasis added).

    b. Defendants' view changed after Board Defendants adopted the Amended Speech Policy in April 2021: On May 5, 2021, Defendant Kolb sent an email to the entire District staff. A true, accurate, and complete copy of the email is attached hereto as **Exhibit J.**

    c. In the email, Defendant Kolb wrote: "The attached Board policy was revised and adopted by the Board last Tuesday. For clarification, [the

Amended Speech Policy] now allows for the [Oregon Education Association's] Black Lives Matter poster to be present on the walls of your classrooms." Ex. J at 1. Defendant Kolb did not state in his May 5 email that the Amended Speech Policy permits teachers to hang the "counter-movements" "Blue Lives Matter" and "All Lives Matter" posters in their classrooms.

d. Attempting to justify his reversal concerning Black Lives Matter posters, Defendant Kolb explained: "The significant change ... is the following statement: '*In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.*' It is deemed by the District that this poster is consistent with our Board Policy ["All Students Belong," adopted in December 2020] and the Board Resolution on Equity, Diversity, and Inclusion [adopted in January 2021]." Ex. J at 1.

113.   Thus, Defendants have by fiat found that permitting Black Lives Matter posters no longer constitutes "viewpoint discrimination." Ex. I at 2. But Defendants have made no similar concession to Blue Lives Matter or All Lives Matter posters.

**E. Defendants' unconstitutional Amended Speech Policy prevented Plaintiffs from freely speaking as citizens on matters of public concern and compels them to comply with the disclaimer requirement.**

114. From April 8 to April 29, 2021, Plaintiffs made frequent social media posts, often daily, about issues relating to "I Resolve" on the "I Resolve" Instagram account. Plaintiffs intended to continue to make similar daily social media posts indefinitely into the future about issues relating to "I Resolve."

115. On April 29, 2021, however, Plaintiffs immediately stopped making such Instagram posts when they discovered that the Board Defendants had adopted the

Amended Speech Policy.  Plaintiffs did so because of Defendants' elusive, subjective, and circular definition of "controversial civil issue" in the Amended Speech Policy. *See* Ex. G.  Given that they were already on administrative leave at that time, Plaintiffs did not want to run afoul of the Amended Speech Policy and thus be subject to possible further discipline, including termination of employment.

116. The Original Speech Policy's disclaimer requirement compelled Plaintiffs to add a disclaimer to the "I Resolve" website stating that the website espouses personal views only and not the views of any education entity, including GPSD. Ex. A at 4.  But for the disclaimer requirement in the Original Speech Policy -- which Plaintiffs added at the behest of the District after the March 31 meeting, before the District put Plaintiffs on leave and before GPSD started receiving complaints -- Plaintiffs would not have included the disclaimer.

117. Plaintiffs did not believe or wish to communicate that their speech is official GPSD speech or that it represents the views of the District. However, they do not want to make the required disclaimer because they wish to avoid placing language on their website and social media that may disparage their speech in the eyes of their readers, or otherwise confuse their readers, by suggesting that the District opposes or disapproves of their speech.

118. Defendants' Amended Speech Policy has also limited and compelled Plaintiffs' speech in other contexts:

> a. During the weekend of May 15, 2021, Damiano was on a float trip with friends on the Rogue River. Under the Amended Speech Policy, Damiano was forced to speak the compelled disclaimer to her friends when expressing her views on any issue that could, in the discretion of District officials, including Defendants, be deemed "controversial." Damiano included the disclaimer when discussing issues including the wisdom of pandemic restrictions and immigration policy.

b. The Amended Speech Policy also stopped Damiano from making personal social media posts she otherwise would because she does not wish to comply with the disclaimer requirement.

c. On May 22, 2021, Defendants' Amended Speech Policy compelled Medart, while at her son's soccer match, to speak the disclaimer when talking with other families about issues related to "I Resolve."

### Defendants Fire Plaintiffs

119.  Before Defendants placed them on administrative leave in April 2021, Plaintiffs had never faced disciplinary action from GPSD for any reason.  In fact, in mid-March 2021, Defendants renewed Plaintiffs' contracts for the 2021–22 school year -- the District offered Plaintiffs letters of intent to sign and return for the 2021-22 school year, and Plaintiffs did sign and return them.  Medart also received an actual contract to sign and return, which we did.

120.  After placing Plaintiffs on administrative leave, Defendants hired Bill Landis ("Mr. Landis"), a former Grants Pass police chief, to investigate Plaintiffs' conduct.  Plaintiffs fully cooperated with the investigation.

121.  Following his investigation, Landis determined that Plaintiffs:

a. Used GPSD facilities, equipment, and supplies for political campaigning efforts.  Nothing Plaintiffs did, however, meets the definition of political campaigning as set forth in Or. Rev. Stat. § 260.432: Plaintiffs did not "solicit any money, influence, service or other thing of value or otherwise promote or oppose any political committee or promote or oppose the nomination or election of a candidate, the gathering of signatures on an initiative, referendum or recall petition, the adoption of a measure or the recall of a public office holder while on the job during working hours."  Oregon law also explicitly permits public employees to express personal political views,

even during working hours. *Id.* Even if Plaintiffs did use GPSD facilities, equipment, and supplies, such use was minimal: Damiano estimates that she used $2 worth of printer paper, and Medart forwarded one e-mail related to "I Resolve" that she received at her GPSD e-mail address from another GPSD employee who did not receive discipline. This use of District resources was not a violation of policy – in fact, Policy GBB explicitly permits teachers and administrators to participate in policy discussions [*see* Ex. "O," cited below] – and was consistent with the use of District resources by all, or at least many, other GPSD staff members. Effectively, the District unfairly and unlawfully singled out Plaintiffs for discriminatory treatment.

b. Used paid District time to support and promote their work on "I Resolve." As stated above, Plaintiffs admit discussing their work with their supervisors, which Oregon law does not prohibit -- in fact, "lobbying" is actually encouraged. Or. Rev. Stat. § 260.432. So, for that matter, is making policy proposals: Attached hereto as **Exhibit "O"** is a copy of GPSD's Policy GBB, which states in relevant part as follows (emphasis added):

"***The Board will encourage employees to contribute their ideas for the continuing betterment of the district.  The staff will be asked to help in developing policies and regulations***, in establishing goals and objectives and in planning curriculum, services, budget and facilities.

In devising rules and procedures for the operation of the schools, administrators will seek the suggestions of those employees who will be affected by such provisions. The professional staff ***will be given opportunities*** to contribute to curriculum development and ***to recommend policies and regulations pertaining to students and instructions***."

Furthermore, given that Defendant Blanchard offered feedback to Damiano on drafts of resolutions "I Resolve" and Defendant Kolb offered to take Plaintiffs' proposals to the Board for adoption, Defendants Blanchard and Kolb were willing participants in such discussion.

c. Failed to utter the disclaimer required under the Original Speech Policy in their "I Resolve" video. Granting that this is true, it is clear from Plaintiffs' video that they were speaking as private citizens on a matter of public concern and not as employees of GPSD: Plaintiffs identified themselves as educators in southern Oregon – a fairly vast place that extends roughly from just south of Eugene to the California border and from the Pacific coast to the Idaho border. Plaintiffs wore no apparel identifying them as GPSD employees. Furthermore, the disclaimer required under the Original Speech Policy constitutes compelled speech, and if the policy were to be applied across the board as written, every GPSD teacher would have to utter the disclaimer when speaking on even relatively trivial matters, such as the quality of food in a given restaurant.

d. Used social media in a manner that caused a substantial disruption to the school environment. Plaintiffs' social media use did no such thing: GPSD might have received some angry e-mails and/or phone calls from District staff and members of the Grants Pass community, but that did not adversely affect GPSD's ability to function. The disapproval of Plaintiffs' peers and community members, however vehement, does not constitute a substantial disruption. Any disruption that occurred was caused not by Plaintiffs, but by two other individuals: 1) Kate Weber, a GPSD employee, who used District resources and time to locate

Plaintiffs' "I Resolve" video and e-mail it to other District staff members, at least one of whom forwarded the video to another staff member; and 2) Defendant Kolb, who actively solicited complaints from GPSD staff members -- and anyone in the Grants Pass community who had a child in a GPSD school -- by deeming Plaintiffs to be in opposition to District values. Any disruption that occurred was caused not by Plaintiffs, but by two other individuals: 1) Kate Weber, a GPSD employee, who used District resources and time to locate Plaintiffs' "I Resolve" video and e-mail it to other District staff members, at least one of whom forwarded the video to another staff member; and 2) Defendant Kolb, who actively solicited complaints from GPSD staff members -- and anyone in the Grants Pass community who had a child in a GPSD school -- by deeming Plaintiffs to be in opposition to District values.

122.    Based on the foregoing, following a 4-3 vote at a pre-termination hearing that took place before the District's Board on July 15, 2021, Defendants fired Plaintiffs.

123.    Landis' findings were merely a pretext to fire Plaintiffs. But for the content of Plaintiffs' speech in their "I Resolve" video, GPSD would not have fired Plaintiffs.

## FIRST CAUSE OF ACTION
## Violation of Plaintiffs' First Amendment Right to Freedom of Speech

### 42 U.S.C. § 1983)

124.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1–120 of this Complaint.

<u>Retaliation</u>

125.   When Plaintiffs communicated their views regarding gender-identity education policy via YouTube, they spoke as private citizens on a matter of public concern and engaged in expression the First Amendment protects.

126.   Plaintiffs' interest as private citizens in discussing matters of public concern outweighs Defendants' interest in the efficient provision of educational services.

<u>Content- and Viewpoint-Based Discrimination</u>

127.   Plaintiffs challenge the part of Defendants' Original Speech Policy that censored speech on "controversial issues" as applied to Plaintiffs.  Plaintiffs also challenge those parts of Defendants' Amended Speech Policy that censor speech on "political or civil issues," "controversial civil issue[s]," and "controversial issues" both facially and as applied to Plaintiffs.

128.   Defendants exercised the unbridled discretion conferred upon them by the Speech Policies to discriminate against Plaintiffs based on both content and viewpoint to punish Plaintiffs for expressing their views regarding gender-identity education policy.

129.   Under both Speech Policies, Defendants have allowed and failed to punish speech by GPSD employees other than Plaintiffs, made while on District premises during school hours – and, in at least one instance, while wearing GPSD apparel – and not while acting within the scope of their employment, on other "political or controversial civil issue[s]."

130.   Furthermore, in firing Plaintiffs, Defendants have violated the District's own Policy GBB, which makes clear that GPSD employees are encouraged to contribute policy proposals concerning students and instruction.  *See* Ex. "O."

<u>Prior Restraint</u>

131.   Defendants' Speech Policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.  Defendants'

Speech Policies and related practices are also underinclusive, prohibiting some expression while leaving other expression equally harmful to GPSD's asserted interests unprohibited.

132.   Defendants' Original Speech Policy placed a prior restraint on speech by prohibiting discussion of political or civil issues during the performance of District duties.

133.   Defendants' Amended Speech Policy likewise places a prior restraint on speech by prohibiting employees from speaking on one side of any political or controversial civil issue while on District premises or within the scope of their employment.

134.   The overbreadth of Defendants' Amended Speech Policy chilled the speech of Plaintiffs, who sought to engage in protected expression, including expression about gender-identity education policy, in their interactions with students, staff, and the public both on and off campus.

<u>Compelled Speech</u>

135.   Plaintiffs challenge the Speech Policies' required disclaimers as applied to them.

136.   By placing Plaintiffs on administrative leave, threatening to terminate their employment, launching a formal investigation into them, engaging in public mischaracherization, prohibiting them from conducting school business, preventing them from taking other opportunities for pay, and ultimately terminating their employment, Defendants punished Plaintiffs for engaging in expression that the First Amendment protects.  GPSD's assertions that Plaintiffs violated District policy notwithstanding, Defendants would not have subjected Plaintiffs to discipline due to the content and viewpoint of Plaintiffs' speech.

137.   Plaintiffs have suffered irreparable harm from Defendants' retaliatory action and the enforcement of the Speech Policies.  They also have no adequate or speedy remedy at law to correct Defendants' deprivation of their rights.

138.   Defendants' actions and policies, as set forth above, serve no legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

139.   Defendants' Speech Policies and related practices are not narrowly tailored as applied to Plaintiffs because Plaintiffs' expression implicates no legitimate interests Defendants might have.

SECOND CAUSE OF ACTION
**Violation of Plaintiffs' State Law Right to Freedom of Speech
(Or. Const. art. I, § 8; Or. Rev. Stat. § 30.265)**

140.   Plaintiffs repeat and reallege each of the allegations in paragraphs 1–135 of this Complaint.

141.   Article I, § 8 of the Oregon Constitution declares that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely *on any subject whatsoever*" (emphasis added).  Oregon's appellate courts have recognized that Article I, § 8 protects freedom of speech to an even greater degree than the First Amendment does.  Indeed, the sweeping protection of Article I, § 8 "extends to all forms of speech, regardless of the social acceptability or offensiveness of the content." *Merrick v. Bd. of Higher Educ.*, 841 P.2d 646, 650 (Or. App. 1992).

142.   Under Oregon law, content-based regulations of speech are only permissible if they fall "within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 [the year Oregon achieved statehood] demonstrably were not intended to reach." *State v. Robertson*, 649 P.2d 569, 576 (Or. 1982).

143.   With regard to the subject of sexuality, no historical exception to the guarantees of free expression were ever intended.  In fact, Oregon law makes clear that "[f]ree and open expression about sexual orientation" – which includes gender identity – "*may **not** be punished* in the interest of a uniform vision on how human sexuality should be regarded or portrayed." *Merrick*, 841 P.2d a 650 [citing *State v. Henry*, 732 P.2d 9, 18 (Or. 1987)]; *see also* Or. Admin. Rule 839-005-0003(16) [defining "sexual orientation" to include "gender identity"].

144.   When Plaintiffs made and published their "I Resolve" video, they spoke about gender identity, a component of sexuality.

145.   By placing Plaintiffs on administrative leave, threatening to terminate their employment, launching a formal investigation into them, prohibiting them from conducting school business, preventing them from taking other opportunities for pay, and ultimately terminating their employment, Defendants punished Plaintiffs for engaging in expression that Article I, § 8 of the Oregon Constitution clearly protects.  In doing so, they punished Plaintiffs in the interest of a uniform vision on how sexuality – gender identity in particular – should be regarded or portrayed, thereby violating Oregon's public policy encouraging free and open expression about gender identity.

### THIRD CAUSE OF ACTION
### Violation of Plaintiffs' Fourteenth Amendment Right to
### Equal Protection of the Laws
### (42 U.S.C. § 1983)

146.   Plaintiffs repeat and reallege each of the allegations in paragraphs 1–141 of this Complaint.

147.   Defendants have taken no disciplinary action against employees who have expressed support for, and endorsed, the concept of shifting gender identity.

However, Defendants have taken disciplinary action against Plaintiffs, who dared openly present dissenting views on those concepts.

148.   Furthermore, Defendants' actions have made clear that those GPSD employees who hold secular viewpoints concerning gender identity will be favored and those who hold Christian or opposing scientific and medical viewpoints – and dare to express them openly – are not.  Such a message directly violates Policy GBB, as it discourages those who hold religious or scientific viewpoints that the District deems anti-transgender from making policy proposals that will better respect the rights of both GPSD's employees and its students.  *See* Ex. "O."

149.   Defendants have thus applied their unconstitutional Speech Policies and related practices to Plaintiffs in a discriminatory and unequal manner, granting other employees the right to express their views on issues related to gender identity while denying that right to Plaintiffs, in violation of Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment.

### FOURTH CAUSE OF ACTION
### Employment Discrimination
### (Title VII)

150.   Plaintiffs repeat and reallege each of the allegations in paragraphs 1–145 of this Complaint.

151.   Title VII prohibits employers from discriminating on the basis of religion. For purposes of Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year …" 42 U.S.C. § 2000e(b).  The term "person" includes governments. 42 U.S.C. § 2000e(a).

152.   Defendant GPSD qualifies as an employer under Title VII.

153.   The term "religion," for purposes of Title VII, "includes ***all*** aspects of religious observance and ***practice***, as well as ***belief*** …" 42 U.S.C. § 2000e(j) (emphasis added).

154.   In threatening to punish, and ultimately punishing, Plaintiffs by placing them on administrative leave and threatening them with dismissal for expressing their biblically-based views on gender and sexuality, Defendants have discriminated against Plaintiffs on the basis of their religion.  Such threats constitute adverse employment actions.  Defendants' unlawful actions were compounded by their termination of Plaintiffs' employment. Defendants' actions have made clear that Defendants are hostile to Plaintiffs' religious viewpoint and impliedly grant to Plaintiffs' former fellow GPSD teachers who do not share their viewpoint the privilege of being able to express their views without fear of punishment.

155.   A copy of Plaintiffs' right-to-sue letter from the Department of Justice is attached hereto as **Exhibit K.**

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A. A judgment declaring:

1. Defendants' retaliation against Plaintiffs for expressing their views regarding gender-identity education policy violates their rights under the First and Fourteenth Amendments to the United States Constitution;

2. As applied, the Original Speech Policy's failure to define "controversial issue" and disclaimer requirement violate the First and Fourteenth Amendments to the United States Constitution;

3. Both facially and as applied, the Amended Speech Policy's (a) definition of "political or civil issue"; (b) definition of "controversial civil issue"; (c) disclaimer requirement; and (d) prohibition against employees

engaging in speech supporting one side of "political or controversial civil issue" while on District premises or acting within the scope of employment violate the First and Fourteenth Amendments to the United States Constitution;

B. Preliminary and permanent injunctive relief directing Defendants sued in their official capacities and their agents, officials, servants, employees, and any other persons acting on their behalf to do the following:

1. Reinstate Plaintiffs to their respective positions at NMS;

2. Remove from Plaintiffs' personnel files any reference to discipline Defendants imposed on Plaintiffs for expressing their views regarding gender-identity education policy, and furthermore draft a letter stating that Plaintiffs did not violate any District policy;

3. Refrain from enforcing Defendants' Amended Speech Policy to prohibit Plaintiffs from, or punish Plaintiffs for, (a) expressing their views on a "political or controversial civil issue," including gender-identity education policy, while on District premises; (b) expressing their views on a "controversial civil issue," including gender-identity education policy, while off duty; and (c) declining to speak the required disclaimer;

4. Refrain from enforcing the Amended Speech Policy's (a) definition of "political or civil issue"; (b) definition of "controversial civil issue"; (c) disclaimer requirement; and (d) prohibition against employees engaging in speech supporting one side of "political or controversial civil issue" while on District premises or acting within the scope of employment; and

5. Ultimately invalidate the Amended Speech Policy.

C. Nominal damages;

D. Compensatory damages;

E.  Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements
    in this action under to 42 U.S.C. § 1988; and

F.  All other further relief to which Plaintiffs may be entitled

Respectfully submitted this 18th day of November, 2021.

*/s/RAY D. HACKE*
RAY D. HACKE
OSB NO. 173647
PACIFIC JUSTICE INSTITUTE
1850 45TH AVE. NE, SUITE 33
SALEM, OR 97305
503-917-4409
rhacke@pji.org
*Lead Counsel*
*Attorneys for Plaintiffs*

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury for all issues so triable.

*/s/ RAY D. HACKE*

RAY D. HACKE
*Attorney for Plaintiffs*

## DECLARATION UNDER PENALTY OF PERJURY

I, RACHEL G. DAMIANO, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of November, 2021, at Grants Pass, Oregon.

_____
RACHEL G. DAMIANO

**DECLARATION UNDER PENALTY OF PERJURY**

I, KATIE S. MEDART, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of November, 2021, at Grants Pass, Oregon.

KATIE S. MEDART

## PROOF OF SERVICE

I am employed in the County of Marion, State of Oregon.  I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave., Suite 33, Salem, OR 97305.

On or about November 18, 2021, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s) addressed to said parties:

**SECOND AMENDED VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL**

## PLEASE SEE ATTACHED SERVICE LIST

 X    BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

___(State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

 X   (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 18, 2021, at Salem, Oregon.

*/s/ LAUREN PEFFERLE*_____
Lauren Pefferle

## SERVICE LIST

Karen Vickers and Beth Plass
Attorneys for All Defendants
Vickers Plass LLC
5200 SW Meadows Rd., Suite 150
Lake Oswego, OR 97035

# EXHIBIT  A



**I Resolve**

Reasonable, loving and tolerant solutions for education.

Sign the Resolution

Home    Take Action    T-Shirts



# I Resolve

Reasonable, loving, and tolerant solutions for education policies that respect everyone's rights.



## T-Shirts Now Available

T-Shirts are sold by a third party vendor, with no profit going to I Resolve.

Buy Your Shirt Here



# Proposed Solutions for Education Systems

Honoring All Students, Staff and Community Members

I Resolve is a grassroots movement intended to protect the hearts and minds of our youth and stand up for truth in our society. We believe that resolutions that are reasonable and fair in both form and operation, are beneficial in helping to safeguard the mental, emotional and physical well-being of all public-school students.
We need communities to band together, through individual and corporate commitment, to protect our youth and make their voice heard to local, state and national leaders and policy makers.

# Current Proposal

We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved.
The resolution statements regarding bathroom and locker room shared space use are suggestions for current structures, until such a time that individual gender neutral bathrooms are required and fully funded for education and youth facilities.
The last two resolutions are proposed as a caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey.

Sign the Resolution

# Resolution 2021-01

Therefore, be it resolved that we urge our local, state and federal leaders to adopt the following principles and policies:

| | |
|---|---|
| Premise<br>**Point 1** | We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female; |
| Resolution 1a<br>**Point 2** | Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designation) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built; |

| Resolution 1b | For any person who is not comfortable using their anatomically-correct space, they may request access to |
|---|---|
| **Point 3** | a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available**; |

| Resolution 2 | A student may, with parent permission, request to be called by a derivative of their legal name but it will |
|---|---|
| **Point 4** | not be mandated that students or staff be required to call the student by their preferred name; and |

| Resolution 3 | A student may, with parent permission, request to be referred to with preferred pronouns, but it will not |
|---|---|
| **Point 5** | be mandated that students or staff be required to use the preferred pronouns. |

| Footnote | **Please note that although not specified in the resolutions, individual gender neutral bathrooms are |
|---|---|
| **Note** | endorsed by I Resolve and encouraged to be fully funded by the state to be implemented in education facilities. |

## I Resolve Movement

▶  Play Video

i



# Instagram Feed













Show More

The views expressed on this site and any related video(s) produced by I Resolve are the expression of the individuals, as private citizens and do not necessarily represent the views or opinions of any specific education entity.

I Resolve Team

©2021 by I Resolve. Proudly created with Wix.com. The ideas expressed on this site are the views of the individuals, expressed as private citizens.

# EXHIBIT B

From: **Katie Medart** kmedart@grantspass.k12.or.us 📎
Subject: Fwd: Meeting today?
Date: April 5, 2021 at 10:36 AM
To: mkmedart0210@gmail.com



Get Outlook for iOS

**From:** Kirk Kolb <KKOLB@grantspass.k12.or.us>
**Sent:** Wednesday, March 31, 2021 1:55:38 PM
**To:** Mickey Jarvis <MJarvis@grantspass.k12.or.us>; Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** RE: Meeting today?

Hi Mickey,

Yes, I am asking that you, or another association representative be present as I meet with Katie.  Although I do not anticipate any disciplinary action, this is a very sensitive and emotive topic and is having an impact on your colleagues.

Katie, Mickey would prefer to meet at 2:45 and I can make that work if you can make it.

Let me know.

Thanks,
Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*



**From:** Mickey Jarvis <MJarvis@grantspass.k12.or.us>
**Sent:** Wednesday, March 31, 2021 1:19 PM
**To:** Kirk Kolb <KKOLB@grantspass.k12.or.us>
**Subject:** Meeting today?

Hello,

I'm just confirming you are asking to meet with Katie today.  If so, I proposed a 2:45 time if possible as Trish and I are meeting with ODE at 3:30 today – unless we are going to be less than say 28 minutes (feels like a tee time).

Thanks,

Thanks.
Mickey

# EXHIBIT C



# North Middle School

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

April 5, 2021

HAND DELIVERED

Dear Katie Medart:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

*Thomas M. Blanchard*

Tommy Blanchard
Principal

cc:  Kirk Kolb
     Mickey Jarvis
     Personnel File
     Payroll

*Developing our unique potential as a community of responsible and resourceful lifelong learners.*

# EXHIBIT D



# North Middle School

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

April 5, 2021

HAND DELIVERED

Dear Rachel Damiano:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

Tommy Blanchard
Principal

cc: Kirk Kolb
Personnel File
Payroll

Developing our unique potential as a community of responsible and resourceful lifelong learners.

# EXHIBIT E

Case 1:21-cv-00859-CL     Document 32     Filed 11/18/21     Page 59 of 84

From: **Office of the Superintendent** office_of_the_superintendent@grantspass.k12.or.us
Subject: We are GP; We ALL Belong
Date: April 6, 2021 at 4:31 PM
To: Office of the Superintendent office_of_the_Superintendent@grantspass.k12.or.us



D7 Family,

I am writing today to address reports of a "movement" circulating on social media that is in direct conflict with the values of Grants Pass School District 7.

To be very clear, we do not support or endorse this message.

District 7 is unequivocally committed to providing welcoming and safe learning environments for **all** students, including our LGBTQ students. In Grants Pass schools, we **ALL** belong, regardless of race, religion, gender, sex, or ability.

Please contact me or our Human Resources Director, Danny Huber-Kantola, with any additional concerns or needed support.

Thank you,

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

# EXHIBIT F



**From: Office of the Superintendent** Office_of_the_Superintendent@grantspass.k12.or.us
**Subject:** We are GP; We All Belong
**Date:** April 7, 2021 at 4:21 PM
**To:** Grants Pass SD 7 Recipients recipients@grantspass.parentlink.net

Scroll down to read in Spanish - *Desplácese hacia abajo para leer en español.*

Grants Pass staff, students, and families,

You may have heard about social media postings discussing LGBTQ policies with reference to schools. We are aware of complaints that two staff members made these postings. At this time, an investigation is underway, and the individuals are not at work.

Grants Pass School District 7 is committed to providing welcoming and safe learning environments for all students, including our LGBTQ students. In Grants Pass schools, we ALL belong, regardless of race, religion, gender, sex, sexual orientation or ability.

We have policies in place to support safe environments for students, including All Students Belong (Policy ACB) and our Equity, Diversity, and Inclusion Resolution (2021-03). We will continue protecting the well-being of all students in our schools, and all complaints alleging violations of District policies are taken seriously and thoroughly investigated.

Thank you,

El personal, los estudiantes y las familias de Grants Pass,

Es posible que haya escuchado sobre publicaciones en las redes sociales que discuten las políticas de LGBTQ con referencia a las escuelas.  Somos conscientes de las quejas de que dos miembros del personal hicieron estas publicaciones.  En este momento, se está llevando a cabo una investigación y las personas no están trabajando.

El Distrito Escolar 7 de Grants Pass se compromete a proporcionar entornos de aprendizaje seguros y acogedores para todos los estudiantes, incluidos nuestros estudiantes LGBTQ.  En las escuelas Grants Pass, TODOS pertenecemos, sin importar raza, religión, género, sexo o capacidad.

Contamos con políticas para apoyar entornos seguros para los estudiantes, incluidos todos los estudiantes pertenecen (Política ACB) y nuestra Resolución de Equidad, Diversidad e Inclusión (2021-03).  Continuaremos protegiendo el bienestar de todos los estudiantes en nuestras escuelas, y todas las quejas que alegan violaciones de las políticas del Distrito se toman en serio y se investigan a fondo.

Gracias,

**Kirk T. Kolb**

Superintendent

Grants Pass School District 7

You are receiving this email because of your relationship with Grants Pass SD 7. If you wish to stop receiving email updates sent through the Blackboard service, please unsubscribe.
Grants Pass SD 7 l 725 NE Dean Drive, Grants Pass, OR 97526 l 541-474-5700

# EXHIBIT G

# Grants Pass School District 7

Code: GBG
Adopted: 6/14/88
Revised/Readopted: 2/24/04
Orig. Code(s): GBG

## Staff Participation in Political Activities

Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a comparable position in public or private employment and within the law.

All district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others. Such discussion and persuasion, however, will not be carried on during the performance of district duties, except in open discussion during classroom lessons that center on a consideration of all candidn «s for a particular office or various sides of a particular political or civil issue.

On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.

No employee will use district facilities, equipment or supplies in connection with political campaigning, nor will any employee use anytime during the working day for campaign purposes.

END OF POLICY

Legal **Reference(s):**

ORS **Chapter** 244
**ORS 260**.432

**Oregon Constitution,** Article **XV, Section 8.**

**Cross Reference(s):**

**INB - Studying Controversial Issues**

1-1

# EXHIBIT H

# Grants Pass School District 7

Code:                    GBG
Adopted:                 6/14/88
Revised/Readopted:       2/24/04; 4/27/21
Orig. Code:              GBG

## Staff Participation in Political Activities

"Employees" shall include all District employees (including administrators, certified employees, classified employees and part-time employees) while acting within the scope of their employment or on behalf of the District, contractors working for the District under District contracts on District premises while performing work for the District, and District volunteers while on District premises or engaged in a District-sponsored activity.

"Speech" shall mean any oral or written statements made by an employee in the course of his or her District duties, including, but not limited to, the display of posters, flyers, clothing or apparel or buttons, stickers or other accessories, which contain a message related to controversial political or civil issues, ballot measures, electoral issues or candidates for an elected position.

"District facilities" shall include, but shall not be limited to, all District buildings, District grounds and parking lots, District transportation vehicles, District sponsored computer networks and e-mail systems, District sponsored social media accounts, District or school sponsored events and District-sponsored virtual classrooms. Board Member e-mail addresses shall not be considered "District facilities" for purposes of this policy.

"District Equipment and Supplies" shall include, but not be limited to, District computers, printers, copiers, mailing or e-mail address lists for students or families, District provided uniforms or sporting equipment, stationary, or other personal property which is owned by the District or provided to students or employees by the District for a school-sponsored event.

"Political or civil issue" shall include, but not be limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree. A controversial civil issue shall specifically include issues which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction. In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.

Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a comparable position in public or private employment and within the law.

All district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others. Such discussion and persuasion, however, will not be carried on during the performance of district duties, except as described in Policy INB. When engaged in off duty activities, on all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.

No employee will use district facilities, computer networks or e-mail systems, equipment or supplies in connection with political campaigning, nor will any employee use any time during the working day for campaign purposes. While on District premises or acting within the scope of employment, no employee shall display or engage in speech supporting a candidate for elected office or supporting one side of any political or controversial civil issue.

END OF POLICY

---

**Legal Reference(s):**

ORS Chapter 244                    ORS 260.432

OR. CONST., art. XV, § 8.

**Cross Reference(s):**

INB - Studying Controversial Issues

# EXHIBIT I

| | |
|---|---|
| **Grants Pass School District 7** | Code: **INB**<br>Adopted: 6/14/88<br>Readopted: 2/24/04<br>Orig. Code(s): INB |

## Studying Controversial Issues

Training for effective citizenship is accepted as one of the major goals of our public schools. Our instructional program developed to achieve this purpose properly places great emphasis upon teaching about our American heritage, the rights and privileges we enjoy as citizens and the citizenship responsibilities that must be assumed in maintaining our American way of life.

In training for effective citizenship, it is frequently necessary for students to study issues that are controversial. In considering such issues, it shall be the purpose of our schools to recognize the student's right and/or obligation to:

1. Study any controversial issue concerning which (at his/her level) the student should begin to have an opinion;

2. Have free access to all relevant information, including the materials that circulate freely in the community;

3. Study under competent instruction in an atmosphere of freedom from bias and prejudice;

4. Form and express his/her own judgments on controversial issues without thereby jeopardizing his/her relations with teachers or the school;

5. Recognize that reasonable compromise is often an important facet in the decision making in our society;

6. Respect minority opinion.

Controversial issues, as well as controversial instructional methods, materials and resource personnel associated with them, by definition generate dissension. There is also an inherent risk that such dissension may escalate into antagonism which may be sufficient to disrupt the educational process. Members of the professional staff are expected to be sensitive to student, staff and community attitudes, to carefully weigh the risks against the significance and educational merit of the issues, methods, materials and personnel involved and, when doubt remains, they are to seek the counsel of their supervisors.

END OF POLICY

---

Legal Reference(s):

ORS 336.067                OAR 581-022-1020
                           OAR 581-022-1910

(continued)                                              1-2

Studying Controversial Issues – INB
(continued)

United States Constitution, Amendment I.
Oregon Constitution, Article 1.

Cross Reference(s):

IB - Freedom of Expression
IICB - Community Resource Persons

# EXHIBIT J

From: **Kevin Bishop** KBishop@grantspass.k12.or.us 📎
Subject: Re: Posters and other items that may be considered controversial political or civil issues
Date: March 31, 2021 at 3:40 PM
To: Michael Endicott MENDICOTT@grantspass.k12.or.us, Kirk Kolb KKOLB@grantspass.k12.or.us
Cc: d7allstaff d7allstaff@grantspass.k12.or.us



First off Black Lives Matter is on its face a racist statement

Get Outlook for iOS

---

**From:** Michael Endicott <MENDICOTT@grantspass.k12.or.us>
**Sent:** Wednesday, March 31, 2021 1:44:41 PM
**To:** Kirk Kolb <KKOLB@grantspass.k12.or.us>
**Cc:** d7allstaff <d7allstaff@grantspass.k12.or.us>
**Subject:** RE: Posters and other items that may be considered controversial political or
civil issues

Mr. Kolb,
I read your message and believe you when you say this District is committed equity and
belonging for all students, but I feel compelled to point out my concerns to you and our
colleagues, about some of the statements made therein.

With respect:

First, I'll say Black Lives Matter is an uplifting and wholesome message and way of
thinking that is perfectly appropriate for our classrooms.

You mentioned that Blue Lives Matter is a counter movement to Black Lives Matter, I agree
that it is a counter movement. But we have to ask ourselves why. Blue lives have always and
explicitly mattered throughout our county's history. We teach our children to respect and
trust police officers from a very early age. Police officers are part of the great *goes-without-
saying* idea that all lives matter. Blue Lives have always mattered in the way that the
dominant culture values lives. But Black Americans are objectively not a part of that *goes-
without-saying* ideal and the examples are legion.

So why is Blue Lives Matter a counter movement? And why does that make Black Lives
Matter controversial? There is no comparison between Black Lives Matter and Blue Lives
Matter, it is a false equivalence. Black people are members of a race that has experienced
racism and discrimination for 400 years on the North American continent while police have
not. Being a police officer is a career choice being Black is not. If a police officer is
persecuted for being a police officer that person, after availing themselves of all available
remedies, can choose to do something else. A Black person cannot choose to not be black in
the face of persecution.

I am very concerned about the statement that it would be hard for the District to "object" to
speech that is "similar" or "responsive" to Black Lives Matter. These are vague terms that do
not justify curtailing anyone's 1st Amendment rights. And I am trying to think of similar or
responsive speech that would agree with Board policy, but I can't think of anything that
would make Black lives not matter, it is a one sided issue, there is no other side, Black Lives
Matter or they don't.

If we are to curtail our 1st Amendment rights I think we deserve an enumerated list of objections, rather than a vague statement that Black Lives Matter is controversial.

Display of the phrase Black Lives Matter or Black Lives Matter symbols in classrooms do not violate any state policy or law. Black Lives Matter is supported by the Oregon School Board Association among many other Oregon education groups. We already teach about the civil rights movement of the 60' and 70's, both sides - the right side and the wrong side. Let's be on the right side of history during this civil rights movement.

Instead of quashing Black Lives Matter posters because some misunderstand the message and make it controversial, we should use it as a tool for education and dialog. We need to stand four square behind the civil rights of our students and they should see it. I think this District is capable of that. After 400 years of racism we can take the time that is given us to help rectify as much of that injustice as we can. Hiding from it as an institution is not the way.

Thank you for listening,
Michael

Stay Safe

---

**From:** Kirk Kolb
**Sent:** Tuesday, March 30, 2021 9:46 AM
**Subject:** Posters and other items that may be considered controversial political or civil issues

Good Morning D7 Family,

I am sending this message regarding a very difficult and emotive topic.  I have had a few people express a desire to put up "Black Lives Matter" posters in their classrooms and have had legal counsel review and consult with the Board.

First, please know that The District is committed to equity and making sure that all students belong. I hope that effort has been made clear with the passage of our "All Students Belong" policy and our School Board Resolution on Equity, Diversity, and Inclusion.

While it is a fact that black lives do matter and discrimination against black students, or students of any color, is absolutely prohibited,  the issue with the phrase "Black Lives Matter", is that it has become identified with a political/civil rights movement that has generated substantial controversy throughout Oregon and the country, including spawning counter-movements such as the "Blue Lives Matter" and "All Lives Matter". These movements and related posters and signs would also be considered controversial civil issues as related and should not be displayed in classrooms or on school property. The concern is that once "Black Lives Matter" posters are posted, then it becomes difficult for the District, under the First Amendment, to object to other posters which may be similar or responsive to "Black Lives Matter" or which cover controversial or disputed subjects of a civil or political nature without engaging in viewpoint discrimination. Board Policy GBG, as written, prohibits employees from expressing one-sided viewpoints on

controversial political or civil issues in the classroom.  Although the phrase should probably not be controversial, it nonetheless has created controversy, including in our community.   District Administration is currently reviewing Policy GBG with the Board and with legal counsel, and the Board has been forwarded information from GPEA regarding Black Lives Matter posters for consideration.  District Administration's role is to enforce policies while the ultimate interpretation and formation of District policy is up to the School Board.

Please be reassured that it continues to be our highest priority to ensure all student feel welcome and a part of our D7 family and we will not tolerate any form or racism or bias.

My sincerest appreciation,

Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*



# EXHIBIT K

From: **Kirk Kolb** KKOLB@grantspass.k12.or.us 
Subject: Updated Board Policy
Date: May 5, 2021 at 8:35 AM
To:

Good Morning D7 Family,

The attached Board policy was revised and adopted by the Board last Tuesday.  For clarification, this policy now allows for the OEA's Black Lives Matter poster to be present on the walls of your classrooms.

The significant change to the policy is the following statement: '*In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.*"  It is deemed by the District that this poster is consistent with our Board Policy ACB and the Board Resolution on Equity, Diversity, and Inclusion.

If you have further questions regarding what can and cannot be present in our schools, please inquire with your building administrator, our HR Director Dan Huber-Kantola, or myself.

Please carefully consider when choosing items to display in your classroom.  Our schools should not be a place of controversy nor a place of promoting one side of a political or civil issue.  Items displayed in your classroom should have an inherent educational purpose tied directly to the education we provide and consistent with district policies or resolutions.

Sincerely,
Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5500
www.wearegp.com

*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*





GBG.doc

# EXHIBIT L



# Grants Pass School District No. 7

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

July 19, 2021

Katie Medart
224 NW Canyon View Drive
Grants Pass, OR 97526

Re: Termination Notice

Dear Katie:

The purpose of this letter is to notify you that the District is terminating your employment effective July 15, 2021, per the School Board's vote on July 15, 2021 to uphold my recommendation for termination.

Respectfully,

Kirk Kolb
Superintendent

*Building Bridges to the Future*

# EXHIBIT M



## Grants Pass School District No. 7

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

July 19, 2021

Rachel Damiano
1069 Christie Place
Grants Pass, OR 97526

Re: Termination Notice

Dear Rachel:

The purpose of this letter is to notify you that the District is terminating your employment effective July 15, 2021, per the School Board's vote on July 15, 2021 to uphold my recommendation for termination.

Enclosed is your final check for July 1, 2021 – July 15, 2021.

Respectfully,

Kirk Kolb
Superintendent

*Building Bridges to the Future*

# EXHIBIT N

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

September 16, 2021

Ms. Rachel Damiano
c/o Ray D. Hacke, Esquire
Pacific Justice Institute
PO Box 5229
Salem, OR  97304

Re:  EEOC Charge Against Grants Pass School District 7
    No. 551202103239

Dear Ms. Damiano:

Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Seattle District Office, Seattle, WA.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Kristen Clarke
Assistant Attorney General
Civil Rights Division

by    /s/ Karen L. Ferguson
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Seattle District Office, EEOC
  Grants Pass School District 7

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

September 16, 2021

Ms. Katie Medart
c/o Ray D. Hacke, Esquire
Pacific Justice Institute
PO Box 5229
Salem, OR  97304

Re:  EEOC Charge Against Grants Pass School District 7
     No. 551202103241

Dear Ms. Medart:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC Seattle District Office, Seattle, WA.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                              Sincerely,

                              Kristen Clarke
                              Assistant Attorney General
                              Civil Rights Division

                         by      /s/ Karen L. Ferguson
                              Karen L. Ferguson
                              Supervisory Civil Rights Analyst
                              Employment Litigation Section

cc: Seattle District Office, EEOC
   Grants Pass School District 7

# EXHIBIT O

| Grants Pass School District 7 | Code: **GBB**<br>Adopted: 6/14/88<br>Readopted: 2/24/04<br>Orig. Code(s): GBB |
|---|---|

## Staff Involvement in Decision Making

The Board will encourage employees to contribute their ideas for the continuing betterment of the district. The staff will be asked to help in developing policies and regulations, in establishing goals and objectives and in planning curriculum, services, budget and facilities.

In devising rules and procedures for the operation of the schools, administrators will seek the suggestions of those employees who will be affected by such provisions. The professional staff will be given opportunities to contribute to curriculum development and to recommend policies and regulations pertaining to students and instruction.

The superintendent will develop channels for the communication of ideas among staff, administrators and Board members and will inform the Board of staff opinion when presenting recommendations for Board actions.

END OF POLICY

---

Legal Reference(s):

ORS 329.704

OAR 581-022-1720

Anderson v. Central Point School District No. 6, 554 F. Supp. 600 (D. Oregon 1982); aff'd in part, 746 F. 2d 505 (9th Cir. 1984).
Connick v. Myers, 461 U.S. 138 (1983).

1-1

**KAREN M. VICKERS,** OSB No. 913810
kvickers@vickersplass.com
Telephone: 503-726-5985
**BETH F. PLASS,** OSB No. 122031
bplass@vickersplass.com
Telephone: 503-726-5975
VICKERS PLASS LLC
5200 SW Meadows Road, Suite 150
Lake Oswego, OR 97035

      Of Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| RACHEL G. DAMIANO and KATIE S. MEDART, <br><br>                     Plaintiffs, <br><br>      v. <br><br> GRANTS PASS SCHOOL DISTRICT 7, an Oregon public body; THE MEMBERS OF THE BOARD OF EDUCATION OF GRANTS PASS SCHOOL DISTRICT 7 – Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie Wilkins, Brian Delagrange, and Casey Durbin – in their official and personal capacities; KIRK T. KOLB, Superintendent, Grants Pass School District 7, in his official and personal capacity; and THOMAS M. BLANCHARD, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity, <br><br>                     Defendants. | Case No. 1:21-cv-00859-CL <br><br><br> DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED VERIFIED COMPLAINT |

      For their answer to plaintiffs' Second Amended Complaint ("Complaint"), defendants

Grants Pass School District 7 ("District"), the members of the Board of Education of Grants Pass

School District 7 (Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie

Wilkins, Brian Delagrange, and Casey Durbin), Kirk T. Kolb, and Thomas M. Blanchard admit,

deny, and allege as follows:

1.

Admit paragraph 1.

2.

Admit paragraph 2.

3.

Admit paragraph 3.

4.

Admit paragraph 4.

5.

Admit paragraph 5.

6.

Admit Damiano is a resident of Oregon and an assistant principal for GP Flex, a school

governed by Grants Pass School District No. 7.

7.

Admit Medart is a resident of Oregon and a teacher for Grants Pass School District No. 7.

8.

Admit that defendant District is public school district and public body.

9.

Admit the allegations in paragraph 9.

10.

Admit that defendants Nelson, Kuhlman, Richardson, Delagrange, Brownell, and

PAGE 2 – DEFENDANTS' ANSWER TO SECOND AMENDED VERIFIED COMPLAINT

Wilkins, either are or were at all times relevant to this Complaint members of the Board of Directors (collectively, "Board Defendants").

11.

Admit the allegations in paragraph 11.

12.

Admit the allegations in paragraph 12.

13.

Admit defendant Kolb has supervisory authority within the District. Deny the remaining allegations in paragraph 13 because the allegations are vague.

14.

Admit the allegations in paragraph 14.

15.

Admit that defendant Kolb supervises defendant Blanchard.

16.

Deny paragraph 16.

17.

Admit paragraph 17.

18.

Admit that defendants Kolb and Blanchard have the authority set forth in District policy and state law.

19.

Neither admit or deny paragraph 19 as it does not contain an allegation of fact.

PAGE 3 – DEFENDANTS' ANSWER TO SECOND AMENDED VERIFIED COMPLAINT

20.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 20, and therefore deny the same.

21.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 21, and therefore deny the same.

22.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 22, and therefore deny the same.

23.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 23, and therefore deny the same.

24.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 24, and therefore deny the same.

25.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 25, and therefore deny the same.

26.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 26, and therefore deny the same.

27.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 27, and therefore deny the same.

28.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 28, and therefore deny the same.

29.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 29, and therefore deny the same.

30.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 30, and therefore deny the same.

31.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 31, and therefore deny the same.

32.

Admit that in January 2021, S.B. 52 was introduced in the Oregon Senate, the content of which speaks for itself.

33.

Admit that in February 2021, the U.S House of Representatives passed the Equality Act, H.R. 5, the content of which speaks for itself.

34.

Admit that a memorandum was circulated.

35.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 35, and therefore deny the same.

36.

Deny the allegations in paragraph 36.

37.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 37, and therefore deny the same.

38.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 38, and therefore deny the same.

39.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 39, and therefore deny the same.

40.

The content of the I Resolve website speaks for itself.  Deny the remaining allegations in paragraph 40.

41.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 41, and therefore deny the same.

42.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph

42, and therefore deny the same.

43.

Deny the allegations in paragraph 43.

44.

Deny the allegations in paragraph 44.

45.

Deny the allegations in paragraph 45.

46.

Deny the allegations in paragraph 46.

47.

The I Resolve website and videos speak for themselves.  Deny the remaining allegations

in paragraph 47.

48.

Deny the allegations in paragraph 48.

49.

Deny the allegations in paragraph 49.

50.

Admit defendants did not assign plaintiffs to work on I Resolve.

51.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph

PAGE 7 – DEFENDANTS' ANSWER TO SECOND AMENDED VERIFIED COMPLAINT

51, and therefore deny the same.

52.

Admit that defendant Kolb told plaintiffs District staff had raised concerns.

53.

Admit that defendant Kolb told plaintiffs there were concerns related to transgender

students.

54.

Deny the allegations in paragraph 54.

55.

Deny the allegations in paragraph 55.

56.

Deny the allegations in paragraph 56.

57.

Admit that defendant Kolb sent an e-mail to Medart, the content of which speaks for

itself.

58.

Admit that the District received complaints from District employees.

59.

The allegations in paragraph 59 assume untrue facts, therefore the allegations are denied.

60.

Deny the allegations in paragraph 60.

61.

Admit that Medart was placed on administrative leave. The content of the notice speaks for itself.

62.

Admit that Damiano was placed on administrative leave. The content of the notice speaks for itself.

63.

Deny the allegations in paragraph 63.

64.

Deny the allegations in paragraph 64.

65.

Admit the allegations in paragraph 65.

66.

Admit that defendant Kolb sent the email an email to District staff, the content of which speaks for itself. Deny the remaining allegations in paragraph 66.

67.

Admit that defendant Kolb sent the email an email to District staff, the content of which speaks for itself. Deny the remaining allegations in paragraph 67.

68.

Admit that defendant Kolb sent the email an email to District staff, the content of which speaks for itself. Deny the remaining allegations in paragraph 68.

69.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 69.

70.

Admit that defendant Kolb sent an email to District staff, students, and families, the content of which speaks for itself.  Deny the remaining allegations in paragraph 70.

71.

Admit that defendant Kolb sent an email to District staff, students, and families, the content of which speaks for itself.  Deny the remaining allegations in paragraph 71.

72.

Admit that defendant Kolb sent an email to District staff, students, and families, the content of which speaks for itself.  Deny the remaining allegations in paragraph 72.

73.

Paragraph 73 assumes untrue facts, defendants therefore deny paragraph 73.

74.

Admit that a meeting of the Board Defendants occurred on April 13, the record of which speaks for itself.

75.

Admit the allegations in paragraph 75.

76.

Deny the allegations in paragraph 76.

PAGE 10 – DEFENDANTS' ANSWER TO SECOND AMENDED VERIFIED COMPLAINT

77.

Deny the allegations in paragraph 77.

78.

Admit that plaintiffs were questioned by an outside investigator.

79.

Admit that the District adopted a policy titled "Staff Participation in Political Activities" the content of which speaks for itself.  Deny the remaining allegations in paragraph 79.

80.

Admit that the District adopted a policy titled "Staff Participation in Political Activities" the content of which speaks for itself.  Deny the remaining allegations in paragraph 80.

81.

Admit that the District adopted a policy titled "Staff Participation in Political Activities" the content of which speaks for itself.  Deny the remaining allegations in paragraph 81.

82.

Admit that the District adopted a policy titled "Staff Participation in Political Activities" the content of which speaks for itself.  Deny the remaining allegations in paragraph 82.

83.

Admit that the District adopted a policy titled "Staff Participation in Political Activities" the content of which speaks for itself.  Deny the remaining allegations in paragraph 83.

84.

Deny the allegations in paragraph 84.

85.

Deny the allegations in paragraph 85.

86.

Deny the allegations in paragraph 86.

87.

Deny the allegations in paragraph 87.

88.

Admit that the District adopted an policy on April 27, 2021, the content of which speaks for itself.  Deny the remaining allegations in paragraph 88.

89.

Admit that the District adopted an policy on April 27, 2021, the content of which speaks for itself.  Deny the remaining allegations in paragraph 89.

90.

 Admit that the District adopted an policy on April 27, 2021, the content of which speaks for itself.  Deny the remaining allegations in paragraph 90.

91.

Admit that the District adopted an policy on April 27, 2021, the content of which speaks for itself.  Deny the remaining allegations in paragraph 91.

92.

Deny the allegations in paragraph 92.

VICKERS PLASS LLC
5200 SW MEADOWS ROAD, SUITE 150
LAKE OSWEGO, OREGON 97035
(503) 726-5985 | (503) 726-5975

93.

Admit that District employees must follow Board policies.

94.

Deny the allegations in paragraph 94.

95.

Admit the District adopted a policy on Studying Controversial Issues, the content of which speaks for itself.

96.

Admit the District adopted a policy on Studying Controversial Issues, the content of which speaks for itself.

97.

Admit the District adopted a policy on Studying Controversial Issues, the content of which speaks for itself.

98.

Admit the District adopted a policy on Studying Controversial Issues, the content of which speaks for itself.

99.

Admit that the District has an amended speech policy, the content of which speaks for itself.

100.

Deny the allegations in paragraph 100.

VICKERS PLASS LLC
5200 SW MEADOWS ROAD, SUITE 150
LAKE OSWEGO, OREGON 97035
(503) 726-5985|(503) 726-5975

101.

The allegations in paragraph 101 are vague and lacking content, and are therefore denied.

102.

Deny the allegations in paragraph 102.

103.

Deny the allegations in paragraph 103.

104.

Admit that defendant Kolb and employees sent emails, the contents of which speaks for themselves.  Deny the remaining allegations in paragraph 104.

105.

The allegation in paragraph 105 lacks foundation and therefore deny the same.

106.

Admit that staff members sent emails, the contents of which speak for themselves.

107.

Admit that staff members sent emails, the contents of which speak for themselves.

108.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 108, and therefore deny the same.

109.

Deny the allegations in paragraph 109.

110.

Deny the allegations in paragraph 110.

PAGE 14 – DEFENDANTS' ANSWER TO SECOND AMENDED VERIFIED COMPLAINT

111.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 111, and therefore deny the same.

112.

Admit that defendant Kolb sent an emails on March 30, 2021 and May, 2021, the contents of which speak for themselves.

113.

Deny the allegations in paragraph 113.

114.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 114, and therefore deny the same.

115.

Deny the allegations in paragraph 115.

116.

Deny the allegations in paragraph 116.

117.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 117, and therefore deny the same.

118.

Lack sufficient knowledge and information to admit or deny the allegations in paragraph 118, and therefore deny the same.

119.

Admit plaintiffs' probationary contracts were renewed.

120.

Admit that defendants hired Bill Landis, a former Grants Pass police chief, to investigate plaintiffs' conduct.

121.

Deny the allegations in paragraph 121.

122.

Admit that the District's Board voted 4-3 to terminate plaintiffs' employment on July 15, 2021 at a hearing before the Board.

123.

Except as specifically admitted herein above, defendants deny the remainder of plaintiffs' complaint and the whole thereof.

**FIRST DEFENSE**

**(Failure to State a Claim)**

124.

Plaintiffs fail to allege facts sufficient to constitute claims against Defendants.

/ / / /

PAGE 16 – DEFENDANTS' ANSWER TO SECOND AMENDED VERIFIED COMPLAINT

**SECOND DEFENSE**

**(Failure to Mitigate)**

125.

Plaintiffs have failed to mitigate damages, if any.

**THIRD DEFENSE**

**(Legitimate, Non-Discriminatory, Non-Retaliatory Reasons)**

126.

Any actions taken regarding plaintiffs' employment were for legitimate, non-discriminatory, non-retaliatory reasons.

**FOURTH DEFENSE**

**(Good Faith Efforts; Not Willful)**

127.

Any alleged damages are barred because defendants made good faith efforts to comply with applicable law.  Any alleged violations were not willful.

**FIFTH DEFENSE**

**(After Acquired Evidence)**

128.

Plaintiffs' requests for relief are limited by the after-acquired evidence doctrine.

VICKERS PLASS LLC
5200 SW MEADOWS ROAD, SUITE 150
LAKE OSWEGO, OREGON 97035
(503) 726-5985| (503) 726-5975

**SIXTH DEFENSE**

**(Undue Burden)**

129.

Plaintiffs' proposed accommodations would place an undue burden on the District.

**EIGHTH DEFENSE**

**(Qualified Immunity)**

130.

The individual defendants are entitled to qualified immunity.

**NINTH DEFENSE**

**(Defendants' Interests)**

131.

Defendants had legitimate reasons and interests for taking actions alleged in this case which outweigh plaintiffs' interests.

**TENTH DEFENSE**

**(Oregon Tort Claims Act)**

132.

Defendants are entitled to the defenses, immunities, and limitations set forth in the Oregon Tort Claims Act.

VICKERS PLASS LLC
5200 SW MEADOWS ROAD, SUITE 150
LAKE OSWEGO, OREGON 97035
(503) 726-5985 | (503) 726-5975

**ELEVENTH DEFENSE**

**(Moot)**

133.

Plaintiffs' have been reinstated so their request for reinstatement is moot.

WHEREFORE, defendants pray that:

Plaintiffs' claims be dismissed with prejudice, that plaintiff take nothing, and for such other relief as the court deems proper.

DATED: December 21, 2021.

VICKERS PLASS LLC

_____*s/ Karen M. Vickers*_____
**KAREN M. VICKERS,** OSB No. 913810
kvickers@vickersplass.com
503-726-5985
**BETH F. PLASS,** OSB No. 122031
bplass@vickersplass.com
503-726-5975
            Of Attorneys for Defendants

VICKERS PLASS LLC
5200 SW MEADOWS ROAD, SUITE 150
LAKE OSWEGO, OREGON 97035
(503) 726-5985 | (503) 726-5975

Ray D. Hacke, OSB No. 173647
PACIFIC JUSTICE INSTITUTE
1850 45th Ave. NE, Suite 33
Salem, OR 97305
Phone: (503) 917-4409
E-mail: rhacke@pji.org

Attorneys for Plaintiffs
RACHEL G. DAMIANO and
KATIE S. MEDART

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| RACHEL G. DAMIANO, and KATIE S. MEDART, <br><br> *Plaintiffs,* <br><br> v. <br><br> GRANTS PASS SCHOOL DISTRICT 7, an Oregon public body, *et al.*, <br><br> *Defendants*. | Case No.: 1:21-CV-00859 <br><br> **MOTION TO DISMISS DEFENDANTS GARY RICHARDSON, CASEY DURBIN, CASSIE WILKINS, AND CLIFF KUHLMAN [Fed. R. Civ. P. 41(a)(2)]** |

Plaintiffs RACHEL G. DAMIANO and KATIE S. MEDART, having determined that Defendants GARY RICHARDSON, CASEY DURBIN, CASSIE WILKINS, AND CLIFF KUHLMAN are not necessary parties in this case, and pursuant to Fed. R. Civ. P. 41(a)(2), hereby voluntarily move to dismiss this case without prejudice solely as to the aforementioned Defendants.

Dated:  May 11, 2022                     PACIFIC JUSTICE INSTITUTE

_/s/ RAY D. HACKE_____
Ray D. Hacke, OSB No. 173647
Attorney for Plaintiffs
RACHEL G. DAMIANO *et al.*
1850 45th Ave. NE, Suite 33
Salem, OR 97305
E-mail: rhacke@pji.org

## PROOF OF SERVICE

I am employed in the County of Marion, State of Oregon.  I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave., Suite 33, Salem, OR 97305.

On or about May 11, 2022, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s), or by attaching it to the body of an electronic mail, addressed to said parties:

**MOTION TO DISMISS DEFENDANTS GARY RICHARDSON, CASEY DURBIN, CASSIE WILKINS, AND CLIFF KUHLMAN [Fed. R. Civ. P. 41(a)(2)]**

## PLEASE SEE ATTACHED SERVICE LIST

_____BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____BY PERSONAL SERVICE:  I caused such documents to be delivered by hand to the office of the addressee(s).

_X__BY ELECTRONIC MAIL:  I caused such documents to be delivered via electronic mail to the office of the addressee(s).

_____BY FACSIMILE TRANSMISSION:  The facsimile machine I used complied with California Rules of Court 2003(3) and no error was reported by the machine. Pursuant to rule 2005(i), I caused the machine to print a record of the transmission, a copy of which is attached to this proof of service.

_____(State) I declare under penalty of perjury under the laws of the State of Oregon that the above is true and correct.

_X__(Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on May 11, 2022, at Salem, Oregon.

_/s/ Lauren Pefferle_____
Lauren Pefferle

## **<u>SERVICE LIST</u>**

- Karen Vickers and Beth Plass
  Vickers Plass, LLC.
  5200 SW Meadows Road, Suite 150
  Lake Oswego, OR 97035
  Attorneys for Defendants
  E-mail: kvickers@vickersplass.com
  bplass@vickersplass.com

**KAREN M. VICKERS,** OSB No. 913810
kvickers@vickersplass.com
Telephone: 503-726-5985
**BETH F. PLASS,** OSB No. 122031
bplass@vickersplass.com
Telephone: 503-726-5975
VICKERS PLASS LLC
5200 SW Meadows Road, Suite 150
Lake Oswego, OR 97035

      Of Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| RACHEL G. DAMIANO and KATIE S. MEDART, <br><br>                      Plaintiffs, <br><br>           v. <br><br> GRANTS PASS SCHOOL DISTRICT 7, an Oregon public body; THE MEMBERS OF THE BOARD OF EDUCATION OF GRANTS PASS SCHOOL DISTRICT 7 – Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie Wilkins, Brian Delagrange, and Casey Durbin – in their official and personal capacities; KIRK T. KOLB, Superintendent, Grants Pass School District 7, in his official and personal capacity; and THOMAS M. BLANCHARD, Principal, North Middle School, Grants Pass School District y, in his official and personal capacity, <br><br>                    Defendants. | Case No. 1:21-cv-00859-CL <br><br><br> DECLARATION OF KAREN M. VICKERS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

I, KAREN M. VICKERS, declare:

      1.      I am one of the attorneys of defendants Grants Pass School District No. 7, Kirk

Kolb, Thomas M. Blanchard, Scott Nelson, Debbie Brownell, and Brian De La Grange.  I make

this declaration based on personal knowledge and am competent to testify as to the matters stated

PAGE 1 – DECLARATION OF KAREN M. VICKERS RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

herein.

2.        Attached hereto as Exhibit 1 is an excerpt and exhibits from the deposition of

plaintiff Rachel Sager provided to me by certified court reporters Veritext.

3.        Attached hereto as Exhibit 2 is an excerpt and exhibits from the deposition of

plaintiff Katie Medart provided to me by certified court reporters Veritext.

4.        Attached hereto as Exhibit 3 is a copy of an excerpt of an interview of Rachel

Damiano.  This document was produced to me by plaintiffs in response to defendants' request

for production.

5.        Attached hereto as Exhibit 4 is a copy of an excerpt of an interview of Katie

Medart.  This document was produced by plaintiffs in response to defendants' request for

production.

6.        Attached hereto as Exhibit 5 is an excerpt and exhibits from the deposition of

Kirk Kolb provided by certified court reporters Naegeli.

7.        Attached hereto as Exhibit 6 is an excerpt and exhibits from the deposition of

Sherryl Ely provided to me by certified court reporters Naegeli.

8.        Attached hereto as Exhibit 7 is an excerpt and exhibits from the deposition of

Tanika Cooks provided to me by certified court reporters Naegeli.

9.        Attached hereto as Exhibit 8 is a redacted copy of an Investigation Report.  This

document was produced by defendants in response to plaintiffs' request for production.

8.        Attached hereto as Exhibit 8 is a redacted copy of an Investigation Report.  This

document was produced by defendants in response to plaintiffs' request for production.

/ / / /

PAGE 2 – DECLARATION OF KAREN M. VICKERS RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

VICKERS PLASS LLC
5200 SW MEADOWS ROAD, SUITE 150
LAKE OSWEGO, OREGON 97035
(503) 726-5985| (503) 726-5975

I hereby declare that the above statement is true to the best of my knowledge and belief,

and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

DATED: August 1, 2022.

VICKERS PLASS LLC

_____s/ Karen M. Vickers_____
**KAREN M. VICKERS,** OSB No. 913810
kvickers@vickersplass.com
503-726-5985
**BETH F. PLASS,** OSB No. 122031
bplass@vickersplass.com
503-726-5975
            Of Attorneys for Defendants

PAGE 3 – DECLARATION OF KAREN M. VICKERS RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Rachel Sager - June 6, 2022

```
 1                   UNITED DISTRICT COURT
 2              FOR THE DISTRICT OF OREGON
 3                   MEDFORD DIVISION
 4
    RACHEL G. DAMIANO and          )
 5  KATIE S. MEDART,
                                   )
 6
                 Plaintiffs,       ) Case No.
 7
        vs.                        ) 1:21-CV-00859-CL
 8
    GRANTS PASS SCHOOL DISTRICT 7, )
 9  an Oregon public body; THE
    MEMBERS OF THE BOARD OF        )
10  EDUCATION OF GRANTS PASS
    SCHOOL DISTRICT 7 – Scott      )
11  Nelson, Cliff Kuhlman, Gary
    Richardson, Debbie Brownell,   )
12  Cassie Wilkins, Brian
    Delagrange, and Casey Durbin – )
13  in their official and personal
    capacities; KIRK T. KOLB,      )
14  Superintendent, Grants Pass
    School District 7, in his      )
15  official and personal
    capacity; and THOMAS M.        )
16  BLANCHARD, Principal, North
    Middle School, Grants Pass     )
17  School District 7, in his
    official and personal          )
18  capacity,
                                   )
19
                 Defendants.       )
20
21
22          DEPOSITION OF RACHEL G. SAGER
23                  June 6, 2022
24                    Monday
25                  8:57 a.m.
```

Page 1

**Vickers Declaration
Exhibit 1 Page 1 of 88**

Rachel Sager - June 6, 2022

```
 1          A.     My name is Rachel Gianina Sager.
 2          Q.     Ms. Sager, my name is Karen Vickers.
 3    We've been previously introduced.  I'm an attorney
 4    representing the defendants in a lawsuit that you
 5    have filed.  At the time you filed the lawsuit,
 6    you were using the last name Damiano; is that
 7    correct?
 8          A.     Yes, it is.
 9          Q.     So I may mess up today and refer to
10    you as Ms. Damiano, but I'll try and call you
11    Ms. Sager.
12                 How is that spelled?
13          A.     S-a-g-e-r.
14          Q.     Okay.  And did you recently marry?
15          A.     I did.
16          Q.     When were you married?
17          A.     March 19th.
18          Q.     Have you ever had your deposition
19    taken before?
20          A.     No.
21          Q.     A couple basic ground rules for the
22    deposition.  First of all, it's important that you
23    answer my questions out loud because we have a
24    court reporter here who takes down everything that
25    is said on the record.
```

Page 7

Rachel Sager - June 6, 2022

```
 1          A.     It was.  Uh-huh.

 2          Q.     And so who interviewed you for the

 3   position?

 4          A.     Trish Evans was in that meeting, and a

 5   South Middle School teacher, Tommy Blanchard,

 6   Barrett Sail.  I don't recall -- I believe there

 7   was a sixth person, but I don't -- yeah, I believe

 8   there was another person, but I don't remember who

 9   that was.

10          Q.     And what is the position for which you

11   were hired?

12          A.     Assistant principal.

13          Q.     For North Middle School?

14          A.     No.  For the -- a middle school

15   assistant principal for the district.  And then I

16   was assigned to North Middle School.

17          Q.     Okay.  Thank you for clarifying.

18          A.     Uh-huh.

19          Q.     And I understand you've now resigned

20   from the district.  Is that correct?

21          A.     I've chosen not to renew my contract.

22   But, yes, in essence.

23          Q.     And what are you going to do next

24   year?

25          A.     I'll be the principal of a charter
```

Page 16

**Vickers Declaration
Exhibit 1 Page 3 of 88**

Rachel Sager - June 6, 2022

1    currently do not -- we watch Edgewater, actually,

2    online, but they don't belong to a church up in

3    Vancouver.

4            Q.    Did you always go to a Christian

5    church in your childhood?

6            A.    I did.

7            Q.    And who is the pastor for the church

8    that you're attending?

9            A.    Mat Heverly is the leading teaching

10   pastor.

11           Q.    And does it belong to any other larger

12   Christian organization?

13           A.    No.  They're an independent.  They

14   have, like, other churches that they partner with,

15   but they are not part of an organization of

16   churches, to my knowledge at least.

17           Q.    Okay.  So going back to your position

18   with Grants Pass School District for the '20 - '21

19   school year, you were hired as a middle school

20   assistant principal; correct?

21           A.    I was.

22           Q.    And who was your supervisor?

23           A.    Tommy Blanchard.

24           Q.    How did you get along with

25   Mr. Blanchard?

                                        Page  29

Rachel Sager - June 6, 2022

```
 1    because there were some home life issues and some
 2    concerning things that the student was going
 3    through.  And I'm not a counselor, so I wasn't
 4    equipped to walk through that with them.
 5                    (Deposition Exhibit No. 1
 6                    marked for identification.)
 7                    MS. VICKERS:  One copy is for your
 8    lawyer.
 9                    THE WITNESS:  Oh, I'm sorry.  There
10    you go.  I'll get the hang of this as you put more
11    exhibits in.
12    BY MS. VICKERS:
13        Q.    I've handed you what's been marked as
14    Exhibit 1, Ms. Sager.  Will you take a minute and
15    look at this document?
16        A.    Yes, I've seen this before, if it's
17    the same copy that we were given.
18        Q.    These are documents that were produced
19    to me by your counsel --
20        A.    Yes.
21        Q.    -- because they say plaintiff and then
22    they have a number at the bottom.
23        A.    Okay.  Yes.
24        Q.    When did you first see this document?
25        A.    February 9, 2021.
```

Page 48

Rachel Sager - June 6, 2022

1          Q.      And what is this document?

2          A.      This is our administrative memo on --

3     well, I can read it to you (reading):      "Gender

4     identity, transgender, name and pronouns

5     guidance."

6          Q.      And in what context did you initially

7     see this document?

8          A.      I was in an all-admin meeting.  So

9     that's all administrators in the district gather

10    together to discuss various things in the

11    district, and this is it.  It was on Zoom.  That

12    meeting was on Zoom, and we were given this

13    document.

14         Q.      And who presented this document?

15         A.      Danny Huber-Kantola.

16         Q.      Do you know who drafted it?

17         A.      I would assume Danny Huber-Kantola

18    because he's our HR director, and he typically is

19    the one that drafts these.

20         Q.      Were you aware that this document was

21    being drafted before you saw it on February 9,

22    2021?

23         A.      No, not a specific document.  Like I

24    said, I knew discussions were happening.  They've

25    been happening for however many years this has

                                        Page 49

Rachel Sager - June 6, 2022

```
 1   been a conversation in terms of the public.

 2              We tend to have -- as you probably

 3   know, education doesn't always have policies

 4   around certain things.  And then things become big

 5   deals in the public eye that the public is

 6   concerned about, and then we respond.

 7        Q.     Did you have objections to this

 8   document?

 9        A.     I did.

10        Q.     And what were those objections?

11        A.     So specifically 6 about -- I believe

12   it was 6 -- using the bathrooms.  Maybe it

13   wasn't 6.

14        Q.     Take a minute and look at it because I

15   do need to know what your objections were.

16        A.     Okay.  Yeah.  Yes, 6.

17        Q.     So you had an objection to

18   paragraph 6?

19        A.     I did.

20        Q.     What were your objections?

21        A.     It was specifically around (reading):

22   "The district will not prohibit students from

23   accessing restrooms, locker rooms, or other

24   facilities which may be separated by gender --

25              (Reporter inquires.)
```

Page 50

**Vickers Declaration
Exhibit 1 Page 7 of 88**

Rachel Sager - June 6, 2022

```
 1   concerns I had as an administrator and then

 2   knowing the beliefs of our staff members.

 3         Q.     What were Katie's concerns?

 4         A.     So Katie is concerned about being

 5   required to use pronouns.  Bathrooms, the safety

 6   of bathroom, because she had grown up in sports

 7   and grown up in locker rooms, and so some of those

 8   concerns.  And then names, being required to use

 9   preferred names.

10         Q.     Okay.  And then tell me --

11         A.     And parents.  She also had a huge

12   concern about parents.  She's a mom herself, and

13   so concerned about whether parents were in the

14   know or not.  And I knew that was a big concern of

15   hers because she had been on an email chain, a

16   couple of email chains that a counselor had simply

17   said, A student came and talked to me.  We're

18   going to call the student by these pronouns and

19   this name and, you know, we're just going to do it

20   because they asked us.  But parents don't know, so

21   don't tell the parents.

22         Q.     That was at North?

23         A.     Yes.

24         Q.     Who was the counselor?

25         A.     Diana Tonnesen.  And that was
```

Page 65

**Vickers Declaration
Exhibit 1 Page 8 of 88**

Rachel Sager - June 6, 2022

1    discusses, but -- and the pattern for the

2    resolution came from the way that school districts

3    write their resolution, so I was trying to be

4    helpful, and, you know, give a solution that was a

5    well-formed solution.  It's what we talk about as

6    administrators a lot amongst ourselves, having

7    well-formed solutions or solutions that are

8    flushed out are more helpful than just, Hey, have

9    you thought about -- so the actual resolution is

10   what I handed him.

11        Q.    What is I Resolve?

12        A.    So I Resolve was the -- is a platform

13   that we created to get this first resolution out.

14   The idea was that, you know, if we came up with

15   other solutions, that we could also put them on

16   I Resolve.  But it's a platform or a short-term or

17   a slang, whatever you want to call it, in regards

18   to how we got out the information about SB52 or

19   about the Equality Act.  It's another one we

20   discussed.

21              But it was a means of bringing this

22   topic to the public, because it's already a matter

23   of public concern, so it was a way to bring more

24   information to the public.

25        Q.    Who created the platform?

Page 79

**Vickers Declaration**
**Exhibit 1 Page 9 of 88**

Rachel Sager - June 6, 2022

```
 1        A.    Which aspect?
 2        Q.    The I Resolve platform.
 3        A.    Yes.   So I did a lot of it.
 4  Katie Medart helped with it as well.
 5        Q.    When did you start working on it?
 6        A.    So the resolution started first, and
 7  that wasn't -- it wasn't I Resolve.   It wasn't
 8  formed as I Resolve yet.   And then I want to say
 9  middle of March is when the idea for I Resolve
10  came.   Yeah, there was a weekend -- originally I
11  had thought I Vow, but I Vow sounded like marriage
12  vows.
13        Q.    Middle of March?
14        A.    I believe so.   Uh-huh.
15        Q.    When did you first discuss it with
16  Katie Medart?
17        A.    So we talked about the resolution
18  first because it was the solution for other policy
19  in the district, because there is no policy for
20  the district either.   And so it was probably
21  middle of March, beginning to the middle of March.
22        Q.    What did the resolution say?
23        A.    Say that again.
24        Q.    What did the resolution say?
25        A.    There was a lot.   The whole first page
```

Page 80

**Vickers Declaration
Exhibit 1 Page 10 of 88**

Rachel Sager - June 6, 2022

```
1    was "whereas," because that's how resolutions are

2    made, with "whereas," and it gives all the

3    background.  And then the "it is resolved that,"

4    or, "I Resolve that" was the four resolutions we

5    have posted on our website.  You can see it on our

6    website.

7          Q.    And did you also create a video, like

8    a film?

9          A.    Yes.  The video was created during

10   spring break.

11         Q.    And did the video mention a particular

12   situation with a transgender student?

13         A.    Katie talked about a situation, yes.

14         Q.    Do you know if that was a real

15   situation?

16         A.    At the time, I didn't even know she

17   was going to give the story; it was on the fly.

18   So, no, I wouldn't have even been able to tell

19   you, and I still can't even tell you which student

20   it would apply to, if it applied to a student.

21         Q.    If it was actually a real student, do

22   you think that was a problem?

23         A.    Well, there were no confidential

24   details given, right.  There was no student name,

25   there was no address, there was no parent's name,
```

Rachel Sager - June 6, 2022

1    there was no which period the student was in.

2    There was no identifying information that anyone

3    could have, without specific confidential

4    knowledge, know who that student was.   So, no, I

5    don't think that's an issue.

6         Q.    How many transgender students are

7    there at North Middle School?

8         A.    I don't know.  You would have to ask

9    Tommy.

10        Q.    Are there more than ten?

11        A.    I truly don't know.  At one point the

12   estimation was 12 or 13, but I'm not sure.

13        Q.    So someone could probably figure it

14   out fairly easily; correct?

15        A.    If they dug and knew -- again, you

16   would have to know confidential information, or

17   you would have to have access to certain systems

18   in order to gather that information.  The general

19   public could not figure that out.

20        Q.    You previously expressed a lot of

21   concern for parents and, you know, parents being

22   able to have control over their children's

23   education.  If you were a parent and a trusted

24   educator talked about your child's transgender

25   situation in a video that was publicly available

                                        Page 82

Rachel Sager - June 6, 2022

```
 1                        (Recess:  10:26 a.m. to 10:37 a.m.)
 2                        THE VIDEOGRAPHER:  We are back on
 3    the record at 10:37.
 4                        (Deposition Exhibit No. 2
 5                        marked for identification.)
 6    BY MS. VICKERS:
 7            Q.     I'm going to hand you what's been
 8    marked as Exhibit 2.  Take a minute, Ms. Sager,
 9    and take a look at Exhibit 2, which is a packet of
10    emails that your lawyer provided to me.
11            A.     Yes.
12            Q.     Thank you.
13            A.     You're welcome.
14            Q.     And I've done the thing that I hate
15    when other lawyers do where they're not in Bates
16    stamp order --
17            A.     Okay.
18            Q.     -- so I'm going to refer to the
19    numbers as we go through it.
20            A.     Okay.
21            Q.     So the first document is marked
22    5415 --
23            A.     Yes.
24            Q.     -- 5416.
25            A.     Yes.
```

Page 84

Rachel Sager - June 6, 2022

1          Q.      What is this?

2          A.      This is from the I Resolve Gmail

3   account, so my name is on there.   But it's from

4   the I Resolve Gmail account.   And it is an

5   inviting to edit to Katie's school email.

6          Q.      Okay.   The next document is 5617,

7   5618.   What is this document?

8          A.      It looks like an email from Katie to

9   me on our school emails about a feedback in

10  timetable doable for responding to ODE.

11             So ODE has board meetings in the

12  middle of a school day.   And so it was response

13  about -- yeah, if we could bring it to the ODE

14  during one of their meetings.

15         Q.      And what you wanted to bring was your

16  resolution?

17         A.      Resolution, uh-huh.

18         Q.      And the first one we looked at that's

19  on the Gmail, that's the resolution; correct?

20         A.      Yes.   It's one of the copies of the

21  resolution.

22         Q.      Who drafted the resolution?

23         A.      I did.

24         Q.      Did you work with legal counsel?

25         A.      No.

Page 85

Vickers Declaration
Exhibit 1 Page 14 of 88

Rachel Sager - June 6, 2022

1      Q.      Have you ever gone to law school?

2      A.      No.

3      Q.      Is anybody in your family a lawyer?

4      A.      No.  Yes, my grandpa was, but ...

5      Q.      I'm assuming he did not help with it?

6      A.      No, he didn't.

7      Q.      So then we have 5227, 5228.  What is

8   that?

9      A.      It is feedback from a staff member to

10   another staff member about the feedback we were

11   trying to give to the school district.  So about

12   the resolution.

13      Q.      So Christopher Jelderks is the staff

14   member?

15      A.      Yes.  And Katie is the one who sent

16   it.

17      Q.      And then the next document is 5231

18   through 5233.  What does that appear to be?

19      A.      Yeah, it looks like an email chain

20   between Katie and Christopher, Chris, about

21   feedback on the resolutions, and then it was sent

22   to me as an FYI, as the last one.

23      Q.      Okay.  And these are Chris Jelderks's

24   comments back to Katie on your school emails;

25   correct?

Page 86

Rachel Sager - June 6, 2022

1      A.    Yes.    Yeah.    And this was all in

2    response to -- in preparing to bring the

3    resolution back to the district.    Again, I know

4    that this is isn't defending time, but this is

5    also, like, part of GBB, that policy asking staff

6    for feedback.

7          Q.    What is Chris Jelderks's position in

8    the district?

9          A.    Science teacher.

10         Q.    Do you have a relationship with

11   Chris Jelderks outside of school?

12         A.    No.

13         Q.    Did you send the resolution to

14   everyone in your building?

15         A.    No.

16         Q.    Why is it being sent to

17   Chris Jelderks?

18         A.    I didn't send it to Chris.    I believe

19   that Katie and Chris have talked about this issue

20   before as being something that they'd both

21   like resolved.    Not to use the word "resolve,"

22   but -- and so I can't tell you why she sent it to

23   him initially, but --

24         Q.    Thank you.

25         A.    -- I know it was for feedback, that

                                        Page 87

**Vickers Declaration
Exhibit 1 Page 16 of 88**

Rachel Sager - June 6, 2022

1    part.

2         Q.    Then next document is 5234 through

3    5236.  And what is that document?

4         A.    Yeah, so that's when I was brought in.

5    I addressed some of the concerns that Chris had

6    had about the resolution and made adjustments.

7         Q.    Okay.  The next document is 3765

8    through 3767.  What is that?

9         A.    So these are comments from a professor

10   at SOU as feedback on the policy.

11        Q.    And they're being sent to

12   Katie Medart?

13        A.    Yes.  And they're being -- yes, that's

14   what it looks like.

15        Q.    The next document is 3769 through

16   3700.  What is that?

17        A.    These are the -- so in Google Docs

18   when a comment is made, when the owner of the

19   document does what's called resolves the comment

20   it means that they either took care of it or they

21   accepted the edit.  And so these are from the

22   I Resolve email.

23              So up at the top if you see comments

24   noreply@docs.google, the owner of the document is

25   I Resolve, which you can also see under where it

Page 88

**Vickers Declaration
Exhibit 1 Page 17 of 88**

Rachel Sager - June 6, 2022

1    says, like -- so on 3768 where it says,

2    Rachel Damiano, but next to it is I Resolve, that

3    means it's from the I Resolve.

4        Q.    Okay.    The next one is 5417 through

5    5418.    What is that?

6        A.    It looks like more comments accepting

7    suggestions from Katie.

8        Q.    The next one is 4657.    And what is

9    that?

10       A.    This is a comment from the I Resolve

11   Google Gmail to Katie just talking about the

12   website.

13       Q.    The next one is 5593.    What is this?

14       A.    It is the resolutions that were signed

15   at the time that was being shared, that

16   spreadsheet being shared with Katie.    At the time,

17   that was the email that I had for Katie.    I didn't

18   have her personal email.

19       Q.    The next one is 3788 through 3789.

20   What's that?

21       A.    Comments from Dorothy about the

22   resolution.    Dorothy has a very different

23   perspective on this situation than Katie and I

24   come from, so we wanted to make sure that we were

25   actually tolerant and fair in the way we

Page 89

**Vickers Declaration**
**Exhibit 1 Page 18 of 88**

Rachel Sager - June 6, 2022

1    approached it, so we asked Dorothy for feedback.

2         Q.   Did you know Dorothy?

3         A.   We didn't.  I didn't know Dorothy.  I

4    apologize.  I misspoke.  Katie asked Dorothy for

5    feedback, and then I was brought in.

6         Q.   Okay.

7         A.   I wasn't opposed to asking Dorothy

8    though.

9         Q.   The next document is 4807.

10        A.   Uh-huh.  So the resolution as written

11   is very wordy and very legalese sounding, and so

12   we made a layman's terms, a quicker version of it

13   for people to be able to understand it better.

14        Q.   The next one is 4665.

15        A.   That's the website.  It looks like

16   it's from Katie's email to herself.

17        Q.   Okay.  The next one is 3647.

18        A.   It looks like Katie sharing the

19   website with Chris Jelderks.

20        Q.   The next one is 4343 through 4344.

21        A.   So this -- so we worked with

22   Edgewater.  Yes, it's the church I go to.  But we

23   worked with Edgewater -- so some background on it.

24   It's an email.  Let me answer your question first,

25   I apologize.  It's an email from Johnnie Collins to

Page 90

Vickers Declaration
Exhibit 1 Page 19 of 88

Rachel Sager - June 6, 2022

1    me about the initial video.  This was the email

2    they had on file for me, because at North Middle

3    School we had worked with -- I had worked with

4    Edgewater at Christmastime.  The entire district

5    did a Christmas drive-through, and Edgewater was

6    very gracious and let us use their radio station.

7    So this was what they had on file for me.  That's

8    where they sent it to.

9           Q.    Okay.  The next one is 5990.  What's

10   that?

11          A.    So this is an email from I Resolve on

12   spring break to the pastors -- two of the pastors

13   at Edgewater talking about the I Resolve movement,

14   and Katie is cc'd on it.

15          Q.    Okay.  The next one is 5177 through

16   5178.

17          A.    So this is an email from the I Resolve

18   email, and it's to ALEC, but Mr. Reynolds runs

19   ALEC about lobbying for them to look at our

20   resolution.  They're a group of people that do

21   legislation fair resolution.  And then Katie and I

22   are cc'd on it.

23          Q.    Okay.  The next one is 6061.  What's

24   that?

25          A.    It's an email from Katie to me that

                                              Page 91

Rachel Sager - June 6, 2022

1    just says that our email is blocked and that no

2    one can view it.

3         Q.    Why was your website blocked?

4         A.    Because it was a newly observed on

5    domain.

6         Q.    Okay.

7         A.    And so the filter blocked it.

8         Q.    The next one is 4351, to 4352.

9         A.    It's just an unblocking of the website

10   as a new domain.

11        Q.    And then the next one is 5959.

12        A.    It's an untitled document shared from

13   I Resolve to Katie.

14        Q.    Okay.  And then the next one is 5068.

15   What is that?

16        A.    Katie sent the website to a couple of

17   the teachers.

18        Q.    Teachers at North Middle School?

19        A.    Yes.  I apologize.  I can be more

20   specific.

21        Q.    Okay.

22        A.    Mitch Meunier and Jason Wright.

23        Q.    Okay.  And the next one is 5070.

24   What's that?

25        A.    It's a conversation back and forth

Page 92

Rachel Sager - June 6, 2022

1    between Jason and Katie about the resolution on

2    the website.

3        Q.    And you talked to other people at

4    North Middle School about the I Resolve platform

5    and resolution; is that correct?

6        A.    No, not about the resolution.  I

7    talked to Katie.  I didn't talk to -- I didn't go

8    and talk to teachers about it.  There was a

9    teacher who has a -- her daughter does a lot of

10   Cricket work, and I had asked her about

11   potentially using her daughter's Cricket for

12   making signature T-shirts, but ...

13       Q.    And you used district emails to do

14   some of the work; correct?

15       A.    Can you be more specific?

16       Q.    Well, we just looked at a bunch of

17   them.

18       A.    Yeah.  So to do some of the feedback

19   work.  A lot of it was from the I Resolve email,

20   but I specifically, yes, responded to some.

21       Q.    And did you use other district

22   facilities and equipment to do the work on

23   I Resolve?

24       A.    De minimusly, but, yes.

25       Q.    What did you use?

Page 93

Rachel Sager - June 6, 2022

1      A.     So can you be -- so the platform of

2  I Resolve or the resolutions?

3      Q.     Okay.  Let's start with the

4  resolution.

5      A.     So the resolutions, again, as

6  feedback.  So I printed them off to give to Tommy,

7  printed them off to give to Danny, so there was

8  some de minimus use of paper.  Took some feedback,

9  obviously, from teachers as you see in here on

10 them.

11          And then in terms of the platform, I

12 used my own computer for most of it.  I think I

13 de min -- like, got on, and the website being

14 blocked, and it's an issue with all of our new

15 domains so I unblocked that, and I'd have to look

16 back on Time System if I used my computer for

17 anything else, but other than that it wouldn't

18 have been.

19          A lot of it was on breaks, per se,

20 because we as admin don't have -- so, like,

21 teachers have specific times that they have

22 breaks, right, in between class and a lunch break.

23 Admin don't have that.  So we kind of step out and

24 take care of our personal stuff when we need to.

25      Q.     What were your work hours for the

Page 94

**Vickers Declaration
Exhibit 1 Page 23 of 88**

Rachel Sager - June 6, 2022

1    '20 - '21 school year?

2       A.   Great question.  In reviewing

3    Bill Landis's report, he asked me the same

4    question.  We don't have exact hours as

5    administrators.  It's a hard one to answer.  And

6    our expectations differ.  Sometimes we're

7    expected -- we're expected to be there when

8    teachers and students are there, but that also

9    varies depending on sometimes the administers have

10    to go off campus and such.  And so anywhere

11    between 7:30 and 3:30ish.

12       Q.   And you said any time there's a new

13    domestic it's blocked.  Do you mean that a domain

14    new to the school district is blocked?

15       A.   By the filter, yeah.  So the same

16    thing has happened with -- we've done work at

17    GPFLEX, and it put up a new -- either a new aspect

18    or Kristin's (phonetic) had to unblock things,

19    right, for the website.  We've had websites that

20    students couldn't get to because they're either

21    newer or there are various reasons why the filter

22    would block them.  And so I can go in and unblock

23    them or ask the filter to unblock them.

24       Q.   Who was the authority to unblock

25    something?

Page 95

Rachel Sager - June 6, 2022

1        A.    So I have authority in GoGuardian to

2    unblocks for students.    In terms of new website

3    filters, so like what you saw in there, it's a

4    form that you fill out.    You click on it and you

5    request for it to be unblocked.    Anyone can do

6    that is my understanding.

7        Q.    So you used your school computer to

8    unblock the I Resolve website?

9        A.    Yeah.    So when she sent it to me, I

10    clicked on it and filled in that form right there.

11        Q.    And why did you fill in the form

12    rather than Katie?

13        A.    I don't know.    That's a great

14    question.    I think she was just asking me to.    I

15    don't know why.    I can't answer that.

16        Q.    Can anyone fill in the form, like any

17    employee?

18        A.    I don't know the answer to that.    I

19    believe the answer is yes, but I've also found

20    things in the past that I thought everyone had

21    access to, and I was the only one that had access,

22    so -- not the only one, but one of the ...

23        Q.    And why did you use time during your

24    workday to work on I Resolve?

25        A.    So different aspects.    So the

Page 96

**Vickers Declaration**
**Exhibit 1 Page 25 of 88**

Rachel Sager - June 6, 2022

1    resolutions part was because I was preparing to

2    give feedback to Danny, right.    So any of the

3    comments, any of the times that Katie said, Hey,

4    you know, this part wasn't added, that was all in

5    preparation because I was meeting with Danny,

6    right, to give feedback.

7                And then in terms of the, like,

8    website being blocked, I couldn't tell you why I

9    didn't, right.    If I got the email, in the moment

10    I like to take care of things, so I took care of

11    it in the moment.

12                And, again, we as administers step

13    off and take breaks sometimes.    So, like, I had my

14    personal computer with me sometimes, and so I'd do

15    something on a personal computer on a break,

16    per se.    And we have public internet at our

17    schools that we can get on to.

18        Q.    And Danny didn't direct you to create

19    I Resolve; right?

20        A.    No, not to create it.

21        Q.    And he didn't request that you create

22    I Resolve?

23        A.    No.  But he was aware once we did make

24    it.  And then in terms of feedback, we give

25    feedback as administers, right.  So when we're

Page 97

**Vickers Declaration
Exhibit 1 Page 26 of 88**

Rachel Sager - June 6, 2022

1   given something, it's both a general practice for

2   us all to look at it and give feedback.  You can

3   look at any email chain between administers for

4   anything that we're given.  So that was part of in

5   bringing feedback to him.

6            And then after my conversation with

7   him, I had told him, I'll bring solutions, and he

8   said okay.  So he was aware.

9        Q.    Are you aware of other administrators

10  drafting resolutions?

11       A.    No.  But I don't know their daily

12  work, and people deal with directors all the time.

13  I know they give feedback.

14       Q.    Did you believe you were authorized to

15  work on I Resolve during work time?

16       A.    The resolutions or I Resolve?  Sorry.

17  The resolutions or the platform?

18       Q.    Start with the resolutions.

19       A.    Okay.  The resolution, again, it was

20  me giving feedback.  It never -- I don't think

21  that I was doing anything wrong by working on it

22  to give feedback, no.  Do I think that Danny told

23  me --

24       Q.    So you're telling me --

25       A.    Can I finish, please?

Page 98

Rachel Sager - June 6, 2022

1       Q.     Sure.

2       A.     Do I think that Danny specifically

3    told me, Okay.  Now go out and draft a whole

4    solution, and come back to me with a full

5    solution?  He didn't say go and do this.  But I

6    said, I'm going to bring you solutions, and he

7    said, Okay.  So I don't think I was doing anything

8    wrong in working on it.

9       Q.     And, in your mind, drafting a

10   resolution that disagrees with what the district

11   memo says was offering feedback?

12      A.     It doesn't fully disagree.  And part

13   of the feedback is to make sure we're compliant

14   with laws, right.  I don't want to be the

15   district, ironically, that gets sued for freedom

16   of speech violation when we mandate teachers call

17   kids by their preferred names and pronouns, right.

18   It's happened multiple times across the nation so

19   far.

20            We just saw -- in the Sixth Circuit

21   Court of Appeals we saw Meriwether win his case

22   against -- his college said, No, you don't get to

23   choose not to use pronouns.  You don't get to call

24   students by their last name.  You must use their

25   name, must use their pronouns.  And the Court of

Page 99

Vickers Declaration
Exhibit 1 Page 28 of 88

Rachel Sager - June 6, 2022

```
 1  belong to any particular groups or clubs or
 2  associations?
 3        A.    The United States Figure Skating
 4  Association, I'm an official for them.  AAE, which
 5  is the Association of American Educators.  It's
 6  who my, like, my liability insurance and stuff is
 7  through.  No others that I can think of.
 8        Q.    Okay.  Thank you.
 9        A.    Uh-huh.
10        Q.    So we were also talking about the
11  platform.
12        A.    Yes.
13        Q.    Were you authorized to work on the
14  platform during work time?
15        A.    No.  I mean, I wasn't given, like, Go
16  and work on this, no.
17        Q.    And what is the platform?
18        A.    The platform, so the website, the
19  video, the Instagram, we had Facebook at one
20  point.  We got rid of it after Kirk Kolb sent out
21  his email, which we'll probably get to at some
22  point in this deposition.
23        Q.    Did you work on the platform during
24  work time?
25        A.    De minimusly, yes.
```

Page 101

Rachel Sager - June 6, 2022

1          Q.      What did you do?

2          A.      That's a great question.    I'd have to

3    look back at when and what I did, but, I mean, as

4    you saw in here, there are a couple of resolves

5    comments.    No, that was part of the resolution.

6    So there was -- not during work time, but you'll

7    see -- like the video was on our district email,

8    that resource.    It was during spring break.

9          Q.      When did you post the video?

10         A.      March 25th of spring break.

11         Q.      And had you shown the video to anyone

12   at the district before you posted it, other than

13   Katie?

14         A.      No.

15         Q.      Why did you post the video on

16   March 25th?

17         A.      So that's when the comments were done

18   between us and Edgewater.    That's when it was

19   finalized.    And so we posted it to YouTube and

20   then put it on our website, which I had given the

21   website to Kirk at the time, and he was aware a

22   video was being made.

23         Q.      When did you make Kirk aware that a

24   video was being made?

25         A.      Friday before spring break.    It's when

Rachel Sager - June 6, 2022

```
 1          A.    Yes.  That is correct.
 2          Q.    How did you find out you were being
 3    put on paid administrative leave?
 4          A.    Tommy brought me in for a meeting.
 5          Q.    What do you remember about that
 6    meeting?
 7          A.    I remember -- what to say?  I remember
 8    that we had just greeted all of the students
 9    coming in, and there was no issue, and then
10    suddenly I was pulled into Tommy's office and he
11    said, You're being put on leave.  And I asked why,
12    and he said, They're investigating the complaints.
13    You are not to work -- you're not to be on campus.
14    You need to get your stuff and leave.  And I
15    didn't ask him any questions because I didn't want
16    to.
17             And so I went and grabbed my stuff,
18    took care of a couple of things that were pending
19    that I needed to and he had given me permission
20    to, and then I left.
21          Q.    Okay.
22             (Deposition Exhibit No. 5
23             marked for identification.)
24    BY MS. VICKERS:
25          Q.    Here is Exhibit 5.  Do you recognize
```

Page 114

Rachel Sager - June 6, 2022

1    Exhibit 5?

2         A.    Yes, I do.

3         Q.    And is that notice of your paid

4    administrative leave?

5         A.    Yes, it is.

6         Q.    And then there was an investigation;

7    correct?

8         A.    Yes.

9         Q.    Who did you -- who were you

10   interviewed by?

11        A.    I was interviewed by

12   Danny Huber-Kantola first with Tommy Blanchard,

13   and then the investigation was taken to a paid

14   third-party, Bill Landis, L-a-n-d-i-s.

15        Q.    When were you interviewed by Danny and

16   Tommy?

17        A.    I don't recall exactly.  I believe

18   Katie was interviewed the next day.  I think I was

19   interviewed that week.  I'll be really honest, all

20   of that blends together.  I wasn't working, and so

21   typically when I work, I can keep track of days a

22   little more.  But it was relatively soon

23   afterwards when I was interviewed by Danny and

24   Tommy.

25        Q.    Was anyone else present?

Page 115

Rachel Sager - June 6, 2022

```
1        A.    No.   We had some phone conversations

2   where she said we're getting a third-party

3   investigator and some emails.   I asked to access

4   my district email a couple of times and just other

5   correspondence.   My correspondence went through

6   Sherry via email.

7                    (Deposition Exhibit No. 6

8                    marked for identification.)

9   BY MS. VICKERS:

10       Q.    I've handed you what's been marked as

11  Exhibit 6, Ms. Sager.

12       A.    Yes.

13       Q.    Do you recognize Exhibit 6?

14       A.    I do.

15       Q.    What is Exhibit 6?

16       A.    It is -- well, if this one is from

17  Sherry.   Yeah.   So this is Sherry's final

18  pronouncements, I guess, of the investigation.

19  And what is copied and pasted is directly from

20  Bill Landis's report.

21       Q.    Okay.

22       A.    Hence the quotations from her.

23                    (Reporter inquires.)

24       A.    From her.   Because she starts her

25  quotation, copies and pastes his findings, and
```

Page 121

Rachel Sager - June 6, 2022

```
 1          A.     Well, when I came back it was 109.  So

 2     between 105 and 109.  We got a pay increase this

 3     year for some reason.

 4          Q.     Okay.  And then if we look at this

 5     last paragraph, it says, "A pretermination hearing

 6     has been scheduled with Superintendent Kolb for

 7     Monday, June 21st."

 8                 Did you attend a pretermination

 9     hearing with Superintendent Kolb?

10          A.     No, I did not.

11          Q.     Why did you not do that?

12          A.     Because I was given advice from the

13     union president, who was not my representation,

14     but she said that never in all of her years of

15     going to a pretermination has it ever changed the

16     outcome.

17                 And so in terms of he and I already

18     had conversation prior, I had been interviewed

19     twice at that point.  And so I felt that it was an

20     unnecessary formality to go and be handed my

21     termination paper, which came immediately after

22     saying that I wasn't going to come to the meeting.

23     So it was already determined before I walked into

24     that meeting.

25          Q.     Okay.  What do you mean?
```

Page 123

**Vickers Declaration**
**Exhibit 1 Page 34 of 88**

Rachel Sager - June 6, 2022

```
 1        A.    So I communicated to the district that

 2   I wouldn't be attending the meeting, and

 3   immediately afterwards, within minutes, I got my

 4   termination letter or recommendation from Kirk.

 5   So it was apparent that it was already drafted and

 6   already determined.

 7                    (Deposition Exhibit No. 7

 8                    marked for identification.)

 9   BY MS. VICKERS:

10        Q.    I've handed you what's been marked as

11   Exhibit 7.  Is that the letter advising that your

12   termination is going to be recommended to the

13   board?

14        A.    Yes.

15        Q.    And do you recall the date of the

16   school board hearing?

17        A.    July 15th, I believe.

18        Q.    Did you talk to anyone on the board

19   prior to the hearing about your hearing?

20        A.    Directly, no.

21        Q.    Indirectly?

22        A.    Not that I recall.  I had heard

23   feedback from others about what they were looking

24   at.  Or I knew I had been given indirect

25   communication from Gary Richardson about just
```

Page 124

Rachel Sager - June 6, 2022

```
 1          Q.    Thank you.
 2          A.    You're welcome.  I apologize.
 3          Q.    So Jim Brumbach asked you for
 4    information to give to Gary Richardson?
 5          A.    So it was more that there were
 6    conversations and wondering -- yes.  The short
 7    answer is yes.
 8          Q.    What information did Jim Brumbach ask
 9    you for?
10          A.    The timeline of what had happened;
11    that they had been told a story from legal
12    counsel, and was there other evidence that was
13    true; is there anything in Bill Landis's report
14    that isn't true, that kind of thing.
15          Q.    So Jim Brumbach is telling you that
16    the board was told a story by legal counsel?
17          A.    So Gary -- Jim is a former pastor, and
18    I believe Gary and Jim meet pretty regularly.  I
19    don't know -- I could never imagine that Gary told
20    him anything that was confidential or things that
21    he wasn't allowed to talk to him about, but it was
22    that the responses about what had actually
23    happened had come from legal counsel and hadn't
24    been given to them by Kirk, is my understanding.
25          Q.    You asked for the board hearing to be
```

Page 126

Rachel Sager - June 6, 2022

1    public; is that correct?

2            A.    We did, yes.

3            Q.    Why did you do that?

4            A.    Because in my interactions with the

5    district thus far, things had been spun and things

6    had been changed after the fact and things had

7    been not done as uprightly as I believe they

8    should have been.  We're also a public entity, and

9    things that happen in -- within our walls I

10   believe should be public, and so I wanted the

11   public to be able to see and be transparent in how

12   we interacted.

13           Q.    What had been spun after the fact and

14   not done the way you thought it should be?

15           A.    A lot.  And that's much -- that's a

16   large conversation -- or that's a long

17   conversation.  Even the fact that Kirk said, I can

18   think about bringing this to the board, and then

19   suddenly a couple of people turn in a complaint,

20   five people turn in complaints, and now it, Oh,

21   this is awful.  This is terrible.  I would never

22   bring this to legal counsel.  And that got spun

23   differently.

24                 The fact that Kirk sent out an email

25   to all staff members and to all families and said,

Page 127

Vickers Declaration
Exhibit 1 Page 37 of 88

Rachel Sager - June 6, 2022

 1    This is in direct opposition to school board -- or

 2    to the school district's values.

 3              The fact that things -- that they were

 4    contacted -- the district was contacted by outside

 5    entities that seemed to have a lot of sway over

 6    how they were making decisions.  And so all of

 7    that.

 8              And just the behind-closed-doors and

 9    things that get misrepresented, I think is not in

10    the public's best interest to have it happen

11    behind closed doors.  And so, again, that's why we

12    had it public.

13         Q.   And did you have legal counsel at the

14    board hearing?

15         A.   No, I did not.

16         Q.   You had the opportunity to bring

17    counsel, but you chose not to; correct?

18         A.   Yes.

19         Q.   You represented yourself?

20         A.   I did.

21         Q.   And the board voted four-three to

22    terminate; is that correct?

23         A.   Four-three to uphold the

24    recommendation, yes.

25         Q.   And then you were ultimately

                                      Page 128

Vickers Declaration
Exhibit 1 Page 38 of 88

Rachel Sager - June 6, 2022

1    reinstated; correct?

2         A.    They reversed the decision.   Yes.

3         Q.    And that happened in November of 2021?

4         A.    It did.

5         Q.    Did you talk to any board members

6    between July 15th of '21 and November of '21?

7         A.    After being fired?   Yes.

8         Q.    Yes.

9               Who did you speak with?

10        A.    Gary Richardson and Todd --

11        Q.    Neville?

12        A.    Neville.   Thank you.

13        Q.    When did you talk to Gary Richardson?

14        A.    It was -- I can't recall exactly.   It

15   was a few weeks after.

16        Q.    Who was present?

17        A.    My now husband and Gary and I.

18        Q.    What did you talk about?

19        A.    We talked about just appeal and if we

20   were allowed to appeal or not and what that --

21   what rights we had to appeal.

22        Q.    And where was that meeting?

23        A.    It was at Gary's work.

24        Q.    And how was the meeting set up?

25        A.    Gary texted me.

                                        Page 129

Vickers Declaration
Exhibit 1 Page 39 of 88

Rachel Sager - June 6, 2022

```
 1   State of Oregon      )
                          ) ss.
 2   County of Douglas    )

 3

 4            I, Denise C. Zito Smith, CSR, a

 5   Certified Shorthand Reporter for the State of

 6   Oregon, hereby certify that the witness was sworn

 7   and the transcript is a true record of the

 8   testimony given by the witness; that at said time

 9   and place I reported by stenotype all testimony

10   and other oral proceedings had in the foregoing

11   matter; that the foregoing transcript consisting

12   of 171 pages contains a full, true, and correct

13   transcript of said proceedings reported by me to

14   the best of my ability on said date.

15            If any of the parties or the witness

16   requested review of the transcript at the time of

17   the proceedings, such correction pages are

18   included.

19            IN WITNESS WHEREOF, I have set my hand

20   this 20th day of June 2022, in the City of

21   Canyonville, County of Douglas, State of Oregon.

22

23   <%9578,Signature%>

24   Denise C. Zito Smith

     Oregon CSR No. 01-0375

25   Expires 9/30/2024
```

Page 172

Vickers Declaration
Exhibit 1 Page 40 of 88

Administrative Memorandum

(Gender Identity, Transgender, Name and Pronoun Guidance)

Dated February 5, 2021

1. Grants Pass School District prohibits discrimination or harassment on any basis protected by law, including sexual orientation and gender identity.  See Policy AC, JB, JF/JFA, GBEA, etc.  Oregon department of education.

2. On May 5, 2016, the Oregon Department of Education issued Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students (hereinafter "Guidance").  The Department of Education has recently confirmed to the District that this Guidance remains effective and operative.  A complete copy of the Guidance is attached to this memorandum for reference.  This Memorandum is intended to summarize the District's interpretation of this guidance. To the extent that issues arise which are not addressed in this Memorandum or the attached Guidance, District employees are encouraged to contact the District Office for additional review and specific guidance.

3. As set forth in the Guidance, it is recommended that District employees accept a student' assertion of his/her/their own gender identity.  When parents are aware of the student's gender identity preferences, District employees should work closely with the student and the student's parents in devising an appropriate plan regarding the confidentiality of the student's transgender identity.  In some cases, transgender students may feel more supported and safe if other students are aware that they are transgender. In these cases, school district staff should work closely with the student, parents, and other staff members on a plan to inform and educate the student's peers. It may also be appropriate for school districts to engage with community resources to assist with educational efforts.

4. When the student's parents are not aware of the student's gender identity preferences, and especially in situations where the parent or guardian may be hostile to the student's preference, District employees should be careful to balance the safety and concern for the well-being of the student with the District's obligations to maintain accurate educational records, which are available to parent, under the Federal Education Rights and Privacy Act ("FERPA").  FERPA permits parents or guardians of minor students (under the age of 18) to review the student's educational records.  If a student wishes to change his or her gender, name, or pronoun, in a classroom or at the school, these preferences, to the extent that they are documented, could be considered educational records that the parent is entitled to inspect under FERPA.

5. So long as a student is a minor, the District should not change the official education records for the student without the knowledge and consent of at least one parent.  Parents have a constitutional right to direct the upbringing of their children, and any formal changes to educational records, such as to gender, names or pronouns should be approved beforehand.  Once a student reaches eighteen (18) years of age, however, the student has the right to change records related to his or her gender, name or pronoun, including educational records.  Even if the



No. 1
Date 6-6-22
R. Sager
CC Reporting

**Plaintiff 2527**

**Vickers Declaration**
**Exhibit 1 Page 41 of 88**

parents do not consent to a formal change of gender, name or pronoun, District employees should not prohibit other students or employees from using the student's preferred name or pronoun in informal or in-person or virtual classroom settings if requested by the student.

6.  In all situations where a student approaches District employees regarding to request a change in gender, pronouns or names, the District, through its counselors and/or school administrators, should work with the student and the student's parents or guardians to ensure that appropriate accommodations can be made for the student based on his or her particular situation.  Absent circumstances that pose a risk to the safety of students, the District will not prohibit students from accessing restrooms, locker rooms or other facilities which may be separated by gender, that are associated with the student's preferred gender identity.

**Plaintiff 2528**

**Vickers Declaration**
**Exhibit 1 Page 42 of 88**

From: **Rachel Damiano (via Google Docs)** iresolve.gp@gmail.com
Subject: Resolution 2021-01 - Invitation to edit
Date: March 10, 2021 at 9:44 AM
To: iresolve@grantspass.k12.or.us



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

 Resolution 2021-01

 I think I am getting mired in the overwhelming arguments against a lot of the policies but here is what I have started. Let me know your thoughts so far. This is a very preliminary draft.

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because iresolve.gp@gmail.com shared a document with you from Google Docs.



Plaintiff 5415

**Vickers Declaration
Exhibit 1 Page 43 of 88**

From: **Katie Medart** <kmedart@grantspass.k12.or.us>
Subject: Re: Resolution 2021-01 - Invitation to edit
Date: March 14, 2021 at 6:21 PM
To: Rachel Damiano <rdamiano.gp@gmail.com>



**From:** Rachel Damiano (via Google Docs) <iresolve.gp@gmail.com>
**Sent:** Wednesday, March 10, 2021 9:44:10 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Resolution 2021-01 - Invitation to edit

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:



Resolution 2021-01

I think I am getting mired in the overwhelming arguments against a lot of the policies but here is what I have started. Let me know your thoughts so far. This is a very preliminary draft.

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because iresolve.gp@gmail.com shared a document with you from Google Docs.

Google™

**Plaintiff 5416**

**Vickers Declaration
Exhibit 1 Page 44 of 88**

From: **Katie Medart** kmedart@grantspass.k12.or.us
Subject: RE: State Board of Education Meeting on March 18, 2021
Date: March 10, 2021 at 3:14 PM
To: Rachel Damiano rdamiano@grantspass.k12.or.us



Sorry, I had a huge project with Jen for science curriculum that took all day! I have to take my son to get fitted for an instrument. I will look at this the next few days and get back to you. I saw the deadline and accepted it. ☺

Thanks for all you are doing. It is exciting.

I will connect again soon,

Katie

**From:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Sent:** Wednesday, March 10, 2021 1:59 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** FW: State Board of Education Meeting on March 18, 2021

I think this timeline is doable, at least for the document. What do you think?

I shared this with you too but in case you didn't get it because it came from a different email address, here is a rough mid draft: https://docs.google.com/document/d/1XNgo-86MVuM3QMDdLvKik94RSDLTlqOZMDX1w67EvsM/edit?usp=sharing

**From:** Oregon Department of Education [mailto:ode@public.govdelivery.com]
**Sent:** Wednesday, March 10, 2021 10:24 AM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Subject:** State Board of Education Meeting on March 18, 2021

**Email caution from the Grants Pass School District Email Filter: This email originated**

**from outside GPSD7. Do NOT click links or open attachments unless you know the**

**content is safe, and you trust the sender.**

Having trouble viewing this email? View it as a Web page.



## State Board of Education Meeting

### Thursday, March 18, 2021
### 9:00 a.m.

Plaintiff 5617

**Vickers Declaration
Exhibit 1 Page 45 of 88**

<u>Video Conference Only</u>

The State Board of Education will hold a Regular Meeting on **Thursday, March 18, 2021 at 9:00 a.m.**

To comply with the Governor's executive orders, the State Board of Education will conduct the March 18, 2021 meeting by video conference only. Members of the public may watch the board meeting live.

**Agendas and materials** for regular board meetings will be posted at least 24 hours prior to the board meeting and can be accessed at Boardbook.

## Public Comment

**Please note:** The Board will only accept written public comment for the March 18, 2021 meeting. The Board is committed to the public comment process and will consider all public comments. Members of the public may submit written comments or testimony to the State Board email address:

StateBoard.PublicEmail@ode.state.or.us; or by mail addressed to the State Board of Education: 255 Capitol Street NE, Salem, OR 97310.

- Clearly label the subject line as: "Public comment" or "Testimony" and include the topic. Example: "Public Comment: Assessment."
- All written public comment will be posted to Boardbook.
- Public comments or testimony submitted the morning of the Board meeting or during the Board meeting will be posted to Boardbook within 48 business hours.

The Board sincerely appreciates your input, and thanks you for your participation.

Corey Rosenberg
State Board of Education Administrator

Stay Connected with the Oregon Department of Education

  

SUBSCRIBER SERVICES:
Manage Subscriptions | Help

*It is a policy of the State Board of Education and a priority of the Oregon Department of Education that there will be no discrimination or harassment on the grounds of race, color, sex, marital status, religion, national origin, age, sexual orientation, or disability in any educational programs, activities or employment. For more information, visit the Anti-Discrimination Policy page.*

This email was sent to rdamiano@grantspass.k12.or.us using GovDelivery Communications Cloud, on behalf of: Oregon Department of Education · 255 Capitol Street NE · Salem, OR 97310



Plaintiff 5618

**Vickers Declaration**
**Exhibit 1 Page 46 of 88**

From: **Katie Medart** kmedart@grantspass.k12.or.us 
Subject: **RE: Copy of Resolution 2021-01 - Invitation to edit**
Date: March 15, 2021 at 4:26 PM
To: Christopher Jelderks cjelderks@grantspass.k12.or.us

https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the ☐☐ does not speci☐cally rescind any speci☐c order or action, its ☐road mandate that agencies revie☐ e☐isting programs and policies likely ☐ill lead to updated guidance, en☐orcement priorities, and rules implementing Title I☐ and other la☐s prohi☐ting se☐ discrimination.

☐hat should schools do now?
The current administration ☐ill likely implement ma☐or changes related to discrimination on the ☐asis o☐ se☐ual orientation or transgender status. This may include re☐uiring schools to allo☐ students to use ☐athrooms and locker rooms that are consistent ☐ith their gender identity, and to play on athletic teams that are consistent ☐ith their gender identity. ☐dditionally, schools can e☐pect more ro☐ust ☐ederal agency investigation o☐ complaints o☐ discrimination ☐ased on gender identity and se☐ual orientation.☐

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

☐idn☐☐ ☐iden ☐ust sign a ☐ig e☐ecutive order allo☐ing trans students to use ☐hat restroom they ☐ant☐

☐ent ☐rom my iPhone

☐n Mar 1☐, 2021, at ☐:0☐ PM, ☐atie Medart ☐via ☐oogle ☐ocs☐☐ drive-shares-noreply@google.com☐ ☐rote:

**Email caution from the Grants Pass School District Email Filter: This**

**email originated from outside GPSD7. Do NOT click links or open**

**attachments unless you know the content is safe, and you trust the**

**sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



**Plaintiff 5227**

**Vickers Declaration**
**Exhibit 1 Page 47 of 88**



Copy of Resolution 2021-01

☐oogle Docs: Create and edit documents online.

☐oogle ☐☐C, 1600 ☐mphitheatre Parkway, Mountain ☐iew, C☐ 9404☐, ☐S☐

☐ou have received this email because kmedart@grantspass.k12.or.us shared a document
with you from ☐oogle Docs.

**Plaintiff 5228**

**Vickers Declaration
Exhibit 1 Page 48 of 88**

**From:** Katie Medart <kmedart@grantspass.k12.or.us> 
**Subject:** FW: Copy of Resolution 2021-01 - Invitation to edit
**Date:** March 16, 2021 at 9:09 AM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>

FYI

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Tuesday, March 16, 2021 9:05 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

·
·
·
- **A public school student seeking to be referred to by a pronoun that is counter to their apparent anatomical presentation,**
- **such as in relation to such youth presenting apparent gender dysphoria (previously 'gender identity disorder', aka, identifies as transgender), should be reasonably accommodated by public school's staff provided with parent permission, however, that any**
- **such policy shall not be mandated upon or required of the public school's** <u>**staff nor shall any such policy be enacted**</u>
- **that infringes upon the public school's staffs' civil and constitutional liberties, including their freedoms of speech and expression.**

·

So, I thought that this was about NOT calling a kid a different name without parent permission.....now it seems the language is pushing for teachers and staff to do what they feel is morally or religiously correct.....that may open up a whole basket of worms....what happens if the person is wacky????? what happens is the person does not want to call kids their regular names?

This resolution is a whole lot broader than just the initial thought...why is that?


Sent from my iPhone


On Mar 15, 2021, at 4:26 PM, Katie Medart <kmedart@grantspass.k12.or.us> wrote:


https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?

**Plaintiff 5231**

**Vickers Declaration**
**Exhibit 1 Page 49 of 88**

What should schools do now?

The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

---

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

On Mar 15, 2021, at 4:04 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email**

**Filter: This email originated from outside GPSD7. Do NOT**

**click links or open attachments unless you know the content**

**is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



Copy of Resolution 2021-01
<image001.png>
Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain
View, CA 94043, USA
You have received this email because

Google™

Plaintiff 5232

**Vickers Declaration**
**Exhibit 1 Page 50 of 88**

kmedart@grantspass.k12.or.us shared a document with
you from Google Docs.

**Plaintiff 5233**

**Vickers Declaration
Exhibit 1 Page 51 of 88**

**From:** Rachel Damiano
**Subject:** RE: Copy of Resolution 2021-01 - Invitation to edit
**Date:** March 16, 2021 at 9:46 AM
**To:** Katie Medart



The parent permission aspect is fixed now. I am glad you guys caught that! I think we do need to leave it up to the discretion of the teacher as well though. Otherwise we risk restricting the same freedom of speech that we are fighting for.

Do you know what he means by the resolution being broader than he thought?

**From:** Katie Medart
**Sent:** Tuesday, March 16, 2021 9:10 AM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Subject:** FW: Copy of Resolution 2021-01 - Invitation to edit

FYI

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Tuesday, March 16, 2021 9:05 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

- **A public school student seeking to be referred to by a pronoun that is counter to their apparent anatomical presentation,**
- **such as in relation to such youth presenting apparent gender dysphoria (previously 'gender identity disorder', aka, identifies as transgender), should be reasonably accommodated by public school's staff provided with parent permission, however, that any**
- **such policy shall not be mandated upon or required of the public school's** <u>**staff nor shall any such policy be enacted**</u>
- **that infringes upon the public school's staffs' civil and constitutional liberties, including their freedoms of speech and expression.**

So, I thought that this was about NOT calling a kid a different name without parent permission.....now it seems the language is pushing for teachers and staff to do what they feel is morally or religiously correct.....that may open up a whole basket of worms....what happens if the person is wacky????? what happens is the person does not want to call kids their regular names?

This resolution is a whole lot broader than just the initial thought...why is that?

Sent from my iPhone

On Mar 15, 2021, at 4:26 PM, Katie Medart <kmedart@grantspass.k12.or.us>

**Plaintiff 5234**

**Vickers Declaration**
**Exhibit 1 Page 52 of 88**

wrote:

https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?

The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

On Mar 15, 2021, at 4:04 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



Plaintiff 5235

**Vickers Declaration**
**Exhibit 1 Page 53 of 88**

Copy of Resolution 2021-01

<image001.png>

Open in Docs



Google Docs: Create and edit documents online.

Google LLC, 1600 Amphitheatre Parkway, Mountain

View, CA 94043, USA

You have received this email because

kmedart@grantspass.k12.or.us shared a document with

you from Google Docs.

**Plaintiff 5236**

**Vickers Declaration
Exhibit 1 Page 54 of 88**

From: **Katie Medart** <kmedart@grantspass.k12.or.us>
Subject: Fwd: Copy of Resolution 2021-01
Date: March 17, 2021 at 5:07 PM
To: Rachel Damiano <rdamiano@grantspass.k12.or.us>



Get Outlook for iOS

From: Dorothy Swain (Google Docs) <comments-noreply@docs.google.com>
Sent: Wednesday, March 17, 2021 5:00 PM
To: Katie Medart
Subject: Copy of Resolution 2021-01

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

---

Dorothy Swain added comments to the following document

📄  Copy of Resolution 2021-01

New
7 comments

---

Comments

objective

👤  Dorothy Swain   New

I would continue to use self-evident here, rather than objective - I
don't think they are synonymous.

Reply                                    Open

'postmodernism'

**Plaintiff 3765**

**Vickers Declaration
Exhibit 1 Page 56 of 88**

Dorothy Swain    New

I think the "post-modernism" connection is the weakest part of this. I would delete the entire segment.

Reply                                                        Open

public education is established, funded, and ordained to teach objective truths

Dorothy Swain    New

Do you have a citation for this?

Reply                                                        Open

antithetical

Dorothy Swain    New

antithetical needs an object - antithetical to what?

Reply                                                        Open

ideology

Dorothy Swain    New

opinion isn't necessarily ideology

Reply                                                        Open

mirrors the rise of postmodernism ideology

Dorothy Swain    New

**Plaintiff 3766**

**Vickers Declaration
Exhibit 1 Page 57 of 88**

needs a citation - the critique of postmodern ideology is just as subjective as postmodernism itself

Reply                                                          Open

opening a discussion to the mental health of a youth believing they are the opposite gender of their anatomy

 Dorothy Swain   New

gender is not sex - gender is social - this phrase seems downright mean-spirited to me

Reply                                                          Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

**Google**

You have received this email because you are a participant in the updated discussion threads. Change what Google Docs sends you. You can not reply to this email.

**Plaintiff 3767**

**Vickers Declaration
Exhibit 1 Page 58 of 88**

From: **Rachel Damiano (Google Docs)** comments-noreply@docs.google.com
Subject: Copy of Resolution 2021-01
Date: March 18, 2021 at 1:49 PM
To: [email protected]

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Rachel Damiano resolved comments in the following document

📄 Copy of Resolution 2021-01

Resolved
6 comments

## Resolved

Comments

objective

Dorothy Swain
I would continue to use self-evident here, rather than objective - I don't think they are synonymous.

Rachel Damiano   New
☐arked as resol☐ed

Reply                                                    Open

'postmodernism'

postmodernism

Dorothy Swain

I think the "post-modernism" connection is the weakest part of this. I would delete the entire segment.

Rachel Damiano    New

Marked as resolved

Reply                                                    Open

antithetical

Dorothy Swain

antithetical needs an object - antithetical to what?

Rachel Damiano    New

Marked as resolved

Reply                                                    Open

ideology

Dorothy Swain

opinion isn't necessarily ideology

Rachel Damiano    New

Marked as resolved

Reply                                                    Open

mirrors the rise of postmodernism ideology

Dorothy Swain

**Plaintiff 3769**



Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA
94043, USA

You have received this email because you are a participant in the
updated discussion threads. Change what Google Docs sends
you. You can not reply to this email.

From:    **Katie Medart (Google Docs)** comments-noreply@docs.google.com
Subject:  Resolution 2021-01.2 - Add: "essentially"
Date:    March 19, 2021 at 1:56 PM
To:      kecotrage@gmail.com

KM

Katie Medart added a suggestion to the following document

📄 Resolution 2021-01.2

👤 Katie Medart    New

**Add:** "essentially"

Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA
94043, USA

You have received this email because you are subscribed to all
discussions on Resolution 2021-01.2. Change what Google Docs
sends you. You can reply to this email to reply to the discussion.

**Google**™

**Plaintiff 5417**

**Vickers Declaration
Exhibit 1 Page 62 of 88**

From: **Rachel Damiano (Google Docs)**
Subject: Resolution 2021-01.2 - Add: "essentially"
Date: March 19, 2021 at 3:49 PM
To:



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Rachel Damiano accepted a suggestion in the following document

📄 Resolution 2021-01.2

Katie Medart

**Add:** *"essentially"*

Rachel Damiano    New

*Accepted suggestion*

Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA



You have received this email because you are a participant in this thread. Change what Google Docs sends you. You can reply to this email to reply to the discussion.

**Plaintiff 5418**

**Vickers Declaration**
**Exhibit 1 Page 63 of 88**

From: **Rachel Damiano (via Google Sites)** iresolve.gp@gmail.com
Subject: I Resolve - Invitation to edit
Date: March 19, 2021 at 4:17 PM
To: rswects.n@grantspass.k12.or.us

RD

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following site:

**I Resolve**


The resources page is currently hidden but I think we can start adding to it and, when we are ready, unhide it for people to have access to.

Open

iresolve.gp@gmail.com is outside your organization.

Google Drive: Have all your files within reach from any device.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

**Plaintiff 4657**

**Vickers Declaration
Exhibit 1 Page 64 of 88**

From: **Rachel Damiano (via Google Sheets)** iresolve.gp@gmail.com 
Subject: Sign Resolution 2021-01 (Responses) - Invitation to edit
Date: March 19, 2021 at 5:29 PM
To: toyodae@grantspass7.k12.or.us

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following spreadsheet:

 Sign Resolution 2021-01 (Responses)

Open in Sheets

iresolve.gp@gmail.com is outside your organization.

Google Sheets: Create and edit spreadsheets online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a
spreadsheet with you from Google Sheets.



**Plaintiff 5593**

**Vickers Declaration**
**Exhibit 1 Page 65 of 88**

From: **Katie Medart** <kmedart@grantspass.k12.or.us> 
Subject: RE: Copy of Resolution
Date: March 22, 2021 at 4:46 PM
To: Swain, Dorothy <DSwain@roguecc.edu>

Hi, Dorothy,

Thank you for your time and constructive criticism. I value and appreciate it. I am collaborating with a colleague here at North on the resolution. At this time, not all of your recommendations were implemented, but I wanted to share the current version on our website: https://sites.google.com/view/iresolve/home

I hope you will see you made an impact. Thank you for making it better.  Please relay to Gary that I appreciate his time and heart felt words, as well.

You will notice on the digital form (which you can click on without signing) that we separated the resolutions (policies) we are advocating for from the why. We recognize community members may support the policies and believe they are fair in form and function, but not agree with our reason why we are advocating for them.  Our website is still under construction. I recommend checking back periodically to see what we have updated.

I miss you dearly too, and I still rave about you, but now to my current colleagues instead of my biology and A&P students. ☺

I hope this week is restful,

Katie

Oh… congrats on retirement! I am so excited and wish I could join!!

**From:** Swain, Dorothy <DSwain@roguecc.edu>
**Sent:** Wednesday, March 17, 2021 5:13 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Copy of Resolution

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hi, Katie,
    I got your Google Doc, and I am honored by your request. I made a few comments on the Google drive. I think that the requests at the end are mostly fair and coherent. The weakest parts for me are in the preliminaries: the equating of "self-evident" truths in the Constitution with the "objective" truths you wish to establish, as well as the attack on post-modernism and the attempt to establish gender fluidity as a mental illness. I think that some people who don't agree with you about mental illness and post-modernism might very well agree to sign your petition if those parts were omitted or softened. Also, you get into this slippery

**Plaintiff 3788**

territory where your attacks are just as subjective as the ideology you wish to reject.
   I miss you dearly, and I wish we still had the regular opportunity to chat!
All the best,
Dorothy

**This next part is from Gary**:

*We are in the process of figuring out how to accommodate those people who identify as something other than traditional definitions. Just as we are coming to understand the depth of racism, we need to remain open to all of the variations of the human being. When we think we understand what "objective truth" is we should take a long look at our motivations. "Separate but equal" was used to justify conditions in the United States for many generations that were never equal. Our understanding of mind-body processes is constantly evolving. Middle school and high school students are indeed trying to figure out who they are and how they fit into the world.*

*We must always practice kindness. This is a teachable moment for the adults as well as the students. When we label a student with political, pseudo-scientific language like "postmodern" we are pointing a finger at their heart. We are saying they are defective.*

*There is an opportunity to show all students how we treat each other. Pretending to understand what "objective truth" is, and whose ideology is correct, only makes it harder to see that individual and their struggle toward selfhood. People trying to figure out how to adjust accommodations is a nationwide puzzle at the moment. The opportunity to be positive role models is at our door.*

*We must always practice kindness.*

Dorothy Swain
Science Faculty
Rogue Community College
3345 Redwood Highway
Grants Pass, OR  97527
(541)-956-7069
Fax (541)-471-3563

This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. This e-mail was sent in good faith to the address you provided to Rogue Community College. We trust that you have password-protected access to this e-mail account and that any transmitted confidential information is secure. If you are not the named addressee, you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail message by mistake, and then delete this e-mail and any attachments from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.

**Plaintiff 3789**

From: **Rachel Damiano (via Google Docs)**
Subject: Layman's Terms Resolution 2021-01 - Invitation to edit
Date: March 22, 2021 at 7:31 PM
To:



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

Layman's Terms Resolution 2021-01

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a
document with you from Google Docs.

**Google**™

**Plaintiff 4807**

**Vickers Declaration
Exhibit 1 Page 68 of 88**

From: **Katie Medart**
Subject: I Resolve
Date: March 22, 2021 at 4:33 PM
To: Katie Medart

https://sites.google.com/view/iresolve/home

Get Outlook for iOS

**Plaintiff 4665**

From: **Katie Medart**
Subject: Check it out
Date: March 24, 2021 at 8:52 AM
To: Christopher Jelderks

KM

Hi, Jelly!

Check out our website at www.iresolvemovement.com

We would like for you to submit a video before Saturday if you are willing? Text or call me at 5414412222 and I will go over details!

God is good!
Katie

Get Outlook for iOS

**Plaintiff 3647**

**Vickers Declaration**
**Exhibit 1 Page 70 of 88**

**From:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Subject:** Fw: Revised!
**Date:** March 25, 2021 at 2:24 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>

RD

I don't have any changes but let me know if you see something! I want to get it on Youtube today to post to the site and start sending out everywhere. 😊

*Rachel Damiano*
Assistant Principal, North Middle School
Canvas Support
Admin Lead for GP Online (Middle School)

**Confidentiality Notice:** *This email and any attachments may contain confidential and privileged information intended for the addressee only. If you are not the addressee, or if you have received this email by mistake, please delete it immediately.*

**From:** Johnie Collins <johnie@edgewaterfellowship.org>
**Sent:** Thursday, March 25, 2021 1:41 PM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>; Josh Cunningham <josh@edgewaterfellowship.org>
**Subject:** Revised!

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hey Rachel,

Here is the revised edit. Thank you for taking the time to look over the last one and make notes on it. Please share with Katie and look this one over and let me know if it can improve. Thank you!

https://www.dropbox.com/s/r1gm0suw0n4nw6/iresolveREVedit_exp2.mp4?dl=0

--
Johnie Collins



Worth Available
Cell: 503.550.7724

**Plaintiff 4343**

From: **Rachel Damiano** <rdamiano@grantspass.k12.or.us>
Subject: **Re: Revised!**
Date: March 25, 2021 at 3:02 PM
To: Johnie Collins <johnie@edgewaterfellowship.org>, Josh Cunningham <josh@edgewaterfellowship.org>, Katie Medart <kmedart@grantspass.k12.or.us>

RD

It looks great! Thank you so much for all the work you guys did. We feel very blessed to have had this opportunity.

I will upload it to Youtube and embed it on the site.

Have a wonderful day!

*Rachel Damiano*
Assistant Principal, North Middle School
Canvas Support
Admin Lead for GP Online (Middle School)

**Confidentiality Notice:** *This email and any attachments may contain confidential and privileged information intended for the addressee only. If you are not the addressee, or if you have received this email by mistake, please delete it immediately.*

**From:** Johnie Collins <johnie@edgewaterfellowship.org>
**Sent:** Thursday, March 25, 2021 1:41 PM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>; Josh Cunningham <josh@edgewaterfellowship.org>
**Subject:** Revised!

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hey Rachel,

Here is the revised edit. Thank you for taking the time to look over the last one and make notes on it. Please share with Katie and look this one over and let me know if it can improve. Thank you!

https://www.dropbox.com/s/r1grn0suw0n4nw6/iresolveREVedit_exp2.mp4?dl=0

--


Johnie Collins

Call: 503.554.7744

**Plaintiff 4344**

**Vickers Declaration**
**Exhibit 1 Page 72 of 88**

From: Rachel Damiano
Subject: Updates on Resolution 2021-01
Date: March 26, 2021 at 2:50 PM
To: Matt Heverly, Kerry Alderson
Cc:

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hi Matt and Kerry,

Thank you again for your support for the resolution regarding gender identity policies for youth. The video team was amazing to work with and they did a great job filming and editing! If you haven't gotten a chance to take a look, the video is posted on the website: iresolvemovement.com

Do you have any ideas on how we could continue to get the word out and increase momentum for the resolution? We posted the video yesterday evening and have 92 views so far and 23 signatures on the new form (we switched from a google form to an Adobe signature form) and 34 signatures from the Google form. We are reaching out to organizations and individuals that are influencers in policies (ALEC, Prager U, Ben Shapiro) to garner their support as well.

We appreciate any feedback or ideas you have for us. Thank you!

Sincerely,
Rachel and Katie

Plaintiff 5990

**Vickers Declaration
Exhibit 1 Page 73 of 88**

From: **Rachel Damiano**
Subject: Proposed Policy regarding Gender Identity Policies as they pertain to Schools
Date: March 26, 2021 at 2:31 PM
To:
Cc:



### Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.

Dear Mr. Reynolds,

We appreciate the work that ALEC does to develop fair policies that are, as stated in the mission statement, "dedicated to the principles of limited government, free markets, and federalism." As such, we would be honored if the Education Task Force would consider our resolution as an alternative policy option to proposed wording in the Equality Act or other state legislation regarding gender identity policies.

We feel the Equality Act, as well as Oregon state proposed legislation, restricts freedoms for US citizens and businesses and puts requirements on education institutions that will have negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical and emotional health of youth.

We are requesting that the task force review our proposed resolution and adopt the policy points to then be put forth at the state and federal levels by legislators. The resolution, our reasoning, and many of our research based resources can be found on our website: iresolvemovement.com On the site, we also have a Youtube link to our video explaining the need for this resolution and have outlined the resolutions below. We appreciate any feedback you or the committee may have for us regarding our proposal.

*We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved. In our current times, gender identity is a hot button topic in politics but the resolution*
*below moves away from an argument about "right" or "wrong". It instead focuses on ways in which we can be respectful to all parties involved, while ultimately protecting the hearts and minds of our youth.*

*Therefore, be it resolved that we urge our local, state and federal leaders to adopt the following principles and policies:*

- *We*
  *recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;*

- *Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;*

- *For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available;*

- *A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and*

- *A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.*

We thank you for your time and attention to this matter.

**Plaintiff 5177**

**Vickers Declaration**
**Exhibit 1 Page 74 of 88**

Sincerely,
Rachel Damiano and Katie Medart
Southern Oregon Assistant Principal and Southern Oregon Science Teacher

From: **Katie Medart** 
Subject: Website blocked
Date: March 29, 2021 at 8:30 AM
To: Rachel Damiano

Good Morning,

Can we have our website unblocked?





## Web Page Blocked!

You have tried to access a web page which is in violation of your internet usage policy.

URL: http://www.iresolvemovement.com/
Category: Newly Observed Domain
User name:
Group name:

To have the rating of this web page re-evaluated please click here.

**Plaintiff 6061**

**Vickers Declaration**
**Exhibit 1 Page 76 of 88**

From: **Rachel Damiano** <rdamiano@grantspass.k12.or.us> 
Subject: **FW: URL Rating Update Notification: Mon, 29 Mar 2021 10:11:28 -0700**
Date: March 29, 2021 at 10:18 AM
To: Katie Medart <kmedart@grantspass.k12.or.us>

The site should be viewable now. :)

-----Original Message-----
From: FortiGuard Web Filtering Service [mailto:fgweb@fortinet.com]
Sent: Monday, March 29, 2021 10:11 AM
To: Rachel Damiano <rdamiano@grantspass.k12.or.us>
Subject: URL Rating Update Notification: Mon, 29 Mar 2021 10:11:28 -0700

Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.

Dear Fortinet customer,

The website(s) you submitted below has been reviewed and updated:

Submission Date:    Mon, 29 Mar 2021 08:34:06 -0700
URL:    hxxp://www[.]iresolvemovement[.]com/
Customer Comment:    https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2firesolvemovement.com&c=E,1,sj60CStiiz9Xl0cHBBsrx8AXqZMhw8xwQi5Thk-0pFxi_YuDFGbJs-CoJhGp6bxGrs-
L1IrrnE6SeTyF-FkT19cMKpGChcSMjbF_HlnjlOXNYGExcXrk&typo=1 is a redirect to a google site. The google site was created by me and although the domain is new, the site itself is safe.
Updated Category:    Advocacy Organizations
Update Date:    Mon, 29 Mar 2021 10:10:08 -0700

If the suggested category does not meet your expectation, kindly contact us through https://linkprotect.cudasvc.com/url?
a=http%3a%2f%2fwww.fortiguard.com%2fcontactus.html%2c&c=E,1,pKK2gY04d_ZGiSPVh4f3VOsVZcWhvIIDlgQBYphHJDn6aht5yv
dvCMlR8M1UljVy3OtmAnehpTF3YlBtHf8mmY8uvduPZmwEY_dxwf0yZQ8B6iZ&typo=1 our Web Filtering team would be happy to assist you.

Note that FortiGuard Web Filtering Service categorizes websites, but it is your IT manager who decides what categories to block or allow. Therefore, if you would like access to the site, please contact your IT manager.

The rating update may not be effective immediately on your network because of the Web filtering cache. If you would like to have the update effective immediately, please contact your network administrator.

Thank you for using FortiGuard Web Filtering Service.

Regards,

FortiGuard Web Filtering Service
Fortinet Inc.

This is an automatically generated notification of rating update.
Please do not reply to this email.

*** Please note that this message and any attachments may contain confidential and proprietary material and information and are intended only for the use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any review, use, disclosure, dissemination, distribution or copying of this message and any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender and destroy this e-mail and any attachments and all copies, whether electronic or printed. Please also note that any views, opinions, conclusions or commitments expressed in this message are those of the individual sender and do not necessarily reflect the views of Fortinet, Inc., its affiliates, and emails are not binding on Fortinet and only a writing manually signed by Fortinet's General Counsel can be a binding commitment of Fortinet to Fortinet's customers or partners. Thank you. ***

**Plaintiff 4351**

**Plaintiff 4352**

**Vickers Declaration**
**Exhibit 1 Page 78 of 88**

**From:** Rachel Damiano (via Google Docs) iresolve.gp@gmail.com 
**Subject:** Untitled document - Invitation to edit
**Date:** March 29, 2021 at 1:39 PM
**To:** 

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

 Untitled document

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a document with you from Google Docs.

**Plaintiff 5959**

**Vickers Declaration
Exhibit 1 Page 79 of 88**

**Katie Medart**

Subject: Policy
Date: March 30, 2021 at 1:52 PM
To: Mitch Meunier, Jason Wright

Hi, Mitch and Jason,

Thank you for the time today! Here is the website: https://www.iresolvemovement.com/

Please let me know if you have any questions,

Katie

**Plaintiff 5068**

**Vickers Declaration**
**Exhibit 1 Page 80 of 88**

**From:** Katie Medart
**Subject:** RE: Policy
**Date:** March 31, 2021 at 8:45 AM
**To:** Jason Wright

Thank you for taking action! I really hope and believe if we all have our voice heard we will make change occur. The challenge is having courage and taking the time to take action.

Have a wonderful day,
Katie

**From:** Jason Wright <JWRIGHT@grantspass.k12.or.us>
**Sent:** Tuesday, March 30, 2021 6:44 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Policy

Thank You Katie. I just signed it.

Get Outlook for iOS

**From:** Katie Medart <kmedart@grantspass.k12.or.us>
**Sent:** Tuesday, March 30, 2021 1:52:47 PM
**To:** Mitch Meunier <MMEUNIER@grantspass.k12.or.us>; Jason Wright <JWRIGHT@grantspass.k12.or.us>
**Subject:** Policy

Hi, Mitch and Jason,

Thank you for the time today! Here is the website: https://www.iresolvemovement.com/

Please let me know if you have any questions,

Katie

Plaintiff 5070



**North Middle School**

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

Plaintiff 110

April 5, 2021

HAND DELIVERED

Dear Rachel Damiano:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

Tommy Blanchard
Principal

cc:  Kirk Kolb
     Personnel File
     Payroll

Developing our unique potential as a community of responsible and resourceful lifelong learners.





**Grants Pass School District No. 7**

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5703
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE *of* BUSINESS SERVICES

June 10, 2021
Rachel Damiano
1069 SE Christie Place
Grants Pass, OR 97526

RE:  Investigation Findings and Recommendation for Termination

Dear Rachel,

An investigation was conducted by Bill Landis at the request of the District regarding the allegations that you violated several District Policies – the findings of which you received a copy of this morning and are included below.

"ALLEGATION #1: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Assistant Principal Rachel Damiano was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Damiano is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that *"No employee will use district facilities, equipment or supplies in connection with political campaigning, nor will any employee use any time during the working day for campaign purposes."* Grants Pass School District 7 policy IIBGA-AR "Electronic Communications System Acceptable Use Regulation" (Exhibit 6E) states that *"Attempts to use the District network for Transmission of any materials regarding political campaigns is strictly prohibited."* The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Damiano and Ms. Medart ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.

Ms. Damiano admits to using District 7 resources to include email, computers, and possibly printers however she states she doesn't recall in many of her answers when asked for specifics. The numerous email Exhibits under Exhibit 4 which included Google Docs associated with "I Resolve" and the proposed resolution, shows that Ms. Damiano used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve" campaign with staff and persons inside and outside of School District 7. While Ms. Damiano did not like referring to "I Resolve" as a political campaign, her efforts both in the video regarding legislation and through the stated purpose of "I Resolve" showed it was a political campaign. This was specifically demonstrated in emails she sent to Daily Wire host Ben Shapiro (Exhibit 4H) and another

*Building Bridges to the Future*



**GPSD 214**

**Vickers Declaration
Exhibit 1 Page 83 of 88**

to Mr. Reynolds of the American Legislative Exchange Council (Exhibit 4I) to gain support for the "I Resolve" resolutions using District 7 School resources. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation effecting gender identity issues with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and pronouns for gender identity students, and require parents be involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Damiano have chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

B.  Used time during her working day for political campaign purposes. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that *"No employee will use district facilities, equipment or supplies in connection with political campaigning, **nor will any employee use any time during the working day for campaign purposes."*** As stated under Allegation 1A above, the "I Resolve" campaign was determined to be a political campaign. Date and time stamps on emails shown in Exhibit 4A through 4E as well as Ms. Damiano's uncertain recollection but admitted use of email during her workday to communicate regarding "I Resolve" supported this finding.  Exhibits 4A and 4B were emails sent to outside persons on March 11th, 2021 at 1:31 PM and 10:51 AM which was a school workday and were titled "file" and "Design" related to t-shirts and color choices for "I Resolve." Ms. Damiano also admitted using District 7 computers to work on "I Resolve" although unable to recall if she used District 7 printers.  Without a forensic computer analysis there is no way to quantify the actual time spent during her workday on the "I Resolve" campaign. The policy does not require a certain amount of time in order to be a violation. It states: *"nor will any employee use **any time** during the working day for campaign purposes"* which did occur on more than one occasion. Had Ms. Damiano not utilized time during her workday for the "I Resolve" campaign this would not have been a violation.

C.  Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that *"On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint."* As stated under Allegation 1A, the "I Resolve" campaign was determined to be a political campaign. In the "I Resolve" video, Ms. Damiano identifies herself by stating: *"Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in as a coach as well. I do not have any children of my own yet, but I do work with youth and that has been a passion of mine for a very long time now."*

Ms. Damiano doesn't introduce herself as a private citizen but rather a Southern Oregon Middle School administrator giving her first name. While she did not say Grants Pass District 7, She at no time in the video states that the views expressed are that of her own and not that of District 7 or any similar type of statement.  A simple internet search using "Rachel southern Oregon middle school assistant principal" finds an article identifying Rachel Damiano and her full name, North Middle School, District 7, when she was hired in August of 2020 https://spcsumo.org.com/southern-oregon/51765/jpe-district-7-welcomes-damiano-as-new-vp.html. Additionally, Ms. Damiano used District 7 email for communications for "I Resolve" to both persons inside of District 7 and outside the District which identified herself as associated with School District 7 with no disclaimer. The media coverage (Exhibits 5A-5E) shows how District 7 was intertwined with Ms. Damiano and the "I Resolve" campaign. The media coverage had no statements by Ms. Medart or Ms. Damiano that made it clear that the "I Resolve" campaign was not affiliated with District 7.

Ms. Medart did tell me in my interview with her on May 13th, 2021 that there was a disclaimer on the video associated with YouTube. I did find a disclaimer on the YouTube site that, if a viewer used a drop-down box prior to playing the video, it could be seen. This however was not initially with the video as Ms. Medart admitted in her interview with Dan Huber-Kantola on April 6th, 2021 when she told him that it had been added later. The "I Resolve" video itself has no information where a viewer would know the campaign isn't associated with the District as nothing is stated. In the opening statements of the video, Ms. Damiano can be heard saying: "I Resolve" and "We Resolve." This was described in one of Ms. Damiano's statements which she felt showed it was made clear.

The word "We" however, could have been construed by a viewer as inclusive of the District. The amount of email complaints, complaints from District 7 employees, and publicity associated shortly after the video and website were published to social media and the internet were representative of how controversial the "I Resolve" proposals and campaign were. Had Ms. Damiano been clear that the expressed views in the "I Resolve" video and campaign were not those of District 7 then this would not have been a violation of District 7 policy.

D.  Used social media and public websites in such a manner that it disrupted the school environment. **"SUSTAINED"** – Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 6C) states that *"Staff members, while on duty and off duty, will treat fellow employees, students and the public with respect while posting on social media websites, etc., in order to prevent substantial disruption in school."* It is clear from the complaints received that the "I Resolve" video posted on YouTube and Facebook, as well as the "I Resolve" website, that a substantial disruption in school occurred. This included student protests (Exhibit 5E), staff complaints, citizen complaints, division among the staff, and was interpreted by some who would be affected by the "I Resolve" resolution as disrespectful.

E.  Posted confidential information about a student on social media and a public website. **"NOT SUSTAINED"**- Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media (Exhibit 6C) states that *"Staff members, while on duty and off duty, will utilize social media websites, public websites, and blogs: in a professional manner by not posting confidential information about students, staff or district business."* In the "I Resolve" video which was posted on social media and a public website, Ms. Medart speaking to Ms. Damiano, disclosed an incident which occurred approximately one year prior within a month or two of returning to teaching at the K-12 level, where she was presented with a female student who was exploring her gender identity and made a request to identify as a male. Lysander Selvig an employee, stated in an interview with me that he absolutely knew who Ms. Medart was speaking of and disclosed the name of the student to me and circumstances regarding details. His information matched Ms. Medart's disclosure in the "I Resolve" video where the student had contacted teaching staff at North Middle School to request they call her by a different male name and male pronouns. This was corroborated by Principal Tommy Blanchard regarding the student who stated it was common knowledge on campus.

Ms. Medart in my interview recanted the story as being truthful and gave unclear responses to my questions stating that in looking back it was hypothetical although she seemed to indicate she initially believed the story as truthful. It is clear that an identified North Middle School student did exactly what Ms. Medart said occurred regarding gender identity transformation to numerous staff members at the school at the approximate time that Ms. Medart said it had occurred. That student or others viewing the "I Resolve" video as did happen with Mr. Selvig, would have identified the specific student who Ms. Medart spoke of even if she now claimed it was hypothetical. Ms. Damiano was not employed by District 7 during the previous school year when this occurred. Ms. Damiano reported that her understanding was that Ms. Medart's story

regarding the student in the "I Resolve" video was hypothetical and not based upon an actual student. There is nothing to sustain this allegation as it is unknown what Ms. Damiano knew and when she knew it to determine if this policy was violated.

F.   Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation." **"NOT SUSTAINED"** – Grants Pass School District 7 policy "ACB" (Exhibit 6B) states that ***"Bias Incident" means a person's hostile expression of animus toward another person or group of person's, relating to the other person's or group's distinguished, or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability or national origin"*** It is not clear if Ms. Damiano's "I Resolve" campaign was "a hostile expression of animus toward those who use a different gender identity. The "I Resolve" campaign is an attempt to change legislation and policies affecting gender identity. Individuals may perceive her actions as biased which is understandable. However, it is not clear based upon the language of the listed policy that her actions constituted a "bias incident" as there weren't enough facts to positively conclude if the allegation was unfounded or in fact was sustained and did occur.

In reviewing Ms. Damiano's job classification (Exhibit 6F), based upon the facts including conduct, I find she failed to meet the standards in her job description under essential duties and responsibilities which included:

- **Establish and maintain effective relationships with students, parents, and staff to promote quality instruction and a healthy school climate**
- **Communicate and collaborate with students, parents, teachers, staff, community, and when appropriate, other agencies to promote an open and participatory school environment**
- **Be knowledgeable of the building's philosophy and establish effective human relationships among students, parents, and teachers, such that results in positive school climate and quality instruction**

<u>Commentary:</u> - The allegations listed were investigated and based upon the facts received, District 7 policies, and Ms. Medart's job description, the "Findings" were determined based upon those factors."

Based on the four (4) sustained Policy violation findings listed above, I am recommending to Superintendent Kolb that he terminate your employment as an Assistant Principal, with Grants Pass School District No. 7.  A pre-termination hearing has been scheduled with Superintendent Kirk Kolb for Monday, June 21, 2021 at 9 A.M at the District Office.  You are welcome to bring a representative with you to that hearing.

Respectfully,

Sherry Ely
Chief Finance & Operations Officer

CC:    Mr. Kirk Kolb, Superintendent
        Mr. Danny Huber-Kantola, Human Resources Director
        Mr. Tommy Blanchard, Principal, North Middle School



# Grants Pass School District No. 7

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

June 21, 2021

Rachel Damiano
1069 SE Christie Place
Grants Pass, OR 97526

RE:  Notice of Recommendation of Termination to the Grants Pass School District 7 Board of Directors

Dear Rachel,

You were provided with a notice from Director Sherry Ely on June 10, 2021 of "Investigation Findings and Recommendation for Termination" on the basis of an Investigation report conducted by Pacific Consulting and Investigation.

Upon complete review of Director Ely's recommendation for termination and the report conducted Bill Landis of Pacific Consulting and Investigation, I have concluded the following:

- You used District facilities, equipment, and supplies to conduct personal business of a political nature.  This is determined to be a violation of Board Policy GBG as state in both Director Ely's letter and the third-party investigation.
- You used the district network for transmission of the related materials and information of these political campaigning efforts.  This is determined to be a violation of Board Policy IIBGR-AR.
- You used paid District time to engage in the efforts to support and promote a campaign of a political nature.  This determined to be a violation of Board Policy GBG.
- When posting the "I Resolve Movement" video, you failed to identify that your political viewpoints were yours personally and not representative of the District.  This is also determined to be a violation of Board Policy GBG.
- Your personal use of social media very much created a substantial disruption to the school environment.  This is determined to be a violation of Board Policy GCAB.

Based on the sustained violations of multiple Board Policies, I am recommending to the Grants Pass School District 7 Board of Directors that they terminate your employment with the district effective immediately.  You have the right to a hearing with the Board.  It is your choice as to whether this hearing is to be conducted in executive session or in session open to the public.  In this hearing you will hear the charges being brought forth and recommendation to the Board.  You have a right to have an attorney present and an opportunity to respond and appeal to the Board.

This hearing will be scheduled for a Special Board meeting in July 2021.  Please let me know if you would like this hearing to be in the open public session or in executive session (closed to the public).

Respectfully,



*Building Bridges to the Future*

**GPSD 966**

Kirk T. Kolb
Superintendent
Grants Pass School District 7

Katie Medart - June 6, 2022

```
 1              UNITED DISTRICT COURT
 2           FOR THE DISTRICT OF OREGON
 3                MEDFORD DIVISION
 4
    RACHEL G. DAMIANO and          )
 5  KATIE S. MEDART,
                                   )
 6
                Plaintiffs,        ) Case No.
 7
         vs.                       ) 1:21-CV-00859-CL
 8
    GRANTS PASS SCHOOL DISTRICT 7, )
 9  an Oregon public body; THE
    MEMBERS OF THE BOARD OF        )
10  EDUCATION OF GRANTS PASS
    SCHOOL DISTRICT 7 – Scott      )
11  Nelson, Cliff Kuhlman, Gary
    Richardson, Debbie Brownell,   )
12  Cassie Wilkins, Brian
    Delagrange, and Casey Durbin – )
13  in their official and personal
    capacities; KIRK T. KOLB,      )
14  Superintendent, Grants Pass
    School District 7, in his      )
15  official and personal
    capacity; and THOMAS M.        )
16  BLANCHARD, Principal, North
    Middle School, Grants Pass     )
17  School District y, in his
    official and personal          )
18  capacity,
                                   )
19
                Defendants.        )
20
21
22         DEPOSITION OF KATIE S. MEDART
23                June 6, 2022
24                  Monday
25                 1:20 p.m.
```

                                        Page 1

**Vickers Declaration
Exhibit 2 Page 1 of 66**

Katie Medart - June 6, 2022

```
1    time -- it could vary, but in general it was

2    Monday through Thursday.  I didn't typically teach

3    classes on Fridays.

4         Q.    What classes were you teaching?

5         A.    I taught -- you want over the span of

6    my time there, like the variety?

7         Q.    Sure.

8         A.    I taught biology, anatomy and

9    physiology, chemistry.

10        Q.    And then you came back to Grants Pass

11   for the '19-'20 school year?

12        A.    Yes.

13        Q.    And what was the position that you

14   had?

15        A.    I was hired at North Middle School

16   for -- I think it's called foundational science

17   teacher with a health endorsement.

18        Q.    Where do your sons go to school?

19        A.    Right now currently?

20        Q.    Yes.

21        A.    My oldest is at North Middle School.

22        Q.    What grade is he in?

23        A.    He's in 6th grade.

24        Q.    So this was his first year at North?

25        A.    Yes.  That is correct.
```

Page 16

Katie Medart - June 6, 2022

1   year.  What classes were you teaching for '20-'21?

2        A.    So my first school year there?

3        Q.    Second.

4        A.    Okay.  Because it changed.  My first

5   school year was 6th grade health and 7th grade

6   science, and then my second school year was 7th

7   grade science.

8        Q.    What was your work schedule?

9        A.    It changed, like, throughout the year;

10  does that make sense?  Because we were hybrid, and

11  so we have a different schedule -- not -- we were

12  online and we had a schedule, and then we moved to

13  hybrid, and then that changed, and then we

14  moved -- I think, all the way by the end of the

15  school year they moved all the way back.  So it

16  changed throughout that year.

17       Q.    Once you got back to in-person school,

18  what time did you get to work and leave work?

19       A.    Well, I got there -- typically, I was

20  there early.  So sometimes I would say by 7:30.

21  And then students didn't come, though, until, I

22  think, 9:15 or 9:30.  They started later.  And

23  they were only there until, I think, noon.  I

24  could be recalling that wrong.  It was a totally

25  different schedule.

Page 49

Katie Medart - June 6, 2022

1          Q.      Did you have flex time during that

2    time period?

3          A.      Yeah, we did.

4          Q.      What was that?

5          A.      It was just the time to be able to

6    work on other stuff.  You didn't have students

7    with you.

8          Q.      Okay.  Who was your supervisor that

9    year?

10         A.      Well, Tommy Blanchard was the

11   principal.

12         Q.      Was that the year that Rachel Damiano

13   came to the district?

14         A.      Yes.  I believe that her first --

15   yeah.  She wasn't there my first year.

16         Q.      Did you know her before she started

17   working for the district?

18         A.      No.  I had never met her before she

19   was my vice principal.

20         Q.      Did you have a particular concern

21   about parental permission for clubs?

22         A.      I did express that.

23         Q.      Why were you concerned about that?

24         A.      Because, to me, it's like a sports

25   activity.  And I think that like anything, my

                                          Page 50

**Vickers Declaration
Exhibit 2 Page 4 of 66**

Katie Medart - June 6, 2022

```
 1   certain pronouns, you can't use those because
 2   they --
 3          A.     Violate my conscience.
 4          Q.     Okay.
 5          A.     But I can still be honoring, loving,
 6   and respecting to them even by not violating my
 7   conscience.
 8          Q.     Before the I Resolve video, was there
 9   some discussion among the staff about political
10   speech?
11          A.     Yes, I believe so.
12          Q.     What was that discussion about?
13          A.     Can you tell me what you're
14   referencing?  Because that was also the election
15   year, so there was lots of political speech that
16   happened amongst staff.  That was pretty broad.
17          Q.     Let's move on.  What is the history
18   beyond I Resolve?
19          A.     Can you clarify?
20          Q.     Sure.  How did it get started?
21          A.     Rachel -- my vice principal, Rachel,
22   approached me and asked if I wanted to help be
23   able to propose policy ideas to be considered, and
24   so -- related to gender identity policies.
25          Q.     When did she approach you about that?
```

Page 64

Katie Medart - June 6, 2022

1          A.      I think it was late February, maybe

2     early March.      It was one -- somewhere in that time

3     frame of last year.

4          Q.      Do you know what motivated her to

5     contact you about -- how did you describe it?

6          A.      About a policy related to gender

7     identity.

8          Q.      Okay.

9          A.      So I think I should just -- I don't

10    want to speculate about her motivation.  I think

11    that's a question to ask her.

12         Q.      Well, she described it slightly

13    differently than you did, so --

14         A.      Okay.

15         Q.      Had you had any communication with her

16    about gender identity issues?

17         A.      No, other than when she came to me.

18             But I think because she was an

19    administrator, she was aware of questions that I

20    had been asking.  She was my vice principal, and

21    so she was in weekly meetings, from my

22    understanding, with Tommy and Bill.  I think they

23    have regular admin meetings, and so she was aware

24    that I had asked questions.

25         Q.      Did she come to you during the work

Page 65

Katie Medart - June 6, 2022

1    time?

2         A.    Not instructional time.  Usually it

3    was -- I think the first time we met was after --

4    either in that reflex time, if students were back

5    on, or in the afternoon at the end of the day.

6    Students never in my classroom with me.

7         Q.    Did you find it odd that your vice

8    principal came and asked you if you wanted to work

9    on policies related to gender identity issues?

10        A.    No.

11        Q.    Why not?

12        A.    Because we implement it in the

13   classroom.  I think it's great that administration

14   is -- actually, our admin get our input on a

15   number of different topics.  Like, I was on a

16   committee for working on a schedule.  And so, no,

17   I didn't think it was odd that she asked me.

18        Q.    What policies did you think needed to

19   be implemented regarding gender identity issues?

20        A.    We didn't have a policy.  It was

21   unclear.  I had multiple emails over the time I

22   had been there telling me different things that we

23   were supposed to do for our procedures.

24               And so it was really to be able to

25   create consistent ideas, and really just for us to

Page 66

Vickers Declaration
Exhibit 2 Page 7 of 66

Katie Medart - June 6, 2022

```
1              MS. VICKERS:  All right.  Let's take a
2   break.
3              THE VIDEOGRAPHER:  We are going off
4   the record at 2:52.
5              (Recess:  2:52 p.m. to 3:04 p.m.)
6              THE VIDEOGRAPHER:  We are back on the
7   record at 3:04.
8   BY MS. VICKERS:
9       Q.    Ms. Medart, we know from previous
10  testimony from Ms. Sager that you started working
11  on I Resolve in March of '21.  Is that correct?
12      A.    Yeah.  It was either -- like I said
13  earlier, it was either March or late February.
14      Q.    Okay.  And what role did you have with
15  I Resolve?
16      A.    So the resolutions -- which we only
17  got to talk about one earlier which was the
18  bathroom idea.  There was other ideas that we
19  suggested in that -- my role was I reviewed and
20  edited.  So she wrote the first draft of the
21  resolution, and then I edited it and helped
22  contribute to the ideas that ended up being on
23  there.
24      Q.    Okay.  Did anyone else help you?  It
25  was you and Ms. Sager, and anyone else?
```

Page 74

Katie Medart - June 6, 2022

```
1          A.     Because we did think we were -- I
2    still don't think I did anything wrong.  And at
3    the time I didn't think I did anything wrong.  I
4    was working with my administrator who was telling
5    me my vice principal is supportive -- my principal
6    is supportive, she's having meetings with him, my
7    superintendent is supportive, my HR director is
8    supportive, and so -- and all of them knew and
9    none of them said anything to me, so I didn't -- I
10   still don't believe I did anything wrong, but at
11   the time I believe I have 100 percent support that
12   all we were doing is saying, Hey, here's some
13   ideas.  What are your thoughts about this, and
14   leading to having a discussion and sharing of
15   ideas.  That's all it was.
16          Q.     And Rachel Sager is your
17   administrator; correct?
18          A.     Yeah.  She was Damiano at the time.
19          Q.     Okay.  And did you use district
20   facilities and equipment for your I Resolve
21   campaign?
22          A.     So I wouldn't call it campaign,
23   but ...
24          Q.     What would you call it?
25          A.     And then I Resolve resolutions -- so
```

Page 84

Katie Medart - June 6, 2022

1    we used minimally, minimus district equipment for

2    the resolution -- the drafting of the resolutions.

3          Q.    What equipment did you use?

4          A.    I used my desktop a little bit, and

5    then the internet -- or the email.

6          Q.    You used your district email?

7          A.    Yeah.    Because Rachel sent it to me as

8    my administrator.    She initiated it and sent it to

9    me at my school email.

10          Q.    And you used work time during the work

11    day to look at your school email?

12          A.    Yeah.    But all the ones, when you look

13    at Landis's things, they were like -- I don't

14    know, you'd have to timestamp, but I think

15    4:00 p.m., 5:00 p.m., or most of them are all,

16    like, either early in the morning.    It was

17    never -- it wasn't during instructional time.    I

18    think there's one exception of one that was right

19    before instructional time was getting ready to

20    start and it was a forward.

21          But, again, I believed -- and I think

22    there's a policy GBV which states that we're

23    allowed to be involved with staff decision-making

24    related to policies.

25          Q.    Okay.    I want you to take a quick look

Page 85

**Vickers Declaration
Exhibit 2 Page 10 of 66**

Katie Medart - June 6, 2022

1    at what's been marked as Exhibit 7.

2                  (Deposition Exhibit No. 7

3                  marked for identification.)

4    BY MS. VICKERS:

5         Q.    And just tell me if these are

6    documents that were created when you were working

7    on I Resolve.

8         A.    Some of these I didn't create.  Some

9    of these are from Rachel to me.

10        Q.    Okay.  And if they're from Rachel to

11   you, are they using your district email?

12        A.    Let me see.  Yeah.  She sent it to my

13   district email on the first couple that I

14   reviewed.

15        Q.    And were those emails and documents

16   all from when you were doing work on I Resolve?

17        A.    On the resolution -- the drafting of

18   the resolution ideas, yes.

19        Q.    Correct.  Okay.  You can put that

20   aside.

21        A.    Can I make a note here?  Like, a lot

22   of these are from spring break.  So that would

23   have been when -- and I know there's a part in our

24   contract that says about, like, we -- that

25   employees -- so contractors, volunteers, everyone

                                    Page 86

Katie Medart - June 6, 2022

1   said, Well, who's going to be here with my

2   students?  And he told me, like, one of the

3   counselors, Diana Tonneson or someone, was going

4   to come in.  I said, Do you want to know what the

5   lesson is on?  He said sure.  I told him it was

6   about chemistry.  And then I was gonna leave, and

7   he told me I needed to pack all of my belongings,

8   that I wouldn't be coming back.

9        Q.    Okay.  Do you want to take a break?

10       A.    Thank you.

11       Q.    Do you want a break or are you okay?

12       A.    I'll be okay.

13       Q.    I'm going to hand you what's been

14   marked as Exhibit 9.

15             (Deposition Exhibit No. 9

16             marked for identification.)

17   BY MS. VICKERS:

18       Q.    Is that the notice that you received

19   that you were being put on paid administrative

20   leave?

21       A.    Yes, this looks accurate.

22       Q.    And then did you, subsequent to that,

23   have an interview with Danny Huber-Kantola?

24       A.    And Tommy Blanchard and Mickey Jarvis.

25   The day after, on April 6th, they told me there

Page 92

Katie Medart - June 6, 2022

```
 1    was -- I had to ask them for my complaints,

 2    because they didn't have them for me when they

 3    placed me on leave.

 4              And then the day after, they said that

 5    they were just going to read my complaints to me,

 6    and then they questioned me for over three

 7    hours -- about three hours.

 8         Q.    Where did the interview take place?

 9         A.    In this room.

10         Q.    And did you admit in that interview

11    that you used work time and resources on the

12    I Resolve campaign?

13         A.    I admitted to them that, yes, I had

14    used my desktop some and some of the equipment,

15    and minimally, and that I believed that I was

16    allowed to do that.

17         Q.    Did you make a complaint, then,

18    against Tommy Blanchard and Danny Huber-Kantola?

19         A.    Yeah, I did, because I believe they

20    were one of the ones named on the list of people,

21    yeah, with Bob and Nika.

22         Q.    So who did you make a complaint

23    against?

24         A.    I think they were both on there

25    with -- so I think it was Tommy and Danny -- do
```

Page 93

**Vickers Declaration
Exhibit 2 Page 13 of 66**

Katie Medart - June 6, 2022

1   you have it there in front of you?

2        Q.      I do not.

3        A.      I don't remember if I named them in

4   there or not.   I know Bob was named in there, and

5   I know Nika was named in there, and I believe I

6   did definitely name Tommy because I reported it to

7   him and he didn't do anything about it.

8        Q.      There was some reason that

9   Danny Huber-Kantola could no longer conduct the

10  investigation.   Do you know why that was?

11       A.      I don't.   I just know that they were

12  asked to recuse themselves and so they did.

13       Q.      So --

14       A.      It might have been that he was named

15  in there as it -- because I know he questioned me

16  about my beliefs and about me being fit to work

17  with students.   And he was aware about what I had

18  done and didn't say anything.

19       Q.      Was it just one complaint against all

20  of them or did you file multiple complaints?

21       A.      No, I didn't file multiple complaints.

22  I had filed -- I had done -- I did file a separate

23  one for Bob and Nika.   It wasn't a formal

24  complaint, but I didn't know anything.   I had

25  never done a formal complaint against anyone, and

Page 94

**Vickers Declaration**
**Exhibit 2 Page 14 of 66**

Katie Medart - June 6, 2022

```
 1   misinformation in there, tons of it, in his
 2   report.
 3            And I asked him about missing
 4   documents and emails that I know exist and that he
 5   left out that were pertinent, and also -- yeah.
 6   So he just wasn't -- I believe he was hired to
 7   come up with false allegations of policy
 8   violation.
 9       Q.    Before filing your own complaint, did
10   you consult with anyone about doing that?
11       A.    Yeah.
12       Q.    Who did you consult with?
13       A.    My union rep.  She told me to do it.
14       Q.    Mickey Jarvis told you to do it?
15       A.    Yes.
16       Q.    Did she --
17       A.    She put a lot of pressure on me to do
18   it.
19       Q.    Did she say it would be a good
20   strategic move?
21       A.    No.
22       Q.    Did you later withdraw your complaint?
23       A.    I did.
24       Q.    Why?
25       A.    Advice of counsel.
```

Page 97

Katie Medart - June 6, 2022

```
1    there's lots of different interactions that our
2    paths cross.  She has a big family here, and it's
3    kind of a small community.
4                    MS. VICKERS:  I'm going to hand you
5    what was been marked as Exhibit 10.
6                    (Deposition Exhibit No. 10
7                    marked for identification.)
8    BY MS. VICKERS:
9         Q.    Do you recognize Exhibit 10?
10        A.    Yes.
11        Q.    What is it?
12        A.    Investigative finding and
13   recommendation for termination.
14        Q.    And this is a letter that you received
15   from Sherry Ely on June 4, 2021?
16        A.    That is correct.
17        Q.    Turn to the last page.
18        A.    (Witness complies.)
19        Q.    Do you believe Ms. Ely would work hard
20   to treat you fairly?
21        A.    Yeah.
22        Q.    When you read this last paragraph, the
23   last sentence -- the second-to-last sentence
24   offers you a pretermination hearing with
25   Superintendent Kolb on Tuesday, June 8th, at the
```

Page 101

**Vickers Declaration
Exhibit 2 Page 16 of 66**

Katie Medart - June 6, 2022

```
 1   district office?
 2          A.    Uh-huh.
 3          Q.    And you're allowed to bring a
 4   representative?
 5          A.    Yeah.
 6          Q.    Did you attend that meet?
 7          A.    I attended the first one.
 8          Q.    Did you attend the one on June 8th
 9   with Superintendent Kolb?
10          A.    I don't recall if that was the date or
11   not.  Is that the first one?
12          Q.    I don't know what you mean when you
13   say the first one.
14          A.    Because after we met with them they
15   were going to give me another one.  And so -- and
16   then after -- and then legal counsel recommended
17   we don't need to go to another one.  But I did
18   attend -- I think that's the only one that they
19   offered -- or that the date was sent.  And so I
20   did -- I attended my pretermination hearing.
21          Q.    Okay.  And who attended with you?
22          A.    Ray and --
23                THE WITNESS:  I believe you were
24   there.  I think that's the meeting you were here
25   for.
```

Page 102

Katie Medart - June 6, 2022

```
1              Q.    So you had Landis's report?

2              A.    Yeah, but I hadn't had it for very

3    long.

4              Q.    And you had union representation?

5              A.    And it had hundreds of pages in it.

6              Q.    So it had a lot of detail?

7              A.    Yeah, hundreds and hundreds of pages.

8    And I did have union representation.

9              Q.    And you had legal counsel?

10             A.    Yes.

11             MS. VICKERS:  I'm going to hand you

12   what's been marked as Exhibit 11.

13             (Deposition Exhibit No. 11

14             marked for identification.)

15   BY MS. VICKERS:

16             Q.    Do you recognize Exhibit 11?

17             A.    Yes, I do.

18             Q.    What is Exhibit 11?

19             A.    It's a notice of recommendation of

20   termination to the Grants Pass School board of

21   directors from Kirk Kolb dated June 18, 2021.

22             Q.    Were there statements in the I Resolve

23   that you didn't agree with?

24             A.    Well, when I proposed it, it was just

25   a sharing of ideas, so I agreed with that.  But it
```

Page 104

Katie Medart - June 6, 2022

```
1   wasn't meant as, like -- it was honestly proposed
2   as, like, here's these ideas to get discussions
3   started that could be a solution for policies
4   related to gender identity which can be divisive
5   or pick one side or the other.  And ours was
6   trying to literally bring multiple sides of an
7   issue together in one common ground.
8          Q.    Did Rachel's dad have something to do
9   with I Resolve?
10         A.    Yeah, I think he contributed his ideas
11  to it.  I think she would -- I didn't ever have
12  any, though, interaction with him, I mean, until
13  after, but not during the developmental stage.  So
14  you'll have to ask her about his actual
15  involvement and what it was.
16                Out of curiosity, what does it have to
17  do with the termination letter?
18         Q.    So do you recall the school board
19  hearing on July 15, 2021?
20         A.    July 15, 2021, yes.
21         Q.    And --
22         A.    It was like kangaroo court.
23         Q.    And you requested an open hearing;
24  correct?
25         A.    Yes, I did.
```

Page 105

Katie Medart - June 6, 2022

```
 1   State of Oregon     )
                         ) ss.
 2   County of Douglas   )

 3

 4           I, Denise C. Zito Smith, CSR, a

 5   Certified Shorthand Reporter for the State of

 6   Oregon, hereby certify that the witness was sworn

 7   and the transcript is a true record of the

 8   testimony given by the witness; that at said time

 9   and place I reported by stenotype all testimony

10   and other oral proceedings had in the foregoing

11   matter; that the foregoing transcript consisting

12   of 131 pages contains a full, true, and correct

13   transcript of said proceedings reported by me to

14   the best of my ability on said date.

15           If any of the parties or the witness

16   requested review of the transcript at the time of

17   the proceedings, such correction pages are

18   included.

19           IN WITNESS WHEREOF, I have set my hand

20   this 17th day of June 2022, in the City of

21   Canyonville, County of Douglas, State of Oregon.

22

23   <%9578,Signature%>

24   Denise C. Zito Smith

     Oregon CSR No. 01-0375

25   Expires 9/30/2024
```

Page 132

**Rachel Damiano (via Google Docs)**
Resolution 2021-01 - Invitation to edit
March 10, 2021 at 9:44 AM



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

 Resolution 2021-01

 I think I am getting mired in the overwhelming arguments against a lot of the policies but here is what I have started. Let me know your thoughts so far. This is a very preliminary draft.

[ Open in Docs ]

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a document with you from Google Docs.



No. 7
Date 6-6-22
K. Medart
CC Reporting

Plaintiff 5415

**Katie Medart**
Re: Resolution 2021-01 - Invitation to edit
March 14, 2021 at 6:21 PM
Rachel Damiano



**From:** Rachel Damiano (via Google Docs) <iresolve.gp@gmail.com>
**Sent:** Wednesday, March 10, 2021 9:44:10 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Resolution 2021-01 - Invitation to edit

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:



Resolution 2021-01

I think I am getting mired in the overwhelming arguments against a lot of the policies but here is what I have started. Let me know your thoughts so far. This is a very preliminary draft.

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043. USA
You have received this email because iresolve.gp@gmail.com shared a document with you from Google Docs.



**Plaintiff 5416**

**Vickers Declaration**
**Exhibit 2 Page 22 of 66**

From: **Katie Medart** kmedart@grantspass.k12.or.us
Subject: RE: State Board of Education Meeting on March 18, 2021
Date: March 10, 2021 at 3:14 PM
To: Rachel Damiano rdamiano@grantspass.k12.or.us



Sorry, I had a huge project with Jen for science curriculum that took all day! I have to take my son to get fitted for an instrument. I will look at this next few days and get back to you. I saw the deadline and accepted it. ☺

Thanks for all you are doing. It is exciting.

I will connect again soon,

Katie

**From:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Sent:** Wednesday, March 10, 2021 1:59 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** FW: State Board of Education Meeting on March 18, 2021

I think this timeline is doable, at least for the document. What do you think?

I shared this with you too but in case you didn't get it because it came from a different email address, here is a rough mid draft: https://docs.google.com/document/d/1XNgo-86MVuM3QMDdLvKik94RSDLTlqOZMDX1w67EvsM/edit?usp=sharing

**From:** Oregon Department of Education [mailto:ode@public.govdelivery.com]
**Sent:** Wednesday, March 10, 2021 10:24 AM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Subject:** State Board of Education Meeting on March 18, 2021

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Having trouble viewing this email? View it as a Web page.



OREGON
DEPARTMENT OF
EDUCATION
BOARD *of* EDUCATION

## State Board of Education Meeting

**Thursday, March 18, 2021**
**9:00 a.m.**

**Plaintiff 5617**

**Vickers Declaration**
**Exhibit 2 Page 23 of 66**

### Video Conference Only

The State Board of Education will hold a Regular Meeting on **Thursday, March 18, 2021 at 9:00 a.m.**

To comply with the Governor's executive orders, the State Board of Education will conduct the March 18, 2021 meeting by video conference only. Members of the public may watch the board meeting live.

**Agendas and materials** for regular board meetings will be posted at least 24 hours prior to the board meeting and can be accessed at Boardbook.

## Public Comment

**Please note:** The Board will only accept written public comment for the March 18, 2021 meeting. The Board is committed to the public comment process and will consider all public comments. Members of the public may submit written comments or testimony to the State Board email address:

StateBoard.PublicEmail@ode.state.or.us; or by mail addressed to the State Board of Education: 255 Capitol Street NE, Salem, OR 97310.

- Clearly label the subject line as: "Public comment" or "Testimony" and include the topic. Example: "Public Comment: Assessment."
- All written public comment will be posted to Boardbook.
- Public comments or testimony submitted the morning of the Board meeting or during the Board meeting will be posted to Boardbook within 48 business hours.

The Board sincerely appreciates your input, and thanks you for your participation.

Corey Rosenberg
State Board of Education Administrator

Stay Connected with the Oregon Department of Education

  

SUBSCRIBER SERVICES:
Manage Subscriptions  |  Help

*It is a policy of the State Board of Education and a priority of the Oregon Department of Education that there will be no discrimination or harassment on the grounds of race, color, sex, marital status, religion, national origin, age, sexual orientation, or disability in any educational programs, activities or employment. For more information, visit the Anti-Discrimination Policy page.*

rdamiano@grantspass.k12.or.us



**Plaintiff 5618**

**Katie Medart**
RE: Copy of Resolution 2021-01 - Invitation to edit
March 15, 2021 at 4:26 PM
Christopher Jelderks



https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?
The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

> On Mar 10, 2021, at 1:00 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



Plaintiff 5227



Copy of Resolution 2021-01

Open in Docs

oogle Docs: Create and edit documents online.

oogle C, 1600 mphitheatre Parkway, Mountain iew, C 9404, S

ou have received this email because kmedart@grantspass.k12.or.us shared a document with you from oogle Docs.

**Plaintiff 5228**

Katie Medart 
FW: Copy of Resolution 2021-01 - Invitation to edit
March 16, 2021 at 9:09 AM
Rachel Damiano

FYI

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Tuesday, March 16, 2021 9:05 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

- **A public school student seeking to be referred to by a pronoun that is counter to their apparent anatomical presentation,**
- **such as in relation to such youth presenting apparent gender dysphoria (previously 'gender identity disorder', aka, identifies as transgender), should be reasonably accommodated by public school's staff provided with parent permission, however, that any**
- **such policy shall not be mandated upon or required of the public school's staff nor shall any such policy be enacted**
- **that infringes upon the public school's staffs' civil and constitutional liberties, including their freedoms of speech and expression.**

So, I thought that this was about NOT calling a kid a different name without parent permission.....now it seems the language is pushing for teachers and staff to do what they feel is morally or religiously correct.....that may open up a whole basket of worms....what happens if the person is wacky????? what happens is the person does not want to call kids their regular names?

This resolution is a whole lot broader than just the initial thought...why is that?

Sent from my iPhone

On Mar 15, 2021, at 4:26 PM, Katie Medart <kmedart@grantspass.k12.or.us> wrote:

https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?

Plaintiff 5231

What should schools do now?

The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

> On Mar 15, 2021, at 4:04 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email**

**Filter: This email originated from outside GPSD7. Do NOT**

**click links or open attachments unless you know the content**

**is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



Copy of Resolution 2021-01
<image001.png>
Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain
View, CA 94043, USA
You have received this email because

**Plaintiff 5232**

**Vickers Declaration**
**Exhibit 2 Page 28 of 66**

kmedart@grantspass.k12.or.us shared a document with
you from Google Docs.

**Plaintiff 5233**

**Rachel Damiano**
RE: Copy of Resolution 2021-01 - Invitation to edit
March 16, 2021 at 9:46 AM
Katie Medart

The parent permission aspect is fixed now. I am glad you guys caught that! I think we do need to leave it up to the discretion of the teacher as well though. Otherwise we risk restricting the same freedom of speech that we are fighting for.

Do you know what he means by the resolution being broader than he thought?

**From:** Katie Medart
**Sent:** Tuesday, March 16, 2021 9:10 AM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Subject:** FW: Copy of Resolution 2021-01 - Invitation to edit

FYI

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Tuesday, March 16, 2021 9:05 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

> · **A public school student seeking to be referred to by a pronoun that is counter to their apparent anatomical presentation,**
> · **such as in relation to such youth presenting apparent gender dysphoria (previously 'gender identity disorder', aka, identifies as transgender), should be reasonably accommodated by public school's staff provided with parent permission, however, that any**
> · **such policy shall not be mandated upon or required of the public school's**
> · **staff nor shall any such policy be enacted**
> · **that infringes upon the public school's staffs' civil and constitutional liberties, including their freedoms of speech and expression.**
> ·

So, I thought that this was about NOT calling a kid a different name without parent permission.....now it seems the language is pushing for teachers and staff to do what they feel is morally or religiously correct.....that may open up a whole basket of worms....what happens if the person is wacky????? what happens is the person does not want to call kids their regular names?

This resolution is a whole lot broader than just the initial thought...why is that?


Sent from my iPhone


On Mar 15, 2021, at 4:26 PM, Katie Medart <kmedart@grantspass.k12.or.us>

**Plaintiff 5234**

wrote:

https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?

The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

On Mar 15, 2021, at 4:04 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



**Plaintiff 5235**

**Vickers Declaration**
**Exhibit 2 Page 31 of 66**



Copy of Resolution 2021-01
<image001.png>
Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain
View, CA 94043, USA
You have received this email because
kmedart@grantspass.k12.or.us shared a document with
you from Google Docs.

Google™

**From:** Katie Medart
**Subject:** Fwd: Copy of Resolution 2021-01
**Date:** March 17, 2021 at 5:07 PM
**To:** Rachel Damiano

KM

Get Outlook for iOS

**From:** Dorothy Swain (Google Docs) <comments-noreply@docs.google.com>
**Sent:** Wednesday, March 17, 2021 5:00 PM
**To:** Katie Medart
**Subject:** Copy of Resolution 2021-01

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Dorothy Swain added comments to the following document

📄 Copy of Resolution 2021-01

New

7 comments

Comments

objective

Dorothy Swain    New

I would continue to use self-evident here, rather than objective - I don't think they are synonymous.

Reply                                                    Open

'postmodernism'

**Plaintiff 3765**

**Vickers Declaration**
**Exhibit 2 Page 33 of 66**

Dorothy Swain    New

I think the "post-modernism" connection is the weakest part of this. I would delete the entire segment.

Reply                                                    Open

public education is established, funded, and ordained to teach objective truths

Dorothy Swain    New

Do you have a citation for this?

Reply                                                    Open

antithetical

Dorothy Swain    New

antithetical needs an object - antithetical to what?

Reply                                                    Open

ideology

Dorothy Swain    New

opinion isn't necessarily ideology

Reply                                                    Open

mirrors the rise of postmodernism ideology

Dorothy Swain    New

**Plaintiff 3766**

needs a citation - the critique of postmodern ideology is just as subjective as postmodernism itself

Reply                                                          Open

opening a discussion to the mental health of a youth believing they are the opposite gender of their anatomy

Dorothy Swain    New

gender is not sex - gender is social - this phrase seems downright mean-spirited to me

Reply                                                          Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

Google

You have received this email because you are a participant in the updated discussion threads. Change what Google Docs sends you. You can not reply to this email.

**Plaintiff 3767**

**Vickers Declaration**
**Exhibit 2 Page 35 of 66**

From: **Rachel Damiano (Google Docs)**
Subject: Copy of Resolution 2021-01
Date: March 18, 2021 at 1:49 PM
To:



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

### Rachel Damiano resolved comments in the following document

📄 Copy of Resolution 2021-01

Resolved
6 comments

## Resolved

Comments

| objective |
| --- |

Dorothy Swain

I would continue to use self-evident here, rather then objective – I don't think they are synonymous.

Rachel Damiano  *New*

☐ arked as resolved

Reply                                                                    Open

'postmodernism'

**Plaintiff 3768**



postmodernism

Dorothy Swain
I think the "post-modernism" connection is the weakest part of this. I would delete the entire segment.

Rachel Damiano    New
Marked as resolved

Reply                                              Open

---

antithetical

Dorothy Swain
antithetical needs an object - antithetical to what?

Rachel Damiano    New
Marked as resolved

Reply                                              Open

---

ideology

Dorothy Swain
opinion isn't necessarily ideology

Rachel Damiano    New
Marked as resolved

Reply                                              Open

---

mirrors the rise of postmodernism ideology

**Plaintiff 3769**

**Vickers Declaration**
**Exhibit 2 Page 37 of 66**



Rachel Damiano    New

☐ arked as resol ed

Reply                                                    Open

opening a discussion to the mental health of a youth believing they are the opposite gender of their anatomy

Rachel Damiano    New

☐ arked as resol ed

Reply                                                    Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because you are a participant in the updated discussion threads. Change what Google Docs sends you. You can not reply to this email.

**Katie Medart (Google Docs)**
Resolution 2021-01.2 - Add: "essentially"
March 19, 2021 at 1:56 PM



Katie Medart added a suggestion to the following document

 Resolution 2021-01.2

Katie Medart    New

**Add:**

Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA
94043, USA

You have received this email because you are subscribed to all
discussions on Resolution 2021-01.2. Change what Google Docs
sends you. You can reply to this email to reply to the discussion.



Plaintiff 5417

**Rachel Damiano (Google Docs)**
Resolution 2021-01.2 - Add: "essentially"
March 19, 2021 at 3:49 PM



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Rachel Damiano accepted a suggestion in the following document

Resolution 2021-01.2

Katie Medard

**Add:** "essentially"

Rachel Damiano    New

*Accepted suggestion*

Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA



You have received this email because you are a participant in this thread. Change what Google Docs sends you. You can reply to this email to reply to the discussion.

**Plaintiff 5418**

**Vickers Declaration
Exhibit 2 Page 40 of 66**

From: **Rachel Damiano (via Google Sites)**
Subject: I Resolve - Invitation to edit
Date: March 19, 2021 at 4:17 PM



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following site:

**I Resolve**

The resources page is currently hidden but I think we can start adding to it and, when we are ready, unhide it for people to have access to.

Open

iresolve.gp@gmail.com is outside your organization.

Google Drive: Have all your files within reach from any device.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

**Plaintiff 4657**

**Vickers Declaration
Exhibit 2 Page 41 of 66**



**Rachel Damiano (via Google Sheets)**
Sign Resolution 2021-01 (Responses) - Invitation to edit
March 19, 2021 at 5:29 PM

RD

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following spreadsheet:

Sign Resolution 2021-01 (Responses)



iresolve.gp@gmail.com is outside your organization.

Google Sheets: Create and edit spreadsheets online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a
spreadsheet with you from Google Sheets.

Google™

**Plaintiff 5593**

**Vickers Declaration**
**Exhibit 2 Page 42 of 66**

**Katie Medart**
RE: Copy of Resolution
March 22, 2021 at 4:46 PM
Swain, Dorothy

KM

Hi, Dorothy,

Thank you for your time and constructive criticism. I value and appreciate it. I am collaborating with a colleague here at North on the resolution. At this time, not all of your recommendations were implemented, but I wanted to share the current version on our website: https://sites.google.com/view/iresolve/home

I hope you will see you made an impact. Thank you for making it better.  Please relay to Gary that I appreciate his time and heart felt words, as well.

You will notice on the digital form (which you can click on without signing) that we separated the resolutions (policies) we are advocating for from the why. We recognize community members may support the policies and believe they are fair in form and function, but not agree with our reason why we are advocating for them.  Our website is still under construction. I recommend checking back periodically to see what we have updated.

I miss you dearly too, and I still rave about you, but now to my current colleagues instead of my biology and A&P students. ☺

I hope this week is restful,

Katie

Oh… congrats on retirement! I am so excited and wish I could join!!

**From:** Swain, Dorothy <DSwain@roguecc.edu>
**Sent:** Wednesday, March 17, 2021 5:13 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Copy of Resolution

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hi, Katie,
  I got your Google Doc, and I am honored by your request. I made a few comments on the Google drive. I think that the requests at the end are mostly fair and coherent. The weakest parts for me are in the preliminaries: the equating of "self-evident" truths in the Constitution with the "objective" truths you wish to establish, as well as the attack on post-modernism and the attempt to establish gender fluidity as a mental illness. I think that some people who don't agree with you about mental illness and post-modernism might very well agree to sign your petition if those parts were omitted or softened. Also, you get into this slippery

**Plaintiff 3788**

**Vickers Declaration**
**Exhibit 2 Page 43 of 66**

territory where your attacks are just as subjective as the ideology you wish to reject.

I miss you dearly, and I wish we still had the regular opportunity to chat!

All the best,

Dorothy

**This next part is from Gary**:

*We are in the process of figuring out how to accommodate those people who identify as something other than traditional definitions. Just as we are coming to understand the depth of racism, we need to remain open to all of the variations of the human being. When we think we understand what "objective truth" is we should take a long look at our motivations. "Separate but equal" was used to justify conditions in the United States for many generations that were never equal. Our understanding of mind-body processes is constantly evolving. Middle school and high school students are indeed trying to figure out who they are and how they fit into the world.*

*We must always practice kindness. This is a teachable moment for the adults as well as the students. When we label a student with political, pseudo-scientific language like "postmodern" we are pointing a finger at their heart. We are saying they are defective.*

*There is an opportunity to show all students how we treat each other. Pretending to understand what "objective truth" is, and whose ideology is correct, only makes it harder to see that individual and their struggle toward selfhood. People trying to figure out how to adjust accommodations is a nationwide puzzle at the moment. The opportunity to be positive role models is at our door.*

*We must always practice kindness.*

Dorothy Swain

Science Faculty

Rogue Community College

3345 Redwood Highway

Grants Pass, OR  97527

(541)-956-7069

Fax (541)-471-3563

This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. This e-mail was sent in good faith to the address you provided to Rogue Community College. We trust that you have password-protected access to this e-mail account and that any transmitted confidential information is secure. If you are not the named addressee, you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail message by mistake, and then delete this e-mail and any attachments from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.

**Plaintiff 3789**

**Rachel Damiano (via Google Docs)**
Layman's Terms Resolution 2021-01 - Invitation to edit
March 22, 2021 at 7:31 PM



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

Layman's Terms Resolution 2021-01

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a
document with you from Google Docs.



**Plaintiff 4807**

**Vickers Declaration**
**Exhibit 2 Page 45 of 66**

**Katie Medart**

I Resolve

March 22, 2021 at 4:33 PM

Katie Medart

https://sites.google.com/view/iresolve/home

Get Outlook for iOS

**Plaintiff 4665**

**Katie Medart** 
Check it out
March 24, 2021 at 8:52 AM
Christopher Jelderks

Hi, Jelly!

Check out our website at www.iresolvemovement.com

We would like for you to submit a video before Saturday if you are willing? Text or call me at 5414412222 and I will go over details!

God is good!
Katie

Get Outlook for iOS

**Plaintiff 3647**

**Vickers Declaration**
**Exhibit 2 Page 47 of 66**

**Rachel Damiano**
Fw: Revised!
March 25, 2021 at 2:24 PM
Katie Medart

RD

I don't have any changes but let me know if you see something! I want to get it on Youtube today to post to the site and start sending out everywhere. 🙂

*Rachel Damiano*
**Assistant Principal, North Middle School**
**Canvas Support**
**Admin Lead for GP Online (Middle School)**

**Confidentiality Notice:** *This email and any attachments may contain confidential and privileged information intended for the addressee only. If you are not the addressee, or if you have received this email by mistake, please delete it immediately.*

**From:** Johnie Collins <johnie@edgewaterfellowship.org>
**Sent:** Thursday, March 25, 2021 1:41 PM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>; Josh Cunningham <josh@edgewaterfellowship.org>
**Subject:** Revised!

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hey Rachel,

Here is the revised edit. Thank you for taking the time to look over the last one and make notes on it. Please share with Katie and look this one over and let me know if it can improve. Thank you!

https://www.dropbox.com/s/r1grn0suw0n4nw6/iresolveREVedit_exp2.mp4?dl=0

--



**Plaintiff 4343**

**Rachel Damiano** 

Subject: Re: Revised!

Date: March 25, 2021 at 3:02 PM

To: Johnie Collins                    , Josh Cunningham                            , Katie Medart

It looks great! Thank you so much for all the work you guys did. We feel very blessed to have had this opportunity.

I will upload it to Youtube and embed it on the site.

Have a wonderful day!

*Rachel Damiano*
Assistant Principal, North Middle School
Canvas Support
Admin Lead for GP Online (Middle School)

**Confidentiality Notice:** *This email and any attachments may contain confidential and privileged information intended for the addressee only. If you are not the addressee, or if you have received this email by mistake, please delete it immediately.*

**From:** Johnie Collins <johnie@edgewaterfellowship.org>
**Sent:** Thursday, March 25, 2021 1:41 PM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>; Josh Cunningham <josh@edgewaterfellowship.org>
**Subject:** Revised!

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hey Rachel,

Here is the revised edit. Thank you for taking the time to look over the last one and make notes on it. Please share with Katie and look this one over and let me know if it can improve. Thank you!

https://www.dropbox.com/s/r1grn0suw0n4nw6/iresolveREVedit_exp2.mp4?dl=0

--



**Plaintiff 4344**

**Rachel Damiano**
Updates on Resolution 2021-01
March 26, 2021 at 2:50 PM
Matt Heverly , Kerry Alderson

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Hi Matt and Kerry,

Thank you again for your support for the resolution regarding gender identity policies for youth. The video team was amazing to work with and they did a great job filming and editing! If you haven't gotten a chance to take a look, the video is posted on the website: iresolvemovement.com

Do you have any ideas on how we could continue to get the word out and increase momentum for the resolution? We posted the video yesterday evening and have 92 views so far and 23 signatures on the new form (we switched from a google form to an Adobe signature form) and 34 signatures from the Google form. We are reaching out to organizations and individuals that are influencers in policies (ALEC, Prager U, Ben Shapiro) to garner their support as well.

We appreciate any feedback or ideas you have for us. Thank you!

Sincerely,
Rachel and Katie

**Plaintiff 5990**

**Rachel Damiano**
Proposed Policy regarding Gender Identity Policies as they pertain to Schools
March 26, 2021 at 2:31 PM



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Dear Mr. Reynolds,

We appreciate the work that ALEC does to develop fair policies that are, as stated in the mission statement, "dedicated to the principles of limited government, free markets, and federalism." As such, we would be honored if the Education Task Force would consider our resolution as an alternative policy option to proposed wording in the Equality Act or other state legislation regarding gender identity policies.

We feel the Equality Act, as well as Oregon state proposed legislation, restricts freedoms for US citizens and businesses and puts requirements on education institutions that will have negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical and emotional health of youth.

We are requesting that the task force review our proposed resolution and adopt the policy points to then be put forth at the state and federal levels by legislators. The resolution, our reasoning, and many of our research based resources can be found on our website: iresolvemovement.com On the site, we also have a Youtube link to our video explaining the need for this resolution and have outlined the resolutions below. We appreciate any feedback you or the committee may have for us regarding our proposal.

*We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved. In our current times, gender identity is a hot button topic in politics but the resolution*
*below moves away from an argument about "right" or "wrong". It instead focuses on ways in which we can be respectful to all parties involved, while ultimately protecting the hearts and minds of our youth.*

*Therefore, be it resolved that we urge our local, state and federal leaders to adopt the following principles and policies:*

- *We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;*

- *Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;*

- *For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available;*

- *A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and*

- *A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.*

We thank you for your time and attention to this matter.

**Plaintiff 5177**

Sincerely,
Rachel Damiano and Katie Medart
Southern Oregon Assistant Principal and Southern Oregon Science Teacher

 **Katie Medart** 
Subject: Website blocked
Date: March 29, 2021 at 8:30 AM
To: Rachel Damiano

Good Morning,

Can we have our website unblocked?

 FortiGuard Web Filtering

 **Web Page Blocked!**

You have tried to access a web page which is in violation of your internet usage policy.

URL: http://www.iresolvemovement.com/
Category: Newly Observed Domain
User name:
Group name:

To have the rating of this web page re-evaluated please click here.

**Plaintiff 6061**

**Vickers Declaration
Exhibit 2 Page 53 of 66**

From: Rachel Damiano
Subject: FW: URL Rating Update Notification: Mon, 29 Mar 2021 10:11:28 -0700
Date: March 29, 2021 at 10:18 AM
To: Katie Medart



The site should be viewable now. :)

-----Original Message-----
From: FortiGuard Web Filtering Service [mailto:fgweb@fortinet.com]
Sent: Monday, March 29, 2021 10:11 AM
To: Rachel Damiano <rdamiano@grantspass.k12.or.us>
Subject: URL Rating Update Notification: Mon, 29 Mar 2021 10:11:28 -0700

Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.

Dear Fortinet customer,

The website(s) you submitted below has been reviewed and updated:

Submission Date:        Mon, 29 Mar 2021 08:34:06 -0700
URL:                    hxxp://www[.]iresolvemovement[.]com/
Customer Comment:       https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2firesolvemovement.com&c=E,1,sj60CStli29Xl0cHBBsrx8AXqZMhw8xwQi5Thk-0pFxi_YuDFGbJs-CoJhGp6bxGrs-
L1IrrnE6SeTyF-FkT19cMKpGChcSMjbF_HlnjlOXNYGExcXrk&typo=1 is a redirect to a google site. The google site was created by
me and althogh the domain is new, the site itself is safe.
Updated Category:       Advocacy Organizations
Update Date:            Mon, 29 Mar 2021 10:10:08 -0700


If the suggested category does not meet your expectation, kindly contact us through https://linkprotect.cudasvc.com/url?
a=http%3a%2f%2fwww.fortiguard.com%2fcontactus.html%2c&c=E,1,pKK2gY04d_ZGiSPVh4f3VOsVZcWhviIDfgQBYphHJDn6aht5yv
dvCMIRr8M1UljVy3OtmAnehpTF3YlBtHfBmmY8uvduPZmwEY_dxwf0yZQ8B6lZ&typo=1 our Web Filtering team would be happy to
assist you.

Note that FortiGuard Web Filtering Service categorizes websites, but it is your IT manager who decides what categories to block or
allow. Therefore, if you would like access to the site, please contact your IT manager.

The rating update may not be effective immediately on your network because of the Web filtering cache. If you would like to have the
update effective immediately, please contact your network administrator.

Thank you for using FortiGuard Web Filtering Service.

Regards,

FortiGuard Web Filtering Service
Fortinet Inc.

This is an automatically generated notification of rating update.
Please do not reply to this email.


*** Please note that this message and any attachments may contain confidential and proprietary material and information and are
intended only for the use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any review,
use, disclosure, dissemination, distribution or copying of this message and any attachments is strictly prohibited. If you have received
this email in error, please immediately notify the sender and destroy this e-mail and any attachments and all copies, whether electronic
or printed. Please also note that any views, opinions, conclusions or commitments expressed in this message are those of the
individual sender and do not necessarily reflect the views of Fortinet, Inc., its affiliates, and emails are not binding on Fortinet and only
a writing manually signed by Fortinet's General Counsel can be a binding commitment of Fortinet to Fortinet's customers or partners.
Thank you. ***

**Plaintiff 4351**

**Vickers Declaration**
**Exhibit 2 Page 54 of 66**

**Plaintiff 4352**

 

**Rachel Damiano (via Google Docs)**
Untitled document - Invitation to edit
March 29, 2021 at 1:39 PM

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

Untitled document

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a document with you from
Google Docs.

**Plaintiff 5959**

**Katie Medart**
Policy
March 30, 2021 at 1:52 PM
Mitch Meunier                    , Jason Wright

Hi, Mitch and Jason,

Thank you for the time today! Here is the website: https://www.iresolvemovement.com/

Please let me know if you have any questions,

Katie

**Plaintiff 5068**

**Katie Medart**
RE: Policy
March 31, 2021 at 8:45 AM
Jason Wright

Thank you for taking action! I really hope and believe if we all have our voice heard we will make change occur. The challenge is having courage and taking the time to take action.

Have a wonderful day,
Katie

**From:** Jason Wright <JWRIGHT@grantspass.k12.or.us>
**Sent:** Tuesday, March 30, 2021 6:44 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Policy

Thank You Katie. I just signed it.

Get Outlook for iOS

**From:** Katie Medart <kmedart@grantspass.k12.or.us>
**Sent:** Tuesday, March 30, 2021 1:52:47 PM
**To:** Mitch Meunier <MMEUNIER@grantspass.k12.or.us>; Jason Wright <JWRIGHT@grantspass.k12.or.us>
**Subject:** Policy

Hi, Mitch and Jason,

Thank you for the time today! Here is the website: https://www.iresolvemovement.com/

Please let me know if you have any questions,

Katie

**Plaintiff 5070**

**Vickers Declaration**
**Exhibit 2 Page 58 of 66**

April 5, 2021

HAND DELIVERED

Dear Katie Medart:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior.  You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story.  This leave in no way is to be construed that you are guilty of said allegations.  You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

Tommy Blanchard
Principal

cc:  Kirk Kolb
     Mickey Jarvis
     Personnel File
     Payroll



**Plaintiff 1212**

**Vickers Declaration
Exhibit 2 Page 59 of 66**



**Grants Pass School District No. 7**
725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5703
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of BUSINESS SERVICES

June 4, 2021
Katie Medart
224 NW Canyon View Drive
Grants Pass, OR 97526

RE:  Investigation Findings and Recommendation for Termination

Dear Katie,

An investigation was conducted by Bill Landis at the request of the District regarding the allegations that you violated several District Policies – the findings of which you received a copy of this morning and are included below.

"ALLEGATION #1: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Teacher Katie Medart was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Medart is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that *"No employee will use district facilities, equipment or supplies in connection with political campaigning, nor will any employee use any time during the working day for campaign purposes."* Grants Pass School District 7 policy IIBGA-AR "Electronic Communications System Acceptable Use Regulation" (Exhibit 7E) states that *"Attempts to use the District network for Transmission of any materials regarding political campaigns is strictly prohibited."* The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Medart and Ms. Damiano ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.

Ms. Medart by her own admission used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve campaign with colleagues, staff, and persons inside and outside of School District 7. This was supported by Exhibits provided regarding email use under Exhibit 4 which were some of the emails provided by the District 7 IT Department. While Ms. Medart did not like referring to "I Resolve" as a political campaign, her efforts both in the video and through the use of District 7 email and face to face contacts on campus to gain support for the "I Resolve" resolutions were determined to be political campaigning which occurred on District 7 School grounds. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and



*Building Bridges to the Future*

**GPSD 629**

pronouns for gender identity students, and require parents be involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Medart have chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

B.  Used time during her working day for political campaign purposes. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that *"No employee will use district facilities, equipment or supplies in connection with political campaigning, nor will any employee use any time during the working day for campaign purposes."* As stated under Allegation 1A above, the "I Resolve" campaign was determined to be a political campaign. Time stamps on emails shown in Exhibit 4 as well as Ms. Medart's admission that she used time during her workday to communicate regarding "I Resolve" both in emails and face to face communications with other District 7 staff and persons outside of District 7. Ms. Medart stated that the time was minimal however besides email and face to face communications, she also admitted using District 7 computers to work on "I Resolve." Without a forensic computer analysis there is no way to quantify the actual time. The policy does not require a certain amount of time in order to violate it, it states: "nor will any employee use any time during the working day for campaign purposes" which did occur on more than one occasion. Had Ms. Medart not utilized time during her workday for the "I Resolve" campaign this would not have been a violation.

C.  Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that *"On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint."* As stated under Allegation 1A, the "I Resolve" campaign was determined to be a political campaign. In the "I Resolve" video, Ms. Medart identifies herself by stating: *"My name is Katie. And my experience with youth is that I have been teaching for the last 10 years. I am currently teaching at a middle school in Southern Oregon, and prior to that for eight years, I was a science instructor for college and then some high school science teaching experience as well. I've been a coach, multiple sports. And then probably my greatest honor of working with youth is that I have two of my own sons."*

Ms. Medart doesn't introduce herself as a private citizen but rather a Southern Oregon Middle School Teacher giving her first name. While she did not say Grants Pass District 7, She at no time in the video states that the views expressed are that of her own and not that of District 7 or any similar type of statement. Ms. Damiano identified herself similarly by saying: *Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in... as a coach as well.* A simple internet search using "Rachel southern Oregon middle school assistant principal" finds an article identifying Rachel Damiano and her full name, North Middle School, District 7, when she was hired in August of 2020. https://spot.snoregon.com/southern-oregon/517035/gp-district-7-welcomes-damiano-as-new-vice.html. This would have then led someone to easily determine Ms. Medart's identity again since she identified herself by her title. Additionally, Ms. Medart used District 7 email for communications for "I Resolve" to persons inside of District 7 and outside identifying herself as associated with School District 7 with no disclaimer. The media coverage (Exhibits 5A-5E) shows how District 7 was intertwined with Ms. Medart and the "I Resolve" campaign. There media coverage had no statements by Ms. Medart or Ms. Damiano that made it clear that the "I Resolve" campaign was not affiliated with District 7.

**GPSD 630**

Ms. Medart did tell me in my interview with her on May 13th, 2021 that there was a disclaimer on the video associated with YouTube. I did find a disclaimer if a viewer used a drop-down box prior to playing the video. This however was not initially with the video as she admitted in her interview with Dan Huber-Kantola on April 6th, 2021 when she told him that it had been added later and the video itself has nothing a viewer would know isn't just Ms. Medart's view. In the opening statements of the video, Ms. Medart can be heard saying: "I Resolve" and "We Resolve." The fact that there is no differentiation of whether the views or resolution expressed is only hers can be complicated by the word "We" and who else she is referring to. Ms. Medart's story of one of her students coming forward within a few days of the "I Resolve" video being published to ask about the video and wondering if she was homophobic also showed how "I Resolve" was associated with her position as a District 7 teacher. The amount of email complaints, complaints form District 7 employees, and publicity associated shorty after the video and website were published to social media and the internet was representative of how controversial the "I Resolve" proposals and campaign were based upon the responses of many. Had Ms. Medart been clear that the expressed views in the "I Resolve" video and campaign were not those of District 7 then this would not have been a violation of District 7 policy.

D. Used social media and public websites in such a manner that it disrupted the school environment. **"SUSTAINED"** – Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 7C) states that *"Staff members, while on duty and off duty, will treat fellow employees, students and the public with respect while posting on social media websites, etc., in order to prevent substantial disruption in school."* It is clear from the complaints received that the "I Resolve" video posted on YouTube and Facebook, and "I Resolve website created a substantial disruption in school which included student protests, staff complaints, citizen complaints, division among the staff, and was interpreted by some who would be affected by the "I Resolve" resolution as disrespectful.

E. Posted confidential information about a student on social media and a public website. **"SUSTAINED"**- Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 7C) states that *"Staff members, while on duty and off duty, will utilize social media websites, public websites, and blogs: in a professional manner by not posting confidential information about students, staff or district business."* In the "I Resolve" video which was posted on social media and a public website, Ms. Medart disclosed an incident which occurred approximately one year prior within a month of returning to teaching at the K-12 level, she was presented with a female student who was exploring her gender identity and made a request to identify as a male. Lysander Selvig stated he absolutely knew who Ms. Medart was speaking of and disclosed the name of the student to me and circumstances regarding details. His information matched Ms. Medart's disclosure in the "I Resolve" video where the student had contacted teaching staff at North Middle School to request they call her by a different male name and male pronouns. This was corroborated by Principal Tommy Blanchard regarding the student who stated it was common knowledge on campus. Ms. Medart in my in my interview recanted the story as truthful and gave unclear responses to my questions stating that in looking back it was hypothetical although she seemed to indicate she believed the story as well. It is clear that a North Middle School student did exactly what Ms. Medart said occurred regarding gender identity transformation to numerous staff members at the school at the approximate time that Ms. Medart said it had occurred. That student or others viewing the "I Resolve" video as did happen with Mr. Selvig, would have identified the specific student who Ms. Medart spoke of even if she now claimed it was hypothetical.

F. Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation." **"NOT SUSTAINED"** – Grants Pass School District 7 policy "ACB" (Exhibit 7B) states that *"Bias Incident" means a person's hostile expression of animus toward another person or*

**GPSD 631**

*group of person's, relating to the other person's or group's distinguished, or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability or national origin"* It is not clear if Ms. Medart's "I Resolve" campaign was "a hostile expression of animus toward those who use a different gender identity. The "I Resolve" campaign is an attempt to change legislation and policies affecting gender identity. Individuals may perceive her actions as biased which is understandable. However, it is not clear based upon the language of the listed policy that her actions constituted a "bias incident" as there weren't enough facts to positively conclude if the allegation was unfounded or in fact was sustained and did occur.

**Allegation #2**: Between October 2020 and March 2021, Katie Medart discriminated against SPED Teaching Assistant Lysander Selvig who is transgender **"NOT SUSTAINED"** – Grants Pass School District 7 policy "ACB" Nondiscrimination (Exhibit 7A) states that the district prohibits discrimination and harassment on any basis protected by law, including sexual orientation which the policy defines as including an individual's actual or perceived gender identity, appearance, expression or behavior differs from that traditionally associated with the individual's sex at birth. Mr. Selvig alleges that he was discriminated against by Ms. Medart when she refused to use his new name and asked him not to use his name with his class, had him work remotely rather than in her class as a SPED assistant making it difficult to do his job, and removed his status in the school network as a SPED assistant which reduced his ability to access information to help students. The emails I located where he and Ms. Medart communicated between October 2020 and April 2021 (Exhibit 9) show that she did call him Lysander in several of those emails making it difficult to prove that she didn't want him using that name.

Ms. Medart had another teaching assistant (Ashley Cook) who also was also working remotely. Ms. Medart told me that it was Ms. Cook's idea to work remotely which she thought was a good idea. When I interviewed Ms. Cook, she stated that was not correct and thought it was odd Ms. Medart did not want her assisting students in her classroom. Although Mr. Selvig thought this was discriminatory, I was unable to determine if it was due to his being transgender since Ms. Cook also was asked to work remotely. Mr. Selvig's belief that Ms. Medart had his status changed regarding the school network was not substantiated as he was able to have Mr. Blanchard change his status back and Ms. Medart denied she had changed his status. Ms. Medart's involvement in the "I Resolve" campaign which proposed changes to legislation and policies although offensive to him and others, were not discriminatory as there were no defined discriminatory conduct identified as described by District 7 policy.

**Allegation #3**: On or about March 2021, Ms. Medart created a hostile work environment for North Middle School Librarian Tanika Cooks. **"UNFOUNDED"** – Ms. Cooks alleged that Ms. Medarts created a hostile work environment when she spread rumors that Ms. Cooks and another teacher had discouraged Principal Tommy Blanchard from allowing Ms. Medarts to attend the student LGBTQ club meeting on campus. Ms. Cooks stated that she knew Ms. Medarts told another teacher that and believed she had told others. Ms. Cooks said she felt that others may have thought she had done as Ms. Medart claimed and had something to do with her not being able to attend the LGBTQ club meetings. When I interviewed Ms. Medart, she admitted telling a teacher who was a friend and in frustration however she said she had received information from Tommy Blanchard that Ms. Cooks and another teacher had suggested she not be able to attend. Ms. Cooks could offer no further information or actions related to her feelings of the hostile work environment although she did state she felt the "I Resolve" campaign had made the school campus divisive as a result. Having no other facts to include I was unable to substantiate Ms. Cooks allegation.

In reviewing Ms. Medart's job classification (Exhibit 7F), based upon the facts including conduct, I find she failed to meet the standards in her job description in the overview, her essential responsibilities, and qualifications which included:

GPSD 632

**Vickers Declaration**
**Exhibit 2 Page 63 of 66**

- Performs instruction and related duties in accordance with District Policies and terms of the teacher contract
- The ability to effectively work and communicate with students, parents, and school personnel from diverse cultures and/or backgrounds
- The ability to work harmoniously with others
- Maintain the integrity of confidential information relating to students, staff, and district patrons
- Cultivate and model a respectful working and learning environment
- Model personal behaviors of honesty, fairness, courtesy and consideration
- Maintain a cooperative relationship with administration, staff, students and parents
- Demonstrate competency in equity, diversity, and inclusion"

Based on the five (5) sustained Policy violation findings listed above, I am recommending to Superintendent Kolb that he terminate your employment as a Teacher, with Grants Pass School District No. 7. A pre-termination hearing has been scheduled with Superintendent Kirk Kolb for Tuesday, June 8, 2021 at 9 A.M at the District Office. You are welcome to bring a representative with you to that hearing.

Respectfully,

Sherry Ely
Chief Finance & Operations Officer

CC:     Mr. Kirk Kolb, Superintendent
        Mr. Danny Huber-Kantola, Human Resources Director
        Mr. Tommy Blanchard, Principal, North Middle School
        Ms. Mickey Jarvis, Association President

GPSD 633



# Grants Pass School District No. 7

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

June 18, 2021

Katie Medart
224 NW Canyon View Drive
Grants Pass, OR 97526

RE:  Notice of Recommendation of Termination to the Grants Pass School District 7 Board of Directors

Dear Katie,

You were provided with a notice from Director Sherry Ely on June 4, 2021 of "Investigation Findings and Recommendation for Termination" on the basis of an investigation report conducted by Pacific Consulting and Investigation.

Upon complete review of Director Ely's recommendation for termination and the report conducted Bill Landis of Pacific Consulting and Investigation, I have concluded the following:

- You used District facilities, equipment, and supplies to conduct personal business of a political nature.  This is determined to be a violation of Board Policy GBG as state in both Director Ely's letter and the third-party investigation.
- You used the district network for transmission of the related materials and information of these political campaigning efforts.  This is determined to be a violation of Board Policy IIBGR-AR.
- You used paid District time to engage in the efforts to support and promote a campaign of a political nature.  This determined to be a violation of Board Policy GBG.
- When posting the "I Resolve Movement" video, you failed to identify that your political viewpoints were yours personally and not representative of the District.  This is also determined to be a violation of Board Policy GBG.
- Your personal use of social media very much created a substantial disruption to the school environment.  This is determined to be a violation of Board Policy GCAB.
- You posted confidential student information in your "I Resolve Movement" video.  While not explicitly using the students name, the specific details of the scenario you described was determined to have occurred to the extent that many individuals were able to discern who you were referencing.  It has been verified that this student was enrolled in your class throughout the 2019-2020 school year.  This is also a violation of Board Policy GCAB.

Based on the sustained violations of multiple Board Policies, I am recommending to the Grants Pass School District 7 Board of Directors that they terminate your employment with the district effective immediately.  You have the right to a hearing with the Board.  It is your choice as to whether this hearing

*Building Bridges to the Future*



No. 11
Date 6-6-22
K. Medart
CC Reporting
B2S

**GPSD 623**

**Vickers Declaration**
**Exhibit 2 Page 65 of 66**

is to be conducted in executive session or in session open to the public. In this hearing you will hear the charges being brought forth and recommendation to the Board. You have a right to have an attorney present and an opportunity to respond and appeal to the Board.

This hearing is scheduled for the next Board meeting on June 22, 2021 as executive session will start at 5:05 PM. Please let me know if you would like this hearing to be in the open public session or in executive session (closed to the public).

Respectfully,

Kirk T. Kolb
Superintendent
Grants Pass School District 7

GPSD 624

**Vickers Declaration
Exhibit 2 Page 66 of 66**

what that means, and at some point you make a comment that that means at some point the district is required to follow those. Is that correct or not correct?

Rachel Damiano:

If Senate Bill 52 passes, which is what we were discussing, if Senate Bill 52 passes and creates a state of emergency, and not the ODE 2016 guidance would become what we're required to, it would be the LGBTQ2SA+ Student Success Plan that is in correlation to the Senate Bill 52. That would become no longer guidance, it would become practices that we're required to follow, because its tied to legislation. Right now, the 2016 guidance is not tied to legislation.

Bill Landis:

The 2016 guidance that you're referring to, you believe that's not something that you have to follow or required to follow?

Rachel Damiano:

It says best practices. It says, specifically, in there that its not legal advice, and its up to districts to choose what they... If it were something that we had to practice, then our district would be out of compliance for the majority of that document.

Bill Landis:

If the superintendent came out and said we're not going to follow something and gave that to you as an administrator, would that be, then, something that you would then follow?

Rachel Damiano:

I think that's a very broad hypothetical. If we're talking about this case specifically, we as administrators, when things are given to us, we are often asked for feedback. It's a practice of our district that we give feedback. If it was something that was said this is required, then I'd have a conversation and say, "Is this becoming policy?". That's the point of being in leadership is to give feedback and to be able to discuss what would work and what wouldn't work within our schools.

Bill Landis:

Sure. In February 2021, when administrators have that meeting and there's a memo about handling situations, and feedback was received, you weren't under the understanding then that that meant that is how to handle some of those situations at that time?

Rachel Damiano:

Yes, it's saying these are the procedures that we would like to follow, moving forward. Like I said, I had some concerns with it and I set up a meeting with HR to have that discussion.

Bill Landis:

You didn't have any discussion with teachers about situations that may have come up after that, as far as how to handle the situation?

Rachel Damiano:

Bill Landis:

Any other staff, employees, or other District 7 related persons?

Rachel Damiano:

No, it's just us two.

Bill Landis:

Okay. Have you used District 7 facilities, equipment, or supplies, email during the I Resolve, or for the I Resolve campaign?

Rachel Damiano:

Minimally, there was some crossover.

Bill Landis:

Tell me about that.

Rachel Damiano:

You can, obviously, see in my email chains... I can't recall all of them because I haven't been able to look at my email, so I wouldn't be able to tell you every time that its crossed over. At one point, there was a copy of the resolutions that was sent to me, in my district email. I had sent a couple of things to a district email for a staff member. The video, once it was recorded in order to be shared with us by this organization, it was sent to my district email. That's what they had on file. After that, moved it off my district email. I'd have to look back at my emails, or I know you have access to those too. If there are any specific questions you have, or any uses, then I can help answer that.

Bill Landis:

Okay. Any reason why you used the district email, which identified you as an assistant principal at North Middle School? Which, those emails have like a signature line, I guess, that shows your name, with your title, and the school you are associated with. Any reason why you used the district email as part of that?

Rachel Damiano:

For which part? Do you have a specific question?

Bill Landis:

For anything related to I Resolve?

Rachel Damiano:

Okay.

Bill Landis:

Specifically I Resolve type emails, video, reaching out to other persons regarding I Resolve. Things like that.

Rachel Damiano:

**Vickers Declaration
Exhibit 3 Page 2 of 3**

Specifically, with the video, like I said, the organization, that's the email they had on file for me. They know that the video and the work was personal work because of the conversation I had with them, outside. In terms of sending it, again, I'd have to look back and see if it came to my district email and I forward it, or if it came to me and I responded. I'd have to look, specifically. For the bulk of the work that I did, I was using my, in terms of I Resolve, I was use my personal email, or our I Resolve email.

Bill Landis:

With the email correspondence, on District 7 email, did you ever communicate with someone that, "Here's my personal email, I need to not use district email", or, "This is not something associated with the district", at any time. Did you do that?

Rachel Damiano:

Again, I'd have to go back and look and see if I put that into an email. I know that there are emails from my personal email that I either started a conversation, or I forwarded it to my personal email to then continue the conversation from my personal email. Again, I'd have to look back and see. I don't recall, off the top of my head, if I wrote it into an email and said disclaimer.

Bill Landis:

Okay. Were you using any equipment from District 7 as part of the I Resolve campaign? Computers? Other printers? Things of that nature to print?

Rachel Damiano:

I worked on my computer. That would be all I could recall. Yeah, that would be... Unless, potentially, if the resolution was printed off. Again, I'd have to go back and look.

Bill Landis:

Was there a discussion in the I Resolve video between you and Katie Medart, involving one of the North Middle School students, that was then posted on YouTube, and the I Resolve website. The video basically got uploaded to YouTube, which is where I observed it.

Rachel Damiano:

Mm-hmm (affirmative).

Bill Landis:

Then you had a personal I Resolve website. Is that correct?

Rachel Damiano:

Yes.

Bill Landis:

That was public?

Rachel Damiano:

Yeah.

some on, I think very little on the laptop, to be honest. I have my own personal computer at home too, a desktop and a Mac, but I cannot say for sure. So I would say there's a possibility also on that one, but that's not my go-to that I use.

Dan Huber-Kantola:

So the initial work on the resolution was done in the morning, like what time?

Katie Medart:

I get to campus at varying times. I don't know. I'd have to pull it up, but not during teaching.

Dan Huber-Kantola:

Anything after 7:30 in the morning?

Katie Medart:

Yes, I would say that there is a chance that there will be timestamps of that.

Dan Huber-Kantola:

Okay. And then during flex time and flex time is 12:30 to 3:30ish?

Speaker 1:

I guess, that we have a little bit of time in there that's set aside for office hours, but by and large it's after lunch.

Dan Huber-Kantola:

Okay. So some of the writing of the resolution was done during flex time as well.

Katie Medart:

Yes.

Dan Huber-Kantola:

So was it written on a Google Doc through the district Google, so you go to your email account, you've got your email that attaches to Google and then it goes to a Google Doc?

Katie Medart:

I think it was shared to my email but it was written on one through I Resolve, Gmail. The drive for the I Resolve.gp. That's where everything is at least right now. So that's where I believe that it was.

Dan Huber-Kantola:

But shared to you through your email address at school?

Katie Medart:

Yes.

**Vickers Declaration
Exhibit 4 Page 1 of 8**

Dan Huber-Kantola:

So did you send the resolution to anybody using school email?

Katie Medart:

I did.

Dan Huber-Kantola:

Who did you send it to?

Katie Medart:

I might miss someone.

Dan Huber-Kantola:

That's okay.

Katie Medart:

Okay. I can pull it up for reference if you like and be able to name that if you want really accurate.

Dan Huber-Kantola:

Sure. If you have it.

Katie Medart:

Okay. Jason Wright, Leanne Wageley, Jordan Kessler. And many of these, I went and talked to and then they said, send it to me. And then I used my work email to send and it's just titled, "policy" and then the link. Mason Mahaffey. I sent it to Dorothy Swain, she's at RCC, and I asked for her opinions and to edit and she helped edit it. I think all of the rest were me personally texting, but I'm not seeing any when I did a search, any additional show up.

Dan Huber-Kantola:

Okay. So a couple of names, Rachel Damiano.

Katie Medart:

Emailing her the site?

Dan Huber-Kantola:

Yeah.

Katie Medart:

Her and I had regular exchanges. I'm sorry. I was assuming that was a given.

Dan Huber-Kantola:

I thought so but it's just-

Katie Medart:

Yeah, to clarify, I understand. So yes is the answer.

Dan Huber-Kantola:

Okay.

Katie Medart:

It wasn't intentional to leave her name out.

Dan Huber-Kantola:

All right. What about Chris Jelderks?

Katie Medart:

Oh, yes, he is. It didn't pull up when I did it, but I did send it to him. And if you ask me, I will be honest. So if you already have the list you can be open and tell me, and I will confirm. I'm just in a search, you can see what I did. It says I Resolve and I'm scrolling through and looking for any that are there.

Dan Huber-Kantola:

I appreciate you being honest and-

Katie Medart:

I'm not trying to hide that.

Dan Huber-Kantola:

I promise you we had not after all the research.

Katie Medart:

Okay.

Dan Huber-Kantola:

I could do it after all the search.

Katie Medart:

Yeah.

Dan Huber-Kantola:

If you have some information I'm completely transparent with you. The reason that Chris came up for me is, I guess I would ask you about when students were there. Is it possible that you sent something regarding I Resolve to Rachel or Chris or something from Chris during school time when kids were there?

Katie Medart:

No, I do not... I have no recollection of any interaction like that.

Dan Huber-Kantola:

There were kids there at that time? So it's 9, 10, 9:00 in the morning, are kids in school?

Katie Medart:

At nine, they are. They had the potential they could have been in the classroom when I forwarded that email. Yes. There was no conversation. No talking about it. There was him giving me that and me forwarding it to her. Is there a chance that you're asking me if kids were sitting in the class? Are you asking me if I spoke about it with kids in the classroom?

Dan Huber-Kantola:

Is there a chance kids were there?

Katie Medart:

Okay. Then yes, there is a chance that kids are in by that time.

Dan Huber-Kantola:

But no speaking to kids, right?

Katie Medart:

No. Other than what I have disclosed to you with my interaction with Griffin Laskey.

Dan Huber-Kantola:

Great. So you did say you had conversations with some of the people, Jason Wright, Jordan Kessler, Mason Mahaffey, Leanne, and then forwarded to them. So when did those conversations take place? Was that during the school day?

Katie Medart:

At the end of the day.

Dan Huber-Kantola:

Like during the flex time or-

Katie Medart:

Like when your students were on campus? Yes. After office hours.

Dan Huber-Kantola:

Okay. So would that have been still during the workday? In some cases prior to 3:30 in the afternoon?

Katie Medart:

Some yes, some after but on property.

Dan Huber-Kantola:

Okay.

Katie Medart:

You're taking really good notes. I'm focusing on answering so I have not been able to record this.

Dan Huber-Kantola:

It's recorded, so we'll make sure you get a copy. So Katie, with those conversations, did you go to them to have those conversations?

Katie Medart:

I did, yes.

Dan Huber-Kantola:

Okay. So you initiated the conversations with them about the I Resolve or was it something that they asked you about, but something that you approached them about?

Katie Medart:

And honestly, I did mention this Jason Wright but Mitch Mooney was another one because they were together. And so you'll see one email sent to him. Now I'm thinking about, I've had people ask me but most of them, I will say, I went and said, "I want to share about policy that we are hoping to have you consider and get your opinion and talk about it."

Speaker 2:

Okay. Appreciate that honesty.

Katie Medart:

Mm-hmm (affirmative).

Dan Huber-Kantola:

So just bluntly, that would be a concern for me that that's violating the policy there. And also probably violating our contract. I think if we looked at article nine in our contract, it talks about all time is teaching time. It's supposed to be just for the educational purposes of school. Might be an exception in there for lunch, but using the internet, using the email and stuff would also likely be a violation of policy. But I won't think about it small, okay. But you can ask Mickey, I tend to be maybe too transparent sometimes.

Speaker 3:

Seems to work best.

Dan Huber-Kantola:

Yeah.

Katie Medart:

I am trying to be very transparent.

Dan Huber-Kantola:

Mickey:

So then, just to clarify that last piece.

Dan Huber-Kantola:

Yeah.

Mickey:

I just want to make sure I'm going to help versus hinder, or compound. So the reason that you are in the I Resolve movement that you created or co-created or participated in, the I Resolve movement is not to push your religious belief.

Katie Medart:

No. It is to write fair policies for all students. That was the intent.

Mickey:

What policy that exists is... or the understanding of the policy.

Katie Medart:

I said, we're going to put it this way. My-

Mickey:

Or the confusion in the policy.

Katie Medart:

Yeah. One, the confusion in the policy, the understanding of what I thought was coming. Our video even makes that clear that this is coming, not that... Our video says that. Not that it's here, not that this is our current policy. It says this is coming.

Mickey:

Thanks. Okay.

Dan Huber-Kantola:

Just to clarify that. The video does talk about the equity at the federal level. And the video does talk about Senate Bill 52? I believe, and so yeah, those are things that are coming.

Katie Medart:

That are open for public comment.

Dan Huber-Kantola:

Yes. But the district guidance, in the ODE guidance, has been there since 2016. And I guess I would ask you, have you seen the ODE guidance document?

Katie Medart:

**Vickers Declaration**
**Exhibit 4 Page 6 of 8**

Dan Huber-Kantola:

And so first one we have to look at was the GCAB violated with the social media posts? Did it cause a disruption? Is it significant or any disruption at school? So did it violate that particular policy? If so, then what? Same with the JOICBAR, the student confidentiality, did the post violate that? And if so, then what? The policy, GBG, about designating viewpoints and that kind of stuff, did that violate that or not? And if so, so forth. Did you violate the user agreement, the internet user agreement, and policy GBG about using school time and school equipment to do political action stuff?

Dan Huber-Kantola:

And if you did violate that, then are there consequences to that? I'm saying with that group of things that Tommy read there, with the ones that are in the complaint about the students and the students feeling welcoming and all of those types of different things. And then just down the line, trying to identify were things violated and that kind of stuff? And I heard what you said, that there was a part of this that you felt like people knew.

Katie Medart:

We really thought we were being respectful and honorable in how we were doing it before just going onto social media. I recognize, just as there's a process that we are going through with this, that there is a process and a respectful way to go about it, and before you go and launch something. And so we really thought that. I believe that, and I believe Rachel will say she believed that. We were not trying to be sneaky, we were not trying to do behind the district's back. It is why we approached people in the district.

Dan Huber-Kantola:

A lot of time, it seems like there was a significant amount of time spent on this, district time, with reaching out to people, with emailing people, with getting revisions to the policy or to the resolution, to those [inaudible 01:56:26], scratched loop policy to the resolution.

Katie Medart:

But do you feel like I didn't do my job?

Dan Huber-Kantola:

I would have a hard time saying that that's within policy to do, to do those things during district time, to use district equipment to do those things.

Katie Medart:

I understand, and I hear what you're saying. And I have obviously confessed to the fact that I did that. I also know that there is so many other staff members that have done the same thing. Should I disclose the one that I sent a screenshot or should we wait?

Mickey:

You... I don't know that I could advise you rightly or wrongly here.

Katie Medart:

**Vickers Declaration**
**Exhibit 4 Page 7 of 8**

Who put those sites up or maintains them?

Katie Medart:

Rachel.

Mickey:

Okay.

Katie Medart:

I get screenshots every once in a while about a message. I'm not on there. I don't go check it. I don't... I'm not-

Mickey:

So Rachel Damiano would be the person to ask about that.

Katie Medart:

Yes. That's who you should ask.

Dan Huber-Kantola:

Okay. I could do that. Did Rachel know that you were spending this much time working on these things, talking to people during the school day?

Katie Medart:

Yes. I went and told her that I talked to so-and-so.

Dan Huber-Kantola:

So when you talked to Jason Wright and Mason Mahaffie and Jordan Kasler, Rachel knew that you'd talked to all those different people. She knew that you talked to them during flex hours?

Katie Medart:

Yes. She has reiterated to me over and over, this is not political issue. This is education policy. Over and over and over. And I believe she will do a much better job explaining the reason, being an administrator, than me trying to articulate. And I hear you clearly telling me that your views are, that is political policy, it's politics, anything to do with any policy is politics, is what I heard you say when I asked you for the definition of it.

Dan Huber-Kantola:

Yeah. Yeah. So she knew you were talking to people to try to gather support for the resolution during the flex time?

Katie Medart:

Yes. I believe she will say that she was aware of that. I would tell her after I did it, "Today, I went and talked to...," "I shared this information. I sent them the link." "This person said they would check it out," "This person said, 'Thank you. They're excited,'" "This person said, 'I signed it.'"

**Vickers Declaration**
**Exhibit 4 Page 8 of 8**



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION

RACHEL G. DAMIANO and KATIE S.
MEDART

          Plaintiffs,

vs.                          Civil No. 1:21-cv-00859-CL

GRANTS PASS SCHOOL DISTRICT 7,
an Oregon public body, et al.,

          Defendants.
_____

DEPOSITION OF

KIRK KOLB

TAKEN ON
TUESDAY, JUNE SEVENTH, 2022
9:01 A.M.

GRANTS PASS SCHOOL DISTRICT
725 NORTHEAST DEAN DRIVE
GRANTS PASS, OREGON 97526

**Vickers Declaration
Exhibit 5 Page 1 of 17**

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 39

1  **gender identity, does the Grants Pass School**

2  **District require that teachers conceal the gender**

3  **identity of a transgender student from his or her**

4  **parents or guardians unless the student gives**

5  **permission to reveal it?**

6           MS. VICKERS:  Object to form.

7           THE WITNESS:  Yeah.  So, yeah, what I do

8  know is if a student requests that parents don't

9  know, we ask the counselors to work with the student

10 to work with their parents, and in the meantime,

11 honor that student's request.

12 **BY MR. HACKE:**

13      **Q.   The request for secrecy?**

14      A.   To withheld it -- withhold that from the

15 parent, yeah.

16      **Q.   Okay.  So if a teacher needs to have a**

17 **parent-teacher conference for some reason with the**

18 **parent or teacher of a transgender student, what**

19 **name and pronouns does the district require the**

20 **teacher to use?**

21      A.   We -- we don't have a procedure

22 established for parent-teacher conferences, and each

23 one of those situations is incredibly unique and

24 depending on the welfare of the student.

25      **Q.   Okay.  Does the Grants Pass School**



Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 40

1    District permit transgender students to use the

2    bathrooms, locker rooms, and other quasi-private

3    facilities associated with their adopted gender

4    identify rather than their biological sex?

5        A.    By law, yes.

6        Q.    To the best of your knowledge, what is the

7    rationale behind this policy?

8        A.    The law.

9        Q.    Okay.  Are you aware that in various

10   settings, prisons, clothing retailer dressing rooms,

11   even public schools, biological males have asserted

12   transgender status to gain access to women's

13   dressing spaces?

14           MS. VICKERS:  Object to the form.

15           THE WITNESS:  I'm not.  I'm not aware of

16   what happens in other contexts or places

17   necessarily.

18   BY MR. HACKE:

19       Q.   Are you aware that biological males have

20   sometimes done that to film women or girls in

21   various states of undress?

22           MS. VICKERS:  Object to form.

23           THE WITNESS:  I'm not aware.

24   BY MR. HACKE:

25       Q.   Are you aware that biological males have

**NAEGELI**
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 52

1    Q.    Okay.  They were not on district property

2  when they made the video, were they?

3    A.    To my knowledge, no.

4    Q.    They made the video at a local church, did

5  they not?

6    A.    To my knowledge, they did.

7    Q.    Okay.

8    A.    I don't know what editing they may or may

9  not have done while on district property.  I know

10 they used district equipment and resources to do so,

11 to do part of their movement so I think it's called.

12    Q.    Okay.  So Ms. Sager and Ms. Medart used

13 equipment that was not owned or provided by the

14 district to make their I Resolve video; am I right?

15    A.    I'm sure some of what they used was not

16 district equipment.

17    Q.    Okay.  They used a camera that was owned

18 by the church where they shot the video, correct?

19    A.    I don't know who owned the camera.

20    Q.    They also used their own personal

21 computers to edit and upload the video to the

22 Internet; am I right?

23    A.    I -- I don't know whose computer they used

24 for editing the video.

25    Q.    In the video -- they also used their own



**NAEGELI**
DEPOSITION *&* TRIAL    (800)528-3335
NAEGELIUSA.COM

**Vickers Declaration**
**Exhibit 5 Page 4 of 17**

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 53

1  **computers to type out their scripts and their**

2  **proposals, did they not?**

3      A.    I do know that their scripts and

4  proposals, there was some that involved the

5  communication over the district -- the district

6  network and district accounts regarding the sharing

7  and soliciting feedback.

8      Q.    Okay.  **In the video, they did not mention**

9  **that they were employees of the Grants Pass School**

10 **District, did they?**

11     A.    I'd have to watch it again.  To the best

12 of my recollection, they did not indicate Grants

13 Pass School District.

14     Q.    **In fact, they did not even mention that**

15 **they live and work in Grants pass; am I right?**

16     A.    No.  I think they said Southern Oregon.

17     Q.    **Okay.  Southern Oregon's a pretty big**

18 **place, isn't it?**

19     A.    Yeah.

20     Q.    **Okay.  Stretches from the Pacific Ocean on**

21 **its west side on the Idaho border on the east?**

22     A.    That would be Eastern Oregon.  I don't

23 know. I don't know what the -- I don't know where

24 the cutoff is for Southern Oregon.

25     Q.    **But Southern Oregon could include any**

**NAEGELI**
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 57

1    **multiple students who might match the illustrative**

2    **scenario in the I Resolve video?**

3        A.    I'm sure there is.

4        **Q.    Okay.  Did Ms. Sager say anything in the I**

5    **Resolve video that disparaged transgender students?**

6        A.    Not to my knowledge.

7        **Q.    What about Ms. Medart?**

8        A.    Not to my knowledge.

9        **Q.    Okay.  Now, on or about March 31, 2021,**

10    **you started receiving informal concerns from**

11    **district staff about the I Resolve video; would you**

12    **say that's accurate?**

13        A.    Staff and community.

14        **Q.    Okay.  To the best of your recollection,**

15    **about how many concerns did you receive?**

16        A.    Over the course of when, on March 31?

17        **Q.    Starting on March 31.**

18        A.    Over the course of the whole thing?  I

19    would have to go back and look, but I would say I

20    personally, I would say, oh, man, that's hard to put

21    a number on it, but it's probably more than 75,

22    fewer than 150.

23        **Q.    Okay.**

24        A.    That's rough estimates.

25        **Q.    Okay.  So to the -- to the best of your --**



NAEGELI
DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 58

1   what exactly were the GPSD staff members you heard

2   from complaining about?

3        A.    I'd have to go back and look at specifics.

4   I believe there were concerns of discriminatory or

5   promoting discriminatory practices has the general

6   flavor of most of what the concerns, I would say.

7        Q.    All right.  In response to the negative

8   reactions to the I Resolve video, did you or did you

9   not tell Ms. Medart and Ms. Sager to take it down?

10       A.    I never told them to take it down.

11       Q.    In response to complaints about the I

12   Resolve video, did you or did you not prohibit Ms.

13   Medart from attending a meeting -- a meeting of

14   North Middle School's LGBTQ Plus student club on

15   March 31, 2021?

16       A.    I denied her request based on the

17   significant disruption and perceived harm that was

18   caused by their actions.

19       Q.    This was despite the fact that the

20   students in the club voted to allow her to attend?

21       A.    Yeah.  I didn't know that at the time, but

22   I guess, yeah.

23       Q.    In response to complaints about the I

24   Resolve video, did you or did you not threaten to

25   pursue disciplinary action against Ms. Sager and Ms.

**NAEGELI**
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 70

1  and thoroughly investigated.  Thank you.

2       Q.   Okay.  So via this email, did you or did

3  you not solicit complaints from GPSD students and

4  their parents?

5           MS. VICKERS:  Object to form.

6           THE WITNESS:  It does not appear that I

7  asked them to contact me.

8           MR. HACKE:  Okay.  At this point, I would

9  like to enter Exhibits K and L into the Record.

10          (WHEREUPON, Landis Report Information on

11 Katie Medart was marked as Exhibit K and Landis

12 Report Information on Rachel Sager was marked as

13 Exhibit L for identification.)

14 BY MR. HACKE:

15      Q.   Okay.  So while Ms. Medart and Ms. Sager

16 were on administrative leave, the district hired a

17 gentleman named Bill Landis to conduct an

18 investigation into their conduct; am I right?

19      A.   Yes.

20      Q.   Okay.  And so exhibit -- Exhibit K, is

21 Exhibit K a true and accurate reflection of a list

22 of exhibits from Mr. Landis' report concerning their

23 conduct?

24      A.   It appears to be something out of one of

25 his reports.

**NAEGELI**
DEPOSITION & TRIAL

**(800)528-3335**
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 93

1          A.    Outside of school hours opposing -- if

2    they are exercising their First Amendment rights,

3    they are entitled to that outside of their

4    responsibilities as teachers.

5          **Q.    Okay.  All right.  So now going back to**

6    **Mr. Landis' investigation, among the things that Mr.**

7    **Landis investigated or that his investigation found**

8    **was that Ms. Sager and Ms. Landis -- or Ms. Medart**

9    **used GPSD facilities, equipment, and supplies for**

10   **political campaigning efforts; am I right?**

11         A.    I believe that was the term he used.

12         **Q.    Okay.  Are you familiar with Section**

13   **260.432 of the Oregon Revised Statutes?**

14         A.    No.

15              **MR. HACKE:**  Okay.  At this point, I would

16   like to enter into the Record Exhibit S.

17              **(WHEREUPON, ORS 260.432 was marked as**

18   **Exhibit S for identification.)**

19              **THE WITNESS:**  I have it.

20   **BY MR. HACKE:**

21         **Q.    Okay.  Did Plaintiffs use school**

22   **facilities, equipment, or supplies to solicit money**

23   **during school hours?**

24         A.    Not that I'm aware of.

25         **Q.    Did the plaintiffs use school facilities,**



NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

**Vickers Declaration**
**Exhibit 5 Page 9 of 17**

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 94

1  equipment, or supplies to solicit influence during

2  school hours?

3      A.    Yes, influence.

4      Q.    How so?

5      A.    They were seeking the influence of their

6  peers and colleagues to support their movement and

7  related proposals.

8      Q.    Did Plaintiffs use school facilities,

9  equipment, or supplies to solicit -- solicit

10  services during school hours?

11      A.    I believe they asked for other school

12  employees to review their video and/or resolution

13  and/or other documents.

14      Q.    Okay.

15      A.    So if those are services, I guess that's

16  -- they want other people to review and advise.

17      Q.    Okay.  Did the school use -- did

18  Plaintiffs use school facilities, equipment, or

19  supplies to solicit any other thing of value during

20  school hours?

21      A.    Anything of value.  Nothing of monetary

22  value that I'm aware of.

23      Q.    Okay.  Did Plaintiffs use school

24  facilities, equipment, or supplies to promote or

25  oppose a political committee during school hours?

**NAEGELI**
DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

Kirk Kolb   June 7, 2022   NDT Assgn # 57963   Page 98

1 the speech is consistent with district policy and

2 resolutions.

3          It's deemed that it's consistent with our

4 Policy ACB and the board resolution on equity,

5 diversity, and inclusion.  Further questions,

6 contact HR director, your building administrator, HR

7 director, or myself.

8          Carefully consider when choosing items to

9 display in our classrooms.  Our school should not be

10 a place of controversy nor a place of promoting one

11 side of a political or civil issue.  Items should

12 have an inherent educational purpose tied directly

13 to the education we provide.

14      **Q.   Okay.  So how would you describe Ms.**

15 **Medart's and Ms. Sager's employment records prior to**

16 **April 2021?**

17      A.   I think as stated earlier both were

18 employees in good standing.

19      **Q.   Okay.  So -- so please describe why you**

20 **recommended the firing of the plaintiffs.**

21      A.   I recommended the firing of the

22 individuals for utilizing, in summary, utilizing

23 district resources to promote what have been viewed

24 as discriminatory actions or policy causing a

25 substantial disruption to the educational



**NAEGELI**
DEPOSITION & TRIAL   (800)528-3335
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 99

1  environment.

2      Q.   Okay.  Did you submit a complaint to the

3  -- to Oregon's Teacher's Standards and Practices

4  committee -- or Teacher's Standards and Practices

5  Commission anticipating, and in essence requesting,

6  that Ms. Medart's license be suspended or revoked?

7      A.   I did not.  I'd have to look, but I

8  anticipated there was a potential consequence.  It

9  wasn't a request, it was an anticipated consequence

10  of their actions.  So I did submit a report to TSPC

11  as I'm required to by law.

12          MR. HACKE:  Okay.  All right.  I'd like to

13  enter Exhibit U into the Record.

14          (WHEREUPON, a Report to the Teacher

15  Standards and Practices Commission was marked as

16  Exhibit U for identification.)

17  BY MR. HACKE:

18      Q.   Can you tell me what Exhibit U is, please?

19      A.   It is the form used to, and this

20  particular document was a report to Teacher

21  Standards and Practices Commission for Katie Sue

22  Medart.

23      Q.   Okay.  All right.  Did you submit -- did

24  you also submit a similar report for Ms. Sager?

25      A.   I did.



**NAEGELI**
DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

**Vickers Declaration**
**Exhibit 5 Page 12 of 17**

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 102

1    Q.    Okay.  So you say in that email that the
2    resolution was discriminatory in nature.  What was
3    your basis for making that claim?
4    A.    To -- their proposal was to not allow
5    transgender students the -- to use the restroom by
6    which they identify --
7    Q.    Okay.
8    A.    -- which is discriminatory.
9    Q.    Was this claim investigated by Mr. Landis,
10   the third-party investigator?
11   A.    I do not believe that was part of his
12   investigation as to whether or not it was
13   discriminatory.
14   Q.    Okay.  Would you say that your comment
15   that it was -- that the I Resolve video was
16   discriminatory in nature was your personal opinion?
17   MS. VICKERS:  Object to the form.
18   THE WITNESS:  It was my understanding of
19   the law at the time so not necessarily my personal
20   opinion, but my interpretation of the law.
21   BY MR. HACKE:
22   Q.    Did your email include the required
23   disclaimer regarding your opinion or were you
24   speaking on behalf the district?
25   A.    Again, it was my interpretation of the law

**NAEGELI**
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 103

1  and not a personal viewpoint.

2      Q.    Did the board vote to reverse the

3  plaintiffs' July -- July 15, 2020 decision to

4  terminate, thereby reinstating the plaintiffs?

5      A.    Four of the board members voted in favor;

6  hence, a majority.

7      Q.    Okay.  So that would be the board did --

8  did reinstate, correct?

9      A.    Correct.

10     Q.    Okay.  Have there been -- have there been

11  student demonstrations arising from the I Resolve

12  video or the employment status of the plaintiffs?

13     A.    Yes.

14     Q.    How have those been handled by the

15  district office?

16     A.    How we handled it, how we handled student

17  demonstrations, try to meet with students, try to

18  maintain civility, try to the best of our ability

19  not to disrupt the educational environment and

20  processes.

21     Q.    Have there been any other student

22  demonstrations this school year that were not

23  related to I Resolve or the plaintiffs?

24     A.    Yes.

25     Q.    Tell me about those.



**NAEGELI** DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

**Vickers Declaration**
**Exhibit 5 Page 14 of 17**

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 104

1    A.    We had a demonstration opposing the

2    potential overturning of Roe v. Wade that took place

3    during class time on Grants Pass High School's

4    football field.

5    **Q.    Okay.**

6    A.    We also had one, a sit-in -- well, sit-in,

7    demonstration during lunch to memorialize George

8    Floyd, expressing concern over excessive police

9    force.

10    **Q.    How were those handled differently from**

11    **the demonstrations concerning I Resolve and the**

12    **plaintiffs?**

13    A.    We learned a lot, how can we help students

14    be safe.  The demonstration over the I Resolve and

15    LGBTQ support resulted in a lot of -- in a lot of --

16    in outside entities antagonizing students who were

17    demonstrating, inciting -- inciting a lot of

18    misbehavior by students.

19    I believe there was one nonstudent adult

20    who was arrested for their behavior, police

21    ultimately trying to maintain order.  We ultimately

22    became a target of some of the behavior.

23    So it was outside of our campus secure

24    walls and so in an effort to -- in an effort to try

25    to maintain students' safety, we worked with



NAEGELI
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

Kirk Kolb    June 7, 2022    NDT Assgn # 57963    Page 105

1    students to keep the demonstration in an area which

2    we could guarantee their safety at a much higher

3    level.  So that was the significance there.

4        Q.    In the last demonstration, were students

5    given discipline for interrupting school time in

6    accordance with state law?

7        A.    Yes.  We -- prior -- so we've had

8    demonstrations over the years, and we've monitored

9    and allowed them to happen.  They've all happened

10   off campus on the streets around the district.

11           They've all been relatively peaceful until

12   the one happened after the I Resolve, which got very

13   incited.  Other participants, uninvited, non -- non-

14   District 7 participants showed up.  We've never had

15   that issue before.  The -- what are they called, the

16   Rogue Valley Salt Shakers showed up and were

17   inciting all kinds of, yeah, awful stuff.

18           And so previously, all demonstrations had

19   been peaceful and then we had this one and it got

20   out of hand and which we said, you know what, we've

21   got to get this under control.

22           Previously, there was never discipline.

23   Going back all the years that I've been a district

24   office employee; so 12 years we had never done

25   discipline.



```
1                          CERTIFICATE

2

3          I, Lee Anne McAdam, do hereby certify that I

4     reported all proceedings adduced in the foregoing

5     matter and that the foregoing transcript pages

6     constitutes a full, true and accurate record of said

7     proceedings to the best of my ability.

8

9          I further certify that I am neither related

10    to counsel or any party to the proceedings nor have any

11    interest in the outcome of the proceedings.

12

13         IN WITNESS HEREOF, I have hereunto set my hand this

14    21st day of June, 2022.

15

16

17

18    _____

19                 Lee Anne McAdam

20

21

22

23

24

25
```



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



(800) 528-3335

N A E G E L I U S A . C O M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION

RACHEL G. DAMIANO and KATIE S.
MEDART

      Plaintiffs,

vs.                Civil No. 1:21-cv-00859-CL

GRANTS PASS SCHOOL DISTRICT 7,
an Oregon public body, et al.,

      Defendants.
_____

DEPOSITION OF

SHERRYL ELY

TAKEN ON
TUESDAY, JUNE SEVENTH, 2022
3:04 P.M.

GRANTS PASS SCHOOL DISTRICT
725 NORTHEAST DEAN DRIVE
GRANTS PASS, OREGON 97526

**Vickers Declaration
Exhibit 6 Page 1 of 8**

Sherryl Ely   June 7, 2022   NDT Assgn # 57963   Page 6

```
1              THE WITNESS:  I do.

2              THE REPORTER:  Thank you.

3   SHERRYL ELY, having been duly sworn, was examined

4   and testified as follows:

5   EXAMINATION

6   BY MR. HACKE:

7        Q.   Please state your full name for the Record

8   spelling your first, middle, and last names.

9        A.   Sherryl Ann Ely.  S-h-e-r-r-y-l A-n-n E-l-

10  y.

11       Q.   Okay.  In preparation for this deposition,

12  did you review facts or utilize documents that have

13  not been disclosed to the plaintiffs?

14       A.   No.

15       Q.   Have you talked to anyone other than your

16  attorney about this case?

17       A.   I have not.

18       Q.   Okay.  Please state your role for the

19  district.

20       A.   I am the chief finance and operations

21  manger.

22       Q.   How long have you been in that role?

23       A.   I have been that role for approximately 12

24  years.

25       Q.   How did you get into that role?
```



NAEGELI
DEPOSITION & TRIAL   (800)528-3335   NAEGELIUSA.COM

Sherryl Ely    June 7, 2022    NDT Assgn # 57963    Page 28

1  had made, but it was something that was coming

2  before the legislature that -- that they were

3  concerned about and were wanting to make their

4  position known as well as supporting the positions

5  of others who believed the same that they did.

6      Q.    **Please -- please describe why you**

7  **recommended that the plaintiffs be fired.**

8      A.    My main reason for recommending

9  termination was really twofold.  One -- well,

10  actually it was threefold.

11          One, they used the district time and

12  equipment to work on the I Resolve campaign or

13  project; so it was working on the video as well as

14  crafting some documents.  And there were just a

15  couple of emails that they had done that were

16  related to that.

17          And then two, in discussing or in -- in

18  making my decision -- so part of that process is

19  that they have the chance to come and talk to me

20  when I make a recommendation, when any administrator

21  makes a recommendation for termination.

22          One of the due process things afforded to

23  them is that they can talk to that person.  Neither

24  one of them wanted to speak with me about that.

25          In my opinion, that was unfortunate



**NAEGELI**
DEPOSITION & TRIAL    (800) 528-3335
NAEGELIUSA.COM

**Vickers Declaration
Exhibit 6 Page 3 of 8**

Sherryl Ely    June 7, 2022    NDT Assgn # 57963    Page 29

1   because I would have liked to talk to both of the

2   ladies about what they had done and why they had

3   done it.  And then my third reason was because they

4   are both probationary.

5       Q.    Okay.  So you said there was only a couple

6   of emails, correct?

7       A.    Right.

8       Q.    Would you say that that's de minimis?

9           MS. VICKERS:  Object to the form.

10          THE WITNESS:  In my opinion, no, it was

11   not de minimis.

12   BY MR. HACKE:

13      Q.    Why is only a couple of emails not de

14   minimis?

15      A.    Just because of the time that they had to

16   have spent on -- on the emails that I reviewed as

17   part of the process.

18      Q.    How much time would you estimate that they

19   spent on those emails?

20      A.    I don't -- I couldn't estimate that.

21      Q.    How long -- how long were these emails?

22      A.    Some of them were, in my opinion, for an

23   email extensive when I consider what I usually put

24   in an email and the -- and the work that they were

25   -- were doing through email.



Sherryl Ely    June 7, 2022    NDT Assgn # 57963    Page 30

1   Q.    So was that the only use of -- of

2   equipment that they did that you found?

3        A.    No.  I believe that they were using some,

4   like, you know, paper, material, copies, that kind

5   of thing as part of the process.

6        Q.    How -- about how much of paper were they

7   using?

8        A.    I could not tell you off the top of my

9   head. I would have to go back to the report to

10  review that.

11       Q.    Okay.  Don't a lot of people at the --

12  throughout the district, you know, print things off

13  on computers that are not work related?

14       A.    Not to my knowledge they don't.

15       Q.    Okay.  So do you still hold to your

16  recommendation?

17       A.    Yes, I do.

18       Q.    Why?

19       A.    So I will go back to my reasoning for

20  recommending termination in the beginning.  The lack

21  of either one of the ladies to want to have a

22  discussion with me about what they did and not

23  wanting to take responsibility for what they did in

24  using district time and equipment to work on the

25  project.



NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

Sherryl Ely   June 7, 2022   NDT Assgn # 57963   Page 32

1  going back and checking.

2      Q.    Were all of those submitted to the

3  plaintiffs during discovery?

4      A.    Yes, any emails that we received would

5  have been submitted.

6      Q.    Okay.  In your estimation, how many phone

7  calls did the district office field between the end

8  of spring break 2021 and the plaintiffs being placed

9  on leave during or regarding the I -- I Resolve

10  video?

11      A.    I want to say that there were about 50,

12  but I would have to go back and -- and count that

13  just to be sure.

14      Q.    Okay.  Was a complete and accurate record

15  of these calls submitted to the plaintiffs during

16  discovery?

17      A.    To my knowledge, yes, they were.

18      Q.    In your estimation, how many phone calls

19  came in after the plaintiffs were put on leave?

20      A.    I -- I don't recall without going back and

21  checking.

22      Q.    Okay.  Were a complete and accurate record

23  of these calls submitted to the plaintiffs during

24  discovery?

25      A.    Yes, they would have been.



NAEGELI
DEPOSITION & TRIAL    (800)528-3335
NAEGELIUSA.COM

**Vickers Declaration**
**Exhibit 6 Page 6 of 8**

Sherryl Ely    June 7, 2022    NDT Assgn # 57963    Page 33

1    Q.    **Have there been student demonstrations**

2    **arising from I -- the I Resolve video or the**

3    **employment status of the plaintiffs?**

4    A.    Yes.

5    Q.    Okay.  How have those been handled by the

6    district office?

7    A.    The way we handle any kind of student

8    demonstration and so students are allowed to

9    peacefully protest, but it has to be within a time

10    frame.

11        They can't just protest for an entire day

12    and so it's usually encompasses a class period that

13    they are allowed to protest.  And so we would tell

14    the students that they had to go back to class, and

15    if students didn't follow what they were asked to

16    do, then there would be disciplinary consequences

17    for that.

18    Q.    Have there been other student

19    demonstrations this school year not related to I

20    Resolve or the plaintiffs?

21    A.    Yes.

22    Q.    How were those handled differently from

23    those about I Resolve?

24    A.    They were handled the same.

25    Q.    In the -- in the last demonstration, were



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

```
1                          CERTIFICATE

2

3        I, Lee Anne McAdam, do hereby certify that I

4   reported all proceedings adduced in the foregoing

5   matter and that the foregoing transcript pages

6   constitutes a full, true and accurate record of said

7   proceedings to the best of my ability.

8

9        I further certify that I am neither related

10  to counsel or any party to the proceedings nor have any

11  interest in the outcome of the proceedings.

12

13       IN WITNESS HEREOF, I have hereunto set my hand this

14  21st day of June, 2022.

15

16

17

18  _____

19               Lee Anne McAdam

20

21

22

23

24

25
```



### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### MEDFORD DIVISION

RACHEL G. DAMIANO and KATIE S.
MEDART

      Plaintiffs,

vs.                          Civil No. 1:21-cv-00859-CL

GRANTS PASS SCHOOL DISTRICT 7,
an Oregon public body, et al.,

      Defendants.
_____





(800) 528-3335
NAEGELIUSA.COM

DEPOSITION OF

TANIKA COOKS

TAKEN ON
WEDNESDAY, JUNE 8, 2022
12:33 P.M.

GRANTS PASS SCHOOL DISTRICT
725 NORTHEAST DEAN DRIVE
GRANTS PASS, OREGON

**Vickers Declaration**
**Exhibit 7 Page 1 of 4**

Tanika Cooks    June 8, 2022    NDT Assgn # 57964                        Page 7

1      A.    At North Middle School.

2      Q.    **How did you and Dustin meet?**

3      A.    At North Middle School.

4      Q.    **Okay.  Please describe your relationship.**

5      A.    He is my boyfriend.

6      Q.    **Okay.  Okay.  You are employed by the**

7   **Grants Pass School District as a library technician**

8   **at North Middle School, correct?**

9      A.    Yes.

10     Q.    **Okay.  How long have you served in that**

11  **position?**

12     A.    About five years now.

13     Q.    **Okay.  How many years have you worked in**

14  **the education field?**

15     A.    This will be my seventh year.

16     Q.    **Okay.  Has all of that been in the Grants**

17  **Pass School District?**

18     A.    Yeah.

19     Q.    **Okay.  And all of those years have been as**

20  **a library technician or were you --**

21     A.    No.

22     Q.    **Okay.  What else have you -- what other**

23  **jobs have you held?**

24     A.    I was an educational assistant.

25     Q.    **Okay.  Now, Rachel Sager, formerly**



**NAEGELI**
DEPOSITION AND TRIAL          **(800)528-3335**
                              NAEGELIUSA.COM

Tanika Cooks    June 8, 2022    NDT Assgn # 57964                    Page 29

```
1        A.   She told them that I was barring her

2   access to the club when that decision had nothing to

3   do with me, that came from the district.

4        Q.   Okay.  All right.

5        A.   Also she went around getting people to

6   sign her I resolve petition which splintered our

7   faculty, and there are people to this day who cannot

8   stand each other because of what she did.

9        Q.   Okay.

10       A.   That was unnecessary, didn't need to

11  happen, and it could have -- if it did need to

12  happen, it could have happened outside of work hours

13  and off campus.

14       Q.   Okay.  Do you recall what you said in your

15  formal complaint?

16       A.   Not particularly.

17       Q.   Okay.  Did you state in your complaint

18  that the I Resolve resolution is anti-LGBTQ and

19  attempts to move rights from LGBTQ students?

20       A.   Is it written there.

21            MR. HACKE:  Well, at this point, we can

22  enter it into the Record as Exhibit C.

23            MS. VICKERS:  It looks like your complaint

24  is this one that you have marked D; is that what you

25  want as the next exhibit?
```



**NAEGELI**
DEPOSITION AND TRIAL    **(800)528-3335**
NAEGELIUSA.COM

**Vickers Declaration**
**Exhibit 7 Page 3 of 4**

```
 1                              CERTIFICATE

 2

 3          I, Lee Anne McAdam, do hereby certify that I

 4     reported all proceedings adduced in the foregoing

 5     matter and that the foregoing transcript pages

 6     constitutes a full, true and accurate record of said

 7     proceedings to the best of my ability.

 8

 9          I further certify that I am neither related

10     to counsel or any party to the proceedings nor have any

11     interest in the outcome of the proceedings.

12

13          IN WITNESS HEREOF, I have hereunto set my hand this

14     28th day of June, 2022.

15

16

17

18     _____

19              Lee Anne McAdam

20

21

22

23

24

25
```

**Pacific Consulting and Investigations**
PO Box 3506 Ashland, Or. 97520
**Tel:** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com
PI-ID: #73728

# GRANTS PASS SCHOOL DISTRICT 7

## CONFIDENTIAL REPORT PART II

## JUNE 2021

Prepared by Bill Landis PI-ID #73728



# TABLE OF CONTENTS

## Contents

Request by _____ 1

Summary: Mentioned Persons, Allegatons, List of Exhibits _____ 2-4

Details _____ 5-64

Findings _____ 65-69

Exhibits _____ 70

# GRANTS PASS SCHOOL DISTRICT 7

## Request by:

Sherry Ely: Dist. 7 Director of Business Services

Grants Pass School District 7

725 NE Dean Dr.

Grants Pass, Or. 97526

541-474-5700

## Request Date:

04/15/2021

## Report Submitted:

06/08/2021

## Assigned Investigator:

Bill Landis (PI-ID #73728)

Pacific Consulting and Investigations

P.O. Box 3506 Ashland, Or. 97520

541-441-2209

## PCI Incident Reference Number:

21-1011/ Part II

**Vickers Declaration**
**Exhibit 8 Page 3 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

## Named Employee:

Rachel Damiano: Assistant Principal North Middle School

## Mentioned Persons:

Kirk Kolb: Grants Pass Dist. 7 School Superintendent

Dan Huber-Kantola: Grants Pass Dist. 7 Director of Human Resources

Tommy Blanchard: North Middle School Principal

Katie Medart: North Middle School Teacher

██████████: District 7 employee (Formal Complaint)

██████████: District 7 employee (Formal Complaint)

██████████: District 7 employee (Formal Complaint)

████████████: District 7 employee (Formal Complaint)

██████████: District 7 employee (Formal Complaint)

████████████: District 7 employee (Formal Complaint)

## Allegations:

#1: In March/April of 2021, it is alleged that Assistant North Middle School Principal Rachel Damiano was involved in a campaign/movement of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Damiano:

A. Used District facilities, equipment or supplies in connection with the political campaign
B. Used time during her working day for political campaign purposes
C. Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7
D. Used social media and public websites in such a manner that it disrupted the school environment
E. Posted confidential information about a student on social media and a public website
F. Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation"

If these allegations are found to be true, Ms. Damiano may have failed to meet the standards of her Grants Pass School Dist. 7 Job Description for her position as well as violated the following policies:

- ACB – All Students Belong
- GBG – Staff Participation in Political Activities
- AC – Nondiscrimination
- GCAB – Personal Electronic Devices and Social Media – Staff
- IIBGA-AR – Electronic Communication System Acceptable Use Regulation

**Vickers Declaration**
**Exhibit 8 Page 4 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

### List of Exhibits:

1. Complaints (formal) from Grants Pass Dist. 7 Staff members:
   A. ■■■■
   B. ■■■■
   C. ■■■■■
   D. ■■■■■
   E. ■■■
   F. ■■■

2. Email complaints from citizens
   A. ■■■
   B. ■■■■
   C. ■■■■
   D. ■■■■
   E. ■■■■■
   F. ■■■■
   G. ■■■■
   H. ■■■■■■■■

3. Email complaints from students (past and present)
   A. ■■■
   B. ■■■■■
   C. ■■■■
   D. ■■■■
   E. ■■■
   F. ■■■

4. Email sent and received by Rachel Damiano on Dist. 7 Email account
   A. ■■■■
   B. ■■■
   C. Medart ■■■■■
   D. Medart
   E. Medart
   F. ■■■
   G. Medart
   H. ■■■
   I. ■■■■
   J. ■■■
   K. ■■■■■

**Vickers Declaration**
**Exhibit 8 Page 5 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

5. Media Coverage
   A. Screenshot from KOBI 5
   B. KOBI 5 news article dated April 7th, 2021
   C. KTVL 10 news article dated April 8th, 2021
   D. KOBI 5 news article dated April 14th, 2021
   E. KTVL 10 news article dated April 15th, 2021

6. Grants Pass District 7 Policies, Guidance, and job description
   A. Grants Pass School District 7 policy "AC" – Nondiscrimination
   B. Grants Pass School District 7 policy "ACB" – All Students Belong
   C. Grants Pass School District 7 policy "GCAB" – Personal Electronic Devices and Social Media – Staff
   D. Grants Pass School District 7 policy "GBG" – Staff Participation in Political Activities
   E. Grants Pass School District 7 policy "IIBGA-AR" - Electronic Communications System Acceptable Use Regulation
   F. Grants Pass School District 7 – "Job Description"
   G. Grants Pass School District 7 – Administrative Memorandum dated February 5th, 2021

7. Thumb drive containing digital files of audio recordings, transcripts, Garrity Rights, notice of investigation, and copy of this report narrative report

**Vickers Declaration
Exhibit 8 Page 6 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

### Details:

On April 12th, 2021, I was contacted by Willard Ransom attorney for Grants Pass School District 7 to see if I was available regarding an investigation involving alleged employee misconduct. I advised him that I was, and I was recontacted on April 14th, 2021 by Mr. Ransom who stated the District 7 School Board had approved the go ahead for me to provide services for an investigation. On April 15th, 2021, I did enter into a Letter of Engagement with Sherry Ely, Grants Pass School District 7 Director of Business Services. I was advised she would be my point of contact during my investigation.

I was informed that District 7 had received several formal complaints from District 7 employees regarding the alleged discriminatory conduct of North Middle School Assistant Principal Rachel Damiano related to the "I Resolve" movement/campaign. Additionally, the School District received emails from citizens who complained about Ms. Damiano in response to the "I Resolve" movement and video that Ms. Damiano had been involved in, along with North Middle School Teacher Katie Medart. On April 20th, I did meet with Sherry Ely to discuss the investigation and scope. Ms. Ely stated that "I Resolve" was not something supported nor affiliated with District 7 and many of the calls and emails received believed that the School District had been involved with "I Resolve" which they were not. I was provided an email where Superintendent Kirk Kolb did notify the School Board on April 5th, 2021 where he said that two employees were promoting a resolution which had been posted on YouTube and Facebook with links for the board to see (Exhibit 7). He also stated: "This has created a significant disturbance that is impacting the entire district" and also said that "we are VERY seriously dealing with this."

Ms. Ely advised that North Middle School Principal Tommy Blanchard and HR Director Dan Huber-Kantola had conducted an interview over the complaints with Ms. Damiano. A complaint was received during their investigation involving administration, so they were recused, and the investigation suspended by District 7. I was advised that all of the documentation including emails, potential involved policies, audio files, documents, and other associated information would be put onto a thumb drive which I could pick up at a later date. Ms. Ely advised that Ms. Damiano had been placed on paid administrative leave as of April 5th, 2021 which was eleven days after the "I Resolve" video appeared to have been released to social media.

On April 23rd, 2021, I did contact Ms. Ely at the District 7 office and received the thumb drive containing the aforementioned documentation including the listed complaints (contents contained in Exhibit 7). After reviewing all the documentation, I found it necessary to divide my instigation into four parts. Part I is dedicated to the allegations regarding Ms. Medart and her alleged violation of District 7 policies. Part II is dedicated to the allegations regarding North Middle School Assistant Principal Rachel Damiano and her alleged policy violations. Part III is dedicated to Counselor Selena Alderson and her alleged policy violations. Part IV was dedicated to Ms. Medart's allegations against school administration for alleged policy violations. I later was informed by Ms. Ely on May 7th, 2021 that Ms. Medart had withdrawn her complaint and therefore Part IV would not be part of the investigation. For purposes of this report, I will be addressing only the allegations made against Ms. Damiano with regards to alleged District 7 policy violations and identified as Part II of the overall investigation.

## GRANTS PASS SCHOOL DISTRICT 7

In reviewing the "I Resolve" video and campaign referred to as "I Resolve", I found it necessary to watch the video which I did (Exhibit 7). I also went to the "I Resolve" website which I found by using an internet search engine to understand what is referred to in the complaints. On the website, it defines the "I Resolve" title as *"Reasonable, loving, and tolerant solutions for education policies that respect everyone's rights." "Proposed Solutions for Education Systems." "Honoring All Students, Staff and Community Members."* It further states: *"I Resolve is a grassroots movement intended to protect the hearts and minds of our youth and stand up for truth in our society. We believe that resolutions that are reasonable and fair in both form and operation, are beneficial in helping to safeguard the mental, emotional and physical sell-being of all public-school students. We need communities to band together, through individual and corporate commitment, to protect our youth and make their voice heard to local, state and national leaders and policy makers."* Under the title "Current Proposal" it states: *"We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved. The resolution statements regarding bathroom and locker room shared space use are suggestions for current structures, until such a time that individual gender neutral bathrooms are required and fully funded for education and youth facilities. The last two resolutions are proposed as a caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey."*

The website has a link which states: "Sign the Resolution." The resolution is listed as "Resolution 2021-01 and says the following:

### Resolution 2021-01

Therefore, be it resolved that we urge our local, state and federal leaders to adopt the

following principles and policies:

Premise
**Point 1**
We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;

Resolution 1a
**Point 2**
Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;

Resolution 1b
**Point 3**
For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available**;

**Vickers Declaration
Exhibit 8 Page 8 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Resolution 2

**Point 4**
A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and

Resolution 3

**Point 5**
A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.

Footnote

**Note**
**Please note that although not specified in the resolutions, individual gender neutral bathrooms are endorsed by I Resolve and encouraged to be fully funded by the state to be implemented in education facilities.

The website has several "Did you know" blocks with information as well as T-Shirts for sale. One of the "Did you know?" blocks is a reference to a recent 6th Circuit Federal Court of Appeals ruling.

### 1ST AMMENDMENT RIGHTS FOR EDUCATORS

A recent court ruling by the 6th Circuit Federal Court of Appeals ruled that Dr. Nicholas Meriwether, a university professor, had grounds to sue the school because they had punished him for not using a student's preferred pronouns. The professor had asked to accommodate by using the student's last name rather than use pronouns and the school refused to allow this. The court held that this punishment by the school was a violation of the professor's First Amendment rights.

In the margin of this particular "Did you know?" is the statement: "*This ruling is a reason why our resolutions include that staff and students will not be mandated to use preferred names and preferred pronouns.*" "If it is mandated, it is a violation of First Amendment Rights." There is also a link to the "I Resolve" video. At the bottom of the website, is the statement: "*The views expressed on this site and any related video(s) produced by I Resolve are the expression of the individuals, as private citizens and do not necessarily represent the views or opinions of any specific education entity.*" This website was viewed by me after the complaints and after my investigation began and it is not known if the website was modified, or language changed or added from the time that the website was first published which appears to be about the same time as the YouTube video upload of March 25th, 2021. The original site now has a message that says: "This site has moved" and a link to click on to the new site.

**Vickers Declaration
Exhibit 8 Page 9 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

I watched the video called "I Resolve" and had it transcribed. I had been advised that the speakers in the video were Katie Medart (North Middle School Teacher) and Rachel Damiano (North Middle School Asst. Principal). I noted that when I watched the "I Resolve" video, they gave only their first names, however they did give information about their professions and introduced themselves as follows:

Rachel Damiano:

I resolve.

Katie Medart:

I resolve.

Rachel Damiano:

We resolve.

Katie Medart:

We resolve. We hope that you will resolve with us. We just want to say a thank you for taking the time to click play on this video, to hear what we have to share with you about policies related to gender identity for our youth. We hope by the end of this viewing, that you are willing to take action to have your voice heard with us. So you might be wondering who are these people? *My name is Katie. And my experience with youth is that I have been teaching for the last 10 years. I am currently teaching at a middle school in Southern Oregon, and prior to that for eight years, I was a science instructor for college and then some high school science teaching experience as well. I've been a coach, multiple sports. And then probably my greatest honor of working with youth is that I have two of my own sons.* Let me introduce, this is Rachel.

Rachel Damiano:

*Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in as a coach as well. I do not have any children of my own yet, but I do work with youth and that has been a passion of mine for a very long time now.*

Ms. Medart asks Ms. Damiano to explain what is bringing them here (the video) and why.

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Why don't you explain what's bringing us here today and why?

Rachel Damiano:

Absolutely. So it's a multifaceted issue right now. So right now at the federal level, there's the Equality Act. It's currently already passed the House and is in filibuster actually right now at the senate level. The Equality Act talks about gender identity and as well, it reverts back to the Civil Rights Act of 1964. And it's adding to that and we'll talk more about the specific aspects of the Equality Act as we kind of move through, but there are parts of the Equality Act that are very specific and very polarizing we think in the way that it's written in terms of some policies.

Rachel Damiano:

And then at the state level for Oregon specifically, there's Senate Bill 52, which would create a state of emergency as it's written for students or for youth specifically that identify as transgender, but it's all about gender identity. And that state of emergency would give a lot of leeway to policymakers without having to go through legislation. So that's Senate Bill 52, along with that is there's an advisory committee that specifically speaks to gender identity and it's called the LGBTQ2SIA+ Student Success Plan. And if Senate Bill 52 is enacted, then that success plan would automatically go, not just as guidance, but would be mandated to public schools as well as really any organization that works with youth.

Rachel Damiano:

And then at the local level, there has been guidance ODE back in 2016, that was about gender identity and best practices. It's not law, but it is when a guidance is given from ODE, it is taken as things that need to be implemented just because of the way that they're written, and they become requirements for schools. So our districts, local districts and districts across the state have taken that guidance and they've had to implement it in various ways that isn't always consistent because they do have some leeway and pulling from the guidance, but they are tied into the guidance and what verbiage is used in the guidance. And I know that you've had some experience specifically at the local level. Can you tell us about what it was like coming back into public education and what that guidance has meant for you as a teacher?

---

**CONFIDENTIAL**

**Vickers Declaration
Exhibit 8 Page 11 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yeah. So before we go to that, let's just recap that because this is going to be really important for the end. The end, when we ask you to take action and understanding why that is so important right now. So we have at the federal level, legislation coming in, that's at the Senate, already passed the house and that will impact every business, every entity. Where so if I asked you what about private schools?

Rachel Damiano:

Yeah. So it'll affect private schools, it'll affect youth organizations. Ultimately, it'll actually affect churches as well and religious organizations. And it's not just K-12. The Equality Act at the federal level actually reaches from infancy to beyond. And any business, basically any business that's outside of your home and it's not just you and your house as an individual, it will affect.

Katie Medart:

So would you also say that it's true that even though we're from Oregon and we're more familiar with what's happening specifically in Oregon, that there's good odds that the issues that we're having in our state are also occurring in other states right now?

Rachel Damiano:

They are. Yeah. And the way that the States have had to reach through legislation and had to create their own gender identity policies is different across the states. The Equality Act would make it mandated across all states.

Katie Medart:

So that's going to be important because we're going to ask you to not just if you're Oregonian, but we're really looking nationwide, feeling that this is really impacting, going to impact you regardless of where you live.

Ms. Damiano asked Ms. Medart how it has been for her coming back to public education from the teacher's side. Ms. Medart gives an answer that includes an incident that occurred within a month or two of Ms. Medart returning to public schools which was the previous year, she is approached by a transgender student of hers who makes a request.

Rachel Damiano:

Well, how has it affected? You've come back into public education and you've seen it from the teacher side. How has that been for you?

---

Page 10:                    **CONFIDENTIAL**                    PCI #21-1011/ Part II

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yeah, so I was in K-12 education and then I left for 8 years, going to teach at a college and then coming back, I came back last year. So the last 2 years I've been back in K-12 and I could not believe the changes that have occurred. One of the biggest ones was within a month of teaching, I was presented with a very foreign circumstance to me. I had a female student. She then was on a journey of exploring what is her gender identity. She had made a request to identify as a male. Then the request came for to go by he and him and to change the name. And so I was sending an email by staff member saying the student is making this request. I've let the student know that we are in support, that we will support this. And I didn't know what to do.

Katie Medart:

So I went to my administration and I asked do parents know? Do we have parent permission? What is our policy? How am I supposed to handle this? And what I found was that, well, there was reference to the ODE guidelines that you mentioned earlier, but that they are guidance's. And so as different scenarios have come up, there hasn't been a consistent response. There isn't consistency because those are guidance's and not required about what I find different schools are doing and what they're implementing, depending on what school you're at and what part that district is wanting to implement it from those guidance's.

After the story told by Ms. Medart, there is more dialogue about what they are asking and "what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option." Ms. Damiano then states what policies and resolutions that they've created.

Rachel Damiano:

That makes sense. And I think that that really rolls into what we're asking and what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option. An option that I don't think has really been put on the table yet. So we want to read them directly for you so that you that I know what those resolutions are and what you're speaking to.

Rachel Damiano:

So this first one really just speaks to us all getting on the same page. So it says it is recognized that accepting very rare, scientifically demonstrable medical conditions, there are two anatomical gender presentations: male and female. So that's specifically talking about in layman's terms, that's

---

**Vickers Declaration
Exhibit 8 Page 13 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

specifically talking about the genitalia that students and humans are born with. And that would roll right into, instead of it being a gender identity issue when it comes to bathrooms and locker rooms, making it about anatomy ultimately. And so the second one is shared public school restrooms and locker rooms, especially as they pertain to spaces predominantly used by student and youth, previously designated by gender could then be re-designated as anatomically male and anatomically female spaces to only be utilized by persons matching the anatomical designation of the spaces as consistent with historically and scientifically demonstrable anatomically correct utilization of those spaces.

*Ms. Medart then explains the intentions of anatomical use of facilities.*

Katie Medart:

Okay. Let's pause. So if you're like what? Let's help you imagine this. So like for example, at the middle school, typically you would go, and you would see, okay, here is rather, it's a restroom or locker room. It says boys, and this one says girls on it. So instead of it saying that it would then read anatomical male, anatomical female, and what that then is referencing is what, in essence, what genitalia do you have because they're designed in form and function, both of facilities for anatomical anatomy.

*Ms. Damiano and Ms. Medart continue with clarification of what someone who is not anatomically male or female yet identifies as such would have as options and also discuss the choice as to use of names or pronouns.*

Rachel Damiano:

So Katie, for this next bullet in talking about, we want to be fair and equitable to all sides. This next bullet, if a student is still uncomfortable using the bathroom or the locker room that matches their anatomy, it says for any person who is not comfortable using their anatomically correct space, they may request access to a private restroom or locker room space, including such spaces that are designated for use by public school staff, to the extent that these spaces are available and exist. So I think just in the end we want, again, we want to give voice and honor all sides involved. And we feel like that point and that resolution really does that. These last couple are really more speaking to the gender identity journey that these students are going through.

Katie Medart:

What it says is a public student seeking to be known by a name other than the name designated on their legal documentation, may at their discretion with parent permission, use a derivative of their

## GRANTS PASS SCHOOL DISTRICT 7

legal name for the purposes of requesting that the public school staff identify the student by such name. It should be reasonably accommodated by public school staff provided however that any such policy shall not be mandated upon or required of the public school staff, nor shall any such policy be enacted that infringes upon the public school staff, civil and constitutional liberties, including their freedoms of speech and expression. And further provided that such derivative of the student's legal name shall not be honored if it is otherwise crude or offensive, as determined by acceptable societal normative, respectful speech.

Rachel Damiano:

Another lots of words and we know that some of these are a lot of words. Part of that is because this is proposed policy. So we want to make sure that we are speaking to the way legislation speaks in the way that policies are written. This one is basically saying in essence, that a student walking through this journey can ask for a preferred name with parents in the know, and with parent permission and that that be about gender identity, that the discussion is centered around gender identity. And so that it is a derivative of one's legal name. And I think you had an example for what would that look like?

Katie Medart:

I do have an example for that, and I want to bring up one other important, bringing us back to that in our state, the ODE guidance of it does encourage parent involvement, but it does not require it. So that was one of the things that I have personally experienced when going and getting clarification is that it is up to the school to determine if they would like to involve the parent or not. So you would find scenarios where the parents are not in the know at all about what is going on with their child as they are going through that journey. And as a parent, that was disturbing for me as I want to be able to offer love and support, especially as they would embark on that journey. So an example would be for the name, if a student's name was Jessica Smith, then Jessica, if was struggling or on the journey of their gender identity, they wanted to, instead of identify, if they were female as male, they can then change their name to Jess.

Rachel Damiano:

Jess, Jesse Smith.

Katie Medart:

Go by Smith.

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Anything that's that derivative. And again, that's to focus on the gender identity piece of it in that journey, not necessarily on name because I think that that can be a rabbit trail. And then also moving into just this last bullet point as well, or the last resolution is really speaking to the pronouns.

Katie Medart:

Yes. And so it really is the same thing, but it is instead of the name, it's saying the same thing for pronoun usage.

Rachel Damiano:

And with that focus on allowing we want to give voice to all sides. We want to be respectful always. And that's something that our nation has been built on. It's a basic action that we should be taking towards others. We should be respectful. And so that's always this underlying, but at the same time also giving freedom to staff and to students without mandating the use of the pronouns or the use of the preferred name.

Katie Medart:

And requiring that we work together with the family. So it's us working with the family or whoever is in that guardian role, the child and with the school and it's bringing us all together.

Ms. Damiano then directs those watching to the "I Resolve" website. This infers by the language for the viewer to lobby political leaders by adding their name and saying they support the resolution. There is the mentioned pending legislation which they list as Oregon's Senate Bill 52, LGBTQ2SIA+ Student Success Plan which is potentially being put into motion, as well as a reference to an upcoming ODE state board meeting on April 15th where your voice can be heard. There is also the mention of the Equality Act which they state has passed in the House, but Senators can be contacted as the video tells viewers that prior to a vote in the Senate: "It doesn't have to be just the way the Equality Act is written." "So it's written in a way that's more fair to all sides and honors all parties involved in this decision."

Rachel Damiano:

Absolutely. And I think that really pulls it all together as well as it takes a community, not just to raise up our youth, but it takes a community to be a healthy society. And so all of these are speaking to parents involved, students involved, community involved, and we need you involved as well. So one of the ways that you can speak out, and one of the things that we need you to do is if this resonates with you as, yeah, this seems fair in how it's written and how it would be implemented. We need you

## GRANTS PASS SCHOOL DISTRICT 7

to tell us that, and we need you to tell our leaders that. And you can do that by going to iresolvemovement.com and on iresolvemovement.com, there is a place where you can read the full resolution, our reasoning behind it, as well as the resolutions in there, all of their legalese glory. And agree and say yes, I can put my name behind this. I can say I agree. And there's a button on there that you push. And then you just fill in your name and you say that you agree.

Katie Medart:

So number one.

Rachel Damiano:

Number one.

Katie Medart:

Go to iresolvemovement.com and digitally sign. And then number two is what about your state?

Rachel Damiano:

Exactly. Yep. So here specifically in Oregon, with the Senate Bill 52 and as well as the LGBTQ2SIA+ Student Success Plan, potentially being put into motion. So the next ODE or state board meeting is April 15th. And I know that's coming up really soon, but in order to have your voice heard, you can speak out directly to the State Board of Education. There is a template on our site, as well as the resolution. You can send it in as public comment at any time before the April 15th meeting and have your voice be heard in that way as well. And then that last one.

Rachel Damiano:

We need you to speak out to your senators and that's not just in Oregon, that is across our nation. It has not been voted upon yet. The Equality Act has not been voted on yet. It has passed the House, but speak out to your senators and say, hey, we have another option for you. It doesn't have to be just the way the Equality Act is written. And that could even mean that you could have a voice in changing what the Equality Act says and how it's written. So it's written in a way that's more fair to all sides and honors all parties involved in this discussion.

Ms. Medart states that "love is action" and if what they presented resonates with the listener, go to the website, and fill out the form, email legislators, and contact your state Senator that is representing your state, and have your voice heard.

**Vickers Declaration**
**Exhibit 8 Page 17 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

If we spoke to you, if you choose to take action, which I love this saying, love is action. So if that's resonating with you, you can one, go to iresolvemovement.com. Number two, for those of you who are here in Oregon, we have a template there, fill that out, email our legislators, letting them know what is your stance and have your voice be heard. And then finally we need everyone, we need to contact your state Senator that is representing your state and be able to have your voice heard at that level.

Ms. Damiano concludes with an end note which is agreed with by Ms. Medart.

Rachel Damiano:

So thank you again for taking the time to watch and to hear us out. And I know for me, I resolve for the students of our community, for the youth of our community and ultimately for the youth of our nation, and I know that sounds big and lofty, but that's why I got into education. I am here to raise up our youth and to safeguard their mental, emotional, physical wellbeing. And we feel that these resolutions do that.

Katie Medart:

Absolutely. Thank you.

(See transcript or listen and watch video for further details Exhibit 7).

---

**Vickers Declaration**
**Exhibit 8 Page 18 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

### Allegation #1

**#1**: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Assistant Principal Rachel Damiano was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Damiano is alleged to have:

    A.   Used District facilities, equipment or supplies in connection with the political campaign

    B.   Used time during her working day for political campaign purposes

    C.   Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7

    D.   Used social media and public websites in such a manner that it disrupted the school environment

    E.   Posted confidential information about a student on social media and a public website

    F.   Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation"

The scope of this investigation is strictly regarding District 7 policies and whether the conduct of Rachel Damiano that is alleged by District 7 employees ██████████████, and ██████████████ (Exhibits 1A-1F) violated the listed School Dist. 7 policies (Exhibit 6A-6E) and if Ms. Damiano failed to meet the standards of her job description (Exhibit 6F). At the center of the complaints is the "I Resolve" campaign and video which are about gender identity policies as stated in the video: *"We just want to say a thank you for taking the time to click play on this video, to hear what we have to share with you about policies related to gender identity for our youth."*

Exhibits 1A, 1B, 1C, 1D, 1E, and1H were formal complaints filed by District 7 staff/employees essentially asserting that Ms. Damiano was involved in a campaign/movement of a political nature believed to be non-sanctioned by Grants Pass School District 7 and alleged to have violated several District 7 policies. Numerous emails were identified by District 7 related to the "I Resolve" campaign and contained in a folder in (Exhibit 7) some of which I have listed in various parts of this report. Those emails used the address @grantspass.k12.or.us which I confirmed to be the School District 7 official email domain.

Exhibits 2A, 2B, 2C, 2D, 2E, 2F, 2G, and 2H are only some of the complaints from citizens sent to District 7 email accounts between April 6th and April 7th, 2021 that included Ms. Medart, Kirk Kolb, Tommy Blanchard, and Rachel Damiano. The complaints called Ms. Damiano transphobic, disturbing, discriminating, and harmful to students. Exhibit 2A included information and a screenshot from the since removed Facebook page which read: *"Our Resolutions: *Bathroom/Locker room use by anatomy, not gender. *Required parent involvement in student's gender journey. *Staff/student freedom to respectfully use or not use a person's preferred name/pronouns."* Exhibit 2B was sent to Ms. Damiano but includes statements regarding Ms. Medart and the campaign. Exhibit 2E and 2F are addressed to Ms. Medart while others are inclusive of both Ms. Damiano and Ms. Medart. Exhibit 2G was one of

**Vickers Declaration
Exhibit 8 Page 19 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

several emails sent to Superintendent Kirk Kolb alleging the School District was actively trying to pass resolutions restricting the rights of trans and gender non-conforming students in his schools. These emails as stated were dated April 6th through April 7th, 2021 and are noteworthy as they show Ms. Damiano is being identified within several days of the video posting to social media as a North Middle School Assistant Principal and associated with the "I Resolve" campaign.

Exhibit 3A, 3B, 3C, 3D, 3E, and 3F are complaints received by email from students and or prior students between April 6th, 2021 and April 8th, 2021. All of the emails are on Grants Pass District 7 email accounts that include Ms. Damiano, and District 7 administrators Kirk Kolb, Tommy Blanchard, and Katie Medart. The emails accuse Ms. Damiano of being prejudiced, disrespectful, and discriminatory as well as referring to the campaign as a disgusting proposal. These emails as stated were dated April 6th through April 8th, 2021 which is noteworthy as they show Ms. Damiano is being identified within several days of the video posting to social media as a North Middle School Assistant Principal and associated with the "I Resolve" campaign.

Exhibits 5A, 5B, 5C, 5D, and 5E are of media coverage surrounding the "I Resolve" campaign between April 7th, 2021 and April 15th, 2021. Exhibit 5A was a screenshot of News Channel KOBI 5 who did a story on April 7th, 2021 and depicts a statement identifying Ms. Damiano as "Assistant Principal of North Middle School." Exhibit 5C is a similar story from News Channel KTVL on April 8th, 2021, identifying both Rachel Damiano and Katie Medart as an Assistant Principal and teacher at North Middle School in Grants Pass. Exhibit 5D is a news story by News Channel KOBI 5 regarding a North Middle School 8th grade student who is protesting the conduct of Ms. Medart and Ms. Damiano related to the "I Resolve" campaign specific to the anatomical bathrooms and the belief that the policies are transphobic. Exhibit 5E is a News Channel KTVL story dated April 15th, 2021 in which students at North Middle School have started a petition to have Ms. Medart and Ms. Damiano fired. The news stories have over 50 comments regarding the stories and many of the comments are adversarial and hostile in support or against the campaign or persons commenting or associated with the stories.

Exhibits 4A, 4B, 4C, 4D, 4E, 4F, and 4G are emails on Ms. Damiano's Grants Pass District 7 account that Ms. Damiano either sent, received, or part of the email conversation related to the "I Resolve" campaign. Numerous emails appear to be during the school workday, associated with the "I Resolve" campaign, and not associated with school business. Exhibit 4A is an email to an outside person regarding the "I Resolve" design and a color reference. Exhibit 4B is an email conversation between District 7 employee ▮▮▮▮▮ and Ms. Damiano regarding "I Resolve" T-shirts. Exhibit 4C is an email conversation between District 7 employee ▮▮▮▮▮ and Ms. Medart dated March 15th, 2021 with one at 4:04 PM and another at 4:11PM, followed by one at 4:26 PM. That conversation is forwarded on to Ms. Damiano by Ms. Medart on March 16th, 2021 at 9:10 AM and Ms. Damiano responds back to Ms. Medart the same day at 9:46 AM. The subject line of those emails is "Copy of Resolution 2021-01 – Invitation to edit." The same resolution of the "I Resolve" campaign. The emails contain a link to a document for editing via Google Docs. In ▮▮▮▮▮ email to Ms. Medart,▮▮▮ asks the question: "*Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?*"

Ms. Medart responds to ▮▮▮ with a web address and a copied portion of the article as I found when I conducted a search of the article referenced. https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift. "*While the EO does not specifically rescind any*

**Vickers Declaration**
**Exhibit 8 Page 20 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

*specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.*

*What should schools do now?*

*The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."*

Exhibit 4D is an email from Ms. Damiano to Ms. Medart including a Google Docs link titled "Copy of Resolution 2021-01" which is part of the "I Resolve" campaign. The subject line is "Copy of Resolution 2021-01." This email is dated March 18th, 2021 at 1:49 PM which was a school day.

Exhibit 4E is another email from Ms. Damiano to Ms. Medart including a Google Docs link titled "I Resolve." The subject line is "I Resolve – Invitation to edit." This email is dated March 19th, 2021 at 4:17 PM which was a school day and is an invitation to edit the document.

Exhibit 4F is an email conversation between Rachel Damiano and ▇▇▇▇▇ who identifies as someone from Edgewater fellowship by ▇ email address. The subject is listed as: "Re: i resolve video." There are several emails between them from March 24th, 2021at 7:32 PM, 8:34 PM, and another at 9:29 PM where Ms. Damiano used District 7 email to communicate. Ms. Damiano has a signature block at the end of her emails with her name and title as Assistant Principal, North Middle School. An additional Edgewater Fellowship person named ▇▇ is copied and the email conversation mentions Ms. Medart as having added some comments next to the video as if referring to edits to the "I Resolve" website. There is a question about YouTube and how best to post it on the site and another comment that Ms. Damiano will forward it to Katie to look at.

Exhibit 4G is an email conversation containing several emails between Ms. Damiano, Ms. Medart, and ▇▇▇▇▇▇ from Edgewater Church dated March 24th, 2021 at 7:32 PM, 7:58 PM, and March 25th, 2021 at 7:29 AM between mentioned persons and another identified by email on a Hotmail account. There is a dropbox link titled "I Resolve" edit in the subject line of the link with conversations about changes to the video and if they are necessary.

Exhibit 4H is an email on District 7 email from Ms. Damiano to Ben Shapiro of the Daily Wire dated March 26th, 2021 at 2:41 PM. Ms. Medart is copied in on the email at her District 7 email. I conducted an internet search and found the Daily Wire organization which reports: "We're one of America's fastest-growing conservative media companies and counter-cultural outlets for news, opinion, and entertainment. We're opinionated, noisy, and having a good time." Ms. Damiano opens the email with: "We appreciate the work that you and the Daily Wire team do to bring common sense to the American people and for your daily fight to safeguard our individual freedoms." The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement

**Vickers Declaration**
**Exhibit 8 Page 21 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

in the process, have been shown to be damaging to the mental, physical, and emotional health of youth. Ms. Damiano writes that "We" are requesting that you and your team review our proposed resolution and, if you agree with it, to speak out in support of this angle on the gender identity and related policy issues. There is a link to the "I Resolve" website and a link to the YouTube video. The email also posts the resolution from the website in its entirety. The email is signed: *"Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher."* The irony is in the signature where although the name of the School and School District are left off of the email other than identifying Southern Oregon Assistant Principal and Science Teacher, it is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4I is an email on District 7 email from Ms. Damiano to Dr. Reynolds of the American Legislative Exchange Council (ALEC) dated March 26th, 2021 at 2:31 PM. Ms. Medart is copied in on the email to her District 7 email account. The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical, and emotional health of youth. The email requests that ALEC review their proposed resolution and adopt the policy points to then be put forth at the state and federal levels by legislators. There is a link to the "I Resolve" website and a copy of the "I Resolve" Resolution regarding bathroom use, name and pronoun choices, and the previous mentioned parental consent. The email is signed: *"Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher."* The same irony exists in this signature as in Exhibit 4J as the name of the School and District are left off of the email other than identifying Southern Oregon Assistant Principal and Science Teacher. However, it is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4J is an email from ███████████ identified as a District 7 employee who sent Ms. Damiano an email on District 7 email to discuss the email made by Ms. Damiano dated April 1st, 2021 and showing the association of the "I Resolve" campaign and Ms. Damiano as a District 7 employee.

Exhibit 4K is an email from Katie Streit of News Channel KOBI 5 dated April 7th, 2021 at 11:02 AM and sent to Ms. Damiano's District 7 email account. The subject line of the email states: "Media Request." The body of the email states: *"Good morning, I am doing a story about Oregon SB 52, I ran across your organization "I Resolve." I was wondering what your availability was today for a quick interview about your perspective on the proposed legislation. I look forward to hearing back from you!"* Ms. Damiano or someone with access to Ms. Damiano's email at 11:50 AM forwards the email to a personal email account which is Rachel.g.damiano@gmail.com. This email, as did others, shows that Ms. Damiano and Ms. Medart were identified as being North Middle School employees associated with the "I Resolve" campaign that involved pending legislation as stated by the reporter. This was within days of the posting of the website and YouTube video.

Because I was aware that District 7 had conducted an interview with Ms. Damiano, I reviewed the audio recording dated April 9th, 2021 (Contained in Exhibit 7). In reviewing the audio recording, I noted information relevant to Allegation #1. According to the recording, Tommy Blanchard, Dan

## GRANTS PASS SCHOOL DISTRICT 7

Huber-Kantola, Ms. Damiano, and ▮▮▮▮▮▮▮ with the Association of American Educators is also present. There are two parts to the interview. Ms. Damiano explains in the interview that several complaints have been received. Mr. Blanchard although not mentioning the campaign, asks Ms. Damiano what social media outlets or media in general have been used and what is open to the general public.

Rachel Damiano:

Yeah, so Facebook has been used, and Instagram are the two social media platforms. And then there was a website. Facebook and the original Instagram were both taken down last week, and there is a new Instagram picture.

Tommy Blanchard:

So you said both of them were taken down and the new Instagram is up?

Rachel Damiano:

Yes.

Tommy Blanchard:

And there's not currently a Facebook one?

Rachel Damiano:

There's not currently Facebook.

Tommy Blanchard:

Okay.

Dan Huber-Kantola:

So the second part of that Rachel, is are all those open to the public?

Rachel Damiano:

Yes.

**Vickers Declaration**
**Exhibit 8 Page 23 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Ms. Damiano did not mention YouTube where I found the "I Resolve" video uploaded on March 25th, 2021. Mr. Blanchard asks Ms. Damiano about what changes have been made to the social media sites and the rationale for the changes made.

Tommy Blanchard:

Okay, so second question you've answered a little bit, but what changes have been made in addition to Facebook coming down? So in terms of the resolution, videos, changes on Instagram. What changes have been made, and what were the rationale for the changes?

Rachel Damiano:

Yeah, so the original Facebook and Instagram were taken down after the office's superintendent sent out an email last week at around 4:30. And around that time both Facebook and Instagram, but mostly Facebook blew up with a lot of hate speech to the point where trying to keep up with reporting the comments to Facebook and mitigating the amount of, like I said, hate speech that was coming our way was overwhelming, so we ended up taking it down.

Rachel Damiano:

We did save a copy of the whole page and, per Facebook's policy, you can actually re-open it if necessary, to find any comments or anything like that. Same with the Instagram. It was to the point where the comments coming towards us were not respectful, they weren't tolerant, they weren't conversation starters, so we felt that it wasn't safe to keep them up.

Rachel Damiano:

So we took them down. And the new Instagram was put up with some more safeguards in place initially, and with one posting. So it has one posting on it.

Tommy Blanchard:

Are people allowed to make comments with [inaudible 00:05:11].

Rachel Damiano:

No.

Tommy Blanchard:

**Vickers Declaration**
**Exhibit 8 Page 24 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

No.

Rachel Damiano:

Not on the Instagram page.

Mr. Kantola asked Ms. Damiano if anyone from District 7 assigned her to work on the policy or campaign (referring to "I Resolve" although not stated).

Dan Huber-Kantola:

And AR says that you can't use... Transmission material regarding political campaigns is strictly prohibited. I guess a couple of questions. I know I didn't assign you to work on the policy that you did. Did Principal Blanchard assign you to work on the policy?

Rachel Damiano:

No.

Dan Huber-Kantola:

Superintendent Kolb?

Rachel Damiano:

No.

Dan Huber-Kantola:

Okay. Any of the directors?

Rachel Damiano:

No.

Dan Huber-Kantola:

Okay, so this particular work was your work?

Rachel Damiano:

It was, yes. [inaudible 00:06:28] our [inaudible 00:06:29].

**CONFIDENTIAL**    PCI #21-1011/ Part II

**Vickers Declaration**
**Exhibit 8 Page 25 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola

Okay. But your personal work, not...

Rachel Damiano

Yeah, personal work.

Dan Huber-Kantola

Personal work, okay. Was any part of this resolution created or edited using a Google account associated with the district?

Rachel Damiano

No. Not the resolution.

Mr. Kantola followed-up with a question regarding feedback on the website or logo using Ms. Damiano's school account or school email account.

Dan Huber-Kantola

Did you receive any feedback about the resolution or the website or the logo or anything using your school account? Your email account?

Rachel Damiano

Yes, probably throughout there somewhere. And you guys have access to that. Can find all those [inaudible 00:07:54]. And to clarify, the assertion is that this is political work, correct?

Dan Huber-Kantola

Two. One, it's [inaudible 00:08:08] some political basis. And two, it wasn't something that was asked to be done during your job assignment.

Rachel Damiano

Okay.

Mr. Kantola asked if Ms. Damiano received feedback regarding the resolution by email.

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. Did receive some feedback regarding the resolution by email?

Rachel Damiano:

Yes.

Dan Huber-Kantola:

Did you receive feedback regarding the logo through your school email account?

Rachel Damiano:

Not through... As previously stated, I used Canva, which is an alternative, which the district doesn't pay for, but did use my district email as my login, yes. For Canva, but not through our Outlook account.

*Ms. Damiano's statement seems to contradict the email evidence (Exhibit 4) showing numerous emails on her District 7 email account. Mr. Kantola asks her more specifically about District 7 email.*

Dan Huber-Kantola:

Did you copy yourself when you had conversations? And did you copy a teacher's email account? That's a district email account?

Rachel Damiano:

Yes. Through some communication.

Dan Huber-Kantola:

Both on the resolution, on the website, and on the...

Rachel Damiano:

Probably in there somewhere, yeah.

Dan Huber-Kantola:

Okay.

**Vickers Declaration**
**Exhibit 8 Page 27 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

How about editing the video? Were there copies of emails that went through the district, email stuff, editing the video?

Rachel Damiano:

Yes, it was sent to the district email, and then we moved it [inaudible 00:12:15] off because of previous work with this organization and the email they had on file.

This last statement would contradict emails discovered that included Edgewater church through email from ▮▮▮▮▮▮▮ (Exhibit 4F) were involved in the video and not an organization that Ms. Damiano was referring to that had her District email "on file." Additionally, there are numerous emails (4C, 4D, 4E, 4F, and 4G) between Ms. Damiano, ▮▮▮▮▮, Ms. Medart, and ▮▮▮▮▮▮▮ involving editing that continued between March 16th, 2021 and March 24th, 2021 which is the day before the video was uploaded to YouTube showing ongoing editing through the use of District 7 email.

Mr. Kantola asks Ms. Damiano about whether or not she talked with other teachers about the "I Resolve" work.

Dan Huber-Kantola:

Okay. Just checking. When you were at school during school time, did you talk to teachers about this particular work?

Rachel Damiano:

About I resolve? No. About the memorandum and the, well, let me clarify. With Katie, yes. The bulk of I resolve work, actual I resolve work was outside of school. I resolve was a reaction and public comment and feedback to a memorandum that was given to us on February 5th, from the district, and to education policies at the state level that are currently open for public comment as per state board agendas. Both the March agenda and the upcoming April agenda.

Dan Huber-Kantola:

Okay. So bulk of the I resolve work outside of school, some of the I resolve work inside the school.

Rachel Damiano:

While on school grounds, yes.

---

**Vickers Declaration**
**Exhibit 8 Page 28 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

While on school time?

Rachel Damiano:

Depends on your definition for school time for-

Dan Huber-Kantola:

Your administrative role is on school time. Because you mentioned Katie. How about your work with Katie during the school day? And correspondence with Katie during the school day about I resolve.

Rachel Damiano:

Yes.

Dan Huber-Kantola:

Is Katie assigned, as a science teacher, to work on I resolve and policy work?

Rachel Damiano:

She is not.

Dan Huber-Kantola:

So Rachel, did you have any conversations with other teachers soliciting support for I resolve or showing them information about the website or any of that kind of thing during...

Rachel Damiano:

Not to my knowledge.

Dan Huber-Kantola:

... during school hours?

Rachel Damiano:

Not to my recollection.

**Vickers Declaration
Exhibit 8 Page 29 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

So you personally did not do that?

Rachel Damiano:

Not to my recollection.

Mr. Kantola asked if Ms. Damiano was aware that any teacher was seeking solicitation for support of the campaign.

Dan Huber-Kantola:

Were you aware of any teacher seeking solicitation for support on showing information on the website or the video or any of that kind of stuff while the teacher was on school during the school day?

Rachel Damiano:

Not until after the fact.

Dan Huber-Kantola:

Can you elaborate on that?

Rachel Damiano:

I was made aware of one day that a teacher, during flex time, was discussing with staff members.

Mr. Kantola asked Ms. Damiano since she was an administrator, what steps she took regarding stopping and documenting the actions of the teacher.

Dan Huber-Kantola:

As an administrator, what steps did you take to stop that and document that stoppage?

Rachel Damiano:

Well, to my understanding, it wasn't political work and against policy, so I had a conversation with Tommy at some point. We have pretty informal conversations in the mornings, and so we've discussed my resolve, we've discussed the resolutions, we've discussed the teacher's reaction to the memorandum, and her concerns. So it was in there, in one of our discussions.

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Anything with the teachers that said you should be doing that for school time?

Rachel Damiano:

Her and I did have a conversation around, after the fact, some follow up that she had wanted to do, and I cautioned her not to do it, but that was written. Her follow up that she wanted to do was in written form and I cautioned her not to.

Rachel Damiano:

And she didn't. She did follow that caution.

Dan Huber-Kantola:

So that one day, was it one teacher that she reached out to? Was it multiple teachers that she reached out to? What was the scope of that solicitation?

Rachel Damiano:

She didn't specify with me, so you would have to ask her.

Dan Huber-Kantola:

So after any conversations that she had on a given day with a teacher, she did not come back to you and say, hey, I had this conversation with, just hypothetically here, ███████ or ███████ or ███████ .

Rachel Damiano:

I was aware that she had conversations with them and others, but the timing of when she had them was never specified. So I could assume that she had talked to them during that flex time, or I could assume that she talked to them after hours. As the specifics of who she talked to during that flex time, I couldn't give you exact names of who she talked to.

Dan Huber-Kantola:

But did she relay that she had talked to those people to you?

---

**CONFIDENTIAL**                    PCI #21-1011/ Part II

**Vickers Declaration
Exhibit 8 Page 31 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

At some point, yes.

Ms. Damiano stated she did not have a conversation with any students about the campaign and to the best of her knowledge neither did any other teachers. Mr. Kantola asked Ms. Damiano about circulation and editing of the "I Resolve" resolution.

Dan Huber-Kantola:

On the 16th did you circulate or be part of the circulation of the document that was editing the I resolve resolution between you and Katie and an outside source and ████████████?

Rachel Damiano:

Was I CC'd on it?

Dan Huber-Kantola:

Were you... Yes.

Rachel Damiano:

I'd have to look back. I know there was a copy made and people looked at it.

Dan Huber-Kantola:

Are you aware that people used school time to look at that?

Rachel Damiano:

I was asked to look at their computer work and see if they used school time to look at it.

Dan Huber-Kantola:

Are you aware that teachers forwarded that information, including forwarding it to you while students were present in their classrooms or potentially present in their classrooms?

Rachel Damiano:

I'd have to look at a timestamp.

**Vickers Declaration**
**Exhibit 8 Page 32 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

So if I gave you a timestamp of 9:15, would you expect students to be present in classrooms on a Tuesday morning?

Rachel Damiano:

Yes, if we had school in session. So, yes.

*Ms. Damiano does not answer the question but infers that she might have been copied in on editing email regarding the resolution and "I Resolve" campaign. Exhibits 4C-4G actually shows she was actively emailing or responding to email regarding the campaign and resolution.*

*Mr. Kantola asked Ms. Damiano if she shared that the "I Resolve" video was her personal viewpoint.*

Dan Huber-Kantola:

So in your communications with other staff, parents, community members, students, about this particular I resolve, and everything that's associated with it, the video... Did you share that this was your personal viewpoint?

Rachel Damiano:

Originally did I use those words? No. In the video, we don't say "this is our personal opinion". We never say we're from district seven. We never identify even our last names, so you would have to do digging to find even where we're from. Per guidance and understanding and reflection, we've added it all over the website. It's in every communication and response that we've sent from here on out as well.

Rachel Damiano:

But we never claimed to be speaking for the district by saying even where we were. There is one Instagram post where a community member, in a string of messages, states at one point... And this is after we've been identified. After everyone knows who we are, where we were. State asks if we took the video down in a statement because we used district seven time and resources to create the video specifically.

Rachel Damiano:

As a social media post, I posted, fact check, no district seven time or resources were used in the creation or promotion of this video, which is true. And that's not saying that I speak for district seven.

## GRANTS PASS SCHOOL DISTRICT 7

It is a response to a factual question. If she had said Rogue River School District time and resources, it would have been a thing. No Rogue River time or resources were used for this.

The listed Exhibits in this report which included numerous District 7 emails with dates and times would indicate it was part of Ms. Damiano's workday and therefore not a truthful statement she made as she stated that "no district seven time or resources were used in the creation or promotion of this video." Mr. Kantola asks if Ms. Damiano is making a factual statement if actually school email and equipment was used.

Dan Huber-Kantola:

Is that an actual and factual statement if actually school email was used to have the video go out to be checked?

Rachel Damiano:

[inaudible 00:25:59]. Video, because it was originally sent to ours, I could see how you could tie it there.

Dan Huber-Kantola:

So is that a factual statement that no district seven equipment was used?

Rachel Damiano:

In creation or promotion.

Rachel Damiano:

I think if you worked on semantics, then...no

Dan Huber-Kantola:

[inaudible 00:26:31] semantics it's that there's a video that's been edited and sent to Katie's district email. Sent to your district email. There's responses about it that says this is good and this isn't good. That's not a semantic thing. It's district seven email that's used to review the video.

Rachel Damiano:

Okay.

**CONFIDENTIAL**    PCI #21-1011/ Part II

## GRANTS PASS SCHOOL DISTRICT 7

Mr. Kantola speaks to Ms. Damiano about District Guidelines specific to handling gender identity students and speaks to what she is trying to promote in opposition to pending laws that will force her and others to use certain pronouns that they currently do not have to do. Ms. Damiano makes a statement about decisions at the State and Federal levels would make things required and states: "That is what we were proactively working to make sure does not happen."

Dan Huber-Kantola:

Rachel, yes, sorry. I apologize. I'm not agreeing that it's not a political issue, but let's say, for hypothetical purposes, that it's not a political issue. Is it still an appropriate use of time for a district seven administrator to use district seven time and knowingly have a district seven teacher use district seven time to promote things that are in opposition to district seven operational guidelines and policy?

Rachel Damiano:

As feedback, as educators, it is part of our discussion, often around policy, feedback on policy, concerns around policy. We don't see all of this as direct opposition to the memorandum, but the memorandum is not policy as per board policy, so it's never gone through the board policy...

Dan Huber-Kantola:

It is a guideline.

Rachel Damiano:

[inaudible 00:28:00]. It's a guideline.

Dan Huber-Kantola:

So I guess I would as you that. Is it appropriate to spend... If you have a teacher that's struggling to follow the operational guidelines of the district, is it appropriate to help that teacher work through the guidelines to be able to follow them as they are written, or is it... Or is it more appropriate to do that, or do you feel like, in the district seven administrative role, it's more important to work with the teacher to try to change them rather than work with the ones that have already been established a month earlier.

---

**CONFIDENTIAL**    PCI #21-1011/ Part II

**Vickers Declaration
Exhibit 8 Page 35 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

So Katie does work within the memorandum. The memorandum says recommended. It's not required. When we brought the concerns to you, it was stated that, if things are going to change, they have to change at the high level because you're operating under the ODE guidelines, and that has been the push for what has been the focus. The resolution is a response to what is coming down from the state, and if it comes down from the state, the memorandum will no longer be guidance, and it will actually no longer be accurate.

Rachel Damiano:

Because of what's coming down from the state and the federal government, it's not going to be recommended anymore for teachers to use or not use pronouns. It will be required. And that is a proactive so that she can continue to follow within guidelines, and other educators can still continue to follow within guidelines, because if it comes down from the state, we have several teachers that will not be able to follow the upcoming, not the current, the upcoming. What's coming down from the federal government.

Dan Huber-Kantola:

I guess I'm confused, Rachel, because I presented the guidelines and the guidance to all of our administrators, and that is our practice. It's not an "if" thing. It is our practice that teachers are expected to use the pronouns that are associated with the gender change. It's not something that's an optional thing. It is something that we try to work with kids on the front end, but at the end of the equation, and even in the guidelines, if a student tells us, and they're going through a gender process change, and they want to use the pronouns "he" and "his", we would follow that.

Dan Huber-Kantola:

And we would help teachers follow that as administrators. Am I missing something?

Rachel Damiano:

Yes. So the memorandum says "recommended", and there's current... So the six circuit federal court of appeals in Ohio-

Dan Huber-Kantola:

[crosstalk 00:30:40].

---

**CONFIDENTIAL**                    PCI #21-1011/ Part II

**Vickers Declaration
Exhibit 8 Page 36 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

I know.

Dan Huber-Kantola:

The district guidelines that you got.

Rachel Damiano:

Says recommended. It does not say required.

Dan Huber-Kantola:

All right. So you really thought that teachers could do whatever they wanted to do?

Rachel Damiano:

If they are respectful... If it is recommended and not required... If we're talking about Katie specifically-

Dan Huber-Kantola:

Any teacher.

Rachel Damiano:

Has a fantastic relationship with her students. I would have every expectation that teachers are respectful to students. That they treat them in a kind and respectful, honoring manner, and if a teacher, because of whatever reason... Freedom of speech or freedom of religion, they have a concern about calling a student by their pronoun or their preferred name, as per the recent ruling that just came out as well, we cannot force them to do that.

Rachel Damiano:

And again, the guidance coming down potentially from the state level, and potentially the federal level, which would be in opposition to the federal court of appeals, [inaudible 00:31:51] decision that was just made, would be that it is required. And that is what we were proactively working to make sure does not happen.

**CONFIDENTIAL**            PCI #21-1011/ Part II

## GRANTS PASS SCHOOL DISTRICT 7

Mr. Blanchard asked Ms. Damiano if she felt that the video and resolution is supportive of District 7 policy ACD – "All Students Belong."

Tommy Blanchard:

There's one question that refers back to board policy ACD, which is all students belong, and the board resolution 2021- Code three, equity, diversity, and inclusion. Do you feel that the video and resolution is supportive of this policy and the board resolution?

Rachel Damiano:

I do. I feel like the resolution is inclusive of all students. It honors all students, all voices. It doesn't give any less treatment to any specific group of students. It gives equal access to all students based on a standard across all students.

Tommy Blanchard:

So, based on your most recent response to Mr. Kantola about teachers not being required to do that, I find that contrary to your most recent response to this question. If a teacher is not willing to honor that, how can we state that all student belong?

Rachel Damiano:

That's the definition of tolerance. Right? Tolerance is the ability to understand that someone else has a different viewpoint, and still be respectful about it. It doesn't mean that you have to agree on everything. It comes down to relationship and respect. If a teacher such as Katie can have conversations with students that are respectful and kind and can give value to the student as a human, then that is accepting of all students.

Rachel Damiano:

If a staff member, any staff member, doesn't feel comfortable calling them by their preferred name or by their preferred pronoun, having a conversation with a student in a very respectful way, that says either, I'm sorry, I cannot honor that. Is there another way? Can I call you by your last name? Can I call you... And then not using, in a derogatory or disrespectful way, if pronouns are slipped, or if there is an attempt not to use pronouns.

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

But again, guidance coming down would require it, and if it was a slip at all, or if they didn't feel comfortable, there would be cause for harassment charges being brought, and discrimination charges being brought. If the guidance coming down... Or not guidance. If the legislation coming down is approved.

Rachel Damiano:

Would I have an expectation, if a teacher didn't feel comfortable? For example, if there was a biologically male student in a classroom, and the biological male student identifies as a female in gender identity, would I have an expectation that the teacher didn't, on purpose, say any disrespectful derogatory name, sir, can I help you? Sir. Right? That's disrespectful, that's derogatory, and that would be...

Rachel Damiano:

Even if the biological male identified as a male but had an issue with being called sir. That's derogatory. That's disrespectful. So that expectations around being respectful, it's not around the use or not use of pronouns.

Mr. Blanchard then asks Ms. Damiano about ███████ complaint (Exhibit 1F).

Tommy Blanchard:

In ███████ complaint, ███ makes mention of... I'm just going to read that [inaudible 00:35:49] part in the statement. Separation of church and state [inaudible 00:35:52] public employee cannot discuss their religious beliefs onto others in a manner that impacts their ability to do their job. So the question is, is this an attempt to promote your religious beliefs [crosstalk 00:36:04] school?

Rachel Damiano:

It is not. It's why we honor all sides. All beliefs and viewpoints on this have a voice. It's not forcing any agenda. It is a, again, tolerant, respectful, kind, and loving conversation around the different opinions. It includes all students, and it is a conversation that includes all students and staff members because they are a part of this equation as well.

Mr. Blanchard asks Ms. Damiano if she is aware of any disruption the circulation of the video or similar material has caused at North Middle School.

**Vickers Declaration
Exhibit 8 Page 39 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Tommy Blanchard:

Okay. Are you aware of any disruption the circulation of the video, or similar material, has caused at North?

Rachel Damiano:

Yes. I don't know if you want me to elaborate on that, but I feel like not... Yes, the circulation, but more the reaction from the community, really, as a whole. And obviously, the staff members that were concerned about it. If we went back to that, my hope even in that time would be that the staff members, if they had concerns, I don't feel like Katie and I have ever, ever in our time in the district not created a safe space for students or staff. And so, yeah. Again, the desire would be that we are having the same expectation for staff as we do, hopefully, for our students, that we can have conversation around disagreeing without jumping to, "This is hateful, this is discriminatory, this is going to create a Nazi space for our kids." Because that's not true, so.

Tommy Blanchard:

So, knowing that there has been some disruption and discomfort, how would you anticipate coming back and handling the current situation?

Rachel Damiano:

Yeah. I think it would have to be a partnership with the district, because I think that the district has some responsibility of how they've reacted, as well. And emails that have been sent out. And yeah, so I think it would have to be a partnership and a conversation. It would have to come from both, because no matter how much Katie and I try to reach out or have conversations because of the reactions from, not just the district, but from community members. That all would have to be repaired and the actual truth would have to get out because right now it's not, and you can see that in media coverage right now, you can see it in comments on Facebook. So it would have to be partnership on all grounds with an understanding and a true desire to be tolerant in conversation. I don't know how much I can press on this.

Rachel Damiano:

But, again, to have a tolerant society, you have to have an ability to have respectful conversations. And, I know it's a current term, but the cancel culture that is happening right now, and as a reaction to what we believe is fair and middle-of-the-road conversation around policy is appalling in a lot of

---

**Vickers Declaration**
**Exhibit 8 Page 40 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

ways. Not specifically the district's reaction, although that has made us feel very unsupported. But...
Yeah.

There were other discussions throughout the interview not relevant to my investigation as I had
learned what I needed to continue my investigation (See audio recording for more details contained in
Exhibit 7).

On May 13th, 2021 at 9:05 AM, I did meet with Rachel Damiano for an interview at the Grants Pass
School District 7 offices in a conference room. I did advise her our conversation was being recorded.
Additionally, Attorneys Ray Hacke who was present in the room, Mathew Hoffman, and Tyson
Langhofer who joined via Zoom conferencing, and Sharon Nelson who is the Director of Legal Services
for the Association of American Educators via Zoom were all there representing Ms. Damiano. District
7 attorney Willard Ransom was present as well. I advised Ms. Damiano of the allegations and potential
policies violated. I did direct her on behalf of the Grants Pass School District 7 to answer any and all
questions truthfully. Ground rules regarding persons present were read into the record and no one
objected to the ground rules. I advised her the investigation was that of an administrative fact finding
and not a criminal matter.

I also provided a "Garrity Rights" form which I read to her she signed acknowledging the notice
(Exhibit 7). Ms. Damiano confirmed she was noticed regarding the investigation and today's
interview. I asked how long she had been employed with the School District and she told me since
August 2020. She stated her title was that of an Assistant Principal for North Middle School. I asked
Ms. Damiano what her duties and responsibilities were in a typical week.

Bill Landis:

What are your duties and responsibilities, let's say, in a typical week, like?

Rachel Damiano:

Right now, for the school district, I have multiple hats. I'm an assistant principal at North Middle
School. I run Canvas support for the district, and I also am the lead administrator for Grants Pass
online at the middle school level. A typical week, a typical Corona week, or what it really should look
like... A typical week could include anything from instructional practices, to working with students, to
doing technical support, to working and looking at policies, to doing student discipline, some very
wide range of responsibilities.

I asked Ms. Damiano what was considered her workday and schedule for a week.

Bill Landis:

Okay. What is considered your workday and/or work schedule for a week?

**Vickers Declaration
Exhibit 8 Page 41 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

We, as administrators, don't have anything specific, or in writing, for what our work schedule, or work time looks like. I think it depends on who you ask, but, official duties for when students are present, right now during corona, students show up at 8:30, and they leave a little afternoon. Teachers show up and they're on campus from 7:30 to 3:30. Typically, I am on campus any time before 7:30 until any time after 4.

Bill Landis:

Okay, and that's not something that's written, that's just, pretty much, a known practice?

Rachel Damiano:

Yeah.

This established that Ms. Damiano perceived her workday to be from 7:30 AM until sometime after 4:00 PM. I asked her if she was familiar with District 7 policies and she said "yes." I asked Ms. Damiano to tell me about the "I Resolve" campaign.

Bill Landis:

Tell me about the I Resolve campaign, what it's about, and when did it start?

Rachel Damiano:

I Resolve, they're just ideas for solutions for some current legislation that is coming down from the state and federal level. There is no specific law, right now, or even policy in the Grants Pass School District, regarding students who, either want to go by a different name, no matter if they identify as transgender or not, want to go by a different name, or different pronouns, as well as bathroom use. There is no specific policy, that's gone through the board.

Rachel Damiano:

We were given a memorandum, as administrators, back in February. We have had several teachers that have been concerned about how do they react in certain situations with students, and there is no guidance, there's no written down guidance for those teachers, staff members. We were given a memorandum in February and that memorandum was... I had some concerns initially when I saw them, or saw it. If you go back and grab the zoom meetings, we had the zoom meeting for that administrative meeting. I expressed some concerns, privately, to the HR director in that meeting. I

## GRANTS PASS SCHOOL DISTRICT 7

had some concerns from there and wanted to voice those and wanted to voice those, so set up a meeting with HR.

Rachel Damiano:

There were also teachers, a teacher in particular, that had some concerns, because that memorandum, not specifically, but the general contents of the memorandum was shared with that teacher. I gathered feedback regarding concerns, brought them to human resources, and brought some solutions with me, because that's how we operate in Grants Pass. As leaders, right, you want to bring solutions. Brought some solutions, was told that this comes from an ODE guidance, and that if the memorandum, or the items within the memorandum, need to change, then things need to change at the state or federal level. I said, "Okay, I'll come back to you with some more solutions". From there, the resolution was written, and discussed, and then we came back to HR and met with HR again-

Bill Landis:

When you say, "the resolution", are you talking about the campaign that you're involved in, the I Resolve movement?

Rachel Damiano:

If you mean campaign, as in a political campaign, we don't believe it's a political campaign. A resolution as in the solutions and ideas for solutions for guidance's, yes.

Bill Landis:

Okay. As I looked and reviewed the video, this is about legislation that you're wanting something applied regarding transgender or transforming students, or individuals? Is that correct?

Rachel Damiano:

As its reaction to policy, or its reaction to legislation that might be coming down, but if you read the resolution itself, it doesn't ever specifically say transgender students.

Bill Landis:

When you say "the resolution", is that something as part of I Resolve, and what you're involved in? That's separate from the school district and your duties?

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Yes. I Resolve, as in... The resolution was verbiage as potential solutions and ideas to bring to the district as, "Hey, this can be an option," because this legislation is possibly coming down. This could be a proactive solution. Again, just ideas, but that I Resolve, the bulk of the I Resolve work, in terms of getting that out to the public, and having the public know, and reaching out to leaders and reaching out to legislators, that's done separately. The resolutions are ideas for solutions.

Bill Landis:

When you talk about the guidance that you received, was it a staff meeting in February, you were talking about something like that?

Rachel Damiano:

It was an administration meeting.

Bill Landis:

Administration meeting?

Rachel Damiano:

Yeah.

Bill Landis:

Was there a memorandum that actually laid out that guidance, and it was adopted, as you said, from the Oregon Department of Education, is that correct?

Rachel Damiano:

I don't know if I'd use the word adopted. There's a 2016 ODE guidance, and it's a very long document with a lot of best practices, that is not legally binding. It says it on page two, I believe, of the guidance. It says this is not legal advice. These are best practices only. From there, districts, right now, have a broad spectrum of best practices that they can choose from. Our district had never written those down. They have kind of picked and chosen. You can probably see, because I know you have review of emails. That guidance has changed, depending on who you talk to and when you talk to them. The memorandum was a way to solidify from when it was told to us, from district leadership, solidify some... These are some of the best practices we're going to pull from that guidance.

**Vickers Declaration**
**Exhibit 8 Page 44 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

That was what you received in February of 2021?

Rachel Damiano:

Yes, February 9th, I believe, was the day we got it. It was drafted on February 5th.

Bill Landis:

When the district gives guidance to staff administrators and teachers, how do you receive that guidance? What does that mean?

Rachel Damiano:

That guidance was never given to teachers, just to clarify.

Bill Landis:

Okay.

Rachel Damiano:

And it still has not been given to teachers. That guidance, as given to use, was given as, "Hey, these are, if these situations come up, this is how we want to react, or this is how we want to handle these procedures".

Bill Landis:

Fair to say then, since you received it as an administrator, if a teacher at a school that you're an assistant principal at had an issue, that guidance was for you then to share with that particular teacher on how to handle something?

Rachel Damiano:

We were specifically told not to share with staff. Yes, so in that instance, if a teacher were to come, then I would ask and say, "Can I share this document?", and receive permission or not receive permission, or I'd go to the principal and ask, "Can I share this document?". That's how we would handle it.

**Vickers Declaration**
**Exhibit 8 Page 45 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

In the I Resolve video that I watched, there's a part where, I believe, Katie Medart is talking to you about the laws and some of the changes prescribed. In that, there's a discussion about ODE guidance, and what that means, and at some point, you make a comment that that means at some point the district is required to follow those. Is that correct or not correct?

Rachel Damiano:

If Senate Bill 52 passes, which is what we were discussing, if Senate Bill 52 passes and creates a state of emergency, and not the ODE 2016 guidance would become what we're required to, it would be the LGBTQ2SA+ Student Success Plan that is in correlation to the Senate Bill 52. That would become no longer guidance, it would become practices that we're required to follow, because it's tied to legislation. Right now, the 2016 guidance is not tied to legislation.

Bill Landis:

The 2016 guidance that you're referring to, you believe that's not something that you have to follow or required to follow?

Rachel Damiano:

It says best practices. It says, specifically, in there that it's not legal advice, and it's up to districts to choose what they... If it were something that we had to practice, then our district would be out of compliance for the majority of that document.

Bill Landis:

If the superintendent came out and said we're not going to follow something and gave that to you as an administrator, would that be, then, something that you would then follow?

Rachel Damiano:

I think that's a very broad hypothetical. If we're talking about this case specifically, we as administrators, when things are given to us, we are often asked for feedback. It's a practice of our district that we give feedback. If it was something that was said this is required, then I'd have a conversation and say, "Is this becoming policy?". That's the point of being in leadership is to give feedback and to be able to discuss what would work and what wouldn't work within our schools.

**Vickers Declaration
Exhibit 8 Page 46 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Sure. In February 2021, when administrators have that meeting and there's a memo about handling situations, and feedback was received, you weren't under the understanding then that that meant that is how to handle some of those situations at that time?

Rachel Damiano:

Yes, it's saying these are the procedures that we would like to follow, moving forward. Like I said, I had some concerns with it, and I set up a meeting with HR to have that discussion.

*I asked Ms. Damiano if she had any discussion with teachers as to how to handle situations outlined in the guidance document (Exhibit 6G).*

Bill Landis:

You didn't have any discussion with teachers about situations that may have come up after that, as far as how to handle the situation?

Rachel Damiano:

If the situation came up... I'd have to look back on if a situation came up within that time. I can say that, confidently, that if a situation did come up within that time, it was handled according to the memorandum.

*I asked Ms. Damiano about "I Resolve" and its affiliation with District 7.*

Bill Landis:

Again, just for clarification, I Resolve, that is not something that was sanctioned by District 7, nor was District 7 authorizing you to work on that as far as part of a school project? Correct?

Rachel Damiano:

Yeah, I Resolve, under what you would code as I Resolve, no. They were aware that it was happening, and were aware before it went public, but in terms of being told to go work on I Resolve and go create a movement or ideas, no. Sharing responses and potential ideas and solutions for the resolution is a practice in our district.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Even though you're sharing, that isn't something that the district or the superintendent said, "Yes, we agree and want to embrace those things", is that correct? You were sharing things that I Resolve, and you felt, as far as some of those legislative proposals that were happening, at any time did you feel that, as you gave feedback about some of the solutions you felt you were offering, was that something that District 7 said they would be embracing and moving with?

Rachel Damiano:

In my first meeting with HR, when I brought the solution about the bathrooms, as part of the memorandum, I gave a potential solution at the time that said, well could we think about xx bathrooms and xy bathrooms, and I was told by the HR director, that's an interesting or creative solution. I could potentially bring that to the team. That's not saying no. Later, when I brought the resolution to the HR director, and then also to the superintendent, the superintendent in our meeting discussed and said, "Okay, I can look this over. I will have legal look it over and make sure that we aren't in violation of any laws, and I could potentially bring this to the school board". That's what I was told before we went public.

Bill Landis:

Essentially, they were saying they would look at it. No one said, "Yes, we're aligned with that and wanting to move forward with that", is that correct?

Rachel Damiano:

Not with those words, but, "I could potentially bring this to the school board", isn't also a no. It's in a process of looking at solutions, and looking at ideas, and discussion. Did they say at the time, "I'm going to adopt this, and we're going to move forward this"? No, but they also didn't say no.

Bill Landis:

Okay. Again, one more clarification. Would you consider I Resolve to be a non-affiliated District 7 campaign movement, or whatever word you want to describe it?

Rachel Damiano:

The movement aspect of it is not part of the district, it's on my personal time.

---

## GRANTS PASS SCHOOL DISTRICT 7

I asked Ms. Damiano to describe what she felt "I Resolve" was since she disagreed that it was a political campaign.

Bill Landis:

Okay. With the I Resolve... What word would you like to describe... I know you said, campaign you didn't feel it was. What would you describe that, I Resolve is the title of it, in the video it's clear.

Rachel Damiano:

Yeah, they're ideas, they're for solutions. It's an idea for solutions that is a discussion, it's a public discussion. It's a matter of public concern.

Bill Landis:

As I watched it, is it opposition to propose legislation that is before the legislative body, currently?

Rachel Damiano:

It is a proposal for different verbiage. If SB 52, or the Equality Act, passes in the way that they are currently written, then once they pass, it would be opposition, I suppose. It's proposal for potential solutions.

Bill Landis:

But opposition to the way it is currently proposed?

Rachel Damiano:

Yes.

I asked Ms. Damiano what her involvement with "I Resolve" has been.

Bill Landis:

Okay. With the I Resolve, what has been your involvement, as far as that program? Did you author it? Are you just a part of something... What has been your involvement?

**Vickers Declaration**
**Exhibit 8 Page 49 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Yeah, I am one of the authors of the resolution, and the website, and social media. I'm involved in all of that.

Bill Landis:

Any other district employees involved with you in that program?

Rachel Damiano:

Yes. There is one teacher involved in it.

Bill Landis:

Would that be Katie Medart?

Rachel Damiano:

It would be, yes.

Bill Landis:

Any other staff, employees, or other District 7 related persons?

Rachel Damiano:

No, it's just us two.

I asked Ms. Damiano if she had used District 7 facilities, equipment, or supplies and email during the "I Resolve" campaign.

Bill Landis:

Okay. Have you used District 7 facilities, equipment, or supplies, email during the I Resolve, or for the I Resolve campaign?

Rachel Damiano:

Minimally, there was some crossover.

Bill Landis:

**Vickers Declaration
Exhibit 8 Page 50 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Tell me about that.

Rachel Damiano:

You can, obviously, see in my email chains... I can't recall all of them because I haven't been able to look at my email, so I wouldn't be able to tell you every time that its crossed over. At one point, there was a copy of the resolutions that was sent to me, in my district email. I had sent a couple of things to a district email for a staff member. The video, once it was recorded in order to be shared with us by this organization, it was sent to my district email. That's what they had on file. After that, moved it off my district email. I'd have to look back at my emails, or I know you have access to those too. If there are any specific questions you have, or any uses, then I can help answer that.

Bill Landis:

Okay. Any reason why you used the district email, which identified you as an assistant principal at North Middle School? Which, those emails have like a signature line, I guess, that shows your name, with your title, and the school you are associated with. Any reason why you used the district email as part of that?

Rachel Damiano:

For which part? Do you have a specific question?

Bill Landis:

For anything related to I Resolve?

Rachel Damiano:

Okay.

Bill Landis:

Specifically I Resolve type emails, video, reaching out to other persons regarding I Resolve. Things like that.

Rachel Damiano:

Specifically, with the video, like I said, the organization, that's the email they had on file for me. They know that the video and the work was personal work because of the conversation I had with them,

**Vickers Declaration**
**Exhibit 8 Page 51 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

outside. In terms of sending it, again, I'd have to look back and see if it came to my district email and I forward it, or if it came to me and I responded. I'd have to look, specifically. For the bulk of the work that I did, I was using my, in terms of I Resolve, I was using my personal email, or our I Resolve email.

Bill Landis:

With the email correspondence, on District 7 email, did you ever communicate with someone that, "Here's my personal email, I need to not use district email", or, "This is not something associated with the district", at any time. Did you do that?

Rachel Damiano:

Again, I'd have to go back and look and see if I put that into an email. I know that there are emails from my personal email that I either started a conversation, or I forwarded it to my personal email to then continue the conversation from my personal email. Again, I'd have to look back and see. I don't recall, off the top of my head, if I wrote it into an email and said disclaimer.

*I asked Ms. Damiano if she used District 7 equipment as part of the "I Resolve" campaign including computers and printers or things of that nature.*

Bill Landis:

Okay. Were you using any equipment from District 7 as part of the I Resolve campaign? Computers? Other printers? Things of that nature to print?

Rachel Damiano:

I worked on my computer. That would be all I could recall. Yeah, that would be... Unless, potentially, if the resolution was printed off. Again, I'd have to go back and look.

*I asked Ms. Damiano about the discussion of a student in the "I Resolve" video.*

Bill Landis:

Was there a discussion in the I Resolve video between you and Katie Medart, involving one of the North Middle School students, that was then posted on YouTube, and the I Resolve website. The video basically got uploaded to YouTube, which is where I observed it.

Rachel Damiano:

Mm-hmm (affirmative).

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Then you had a personal I Resolve website. Is that correct?

Rachel Damiano:

Yes.

Bill Landis:

That was public?

Rachel Damiano:

Yeah.

Bill Landis:

You recall a discussion in the video, where you discuss a North Middle School student, or Katie does with you?

Rachel Damiano:

She discusses a situation, but the details of that situation actually don't describe any one student. It's a compilation of multiple students and the actual situation that happened, didn't even happen that way.

Bill Landis:

As I recall, what she was discussing in the video was, right after she came, about a year ago, to the district, back to work for the district, she had a student approach her about wanting to be referred to as a male, currently a female going through a change. In the video, it appeared to me, that she was talking about a specific person and incident.

Rachel Damiano:

Yes, I believe, that is how the situation is that she talked about. Since reflecting on that, as part of the video, she and I have determined that wasn't either a situation that happened right away, or it was different specifics to that student, and so that student is not identifiable through that story.

---

Page 51:                                  **CONFIDENTIAL**                              PCI #21-1011/ Part II

**Vickers Declaration
Exhibit 8 Page 53 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So that story was not truthful?

Rachel Damiano:

That story had elements that were truthful. Situations similar that happened when she was recalling it and when... If you look at the situation, specifically, that happened that would identify a student, there were elements that were mixes of multiple situations that happened in that recollection.

Bill Landis:

I guess my question... I'm a little confused. The accounting that she gave, and you discussed with her, she was telling you about, was something that you discussed with her later that was not accurate.

Rachel Damiano:

Yes, would be the short answer to that.

Bill Landis:

I guess my follow-up question would be, would one of your students at North Middle School, including the student that was referred to, be able to identify, who she and you were speaking about in the video?

Rachel Damiano:

No.

Bill Landis:

That's because the story isn't really accurate to a particular situation?

Rachel Damiano:

Yes. I know this is all confidential, so can I give you more details as to what that actual situation was?

Bill Landis:

Sure, possibly, maybe, without mentioning a name.

# GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Yes. I don't even know who this student is. I couldn't give you a name because, first of all, I wasn't there during that time. ████████████████████ ███ ███
████████ ████████████████████████████
████████████████████████ .

*I asked Ms. Damiano if she discussed the handling of matters involving transgender students and the District in the "I Resolve" video that was posted on social media.*

Bill Landis:

Okay. Did you discuss the handling of matters involving transgender students and the district in the I Resolve video, which was posted on YouTube, and the I Resolve public website?

Rachel Damiano:

Grants Pass, specifically?

Bill Landis:

Yes.

Rachel Damiano:

No.

Bill Landis:

But you referred to the district that you worked for?

Rachel Damiano:

No, I never referred to Grants Pants school district.

Bill Landis:

Okay, was there a conversation that occurred about the handling of situations involving transgender student or students at all?

---

**CONFIDENTIAL**                  PCI #21-1011/ Part II

**Vickers Declaration**
**Exhibit 8 Page 55 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

In the video, we say, "districts", and then we say, "and districts across Oregon". That's how schools are run, is in districts.

*I asked Ms. Damiano if she worked on the "I Resolve" campaign during her workday.*

Bill Landis:

Okay. When we talked about the emails and the I Resolve program, or movement, what word do you use to describe it?

Rachel Damiano:

Movement is fine.

Bill Landis:

Okay. Did you work on that during your school work day?

Rachel Damiano:

I think that goes back to your original question about defining school work day. There were minimal aspects of I Resolve that were worked on while I was on campus.

Bill Landis:

Do you have any idea how much and how often?

Rachel Damiano:

No. I know that it never interfered with my other work as an assistant principal, Canvas support for the district, or as my GP online administrator hat.

Bill Landis:

When abouts did the I Resolve campaign start that you would have used some time to work on that movement?

Rachel Damiano:

I met with HR late February, so March. Sometime early in March.

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

That was basically when you initiated the program, and the title was picked, and moving forward?

Rachel Damiano:

I Resolve, as a movement, or as a matter of public concern, or making it a matter of public concern, would have come mid to late March. In terms of publicizing it, it didn't come until late March, right before Spring Break. Then Spring Break happened, and the bulk of it happened during Spring Break, is when we posted.

Bill Landis:

The earliest you would have been working on that program on school time would have been towards the end of February, some time?

Rachel Damiano:

No, mid-March. Actual I Resolve work.

I asked Ms. Damiano if she promoted the campaign with other staff during the workday, including emailing with others, discussing the "I Resolve" campaign, using District 7 email.

Bill Landis:

Okay. Did you promote the campaign with other staff during the workday, including emailing with others, discussing the I Resolve campaign, using District 7 email?

Rachel Damiano:

Again, I'm going to shift it off of being campaign, because we don't believe its campaign, or political work. Was there minimal discussion with staff members via email? Yes.

Bill Landis:

When you say you don't believe it's political work, isn't what you said, the I Resolve movement is opposing legislation that's currently either in committee, or before the legislative body, with titles, and that you're wanting some modification or change to what is being proposed, or going to be, possibly, moving forward. Would that not be considered political?

**Vickers Declaration
Exhibit 8 Page 57 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Political, according to Oregon revised states statutes? No. Political campaigning, in terms of... When you call it a political campaign, it's specifically referencing ORS 260.432, for public employees, and for political campaigning. Which gives, very specifically, on page nine, I think it's page nine... For instances, that political campaigning, as the verbiage used, political campaigning, is applicable and we don't fall under any of those four. In terms of being tied to something that is political, or being tied to a bad legislation, in common terms, or in the public's terms, would you probably use political? Yes, but it's a matter of public concern and it's just ideas for solutions. If you are talking about legally political campaigning and what public employees are tied to, we don't believe it's public campaigning.

Bill Landis:

I'm talking about the school policy, not Oregon revised statute.

Rachel Damiano:

Yes, tied to GBG, which references, and is tied to ORS 260.432. It's my understanding that's why this board policy exists is because of ORS 260.432 and how its applied to public employees.

Bill Landis:

So, you're understanding is you don't feel that opposing legislation, or discussing with other staff members, what you're proposing with the I Resolve movement, had anything to do with politics or being political?

Rachel Damiano:

Yeah, so what we ask for in I Resolve, right in the video, and outside, is that the public, because it's a matter of public concern, that the public, if they are concerned or if they agree, to reach out to their leaders on their own. In terms of discussion with staff members about the resolution, that, again, is just ideas for solutions for something that's not even for policy. It wasn't an opposition to anything because according to our school district, and according to our policies that currently exists, there is no opposition because there is no policy on how to deal with, or how to interact with students in situations that are specifically about gender identity. The memorandum has not been given publicly.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

But fair to say, you're opposing what is proposed then, before the legislatures and those bills you referred to in the video, that are moving forward?

Rachel Damiano:

In terms of the current verbiage, are we giving alternative ideas? Yes. It's not passed. Yes, we say, "Please don't vote for it, as currently written", but we say, even in the video, we're giving ideas for possible solutions on how to change verbiage.

Bill Landis:

In the videos, you make it clear that your position is that you believe that those need to be changed as they are written.

Rachel Damiano:

As they are currently written, yes.

Bill Landis:

So, it's not just an idea. It's your belief of what needs to happen that you're proposing?

Rachel Damiano:

My belief about current... Yes, and we say it's our belief, and ours, not the districts.

I asked Ms. Damiano about receiving emails related to the "I Resolve" campaign on her District 7 email account regarding outside entities and or other staff members.

Bill Landis:

Did you receive emails related to the I Resolve campaign on your District 7 email account, from outside entities or other staff members?

Rachel Damiano:

Yes.

Bill Landis:

**Vickers Declaration**
**Exhibit 8 Page 59 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Do you think that that, then, had identified yourself as a District 7 employee, related to the I Resolve video?

Rachel Damiano:

Yes. In terms of who I work for, yes, but we never claimed that its District 7's ideas, or that its District 7's... We aren't speaking for District 7.

*I asked Ms. Damiano if and where she expressed that the views of "I Resolve" were her own and not the views of District 7.*

Bill Landis:

Where did you express that this was not District 7, and your own personal views?

Rachel Damiano:

In terms of conversations with organizations, or for outside entities, they are well aware that it is our personal beliefs, or our personal beliefs and opinions. In terms of in emails, again, I'd have to go back and look, specifically. I would say, where do we claim that is District 7? That we say that we're speaking for the district, or the district is in... We don't say that anywhere.

Bill Landis:

In the video, did you express that this was your personal view, and not that of the district, or districts?

Rachel Damiano:

We never even claim our last names in the video. We never say our last names, we never say what district we work for, we never say what middle school we work for. We don't even say we work at the same school. We say "we" over 20 times, and we say "I", I don't even how many times. We never say, "the district says this". In Southern Oregon, alone, there are over seven counties, that each have their own multiple school districts, multiple middle schools. We never say that we're speaking for them. It's not typical practice, even here in the district, for someone, at the beginning of a sentence, to out rightly say a disclaimer. This is my personal opinion. It is on our website. It's the footer on our website. It's the footer, if you open up the YouTube description. It says the resolution, and at the bottom it says, these are our personal viewpoints and not that of the district.

*I asked Ms. Damiano when she recalled that the "I Resolve" video was published to YouTube and the public website.*

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Do you remember about when the I Resolve video was published to YouTube and/or to a public website, about?

Rachel Damiano:

Yeah, it was Spring Break, end of Spring Break.

Bill Landis:

You identified yourself as a Southern Oregon middle school assistant principal. Is that correct?

Rachel Damiano:

Yes. As experience, not as who I'm speaking for.

Bill Landis:

Did you receive email from outside the district from persons, including the media, who had identified you as from the I Resolve campaign?

Rachel Damiano:

Media on my email? I'd have to go back and look. I can't recall if it would have come to my school email. I haven't been able to access since I was put leave. If it's come after April 5th, I wouldn't know.

Ms. Damiano stating "I wouldn't know" regarding email from the media was questionable as the email sent to her District 7 account requesting an interview on April 7th (Exhibit 4K) had been forwarded to "Rachel.g.damiano@gmail.com approximately 48 minutes after being sent to her District 7 account.

I asked Ms. Damiano why she would identify herself as a Southern Oregon Middle School Assistant Principal over just identifying herself as a citizen.

Bill Landis:

I guess my question is, why identify as a Southern Oregon middle school assistant principal, which kind of narrowed the field, versus, "Hey, I'm Rachel and I'm a concerned citizen about these issues"?

**Vickers Declaration**
**Exhibit 8 Page 61 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

When said in the video... Again, we aren't speaking for my position as an administrator. We're giving credibility to the experiences, or I'm giving credibility to my experience and where knowledge comes from and why I have this knowledge and the experiences that I do.

Bill Landis:

Does District 7 policy require you to state that it's a personal viewpoint, or expressed viewpoint, when dealing with controversial issues in the public?

Rachel Damiano:

It does, in policy GBG.

Bill Landis:

In the video, did you do that?

Rachel Damiano:

Do we out rightly claim and say a disclaimer at the beginning that says this is our personal opinion and not that of the district? No. We also never claim the district that we work for. We say multiple times, its inferred throughout the entire video, that says "we, I, we believe", in terms of I Resolve. At the beginning, we even say, "I resolve, I resolve, we resolve", as in the two of us, not the district we work for.

Bill Landis:

But you said, not at the beginning, but at any time in the video, did you, as the policy requires, make an overt statement that this is a personal viewpoint and nothing to do with an employer?

Rachel Damiano:

Do I say disclaimer as one would write, legally? No, but again, I say, "I", and "we", and we in that way say that it's our own opinion, without personally saying... At the end of the video, I say, "I personally resolve for the students of the community and for students across the nation", but I do say, "I resolve".

---

**CONFIDENTIAL**                      PCI #21-1011/ Part II

**Vickers Declaration
Exhibit 8 Page 62 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Would you agree that I resolve doesn't necessarily separate you from the district?

Rachel Damiano:

I wouldn't say it ties me to the district. Again, I never even say what district I work for, so to be tied to an entity that's never identified anyways, no matter if someone else identifies me for that district; In the video I never even say my last name. It's hard to be tied to something that is anonymity.

I asked Ms. Damiano if she emailed a national podcast host, Ben Shapiro of the Daily Wire, to promote the "I Resolve" campaign to garner support using District 7 email.

Bill Landis:

In speaking about tying yourself to the district, did you email a national podcast host, Ben Shapiro, of The Daily Wire, to promote the I Resolve campaign, or movement, and try to garner support using your District 7 email?

Rachel Damiano:

I'd have to look if it was from my District 7 email. It sounds like that I did, if it's from there.

Bill Landis:

Would that not be identifying you as part of the district?

Rachel Damiano:

It would if I did it from my district email and don't say in there that it's my personal.

Bill Landis:

Okay, and you don't recall if you did that?

Rachel Damiano:

No, not from my district email.

I asked Ms. Damiano if she emailed the American Legislative Exchange Council (ALEC) which is a legislative organization to garner support for "I Resolve" using District 7 email.

**Vickers Declaration**
**Exhibit 8 Page 63 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Did you email the ALEC organization, which is a legislative organization, to garner support for the I Resolve campaign, using your District 7 email?

Rachel Damiano:

Again, I'd have to look and see if it was from my District 7 email. I know that flipping from Gmail accounts, I'd have to look and see if I did it from my personal or my district.

Bill Landis:

If you did that, would that be, again, not separating yourself from the district since you're representing yourself with your signing the bottom as Assistant Principal, North Middle School, and verbiage.

Rachel Damiano:

It depends on what I wrote in the body of the email, and what the disclaimer says on I Resolve work.

Bill Landis:

Do you recall doing that or not?

Rachel Damiano:

No.

I asked Ms. Damiano if she solicited support, gave feedback, or initiated conversations regarding the "I Resolve" resolutions while she was responsible for kids at school.

Bill Landis:

Did you solicit support, give feedback, or initiate any conversations regarding the resolutions, the I Resolve resolution, while you were responsible for kids at the school?

Rachel Damiano:

While students were on campus? That would be the time. Did I solicit support, as in, have a conversation, or solicit as in go out and seek out people coming in?

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Any of that.

Rachel Damiano:

While students were on campus? Again, I'd have to look at time stamps of either when an email was sent or if a conversation happened. I don't recall ever having a conversation, while students were on campus. In terms of email, students were on campus for several hours, and I'm not always out doing supervision or in charge of them, in front of me, like a teacher would be.

Bill Landis:

Did you have any direct conversations with students about the resolution?

Rachel Damiano:

No, not with students.

*I asked Ms. Damiano if she would agree that transgender issues can be controversial with regards to legislation.*

Bill Landis:

Would you agree that transgender issues can be controversial, with regards to legislation?

Rachel Damiano:

Yes.

*I asked Ms. Damiano since she identified herself as an Assistant Principal at a Middle School in Southern Oregon in the "I Resolve" campaign, what would she say her message was for all the students in this campaign since it has been brought into the school.*

Bill Landis:

Since you identify yourself as a middle school assistant principal, from Southern Oregon, in the I Resolve campaign, and you've gone a step further with District 7 email use involved in the I Resolve campaign, which identified you as a North Middle School administrator, what would you say is your message for all the students in this campaign, since it's been brought into the school?

---

**CONFIDENTIAL**    PCI #21-1011/ Part II

**Vickers Declaration
Exhibit 8 Page 65 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Separating those, by the resolution or by the movement in general, what do you feel like this is saying to the students?

Bill Landis:

In the news media, there have been students, as well as emails, who have responded about the I Resolve movement and issues. Since you are one of the founders, and/or author involved in the video, and a North Middle School administrator as identified, what is the message for the students in this campaign, since it was brought into the school and students are aware?

Rachel Damiano:

The message as our purpose, and the heart behind it, is to be reasonable, tolerant, loving, solutions for issues that have many sides. This is in terms of tolerance, being able to have a conversation, and to care for our students, all of our students, including our transgender students. In subsequent messaging that we put out on social media, we talk very specifically, we are for all students. We love all of our students, we care about all of students, and we want all of our students to feel like they belong. We feel that these solutions do that and that the conversation, the true conversation out of the resolution, not what the media spun, not what the public or certain people decided to spin it in a different way; What our heart behind it was to be a tolerant and loving solution for all of our students.

I asked Ms. Damiano if she had been truthful in her answers and she stated she had been. I asked if she or anyone else wished to add or clarify anything and they stated they did not. Having no further questions I concluded my interview with her (see transcript for further details Exhibit 7).

# GRANTS PASS SCHOOL DISTRICT 7

## <u>Findings</u>:

Allegations in an investigation have the potential to fall into four specific categories.

- **Sustained:**  My investigation resulted in sufficient evidence from one or more sources to conclude the incident occurred.
- **Not Sustained:**  I did not have enough evidence to prove or disprove the allegation.  It does not mean that I do not believe it happened, only that I do not have enough evidence to sustain that particular complaint.
- **Exonerated:**  Means the activity or action did occur, but it was appropriate (per policy, or lawful, etc.) given the circumstances.
- **Unfounded:**  Means no evidence existed to support the claim.

**ALLEGATION #1:** In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Assistant Principal Rachel Damiano was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Damiano is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign.
  **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that "***No employee will use district facilities, equipment or supplies in connection with political campaigning,*** *nor will any employee use any time during the working day for campaign purposes."* Grants Pass School District 7 policy IIBGA-AR "Electronic Communications System Acceptable Use Regulation" (Exhibit 6E) states that ***"Attempts to use the District network for Transmission of any materials regarding political campaigns is strictly prohibited."*** The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Damiano and Ms. Medart ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.

Ms. Damiano admits to using District 7 resources to include email, computers, and possibly printers however she states she doesn't recall in many of her answers when asked for specifics. The numerous email Exhibits under Exhibit 4 which included Google Docs associated with "I Resolve" and the proposed resolution, shows that Ms. Damiano used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve" campaign with staff and persons inside and outside of School District 7. While Ms. Damiano did not like referring to "I Resolve" as a political campaign, her efforts both in the video regarding legislation and through the stated purpose of "I Resolve" showed it was a political campaign. This was specifically demonstrated in emails she sent to Daily Wire host Ben Shapiro (Exhibit 4H) and another to Mr. Reynolds of the American Legislative Exchange Council (Exhibit 4I) to gain support for the "I Resolve" resolutions using District

---

**Vickers Declaration
Exhibit 8 Page 67 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

7 School resources. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation effecting gender identity issues with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and pronouns for gender identity students, and require parents be involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Damiano have chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

B.  Used time during her working day for political campaign purposes. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that "*No employee will use district facilities, equipment or supplies in connection with political campaigning, **nor will any employee use any time during the working day for campaign purposes.**"* As stated under Allegation 1A above, the "I Resolve" campaign was determined to be a political campaign. Date and time stamps on emails shown in Exhibit 4A through 4E as well as Ms. Damiano's uncertain recollection but admitted use of email during her workday to communicate regarding "I Resolve" supported this finding.  Exhibits 4A and 4B were emails sent to outside persons on March 11th, 2021 at 1:31 PM and 10:51 AM which was a school workday and were titled "file" and "Design" related to t-shirts and color choices for "I Resolve." Ms. Damiano also admitted using District 7 computers to work on "I Resolve" although unable to recall if she used District 7 printers.  Without a forensic computer analysis there is no way to quantify the actual time spent during her workday on the "I Resolve" campaign. The policy does not require a certain amount of time in order to be a violation. It states: "*nor will any employee use **any time** during the working day for campaign purposes*" which did occur on more than one occasion. Had Ms. Damiano not utilized time during her workday for the "I Resolve" campaign this would not have been a violation.

C.  Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that "*On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.*" As stated under Allegation 1A, the "I Resolve" campaign was determined to be a political campaign. In the "I Resolve" video, Ms. Damiano identifies herself by stating: "***Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in as a coach as well. I do not have any children of my own yet, but I do work with youth and that has been a passion of mine for a very long time now.***"

Ms. Damiano doesn't introduce herself as a private citizen but rather a Southern Oregon Middle School Teacher giving her first name. While she did not say Grants Pass District 7, She at no time in the video states that the views expressed are that of her own and not that of District 7 or any similar type of statement.  A simple internet search using "Rachel southern Oregon middle school assistant principal" finds an article identifying Rachel Damiano and her full name, North Middle School, District 7, when she was hired in August of 2020 https://spotonoregon.com/southern-oregon/517035/gp-district-7-welcomes-damiano-as-new-vice.html. Additionally, Ms. Damiano used District 7 email for communications for "I Resolve" to both persons inside of District 7 and outside the District which

---

**CONFIDENTIAL**

**Vickers Declaration
Exhibit 8 Page 68 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

identified herself as associated with School District 7 with no disclaimer. The media coverage (Exhibits 5A-5E) shows how District 7 was intertwined with Ms. Damiano and the "I Resolve" campaign. The media coverage had no statements by Ms. Medart or Ms. Damiano that made it clear that the "I Resolve" campaign was not affiliated with District 7.

Ms. Medart did tell me in my interview with her on May 13th, 2021 that there was a disclaimer on the video associated with YouTube. I did find a disclaimer on the YouTube site that, if a viewer used a drop-down box prior to playing the video, it could be seen. This however was not initially with the video as Ms. Medart admitted in her interview with Dan Huber-Kantola on April 6th, 2021 when she told him that it had been added later. The "I Resolve" video itself has no information where a viewer would know the campaign isn't associated with the District as nothing is stated. In the opening statements of the video, Ms. Damiano can be heard saying: "I Resolve" and "We Resolve." This was described in one of Ms. Damiano's statements which she felt showed it was made clear.

The word "We" however, could have been construed by a viewer as inclusive of the District. The amount of email complaints, complaints from District 7 employees, and publicity associated shortly after the video and website were published to social media and the internet were representative of how controversial the "I Resolve" proposals and campaign were. Had Ms. Damiano been clear that the expressed views in the "I Resolve" video and campaign were not those of District 7 then this would not have been a violation of District 7 policy.

D.  Used social media and public websites in such a manner that it disrupted the school environment. **"SUSTAINED" –** Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 6C) states that ***"Staff members, while on duty and off duty, will treat fellow employees, students and the public with respect while posting on social media websites, etc., in order to prevent substantial disruption in school."*** It is clear from the complaints received that the "I Resolve" video posted on YouTube and Facebook, as well as the "I Resolve" website, that a substantial disruption in school occurred. This included student protests (Exhibit 5E), staff complaints, citizen complaints, division among the staff, and was interpreted by some who would be affected by the "I Resolve" resolution as disrespectful.

E.  Posted confidential information about a student on social media and a public website. **"NOT SUSTAINED"-** Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 6C) states that ***"Staff members, while on duty and off duty, will utilize social media websites, public websites, and blogs: in a professional manner by not posting confidential information about students, staff or district business."*** In the "I Resolve" video which was posted on social media and a public website, Ms. Medart speaking to Ms. Damiano, disclosed an incident which occurred approximately one year prior within a month or two of returning to teaching at the K-12 level,



---

**CONFIDENTIAL**                    PCI #21-1011/ Part II

**Vickers Declaration
Exhibit 8 Page 69 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

███████████████████████████, This was corroborated by Principal Tommy Blanchard
███████████████████████████████.

Ms. Medart in my interview recanted the story as being truthful and gave unclear responses to my questions stating that in looking back it was hypothetical although she seemed to indicate she initially believed the story as truthful. ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████ Ms. Damiano was not employed by District 7 during the previous school year when this occurred. Ms. Damiano reported that her understanding was that Ms. Medart's story regarding the student in the "I Resolve" video was hypothetical and not based upon an actual student. There is nothing to sustain this allegation as it is unknown what Ms. Damiano knew and when she knew it to determine if this policy was violated.

F.   Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation." **"NOT SUSTAINED" –** Grants Pass School District 7 policy "ACB" (Exhibit 6B) states that ***"Bias Incident" means a person's hostile expression of animus toward another person or group of person's, relating to the other person's or group's distinguished, or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability or national origin"*** It is not clear if Ms. Damiano's "I Resolve" campaign was "a hostile expression of animus toward those who use a different gender identity. The "I Resolve" campaign is an attempt to change legislation and policies affecting gender identity. Individuals may perceive her actions as biased which is understandable. However, it is not clear based upon the language of the listed policy that her actions constituted a "bias incident" as there weren't enough facts to positively conclude if the allegation was unfounded or in fact was sustained and did occur.

In reviewing Ms. Damiano's job classification (Exhibit 6F), based upon the facts including conduct, I find she failed to meet the standards in her job description under essential duties and responsibilities which included:

- **Establish and maintain effective relationships with students, parents, and staff to promote quality instruction and a healthy school climate**
- **Communicate and collaborate with students, parents, teachers, staff, community, and when appropriate, other agencies to promote an open and participatory school environment**
- **Be knowledgeable of the building's philosophy and establish effective human relationships among students, parents, and teachers, such that results in positive school climate and quality instruction**

<u>**Commentary:**</u> - The allegations listed were investigated and based upon the facts received, District 7 policies, and Ms. Medart's job description, the "Findings" were determined based upon those factors.

---

**Vickers Declaration
Exhibit 8 Page 70 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

**END of REPORT**

Pacific Consulting and Investigations
PO Box 3506 Ashland, Or. 97520
**Tel** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com

**Vickers Declaration**
**Exhibit 8 Page 71 of 71**

**Pacific Consulting and Investigations**
PO Box 3506 Ashland, Or. 97520
**Tel:** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com
PI-ID: #73728

# GRANTS PASS SCHOOL DISTRICT 7

## CONFIDENTIAL REPORT PART I

## JUNE 2021

Prepared by Bill Landis PI-ID #73728



**GPSD 285**

**Vickers Declaration**
**Exhibit 9 Page 1 of 136**

# TABLE OF CONTENTS

## Contents

Request by _____ 1

Summary: Mentioned Persons, Allegatons, List of Exhibits _____ 2-4

Details _____ 5-128

Findings_____ 129-134

Exhibits_____135

**GPSD 286**

# GRANTS PASS SCHOOL DISTRICT 7

## Request by:

Sherry Ely: Dist. 7 Director of Business Services

Grants Pass School District 7

725 NE Dean Dr.

Grants Pass, Or. 97526

541-474-5700

## Request Date:

04/15/2021

## Report Submitted:

06/03/2021

## Assigned Investigator:

Bill Landis (PI-ID #73728)

Pacific Consulting and Investigations

P.O. Box 3506 Ashland, Or. 97520

541-441-2209

## PCI Incident Reference Number:

21-1011/ Part I

**GPSD 287**
**Vickers Declaration**
**Exhibit 9 Page 3 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

### Named Employee:

Katie Medart: North Middle School Teacher

### Mentioned Persons:

Kirk Kolb: Grants Pass Dist. 7 School Superintendent
Dan Huber-Kantola: Grants Pass Dist. 7 Director of Human Resources
Tommy Blanchard: North Middle School Principal
Rachel Damiano: North Middle Assistant Principal
███████████: District 7 employee (Formal Complaint)
██████: District 7 employee (Formal Complaint)
██████: District 7 employee (Formal Complaint)
████████████: District 7 employee (Formal Complaint)
██████████: District 7 employee (Formal Complaint)
██████████: District 7 employee (Formal Complaint)
█████████: District 7 SPED Teaching Assistant
███████: District 7 Librarian

### Allegations:

**#1**: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School
Teacher Katie Medart was involved in a campaign of a political nature non-sanctioned
by Grants Pass School District 7 where Ms. Medart is alleged to have:

- A. Used District facilities, equipment or supplies in connection with the political campaign
- B. Used time during her working day for political campaign purposes
- C. Failed to designate that the viewpoints she represented on the issues involved in the
  political campaign, were her personal viewpoints and not that of District 7
- D. Used social media and public websites in such a manner that it disrupted the school
  environment
- E. Posted confidential information about a student on social media and a public website
- F. Created a "bias incident" where her actions as a District employee with regards to the
  political campaign/movement involved behavior or language which was derogatory
  and directed at those persons and or students "sexual orientation"

**#2**: Between October 2020 and March 2021, Katie Medart discriminated against ████████████
████████████████████

**#3**: On or about March 2021, Ms. Medart created a hostile work environment for ████████████
████████████████

---

**CONFIDENTIAL**

## GRANTS PASS SCHOOL DISTRICT 7

If these allegations are found to be true, Ms. Medart may have failed to meet the standards of her Grants Pass School Dist. 7 Job Description for her position as well as violated the following policies:

- ACB – All Students Belong
- GBG – Staff Participation in Political Activities
- AC – Nondiscrimination
- GCAB – Personal Electronic Devices and Social Media – Staff
- IIBGA-AR – Electronic Communication System Acceptable Use Regulation

## List of Exhibits:

1. Complaints (formal) from Grants Pass Dist. 7 Staff members:
   A. ▉▉▉▉▉▉:
   B. ▉▉▉▉▉▉
   C. ▉▉▉▉▉▉▉
   D. ▉▉▉▉▉▉
   E. ▉▉▉▉▉▉▉
   F. ▉▉▉▉▉
   G. ▉▉▉▉
   H. ▉▉▉▉▉▉

2. Email complaints from citizens
   A. ▉▉▉▉▉▉▉: dated April 7th, 2021
   B. ▉▉▉▉▉▉▉: dated April 7th, 2021
   C. ▉▉▉▉▉: dated April 7th, 2021
   D. ▉▉▉▉▉▉: dated April 7th, 2021
   E. ▉▉▉▉▉: dated April 7th, 2021
   F. ▉▉▉▉▉: dated April 6th, 2021
   G. ▉▉▉▉▉▉: dated April 6th, 2021
   H. ▉▉▉▉▉▉: dated April 7th, 2021

3. Email complaints from students (past and present)
   A. ▉▉▉▉▉▉: dated April 6th, 2021
   B. ▉▉▉▉▉: dated April 8th, 2021
   C. ▉▉▉▉▉: dated April 7th, 2021
   D. ▉▉▉▉▉: dated April 7th, 2021

4. Email regarding "I Resolve" sent and received on Dist. 7 Email account
   A. Emails to and from ▉▉▉▉▉▉: March 15th, 2021 4:04 PM
   B. Emails to and from Damiano and ▉▉: March 26th, 2021 2:41 PM
   C. Email to ▉▉▉▉▉: March 17th, 2021 5:13 PM
   D. Email Rachel Damiano from ▉▉▉▉: March 24th, 2021 7:32 PM
   E. Email to ▉▉▉▉ signed by Medart and Damiano: March 26th, 2021 2:31 PM

# GRANTS PASS SCHOOL DISTRICT 7

    F.   Email to Ben Shapiro signed by Medart and Damiano: March 26th, 2021 2:41 PM
    G.  News media to Rachel Damiano: April 7th, 2021 11:02 AM

5.   Media Coverage
    A.   Screenshot from KOBI 5
    B.   KOBI 5 news article dated April 7th, 2021
    C.   KTVL 10 news article dated April 8th, 2021
    D.   KOBI 5 news article dated April 14th, 2021
    E.   KTVL 10 news article dated April 15th, 2021

6.   Emails between Katie Medart and ▮▮▮▮▮▮ between October 6, 2020 and April 2, 2021

7.   Grants Pass District 7 Policies, Guidance, and job description
    A.   Grants Pass School District 7 policy "AC" – Nondiscrimination
    B.   Grants Pass School District 7 policy "ACB" – All Students Belong
    C.   Grants Pass School District 7 policy "GCAB" – Personal Electronic Devices and Social Media – Staff
    D.   Grants Pass School District 7 policy "GBG" – Staff Participation in Political Activities
    E.   Grants Pass School District 7 policy "IIBGA-AR" - Electronic Communications System Acceptable Use Regulation
    F.   Grants Pass School District 7 – "Job Description"
    G.  Grants Pass School District 7 – Administrative Memorandum dated February 5th, 2021

8.   Thumb drive containing information including documents, emails, photos, memos, videos, and other information as the foundation for this investigation received from District 7

9.   Thumb drive containing digital files of audio recordings, transcripts, notices of investigation, Garrity Rights form, and items related to this investigation as well as a copy of this narrative report

**GPSD 290**
**Vickers Declaration**
**Exhibit 9 Page 6 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

### Details:

On April 12th, 2021, I was contacted by Willard Ransom attorney for Grants Pass School District 7 to see if I was available regarding an investigation involving alleged employee misconduct. I advised him that I was, and I was recontacted on April 14th, 2021 by Mr. Ransom who stated the District 7 School Board had approved the go ahead for me to provide services for an investigation. On April 15th, 2021, I did enter into a Letter of Engagement with Sherry Ely, Grants Pass School District 7 Director of Business Services. I was advised she would be my point of contact during my investigation.

I was informed that District 7 had received several formal complaints from District 7 employees regarding the alleged discriminatory conduct of North Middle School teacher Katie Medart related to the "I Resolve" movement/campaign. Additionally, the School District received emails from citizens who complained about Katie Medart in response to the "I Resolve" movement and video that Ms. Medart had been involved in along with North Middle School Assistant Principal Rachel Damiano. On April 20th, I did meet with Sherry Ely to discuss the investigation and scope. Ms. Ely stated that "I Resolve" was not something supported nor affiliated with District 7 and many of the calls and emails received believed that the School District had been involved with "I Resolve" which they were not. I was provided an email where Superintendent Kirk Kolb did notify the School Board on April 5th, 2021 where he said that two employees were promoting a resolution which had been posted on YouTube and Facebook with links for the board to see (Exhibit 8). He also stated: "This has created a significant disturbance that is impacting the entire district" and also said that "we are VERY seriously dealing with this."

Ms. Ely advised that North Middle School Principal Tommy Blanchard and HR Director Dan Huber-Kantola had conducted an interview over the complaints with Ms. Medart. Ms. Medart had filed a discrimination complaint involving them and so they were recused, and the investigation suspended by them. Additionally, ██████████ filed a formal complaint with the School District alleging Ms. Medart discriminated against ███ because ███ is transgender. Lastly, a formal complaint was received by ████████████ ████████████ who alleged Ms. Medart had created a hostile work environment related to ███████ role as North Middle School ████████████ I was advised that all of the documentation including emails, potential involved policies, audio files, documents, and other associated information would be put onto a thumb drive which I could pick up at a later date. Ms. Ely advised that Ms. Medart had been placed on paid administrative leave as of April 5th, 2021 which was eleven days after the "I Resolve" appeared to have been released.

On April 23rd, 2021, I did contact Ms. Ely at the District 7 office and received the thumb drive containing the aforementioned documentation including the listed complaints (Exhibit 8). After reviewing all the documentation, I found it necessary to divide my instigation into four parts. Part I is dedicated to the allegations regarding Ms. Medart and her alleged violation of District 7 policies. Part II is dedicated to the allegations regarding North Middle School Assistant Principal Rachel Damiano and her alleged policy violations. Part III is dedicated to Counselor Selena Alderson and her alleged policy violations. Part IV was dedicated to Ms. Medart's allegations against school administration for alleged policy violations, but I was informed by Ms. Ely on May 7th, 2021 that Ms. Medart had

## GRANTS PASS SCHOOL DISTRICT 7

withdrawn her complaint. For purposes of this report, I will be addressing only the allegations made against Ms. Medart with regards to alleged District 7 policy violations and identified as Part I of the overall investigation.

In reviewing the "I Resolve" video and campaign referred to as "I Resolve", I found it necessary to watch the video which I did (Exhibit 8). I also went to the "I Resolve" website which I found by using an internet search engine to understand what is referred to in the complaints. On the website, it defines the "I Resolve" title as *"Reasonable, loving, and tolerant solutions for education policies that respect everyone's rights." "Proposed Solutions for Education Systems." "Honoring All Students, Staff and Community Members."* It further states: *"I Resolve is a grassroots movement intended to protect the hearts and minds of our youth and stand up for truth in our society. We believe that resolutions that are reasonable and fair in both form and operation, are beneficial in helping to safeguard the mental, emotional and physical well-being of all public-school students. We need communities to band together, through individual and corporate commitment, to protect our youth and make their voice heard to local, state and national leaders and policy makers."* Under the title "Current Proposal" it states: *"We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved. The resolution statements regarding bathroom and locker room shared space use are suggestions for current structures, until such a time that individual gender neutral bathrooms are required and fully funded for education and youth facilities. The last two resolutions are proposed as a caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey."*

The website has a link which states: "Sign the Resolution." The resolution is listed as "Resolution 2021-01 and says the following:

### Resolution 2021-01

Therefore, be it resolved that we urge our local, state and federal leaders to adopt the

following principles and policies:

Premise

**Point 1**
We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;

Resolution 1a

**Point 2**
Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;

**GPSD 292**
**Vickers Declaration**
**Exhibit 9 Page 8 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Resolution 1b

**Point 3**

For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available\*\*;

Resolution 2

**Point 4**

A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and

Resolution 3

**Point 5**

A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.

Footnote

**Note**

\*\*Please note that although not specified in the resolutions, individual gender neutral bathrooms are endorsed by I Resolve and encouraged to be fully funded by the state to be implemented in education facilities.

The website has several "Did you know" blocks with information as well as T-Shirts for sale. One of the "Did you know?" blocks is a reference to a recent 6th Circuit Federal Court of Appeals ruling.

**1ST AMMENDMENT RIGHTS FOR EDUCATORS**

A recent court ruling by the 6th Circuit Federal Court of Appeals ruled that Dr. Nicholas Meriwether, a university professor, had grounds to sue the school because they had punished him for not using a student's preferred pronouns. The professor had asked to accommodate by using the student's last name rather than use pronouns and the school refused to allow this. The court held that this punishment by the school was a violation of the professor's First Amendment rights.

In the margin of this particular "Did you know?" is the statement: "*This ruling is a reason why our resolutions include that staff and students will not be mandated to use preferred names and preferred pronouns.*" "If it is mandated, it is a violation of First Amendment Rights." There is also a link to the "I Resolve" video. At the bottom of the website, is the statement: "*The views expressed on this site*

**GPSD 293**
**Vickers Declaration**
**Exhibit 9 Page 9 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

*and any related video(s) produced by I Resolve are the expression of the individuals, as private citizens and do not necessarily represent the views or opinions of any specific education entity."* This website was viewed by me after the complaints and after my investigation began and it is not known if the website was modified, or language changed or added from the time that the website was first published which appears to be about the same time as the YouTube video upload of March 25th, 2021. The original site now has a message that says: "This site has moved" and a link to click on to the new site.

I watched the video called "I Resolve" and had it transcribed. I was advised that the speakers in the video were Katie Medart and Rachel Damiano (North Middle School Asst. Principal) although they gave only their first names, however they did give information about their professions. Ms. Medart in the video introduced herself as follows:

> Rachel Damiano:
>
> I resolve.
>
> Katie Medart:
>
> I resolve.
>
> Rachel Damiano:
>
> We resolve.
>
> Katie Medart:
>
> We resolve. We hope that you will resolve with us. We just want to say a thank you for taking the time to click play on this video, to hear what we have to share with you about policies related to gender identity for our youth. We hope by the end of this viewing, that you are willing to take action to have your voice heard with us. So you might be wondering who are these people? ***My name is Katie. And my experience with youth is that I have been teaching for the last 10 years. I am currently teaching at a middle school in Southern Oregon, and prior to that for eight years, I was a science instructor for college and then some high school science teaching experience as well. I've been a coach, multiple sports. And then probably my greatest honor of working with youth is that I have two of my own sons.***

Ms. Medart asks Ms. Damiano to explain what is bringing them here (the video) and why.

> Katie Medart:
>
> Why don't you explain what's bringing us here today and why?

---

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Absolutely. So it's a multifaceted issue right now. So right now at the federal level, there's the Equality Act. It's currently already passed the House and is in filibuster actually right now at the senate level. The Equality Act talks about gender identity and as well, it reverts back to the Civil Rights Act of 1964. And it's adding to that and we'll talk more about the specific aspects of the Equality Act as we kind of move through, but there are parts of the Equality Act that are very specific and very polarizing we think in the way that it's written in terms of some policies.

Rachel Damiano:

And then at the state level for Oregon specifically, there's Senate Bill 52, which would create a state of emergency as it's written for students or for youth specifically that identify as transgender, but it's all about gender identity. And that state of emergency would give a lot of leeway to policymakers without having to go through legislation. So that's Senate Bill 52, along with that is there's an advisory committee that specifically speaks to gender identity and it's called the LGBTQ2SIA+ Student Success Plan. And if Senate Bill 52 is enacted, then that success plan would automatically go, not just as guidance, but would be mandated to public schools as well as really any organization that works with youth.

Rachel Damiano:

And then at the local level, there has been guidance ODE back in 2016, that was about gender identity and best practices. It's not law, but it is when a guidance is given from ODE, it is taken as things that need to be implemented just because of the way that they're written, and they become requirements for schools. So our districts, local districts and districts across the state have taken that guidance and they've had to implement it in various ways that isn't always consistent because they do have some leeway and pulling from the guidance, but they are tied into the guidance and what verbiage is used in the guidance. And I know that you've had some experience specifically at the local level. Can you tell us about what it was like coming back into public education and what that guidance has meant for you as a teacher?

*Ms. Medart in the video asks Ms. Damiano for a recap of what was just said specifically about the legislation at the Senate level and the effects on private schools, youth organizations, churches, religious organizations, and not just K-12.*

**GPSD 295**
**Vickers Declaration**
**Exhibit 9 Page 11 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yeah. So before we go to that, let's just recap that because this is going to be really important for the end. The end, when we ask you to take action and understanding why that is so important right now. So we have at the federal level, legislation coming in, that's at the Senate, already passed the house and that will impact every business, every entity. Where so if I asked you what about private schools?

Rachel Damiano:

Yeah. So it'll affect private schools, it'll affect youth organizations. Ultimately it'll actually affect churches as well and religious organizations. And it's not just K-12. The Equality Act at the federal level actually reaches from infancy to beyond. And any business, basically any business that's outside of your home and it's not just you and your house as an individual, it will affect.

Katie Medart:

So would you also say that it's true that even though we're from Oregon and we're more familiar with what's happening specifically in Oregon, that there's good odds that the issues that we're having in our state are also occurring in other states right now?

Rachel Damiano:

They are. Yeah. And the way that the States have had to reach through legislation and had to create their own gender identity policies is different across the states. The Equality Act would make it mandated across all states.

Katie Medart:

So that's going to be important because we're going to ask you to not just if you're Oregonian, but we're really looking nationwide, feeling that this is really impacting, going to impact you regardless of where you live.

Ms. Damiano asked Ms. Medart how it has been for her coming back to public education from the teacher's side. Ms. Medart gives an answer that includes an incident that occurred within a month of Ms. Medart returning to public schools which was the previous year, she is approached by a transgender student of hers who makes a request.

Rachel Damiano:

Well, how has it affected? You've come back into public education and you've seen it from the teacher side. How has that been for you?

**GPSD 296**
**Vickers Declaration**
**Exhibit 9 Page 12 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yeah, so I was in K-12 education and then I left for 8 years, going to teach at a college and then coming back, I came back last year. So the last 2 years I've been back in K-12 and I could not believe the changes that have occurred. One of the biggest ones was within a month of teaching, I was presented with a very foreign circumstance to me. I had a female student. She then was on a journey of exploring what is her gender identity. She had made a request to identify as a male. Then the request came for to go by he and him and to change the name. And so I was sending an email by staff member saying the student is making this request. I've let the student know that we are in support, that we will support this. And I didn't know what to do.

Katie Medart:

So I went to my administration and I asked do parents know? Do we have parent permission? What is our policy? How am I supposed to handle this? And what I found was that, well, there was reference to the ODE guidelines that you mentioned earlier, but that they are guidance's. And so as different scenarios have come up, there hasn't been a consistent response. There isn't consistency because those are guidance's and not required about what I find different schools are doing and what they're implementing, depending on what school you're at and what part that district is wanting to implement it from those guidance's.

After the story told by Ms. Medart, there is more dialogue about what they are asking and "what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option." Ms. Damiano then states what policies and resolutions that they've created.

Rachel Damiano:

That makes sense. And I think that that really rolls into what we're asking and what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option. An option that I don't think has really been put on the table yet. So we want to read them directly for you so that you know what those resolutions are and what you're speaking to.

Rachel Damiano:

So this first one really just speaks to us all getting on the same page. So it says it is recognized that accepting very rare, scientifically demonstrable medical conditions, there are two anatomical gender presentations: male and female. So that's specifically talking about in layman's terms, that's

---

## GRANTS PASS SCHOOL DISTRICT 7

specifically talking about the genitalia that students and humans are born with. And that would roll right into, instead of it being a gender identity issue when it comes to bathrooms and locker rooms, making it about anatomy ultimately. And so the second one is shared public school restrooms and locker rooms, especially as they pertain to spaces predominantly used by student and youth, previously designated by gender could then be re-designated as anatomically male and anatomically female spaces to only be utilized by persons matching the anatomical designation of the spaces as consistent with historically and scientifically demonstrable anatomically correct utilization of those spaces.

*Ms. Medart then explains the intentions of anatomical use of facilities.*

Katie Medart:

Okay. Let's pause. So if you're like what? Let's help you imagine this. So like for example, at the middle school, typically you would go, and you would see, okay, here is rather, it's a restroom or locker room. It says boys, and this one says girls on it. So instead of it saying that it would then read anatomical male, anatomical female, and what that then is referencing is what, in essence, what genitalia do you have because they're designed in form and function, both of facilities for anatomical anatomy.

*Ms. Damiano and Ms. Medart continue with clarification of what someone who is not anatomically male or female yet identifies as such would have as options and also discuss the choice as to use of names or pronouns.*

Rachel Damiano:

So Katie, for this next bullet in talking about, we want to be fair and equitable to all sides. This next bullet, if a student is still uncomfortable using the bathroom or the locker room that matches their anatomy, it says for any person who is not comfortable using their anatomically correct space, they may request access to a private restroom or locker room space, including such spaces that are designated for use by public school staff, to the extent that these spaces are available and exist. So I think just in the end we want, again, we want to give voice and honor all sides involved. And we feel like that point and that resolution really does that. These last couple are really more speaking to the gender identity journey that these students are going through.

Katie Medart:

What it says is a public student seeking to be known by a name other than the name designated on their legal documentation, may at their discretion with parent permission, use a derivative of their

**GPSD 298**
**Vickers Declaration**
**Exhibit 9 Page 14 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

legal name for the purposes of requesting that the public school staff identify the student by such name. It should be reasonably accommodated by public school staff provided however that any such policy shall not be mandated upon or required of the public school staff, nor shall any such policy be enacted that infringes upon the public school staff, civil and constitutional liberties, including their freedoms of speech and expression. And further provided that such derivative of the student's legal name shall not be honored if it is otherwise crude or offensive, as determined by acceptable societal normative, respectful speech.

Rachel Damiano:

Another lots of words and we know that some of these are a lot of words. Part of that is because this is proposed policy. So we want to make sure that we are speaking to the way legislation speaks in the way that policies are written. This one is basically saying in essence, that a student walking through this journey can ask for a preferred name with parents in the know, and with parent permission and that that be about gender identity, that the discussion is centered around gender identity. And so that it is a derivative of one's legal name. And I think you had an example for what would that look like?

Katie Medart:

I do have an example for that, and I want to bring up one other important, bringing us back to that in our state, the ODE guidance of it does encourage parent involvement, but it does not require it. So that was one of the things that I have personally experienced when going and getting clarification is that it is up to the school to determine if they would like to involve the parent or not. So you would find scenarios where the parents are not in the know at all about what is going on with their child as they are going through that journey. And as a parent, that was disturbing for me as I want to be able to offer love and support, especially as they would embark on that journey. So an example would be for the name, if a student's name was Jessica Smith, then Jessica, if was struggling or on the journey of their gender identity, they wanted to, instead of identify, if they were female as male, they can then change their name to Jess.

Rachel Damiano:

Jess, Jesse Smith.

Katie Medart:

Go by Smith.

**GPSD 299**
**Vickers Declaration**
**Exhibit 9 Page 15 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Anything that's that derivative. And again, that's to focus on the gender identity piece of it in that journey, not necessarily on name because I think that that can be a rabbit trail. And then also moving into just this last bullet point as well, or the last resolution is really speaking to the pronouns.

Katie Medart:

Yes. And so it really is the same thing, but it is instead of the name, it's saying the same thing for pronoun usage.

Rachel Damiano:

And with that focus on allowing we want to give voice to all sides. We want to be respectful always. And that's something that our nation has been built on. It's a basic action that we should be taking towards others. We should be respectful. And so that's always this underlying, but at the same time also giving freedom to staff and to students without mandating the use of the pronouns or the use of the preferred name.

Katie Medart:

And requiring that we work together with the family. So it's us working with the family or whoever is in that guardian role, the child and with the school and it's bringing us all together.

Ms. Damiano then directs those watching to the "I Resolve" website. This infers by the language for the viewer to lobby political leaders by adding their name and saying they support the resolution. There is the mentioned pending legislation which they list as Oregon's Senate Bill 52, LGBTQ2SIA+ Student Success Plan which is potentially being put into motion, as well as a reference to an upcoming ODE state board meeting on April 15th where your voice can be heard. There is also the mention of the Equality Act which they state has passed the House, but Senators can be contacted as it tells viewers that prior to a vote in the Senate: "It doesn't have to be just the way the Equality Act is written. So it's written in a way that's more fair to all sides and honors all parties involved in this decision."

Rachel Damiano:

Absolutely. And I think that really pulls it all together as well as it takes a community, not just to raise up our youth, but it takes a community to be a healthy society. And so all of these are speaking to parents involved, students involved, community involved, and we need you involved as well. So one of the ways that you can speak out, and one of the things that we need you to do is if this resonates with you as, yeah, this seems fair in how it's written and how it would be implemented. We need you to tell us that, and we need you to tell our leaders that. And you can do that by going to

## GRANTS PASS SCHOOL DISTRICT 7

iresolvemovement.com and on iresolvemovement.com, there is a place where you can read the full resolution, our reasoning behind it, as well as the resolutions in there, all of their legalese glory. And agree and say yes, I can put my name behind this. I can say I agree. And there's a button on there that you push. And then you just fill in your name and you say that you agree.

Katie Medart:

So number one.

Rachel Damiano:

Number one.

Katie Medart:

Go to iresolvemovement.com and digitally sign. And then number two is what about your state?

Rachel Damiano:

Exactly. Yep. So here specifically in Oregon, with the Senate Bill 52 and as well as the LGBTQ2SIA+ Student Success Plan, potentially being put into motion. So the next ODE or state board meeting is April 15th. And I know that's coming up really soon, but in order to have your voice heard, you can speak out directly to the State Board of Education. There is a template on our site, as well as the resolution. You can send it in as public comment at any time before the April 15th meeting and have your voice be heard in that way as well. And then that last one.

Rachel Damiano:

We need you to speak out to your senators and that's not just in Oregon, that is across our nation. It has not been voted upon yet. The Equality Act has not been voted on yet. It has passed the House, but speak out to your senators and say, hey, we have another option for you. It doesn't have to be just the way the Equality Act is written. And that could even mean that you could have a voice in changing what the Equality Act says and how it's written. So it's written in a way that's more fair to all sides and honors all parties involved in this discussion.

Ms. Medart states that "love is action" and if what they presented resonates with the listener, go to the website, and fill out the form, email legislators, and contact your state Senator that is representing your state, and have your voice heard.

**GPSD 301**
**Vickers Declaration**
**Exhibit 9 Page 17 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

If we spoke to you, if you choose to take action, which I love this saying, love is action. So if that's resonating with you, you can one, go to iresolvemovement.com. Number two, for those of you who are here in Oregon, we have a template there, fill that out, email our legislators, letting them know what is your stance and have your voice be heard. And then finally we need everyone, we need to contact your state Senator that is representing your state and be able to have your voice heard at that level.

Ms. Damiano concludes with an end note which is agreed with by Ms. Medart.

Rachel Damiano:

So thank you again for taking the time to watch and to hear us out. And I know for me, I resolve for the students of our community, for the youth of our community and ultimately for the youth of our nation, and I know that sounds big and lofty, but that's why I got into education. I am here to raise up our youth and to safeguard their mental, emotional, physical wellbeing. And we feel that these resolutions do that.

Katie Medart:

Absolutely. Thank you.

(See transcript or listen and watch video for further details Exhibit 8).

I was advised that the "I Resolve" video had been uploaded to YouTube a social media web linked site and that there was an "I Resolve" Facebook page. In searching YouTube, I did find the "I Resolve" video was uploaded to YouTube on March 25th, 2021 and as of May 2021 had over 5,500 views. Prior to clicking on the video to watch, there was a statement that read: "If you agree this is pragmatic and fair, please sign at: www.iresolvemovement.com This resolution is focused on gender identity policies. It is in response to the polarizing nature of adopted guidelines and proposed legislation." That is what is visible to someone prior to clicking on the video. There is a "Show More" hyperlink which when selected, shows the resolutions from the website and at the bottom states: "Please note that the views expressed in this video are the personal and 1st amendment protected opinions of the speakers and do not necessarily represent the views of any specific school entity. They are expressed in the speakers' capacity as private citizens." It is not known if those comments were there at the time of uploading the video to YouTube. Also, the site states that "comments" had been turned off so persons could not comment on the video. That too is unknown if that was changed from the original posting date. I did search Facebook and did not find the link and had been told the Facebook page was removed.

Since there are three allegations, I will complete the remainder of my report addressing each allegation separately.

## GRANTS PASS SCHOOL DISTRICT 7

### Allegation #1

**#1**: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School
Teacher Katie Medart was involved in a campaign of a political nature non-sanctioned
by Grants Pass School District 7 where Ms. Medart is alleged to have:

A. Used District facilities, equipment or supplies in connection with the political campaign
B. Used time during her working day for political campaign purposes
C. Failed to designate that the viewpoints she represented on the issues involved in the
political campaign, were her personal viewpoints and not that of District 7
D. Used social media and public websites in such a manner that it disrupted the school
environment
E. Posted confidential information about a student on social media and a public website
F. Created a "bias incident" where her actions as a District employee with regards to the
political campaign/movement involved behavior or language which was derogatory
and directed at those persons and or students "sexual orientation"

The scope of this investigation is strictly regarding District 7 policies and whether the conduct of Katie
Medart that is alleged by District 7 employees ███████ (Exhibits 1A-1H) violated the listed School Dist. 7
policies (Exhibit 7A-7E) or if Ms. Medart failed to meet the standards of her job description (Exhibit
7F). At the center of the complaints is the "I Resolve" campaign and video which are about gender
identity policies as stated in the video: *"We just want to say a thank you for taking the time to click play
on this video, to hear what we have to share with you about policies related to gender identity for our
youth."*

Exhibits 1C, 1D, 1E, 1F, 1G, and 1H were formal complaints filed by District 7 staff/employees
essentially asserting that Ms. Medart was involved in a campaign/movement of a political nature
believed to be non-sanctioned by Grants Pass School Dist. 7 and alleged to have violated several
District 7 policies. Numerous emails were identified by District 7 related to the "I Resolve" campaign
and contained in a folder in (Exhibit 8) some of which I have listed in various parts of this report.
Those emails used the address @grantspass.k12.or.us which I confirmed to be the School District 7
official email domain.

Exhibits 2A, 2B, 2C, 2D, 2E, 2F, 2G, and 2H are only some of the complaints from citizens sent to
District 7 email accounts between April 6th and April 7th, 2021 that included Ms. Medart, Kirk Kolb,
Tommy Blanchard, and Rachel Damiano. The complaints called Ms. Medart transphobic, disturbing,
discriminating, and harmful to students. Exhibit 2B was sent to Ms. Damiano but talks about Ms.
Medart. Exhibit 2F was one of several emails sent to Superintendent Kirk Kolb alleging the School
District was actively trying to pass resolutions restricting the rights of trans and gender non-
conforming students in his schools. Exhibit 2H included information and a screenshot from the since
removed Facebook page which read: *"Our Resolutions: *Bathroom/Locker room use by anatomy, not
gender. *Required parent involvement in student's gender journey. *Staff/student freedom to respectfully*

---

# GRANTS PASS SCHOOL DISTRICT 7

*use or not use a person's preferred name/pronouns."* These emails as stated were dated April 6th through April 7th, 2021 and are noteworthy as they show Ms. Medart is being identified within several days of the video posting to social media as a North Middle School Teacher and associated with the "I Resolve" campaign.

Exhibit 3A, 3B, 3C, and 3D are complaints received by email from students and prior students between April 6th, 2021 and April 8th, 2021. All of the emails are on Grants Pass District 7 email accounts that include Ms. Medart, and District 7 administrators Kirk Kolb, Tommy Blanchard, and Rachel Damiano. The emails accuse Ms. Medart of being prejudiced, disrespectful, and discriminatory as well as referring to the campaign as a disgusting proposal. These emails as stated were dated April 6th through April 8th, 2021 and are noteworthy as they show Ms. Medart is being identified within several days of the video posting to social media as a North Middle School Teacher and associated with the "I Resolve" campaign.

Exhibits 5A, 5B, 5C, 5D, and 5E are of media coverage surrounding the "I Resolve" campaign between April 7th, 2021 and April 15th, 2021. Exhibit 5A was a screenshot of News Channel KOBI 5 who did a story on April 7th, 2021 and depicts a statement identifying Ms. Damiano as "Assistant Principal of North Middle School." Exhibit 5C is a similar story from News Channel KTVL on April 8th, 2021, identifying both Rachel Damiano and Katie Medart as an Assistant Principal and teacher at North Middle School in Grants Pass. Exhibit 5D is a news story by News Channel KOBI 5 regarding a North Middle School 8th grade student who is protesting the conduct of Ms. Medart and Ms. Damiano related to the "I Resolve" campaign specific to the anatomical bathrooms and the belief that the policies are transphobic. Exhibit 5E is a News Channel KTVL story dated April 15th, 2021 in which students at North Middle School have started a petition to have Ms. Medart and Ms. Damiano fired. The news stories have over 50 comments regarding the stories and many of the comments are adversarial and hostile in support or against the campaign or persons commenting or associated with the stories.

Exhibits 4A, 4B, 4C, 4D, 4E, 4F, and 4G are emails on Ms. Medart's Grants Pass District 7 account that Ms. Medart was either sent, received, or part of the email conversation related to the "I Resolve" campaign. Numerous emails appear to be during the school workday, associated with the "I Resolve" campaign, and not associated with school business. Exhibit 4A is an email conversation between District 7 employee ▓▓▓▓▓▓▓ and Ms. Medart dated March 15th, 2021 with one at 4:04 PM and another at 4:11▓▓, followed by one at 4:26 PM. The subject line of those emails is "Copy of Resolution 2021-01 – Invitation to edit." The same resolution of the "I Resolve" campaign. The emails contain a link to a document for editing via Google Docs. In ▓▓▓▓▓▓ email to Ms. Medart, he asks the question: *"Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?"*

Ms. Medart responds to him with a web address and a copied portion of the article as I found when I conducted a search of the article referenced. https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift *"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.*

## GRANTS PASS SCHOOL DISTRICT 7

*What should schools do now?*

*The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."*

Exhibit 4B is an email stream between March 15th, 2021 at 4:04 PM and March 16th, 2021 at 9:46 AM that begins with Exhibit 4A but includes ▇▇▇▇▇▇ sending feedback to Katie Medart related to the "I Resolve" resolution 2021-01 as is in the subject line of the email. On March 16th, 2021 at 9:05 AM, ▇▇▇▇▇▇ offers feedback on the resolution. Then on March 16th, 2021 at 9:10 AM, Ms. Medart forwards the mentioned email conversation to Ms. Damiano using District 7 email. On March 16th, 2021 at 9:46 AM, Ms. Damiano responds to Ms. Medart with a statement that a suggestion offered has been fixed stating she is glad they caught that and asks Ms. Medart an additional question.

Exhibit 4C is email dated March 17th, 2021 at 5:13 PM and March 22nd, 2021 at 4:46 PM on District 7 email between Ms. Medart and ▇▇▇▇▇▇▇▇▇ member as her email indicates. The subject line of the email is: "Copy of Resolution." In that email, a Google Document has been shared with ▇▇▇▇▇▇ by Ms. Medart and by statements such as "gender fluidity" in the body of the email it is clear it is in reference to the "I Resolve" campaign. Ms. Medart's response to Ms. Swain gives more information about the website under construction with a link to the "I Resolve" website.

Exhibit 4D is an email conversation between Rachel Damiano and ▇▇▇▇▇▇ who identifies as someone from Edgewater fellowship by his email address. There are several emails between them from March 24th, 2021at 7:32 PM and another at 9:29 PM where Ms. Damiano used District 7 email to communicate. Ms. Damiano has a signature block at the end of her emails with her name and title as Assistant Principal, North Middle School. An additional Edgewater Fellowship person named Josh is copied and the email conversation mentions Ms. Medart as having added some comments next to the video as if referring to edits to the "I Resolve" website. There is a question about YouTube and how best to post it on the site and another comment that Ms. Damiano will forward it to Katie to look at.

Exhibit 4E is an email on District 7 email from Ms. Damiano to Dr. Reynolds of the American Legislative Exchange Council (ALEC) dated March 26th, 2021 at 2:31 PM. Ms. Medart is copied in on the email to her District 7 email account. The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical and emotional health of youth. The email requests that ALEC review their proposed resolution and adopt the policy points to then be put forth at the state and federal levels by legislators. There is a link to the "I Resolve" website and a copy of the "I Resolve" Resolution regarding bathroom use, name and pronoun choices, and the previous mentioned parental consent. The email is signed: "*Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher.*" The irony of the signature is that although the name of the

## GRANTS PASS SCHOOL DISTRICT 7

School and District are left off of the email other than identifying Southern Oregon Assistant Principal and Science Teacher, the email is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4F is an email on District 7 email from Ms. Damiano to Ben Shapiro of the Daily Wire dated March 26th, 2021 at 2:41 PM. Ms. Medart is copied in on the email at her District 7 email. I conducted an internet search and found the Daily Wire organization which reports: "We're one of America's fastest-growing conservative media companies and counter-cultural outlets for news, opinion, and entertainment. We're opinionated, noisy, and having a good time." Ms. Damiano opens the email with: "We appreciate the work that you and the Daily Wire team do to bring common sense to the American people and for your daily fight to safeguard our individual freedoms." The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical and emotional health of youth. Ms. Damiano writes that "We" are requesting that you and your team review our proposed resolution and, if you agree with it, to speak out in support of this angle on the gender identity and related policy issues. There is a link to the "I Resolve" website and a link to the YouTube video. The email also posts the resolution from the website in its entirety. The email is signed: "*Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher.*" The same irony exists in this signature as in Exhibit 4E as the name of the School and District are left off of the email other than identifying Southern Oregon Assistant Principal and Science Teacher however, it is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4G is an email from Katie Streit of News Channel KOBI 5 dated April 7th, 2021 at 11:02 AM and sent to Ms. Damiano's District 7 email account. The subject line of the email states: "Media Request." The body of the email states: "*Good morning, I am doing a story about Oregon SB 52, I ran across your organization "I Resolve." I was wondering what your availability was today for a quick interview about your perspective on the proposed legislation. I look forward to hearing back from you!*" Ms. Damiano or someone with access to Ms. Damiano's email at 11:50 AM forwards the email to a personal email account which is ▮▮▮▮▮▮▮▮▮▮▮▮▮. This email, as did others, shows that Ms. Damiano and Ms. Medart were identified as being North Middle School employees associated with the "I Resolve" campaign and that it involved pending legislation as stated by the reporter. This was within days of the posting of the website and YouTube video.

Because I was aware that District 7 had conducted an interview with Ms. Medart, I reviewed the audio recording (Exhibit 8). In reviewing the audio recording, I noted information relevant to Allegation #1. According to the recording, the interview takes place on April 6th, 2021 at 2:30 PM. Present in the interview are Dan Huber-Kantola, Tommy Blanchard, Katie Medart, and ▮▮▮▮▮▮▮▮▮▮▮ and advocate for Ms. Medart. Part I of the interview is about clarification and a break is taken. Part II of the interview begins with a question to Ms. Medart if she was aware of disruptions the "I Resolve" video and or campaign has caused North Middle School and the District.

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Can I actually ask? So when you said, "are you aware of any disruptions that it has caused at North Middle School or the district..."

Speaker 1:

Any possible.

Katie Medart:

Any possible. Can you give me examples of disruptions? Like what would be an example of possible disruption?

Speaker 1:

Conversation, time devoted to that divisiveness whether within the school or district, email communications, phone calls from district employees or the community.

Katie Medart:

And also you said caused, so specifically at North Middle School or at the district?

Speaker 1:

As a result of I Resolve.

Katie Medart:

So possible conversation, time spent on that divisiveness, email communication or phone calls from staff, student, or community?

Speaker 1:

Community, yeah.

Katie Medart:

That would be examples. Okay. There has been communication amongst staff, email communication and conversation none of... And are you asking about am I aware of others or just like my personal interactions?

## GRANTS PASS SCHOOL DISTRICT 7

Speaker 1:

Right now, just are you generally aware of possible disruption?

Katie Medart:

From my complaints alone, I think the answer to that is yes. And then also I had an interaction with a student and the time spent on that was about five to seven minutes, asking for clarification.

Speaker 1:

Are you saying you were asking for clarification?

Katie Medart:

No.

Speaker 1:

The student was asking for clarification?

Katie Medart:

The student.

Speaker 1:

Okay.

Speaker 2:

So when was that, Katie?

Katie Medart:

I'm sorry. I wrote about the interaction.

Speaker 1:

It's okay.

**GPSD 308**
**Vickers Declaration**
**Exhibit 9 Page 24 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

And I am not quite all organized yet.

Katie Medart:

It was on April 2nd, at approximately 11:25 AM. And I can confirm that they made it to their next class and that was by 11:32 AM because their teacher, I let them know "please excuse this student." And they said, got it. And confirmed that with me.

Speaker 2:

So what was the student asking about?

Katie Medart:

Do you want me to report what it was about?

Speaker 2:

Sure.

Katie Medart:

Okay. Do you want to know the student's name?

Speaker 2:

Sure.

Katie Medart:

Okay. So ████████, toward the end of class said, "Mrs. Medart, can I talk to you after class?" Me: "absolutely." Class ended. I walked to ████. I said, "did you still want to talk to me about something?" As █ is packing up his backpack. █ said, "yes." And while other students packed and walked out, I asked ███ if █ wanted to come on to the back of the room. And █ said, "sure, but I need my phone." I walked toward ███. All students had left, and █ opened... I don't know what █ opened. I think it was a text message, but I honestly can't confirm if it was or not. Scrolled to I Resolve video. █ said, "have you seen, are you aware that you're in this video?" I said, "I am aware. That is me in that video."

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Students were coming in for my third period. So I asked if we could talk outside. So this will all be on the North Middle School security cameras at that point. ███, "sure." ███ said, sure. I squatted down because ███ is like this big, he's very little, short, and asked if we could talk after school. ███ said ███ couldn't because ███ gets picked up. I said, "okay, what questions do you have?" ███ : "my friend wants to know if you are homophobic." Me: "███, please look at me when I say this, absolutely not. I love all students. Do you feel that way? Have you watched the video?" ███ : "no, I haven't, I like..." And you're going to hear me talk about ███ . "I like you are one of my favorite teachers. So I'm talking to you." Me: "it is about policy for students that I want for all students." ███ : "oh, okay."

Katie Medart:

Me: "do you want to tell me your friend's name so I can reach out to them?" And I could see he was thinking. Me: "how about you tell your friend that I do care about how they feel, and I would like to talk with them if they have questions, I would like to understand why my video made them feel that way. I don't want anyone to feel that way." ███ : "yeah, okay." Me: "███, I just want to say thank you. That took courage and you were very respectful. Do you have any other questions? ███ : "yeah, for science, like as an atomic number gets bigger does it just get harder math? Because it's like easy." Me: "it gets more complicated with chemical equations and molecular formulas." ███ : "cool." Me: "you like this stuff, huh? I could tell in class you caught on quick." ███ : "yeah." Me: "okay, who is your teacher so I can send a message that I held you up?" ███ : "Mr. Maxwell." Me: "okay, have a great weekend." ███ : "thanks, you too."

Ms. Medart was asked if she designated that the viewpoints expressed with regards to "I Resolve" were her personal viewpoints and not that of the School Districts.

Katie Medart:

I didn't talk a lot about like legislation and stuff like that. I did say in there that I am concerned, as a parent I was concerned. I also know that we did not say that what school district we were part of, and that was so that it was not representative that we were speaking for school district 7. And when I read over and trying to hear the complaints, I felt like some if not everyone was just like... Some people even said it was made clear that it was ours and other people made the claim saying that that wasn't made clear to them. But other complainants said that it was made clear that that is our opinions and our beliefs.

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. And no mention that these don't represent the views of the district that I'm where and work or anything like that, right?

Katie Medart:

Any what?

Dan Huber-Kantola:

Any reference to the district at all, like these views don't represent the district where we work or where I've worked specifically?

Katie Medart:

No, but since hearing that we have went and added a very clear statement to that, it says that now. So that it is on trying to hear other perspectives, we have went and added a statement so that there can be zero question of that.

*Ms. Medart was asked if there was any time or equipment spent that was district time or district equipment creating that resolution.*

Dan Huber-Kantola:

Okay, yeah. So I guess the question was, was there any time or equipment spent that was district time or district equipment creating that resolution?

Katie Medart:

Yes.

Dan Huber-Kantola:

Okay. What did you do? What time, what equipment was used to create it?

Katie Medart:

It was all done before. And never, ever were students ever. All done either early in the morning, some mornings. I mean, you'll be able to timestamp all, I'm pretty sure you guys have access to any time I'm

## GRANTS PASS SCHOOL DISTRICT 7

on a school computer and it will show I Resolve. So I would say in the mornings or it would be done in my flex time.

Dan Huber-Kantola:

During flex time?

Katie Medart:

Yeah. And when I say, like the writing of that. But as far as like, when we videoed all that, that was all during spring break. So lots of work went into it during spring break. That part that didn't was the initial first draft of the I Resolve. And when I say computer, so some at my desktop in my classroom, and then some on, I think very little on the laptop, to be honest. I have my own personal computer at home too, a desktop and a Mac, but I cannot say for sure. So I would say there's a possibility also on that one, but that's not my go-to that I use.

Dan Huber-Kantola:

So the initial work on the resolution was done in the morning, like what time?

Katie Medart:

I get to campus at varying times. I don't know. I'd have to pull it up, but not during teaching.

Dan Huber-Kantola:

Anything after 7:30 in the morning?

Katie Medart:

Yes, I would say that there is a chance that there will be timestamps of that.

Dan Huber-Kantola:

Okay. And then during flex time and flex time is 12:30 to 3:30ish?

Speaker 1:

I guess, that we have a little bit of time in there that's set aside for office hours, but by and large it's after lunch.

---

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. So some of the writing of the resolution was done during flex time as well.

Katie Medart:

Yes.

Dan Huber-Kantola:

So was it written on a Google Doc through the district Google, so you go to your email account, you've got your email that attaches to Google and then it goes to a Google Doc?

Katie Medart:

I think it was shared to my email, but it was written on one through I Resolve, Gmail. The drive for the I Resolve.gp. That's where everything is at least right now. So that's where I believe that it was.

Dan Huber-Kantola:

But shared to you through your email address at school?

Katie Medart:

Yes.

Ms. Medart was asked if she sent the resolution to anybody using school email.

Dan Huber-Kantola:

So did you send the resolution to anybody using school email?

Katie Medart:

I did.

Dan Huber-Kantola:

Who did you send it to?

**GPSD 313**
**Vickers Declaration**
**Exhibit 9 Page 29 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I might miss someone.

Dan Huber-Kantola:

That's okay.

Katie Medart:

Okay. I can pull it up for reference if you like and be able to name that if you want really accurate.

Dan Huber-Kantola:

Sure. If you have it.

Katie Medart:

Okay. ███████████████████████████████. And many of these, I went and talked to and then they said, send it to me. And then I used my work email to send and it's just titled, "policy" and then the link. ████████ affey. I sent it to ████████ in, she's at ███, and I asked for █ r opinions and to edit and █████ helped edit it. I think all of the rest were me personally texting, but I'm not seeing any when I did a search, any additional show up.

Dan Huber-Kantola:

Okay. So a couple of names, Rachel Damiano.

Katie Medart:

Emailing her the site?

Dan Huber-Kantola:

Yeah.

Katie Medart:

Her and I had regular exchanges. I'm sorry. I was assuming that was a given.

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

I thought so but it's just-

Katie Medart:

Yeah, to clarify, I understand. So yes is the answer.

Dan Huber-Kantola:

Okay.

Katie Medart:

It wasn't intentional to leave her name out.

Dan Huber-Kantola:

All right. What about ▮▮▮▮▮▮▮▮?

Katie Medart:

Oh, yes, he is. It didn't pull up when I did it, but I did send it to him. And if you ask me, I will be honest. So if you already have the list you can be open and tell me, and I will confirm. I'm just in a search, you can see what I did. It says I Resolve and I'm scrolling through and looking for any that are there.

Dan Huber-Kantola:

I appreciate you being honest and-

Katie Medart:

I'm not trying to hide that.

Dan Huber-Kantola:

I promise you we had not after all the research.

Katie Medart:

Okay.

---

**CONFIDENTIAL**                          PCI #21-1011/ Part I

**GPSD 315**
**Vickers Declaration**
**Exhibit 9 Page 31 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

I could do it after all the search.

Katie Medart:

Yeah.

Dan Huber-Kantola:

If you have some information I'm completely transparent with you. The reason that ██ came up for me is, I guess I would ask you about when students were there. Is it possible that you sent something regarding I Resolve to Rachel or ██ or something from ██ during school time when kids were there?

Katie Medart:

No, I do not... I have no recollection of any interaction like that.

Dan Huber-Kantola:

Okay. It would have been brief and it looks like it's the potentially that the resolution was shared on the evening of the 16th. That maybe ████████ sent it to you the morning of the 16th? And that maybe it was forwarded to Rachel on the morning of the 16th.

Katie Medart:

And I'm sorry, what is it? Can I look up what you're referencing?

Dan Huber-Kantola:

Yeah, it would have been the resolution. I believe it would've been... You mentioned maybe ████ had sent something to ██ or you had sent something to ██ ██ had forwarded that to you with some comments.

Katie Medart:

So you say, look up March 16th?

**GPSD 316**
**Vickers Declaration**
**Exhibit 9 Page 32 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Look up March 16th, the morning of March 16th.

Katie Medart:

And to ██████████?

Dan Huber-Kantola:

It might've been from ██████████ and then forwarded to Rachel.

Katie Medart:

Okay. So there's one on March 15th. Is that what you're saying? That was received from ██████████ and then March 16th, yep, that he highlighted a part on. Oh, he gave feedback, he read it. Is that what you're referencing?

Dan Huber-Kantola:

Yeah.

Katie Medart:

Okay. Yep. And then I forwarded it. Yeah, but there was no... It's just that FYI then I forwarded it to Rachel. Like are you asking me to confirm that I did that?

Dan Huber-Kantola:

Yeah.

Katie Medart:

Yeah, I did do that. I mean, it shows there. I did that. Yes.

Dan Huber-Kantola:

There were kids there at that time? So it's 9, 10, 9:00 in the morning, are kids in school?

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

At nine, they are. They had the potential they could have been in the classroom when I forwarded that email. Yes. There was no conversation. No talking about it. There was him giving me that and me forwarding it to her. Is there a chance that you're asking me if kids were sitting in the class? Are you asking me if I spoke about it with kids in the classroom?

Dan Huber-Kantola:

Is there a chance kids were there?

Katie Medart:

Okay. Then yes, there is a chance that kids are in by that time.

Dan Huber-Kantola:

But no speaking to kids, right?

Katie Medart:

No. Other than what I have disclosed to you with my interaction with ██████████.

Dan Huber-Kantola:

Great. So you did say you had conversations with some of the people, ██████████, ██████████, ██████████, ████, and then forwarded to them. So when did those conversations take place? Was that during the school day?

Katie Medart:

At the end of the day.

Dan Huber-Kantola:

Like during the flex time or-

Katie Medart:

Like when your students were on campus? Yes. After office hours.

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 318**
**Vickers Declaration**
**Exhibit 9 Page 34 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. So would that have been still during the workday? In some cases prior to 3:30 in the afternoon?

Katie Medart:

Some yes, some after but on property.

Dan Huber-Kantola:

Okay.

*Ms. Medart is asked more specifically about the conversations with District 7 staff and "I Resolve."*

Dan Huber-Kantola:

Okay. So you initiated the conversations with them about the I Resolve or was it something that they asked you about, but something that you approached them about?

Katie Medart:

And honestly, I did mention this ▮▮▮▮▮▮, but ▮▮▮▮▮▮▮▮ was another one because they were together. And so you'll see one email sent to him. Now I'm thinking about, I've had people ask me but most of them, I will say, I went and said, "I want to share about policy that we are hoping to have you consider and get your opinion and talk about it."

Speaker 2:

Okay. Appreciate that honesty.

Katie Medart:

Mm-hmm (affirmative).

Dan Huber-Kantola:

So just bluntly, that would be a concern for me that that's violating the policy there. And also probably violating our contract. I think if we looked at article nine in our contract, it talks about all time is teaching time. It's supposed to be just for the educational purposes of school. Might be an exception in there for lunch, but using the internet, using the email and stuff would also likely be a violation of policy.

## GRANTS PASS SCHOOL DISTRICT 7

The interview went long however the aforementioned statements are what I found to be most relevant to Allegation #1 (Listen to audio from April 6th, 2021 interview for more details Exhibit 8).

On May 13th, 2021 at 12:50 PM, I did meet with Katie Medart for an interview at the Grants Pass School District 7 offices in a conference room. I did advise her our conversation was being recorded. Also present was ███████████████████. Additionally, Attorneys Ray Hacke, Mathew Hoffman, Ralph Wiser, and Tyson Langhofer representing Ms. Medart joined in on the interview via Zoom video conferencing provided by District 7. District 7 Attorney Willard Ransom also was present. I advised Ms. Medart of the allegations and potential policies violated. I did direct her on behalf of the Grants Pass School District 7 to answer any and all questions truthfully. Ground rules regarding persons present were read into the record and no one objected to the ground rules. I advised her the investigation was that of an administrative fact finding and not a criminal matter.

I also provided a "Garrity Rights" form which I read to her she signed acknowledging the notice (Exhibit 9). I asked how long she had been employed with the School District and she told me her contract began in July 2019. She stated her title was that of a foundational Science Teacher with health endorsement. Ms. Medart also stated she teaches 7th grade science. Ms. Medart said that her workday is from 7:30 – 3:30. I asked if she was familiar with District 7 policies and she stated: "yes, I believe that's safe to say." I advised Ms. Medart that I would be separating the questions to address the three areas of the investigation related to ██████████ complaint, ██████████ complaint, and grouping the remaining complaints which were regarding the "I Resolve" campaign.

For this part of the narrative report, I will cover the portion of the interview with Ms. Medart related to Allegation #1.

> Bill Landis:
>
> Okay. Moving along. Complaints regarding posting information to social media and public websites, causing a substantial disruption, posting confidential information about a student and district business, use of district facilities, equipment or supplies in connection with political campaigning, working on a personal campaign during your prescribed workday, failure to designate that the viewpoints expressed by you were your own and not to be interpreted as the district's official viewpoint on a controversial issue, discussion and correspondence with other district employees regarding a political campaign during the performance of your district duties, and failure to meet the responsibilities and duties of your job description, in this latest complaint.
>
> Bill Landis:
>
> So we spoke about the I Resolve campaign. When did that start? I'm sorry campaign, you want me to use...

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Ideas.

Bill Landis:

Ideas. I'm sorry. Forgot.

Katie Medart:

Proposed policy, resolution.

I asked Ms. Medart if "I Resolve" was a non-affiliated District 7 project.

Bill Landis:

Okay. And this was a non-affiliated District 7 project. Correct?

Katie Medart:

Correct.

I asked Ms. Medart about her involvement in the project.

Bill Landis:

So what has been your involvement in this?

Katie Medart:

My involvement?

Bill Landis:

So I saw you in the video. Were you part of the scripting of it? Were you part of the idea and concept? What's been-

Katie Medart:

Yeah, the video was actually impromptu. So I, obviously, was part of it, and then I helped... Rachel, you're aware?

**GPSD 321**
**Vickers Declaration**
**Exhibit 9 Page 37 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Yes.

Katie Medart:

I edited and helped write parts of the policy.

Bill Landis:

Because this is not a private-

Katie Medart:

Proposed policy.

Bill Landis:

... matter. Would you agree this is a public website, public social media postings on YouTube with yourself and Rachel in the video. Is that correct?

Katie Medart:

That it's out there for the public?

Bill Landis:

Yes.

Katie Medart:

Yes. Yeah.

I asked Ms. Medart about the use of District 7 facilities, equipment, supplies, and email regarding "I Resolve."

Bill Landis:

Have you used District 7 facilities, equipment or supplies, email, regarding the... I'm sorry the proposal, the project. I think project's probably a better word for me, because it's kind of confusing, for the I Resolve proposal project?

**CONFIDENTIAL**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I have used minimal district resources.

Bill Landis:

Okay, and explain that. What has been used?

Katie Medart:

Well, you can see my email was used for some of it.

Bill Landis:

Okay.

Katie Medart:

And as already stated in my first investigation, that some work was on my computer.

Bill Landis:

Your District 7 computer?

Katie Medart:

Yeah, my desktop.

I asked Ms. Medart about her choice to use District 7 email since "I Resolve" was a non-District 7 project.

Bill Landis:

Okay. So why District 7 email? Why use District 7 email?

Katie Medart:

I still don't believe we have violated any policy, and that I was in violation of anything that we were doing.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

But I'm saying... Well, I get that you're saying you don't feel like you've violated policy, but was there ever a time that you felt like that this was needing to be separate from the district?

Katie Medart:

From my district email?

Bill Landis:

The I Resolve proposal project, was there a feeling that needed to be separate from the district?

Katie Medart:

We were open and transparent through the whole process.

Bill Landis:

So in the video I noticed you didn't identify yourself, though, as a North Middle School teacher.

Katie Medart:

Uh-huh (affirmative), because I was speaking as a private citizen.

Bill Landis:

So then why use district email for correspondence related to the I Resolve project?

Katie Medart:

Because I didn't believe it was... One, it was initiated to my district email. Rachel first sent me an email to my district email, and so it was initiated in that. I didn't think it was in violation of... I still don't. I don't believe it's in violation of any policies.

Bill Landis:

But there was a conscious effort you said to be a private citizen in the video, which was the crux of this proposal project. But yet-

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 324**
**Vickers Declaration**
**Exhibit 9 Page 40 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Because I'm speaking of my opinion about a proposal for a matter of public concern. My opinion doesn't mean that I can go and speak on behalf of my school district.

Bill Landis:

So did you email person or persons at ████████████, on District 7 email, about the I Resolve proposal project?

Katie Medart:

I did.

Bill Landis:

Okay. And when you use a district email, do you have a signature line at the bottom of your emails that says your name and title?

Katie Medart:

I actually don't think mine does.

Bill Landis:

Okay. So with the address-

Katie Medart:

Could be wrong, but I'm pretty sure I have not set up my signature. I might be wrong.

Bill Landis:

And so with the email address that uses the Grants Pass District 7 server, would you agree that people know that that's coming from the school district?

Katie Medart:

No. I believe, in all my communications, I've been very clear that these are my personal views.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Did you receive email from the news media at your District 7 email requesting interviews or things of that nature?

Katie Medart:

I don't know. You'll have access. I don't recall. I thought you sent an email about media to me. Or not a email, but-

████████:

[inaudible 00:56:55]

Katie Medart:

... messages. I don't recall that.

Bill Landis:

Did you receive email from citizens outside of the district related to the I Resolve proposal project?

Katie Medart:

I'm sorry, repeat the question?

Bill Landis:

Did you receive email on your District 7 email related to the I Resolve proposal project from outside the district? Did-

Katie Medart:

Yes.

I asked if Ms. Medart was aware that the District 7 Superintendent was receiving emails regarding "I Resolve" inferring District participation.

Bill Landis:

Were you aware whether Superintendent Kolb was receiving emails, as if the district had participated, prior to be putting put on leave?

---

**GPSD 326**
**Vickers Declaration**
**Exhibit 9 Page 42 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

He called a meeting with Rachel and I on March 31st. I believe it's March 31st, and then he separated us. And he said that he didn't believe, this should be in writing, you can see this in the email, but he stated that he didn't believe that there would be any discipline in nature. Just wanted to share a concern. And then, he had ▇▇▇▇▇ and I meet with him.

Bill Landis:

And the March 31, 2021 date, how long was that after the video basically became public? Ballpark?

Katie Medart:

The video? When did it become public?

Bill Landis:

Yes.

Katie Medart:

It was public before that.

Bill Landis:

Yeah. I mean, do you remember how long before the March 31st meeting?

Katie Medart:

I thought it was a Wednesday. I don't remember what day it was posted on YouTube, but that was during spring break.

Bill Landis:

Was it within a few days that you were called to meet with Superintendent Kolb after the video was made public? Do you recall?

Katie Medart:

It may have been four days, four or five days after.

## GRANTS PASS SCHOOL DISTRICT 7

I asked Ms. Medart if she discusses in the "I Resolve" video one of her students which she can be seen doing in the video where she is telling a story of being approached by a student and regarding their gender identity transformation.

Bill Landis:

Did you discuss one of your students in a video, in the video that was then posted on YouTube, and the I Resolve website?

Katie Medart:

No.

Bill Landis:

Okay, so in the video, and watching the video, you talk about shortly after coming back to the district, approximately a year ago, that you were confronted with a situation where one of ███████████ was basically wanting to █████████████████, I believe, to █████.

Katie Medart:

I was giving a scenario. I, in considering, do not believe I gave any personal identifying information at all to a student, and was very mindful of that when speaking.

Bill Landis:

Right. So my question is that, did you discuss one of your students? I get that you don't feel that you did. I'm asking you a question about did you discuss one of your students in the video? Because there's a part where you start explaining about shortly after coming to work at the district, i.e., the district's not identified, i.e., but you became identified, about a student, and basically their journey from going from, I believe, it was female to male, and the circumstances surrounding that.

Katie Medart:

Yeah. And at the time, I believed, I thought, looking back at it, that was very accurate. But my intent was to give a hypothetical and it actually is a hypothetical situation.

Bill Landis:

So-

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Which is relevant, just being able to talk to parents and teachers about a hypothetical situation that is relevant.

Bill Landis:

So that situation never took place in your classroom.

Katie Medart:

No. The one that is on the video, and looking back at it, even though at the time, and knowing my intent was to give a scenario or hypothetical situation, and then, after looking back at it, it is truly a hypothetical situation.

Bill Landis:

But that wasn't given to... On the video, you stated as a circumstance that occurred to you.

Katie Medart:

Yes. My intent in doing that... And I would say, Have you ever misspoke? Looking back at it, I was talking about a hypothetical situation.

Bill Landis:

Okay. So, question for you since you know your students. Would one of your students be able to identify who you were speaking of in the video?

Katie Medart:

Well, I don't want to speculate on my students' behalf.

Bill Landis:

So none of the information you gave, as you said, was hypothetical.

Katie Medart:

I answered this before in my other interview with Mr. Blanchard. I told him absolutely not. And they didn't like that answer.

---

**GPSD 329**
**Vickers Declaration**
**Exhibit 9 Page 45 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So you can bear with me.

Katie Medart:

Okay.

Bill Landis:

My interview is not based upon prior interviews, and to get it into the record, I have to ask you these questions, so that I can do my due diligence-

Katie Medart:

So their stuff isn't entered record?

Bill Landis:

Their stuff, I believe is entered record. But I'm not using what they did, I'm doing my own, because my scope, I want to make sure is my own scope of what I've been directed to do.

Katie Medart:

Okay. So you won't be using that recording?

Bill Landis:

That recording is in record and it is part of what I was given, and so accessible to whoever and stuff. So that will be reviewed and looked at. I don't understand your question. I'm just trying to to get things onto the record. I'm not sure what you were asked or not asked, but it is available, yes.

Katie Medart:

I will say, I assumed that you had that, you reviewed that, so you would know the answer to the question that you are asking me.

Bill Landis:

And even if I do know some of the answers to the questions I'm asking you, to get it onto the record, I need to hear it from you.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 330**
**Vickers Declaration**
**Exhibit 9 Page 46 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Okay.

Bill Landis:

Did you in the video discuss the handling of matters involving transgender students and the district?

Katie Medart:

Can I just refer you to the video, as it states everything that you're asking. You're asking me to recall the details of a 17-minute-long video, almost, that I filmed six weeks ago.

Bill Landis:

Okay. And you haven't watched it since?

Katie Medart:

No, I have watched it since, but I haven't watched it to the point where I feel like an accurate answer to that would be to refer you to it, so that there wasn't a mistake and what is being recalled.

Bill Landis:

Okay. So after what I viewed, where you talk about the student, you mentioned that there are issues regarding guidance from the district. Do you recall that, and not getting proper guidance?

Katie Medart:

So in the video, does it mention that I expressed that I did not receive proper guidance?

Bill Landis:

Correct.

Katie Medart:

Yes. Or clear direction? I don't know exactly what it says in there.

I asked Ms. Medart if she worked on the "I Resolve" proposal project during her school workday.

---

**GPSD 331**
**Vickers Declaration**
**Exhibit 9 Page 47 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So did you work on the I Resolve proposal project during your school work day?

Katie Medart:

I did minimal work using minimal resources from the school to work on I Resolve during my work day.

Bill Landis:

How much and how often?

Katie Medart:

How much and how often? Well, there's emails that would show any of the work that I did do.

Bill Landis:

So there's emails, certainly is some of this, but I'm asking... I don't what other work. You said you did some things on your computer, so I'm not sure what.

Katie Medart:

Well, that was in reference to the emails. Any of the actual time to look over or write the policies was done when I was at home in the evening.

Bill Landis:

Were some of the emails communication to you on your Grants Pass email regarding reviewing the video and making editing suggestions and things like that?

Katie Medart:

Yeah, that would have been at home.

Bill Landis:

Okay. So, any idea during, how long did you-

---

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I'm jammed when I'm on campus, teaching students. We only have five minute passing periods, and all the COVID safety protocols you go through, and not to mention delivering instruction. And just so you know for my subject, to engage our students, we did a lab every week that they came to campus. So you're up and you're going and you're totally captivated by what you're doing, and then that also takes tons of hours of planning and doing that, and I have always done my job duties.

*I asked Ms. Medart if she had face to face conversations with persons about the "I Resolve" project.*

Bill Landis:

Okay. And did you have face-to-face discussions with persons about I Resolve proposal project?

Katie Medart:

I notified some staff members about the ideas proposed, about what was potentially being proposed, and an idea that we were proposing.

Bill Landis:

Did you advocate for them to go on the website and see it and to understand it or things like that?

Katie Medart:

I shared the website with them.

Bill Landis:

And when you say staff, how many people are we talking about?

Katie Medart:

That would be in the emails, who I sent it to. Because after I talked to them, after I notified them that it was available, and to consider this, I sent an email, and it was typically policy, and then the website, www.iresolvemovement.com.

Bill Landis:

So my question to you is, do you have any idea how many staff members, ballpark, that you reached out to about the project proposal, and the website?

**GPSD 333**
**Vickers Declaration**
**Exhibit 9 Page 49 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Not off the top of my head, I don't. I'd have to go pull them up and then count how many that it was.

Bill Landis:

Do you think it's more than 10?

Katie Medart:

I think it could be right around 10.

Bill Landis:

Okay. Did you have any others where you were face to face and it's not email, as far as that conversation regarding that?

Katie Medart:

I do not recall that. I believe right after I sent people an email.

Bill Landis:

Did you have discussions with Rachel during school time regarding the proposal project?

Katie Medart:

Very minimum. Most of our meetings that we had, when we had meetings, were really about... The few that we had on campus were not related to the I Resolve. Most of that work was done during spring break.

*I asked Ms. Medart if she had made it clear that the viewpoints expressed in the "I Resolve" project and video were not to be interpreted as the District's official viewpoint on a controversial issue.*

Bill Landis:

Did you make it clear that the viewpoints expressed in the proposal project, I Resolve, and video were not your own, and not to be interpreted as the district's official viewpoint on a controversial issue?

Katie Medart:

Yes, I believe that I made it clear that those were my personal views.

---

**CONFIDENTIAL** PCI #21-1011/ Part I

**GPSD 334**
**Vickers Declaration**
**Exhibit 9 Page 50 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

And how did you make it clear?

Katie Medart:

Well, when you look at the video, it clearly states that this is my belief, I as a parent.

Bill Landis:

Okay.

Katie Medart:

I Resolve.

Bill Landis:

Just so I can be clear, because I watched the video, and I saw you introduce yourself as a southern Oregon middle school teacher, and at no point did you make a statement or clarify that that is not something to do with your position or what you're advocating for in the video.

Katie Medart:

I actually believe that's incorrect. I don't believe I introduced myself as a southern Oregon middle school teacher. I think I shared that I was my experience that I have working with youth, and I introduced myself as someone who has experience working with youth. And I talked about how I'm a coach and a mother, a parent, and that I have other experience also, as a teacher, and talked about the range of teaching experience that I have.

Bill Landis:

Okay. So that's how you introduced yourself, you recall.

Katie Medart:

Yes.

**GPSD 335**
**Vickers Declaration**
**Exhibit 9 Page 51 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So where did you then express that regarding this controversial issue that your views being expressed were not that of the Southern Oregon middle school that you worked for.

Katie Medart:

I think you clearly get that as you listen to all my statements that are given in there that say, "I believe," "In my opinion." I think those phrases come up over and over and over and over throughout that video. I probably... I don't know, I guess, more than, very, very often.

*I asked if she felt she had clarified in the video that the viewpoint was not that of the School District's then why use District 7 email for correspondence related to "I Resolve."*

Bill Landis:

I'm asking why if you were trying to not convolute the district's position and your own being a personal view would you not use personal email instead use district email, such as reaching out ██, to look at and give input about the I Resolve project and proposal as you did to employees?

Katie Medart:

I believe, in everyday work, we come in and talk about opinions on different things, and you're not representing your district. I believe that literally happens every day at the workplace. In the way that you speak without every time, so I hear you saying... I almost feel like you're saying... The only way to make it clear is if I say every time before I give my opinions, "This is in no way District 7's views." Right?

Katie Medart:

But I don't think we do that. I think in our normal daily work, all the time when we give our opinions on different things, from context of speech when we say, "I believe," or "In my opinion," which we do over and over and over in that video. And in my communications with anyone, I have been very consistent in that these are my views, speaking on. And so, I don't think that sending it from an email says, that you're speaking on behalf of someone else's views.

*I asked Ms. Medart if there was ever a time where she was entrusted with the supervision or teaching of students while working on the "I Resolve" project.*

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So basically what I'm trying to find out is, with the I Resolve proposal project, was there any time you were working on that, when you were entrusted with kids in your classrooms and teaching? Were there any times where you had a conversation with students about the I Resolve proposal project or things of that nature?

Katie Medart:

So I have never initiated any conversation with a student about I Resolve, and working on it, no. If you're specifically asking about Mr. Kantola brought up an email that was from a staff member that I forwarded. That staff member had given opinion, or feedback, and I forwarded that. And that was not when class started, and so I cannot say that I have even done anything ever when a student was present, or speak. I do not recall that as being there.

Bill Landis:

Okay. And you made a statement about you've never initiated a conversation with a student about the I Resolve proposal project, but have you had a conversation with a student or students about the I Resolve proposal project?

Katie Medart:

So, I had a student ask me about the I Resolve.

Bill Landis:

Tell me about that conversation.

Katie Medart:

I would honestly like to defer you to my first recording. And the only reason why is, because I went over in detail in that first recording, and I had immediately journaled about it, and then I submitted that in its full entirety during my first recording.

I asked Ms. Medart if Transgender issues can be controversial with regards to legislation.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 337**
**Vickers Declaration**
**Exhibit 9 Page 53 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. And so the only thing, we use the term controversial before, but I want to try to tie that to what my question really is. But would you agree that transgender issues can be controversial with regards to legislation?

Katie Medart:

Can be controversial with regards to legislation?

Bill Landis:

Yes.

*I asked Ms. Medart what her message was to the students since "I Resolve" had been brought into the school and affected students.*

Bill Landis:

So I want to ask you, since you identify yourself as a teacher from Southern Oregon in the I Resolve proposal project, and you've gone a step further with District 7 email use supporting or use for the purpose of communicating about the I Resolve proposal project, what is your message for the students in the campaign, since it has been brought into the school?

Katie Medart:

So, what I hear you saying is, and then you keep taking that I spoke from all different perspectives as a youth and you're putting together... I did not speak as a teacher representing the school district. But if I focus on the second part of your question, it is, what do I believe... Are you asking what is my message to students?

Bill Landis:

Yes, now that it's into the school. Like you said, a student contacted you because they said they saw you in the video.

Katie Medart:

My message to students is that it's loving and tolerant and respecting the rights of all individuals.

---

## GRANTS PASS SCHOOL DISTRICT 7

I asked Ms. Medart if she had been honest and truthful in her answers to me and she said: "Yes." I asked if she or anyone else in the interview had anything they wished to add or clarify and all said they did not. (See transcript for further details regarding Allegation #1 Exhibit 9).

**GPSD 339**
**Vickers Declaration**
**Exhibit 9 Page 55 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

### Allegation #2

**#2:** Between October 2020 and March 2021, Katie Medart discriminated against ██████ ██████████████████████

On April 6th, 2021, ████████ filed a formal complaint against Katie Medart for discriminating against him based upon his sexual orientation as stated in his complaint (Exhibit 1A). In the complaint, ████████ writes: "████████████████████ *and I am assigned to work in Katie Medart's second period science class. Ms. Medart has discriminated against me in multiple ways because of my sexual orientation/gender identity.*

*I identify as* ████ *and the name I use is* ████████. *Ms. Medart told me that she doesn't allow her students to use names other than their legal names, so she asked me not to refer to myself as* ████████ *She also asked the students not to refer to me as* ████████.

*At the beginning of the school year, Ms. Medart explained what I would be doing in the classroom and how I could help the students. In December, I had* ████ *as a step in my transition. In January, Ms. Medart asked a lot of questions about the nature of my* ████. *The conversation become very awkward. Prior to this conversation, I was working with the students in Ms. Medart's classroom every day. In mid-February, Ms. Medart asked me not to be in the classroom with the students and to only work with the students who are online, and to work with them outside of the classroom. I feel that Ms. Medart asked me to not be in the classroom with students because of my* ████████████ *and as a way to discriminate against me because of my gender identity.*

*Ms. Medart and Rachel Damiano, Assistant Principal at North Middle School, are leaders of the "I Resolve" movement that is actively trying to take rights away from the transgender community. During school and working hours, Ms. Medart has been talking to staff about a Resolution pertaining to gender identity policies and encouraging staff to sign it. This Resolution is anti-LGBTQ and attempts to remove rights from LGBTQ students. Promoting this Resolution during school and working hours violates Board Policy GBG – Staff Participation in Political Activities. It also does not align with the Grants Pass School District Equity, Diversity, and Inclusion Resolution."*

In his complaint, ████████ listed ████████ as a witness and referred to the "I Resolve" video with reference to Ms. Medart speaking about a student in her class.

On May 7th, 2021 I did meet with ████████ at the Grants Pass District 7 offices in a conference room to interview him. I did advise ████████ our conversation was being recorded. Also present was ████████████████████. ████ was given a witness admonishment statement which included a directive on behalf of District 7 to answer all of my questions truthfully. I asked ████████ if ██ had been noticed regarding the investigation and today's interview and ██ confirmed that he had. I asked ████████ how long he had been employed by District 7 and he stated that he had been employed since October 2018 but had assumed his current position in September 2020. I asked what his new position was, and he stated that it was as a special education assistant. I asked ████████ about his duties.

**GPSD 340**
**Vickers Declaration**
**Exhibit 9 Page 56 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

As an assistant, tell me what that entails as far as your work duties in a typical week.

███████████:

I work primarily at the resource room, students in special education. What I do is I go to various general education classrooms that have a high concentration of special education students in it so that I can make sure that they receive all the modifications and accommodations that are in their IEPs.

Bill Landis:

I understand as an example, in Ms. Medart's class, there are a diversity of students that include special ed students and non special ed students?

███████████:

Yes.

Bill Landis:

Your job as an assistant is to assist the special ed students with curriculum and meeting the goals of the class?

███████████:

Yes.

Bill Landis:

Okay. Is it safe to say that with your assistance to Ms. Medart at North Middle School, that you also do that for other classes and other teachers?

███████████:

Yes, absolutely.

Bill Landis:

So you don't have one particular class that you work with?

---

**CONFIDENTIAL**    *PCI #21-1011/ Part I*

**GPSD 341
Vickers Declaration
Exhibit 9 Page 57 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

███████████:

No, I have a full day of classes. Just like how a student goes from class to class.

I asked ██████ about his work week when he assumed his new role in 2020.

Bill Landis:

When you assumed that role in 2020, and we're in the middle of a pandemic, what did 2020 look like for you as far as work week or work schedule?

███████████:

In the beginning, we were entirely distance learning so I primarily would be in the library or in a classroom with a computer, joining in on their online classes and providing assistance in that way, through breakout rooms and conferencing with students over Zoom during office hours.

Bill Landis:

Is that fair to say that you're talking about September 2020?

███████████:

Yes.

Bill Landis:

So new school year 2020, September, you're doing it through the internet and online because students are not back physically at school.

███████████:

Right.

Bill Landis:

Okay. How did the rest of 2020 play out?

**CONFIDENTIAL**          PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

████████ :

For the rest of 2020, I believe we were still in the distance learning. Only in February did we transition to hybrid learning. When that happened, then I would be in the classes physically assisting with the special education students that way.

████ recalled that February 24th, 2021 was when classes resumed on campus. I did show the complaint he filed and the copy I received which he confirmed was what he filed (Exhibit 1A). I asked if in February when classes resumed if that was the first time he was fulfilling his duties as a special ed assistant in person.

Bill Landis:

Okay. That was the first time you were in your new duties as a special ed in the classrooms?

████████ :

Yeah, physically in the classroom.

Bill Landis:

You rotated among how many teachers would you say?

████████ :

I had seven class periods, so seven teachers.

Bill Landis:

Okay, seven different teachers.

████████ :

Or six, because the one period is lunch. Six teachers.

Bill Landis:

So you're not assigned to any one teacher?

████████ :

No.

---

## GRANTS PASS SCHOOL DISTRICT 7

I asked ▮▮▮▮ about his gender transition which we had briefly discussed prior to going on the record for clarity.

Bill Landis:

Okay. As I read your complaint, I understand, and we talked a little bit before we went on the record, that you went through a transition, gender-wise.

▮▮▮▮▮:

Yes.

Bill Landis:

Can you tell me about that.

▮▮▮▮▮:

I've known for a very long time that I'm a transgender, female to male. I've been transitioning medically over the past two years, and recently had chest masculinization surgery in December.

Bill Landis:

When you were hired on with the district, your name was, what?

▮▮▮▮▮:

It was ▮▮▮▮ still legally when I was first hired. It only recently changed legally to ▮▮▮▮.

Bill Landis:

Okay. At some point, you did make it known to the district and/or middle school that your name was something different?

▮▮▮▮▮:

Yes. We're currently still going through the logistics of getting it changed in the system. I've been in contact with ▮▮▮ about that.

---

Page 58:                              **CONFIDENTIAL**                              PCI #21-1011/ Part I



## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Tell me what you did to notify the school and when about that occurred.

██████████:

When I notified the administration at North, it was less about changing it in the system because that's through the district office, and more about, more social of what I would be referred to at the school by staff members. I had a conversation with Tommy Blanchard and which he asked if I wanted to use ██████ and he/him pronouns and I said yes. That was at the end of the 2020 school year, before we transitioned into distance learning.

█████ said that it was ████████ responsibility to inform others of his name change.

Bill Landis:

Okay. You know what he did as a result of that? Did he notify your teachers, or did he let you approach them?

██████████:

At the time, I was still in my Educational Assistant Supervision position, so there were no teachers to notify. But he communicated it with the office staff and at the beginning of 2020, this school year, in September, we did talk to some of the teachers. But it was my responsibility to let them know.

Bill Landis:

Who did you have conversations with to let them know that, "My name is now ██████," and did you talk about the transition you were going through?

██████████:

A little bit, yes. When I first started in this position, I initially met with each teacher individually or talked with them either in their conference or in person, depending on if they were distanced from home or if they were on campus. I told them that, "My name on the system right now is ██████. I go by ██████ now." I let them know that that was what I'm going by and that I use he/him pronouns. I did speak with each teacher individually about that. That was on my first time being in each of their classrooms so we're able to talk about it that way first.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

When abouts did those conversations take place? In September, were you able to interact face to face with teachers even though school did not start back up?

███████████ :

Most of the staff was on campus, just in their classrooms. For certain teachers, I was able to go have that conversation face to face. With others, Katie included, she was working remotely from home. So I spoke with her over Zoom.

*I asked about his conversation with Ms. Medart regarding his name change.*

Bill Landis:

So you had a conversation with Teacher Katie Medart about the name change?

███████████ :

We discussed that right after my first class with her, because I introduced myself as ███████ and then we spoke about it afterwards.

Bill Landis:

Tell me about that conversation.

███████████ :

She asked that, after the classes of the day were over, that I hop in to a Zoom meeting with her because she was working remotely from home. We discussed, she asked about the name and asked that not use a name that's different from the system because she doesn't allow students to use it, to use different names than in the system.

Bill Landis:

This conversation was some time in September 2020?

███████████ :

This would have been September, possibly early October at this time.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. The purpose of the meeting was you asking to meet with her or her wanting to talk to you? How did that come about?

███████████:

She asked to meet with me after the first time that I was in her class online. We were just discussing partially how I would be assisting with special education students in her class, and then the name issue came up after that.

Bill Landis:

Same conversation you were having with other teachers, you were having with her?

███████████:

Yes.

Bill Landis:

The conversation was, "I'm going by ██████ now." Did you talk about the reasons behind that? That you're transitioning?

███████████:

Yes. Some of the teachers actually knew from when I went to middle school there so they were familiar with me as ██████. I was just letting them know, "I go by ██████. It's because I'm transitioning to male. I use he/him pronouns and please, Mister instead of Ms. in the classroom."

Bill Landis:

Is that the conversation you had with Katie Medart?

███████████:

Yes.

Bill Landis:

Then she requested to have a Zoom meeting as a follow up to that?

## GRANTS PASS SCHOOL DISTRICT 7

█████████ :

Yes, I've mentioned that I go by Mister and ██████ when I was introducing myself. She asked to connect with me later about that. So then we connected in a Zoom meeting after, at the end of the day.

Bill Landis:

So same day?

█████████ :

Yes, same day.

Bill Landis:

So you had a Zoom meeting, so you were at home and she was...

█████████ :

I was on campus and she was at home.

I asked ████████ how the Zoom meeting later that day went.

Bill Landis:

Okay. So tell me about the Zoom meeting.

█████████ :

I joined her Zoom conference in her personal meeting room. Initially we were just talking about how I would be assisting special education students in our classroom and how that would look online and later in person hopefully, and how we would work together and communicate through that. We talked about how I introduced myself as ████████ and as Mister ██████ . She asked that I please not do that and that Mister ██████ is fine but she doesn't want me to use a name not in the system. So no ████████ . Which at this point I said, "That's okay because I go by Mister ██████ anyway, I don't use first name basis with the students." At this point she mentioned to me that when I introduced myself in her class, she had a student directly message her over Big Blue Button, which is where they do their class conferences. The student asked, "Can I go by a different name?" And she said, "No, and we're

---

**GPSD 348**
**Vickers Declaration**
**Exhibit 9 Page 64 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

not using..." that's what she relayed to me in the Zoom meeting later. She told me that a student had messaged her and then she had told them no.

Bill Landis:

That was over the change from ▮▮▮▮ to ▮▮▮▮.

▮▮▮▮▮▮:

Yes.

Bill Landis:

But she said she was okay with Mister ▮▮▮ or referring to yourself as a male?

▮▮▮▮▮▮:

Yes.

Bill Landis:

Okay. Anything else in the Zoom interview remarkable about the conversation?

▮▮▮▮▮▮:

The only thing that struck me as odd is that she asked if I had a concern, that I not take it to the office or to Tommy Blanchard. She asked that if I had a concern, that I take it up with her and not tell essentially anyone else. That struck me as odd a bit at the time. She said that she doesn't want to cause unnecessary drama in the workplace and that she would prefer to work through it with her. It struck me as a bit odd saying, "Please don't talk to Tommy if there's an issue."

Bill Landis:

Did you understand what she meant by if there's an issue or what she was referring to?

▮▮▮▮▮▮:

She just meant in general I think. She didn't state any specifics. At the time I assumed maybe if there's an issue with a student or if there's an issue with modifications to a student's work. But she didn't specify.

## GRANTS PASS SCHOOL DISTRICT 7

I asked ███████ about when he started to feel there was a different treatment of him.

Bill Landis:

You felt that there was a different treatment of you and you felt it because of what you were going through. Correct?

███████:

Right.

Bill Landis:

So tell me about what led you to file the complaint feeling that you were being discriminated?

███████ ig:

Right.

Bill Landis:

Is that a true characterization? Do you feel that's what this is about? You felt like you were being discriminated?

███████:

Yes, I do. After I had ███████ in December and I was gone for a week after ███████, before I could come back on campus... but at that point, I think winter break was in motion.

Bill Landis:

If we could get just a general... You had ███████ in December?

███████:

On December 1st.

Bill Landis:

Okay. Close to the Christmas break timeframe?

---

**GPSD 350**
**Vickers Declaration**
**Exhibit 9 Page 66 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

▬▬▬▬▬▬▬ :

Yes. Right before the winter break happened.

Bill Landis:

And you were off work for how long?

▬▬▬▬▬▬▬ :

I believe it was just a week. I believe there was time between that where I was back on campus but it was a very short amount of time.

Bill Landis:

And then Christmas break.

▬▬▬▬▬▬▬ :

Yes.

Bill Landis:

Okay.

▬▬▬▬▬▬▬ :

I had ▬▬▬▬▬ in December. In January I believe it was, Ms. Medart approached me in person and asked, "Why were you gone?" And I said, "I had my ▬▬▬▬▬" She said, "If you don't mind, what did you have ▬▬▬▬ regarding?" I was honest and I told her it was a part of my ▬▬▬▬▬ and that it was to ▬▬▬▬▬▬▬▬ in order to be more comfortable physically. After this became pretty awkward and it eventually just ended with her just walking away.

Bill Landis:

So the conversation became awkward as soon as you explained what you had done?

▬▬▬▬▬▬▬ :

Yes. It was initially very friendly and then I explained and then it became, "Oh, okay." And the conversation ended. It had some awkwardness as we were trying to end it essentially.

---

**CONFIDENTIAL**    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Question, did you think it odd that she was asking specifically about ▇▇▇▇▇ Did you have that kind of relationship?

▇▇▇▇▇▇ :

I did find it a little odd. We did not have that kind of relationship. We have not had much personal contact at all over the time that I've been in her class beyond what's happening in the class and work related conversations. At the time, I did try and give the benefit of the doubt of maybe she's trying to be friendly. But after it became awkward, it felt a bit odd afterwards for sure.

Bill Landis:

Did you feel caught off guard about being asked about the specifics of the ▇▇▇▇ ?

▇▇▇▇▇▇ :

Yes. At the time I believe I was just walking down the hallway and she stopped me in the hallway and asked. It did catch me off guard that she would ask about that. Especially in that specific environment, just in the hallway.

Bill Landis:

Had you told her before going to have the ▇▇▇▇ , you would be off ▇▇▇▇▇ ?

▇▇▇▇▇▇ :

Yes, all of my teachers knew that I was going to be gone for that week because of ▇▇▇▇▇ .

Bill Landis:

So they knew you were having ▇▇▇▇ ...

▇▇▇▇▇▇ :

Just not what it was.

I asked ▇▇▇▇▇ about what else had occurred.

---

**CONFIDENTIAL**                        PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

███████ :

After that, a new quarter started at some point at the school so that their campus pages for the classrooms had to be changed to the new quarter page. It was quarter two I believe and then quarter three had started. On the quarter three page, I noticed that I had lost my privileges as teacher's aide position. I was demoted down to student position so I lost a lot of my abilities in her class page.

Bill Landis:

Tell me about that because as a lay person, I don't understand how that... So as a special ed assistant in her classroom, you have certain access to things based on a stature position, is that fair to say?

███████ :

Yes.

Bill Landis:

And do you have that in every classroom?

███████ :

Yes.

Bill Landis:

In every other classroom, what is that stature that you would be on or in?

███████ :

The would be either TA or EA, depending on educational assistant or teacher's assistant. It just gives me the ability to check a student's grades, to private message a student, to set up a conference, to look at things that haven't been published yet and to create breakout rooms and meetings, things like that.

Bill Landis:

Prior to the new quarter and ███████ Give me an idea. In January, you come back. When abouts does is the new quarter that you're referring to, ballpark?

## GRANTS PASS SCHOOL DISTRICT 7

████████ :

I believe quarter three started in mid to late January. It was after a couple of weeks I believe.

Bill Landis:

Okay. A couple of weeks, fair to say, after the conversation with Ms. Medart in the hallway?

████████ :

Yes.

Bill Landis:

Prior to ██████ and the conversation beginning in September, you had access in her class as a TA or EA?

████████ :

Yes.

Bill Landis:

That gave you access to grades and messaging. Anything else?

████████ :

Yes, it gave me access to essentially view all of the things as a teacher without having the ability to change things as a teacher.

Bill Landis:

And you have that access in the other six classes?

████████ :

Yes.

Bill Landis:

Still have it?

---

Page 68:                    **CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 354**
**Vickers Declaration**
**Exhibit 9 Page 70 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

███████████ :

Yes.

Bill Landis:

At some point, the new quarter starts mid January-ish let's say. And you realize that your status is now, what?

███████████ :

Same as a student. When we are added into the new quarter classrooms, the teacher's aides don't get added automatically. We have to be manually added in. So every time we have to send an email to all the teachers saying, "Hey, please remember to add in your aides." I noticed that this time I was added in manually as a student.

Bill Landis:

The teachers manually add?

███████████ :

Yes, the teachers have to manually add the aides for their classes.

Bill Landis:

So in the first and second quarter in Ms. Medart's class, what did she add you as?

███████████ :

When I was first added, it was added by Tommy Blanchard. I was added as a TA. The second time, it was by Katie Medart and it was a TA. The third time I was added as a student.

Bill Landis:

How do you know that Principal Blanchard did it the first time and Katie Medart did it the second quarter?

---

**GPSD 355**
**Vickers Declaration**
**Exhibit 9 Page 71 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

███████████ :

The first time was Tommy Blanchard just because I had started into the classes while they had already started so he just added me into all of them at once without having to go through the teachers. The second time was all the teachers have to add me manually.

Bill Landis:

The third quarter where you were entered in her class as a student, the other six teachers continued you on as a TA. Is that correct?

███████████ :

Yes.

Bill Landis:

And so you felt a different treatment at that point?

███████████ :

Yes. I have found it very odd.

Bill Landis:

Did you contact Ms. Medart to inquire about that?

███████████ :

I did get it changed back to TA. I was able to go back and see grades and whatnot.

Bill Landis:

Tell me about how you got it changed.

███████████ :

I believe I talked to, I think it was Tommy. It might have been an IT. I sent an email via... I asked one of my coworkers what I should do to get it changed and they recommended that I email IT I believe or talk to Tommy. So I did that. It did get changed. I don't believe it was through Katie herself.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

My question to you is, did you contact Ms. Medart about the change?

:

No. No, we didn't talk about that. I believe I mentioned it to her in her class and told her that it was at student level and that it was being changed so that I could assist her students. She didn't seem to have any issue with that at the time. She didn't say that she didn't want it to be changed.

*So for clarification I asked if he did contact her and what he found out.*

Bill Landis:

You do contact her? What do you recall that you... You noticed, "I'm a student, I can't do what I've been doing or how I need to do this." And so, do you say, "Hey, Katie or Ms. Medart, trying to figure this out"?

:

I was able to get it changed fairly easily via my coworker who let me know who to contact. When I talked to Katie about it, it was already in the process of being changed I believe. I had already sent the email or talked to Tommy. I believe it was Tommy. I just let her know, "I think you may have added me as a student. I'm getting it changed to TA so that I can assist the students. Is that okay?" She didn't have an issue with it. At the time I assumed that maybe it was a mistake or who knows.

*Leading to his complaint of April 6th, 2021, I asked what else had occurred.*

:

Right. So then when students became back on campus around February 24th I believe we said. I was in person in the classes. After the first couple of weeks... With our schedule, I'm only that class two days a week because they only have that class on campus two days a week.

Bill Landis:

What is the actual class title?

:

It's 7th grade science.

**GPSD 357**
**Vickers Declaration**
**Exhibit 9 Page 73 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay.

██████████:

I'm in that class Mondays and Fridays. After the first I believe two weeks or possibly three, I believe it was just two, she asked me to not be in her classroom anymore. She asked me to work remotely from somewhere else on campus and that I can be in the online portion of the class assisting with just the online students and none of the students in campus.

Bill Landis:

So you come back in January, you have the teaching assistant/ student status change within a couple of weeks, middle of January. And then about what time is it that she asked you not to be present in the class?

██████████:

This would have been in March because it was a few weeks after we had been on campus which was the end of February. I would assume, mid to possibly late March.

Bill Landis:

This is during or after one of her classes?

██████████:

After her class, when I was physically in the classroom and as students were packing up, going out. She spoke to me and said, "Can you do remote and work with just the online students."

Bill Landis:

Would that leave some special ed students in her classroom without assistance?

██████████:

Yes, because there are special education students on... We have two groups of students. One that do half online, half in person. And then they switch. So that way they only have the amount of students

**GPSD 358**
**Vickers Declaration**
**Exhibit 9 Page 74 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

on campus while every student still gets the opportunity to be on campus. If I was doing just online, there would still be special education students in the classroom and vice versa.

Bill Landis:

So she says, "You can be online but I don't want you in my classroom." So where would you be or need to be?

████████:

From there, I would work in the library just on my little Chromebook.

Bill Landis:

Okay. How did you respond when that request came? What was the discussion?

████████:

At the time, it was right at the end of her class so I was about to go to another class. I told her, "All right, we'll see how that works. Okay, I guess I'll do that," because it's her class.

Bill Landis:

But did you feel that as a special education assistant, that that would leave some students not getting the assistance in the purpose that you're in the class or part of the class?

████████:

Yes, absolutely. I was concerned about that. I spoke to my coworkers about that, the other special education aides about that. Just to ask, "Do you think that's something that I should talk to with Tommy or with the special education teachers?" Essentially because everything has been so up in the air, no one knows about what protocols we should do. They said, "Maybe you should just try that out and see." So that's what I did. I started in the classrooms online. And then at that point I noticed that in Big Blue Button, I did not have TA status still. I had TA status on campus but not in Big Blue Button, which is where they do their actual conferences, where they have cameras on and typing. I realized I was not able to open breakout rooms myself still in Big Blue Button.

I asked ████████ if he knew if anyone else was asked to do the same thing.



## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. What was the feedback you got from your coworkers when you were... Were anybody else asked to do the same thing?

▬▬▬▬▬▬▬ :

From who I spoke to, she said that she hadn't had that experience. But she didn't seem too concerned about it so I agreed to do that with Katie.

Bill Landis:

Does Ms. Medart have other teaching assistants in other classes?

▬▬▬▬▬▬▬ :

I'm not certain about that. I was under the impression that she did at first but over time I'm not sure who would have been in there so I don't think so.

Bill Landis:

At the time you were asked to work remotely from the library and online with just the online students, was there a reasoning given or was there questions by you to change or?

▬▬▬▬▬▬▬ :

Yes. I was a little bit confused at first about the reasoning. She explained that it was so that I could assist the online half of her class while she's assisting the inverse half while they're doing things like labs and experiments. So that way the online portion could get some assistance with their instruction.

Bill Landis:

But if you were in the class, would the online students be being neglected or would you still be addressing them as well being in the class?

▬▬▬▬▬▬▬ :

When I was in the class, what I would do is I would have my Chromebook open so I would still be in the Big Blue Button meeting and able to respond to messages and questions and assist that way if I needed to. In general, what most of the classes have done is that the online portion has some

---

**GPSD 360**
**Vickers Declaration**
**Exhibit 9 Page 76 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

asynchronous work that they aren't necessarily doing with direct instruction. Usually what I would do is if a student had a question about their assignment, I would be able to message them on Big Blue Button while I was in the classroom.

Bill Landis:

So my question is by being removed into the library to just deal with the online students, was that something that wasn't happening when you were physically in the classroom?

████████:

I would say it was happening while I was physically in the classroom because I still had my Chromebook open in the class, able to assist in that way. But they would obviously get a lot less direct one on one time when they're just online.

Bill Landis:

Okay. Her explanation was then that you would just be focused on that particular group?

████████:

Yes.

Bill Landis:

What did you think about that as an explanation?

████████:

I was confused about that at first, which is why I did go to my coworker and ask if that was om that she experienced. With the explanation, I did think perhaps the students that are online, they do get less one on one time. Perhaps if she's focusing in the in-person half and I'm focusing on the online class, perhaps if that's the way she wants to do her classroom, then I suppose then that's fine.

 explained that after that "I Resolve" came out he began to think about what was transpiring.

████████:

That went on for a fairly short amount of time before... and then although the I Resolve thing started coming up. I believe that that was all posted pretty... essentially while this thing was happening where

## GRANTS PASS SCHOOL DISTRICT 7

she was asking me to not be in the classroom. That led me to think perhaps this was related to that, maybe there's some ulterior motives behind what's been occurring which was then in turn... I was alerted of all that by the librarian at North. At this time was when I started to reflect on all the experiences through the school year. I think there's some ulterior motives and that's when I filed the complaint on April 6th.

I asked ▮▮▮▮▮ about his communication with Ms. Medart after he was asked to work remotely.

Bill Landis:

How is she able to know if you're assisting the students and interacting with them?

▮▮▮▮▮:

In the Big Blue Button meeting online, she would be in it as well but she would be not on the computer while she would be helping the students on campus.

Bill Landis:

Did you and her have feedback about students and things?

▮▮▮▮▮:

I would communicate with her about concerns I have with a student or things that needed to be modified for a student. But beyond that she would not be present while I was working with the online students.

Bill Landis:

Was that feedback what you consider to be normal as far as discussions about particular students?

▮▮▮▮▮:

Yes.

I asked ▮▮▮▮▮ about how he became aware of the "I Resolve" campaign.

Bill Landis:

Tell me how you became aware of that and what you learned about it this campaign and what it is.

## GRANTS PASS SCHOOL DISTRICT 7

████████████ :

I became aware of this when the librarian at North sent me the link to the video and said, "You might want to look at this."

Bill Landis:

Who is the ██████ ?

████████████ :

██████████ .

Bill Landis:

Okay.

████████████ :

She sent me the link to the video and I watched it and I was a bit disturbed. From there...

Bill Landis:

Tell me about your perception of the video and what disturbed you.

████████████ :

What disturbed me particularly was that she focused a lot on names in the video. After having that experience where she asked me to not use my preferred name even though at that point it was being legally changed. Seemed odd when it was paired with the desire to not let transgender students use their preferred names.

Bill Landis:

So that's what I want to hear about. You said the names part of the video I Resolve offended you.

████████████ :

Right.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

What was said or what was her statements that made you feel how you felt?

████████:

I believe what they said in the video was, I don't know word for word, but it was something along the lines of how they want students to only use a different name that's their legal name if it's a derivative of the legal name, if they have parental consent and then it should be a choice by teachers. I thought that that's inappropriate because, especially if you have parental consent, that it shouldn't be a choice for the teachers.

Bill Landis:

And so, you as an adult, felt that what she was wanting support for was to stay with your given name.

████████:

Right. And even though it was being legally changed. And then in the video, I also had a concern where she brought up a student that actively goes to North and used them as an example without naming names. But I and I think most other people that are familiar with that student knew exactly who she was talking about. I found that inappropriate.

That statement by ████████ meant he knew or believed he knew the student who actually existed that Ms. Medart was referring to when she described a situation with a student who was going through transitioning their gender identity. On June 2nd, 2021 at 9:35 AM, I had a follow-up phone conversation with ████████ to inquire more details about the student he believed Ms. Medart was referring to in the "I Resolve" video. This was as a result of Ms. Medart's denial that the person or situation was real when I interviewed her. For purposes of protecting the student, the name "Jane Doe" will be used in this narrative however, the students real name is available should that become an issue. ████████ told me that in February/March of 2020 and before the North Middle School campus was closed due to COVID, he was working as an Educational Assistant Supervisor referred to as a Campus Monitor. Each Wednesday during that time there were weekly meetings with other Campus Monitors to discuss issues and other business.

████████ reported that in one of those meetings in February/March 2020, then North Middle School ████████, brought up in the meeting as a "heads up" that a student named "Jane Doe" was contacting different staff around campus to report that she now wanted to be known as "John Doe" and wanted staff to refer to her as he and use male pronouns. This was reported to be supported by the mother but not the father. Guidance he received at that time was just to be aware. ████████ said he in fact was approached by "Jane Doe" and asked that he use the name "John Doe"

# GRANTS PASS SCHOOL DISTRICT 7

and use male pronouns which ███████ believed occurred before the meeting took place. ████████ stated others in attendance at that meeting were campus monitors ████████, Ms. Medart, and ████████, ████████ told me that he absolutely believed that was who Ms. Medart was referring to in the "I Resolve" video and stated that others believed that as well including ████████ who shared the video with him.

After concluding my phone call with ████████, I contacted North Middle School Principal Tommy Blanchard on June 2nd, 2021 at 9:48 AM to corroborate what ████████ had just told me. I asked Mr. Blanchard about the student "Jane Doe" as told to me by ████████. Mr. Blanchard acknowledged that back during that time frame, that particular student was contacting staff around campus asking to be called by a male name and requested that they refer to them using male pronouns. Mr. Blanchard stated that the student was quite demonstrative around campus and that it was widely known around campus that the student wanted to identify differently. As Mr. Blanchard put it, it was common knowledge about the student and the student's request.

I asked ████████ about his six other classes he assists in.

> Bill Landis:
>
> And the other six classes that you have, you're still with the same challenges? So you have half students online, half students in class.
>
> ████████:
>
> Right.
>
> Bill Landis:
>
> And all other six, you're doing your job in the classroom with that?
>
> ████████:
>
> Right.

I asked about ████████ and his listing her as a witness.

> Bill Landis:
>
> Okay. Look at my questions here. When we talked about ████████, so you listed her as a witness in your complaint. Anything remarkable outside of what you talked about? She just happened to share the video with you about I Resolve and then also commented to you that she thought it was inappropriate?

---

## GRANTS PASS SCHOOL DISTRICT 7



███████████ :

Essentially, I have been in communication with her for quite a while because when we were working entirely distance learning, I worked in the library where she would be. She was pretty familiar with my routine essentially.

Bill Landis:

Okay. That will be what she is a witness to?

███████████ :

Yeah.

Bill Landis:

Just discussions with her and the I Resolve video that she forwarded, that kind of thing?

███████████ :

Yes.

Bill Landis:

Was she present for any discussions with Ms. Medart or anything?

███████████ :

No.

I asked ██████ if anyone else had been present for any of the mentioned discussions with Ms. Medart.

Bill Landis:

Anyone else you can think of that was present with any of the discussions with Ms. Medart?

███████████ :

The only thing I can think of is when she asked me to not be in her classroom anymore, there were still students packing up and going out. There were students that were privy to that.

---

**GPSD 366**
**Vickers Declaration**
**Exhibit 9 Page 82 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

I asked ████ how he had been affected personally.

Bill Landis:

Okay. How has this affected you personally?

████████:

It's made me very uncomfortable personally. It has definitely caused a very large rift in the workplace at North. I feel like a lot of staff members, especially teachers that were close with Katie, they've not retaliated or anything but they've definitely treating me with some more distance and some more discomfort. It has made me feel a little bit uncomfortable just being there in the workplace. But there hasn't been any severe issues.

Bill Landis:

No overt comments or actions?

████████:

No.

I asked ████ if there were any email interactions between he and Ms. Medart that he thought would be helpful.

Bill Landis:

Is there any email interactions between you and Ms. Medart that would be relevant do you think to this discussion about your feelings of discrimination?

████████:

Not that I think would be relevant, only discussions about students and concerns. I can check through and make sure there's nothing in those.

I asked ████ if there was anything else that he wished to add or clarify and he said there was not. Having no further questions I concluded my interview with him (See transcript for further details Exhibit 9).

On May 7th, 2020 at 10:40 AM, I did interview ████████ regarding her complaint (Exhibit 1B) which will be covered under Allegation #3. However there were some questions asked of her because ████ had listed her as a witness. I asked her about that.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

There was an allegation made by ████████ , that teacher Katie Medart discriminated against him. Do you have any knowledge of discrimination against ████████ ?

████████ :

Only what I was told by ████████

Bill Landis:

And do you recall when you were told of discrimination? Was there more than one occasion?

████████ :

████████ told me early last month when all of this kind of began.

Bill Landis:

So early in April?

████████ :

Mm-hmm (affirmative).

Bill Landis:

Is that correct? So, and just give me verbal answers so the recording can get it.

████████ :

Yes.

I asked what ████████ recalled ████████ telling her.

Bill Landis:

That's okay. And what do you recall ████ telling you?

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 368**
**Vickers Declaration**
**Exhibit 9 Page 84 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

████████:

That Katie, would refuse to call ████████ by ████████ and that after ████████ returned from having top ████████ that Katie began to make him sit outside of classroom.

Bill Landis:

████████████████

████████:

██████████████████████  ████████████████████████████
████████

Bill Landis:

██████████  ████████████████████████████████?

████████:

Sometimes.

Bill Landis:

████████████████████ ████████ ████████████████

████████:

████████████████████████████████████████████.

Bill Landis:

████████████████████████████████

████████:

████████████████

Bill Landis:

████████████████ ████ ████████████████████████
████████████████████

---

**GPSD 369**
**Vickers Declaration**
**Exhibit 9 Page 85 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

█████████:

I have not personally witnessed anything.

Bill Landis:

So based on what █████ told you?

█████████:

Right.

Bill Landis:

Do you know if other teaching assistants were treated differently during this time?

█████████:

I do not know. █████ is our only ████ employee.

Bill Landis:

Only ████ employee at North Middle School?

█████████:

At North.

Bill Landis:

Okay. Is there anything you wish to add or clarify regarding ███████ allegation?

█████████:

No.

Having no further questions of ███████ regarding ████████, I concluded that portion of my interview with ███ (See transcript for further details Exhibit 9).

In my interview conducted with Ms. Medart on May 13th, 2021 where I covered part of the interview related to Allegation #1, I also asked her about ████████ complaint under Allegation #2. I asked Ms.

# GRANTS PASS SCHOOL DISTRICT 7

Medart if she had seen the complaint and been noticed, and she acknowledged that she had. I asked about ███████ and his duties in Ms. Medart's classroom.

Bill Landis:

Okay. I get acronyms sometimes, and the school district uses them, but I don't necessarily know. And his duties in your classroom from the beginning of the school year, in September 2020, through the end of March 2021.

Katie Medart:

You'll have to ask ██████ about... That's asking me to speculate about ██████ duties in my classroom.

Bill Landis:

So ██████ is assigned to a classroom of yours to assist you with students in the classroom?

Katie Medart:

That is correct.

Bill Landis:

And who directs him as far as what he's to do in the classroom?

Katie Medart:

I don't know who ██████ reports to as far as who is the supervisor of ██████

Bill Landis:

So if ██████ comes into your classroom to help with students, you have no communication or things-

Katie Medart:

No, we collaborate. I collaborate with any assistant that is assigned to my class.

---

**GPSD 371**
**Vickers Declaration**
**Exhibit 9 Page 87 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So what is your understanding of ████ duties and responsibilities within your classroom?

Katie Medart:

I've never been given a list of what ████ duties in that... So I-

Bill Landis:

I'm saying what is your understanding of what █████ responsibilities or duties are in your classroom? How do you collaborate or communicate about students what you're doing, if you don't know what-

Katie Medart:

Okay, so you're asking me how do I collaborate or communicate with ████? In my brain, that's a different question than, do I know all of ████ job duties in my classroom? And I do not know what ████ job duties specifically are for what ████ was hired for.

Bill Landis:

Do you know any of them?

Katie Medart:

I don't. I know, typically, in my experience of working with any education assistant, we collaborate, we talk about ways that we can work to best serve our students in the classroom.

Bill Landis:

So if I'm understanding you, █████ is independent of what you do, but he works within your classroom?

Katie Medart:

Yes.

I asked Ms. Medart about when she met ████.

---

**GPSD 372**
**Vickers Declaration**
**Exhibit 9 Page 88 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. And did you just meet ███████ at the beginning of the school year, September 2020?

Katie Medart:

No. It was not at the beginning. I don't remember when the meet date was, but ██████ came in after... It wasn't at the beginning. I was well into the school year.

Bill Landis:

Okay. And at some point, he was brought into your classroom, or directed to your classroom, to work as a special ed assistant?

Katie Medart:

Yes, that is correct.

Bill Landis:

Okay. And was that the first time you met him?

Katie Medart:

Yes. I actually met █████ for the first time with all my students.

Bill Landis:

And do you remember about when that was? Was it in 2020?

Katie Medart:

Oh, 2020? Well, it was this school year, but I don't know if it was '19 or '20. I'd have to go and... There'll be record, email record, that would state when we met.

Bill Landis:

I mean, this school year is 2020-21, correct?

Katie Medart:

Yes. Oh yeah, so 2020. But what I'm trying to say is, I don't know, I believe it was in 2020 then.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

When students-

Katie Medart:

But it wasn't at the very beginning of the school year. That is what I'm recalling.

Bill Landis:

Okay.

Katie Medart:

Yes. We were still in CDL. But if you're asking me was that in October? But I believe it was in 2020. And again, this could be verified just by looking at email, because there will be a email that-

Bill Landis:

Right. Well, I'm just trying to get your recollection, as far as verification. So even what you recall or what you think is fine.

Katie Medart:

Okay. So I think it was in 2020.

I asked Ms. Medart to tell me about her introduction to █████

Bill Landis:

Okay. Tell me about your introduction to him.

Katie Medart:

I did not introduce ████ ████ introduced ████

Bill Landis:

Okay. Tell me about that.

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

████████ joined our class, and I told the students we have a new education assistant joining our class, because we are at that time in CDL, so entirely virtual. And ████████ said, "You can call me ████████ ████████, ████████ or ████████."

I asked Ms. Medart if she had a conversation with ████████ about his transformation and his disclosure he was identifying as ████████████ and male and no longer ████████.

Bill Landis:

Okay. Did you have a conversation with him about his transformation and his disclosure that he was identifying as ████████████, and male and no longer ████████?

Katie Medart:

No.

Bill Landis:

That never occurred?

Katie Medart:

To make sure I'm understanding your question, did I have a conversation about ████████ transitioning and changing ████████ gender or name, preferred name, from ████████ to ████████ We never ever talked about ████████ transitioning.

Bill Landis:

Okay. So ████████ didn't come to you and explain that he was in the system as ████████, but was now going through a transformation and was now identifying as male, with male pronouns, and that his name was ████████ and not ████████?

Katie Medart:

I never, ever was notified that ████████ was transitioning. I asked ████████ what ████████ preferred after ████████ introduced all four names as an option. I've honored what ████████ asked in all email communication.

---

Page 89:                              **CONFIDENTIAL**                              PCI #21-1011/ Part I

**GPSD 375**
**Vickers Declaration**
**Exhibit 9 Page 91 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So you never asked ████████ not to use the word, or name ██████ in your classroom?

Katie Medart:

No.

Bill Landis:

Okay.

Katie Medart:

I asked ██████ what ██████ preferred to go by and then have honored what ██████ had requested.

Bill Landis:

So ██████ recalls a conversation with you that day that he explained about his transformation, and that you later asked to Zoom conference with him or talk about it in more detail. Do you recall that?

Katie Medart:

Absolutely not.

I asked Ms. Medart if she had asked students not to refer to ████████ as ████████

Bill Landis:

Okay. Did you ask students not to refer to ████████ as ████████?

Katie Medart:

No.

I asked Ms. Medart if she received guidance from the District on situations such as this.

Bill Landis:

So had you received guidance from the district on situations such as this?

---

**GPSD 376**
**Vickers Declaration**
**Exhibit 9 Page 92 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Such as what?

Bill Landis:

Such as someone coming to you and saying, "Hey, I'm no longer ███. I'm in a transformation into male and I want to go by this name now?"

Katie Medart:

No, because that didn't happen. There was no mention that ███ was transitioning.

Bill Landis:

So did you see in the system that ███ name was ███e?

Katie Medart:

Yes, I did see that.

Bill Landis:

And he came to you and said, "My name is now ███"?

Katie Medart:

No. He... ███ in our Big Blue Button conference, as stated earlier, introduced ███ as willing to go by ███, ███, ███ or ███ in a Big Blue... And then in a conference following, that was already set up before that, ███ requested, when I asked, "What would you prefer?" I then honored ███ request. And you'll see that from my email communications.

Bill Landis:

And so how did you refer to ███ in your communications either in person or by email?

Katie Medart:

███

**GPSD 377**
**Vickers Declaration**
**Exhibit 9 Page 93 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay.

Katie Medart:

And that's in all my email communication.

After some discussion about "I Resolve" and its proposals and resolution which would affect ███
███, I asked if Ms. Medart recalled a conversation she had with ██████ about ██████ he was having or had.

Bill Landis:

Did ████ have a conversation with you about ██████ that he was having, or had?

Katie Medart:

No. No, I had an interaction, walking to the, I think as we're going to the staff room or the restroom, and I saw ██████ on campus, I saw ██████ I said, "Oh, I'm glad you're back." And that was the nature of our interaction.

Bill Landis:

Did you ask him about the ██████ and what he had done?

Katie Medart:

No.

Bill Landis:

Did you find out about what the ██████ was or what he had done?

Katie Medart:

No. Not until I was served my complaint. Which is one of my questions, if ██████ felt I discriminated against ██████, why was this not brought up any time before I Resolve? And even as of April 2nd, which I was put on leave, on April 5th, I sent one, saying, "Hi ██████ We missed you in period two. I actually looked for you all week in the monitoring, because I remember you helped with the check-in process but haven't seen you. I was going to ask if we could discuss what you're observing for the

## GRANTS PASS SCHOOL DISTRICT 7

students online during period two, and if we could come up with a plan to further help students this next week before the quarter ends. Please let me know if there's a time that works for you Monday morning. Hope you are well. Katie."

Bill Landis:

And when's that dated?

Katie Medart:

April 2, 2021 at 1:06.

I asked Ms. Medart if she made a change regarding ██ ██ presence in her classroom.

Bill Landis:

Did you make a change regarding █████ presence in your classroom?

Katie Medart:

No, I did not.

Bill Landis:

So █████ reports that he was asked to remotely work with the special ed students online and not inside the classroom, sometime in, I want to say February or somewhere in there?

Katie Medart:

Yes, but I didn't... What you just brought up, I have a second EA in the class, █████ █████. It's actually her idea to help a student online and not report to class. I shared that with █████ and █████ thought that was a good idea, and offered to do the same thing. Because how our current class is structured, is half the students come to campus, half of the students are online. And so █████ offered to best help meet the needs of our students to do the same thing.

Bill Landis:

So both of your assistants work remotely.

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yes.

Bill Landis:

Okay. And this was a change to the norm sometime in February, based upon what your other assistant had offered and thought was a good idea.

Katie Medart:

Yes.

Bill Landis:

Okay.

Katie Medart:

It was shared, and ████ thought it was a good idea how to best help students.

Bill Landis:

And you said he received that as a good idea, you said?

Katie Medart:

Yeah.

Ms. Medart's assertion that ████ thought it was a good idea was not what ████ thought or felt. I later contacted ████ who contradicted Ms. Medart's statement that it was ████ idea, and she too did not feel it was a good idea (See interview with ████ below).

I asked Ms. Medart about ████ status change in the School virtual classroom system.

Bill Landis:

So regarding the quarter three page, and bear with me as I try to walk through your system, because I don't know as an outsider, but where students, staff and teaching assistants have access online, is that correct?

---

Page 94:                     **CONFIDENTIAL**                     PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I'm sorry, what was the question?

Bill Landis:

So there's a system that you have where yourselves, staff, teaching assistants, have access to students and students online in a virtual system?

Katie Medart:

Yeah.

Bill Landis:

And is my understanding that ███████ status was changed to that of a student, rather than an EA a TA, which limited his ability to check grades, private message students, and set up conferences with students, or create breakout rooms when the quarter changed from two to three.

Katie Medart:

I have no recollection of that.

Bill Landis:

Okay. In those statuses, and when those are set up each quarter, is that something you as a teacher set up?

Katie Medart:

Well, I think Mr. Blanchard did ███████ And I think ███████, because they joined not at the beginning. If I recall, there will be an email for this. All of the EAs, because our learning management system is new, were left out because we didn't know that you had to re-enroll them every single quarter. And there will be an email that verifies that.

Bill Landis:

Okay. So that's nothing you specifically did to change status.

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Absolutely not.

Bill Landis:

Okay.

Katie Medart:

That would be wrong, and I would not do that.

Ms. Medart sent an email to North Middle School Principal Tommy Blanchard on February 24th, 2021. In that email she stated:

*Good morning, Tommy,*

*I was processing your comments about not knowing what it is to be transgender and not to judge and that some have views against it because of religious beliefs. Tommy, the core reason for me is that I believe I am protecting kids. That I should take action and speak up when we love someone and we believe they are going down a path that will hurt them and lead to heartache. I do not believe minors are competent to understand and make such a life impacting decision. Out of loving them I want to try to help prevent them from going down a road they may never be able to recover from. I haven't checked most recent statistics, but in past years when I have looked, transgender population have disproportionately high rates of illness and death. I also think individuals that identify as transgender make up roughly 0.7 percent of the American population and I don't understand why we change bathrooms or procedures without giving more weight to the hurt that may come for 99% of the us population that does not identify as transgender.*

*Thanks for hearing my perspective. Please let me know if you have any questions or concerns. Have a great day,*

*Katie*

I asked Ms. Medart about that email specific to what she meant by several comments made within.

Bill Landis:

Okay. So in a District 7 email to Principal Tommy Blanchard discussing the topic of transgender, dated February 24, 2021, you wrote, and I quote, "I believe I am protecting kids that I should take action and speak up when we love someone, and we believe they're going down a path that will hurt them and lead to heartache. I do not believe minors are competent to understand and make such a life-impacting decision. Out of loving them, I want to try to help prevent them from going down a road they may never be able to recover from.

---

**GPSD 382**
**Vickers Declaration**
**Exhibit 9 Page 98 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

"I haven't checked most recent statistics, but in the past years when I have looked, transgender population have disproportionately high rates of illness and death. I also think individuals that identify as transgender make up roughly .7% of the American population, and I don't understand why we change bathrooms or procedures without giving more weight to the hurt that may come from the 99% of the US population that does not identify as transgender."

Bill Landis:

You state in that email that, I quote, "I believe I am protecting kids..." Do you believe the district is protecting them? Is this something you feel like you need to do differently than what the district is doing?

Katie Medart:

I don't want to speculate on behalf of the district. You can ask the members of the district what they believe.

Bill Landis:

Okay. So what do you mean by, "I believe I'm protecting the kids"?

Katie Medart:

I believe personally in creating... Just what it says there.

Bill Landis:

I know. But how do you believe you're protecting the kids? I don't understand.

Katie Medart:

By advocating, considering all students who make up our population, the diversity of all of our students.

Bill Landis:

Okay. And what path were you referring to in your email that leads to hurt and heartache?

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I'm sorry. I need context for it.

Bill Landis:

Okay. So I just read you the email and basically it says, "... and we believe they're going down a path that will hurt them and lead to heartache." They being who, and what hurt and heartache are you referring to? Because this is about transgender, so that's why I'm asking.

Katie Medart:

And so why is this relevant to my complaint that I discriminated against ██████

Bill Landis:

Why is that relevant?

Katie Medart:

Yes.

Bill Landis:

Because it's a foundation for me to understand if he's being discriminated or not based on this email that you sent that was about transgender. So I'm using that to try to understand.

Katie Medart:

But it's not. Because ██████ an adult.

Bill Landis:

Okay, so I don't argue. I'm asking you to answer a question.

Katie Medart:

But ██████ is an adult and that is about kids.

**CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. You're welcome to object to the question, but I'm directing you to answer the question. So I'm asking you a question. What did you mean by that "... they are going down a path that will hurt them and lead to heartache." They, being who and what did you mean by that?

Katie Medart:

As specified in there, referring to kids, and not having their prefrontal cortex of their brain, it's in the beginning of maturation stages. And in considering that, that they're not of development and of age to be able to make competent, life-changing decisions, and that is my opinion and my belief.

Bill Landis:

And they being those who would want to identify differently than their given gender?

Katie Medart:

Yeah.

Bill Landis:

What did you mean when you said-

Katie Medart:

And not just they... I mean, it doesn't just apply to transgender students. I feel that about the brain of all minors.

Bill Landis:

But this email is about transgender.

Katie Medart:

It is.

Bill Landis:

Okay. And so what did you mean when you said, "I want to try to help prevent them from going down a road they may never be able to recover from."

**GPSD 385**
**Vickers Declaration**
**Exhibit 9 Page 101 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I mean that I do not take it, the responsibility, lightly the fact that we are talking about life-changing decisions regarding minors.

Bill Landis:

Regarding gender changes or transformation?

Katie Medart:

In that email specifically talking about that.

Bill Landis:

So that's correct?

Katie Medart:

Yeah. It's talking about that specific... You're asking about that email?

I asked about who makes up the "99%" that she was referring to regarding the changes to bathrooms.

Bill Landis:

Yeah. So who makes up the 99% that you're talking about when you question why things need to be changed regarding bathrooms and things? Are you talking about yourself? Who are you referring to?

Katie Medart:

Anyone else in that case wasn't... Because I gave a statistic regarding identifying as transgender, specifically. So then it would be anyone who didn't identify as transgender.

I asked Ms. Medart if there was anything else she wished to add or clarify regarding this specific complaint (Allegation #2).

Bill Landis:

Okay. Is there anything you wish to add or clarify regarding this complaint?

Katie Medart:

I did not discriminate against ███████ I have treated ███████, respectful, professional, and fair.

# GRANTS PASS SCHOOL DISTRICT 7

I then asked if anyone else present had anything they wished to add or clarify and they stated they did not. Having no further questions, I concluded that portion of my interview with Ms. Medart regarding Allegation #2 (See transcript for further details Exhibit 9).

On May 27th, 2021, I spoke with Grants Pass District 7 Teaching Assistant ███████ by telephone. ███████ was mentioned by Ms. Medart of having offered an idea to assist her class remotely and Ms. Medart thought it to be a good idea so she had ███████ do the same. I advised ███████ our conversation was being tape recorded. I did advise ███████ that she was a potential witness and advised her that I was contracted to investigate allegations of workplace discrimination by North Middle School Teacher Katie Medart. ███████ was advised that I was directed on behalf of District 7 her employer to answer questions truthfully which she stated she understood. ███████ said ███ came to work at North Middle School in January of 2021 transferring from ███████████████████ where she worked for two months. ███ said ███ had worked at ███████████ for two years and left for a short time to go to ███ with ███████ before returning to ███████. I asked about her duties and responsibilities since January of 2021 when ███ arrived at North Middle School.

Okay. So tell me about your duties and responsibilities since January of 2021.

███████:

So, I am a special needs instructional aid. So, I'm a little bit different than some of the aids because I work one-on-one with one particular student, he's still just online and not in person right now. And then I do work with small groups of students in life skills, study skills-like classes. So that's what I do, and some of them I go class to class with.

Bill Landis:

So do you do that with different teachers in different classes at North Middle School?

███████:

Yes, sort of. I work with some of the study skill teachers. And at first, I was mainly like in their rooms, and then I went to science with my one-on-one student, but since we've turned in person, I go to another gen-ed class, another gen-ed science class as well.

I asked about her duties specific to Ms. Medart's class.

Bill Landis:

So tell me about your duties in Katie Medart's class since January, 2021.

**GPSD 387**
**Vickers Declaration**
**Exhibit 9 Page 103 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

█████████:

Well, I worked one-on-one with one of the ████████, and I would go, because ██ online only, to class with ██ and join their classroom via ██ [inaudible 00:05:09] and help ██ one-on-one. When we returned to campus, I was just one-on-one, I never joined in and sat in class because Katie didn't allow me in her classroom, and I don't think she allowed our other aid in that class, ███████, in her room either. ██ sat somewhere else on campus [crosstalk 00:05:27] participated in class.

Bill Landis:

So I understand the acronym. So ███, you said? ████████████?

█████████:

Yeah, I'm ███████

Bill Landis:

And that stands for ████████████?

█████████:

Yes, yeah, I'm a ██████████.

Bill Landis:

And in Katie Medart's class, your responsibility is for ██████████████, but also ████████████ ████████████ as well?

█████████:

Yeah, if my student was absent that day, then I would hop in and help our other... We have another EA in that class, ████████████. And I'd hop in and help ████████ with the rest of the ██████ students who are in that class. I remember we did it remotely because even when we turned into being partially in person, Katie didn't allow us in her classroom.

I asked ████████ to tell me about what she meant by not being allowed in the classroom.

Bill Landis:

And so tell me about what do you mean by not allowing you in the classroom?

## GRANTS PASS SCHOOL DISTRICT 7

 :

I mean she didn't really give us a specific reason other than that she didn't really feel like we were needed to be in that classroom, which I don't know. I felt like it was odd considering we help sped students, so I pretty much just rolled with teaching myself stuff off of YouTube that I didn't understand because some of it's hard to grasp if we're not sitting in class.

Bill Landis:

Did you bring that to her attention, or have a discussion with her about the ability to help?

 :

Yeah, a little bit. I told her it made it a little more difficult not being there in class sometimes, to grasp some materials. But I also try not to overstep my boundaries because it's up to whether the teachers think that those kids can be okay in those classes, and whether we're a distraction or not. We haven't really worked in person with the... Well, we have worked in person with some of those students because we're [inaudible 00:07:21] classes with them. We haven't worked in person with those students since Katie's leave, now that we have the stuff in there. Me and ███████ have been in and out of that room. If I don't have a one-on-one student, I try to go down and help out.

Bill Landis:

So in January of 2021, you go to North, changing schools. And as far as Katie Medart's class, she informs you that she doesn't want you physically in the class, that she wants you to remotely assist the student.

███████ :

Yeah. When we turned to being in person, I can't even remember what month that was because it's all blurry, to be honest, with all the changes that keep happening. So when we moved to in-person, I didn't get to join everybody else in class, I still worked remotely somewhere else on campus and joined in via conference.

Bill Landis:

And you said you thought that was odd and kind of tried to ask-

**GPSD 389**
**Vickers Declaration**
**Exhibit 9 Page 105 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

:

Yeah, I thought it was odd that we weren't allowed to sit in her room with our students. It was just weird. I don't know. And I don't really have a reason behind it, it was just weird not getting to be a part of class and even if I was working with a student who wasn't in person, it would have been helpful to sit in class.

Bill Landis:

Okay. And you don't have any idea why she was asking that?

:

Not really. I just tried to respect teachers wishes like we're supposed to and I always ask how I can best assist supporting our students and working in their classrooms. And that's what she wanted me to do, so I continued to work one-on-one with my students and kept going on like we were a normal CDL and just kept doing my best.

I asked  if she had an idea of why since she thought it was odd.

Bill Landis:

Yeah. So you said you thought it was odd and then you said, and no, not really understanding, but did you have some idea or something to indicate what you thought?

:

I'm not really sure if it was just she was worried about it being a distraction or, it had to do with my student in particular because he's a tougher sped student with bigger behaviors. I don't know. She just didn't want us participating with everybody else because of that, I don't really know. I mean, I can take guesses, but I don't know that that's particularly fair, and I didn't really want to dig into why because that's what she tells me is best to support her classroom. I don't feel like I have any grounds to sit there and argue with her because I'm not the one in charge.

Bill Landis:

So when you were doing that remotely after she made the request, the ████ student you're assigned to is with you then, and not in the classroom?

## GRANTS PASS SCHOOL DISTRICT 7

████████:

Yeah, ██ is still at home, but if ███ didn't attend, it was silly for me not to be able to go into the class and help everybody else out.

I asked about her prior experience prior to COVID was in the classroom as a █████████ ██████.

Bill Landis:

Right. Okay. And you had never been at, during COVID and before you transferred in January prior to school basically being not in person, I would guess March of 2020 when COVID hit strongly and school's probably suspended in class teaching. Was it safe to say that your experience prior to that was in classroom assistance as a special ed teaching assistant?

████████:

Yeah. When COVID hit and everything like that, I was in ████████ still, and my prior experience in school was what we call normal functioning. So when I hopped in over at ██████ in November, it was everybody had some experience dealing with this already since the prior Spring, so I was new to that all because I hadn't been working at the school when COVID hit.

I asked ████████ if she had anything else she wished to add or clarify. ████████ offered that she hadn't seen Ms. Medart discriminate against ████████ but did talk about how Ms. Medart and the "I Resolve" video negatively impacted students on campus.

Bill Landis:

And you said you heard from your students about what had gone on because you're not on social media much?

████████:

Yeah, they all are very active on social media and I'm not. So I've definitely heard students talking about it all over campus and stuff like that. And got to observe some of them silently protesting it all with clothing they wore, or body paint. [inaudible 00:13:17] I did get to see how it affected and made some students uncomfortable because they are... I don't know. I don't even like to use the word... Or different from other students. They're part of that community. I don't know. I know that it did get affect our students and a lot of them found it shocking and were quite upset about it.

**GPSD 391**
**Vickers Declaration**
**Exhibit 9 Page 107 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Do you recall if what you saw and observed or heard from your students occurred while Katie was still there at the school before being suspended or placed on admin leave?

████████:

No. I didn't really hear anything till after she had been suspended. And I don't know, I think it was probably like the first week after she was gone it really started to leak all over social media and students started finding out and being like, "Hey, did you see this?" And stuff like that.

Bill Landis:

And when you say-

████████:

It was probably like a-

Bill Landis:

When you say, "Did you see this..." meaning you're referring to the video that she made with Rachel Damiano?

████████:

Mm-hmm (affirmative), yeah. A lot of students were talking about how they saw it on social media and they were asking their friends. I just heard students talking in small groups about like, "Hey, did you watch this? How do you feel about this?" Stuff like that.

Bill Landis:

Right, okay. Anything else you wish to add or clarify?

████████:

No, I think that's pretty much all I know about the situation and really all that I've observed considering I have really limited contact with her classroom, and I didn't have very much interaction with her during all of my time at north.

## GRANTS PASS SCHOOL DISTRICT 7



Having no further questions I concluded my interview with ███████ (See transcript for further details Exhibit 9).

Because Ms. Medart had stated that she had been communicating with ███████ and using his requested name ███████ in her communications, I did request District 7 email between Ms. Medart and ███████ between the beginning of the school year and the end of March 2021 from Ms. Ely. I did receive nine emails and or email conversations between she and ███████ (Exhibit 9) dated between October 6th, 2020 and April 2nd, 2021. In those emails, it is clear that Ms. Medart had used the name ███████ when communicating with ███████ as I observed in several of the emails.

**GPSD 393**
**Vickers Declaration**
**Exhibit 9 Page 109 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

### Allegation #3

**#3:** On or about March 2021, Ms. Medart created a hostile work environment for North Middle School ███████████████. After reviewing ████████ complaint (Exhibit 1B), I did meet with her to interview her regarding her complaint. On May 6th, 2021 at 10:40 AM, I did meet with ████████████ at the Grants Pass Dist. 7 offices in Grants Pass. I did advise her I was recording our conversation. Also present was ████ ███████████████████. I did advise ████████ that I had been contracted by District 7 to conduct an investigation into ████████ allegation that Ms. Medart had created a hostile work environment. I did confirm that she had been noticed by District 7 of the interview and I did direct her to answer all of my questions truthfully on behalf of District 7 which she indicated she understood. ████████ told me she had been employed with District 7 for six years. She told me she is the ███████████ at North Middle School. She also stated she is the ██████████████ on campus and the advisor for the ████████████████████████ which are both voluntary positions. I asked ████████ to tell me about her complaint.

███████████:

So all of this began mid-March, the week before spring break, March 16th. Katie had reached out to ████ asking if she could attend our meetings for the club.

Bill Landis:

And this is the LGBTQ club and ███ being ███████?

███████████:

Right.

Bill Landis:

Another advisor. And ███ told you that she had reached out to him?

███████████:

Yes. ███ told me and ███ also made Tommy aware. And ███ seemed a little concerned because ███ wasn't quite sure why she wanted to join. So ███ let me know that ███ had concerns. And so I had to deliver a note that day to a student in her class. And so I took the opportunity to speak with her about it. I asked her twice, I said, "Hey ███, let me know that you were interested in attending our meetings. And I just wanted to know why." And she told me that she wanted to get to know these students better.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

█████████ :

And that she was coming from a place of love. She also told me that her █████████ and that she still allowed him over when [inaudible 00:10:57] return home. I thought the use of "still" was awkward. So after our conversation... Do you want me to go into detail about the conversation?

Bill Landis:

Yeah, sure.

█████████ :

She asked if you had to be gay to be in the club, before I could answer the question, she said, "█████ █████████ ." And she goes, "You're not gay." Which I had never said yes or no to. So I really don't know why she thought she had the right to speak on my sexuality. And I said, "No, you don't have to be gay to be in the club, but we do need to have people who support the support group." So I asked her if she was supportive, she told me that she was not, which led me further to think, okay, what do you want? If you're not trying to come there to be supportive of these kids. So conversation concluded. I told her that I would send her the link to our next meeting. This happened on a Tuesday, our next meeting would have been the next day.

Bill Landis:

Do you remember what day, approximately?

█████████ :

March 16th.

Bill Landis:

Okay. 2021?

█████████ :

Yes. We have weekly zoom meetings every Wednesday at 9:00 AM.

Bill Landis:

And this is the club?

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

███████:

The ████████, that is our meeting time. So our next meeting would have been the next day. I told her that I would send her a zoom link to it. And then I left her class, went back to the library. That is when the principal, Tommy Blanchard approached me and said that he had been in contact with the District and District lawyers regarding club operations. And he had told me because the students in the club had never created their bylaws or any rules regarding visitors, to the club that, they would need to do that prior to her coming and sitting in. So I informed him that I had already told her that I will send her a link to it. He said, "Don't worry, I'll have a talk with her. I'll let her know that it can't be done this week." I said, "Okay." The next day, Wednesday, I had a meeting with the kids. We created-

Bill Landis:

Your kids being the club?

███████:

Right. We had our meeting, I told the kids that they need develop their rules around visitors to the club. We did that, typed it out, we sent it off to the principal. Tommy had informed me that he did speak with Katie. He did tell her that because the kids needed to create their bylaws and stuff, that she would not be able to attend the meeting on Wednesday. Apparently, she was very upset about this. She let him know that she was very upset about it.

Bill Landis:

How do you know she was upset?

███████:

He told me.

Bill Landis:

Tommy Blanchard?

███████:

Yes.

## GRANTS PASS SCHOOL DISTRICT 7

Mr. Blanchard advises ███████ to reach out to Ms. Medart in an email letting Ms. Medart know she can attend the following week.

████████:

So he said that it would be nice if I reached out to her with an email, letting her know that she could attend the next week, which would be the week we returned from spring break.

Bill Landis:

In my understanding, the bylaws that were voted on by the students in the club, was that a vote would be taken to determine if someone could come to the meeting. Is that correct?

████████:

No. They determined that they would allow visitors, but that they would prefer that the visitors were supportive. Also, they determined that they wanted to use visiting time in order to just share their stories.

Bill Landis:

Okay. So visitors would be permitted to attend?

████████:

Right.

Bill Landis:

Okay.

████████:

So we go on spring break-

Bill Landis:

Spring breaks approximately third week of March?

## GRANTS PASS SCHOOL DISTRICT 7

███████ :

Right. So then our next meeting would have been on March 31st. When we got back after our spring break, I received an email from her, I guess she sent the email on March 19th, but, I didn't actually read the email until the Sunday prior to starting back, because I don't check my emails on a break.

███████ :

And her email was, "Hi ███ , thank you for informing me that I will get to attend the next meeting. I would like to share that. I do not think the decision to exclude me this week was fair. I felt judged and screened by both you and ███ . And I asked to attend to learn about the club and hear student perspectives. I believe I was very open and accommodating to both of your questions and comments to put your concerns at rest. By the end of my conversations with each of you, you both shared, I could attend and was welcome. So you can imagine how disheartening it was. When Tommy told me I was not allowed to attend after you and ███ both advocated against it."

███████ said she felt the email from Ms. Medart was hostile.

███████ :

So when I'm reading this, Sunday night, I immediately felt that it was hostile because of this part that says I was not allowed to attend after you and ███ advocated against it. So I highlighted that part and I forwarded the email to Tommy and I told him, "I don't know how to respond to this. What does she mean?"

Bill Landis:

Because the way you explained it to me was that, Tommy Blanchard, the principal, was approached by yourself and ███ as to how to proceed with her request to attend. And he said after legal counsel that you needed to adopt student bylaws. And that's what prohibited her from attending the meeting.

███████ included the email from Ms. Medart dated March 19th (Exhibit 1B) where she writes to ███ ███ that she felt the decision to exclude her was fair. She also made a statement in the email that stated: "you can imagine how disheartening it was when Tommy told me I was not allowed to attend after you and ███ both advocated against it." Ms. Medart ends the email with the statement: "I hope you have a wonderful Spring break, Katie." Also included in ███████ complaint were several email interactions regarding the requested attendance by Ms. Medart of the ███████ club meetings. I asked

Page 112:                    **CONFIDENTIAL**              PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

████████ if she felt that Ms. Medart had assumed wrongly that ████████ and ████████ had discouraged Tommy Blanchard.

Bill Landis:

But you think then, that Ms. Medart assumed wrongly that you and/or ████████ had discouraged Tommy Blanchard?

████████ :

Yes. So I came into work Monday morning. I still felt uneasy about this email. I went to Tommy's office to just kind of talk to him about it again, especially when he let me know that she was frustrated about it. And I said, "I really don't need somebody out there thinking that I've done something to them that I haven't, are you sure this person is okay?" He said that she was probably just speaking out of anger and that it was probably nothing. So I said, "Okay." So the next day-

Bill Landis:

And what day about was this, in March?

████████ :

Yeah. So this would've been the 29th, Tuesday. No, the 30th, because Wednesday was the 31st. So, coming to school Tuesday, I go and I speak with ████████ , because whenever I'm stressed out or just need a friend to talk to, I talked to ██ .

Bill Landis:

Who is ████ den?

████████ :

He is the ████████ (unintelligible).

Bill Landis:

Okay.

**GPSD 399**
**Vickers Declaration**
**Exhibit 9 Page 115 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

▮▮▮▮▮:

So we were just talking and he informed me that another one of our colleagues was saying that I discriminated against Katie, by not allowing her into the club. And basically that this was something going around. So-

Bill Landis:

So ▮▮▮▮ tells you that another staff teacher, or other, at North Middle School, was making statements that they had heard that you had something to do with Ms. Medart not being able to attend?

▮▮▮▮▮:

Yes.

Bill Landis:

Okay. And who was that member?

▮▮▮▮▮:

▮▮▮▮▮.

Bill Landis:

And ▮▮▮▮▮ had spoken with ▮▮▮▮, saying that he had heard that you had discouraged Tommy Blanchard from allowing Ms. Medart to attend?

▮▮▮▮▮:

I don't know if the conversation went that deep but, the main statements was that I discriminated against her by not letting her in there.

I asked if that was why ▮▮▮▮ felt that things were being said.

Bill Landis:

Okay. And that's where you started to feel that things were being said?

---

Page 114:                    **CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

████████:

Right. If she's telling him that, she's probably telling other people that it's not right to spread lies about people, especially in their place of work.

████████ offered no other names of persons who may have been spoken to by Ms. Medart regarding the allegations she was spreading false information about ████████. ████████ did offer that ████████ ████████, ████████████, and ████████████ knew of Ms. Medart talking with them about "I Resolve" stuff. I clarified that ████████ was now speaking about the "I Resolve" campaign.

Bill Landis:

Okay. But that's separate from what you're feeling, as far as that she spread statements and rumors that weren't accurate about you and her ability to attend the club meeting?

████████:

Right. So, the district becomes aware of this video that her and Rachel produced and this movement. I get an email from ████████, the ████████████, she sent out email to basically all higher ups in the District. She sent it to me, because I'm the advisor of the ████████ at North. And she sent it to the ████████████ at the high school as well. Just to make us aware.

I found the email ████████ was referring to which ████████ sent out on March 30th, 2021 (Exhibit 1B). I asked ████████ if this was to make her aware of the "I Resolve" video.

Bill Landis:

To make you aware that there was a video called 'I resolve?' Okay.

████████:

And once I saw it and I saw who was in it, I then stated on this email chain with everyone that I didn't think that it was a good idea for her to attend our club. Considering that she's clearly a part of a movement that is advocating against those children.

Bill Landis:

Okay. And you stated that to who?

## GRANTS PASS SCHOOL DISTRICT 7

████████:

It's in the... Do you have that?

████████:

It's in the email exchange. [crosstalk 00:28:10].

Bill Landis:

And if that's going to be something, I'll get that?

████████:

Yeah, I'll scan it to you, for sure.

Bill Landis:

So at some point later, you express because of the 'I resolve' video, which has issues related to transgender students, that you felt not good for her to attend the club?

████████:

Right.

Bill Landis:

And this was after the decision by Tommy Blanchard?

████████:

Right.

Bill Landis:

Not to allow her, and after you had heard that she had thought you and █████ were responsible for not allowing her to attend?

████████:

Right.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay.

████████ :

And so she was still set up to attend our meeting, on Wednesday, 31st. But once all of this stuff hit and came out, Tommy had to, again, let her know that she would not be allowed to attend this meeting.

Bill Landis:

So after she was going to be allowed because of the bylaws, he then informed her of that because of the 'I resolve' video, she won't be able to attend?

████████ :

Right.

Bill Landis:

Okay. And this is the end of March?

████████ :

Yes.

Bill Landis:

Okay.

████████ :

This is March 31st.

I asked again about ████████ complaint and about Ms. Medart spreading rumors.

Bill Landis:

And I read in your complaint that spreading rumors, the rumors you heard via ████████ that ████████ had shared with him, and so that's what you know about the rumors?

## GRANTS PASS SCHOOL DISTRICT 7



███████████:

Mm-hmm (affirmative).

I asked if that is what created the hostile work environment.

Bill Landis:

And that that helps create the hostile work environment you're feeling. Is that correct?

███████████:

Right. Well, not only that, but because they've done this, it has completely divided our staff.

Bill Landis:

So I want to get to that. So, because they've done this meaning, Katie Medart and Rachel Damiano and the video 'I resolve'?

███████████:

Right.

████████ spoke of incidents she was aware of where Ms. Medart

Bill Landis:

So let me ask you, because you talk in your complaint, submitted to Tommy Blanchard, about creating factions within North Middle School, and has pitted staff against each other by encouraging staff to sign her anti LGBTQ resolution during school and working hours. How are you aware of that? Or what information do you have that that was occurring?

███████████:

She was going around to people's classrooms and talking to them about this. And-

Bill Landis:

So what's your account of that? Is that something you were told or do you have firsthand knowledge of that occurring?

**GPSD 404**
**Vickers Declaration**
**Exhibit 9 Page 120 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

████████ :

Well, obviously she didn't come to me, so it was very directed, I think at people who she felt would be supportive to this.

Bill Landis:

And how did you become aware that that was occurring if you weren't present?

████████ :

A teacher that she had approached.

Bill Landis:

And who was that?

████████ :

████████ .

Bill Landis:

And, ████████ is listed on your complaint?

Tanika Cooks:

Yes.

Bill Landis:

Okay. And so ████████ shared with you that, Katie Medart or Rachel Damiano, had approached her to support the 'I resolve' campaign is that accurate?

████████ :

Campaign, movement. But yes, ██ was very disturbed by it all and ██ really didn't know-

Bill Landis:

"She," being ████████ ?

**GPSD 405**
**Vickers Declaration**
**Exhibit 9 Page 121 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

███████ :

Yes. ████ was very disturbed by it at all. She didn't understand why or how they were able to do this. ████ understood that this was a violation of school policy.

Bill Landis:

And what part, violation of school policy are you referring to?

███████ :

The part where you're not allowed to push political agendas during work hours.

I asked ████████ if she was aware other incidents regarding the "I Resolve" movement/campaign on campus.

Bill Landis:

Are you aware if there was any other means of communication during school hours in support of 'I resolve' by Katie or Rachel Damiano, like emails or other communications or is ████ pretty much what you're aware of that you felt was happening with others?

███████ :

No one else has explicitly told me that that's what happened, but I do believe that she spoke to others.

Bill Landis:

Okay. And that's just a feeling you have.

I asked about ████████ complaint where she states she feels North Middle School is no longer a safe place to work.

Bill Landis:

So the other thing you list, is that you feel North Middle School is no longer a safe place to work. And what makes you feel that way? Or what are you referring to?

---

## GRANTS PASS SCHOOL DISTRICT 7

████████:

I'm referring to the emotional toll that this has all taken on me. I am no longer happy to be on my campus. It gives me extreme anxiety every day that I have to go work.

Bill Landis:

Is it specific to Ms. Medart or Ms. Damiano or is it specific to other things?

████████:

It is because of the division they have, and it is because those on campus, who are in support of this, and because of that they have a negative opinion of me because they support her and they believe that I actually discriminated against her.

Bill Landis:

When you say they, you're talking about those that you feel are in support of 'I resolve' and Katie and Rachel's movement?

████████:

Yes.

Bill Landis:

And is that a feeling or are there things that you articulate where that makes you feel that way?

████████:

Well, the lies being spread and it is a feeling. It's a very strong uneasy feeling.

Bill Landis:

And anything that anyone else has done or changed with you, relationship wise, that makes you feel that way?

████████:

I just try and keep my distance from everybody.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 407**
**Vickers Declaration**
**Exhibit 9 Page 123 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

I asked ▌▌▌▌ if she had anything ▌ wished to add or clarify. I wasn't sure I had all of the documentation ▌▌▌▌ was referring to and ▌▌▌▌ later emailed me the documents which I confirmed and are part of Exhibit 1B. Having no further questions I concluded my interview with ▌▌ ▌▌ (See transcript for further details Exhibit 9).

As part of my interview which I conducted on May 13th, 2021 with Ms. Medart, with parts I included in Allegations #1 and #2, I did also ask her about ▌▌▌▌ complaint in that interview. I began by summarizing ▌▌▌▌ complaint.

Bill Landis:

Okay. All right. So move on to the next formal complaint that was received by ▌▌▌▌ related to hostile work environment. ▌▌▌▌ alleges that in March of this year, you requested the ability to attend the ▌▌▌▌ meeting. Principal Blanchard was consulted, which delayed that opportunity. Two days later you sent an email to ▌▌▌▌ alleging that she and ▌▌▌▌, another advisor, had advocated against your attendance, and you voice your displeasure telling her how you felt, including that it was unfair. Does that sound about right? I'm summarizing what her complaint is.

Katie Medart:

You're summarizing what she said. Do you want me to comment if I agree with what she said or not?

Bill Landis:

Yeah, we can stop there and just say without more details, that's her summary of what she believes, sometime mid March.

Katie Medart:

Yeah. So I did try to attend. I asked ▌▌▌▌ if I could attend the ▌▌▌▌ meeting. And then... You want my recounts of why I recall?

Bill Landis:

Yeah, sure, if you want to add that. Sure.

Katie Medart:

I'll just listen. I'm sorry, I shouldn't interrupted you.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

No, that's fine. Anything you want to clarify? Because this is a summary she's stating, and I'm trying to paraphrase that. So that's why I was just adding that. We can go on, and then, if there's something you want to add that's more or you disagree with, you can add that.

Bill Landis:

Principal Blanchard received legal guidance after the request, according to her, and it was determined that the students in the club could decide their own bylaws regarding attendance. You were then invited by the students for the March 31st club meeting. Does that part sound about right, too?

Katie Medart:

No. You said the bylaws. Is that what you just read?

Bill Landis:

Yes.

Katie Medart:

Yeah. No. I actually believe it was April 7th, I saw an email about a meeting, so that is not true. And that was requesting to meet for the club to do bylaws.

Bill Landis:

Okay. At some point, though, the club did, basically, I guess, construct some bylaws and at some point, you were notified that you could attend a club meeting. Is that correct?

Katie Medart:

Okay. So yes, I tried to attend. I was denied the first time. I was given the reason that concerns were brought by █████ and ███, and that then the District Council...

Bill Landis:

And so you said that-

---

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

HR were involved, and I was told when there is no club policies, that it defaults to the vote of the members of the club. So I was not allowed to attend, and then it went to the members of the club. My name was given specifically, Mrs. Medart, would like to attend, and the students voted, with excitement, saying yes, we would like Mrs. Medart to attend. And then I tried to, I was approved to attend a second meeting, and I was told right before that I could not attend because of my work with I Resolve.

Bill Landis:

Okay. So basically, you made the request. I think there was some communications between you and ███████ about getting a Zoom invite, and then, that didn't occur, and it got referred to Principal Blanchard. I'm summarizing again. And it was delayed until the students took a vote after guidance that Principal Blanchard received. Somewhere in there you said that you felt that you were not advocated for attending by ██████████ and ████████. Is that correct?

Katie Medart:

Yeah, I believe they both discriminated against me.

I asked Ms. Medart to tell me why she believed that.

Bill Landis:

So tell me how you come to believe that.

Katie Medart:

Well, I believe you have a copy of my discrimination complaint.

Bill Landis:

Sure, but I-

Katie Medart:

Where I outline all of that and put direct quotes. And the only reason why I reference that to you is that, so I don't misrecall any of the things that I put in there.

**GPSD 410**
**Vickers Declaration**
**Exhibit 9 Page 126 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

And just to be clear, I was notified that that complaint has been withdrawn, is that correct?

Katie Medart:

That's correct.

Bill Landis:

So for this, so I can get it on the record, what I want to know is, you made a statement, I believe, and I want to make sure that I don't put words in your mouth, that you believe that ████████ and ████ ████ did not want you to attend the club meeting.

Katie Medart:

Yes.

Bill Landis:

And how do you believe or how did you come to know that that occurred?

Katie Medart:

Couple of reasons. First, they both told me I could not. And then after listening to a line of hostile and discriminatory comments, which I immediately reported to my supervisor, Tommy Blanchard. He informed me that they had already been to him and expressed concerns about me being able to attend.

Bill Landis:

Okay. And did you send an email to ████████ regarding your displeasure or fact that you felt unfair treatment for her not advocating, or for-

Katie Medart:

Would you like me to read it?

Bill Landis:

Sure.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 411**
**Vickers Declaration**
**Exhibit 9 Page 127 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I brought it in, because I saw the one that is submitted in my complaint looks like a ransom letter. Which I don't know why. I have nothing to do with that. Mine does not look like that, that I sent.

Bill Landis:

Sure.

Katie Medart:

"Hi, ▓. Thank you for informing me that I will get to attend the next meeting. I would like to share that I do not think the decision to exclude me this week was fair. I felt judged and screened by both you and ▓, as I asked it and to learn about the club and hear student perspectives. I believe I was very open and accommodating to both of your questions and comments to put your concerns at rest. By the end of my conversations with each of you, you both shared I cannot attend, or I could attend and was welcome. So you can imagine how disheartening it was when Tommy told me I was not allowed to attend after you and ▓ both advocated against it. Looking forward, I am thankful students approved of my presence. I hope you have a wonderful spring break Katie.

Bill Landis:

Okay. And so that's what you recall sending or did send to ▓ regarding that.

Katie Medart:

Yes.

Katie Medart:

And even... This is important, so I will share this. I even said good morning to her the morning of the second meeting. I saw her walking into ▓ and I said "Good morning." You will see email documentation of all this. Because I had to report her treating me hostile, because I said, "Good morning," and she ignored. I assumed she didn't hear me. So as I got closer, I said, "Good morning" again. She stopped, looked at me, rolled her eyes and walked into ▓. I just walked away. The reason why we even crossed path is because I was going to use the restroom. And then I went and reported it immediately to Tommy the interaction that had happened.

*I asked Ms. Medart about ▓ allegation regarding Ms. Medart telling other staff that ▓ and ▓ had advocated against her.*

Page 126:                    **CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So ▮▮▮▮ alleges that you then told other staff that ▮▮▮▮ and ▮▮▮▮ advocated against your attendance at the club, creating hostility felt by her from other employees. ▮▮▮▮ denies requesting that Principal Blanchard not allow you to attend, and that the decision was his. Did you have a conversation with other teachers and staff telling them ▮▮▮▮ and ▮▮▮▮ had advocated against you attending the ▮▮▮▮ meetings?

Katie Medart:

I had a conversation where I stated the facts of what happened to me.

Bill Landis:

And who did you have that conversation with?

Katie Medart:

Who?

Bill Landis:

Was it other staff-

Katie Medart:

Another teacher.

Bill Landis:

Okay, and who was that?

Katie Medart:

▮▮▮▮▮▮ .

Bill Landis:

Did you also have a conversation with ▮▮▮▮ about that?

---

**CONFIDENTIAL**                PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

No I did not.

*I asked Ms. Medart about the reason for having the conversation with another teacher and she told me that she went to talk to the teacher about "I Resolve."*

Bill Landis:

Okay. And what was the reason for having a conversation with the other teacher?

Katie Medart:

I went in to share about the ideas for I Resolve, and I think it was just, I was getting ready... I don't even know why it came up. It was on that day, though. I think it was just a normal... I don't know if he had heard something. I don't know. I don't recall why it came up to be honest.

Bill Landis:

Okay. Is there anything else you wish to add or clarify regarding this complaint?

Katie Medart:

I do not believe I have created a hostile work environment, as ████████ has claimed in her complaint. And I actually believe the opposite is true, that she has created one for me.

*Having no further questions, I concluded my conversation with Ms. Medart regarding that portion of the investigation (See transcript for further details Exhibit 9).*

**GPSD 414**
**Vickers Declaration**
**Exhibit 9 Page 130 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

## <u>Findings</u>:

Allegations in an investigation have the potential to fall into four specific categories.

- **<u>Sustained</u>:**  My investigation resulted in sufficient evidence from one or more sources to conclude the incident occurred.
- **<u>Not Sustained</u>:**  I did not have enough evidence to prove or disprove the allegation.  It does not mean that I do not believe it happened, only that I do not have enough evidence to sustain that particular complaint.
- **<u>Exonerated</u>:**  Means the activity or action did occur, but it was appropriate (per policy, or lawful, etc.) given the circumstances.
- **<u>Unfounded</u>:**  Means no evidence existed to support the claim.

**ALLEGATION #1:** In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Teacher Katie Medart was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Medart is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that *"**No employee will use district facilities, equipment or supplies in connection with political campaigning,** nor will any employee use any time during the working day for campaign purposes."* Grants Pass School District 7 policy IIBGA-AR "Electronic Communications System Acceptable Use Regulation" (Exhibit 7E) states that ***"Attempts to use the District network for Transmission of any materials regarding political campaigns is strictly prohibited."*** The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Medart and Ms. Damiano ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.

Ms. Medart by her own admission used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve campaign with colleagues, staff, and persons inside and outside of School District 7. This was supported by Exhibits provided regarding email use under Exhibit 4 which were some of the emails provided by the District 7 IT Department. While Ms. Medart did not like referring to "I Resolve" as a political campaign, her efforts both in the video regarding legislation and through the use of District 7 email and face to face contacts on campus to gain support for the "I Resolve" resolutions were determined to be political campaigning which occurred on District 7 School grounds. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and pronouns for gender identity students, and require parents be

---

**GPSD 415**
**Vickers Declaration**
**Exhibit 9 Page 131 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Medart have chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

B.  Used time during her working day for political campaign purposes. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that "*No employee will use district facilities, equipment or supplies in connection with political campaigning, **nor will any employee use any time during the working day for campaign purposes.***" As stated under Allegation 1A above, the "I Resolve" campaign was determined to be a political campaign. Time stamps on emails shown in Exhibit 4 as well as Ms. Medart's admission that she used time during her workday to communicate regarding "I Resolve" both in emails and face to face communications with other District 7 staff and persons outside of District 7. Ms. Medart stated that the time was minimal however besides email and face to face communications, she also admitted using District 7 computers to work on "I Resolve." Without a forensic computer analysis there is no way to quantify the actual time. The policy does not require a certain amount of time in order to violate it, it states: "nor will any employee use any time during the working day for campaign purposes" which did occur on more than one occasion. Had Ms. Medart not utilized time during her workday for the "I Resolve" campaign this would not have been a violation.

C.  Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that "***On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.***" As stated under Allegation 1A, the "I Resolve" campaign was determined to be a political campaign. In the "I Resolve" video, Ms. Medart identifies herself by stating: "***My name is Katie. And my experience with youth is that I have been teaching for the last 10 years. I am currently teaching at a middle school in Southern Oregon, and prior to that for eight years, I was a science instructor for college and then some high school science teaching experience as well. I've been a coach, multiple sports. And then probably my greatest honor of working with youth is that I have two of my own sons.***"

Ms. Medart doesn't introduce herself as a private citizen but rather a Southern Oregon Middle School Teacher giving her first name. While she did not say Grants Pass District 7, She at no time in the video states that the views expressed are that of her own and not of District 7 or any similar type of statement. Ms. Damiano identified herself similarly by saying: ***Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in... as a coach as well.*** A simple internet search using "Rachel southern Oregon middle school assistant principal" finds an article identifying Rachel Damiano and her full name, North Middle School, District 7, when she was hired in August of 2020. https://spotonoregon.com/southern-oregon/517035/gp-district-7-welcomes-damiano-as-new-vice.html. This would have then also led someone to easily determine Ms. Medart's identity again since she identified herself by her title. Additionally, Ms. Medart used District 7 email for communications for "I Resolve" to persons inside of District 7 and outside identifying herself as

**GPSD 416**
**Vickers Declaration**
**Exhibit 9 Page 132 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

associated with School District 7 with no disclaimer. The media coverage (Exhibits 5A-5E) shows how District 7 was intertwined with Ms. Medart and the "I Resolve" campaign. There media coverage had no statements by Ms. Medart or Ms. Damiano that made it clear that the "I Resolve" campaign was not affiliated with District 7.

Ms. Medart did tell me in my interview with her on May 13th, 2021 that there was a disclaimer on the video associated with YouTube. I did find a disclaimer if a viewer used a drop-down box prior to playing the video. This however was not initially with the video as she admitted in her interview with Dan Huber-Kantola on April 6th, 2021 when she told him that it had been added later and the video itself has nothing a viewer would know isn't just Ms. Medart's view. In the opening statements of the video, Ms. Medart can be heard saying: "I Resolve" and "We Resolve." The fact that there is no differentiation of whether the views or resolution expressed is only hers can be complicated by the word "We" and who else she is referring to. Ms. Medart's story of one of her students coming forward within a few days of the "I Resolve" video being published to ask about the video and wondering if she was homophobic also showed how "I Resolve" was associated with her position as a District 7 teacher. The amount of email complaints, complaints form District 7 employees, and publicity associated shorty after the video and website were published to social media and the internet was representative of how controversial the "I Resolve" proposals and campaign were based upon the responses of many. Had Ms. Medart been clear that the expressed views in the "I Resolve" video and campaign were not those of District 7 then this would not have been a violation of District 7 policy.

D.  Used social media and public websites in such a manner that it disrupted the school environment.
    **"SUSTAINED"** – Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 7C) states that ***"Staff members, while on duty and off duty, will treat fellow employees, students and the public with respect while posting on social media websites, etc., in order to prevent substantial disruption in school."*** It is clear from the complaints received that the "I Resolve" video posted on YouTube and Facebook, and "I Resolve website created a substantial disruption in school which included student protests, staff complaints, citizen complaints, division among the staff, and was interpreted by some who would be affected by the "I Resolve" resolution as disrespectful.

E.  Posted confidential information about a student on social media and a public website. **"SUSTAINED"**-
    Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 7C) states that ***"Staff members, while on duty and off duty, will utilize social media websites, public websites, and blogs: in a professional manner by not posting confidential information about students, staff or district business."*** In the "I Resolve" video which was posted on social media and a public website, Ms. Medart disclosed an incident which occurred approximately one year prior within a month of returning to teaching at the K-12 level, she was presented with a ██████████████ ███████████████████████████████████████████████████████████████████ ▮ stated he absolutely knew who Ms. Medart was speaking of and disclosed the name of the student to me and circumstances regarding details. His information matched Ms. Medart's disclosure in the "I Resolve" video where the ████████████████████████████████████████████████████ This was corroborated by Principal Tommy Blanchard regarding the student ███████████████████████████████. Ms. Medart in my

## GRANTS PASS SCHOOL DISTRICT 7

interview recanted the story as truthful and gave unclear responses to my questions stating that in looking back it was hypothetical although she seemed to indicate she believed the story as well. It is clear that a North Middle School student did exactly what Ms. Medart said occurred regarding gender identity transformation to numerous staff members at the school at the approximate time that Ms. Medart said it had occurred. That student or others viewing the "I Resolve" video as did happen with ██████ ██████ would have identified the specific student who Ms. Medart spoke of even if she now claimed it was hypothetical.

F.    Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation." **"NOT SUSTAINED"** – Grants Pass School District 7 policy "ACB" (Exhibit 7B) states that ***"Bias Incident" means a person's hostile expression of animus toward another person or group of person's, relating to the other person's or group's distinguished, or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability or national origin"*** It is not clear if Ms. Medart's "I Resolve" campaign was "a hostile expression of animus toward those who use a different gender identity. The "I Resolve" campaign is an attempt to change legislation and policies affecting gender identity. Individuals may perceive her actions as biased which is understandable. However, it is not clear based upon the language of the listed policy that her actions constituted a "bias incident" as there weren't enough facts to positively conclude if the allegation was unfounded or in fact was sustained and did occur.

**Allegation #2**: Between October 2020 and March 2021, Katie Medart discriminated against ██████ ███████████████████████ who is transgender **"NOT SUSTAINED"** – Grants Pass School District 7 policy "ACB" Nondiscrimination (Exhibit 7A) states that the district prohibits discrimination and harassment on any basis protected by law, including sexual orientation which the policy defines as including an individual's actual or perceived gender identity, appearance, expression or behavior differs from that traditionally associated with the individual's sex at birth. ██████ alleges that █ was discriminated against by Ms. Medart when she refused to use █ new name and asked █ not to use █ name with her class, had █ work remotely rather than in her class as a SPED assistant making it difficult to do █ job, and removed his status in the school network as a SPED assistant which reduced his ability to access information to help students. The emails I located where he and Ms. Medart communicated between October 2020 and April 2021 (Exhibit 9) show that she did call him ██████ in several of those emails making it difficult to prove that she didn't want him using that name.

Ms. Medart had another teaching assistant ███████████) who also was also working remotely. Ms. Medart told me that it was ████████ idea to work remotely which she thought was a good idea. When I interviewed ███████, she stated that was not correct and thought it was odd Ms. Medart did not want her assisting students in her classroom. Although ████████ thought this was discriminatory, I was unable to determine if it was due to █ being transgender since ████████ also was asked to work remotely. ██████ belief that Ms. Medart had █ status changed regarding the school network was not substantiated as █ was able to have Mr. Blanchard change his status back and Ms. Medart denied she had changed █ status. Ms. Medart's involvement in the "I Resolve" campaign which proposed changes to legislation and

**GPSD 418**
**Vickers Declaration**
**Exhibit 9 Page 134 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

policies although offensive to him and others, were not discriminatory as there were no defined discriminatory conduct identified as described by District 7 policy.

**Allegation #3**: On or about March 2021, Ms. Medart created a hostile work environment for North Middle School ███████████████. **"UNFOUNDED"** – ██████ alleged that Ms. Medarts created a hostile work environment when she spread rumors that ██████ and another teacher had discouraged Principal Tommy Blanchard from allowing Ms. Medarts to attend the student ████████ meeting on campus. ████████ stated that she knew Ms. Medarts told another teacher that and believed she had told others. ████████ said █ felt that others may have thought █ had done as Ms. Medart claimed and had something to do with her not being able to attend the ████████ meetings. When I interviewed Ms. Medart, she admitted telling a teacher who was a friend in frustration however she said she had received information from Tommy Blanchard that ████████ and another teacher had suggested she not be able to attend. ████████ could offer no further information or actions related to her feelings of the hostile work environment although █ did state she felt the "I Resolve" campaign had made the school campus divisive as a result. Having no other facts to include I was unable to substantiate ████████ allegation.

In reviewing Ms. Medart's job classification (Exhibit 7F), based upon the facts including conduct, I find she failed to meet the standards in her job description in the overview, her essential responsibilities, and qualifications which included:

- **Performs instruction and related duties in accordance with District Policies and terms of the teacher contract**
- **The ability to effectively work and communicate with students, parents, and school personnel from diverse cultures and/or backgrounds**
- **The ability to work harmoniously with others**
- **Maintain the integrity of confidential information relating to students, staff, and district patrons**
- **Cultivate and model a respectful working and learning environment**
- **Model personal behaviors of honesty, fairness, courtesy and consideration**
- **Maintain a cooperative relationship with administration, staff, students and parents**
- **Demonstrate competency in equity, diversity, and inclusion**

<u>**Commentary:**</u> - The allegations were investigated and based upon the facts received, District 7 policies and Ms. Medart's job description were used to determine if any violations occurred.

---

# GRANTS PASS SCHOOL DISTRICT 7

**END of REPORT**

Pacific Consulting and Investigations
PO Box 3506 Ashland, Or. 97520
**Tel** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com

**GPSD 420**
**Vickers Declaration**
**Exhibit 9 Page 136 of 136**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION

RACHEL G. DAMIANO and KATIE S. MEDART

      Plaintiffs,

vs.                         Civil No. 1:21-cv-00859-CL

GRANTS PASS SCHOOL DISTRICT 7,
an Oregon public body, et al.,

      Defendants.
_____



DEPOSITION OF

BRIAN DELAGRANGE

TAKEN ON
WEDNESDAY, JUNE 8, 2022
2:03 P.M.

GRANTS PASS SCHOOL DISTRICT
725 NORTHEAST DEAN DRIVE
GRANTS PASS, OREGON

Brian De La Grange    June 8, 2022    NDT Assgn # 57964                    Page 2

---

**2**

1                    APPEARANCES
2
3  Appearing on behalf of the Plaintiffs:
4  RAY D. HACKE, ESQUIRE
5  Pacific Justice Institute
6  1850 45th Avenue, Suite 33
7  Salem, Oregon  97305
8  (503) 917-4409
9  rhacke@pji.org
10
11  Appearing on behalf of the Defendants:
12  KAREN M. VICKERS, ESQUIRE
13  Vickers Plass LLC
14  5200 Southwest Meadows Road
15  Lake Oswego, Oregon  97035
16  (503) 726-5975
17  kvickers@vickersplass.com
18
19
20
21
22
23
24
25

---

**4**

1                    EXHIBITS
2  Exhibit                          Page
3
4  A    STAFF INVOLVEMENT IN DECISION      22
5        MAKING
6
7  B    NONDISCRIMINATION                23
8
9  C    STAFF PARTICIPATION IN           31
10       POLITICAL ACTIVITES
11
12  D    GRANTS PASS SCHOOL DISTRICT 7    32
13
14  E    I RESOLVE EDUCATORS FOR POLICY   37
15        VIOLATION
16
17
18
19
20
21
22
23
24
25

---

**3**

1                    INDEX
2                          Page
3
4  EXAMINATION BY MR. HACKE          6
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**5**

1                DEPOSITION OF
2                BRIAN DELAGRANGE
3                    TAKEN ON
4            WEDNESDAY, JUNE 8, 2022
5                  2:03 P.M.
6
7        THE VIDEOGRAPHER:  We are on the Record.
8  The time is 2:03.  The date is June 8, 2022.  This
9  is the beginning of the deposition of Brian
10  Delagrange Case caption is Damiano versus Grants
11  Pass School District.  Will counsel introduce
12  yourselves and state whom you represent?
13        MR. HACKE:  My name is Ray Hacke.  I
14  represent -- I'm with the Pacific Justice
15  Institute's Oregon office.  I represent the
16  plaintiffs, Katie Medart and Rachel Damiano.
17        MS. VICKERS:  Karen Vickers for the
18  defendants.
19        THE VIDEOGRAPHER:  Court reporter will now
20  swear in the witness.
21        THE REPORTER:  Would you raise your right
22  hand?  Under penalty of perjury, do you solemnly
23  swear or affirm that the testimony you are about to
24  give in this matter will be the truth, the whole
25  truth, and nothing but the truth?

---

**NAEGELI**
DEPOSITION AND TRIAL

**(800)528-3335**
NAEGELIUSA.COM

Brian De La Grange   June 8, 2022   NDT Assgn # 57964   Page 13

---

**46**

1 plaintiffs, to the best of your recollection, Ms.
2 Sager and Ms. Medart returned to work the following
3 Monday, right?
4    A. I am unaware of those details.
5    Q. So if -- if the reinstatement hearing took
6 place on November 9, the following Monday would be
7 November 15; does that sound right?
8    A. Sure.
9    Q. Okay. And that afternoon, a walkout took
10 place to protest their return, correct?
11    A. There was a walkout. I don't know what
12 the date on that was.
13    Q. Okay. Who organized the walkout?
14    A. It was student organized.
15    Q. Was your daughter among the participants
16 in the walkout?
17    A. She was not.
18    Q. Okay. How about you, were you a
19 participant in the walkout at Grants Pass High
20 School that opposed the plaintiffs' reinstatement?
21    A. I was not.
22    MR. HACKE: What was the -- so -- all
23 right. I guess that's all the questions that I
24 have.
25    THE WITNESS: Okay.

---

**47**

1    THE VIDEOGRAPHER: Counselor, any
2 questions?
3    MS. VICKERS: I have no questions.
4    THE VIDEOGRAPHER: Okay. This marks the
5 end of the deposition of Brian DeLaGrange. Court
6 reporter will now take orders for transcripts.
7    THE REPORTER: Mr. Hacke, do you wish to
8 order the original transcript.
9    MR. HACKE: I do.
10    THE REPORTER: Thank you.
11    MS. VICKERS: And I will have a copy,
12 please.
13    THE REPORTER: Thank you.
14    THE VIDEOGRAPHER: Counselor is receiving
15 a DVD or video. Would you like to order a video?
16    MS. VICKERS: I would not like to order a
17 video at this time, but thank you.
18    THE VIDEOGRAPHER: Thank you, Counselor
19 Vickers. The time is 2:52, and we are off the
20 Record.
21    (WHEREUPON, the deposition of BRIAN
22 DELAGRANGE was concluded at 2:52 p.m.)
23
24
25

---

**48**

1    CERTIFICATE
2
3
4    I, the undersigned, Steve Brown, am a videographer
5 on behalf of NAEGELI Deposition & Trial. I do hereby
6 certify that I have accurately made the video recording
7 of the deposition of Brian DeLaGrange, in the above
8 captioned matter on the 8th day of June, 2022, taken at
9 the location of 725 NE Dean Dr., Grants Pass, OR 97256.
10
11    No alterations, additions, or deletions were made
12 thereto.
13
14    I further certify that I am not related to any of
15 these parties in the matter and I have no financial
16 interest in the outcome of this matter.
17
18
19
20 /S/ Steve Brown
21
22
23
24
25

---

**49**

1    CERTIFICATE
2
3    I, Lee Anne McAdam, do hereby certify that I
4 reported all proceedings adduced in the foregoing
5 matter and that the foregoing transcript pages
6 constitutes a full, true and accurate record of said
7 proceedings to the best of my ability.
8
9    I further certify that I am neither related
10 to counsel or any party to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13    IN WITNESS HEREOF, I have hereunto set my hand this
14 28th day of June, 2022.
15
16
17
18
19 /S/ Lee Anne McAdam
20
21
22
23
24
25

---

**NAEGELI**
DEPOSITION AND TRIAL

**(800)528-3335**
NAEGELIUSA.COM

# EXHIBIT M-19

Social Media Timeline and Proposed Plan
I Resolve

Leading up to receiving the confirmation of the revised GBG board policy, we were posting daily for 2 weeks (Monday-Saturdays) with general facts and scenarios related to the resolution. The timeline and plan moving forward is below. All posts referenced are on the Instagram account and can be viewed in this folder.

- 4/8/2021
  - New Instagram created (iresolve_movement)
  - "We are" Summary video posted
- 4/9/2021
  - Let Us Be Clear video posted
- 4/15/2021
  - KAJO radio spot promo posted
- 4/20/2021- Daily post campaign started
  - KAJO radio spot link posted
  - Scenario #1 posted
- 4/21/2021
  - Scenario #2 a&b posted
- 4/22/2021
  - Scenario #3 posted
- 4/23/2021
  - Scenario #4 posted
- 4/24/2021
  - Scenario #5 posted
- Sunday -  no social media post
- 4/26/2021
  - Fact #1 posted
- 4/27/2021
  - Fact #2 posted
  - I Resolve Movement video converted to IGTV video and reposted
  - *GPSD Board Meeting- Revisions to GBG discussed*
    - *Revisions to GBG passed*
    - *We were not able to attend the meeting and therefore did not know the revisions had passed (or the specific verbiage of the revisions) until we received the Zoom link on Thursday.*
- 4/28/2021
  - Fact #3 posted
- 4/29/2021
  - Fact #4 posted at approximately 9AM
  - *9:40AM- Email from Tonya Doane with Zoom recording of board meeting*
    - *We did not post after receiving this recording because we now had confirmation of the verbiage passed by the board.*

1

- 4/30/2021- **No Post**
  - Plan to post Fact #5 regarding frontal lobe development
  - *9:19AM- <u>Email from Tonya Doane</u> (Clerk to the Office of the Superintendent) with <u>revised board policy</u> (GBG)*
- 5/1/2021- **No Post**
  - Plan to post Fact #5 regarding parental involvement
- 5/3/2021
  - *Revised School Board policy GBG posted on Oregon School Board Association website- <u>Email sent to ADF with confirmation</u>*
    - *In order for a board policy to be an official policy, it must be approved and posted by OSBA.*
- *Week of 5/3/2021-5/8/2021*
  - *Tentative plan was set for daily posts regarding recent Keira Bell ruling in Great Britain as well as facts from recent Great Britain study on effects in adults from affirmation as a youth.*
- 5/5/2021
  - *<u>Email from Kirk Kolb</u> to D7 staff with the revised policy as well as explanation that the policy now allows BLM posters to be posted in classrooms*
- 5/7/2021
  - Post promoting I Resolve logo T-Shirts from third party vendor

In addition to the plan for 5/3/2021-5/8/2021 outlined above, we had also planned to:
- Continue with weekly social media campaigns outlining facts, scenarios, new legislation, changes in legislation, etc.
- Record more than one additional video explaining any new legislation, changes in policies, etc.
- Respond to social media private messages, etc. regarding questions about the resolutions, next steps, etc.
- Add a "Contact Us" section to the website for community members to reach out to us regarding the resolutions, clarifications, and next steps.

# EXHIBIT M-22



1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF OREGON

3       MEDFORD DIVISION

4

5 RACHEL G. DAMIANO and KATIE S. )
  MEDART,          )

6              )
         Plaintiffs, ) No. 1:21-cv-00859-CL

7              )

8      vs.    ) November 30, 2022
              )

9 GRANTS PASS SCHOOL DISTRICT   ) Portland, Oregon
  NO. 7, KIRK T. KOLB, THOMAS   )

10 BLANCHARD, SCOTT NELSON, et  )
  al,,           )

11             )
       Defendants. )

12

13

14  TRANSCRIPT OF PROCEEDINGS FROM ELECTRONIC RECORDING

15      (Motion Hearing by Phone)

16

17    BEFORE THE HONORABLE MARK D. CLARKE

18   UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

19

20

21

22

23 Transcribed By:    Ryan White, RMR, CRR, CSR/CCR
           United States District Courthouse

24          1000 SW 3rd Avenue, Room 301
           Portland, Oregon 97204

25          (503) 326-8184

```
 1                          APPEARANCES

 2

 3   For the Plaintiffs:      PACIFIC JUSTICE INSTITUTE
                              By:  RAY D. HACKE
 4                            rhacke@pji.org
                              317 Court Street NE, Suite 202
 5                            Salem, Oregon 97301
                              (503) 917-4409
 6

 7   For the Defendants:      VICKERS PLASS LLC
                              By:  KAREN M. VICKERS
 8                            kvickers@vickersplass.com
                              5200 SW Meadow Road, Suite 150
 9                            Lake Oswego, Oregon 97035
                              (503) 726-5985
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (November 30, 2022; 2:06 p.m.)

2

3                  P R O C E E D I N G S

4

5          THE CLERK:  United States District Court is now in

6    session.  The Honorable Mark D. Clarke presiding.

7          The case on the calendar is Damiano v. Grants Pass

8    School District, et al, case number 1:21-cv-00859-CL.

9          Ray Hacke is here on behalf of plaintiffs.  Karen

10   Vickers on behalf of defendants.

11         THE COURT:  Good afternoon to everyone.

12         MS. VICKERS:  Good afternoon, Your Honor.

13         THE COURT:  So we have been studying all the papers

14   that you've filed, but look forward to your comments and

15   arguments, starting with Ms. Vickers.

16         MS. VICKERS:  Thank you, Your Honor.

17         This is defendants' motion for summary judgment, and I

18   just have a few comments -- I think the briefing is pretty

19   comprehensive -- and I'd also be happy to try and answer any

20   questions.

21         I just want to talk a little bit about the background

22   of this case.

23         First of all, the Grants Pass School District put

24   forth an administrative memorandum in February of 2021, which is

25   at page 41 of Exhibit 1 to my declaration, and that memorandum,

1   the subject matter was gender identity, transgender name and

2   pronoun guidance, and it dealt with both issues.

3          The plaintiffs in this case, Rachel Damiano, who is

4   now known as Rachel Sager, and Katie Medart were both employees

5   at North Middle School in the Grants Pass school district.

6   Ms. Sager was a probationary vice principal and Ms. Medart was a

7   probationary teacher.

8          They didn't agree with the guidance and they worked on

9   a resolution called I Resolve and they developed this resolution

10  using both work time and their work email, and in late March,

11  they posted to YouTube a video, that it talked about the

12  resolution, and they put it on other social media platforms as

13  well, and essentially the resolution talked about how students

14  should use the restroom of their biological sex, is basically

15  what they were saying.

16         And this particular social media -- putting this on

17  YouTube, et cetera, caused (break in audio) to come forth to the

18  school district from patrons to these other employees.  And so

19  Ms. Sager and Ms. Medart were placed on paid administrative

20  leave and the district hired an outside investigator, former

21  Grants Pass Police Chief Bill Landis, to look into the

22  situation, and Mr. Landis did a complete investigation, and his

23  reports are at Exhibit 8 and Exhibit 9 to my declaration, and he

24  confirmed that there were policy violations.

25         So pursuant to the district's process, Sherry Ely, who

1  was the district's chief financial officer at the time, reviewed

2  the report and then offered to meet with the plaintiffs so that

3  they could explain their side of the situation to Ms. Ely.  They

4  refused to meet with Ms. Ely, and so based on the information

5  that she had, Ms. Ely recommended to Former Superintendent Kirk

6  Kolb that the plaintiffs be terminated from employment.

7       Former Superintendent Kolb also reviewed Ms. Ely's

8  recommendation and he offered to meet with the plaintiffs, and,

9  again, they refused the opportunity to meet.  So Mr. Kolb

10 recommended the plaintiffs' dismissal to the school board.  And

11 as probationary employees, the plaintiffs could be terminated

12 for any cause deemed in good faith sufficient by the board under

13 ORS 342.835.

14      The plaintiffs requested that they have a public

15 hearing before the board.  They could have had hearings in

16 executive session, but they wanted to have public hearings.  So

17 the board had public hearings in July 2021 and voted 4-3 to

18 uphold the recommendation for termination.

19      After some other event, the board, in November 2021,

20 voted 4-3 to reinstate the plaintiffs to the school district.

21 So they were again employed.  And Ms. Sager left the district in

22 June of 2022 for a different job, and I believe Ms. Medart

23 remains employed.

24      The plaintiffs bring claims against the board members

25 who voted against their reinstatement.  All of the other board

1   members have been dismissed.  So only those who voted against

2   their reinstatement were Scott Nelson, Debbie Brownell, and

3   Brian De La Grange, are the board members still in this lawsuit.

4        The board is not an entity separate from the district

5   and these board members have legislative immunity for any

6   policies which were adopted, and under the *Doe v. Claiborne* case

7   and other cases, they cannot be sued simply for their action of

8   voting.  Being one member of a board that votes is not enough to

9   be a defendant in a claim for a constitutional violation.  They

10  took no other action against the plaintiffs.  So the board

11  members should be dismissed from this case.

12       Additionally, plaintiffs bring claims against the

13  school district itself, and they also sue the North Middle

14  School Principal Tommy Blanchard, and the former CFO, Sherry

15  Ely, and former superintendent Kirk Kolb.  And basically what

16  their claims are for, are for First Amendment retaliation and

17  then an equal protection claim under Section 1983.  They also

18  bring some state law claims and a Title VII claim.

19       With regard to the Section 1983 claim, if there's no

20  constitutional violations, those claims go away, and our

21  position is that the Section 1983 claims -- there is no evidence

22  of a constitutional violation.

23       As the Court knows, in a First Amendment retaliation

24  claim, the five-part test is outlined in the *Eng v. Cooley* case,

25  and element number 4 is whether the district had adequate

1    justification for treating plaintiffs differently from other

2    members of the general public, and this is the test that is

3    generally known as the *Pickering* balancing test.

4          And we've talked about this test at length in our

5    motion at pages 10 through 12, and then our reply at pages 6

6    through 8, and we believe that there is sufficient evidence in

7    the record to support the district's decision under *Pickering* to

8    recommend the termination and terminate the plaintiffs, and that

9    evidence is found at Kolb's depo, which is Exhibit 5; Ely's

10   depo, which is Exhibit 6; Tanika Cooks' depo, which is

11   Exhibit 7; and the Landis reports, which are Exhibits 8 and 9.

12         Essentially, this video which plaintiffs made and used

13   work time and work email to make, in part, and then posted on

14   social media caused complaints, caused student protests, caused

15   staff people to become upset with each other, and the disruption

16   or anticipated disruption was sufficient to support the

17   district's decision and it was not a First Amendment violation

18   by the district.

19         Separately, with regard to the equal protection claim,

20   as best I can understand, the plaintiffs are claiming that they

21   are being subject to an equal protection violation because they

22   were treated differently from other people on the basis of

23   speech.  They're not claiming they were treated differently

24   because of a protected class, and under the *Engquist* case, being

25   treated differently on the basis of your speech is basically a

1  class-of-one equal protection theory, which is not allowed.  So

2  the district and all of the defendants should be entitled to

3  summary judgment on that claim as well.

4       So if there's no constitutional violations, the 1983

5  claims go away.

6       If the Court does find that there's a constitutional

7  violation, we would ask that the Court still grant summary

8  judgment for the individual defendants.

9       With regard to North Middle School Principal Tommy

10 Blanchard, he simply has no personal involvement sufficient to

11 support a claim, a constitutional claim against him, so he

12 should be out of the case on that basis.

13       Additionally, with regard to Defendants Kolb, Ely, and

14 Blanchard, they're all entitled to qualified immunity.  There is

15 no case, you know, substantially similar to this case such that

16 they would have known they were somehow violating the

17 plaintiffs' constitutional rights, especially in light of the

18 fact that they were relying on investigations conducted by a

19 respected law enforcement official who found violations, and

20 that's what they relied upon in moving forward.

21       So therefore, we would ask that the Court grant

22 summary judgment for the individual defendants, even if the

23 constitutional claims are allowed to go forward.

24       With regard to the Title VII claim, again, the action

25 was for legitimate nondiscriminatory reasons, and there are no

1  comparators to support plaintiffs' Title VII claim, so the

2  district should be entitled to summary judgment on that claim.

3  Only the district can be a defendant on the Title VII claim.

4       And with regard to the Oregon constitutional claims,

5  it's well established that, under *Hunter v. City of Eugene*, you

6  cannot get damages for a claim under the Oregon constitution,

7  and so, therefore, we would ask the Court to grant summary

8  judgment on those claims as well.  We've also made some other

9  arguments in our briefing with regard to the Oregon

10 constitutional claims.

11      So essentially, Your Honor, those are our comments in

12 a nutshell, and if there's any questions, I would be happy to

13 try and answer them.

14      Thank you for your time.

15      THE COURT:  I appreciate it.  So I -- yeah, I

16 understand your position pretty well.  I think you did a nice

17 job of summarizing.

18      Let me -- I just have a couple issues I wanted to talk

19 to you about.  And I'm -- you know, I'm familiar with the

20 *Pickering* test.  I understand it.

21      And what -- if I -- if I boil it down, the school

22 district's position is that, you know -- you know, we had the

23 right to take action, not -- not to terminate anybody because of

24 the contents of their views, but -- and certainly these -- I

25 assume the district would say these plaintiffs could certainly

1   have went to school administrators and provided their thoughts

2   and response to these policies that were being developed.

3           But what I understand the district's position was is,

4   well, once -- once the plaintiffs did the -- you know, social

5   media post and then there was a community sort-of

6   uprising -- teachers, students -- the disruption to the

7   educational system, that that's what ultimately led to the

8   district doing what they did, not -- not the contents of their

9   views, and you point in part to the fact that there's, you know,

10  an independent -- and independent investigator was hired here

11  which mitigates against this idea that it was a content-based

12  decision.

13          But I think Mr. Hacke, in parts in his papers, and I

14  assume he will today, will say that there's factual disputes

15  here.  If you take all the facts in the light most favorable to

16  the two plaintiffs here, I think he's going to say that is

17  there -- there's a factual dispute as to whether or not, in

18  fact, the district did terminate these two plaintiffs because

19  they disagreed with their -- with their viewpoints, that -- that

20  any -- any disruption wasn't caused by these plaintiffs, but was

21  caused by the school district.  I mean, some version of that I'm

22  going to hear.

23          So I guess what I'd like to hear your thoughts about

24  is, again, looking at this in every way possible to the

25  plaintiffs and inferences in their favor, is there some factual

1    dispute here as to whether they were terminated because of the

2    disruption of the educational system there versus just the

3    content of their speech, that the school officials and school

4    board members, by a majority, didn't agree with.

5         MS. VICKERS:  Right.  Well, I think that the evidence

6    in the record -- okay.  If you look at -- I'll just -- let's

7    see -- Kolb's deposition, and it's pages -- Exhibit 5, pages 6

8    and 7, talks about how he started to get complaints.

9         The difficulty is that they're getting -- the district

10   is getting complaints because of the video that plaintiffs

11   posted, and so the complaints are causing disruption in the

12   district, again -- and it's page 6 and 7 of the Ely deposition,

13   and it's page 3 of the Cooks deposition talking about how

14   people, you know, can't stand each other because of what

15   happened here.  So it was the disruption itself that was the

16   problem.

17        And, you know, you could talk about anything.  The

18   disruption that it's causing is the reason the school district

19   has to take action.  If it had never caused any disruption, the

20   district wouldn't necessarily have had to take any action.

21        But they can't just ignore when people are complaining

22   and kids are protesting and staff don't want to talk to each

23   other.  That's the issue and that's why *Pickering* exists,

24   because you can have protected speech, but if that speech in

25   your government workplace causes so much disruption or is likely

1   to cause disruption, then the weight is on the side of the

2   government employer to take action, and that's what happened

3   here.  Because sometimes there's speech and there's no

4   disruption, so nothing happens.

5         So it's not the speech itself.  It's the disruption

6   that was occurring because of the speech.  And so then that's

7   why Landis gets involved.  Once that happens, they put them on

8   paid administrative leave, which is fine.  That's not any sort

9   of violation.  That's just standard employment procedure.  And

10  once Landis gets involved and looks at everything, then he

11  finds, you know, policy violations.

12        So I think *Pickering* does weigh in for the district.

13  I don't know what else they would have done.  And I think that's

14  why *Pickering* is decided the way it is, so that you don't have

15  employees who are posting what is essentially protected speech,

16  but it's causing so much disruption in your workplace that you

17  can't operate sufficiently.

18        And the fact that kids were still being educated,

19  well, I think that's a pretty low bar.  And plaintiffs' counsel

20  wants to argue, since kids could still go to school and be

21  educated, this wasn't sufficient disruption, and I don't think

22  that's what *Pickering* -- that would be my position.

23        THE COURT:  All right.  Thank you.  I appreciate your

24  answer.  Thank you.

25        Mr. Hacke, welcome to you.  Go right ahead.

1          MR. HACKE:  All right.  Thank you, Your Honor.

2          As you know, under Federal Rule of Civil Procedure

3    56(a), summary judgment is only proper if the movant proves two

4    things:  First is that there's no dispute as to any material

5    fact.  This is an absolute.  If there is a dispute of even a

6    single material fact, summary judgment is not appropriate.

7          This is especially true when viewing the facts in the

8    light most favorable to the nonmoving party, as this Court must,

9    and the plaintiffs are the nonmoving parties here.

10         As indicated in both our opposition brief and the

11   multiple exhibits we provided in support of that brief, there

12   are multiple material facts that are in dispute here.  I

13   identified at least ten in our brief.  But if you break some of

14   them down, there are actually more.  And because there are

15   multiple material facts in dispute, summary judgment is

16   inappropriate here and I ask that you deny the motion for

17   summary judgment accordingly.

18         The second thing the defendants must prove is that

19   they are entitled to judgment as a matter of law, and the

20   overwhelming body of case law supports the plaintiffs' right to

21   speak on areas of public concern.  That body of case law

22   includes *Pickering*, which declares that "Educators' right to

23   speak on matters of public concern must be balanced against

24   school interests and promoting the efficiency of the public

25   services it performs."

1    In *Pickering,* the Supreme Court noted that teachers

2    are, as a class, the members of the community most likely to

3    have informed and (indiscernible) opinions on how proposed

4    public policies will impact public schools, you know, in the

5    work the teachers do in the classroom or the students' ability

6    to learn.

7        That's all the plaintiffs did here by their I Resolve

8    video, provided an informed opinion concerning gender identity

9    policy.  And of course, the Supreme Court, "It is essential that

10   teachers be able to speak up freely on such questions without

11   fear of retaliatory dismissal."  Because the Grants Pass School

12   District penalized the plaintiffs for speaking out freely, the

13   defendants are dead wrong that no constitutional violation

14   occurred here.

15       Furthermore, in *Tinker v. Des Moines Independent*

16   *Community School District*, in the late 1960s, through *Kennedy v.*

17   *Bremerton School District* earlier this year, the Supreme Court

18   has consistently made clear that to justify prohibition of a

19   particular expression of opinion, a school district must be able

20   to show that its action was caused by something more than the

21   mere desire to avoid the discomfort and unpleasantness that

22   always accompanies an unpopular viewpoint.  That's really what

23   this case is about here.

24       Katie Medart and Rachel Sager's I Resolve video

25   expressed viewpoints that angered a small number of their

1    colleagues who held opposing viewpoints.  There were only five

2    complaints initially and -- before, you know, Kirk Kolb, the

3    former superintendent of the district, basically went out and

4    asked the community to submit more.

5         District policy expressly allowed the plaintiffs to

6    take a stance on either side of a particular issue at the time

7    the plaintiffs published their I Resolve video.  But because the

8    plaintiffs took a stand on a highly controversial topic

9    that -- and there's -- and some people found their stance

10    offensive -- and, again, it was a relatively small number -- the

11    district effectively revoked that privilege for all of its

12    employees, changing its policy in a manner that paid lip service

13    to district employees' First Amendment rights on one hand, while

14    imposing conditions that chilled the exercise of those rights on

15    the other, rather than respect their constitutional rights to

16    take a particular side on the issue of gender identity policy

17    within public schools and parental authority for --

18         THE COURT:  Mr. Hacke, if I could just -- if I could

19    just ask you -- I mean, just -- let me just make sure I'm

20    tracking you here.

21         I mean, what I understand from the school district is

22    that -- I believe is I don't believe they're saying that your

23    clients were somehow prevented from offering their views to the

24    district in terms of their position about the policy or thoughts

25    of changing the policy or modifying the policy or anything.  I

1   don't hear anybody on the defense side saying that they don't

2   have the right to do that and I assume they're even encouraged

3   to do that.

4           But the fly in the ointment here, wasn't it, that when

5   your folks -- when your clients went out and published social

6   media posts, you know, almost a -- you know, advocating for

7   changes not only in the district policy but even on some kind of

8   a broader national level, I mean, that was the fly in the

9   ointment here, wasn't it?

10          I mean, in other words, part of what -- a lot what

11  you're talking about is your clients' right to speak out and

12  give their opinions and I don't hear anybody saying they can't

13  do that.  I mean, isn't the problem here is that when they went

14  public with this, it generated so much controversy in the local

15  community and the school district that it -- that -- isn't that

16  the real problem?

17          MR. HACKE:  I would -- I would say, no, Your Honor.

18  But if it is a real problem, like I said, you know, the

19  overwhelming body of jurisprudence makes clear that, you know,

20  they can't -- that the districts can't censor speech based on

21  the discomfort and unpleasantness that always accompanies an

22  unpopular viewpoint.  That's been made clear from -- from *Tinker*

23  all the way down through *Kennedy* earlier this year.  It was made

24  clear and the Supreme Court has been pretty consistent on that

25  point.

1      You know, and as I mentioned, Your Honor, there were

2  only five complaints initially, okay, and -- you know, and it

3  initially only started with one.  There's always going to be

4  people who disagree.  Okay?

5      But there -- and, you know, if you're -- basically

6  you're there saying, well, you know, it's the disruption that it

7  caused.  Well, I'm glad you bring that up, Your Honor, because,

8  first of all, with regard to that issue, our clients -- there

9  are three disputed material facts concerning disruption:  First

10 is whether a disruption even occurred, let alone a substantial

11 one; second, whether any -- second, whether any disruption that

12 did occur, assuming there was one, was substantial; and third is

13 who caused that disruption.

14      On the first point, you know, both Superintendent Kolb

15 and Principal Blanchard, as well as other people that were

16 deposed, concede that learning continued to take place on the

17 GPSD campuses after plaintiffs published their I Resolve video.

18 As indicated in *Mahanoy Area School District v. BL*, the mere

19 fact that somebody in a school community publishes a video that

20 creates a buzz on campus does not mean that a disruption,

21 substantial or otherwise, occurred.

22      Now, this is especially true where any (indiscernible)

23 is minimal, and, you know -- and, you know, Superintendent Kolb

24 and Principal Blanchard, you know, made such concessions here.

25 And also, (indiscernible) involved student speech and not

1  teacher speech.  *Tinker*, and the -- and they reiterated this in

2  *BL*, made clear that neither teachers nor students shed their

3  freedom of speech at the schoolhouse gate.  The Supreme Court

4  affirmed that in *Kennedy v. Bremerton School District* earlier

5  this year and that one is a teacher speech case.

6          So, you know, for the Supreme Court to keep banging

7  that drum, you know, it makes clear that, you know, those cases

8  are still on point.

9          The second, you know, material fact in dispute is

10 whether there -- any disruption that occurred was substantial,

11 you know.  So if -- the definition of "substantial disruption"

12 is "one that substantially interferes with the work of the

13 school or impinges on the rights of other students."  So school

14 Superintendent Kolb and Principal Blanchard have both

15 acknowledged that learning still took place, which shows that

16 plaintiffs' speech did not substantially interfere with the work

17 of any school in the district.

18         You know, students still showed up to class, still

19 turned in their homework, they listened to their teachers, you

20 know, for the most part.  I'm sure there were some, but, you

21 know, no invasion of students' rights occurred here either, you

22 know.  And the Supreme Court declared in *Tinker* and affirmed in

23 *BL* students have no right to avoid the discomfort and

24 unpleasantness that always accompanies an unpopular viewpoint.

25         And finally, you know, the last point is who caused

1    the disruption.  You know, that's a very disputed material fact.

2          You know -- and plaintiffs can point to any number of

3    individuals who caused it.  They can point to Kate Weber and

4    Tanika Cooks, who were librarians (indiscernible) who work in

5    the school district who sent out emails to staff and/or students

6    labeling plaintiffs' I Resolve video unfairly as anti-trans.  So

7    basically they engaged in inflammatory speech.

8          And on that point, you know, concerning Title VII, you

9    know, opposing counsel earlier said that there is no comparator.

10   Well, guess what?  Kate Weber and Tanika Cooks are comparators

11   and they were not punished for their speech.

12         Second of all, Superintendent Kolb reached out to the

13   community.  So, you know, they can't -- the superintendent,

14   Kolb, can't reach out to the community and then turn around, you

15   know, and say, well, look at all these responses they got.  They

16   caused the substantial disruption.  No, you know, the community

17   would have left it alone if he hadn't said anything.

18         And then finally, De La Grange, who is one of the

19   board members in this case, you know, (indiscernible) into a

20   thread of comments on Facebook concerning the plaintiffs'

21   conduct and solicited those who opposed plaintiffs' viewpoint to

22   sound off in an upcoming board meeting.

23         So what each of these individuals who helped

24   (indiscernible) against the plaintiffs, but did, was create a

25   textbook heckler's veto, which is a government silencing a

1   speech that -- because it causes discomfort, fear, or even

2   anger.  Okay.  And school districts -- as the Supreme Court made

3   clear in *Kennedy* earlier this year -- I mean, may not use a

4   heckler's veto to chill free speech or religious exercise.

5          So -- so anyway, I'd like to take this opportunity to

6   respond to certain things in the defendant's reply brief, you

7   know, that are not correct.

8          First is that the adverse employment action at issue

9   in this case, the temporary termination of plaintiffs'

10  employment -- you know, first of all, I should mention that

11  plaintiffs' employment had not been terminated when we commenced

12  this case.  They filed two amended complaints since then, and in

13  their operative complaint, plaintiffs assert in paragraph 154

14  that in threatening to punish and ultimately punishing the

15  plaintiffs by placing them on administrative leave and

16  threatening them with dismissal for expressing their

17  (indiscernible) based views on gender and sexuality, defendants

18  have discriminated against the plaintiffs on the basis of their

19  religion.

20         Plaintiffs [sic] are just flat-out incorrect when they

21  assert on page 4 of their reply that factual allegations

22  concerning their -- those matters were not part of plaintiffs'

23  complaint and should not be considered.  They were a part of

24  plaintiffs' complaint and very much should be considered.

25         The second assertion the defendants make in their

1  reply brief that isn't true is, you know, that plaintiffs did

2  not respond to plaintiffs' [sic] argument that the board

3  members, at least the ones still remaining in this case -- De La

4  Grange, Brownell, and Nelson -- should be dismissed.  Plaintiffs

5  did respond to that argument.

6           I refer the Court to page 27 of our opposition brief

7  which notes that the board members acted under color of state

8  law, and pages 32 and 33 which notes that, one, plaintiffs are

9  suing the board members in their individual capacities for

10  damages, which -- and they're not protected by immunity because

11  they very clearly violated a constitutional law, they can be

12  stripped of their immunity because of that; two, the board voted

13  4 to 3 to fire the plaintiffs and they could not have achieved

14  that majority without the board members' votes; three, the board

15  members personally participated in the deprivation of

16  plaintiffs' constitutional rights; and four, the board members

17  violated a clear constitutional right, which is plaintiffs'

18  right to speak on a matter of public concern and not have

19  regulations imposed them -- upon them that are hostile with

20  their Christian faith.

21           You know, the defendants assert that the plaintiffs'

22  official capacity claims are duplicative.  They are not, you

23  know, because the plaintiffs are suing the individual defendants

24  for damages in their individual capacities.  Plaintiffs'

25  opposition brief makes this clear on -- see page 32.

1      Plaintiffs are also suing the defendants in their

2  official capacities because they are seeking injunctive relief,

3  and, you know, I'll refer you to the case of *Moses v. Alaska*

4  *Governments*, 2022 US District Lexis 99057, at pages 14 and 15,

5  which says that, you know, they have to name the official within

6  the entity who can appropriately respond to the injunctive

7  relief.  And, you know, that was Kirk Kolb to -- and, to some

8  degree, Tom Blanchard still can, as well as these board members.

9      You know, the plaintiffs concede -- the defendants

10  assert that plaintiffs concede that the board members are

11  entitled to legislative immunity.  We conceded that on one issue

12  only, which is with regard to their enactment of the amended

13  speech -- speech policy whose constitutionality we are

14  challenging.

15      Plaintiffs do not concede whether (indiscernible)

16  immunity as to the board's decision to terminate their

17  employment and to -- and for -- to say that we conceded the

18  issue of legislative immunity as a whole is a misstatement.  At

19  best, it is a half truth.

20      And, you know, furthermore, you know, the defendants

21  concede that the board members do not have immunity under the

22  Eleventh Amendment, but plaintiffs never raised the Eleventh

23  Amendment.  What they asserted is that a government official who

24  violates state law is stripped of his official representative

25  character and is subjecting his person to the consequences of

1  his individual conduct. There's a Supreme Court case very much

2  on point, *Scheuer v. Rhodes*, 416 US 232.

3       So, you know, the next point that the defendants, you

4  know, incorrectly assert in their reply brief are -- you know,

5  is that plaintiffs' commented on political matters during the

6  scope of their employment. You know, at best, whether -- again,

7  that is an issue of disputed fact, which makes summary judgment

8  inappropriate.

9       The Supreme Court has made clear of via *Garcetti v.*

10  *Ceballos* that even speech made by a public employee while at

11  work during working hours might be -- might still be made as a

12  private citizen, not as an employee, because such speech is not

13  done during or within the scope of the employee's employment.

14       The Supreme Court also made clear in *Garcetti* that, to

15  some degree, the First Amendment protects teachers' rights to

16  share their views in the workplace like any other citizen.

17       I'd like to point you to *Dahlia v Rodriguez*, 735 F.3d

18  1060, where the Ninth Circuit listed 12 illustrative factors for

19  determining whether a government employee speaks as a private

20  citizen rather than the government employee. I won't go through

21  them all here. I've already done that sufficiently in my

22  briefing, Your Honor.

23       But it does -- what it does -- what the brief does

24  demonstrate, that the factors overwhelmingly favor the

25  plaintiffs because they made the I Resolve video on their own

1   time, off school grounds, using private party resources.  They

2   made sure that they did not state or even imply who they worked

3   for.  They did not wear or display items that could link them to

4   the district.  They did not even state which city they lived in.

5   They said they live in southern Oregon, which covers quite a bit

6   of territory from the Pacific Ocean to the Idaho border and, you

7   know, the California border up to, you know, Eugene, arguably.

8         And then even if the plaintiffs did talk about a

9   matter within the scope of their employment, that's not

10  dispositive here because, as I mentioned, teachers, you know,

11  are -- they're the ones most likely to have informed opinions on

12  matters that affect their ability to do -- and it's not just

13  their right that's at issue, you know, it's -- the public's

14  interest is served by it as well, the state's as much as the

15  public's interest, in receiving informed opinions as it is the

16  employee's own right to disseminate it.

17        You know, plaintiffs -- defendants incorrectly assert

18  that plaintiffs' opposition brief fails to address their prior

19  restraint claim.  Now, I'll readily admit here we don't use the

20  words "prior restraint," but they do assert that their

21  19- -- their Section 1983 claims do not fail as a matter of law

22  because defendants sought to chill plaintiffs' exercise of their

23  First Amendment right, their freedom of speech in particular.

24  That's listed on pages 23 to 27 of the opposition brief.  You

25  know, a prior restraint, by definition, chills the exercise of

1    free speech.  So we might not have used the language the

2    district wanted, but, you know, it's -- that issue is addressed.

3         They also bring up the issue of *OSU Student*

4    *Alliance v. Ray* saying it does not apply.  And while the

5    defendants are correct that *OSU Student Alliance* is not a public

6    employee speech case, this is the point entirely:  *OSU Student*

7    *Alliance* makes clear that where a government entity impinges on

8    a plaintiff's First Amendment rights by limiting plaintiff's

9    access to a public forum, the equal protection clause does

10   apply, and this is especially true where the entity, indeed, is

11   in viewpoint discrimination, which the district has done here.

12        *OSU Student Alliance*, I should note, relies on

13   multiple public employee cases in making this determination and

14   furthermore declared that there is no authority for the

15   proposition that equal protection claims dependent on First

16   Amendment claims requires dismissal of the equal protection

17   claim.  So we very much can do both.

18        You know, it's not -- you know -- you know, it's a

19   violation of equal protection for people to be able to express,

20   you know, viewpoints on one side of the gender identity policy

21   issue and to side with the other side.  That's -- that's

22   straight-up viewpoint discrimination.  That's -- that shows

23   hostility towards religion, especially if it's a religious point

24   being expressed.

25        So, you know, plaintiffs are not attempting to avoid

1  the *Pickering* analysis by their equal protection claim.  They've

2  fully addressed the *Pickering* analysis and said, under the

3  *Pickering* analysis, the law favors them.

4         You know, plaintiffs -- defendants wrongly

5  assert -- or incorrectly assert, I should say, that Principal

6  Blanchard took no action against plaintiffs' employment.  You

7  know, again, plaintiffs incorporated the facts as stated in the

8  (indiscernible) complaint into their opposition brief.

9  Plaintiffs asserted that Principal Blanchard subjected them to

10 questioning about whether their religious beliefs disqualified

11 them from employment as public school educators.  That shows

12 hostility and their (indiscernible) reflect this.

13        Plaintiffs also assert that it was Principal Blanchard

14 who put them on administrative leave.  In fact, they can provide

15 evidence that it's his name and signature on the letters

16 informing them that they were being put on administrative leave.

17 And so Principal Blanchard just should not be dismissed.  He's

18 very much involved.

19        You know, the -- so, you know, other -- other disputed

20 material facts, you know, one of which is whether plaintiffs'

21 speech was a substantial or motivating factor in their firing,

22 plaintiffs can show that it was.

23        You know, under *Pinard v. Clatskanie School District*,

24 467 F.3d 755, which came out of the District of Oregon before

25 going into the Ninth Circuit, a plaintiff can establish

1    protected speech was a substantial motivating factor in an

2    advance employment action by presenting evidence of one of three

3    things:  Proximity in time between the protected speech and the

4    alleged retaliatory decision; two, defendant expressed

5    opposition to the speech; or three, the defendants proffered

6    reason for the adverse employment action was false or

7    pretextual.

8         You know, first of all, the defendant did express

9    opposition to the speech -- that's the big one -- you know,

10   because when Superintendent Kolb reached out to the community

11   and said that, you know, plaintiffs' I Resolve video was in

12   direct opposition to the district's values, that expressed

13   opposition right there.

14        Principal Blanchard expressed his opposition to

15   plaintiffs' speech by repeatedly questioning the plaintiffs as

16   to whether their beliefs made them unfit to serve as public

17   educators.

18        And so, you know, De La Grange expressed opposition to

19   the plaintiffs' speech multiple times in multiple settings.

20   Ms. Medart can testify that on April 12th -- I don't know if you

21   saw that Facebook post -- you know, and Ms. Sager can testify

22   that at the July 15th hearing where she was fired, De La Grange

23   declared "It's hard for me not to see how allowing this

24   administrator to stay will not make some group of kids feel less

25   safe in our schools."

1    If we're talking about the element of proximity in

2 time, you know, they post their video on March 25th, 2021.

3 Superintendent Kolb threatened to fire them less than a week

4 later.  They were put on unpaid leave less than two weeks later,

5 on April 5, 2021; and they were fired three months later, on

6 July 15th.

7    The plaintiffs -- you know, and the defendants'

8 proffered explanation, you know, it's pretextual.  You know,

9 plaintiffs can show that their actions did not meet the

10 definition of political campaigning under Oregon law.  I'll

11 refer you to ORS 260.432(2).  The plaintiffs can show that any

12 use of GPSD resources during working hours was de minimis and

13 that GPSD policy allows for such de minimis usage.

14    Plaintiffs can also show that there are similarly

15 situated employees using district resources during working hours

16 to engage in advocacy and various topics and were not punished,

17 one of those being Kirk Kolb, who, you know, basically said that

18 the phrase "black lives matter" probably should not be

19 controversial.

20    They can point to Ms. Weber's use of district

21 resources during school hours before plaintiffs' I Resolve video

22 to -- you know, district employees (indiscernible) sentiment

23 against them.

24    And, you know, another disputed fact in this case is

25 whether plaintiffs would have reached the same decision even

1  absent plaintiffs' protected speech.

2       You know, it's -- you know, the district took no

3  action against Kate Weber for campaigning to get more school

4  library funding.  School Superintendent Kolb used district time

5  and resources to declare -- I think I've already covered that.

6       And then, finally -- or, you know, another disputed

7  fact is whether plaintiffs acted to reduce transgender student

8  rights.

9       Now, viewing this case in the light most favorable to

10  the plaintiffs, as this Court must, plaintiffs did not seek to

11  nor did they reduce transgender students' rights; rather,

12  plaintiffs sought to balance the transgender students' rights

13  with the rights of other students, teachers, and administrators,

14  as well as the right to parent.  The plaintiffs recognize that

15  there are a number of different groups who are affected by

16  gender identity policy, and while they have no desire to trample

17  on the rights of the marginalized, the law makes clear that the

18  constitutional protections do not flow in one direction.

19       Section I of the Fourteenth Amendment is called the

20  equal protection clause, not the special protection clause.

21  *Masterpiece Cakeshop*, you know, which is probably the biggest

22  case on point there, says that while our society has come to the

23  recognition that LGBTQ+ persons cannot be treated as social

24  outcasts or as inferior in dignity and worth, government, if it

25  is to respect the constitution's guarantee of free exercise,

1  cannot impose regulations that are hostile to the religious

2  beliefs of affected citizens.  Governments have to protect -- to

3  balance those protections.

4        And all my client did here was advocate for such a

5  balance, and *Kennedy* makes clear that affected citizens include

6  public school teachers who wish to abide by their religious

7  convictions concerning -- and, you know, plaintiffs can present

8  evidence that they wanted the district to provide, you know,

9  caring, neutral, pragmatic, and unbiased support of students and

10  staff as a student navigates their own transgender identity

11  journey and so -- at the same time, respecting teachers'

12  religious and free speech rights as well as parental rights.

13        And, you know, finally, you know, the -- you know,

14  basically, I think the main thing -- one of the main things the

15  Court needs to decide here is whether plaintiffs' First

16  Amendment rights outweigh defendants' interests, and they do.

17        You know, First Amendment rights that apply to the

18  special characteristics of the school environment are available

19  to teachers and students.  So to (indiscernible) a person of a

20  school to justify protection of a prohibition of a particular

21  expression of opinion, it must be able to show something (audio

22  distortion) something more than a desire to avoid discomfort and

23  unpleasantness that always accompanies unpopular viewpoints.

24  Simple undifferentiated fear or apprehension is not enough to

25  overcome the right of free expression.

1        Threatened disruption by others, as the Ninth Circuit

2 held last year in *Moser v. Las Vegas Metro Police Department,*

3 "Threatened disruption by others reacting to public employee

4 speech simply may not be allowed to serve as justification for

5 public employer disciplinary action directed at that speech."

6 In other words, the fact that there may be a negative reaction

7 to a government employee's publicly-expressed viewpoint is no

8 reason to discipline that employee for expressing that

9 viewpoint.  The Supreme Court affirmed that earlier this year in

10 *Kennedy*.

11        And, you know, I think I've covered -- you know -- and

12 one last -- one last thing.  This will be my final point, Your

13 Honor.

14        District policy, the district's own policy allows

15 employees to participate wholly in the affairs of public

16 interest on a local, county, state, and national level on the

17 same basis as any citizen in a comparable position in public or

18 private employment.  It also allows employees to choose either

19 side of a particular issue and support their viewpoints as they

20 desire by vote, discussion, or the persuasion of others.

21        The district cannot, on the one hand, give its

22 employees freedom by a written policy to take any side of a

23 particular issue, then claim with a straight face that it has an

24 interest that outweighs the plaintiffs' interest in taking a

25 particular side.  That's why the defendants are not entitled to

 1  judgment as a matter of law, and we ask, respectfully, that the

 2  Court deny the defendant's motion for summary judgment,

 3  Your Honor.

 4         THE COURT:  All right.  Thank you, Mr. Hacke.

 5         Ms. Vickers, anything further from you?

 6         Ms. Vickers?

 7         MS. VICKERS:  I'm sorry.  I was on mute.

 8         THE COURT:  Yeah.  Anything further from you?

 9         MS. VICKERS:  I just want to say, you know, the

10  district has an administrative memorandum that protects kids,

11  including trans kids.  Those kids have to be at school.

12         Plaintiffs chose to work in a public school.  They

13  need to abide by the laws and the policies of a public school.

14  They can express their views, but they also chose to put this

15  thing on social media, which caused this whole thing, and led to

16  the disruption, which led to the investigation which determined

17  the policy violations, and those were all choices that they made

18  as opposed to kids who have to go to school every day and be in

19  their classroom.

20         And that's all I have to say.

21         THE COURT:  All right.  Well, I thank you both for

22  your comments.  You know, this -- this case obviously involves

23  important -- important rights and issues on both sides of the

24  case.  I mean, obviously the plaintiffs clearly have sincere

25  beliefs that they were -- they were expressing in different ways

1     here.

2           On the other hand, they're also public employees,

3     which changes the mix a little bit.  That -- you know, the

4     district -- district has obligations to, you know, regulate and

5     protect its learning environment.

6           I do think -- I recognize there's multiple claims here

7     under federal and state law, but I do think -- I do kind of view

8     the heart of this case revolving around this *Pickering* test,

9     frankly.  And even if the plaintiff -- even if we assume the

10    plaintiffs prevail on sort of the first three of the issues on

11    the *Pickering* test, that's sort of -- the final catch-all

12    question, really, is -- is can -- assuming the plaintiff meets

13    the first part of that, can -- the burden then shifts to the

14    school district to show that that -- the district's legitimate

15    administrative interest outweighs the employees' First Amendment

16    rights.  That's -- I think that's kind of the heart of where we

17    are.

18          We have important rights that the plaintiffs have and

19    important rights that the district has.  And I recognize the

20    plaintiff is saying, well, there's lots of issues of fact here

21    that we need to put -- we need to put people in a jury box to

22    make those determinations, but I think the task for the Court is

23    to, in large part, walk through that test, look at the record

24    that we have before us, and decide are there really any factual

25    disputes here.  And I think that's what we need to do.

1    But I'm certainly respectful of the views here on both

2    sides.  I understand, you know, the strong, strong feelings

3    about it.  We will go back in light of all your comments, take a

4    hard look at what -- what we have in the record, what we don't

5    have in the record, and then, you know, we'll get out a decision

6    as quick as we can get it out.

7    But again, appreciate -- appreciate your comments and

8    arguments today.

9    Thank you, everyone.

10

11    (The proceedings concluded at 2:54 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2

STATE OF OREGON        )
3                              ) ss.
COUNTY OF MULTNOMAH    )

4

5          I, RYAN A. WHITE, a Registered Merit Reporter,

6   Certified Realtime Reporter, and Certified Shorthand Reporter

7   for Oregon and Washington, do hereby certify:

8          That the foregoing transcript of an audio recording

9   was prepared under my direction and that it is a complete and

10  accurate transcript of the audio recording to the best of my

11  ability;

12         That I am not a relative, employee, attorney, or

13  counsel to this action, or of any such attorney or party or

14  financially interested in said action or outcome thereof;

15

16         DATED this 9th day of May, 2023.

17

18

19                              // Ryan White
                                _____
20                              RYAN WHITE
                                Registered Merit Reporter
                                Certified Realtime Reporter
21                              Expires 9/30/2025
                                Oregon CSR No. 10-0419
22                              Expires 12/31/2023

23

24

25