APPEAL NO. 23-35288

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

RACHEL G. DAMIANO; KATIE S. MEDART,

*Plaintiffs-Appellants*,

v.

GRANTS PASS SCHOOL DISTRICT NO. 7, an Oregon public body; KIRK T. KOLB, Superintendent, Grants Pass School District 7, in his official and personal capacity; THOMAS M. BLANCHARD, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity; SCOTT NELSON; DEBBIE BROWNELL; BRIAN DELAGRANGE, in their official and personal capacities,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Oregon
Case No. 1:21-cv-00859-CL / Hon. Mark D. Clarke

## APPELLANTS' FURTHER EXCERPTS OF RECORD

JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org

MATTHEW B. MCREYNOLDS
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827
(916) 857-6900
mattmcreynolds@pji.org

TYSON C. LANGHOFER
MATHEW W. HOFFMANN
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

*Counsel for Plaintiffs-Appellants*

| Document Description | ECF No. | FER No. |
|---|---|---|
| Exhibit M-16 to Medart Declaration – Medart Investigation Transcript | 73 | 3–70 |

# EXHIBIT M-16

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

Okay, well, thank you guys for coming in. Kind of like we just started, so I want to make sure everybody knows that the meeting today is being recorded. And so the first thing I would ask that we do is that we identify ourselves for the record. So today is, I believe it is Tuesday, the 6th of April, and it's approximately 2:30 in the afternoon. My name is Danny Huber Kantola, and I'm the human resources director. And we'll make Tommy go next.

Tommy Blanchard:

Tommy Blanchard, principal at North Middle School.

Katie Medart:

Katie Medart, science teacher at North Middle School.

Mickey Jarvis:

Mickey Jarvis, GPEA president and advocate for Katie Medart.

Dan Huber-Kantola:

Great, thank you guys. And so process wise, Katie, probably talk a lot to you, mainly to you. And I think Tommy now tried to go through the complaints. We got five complaints. Just bluntly, we received some other emails late yesterday, early today, and we're trying to figure out are those actually complaints or not, and we would need to then forward those to you if they are. And in trying to go through the complaints, I think what we discovered looking at them is that we have three that are fairly similar in the wording and the sequencing and that kind of stuff. And then there's two that are distinctly different.

Dan Huber-Kantola:

And so I think how we would like to go through them is to try to go through the three that are similar with a set of questions, and that will answer some of the issues that are being alleged in the other two complaints, and then finish off the other two complaints with a couple of other questions. And then maybe when we're done with that process, go through some timeline stuff and those types of things. Okay? How's that? And with that, I would let Tommy start with the first.

Dan Huber-Kantola:

So when I said three that are similar, really Rachel Watson, Dawn Perry, Kate Weber's complaints are all very similar in sequencing and very similar in nature. And so if we step through that, I think we'll address those three. And I think Tommy's going to address the first part of it and ask some questions from there.

Tommy Blanchard:

Okay. So first question has to do with policy GCAB in regards to social media. And so the specific part of the policy says that staff are subject to disciplinary action up to and including dismissal for using a personal electronic device in any manner that is illegal or violates the terms of this policy. Staff actions on social media websites, public websites, and blogs, while on or off duty which disrupt the school environment may be subject to disciplinary action up to and including dismissal. Any activity that may constitute a crime under state or federal law will be reported to law enforcement and/or other appropriate state or federal agency.

This transcript was exported on May 31, 2021 - view latest version here.

Tommy Blanchard:

So that's the specific part of the GCAB that we're referring back to. And so the first question is, what social media outlets have been used and are they open to the general public?

Dan Huber-Kantola:

Okay. And before you answer that, I guess one more quick thing. I know you will be, but just need to remind everybody we just need to be truthful in anything that we say and truthful in anything that we answer. Just bluntly, not being truthful about answers and things is something that could potentially lead to termination. So you need to know that upfront. And with that, I'll let you go ahead and answer the question about the media, the social media.

Katie Medart:

So am I supposed to answer these or are we getting the questions during this?

Mickey Jarvis:

So that's something that we certainly could do. We could request the questions and answer them at a later date. That is possible.

Dan Huber-Kantola:

Actually, we ...

Mickey Jarvis:

Or we could caucus in between.

Dan Huber-Kantola:

We could caucus in between, but I think we need to progress with this is our charge forward.

Mickey Jarvis:

Sure. So can we just ask for a clarification? So in what context? Personal? So your question, what is it about?

Dan Huber-Kantola:

So the I Resolve Movement is out and about and-

Mickey Jarvis:

Okay. I just wanted to clarify that that's what you were talking about and that we weren't talking about something other than that. So then if you're rephrasing, it would be ...

Dan Huber-Kantola:

Yeah. So in regards to the I Resolve Movement, what social media outlets have been used, and are they open to the general public?

Mickey Jarvis:

This transcript was exported on May 31, 2021 - view latest version <u>here.</u>

Well, thank you.

Dan Huber-Kantola:
Thank you.

Mickey Jarvis:
And then yes. Of course it's entirely up to you, but I would say that what Danny said about truthfulness is probably also related for being forthcoming with information. But if there's a point where you want to caucus, we can leave the room and come back.

Katie Medart:
Okay. So to my knowledge and understanding, there is an Instagram page and a Facebook page for I Resolve. And there is a YouTube video, which is temporarily only accessible with the link, so it's not open to the general public. So you have to have the link to be able to view it. That was my last knowledge and what I checked. And so Instagram, Facebook, YouTube, and then a website www.iresolvemovement.com.

Tommy Blanchard:
So to the best of your knowledge, that if somebody were to go to YouTube and try to find the video, they are not able to access the video unless they have the link that's been presented to click on it.

Katie Medart:
Yes.

Tommy Blanchard:
Okay.

Katie Medart:
And that is as of I know that the last I checked, which was last night and I think this morning, and that was the case.

Tommy Blanchard:
Okay.

Mickey Jarvis:
And so do you want to talk about how someone would get the link?

Katie Medart:
So certainly, they could send it via text message. They could ...

Mickey Jarvis:
I would have to know about it. You would have to give me that information?

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Yeah, yeah. As of today, yeah. Yes.

Tommy Blanchard:

So a week ago, if I was going onto Facebook, and I don't have a Facebook account so I'm stretching here, to be honest with you. So if I go onto Facebook and I look up I Resolve a week ago and I click on it, would I be able to access the video just as a member of the general public?

Katie Medart:

I believe a week ago that was true. Yeah. And I personally am not on social media either, but I Resolve is.

Tommy Blanchard:

Okay. Did you know that that was going to be on Facebook and Instagram?

Katie Medart:

Yes. I was aware that it would be on there.

Tommy Blanchard:

Okay. So I take it, since you don't have an account, you didn't post it?

Katie Medart:

No, I did not.

Tommy Blanchard:

Who posted it then?

Katie Medart:

Rachel.

Tommy Blanchard:

Okay.

Mickey Jarvis:

Do we know who we mean by Rachel?

Tommy Blanchard:

Rachel Damiano?

Katie Medart:

Yes.

Tommy Blanchard:

Okay. Are you aware of any potential disruptions that it has caused at either North Middle School or in the district?

This transcript was exported on May 31, 2021 - view latest version here.

Katie Medart:

Can I talk to you?

Mickey Jarvis:

Sure. Excuse us.

Dan Huber-Kantola:

Sure.

This transcript was exported on May 31, 2021 - view latest version here.

Speaker 1:

We are back.

Katie Medart:

Can I actually ask? So when you said, "are you aware of any disruptions that it has caused at North Middle School or the district..."

Speaker 1:

Any possible.

Katie Medart:

Any possible. Can you give me examples of disruptions? Like what would be an example of possible disruption?

Speaker 1:

Conversation, time devoted to that divisiveness whether within the school or district, email communications, phone calls from district employees or the community.

Katie Medart:

And also you said caused, so specifically at North Middle School or at the district?

Speaker 1:

As a result of I Resolve.

Katie Medart:

So possible conversation, time spent on that divisiveness, email communication or phone calls from staff, student, or community?

Speaker 1:

Community, yeah.

Katie Medart:

That would be examples. Okay. There has been communication amongst staff, email communication and conversation none of... And are you asking about am I aware of others or just like my personal interactions?

Speaker 1:

Right now, just are you generally aware of possible disruption?

Katie Medart:

From my complaints alone, I think the answer to that is yes. And then also I had an interaction with a student and the time spent on that was about five to seven minutes, asking for clarification.

This transcript was exported on May 31, 2021 - view latest version here.

Speaker 1:

Are you saying you were asking for clarification?

Katie Medart:

No.

Speaker 1:

The student was asking for clarification?

Katie Medart:

The student.

Speaker 1:

Okay.

Speaker 2:

So when was that, Katie?

Katie Medart:

I'm sorry. I wrote about the interaction.

Speaker 1:

It's okay.

Katie Medart:

And I am not quite all organized yet.

Katie Medart:

It was on April 2nd, at approximately 11:25 AM. And I can confirm that they made it to their next class and that was by 11:32 AM because their teacher, I let them know "please excuse this student." And they said, got it. And confirmed that with me.

Speaker 2:

So what was the student asking about?

Katie Medart:

Do you want me to report what it was about?

Speaker 2:

Sure.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Okay. Do you want to know the student's name?

Speaker 2:

Sure.

Katie Medart:

Okay. So ▓▓ ▓▓, toward the end of class said, "Mrs. Medart, can I talk to you after class?" Me: "absolutely." Class ended. I walked to ▓▓. I said, "did you still want to talk to me about something?" As he is packing up his backpack. He said, "yes." And while other students packed and walked out, I asked him if he wanted to come on to the back of the room. And he said, "sure, but I need my phone." I walked toward him. All students had left and he opened... I don't know what he opened. I think it was a text message, but I honestly can't confirm if it was or not. Scrolled to I Resolve video. He said, "have you seen, are you aware that you're in this video?" I said, "I am aware. That is me in that video."

Katie Medart:

Students were coming in for my third period. So I asked if we could talk outside. So this will all be on the North Middle School security cameras at that point. ▓▓, "sure." He said, sure. I squatted down because ▓▓ is like this big, he's very little, short and asked if we could talk after school. He said he couldn't because he gets picked up. I said, "okay, what questions do you have?" ▓▓, "my friend wants to know if you are homophobic." Me: "▓▓ please look at me when I say this, absolutely not. I love all students. Do you feel that way? Have you watched the video?" ▓▓, "no, I haven't, I like..." And you're going to hear me talk about him. "I like you are one of my favorite teachers. So I'm talking to you." Me: "it is about policy for students that I want for all students." ▓▓, "oh, okay."

Katie Medart:

Me: "do you want to tell me your friend's name so I can reach out to them?" And I could see he was thinking. Me: "how about you tell your friend that I do care about how they feel and I would like to talk with them if they have questions, I would like to understand why my video made them feel that way. I don't want anyone to feel that way." ▓▓, "yeah, okay." Me: "▓▓, I just want to say thank you. That took courage and you were very respectful. Do you have any other questions? ▓▓, "yeah, for science, like as an atomic number gets bigger does it just get harder math? Because it's like easy." Me: "it gets more complicated with chemical equations and molecular formulas." ▓▓, "cool." Me: "you like this stuff, huh? I could tell in class you caught on quick." ▓▓, "yeah." Me: "okay, who is your teacher so I can send a message that I held you up?" ▓▓, "Mr. Maxwell." Me: "okay, have a great weekend." ▓▓, "thanks, you too."

Speaker 1:

Great. Thank you, Katie.

Katie Medart:

You're welcome.

Speaker 1:

Do you have any more questions about the [inaudible 00:08:45]?

This transcript was exported on May 31, 2021 - view latest version here.

Speaker 2:

All right. So let's look at the policy. We're going to ask you a question about is J-L-slash-I-G-B-A-B-dash-A-R, and it's the confidentiality of student records. Specifically, each district shall protect the confidentiality of personally identifiable information. So this is specifically to a reference in the video and information that you shared at the beginning of the video where you were sharing an experience that you had with a student. And the question would be, would somebody be able to identify who that student was? Or would somebody in the class be able to identify who that student was?

Katie Medart:

I believe absolutely not.

Speaker 2:

When you say absolutely not, what makes you so certain when you say absolutely? I would understand if you said, probably not but absolutely means that probably wouldn't happen. So what makes you so strong in that?

Katie Medart:

Because in my brain it's just a scenario, a general scenario. And even though there's been multiple, different, unique, individualized experiences, I believe it's in reference how what was in there was meant as like a scenario.

Dan Huber-Kantola:

So was it based on a real scenario from the first year, first fall of teaching?

Katie Medart:

Yes. And I know that student and I know a scenario and that the student has moved last year.

Speaker 1:

So the student may not have seen or even if they would've seen-

Katie Medart:

And it was actually parked in my brain. It was multiple scenarios not just one in particular.

Dan Huber-Kantola:

So it wasn't about just one student in the fall where for instance, if you had a group of 25 people, seven classes that they could know? Because there's a small number of kids, students that would have identified with different gender identities. I guess that was the fear and probably the fear of the complaint is based on the size of the school, the length of time that you've been teaching and the number of students who would identify the different gender identity, that's a pretty small pool. The student might be known to somebody who watched that video.

This transcript was exported on May 31, 2021 - view latest version here.

Katie Medart:

I also think that that assumes that we know all students that identify that way when we're constantly being aware of other students who may choose to... Who may identify that way.

Speaker 1:

Okay. Thanks Katie.

Katie Medart:

Mm-hmm (affirmative).

Dan Huber-Kantola:

Okay, at different policies, and you can probably see what we're trying to do is to address the complaint, specifically the policies relate right down the line to the policies that are in the complaint themselves. And so the one that comes up next in the complaint is policy GBG and it comes up in a couple of different ways. One is it set talks about, all controversial issues employees must designate that the viewpoints they represent on the issues are personal viewpoints and they're not interpreted as the district's official viewpoint.

Dan Huber-Kantola:

And then the second part of that one talks about, no employee will use district facilities, equipment, or supplies in connection with any kind of political campaigning, nor will any employee use any time during the workday for campaign purposes. And one that's not mentioned in the complaint but it is related and we need to talk about it is policy I-I-V-G-A-N-S-E-A-R and really what that is in reference to is, the technology acceptable use policy that we all do in safe schools at the beginning of the year. And I think a couple of the things in that particular thing, it references back to the policy I-I-G-A-R but basically Katie, what it says in there is you can't use any district... None of us can use district equipment, district time for political activity type of things. And so questions relate to those two policies. So the first part of that GBG, during the video did you share that this was your personal viewpoint?

Katie Medart:

I didn't talk a lot about like legislation and stuff like that. I did say in there that I am concerned, as a parent I was concerned. I also know that we did not say that what school district we were part of, and that was so that it was not representative that we were speaking for school district 7. And when I read over and trying to hear the complaints, I felt like some if not everyone was just like... Some people even said it was made clear that it was ours and other people made the claim saying that that wasn't made clear to them. But other complainants said that it was made clear that that is our opinions and our beliefs.

Dan Huber-Kantola:

Okay. And no mention that these don't represent the views of the district that I'm where and work or anything like that, right?

Katie Medart:

Any what?

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

Any reference to the district at all, like these views don't represent the district where we work or where I've worked specifically?

Katie Medart:

No, but since hearing that we have went and added a very clear statement to that, it says that now. So that it is on trying to hear other perspectives, we have went and added a statement so that there can be zero question of that.

Speaker 1:

Okay. Thanks Katie.

Dan Huber-Kantola:

So some questions about the resolution and school equipment and time and that kind of thing. So was any part of the resolution created using school equipment?

Katie Medart:

Can I ask something because this is about the political policy, right? One thing, because in our brain, and I hear you saying that it is, but my frame of reference is that it was education policy and not political. And so I would just like to ask, can you define political for us? For me? So that I can understand what is that that makes this, that this is political.

Dan Huber-Kantola:

I think policy is formed by political bodies. Whether it's a school board, whether it's a legislative body, whether it's an ODE board type of thing, that policies are political. Kirk doesn't write policies, Danny doesn't write policies, but the school board does policies. And I think we would have a hard time arguing that this isn't somewhat, if not completely political in nature. It's a very controversial issue. I mean, I think even some of the things that your video talks about, it talks about addressing politicians and federal policies and state policies, and I think it gets into district action.

Katie Medart:

So I hear though that just any policy makes it a political issue.

Dan Huber-Kantola:

I think especially of this nature, yeah. I would say yes.

Katie Medart:

Okay. And then the interesting part is, like if I walked you through the process of that, when we were trying to model what the district and board adopted to oppose the current RSSL so the Ready Schools, Safe Learners and that one was current law. That then from my understanding, so are you saying that was made by the school board members wrote that, not district employees?

Dan Huber-Kantola:

This transcript was exported on May 31, 2021 - view latest version here.

RSSL?

Katie Medart:

Yeah. That was sent up to oppose the current-

Dan Huber-Kantola:

It was an action taken by a political body. They formed a resolution to change the policy, yeah.

Katie Medart:

And that was the school board who did that?

Dan Huber-Kantola:

That was the school board who did that.

Katie Medart:

Okay.

Dan Huber-Kantola:

Yeah.

Katie Medart:

And so we took that as the template of seeing that modeled and thought that that was what to do. And you'll see that in our original version, that it was literally modeled right after that. And then, so that I wanted to ask about. And then I'll go back to your question though, what was your question?

Dan Huber-Kantola:

Okay, yeah. So I guess the question was, was there any time or equipment spent that was district time or district equipment creating that resolution?

Katie Medart:

Yes.

Dan Huber-Kantola:

Okay. What did you do? What time, what equipment was used to create it?

Katie Medart:

It was all done before. And never, ever were students ever. All done either early in the morning, some mornings. I mean, you'll be able to timestamp all, I'm pretty sure you guys have access to any time I'm on a school computer and it will show I Resolve. So I would say in the mornings or it would be done in my flex time.

Dan Huber-Kantola:

This transcript was exported on May 31, 2021 - view latest version here.

**During flex time?**

Katie Medart:

Yeah. And when I say, like the writing of that. But as far as like, when we videoed all that, that was all during spring break. So lots of work went into it during spring break. That part that didn't was the initial first draft of the I Resolve. And when I say computer, so some at my desktop in my classroom, and then some on, I think very little on the laptop, to be honest. I have my own personal computer at home too, a desktop and a Mac, but I cannot say for sure. So I would say there's a possibility also on that one, but that's not my go-to that I use.

Dan Huber-Kantola:

So the initial work on the resolution was done in the morning, like what time?

Katie Medart:

I get to campus at varying times. I don't know. I'd have to pull it up, but not during teaching.

Dan Huber-Kantola:

Anything after 7:30 in the morning?

Katie Medart:

Yes, I would say that there is a chance that there will be timestamps of that.

Dan Huber-Kantola:

Okay. And then during flex time and flex time is 12:30 to 3:30ish?

Speaker 1:

I guess, that we have a little bit of time in there that's set aside for office hours, but by and large it's after lunch.

Dan Huber-Kantola:

Okay. So some of the writing of the resolution was done during flex time as well.

Katie Medart:

Yes.

Dan Huber-Kantola:

So was it written on a Google Doc through the district Google, so you go to your email account, you've got your email that attaches to Google and then it goes to a Google Doc?

Katie Medart:

I think it was shared to my email but it was written on one through I Resolve, Gmail. The drive for the I Resolve.gp. That's where everything is at least right now. So that's where I believe that it was.

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

But shared to you through your email address at school?

Katie Medart:

Yes.

Dan Huber-Kantola:

So did you send the resolution to anybody using school email?

Katie Medart:

I did.

Dan Huber-Kantola:

Who did you send it to?

Katie Medart:

I might miss someone.

Dan Huber-Kantola:

That's okay.

Katie Medart:

Okay. I can pull it up for reference if you like and be able to name that if you want really accurate.

Dan Huber-Kantola:

Sure. If you have it.

Katie Medart:

Okay. Jason Wright, Leanne Wageley, Jordan Kessler. And many of these, I went and talked to and then they said, send it to me. And then I used my work email to send and it's just titled, "policy" and then the link. Mason Mahaffey. I sent it to Dorothy Swain, she's at RCC, and I asked for her opinions and to edit and she helped edit it. I think all of the rest were me personally texting, but I'm not seeing any when I did a search, any additional show up.

Dan Huber-Kantola:

Okay. So a couple of names, Rachel Damiano.

Katie Medart:

Emailing her the site?

Dan Huber-Kantola:

Yeah.

This transcript was exported on May 31, 2021 - view latest version here.

Katie Medart:

Her and I had regular exchanges. I'm sorry. I was assuming that was a given.

Dan Huber-Kantola:

I thought so but it's just-

Katie Medart:

Yeah, to clarify, I understand. So yes is the answer.

Dan Huber-Kantola:

Okay.

Katie Medart:

It wasn't intentional to leave her name out.

Dan Huber-Kantola:

All right. What about Chris Jelderks?

Katie Medart:

Oh, yes, he is. It didn't pull up when I did it, but I did send it to him. And if you ask me, I will be honest. So if you already have the list you can be open and tell me, and I will confirm. I'm just in a search, you can see what I did. It says I Resolve and I'm scrolling through and looking for any that are there.

Dan Huber-Kantola:

I appreciate you being honest and-

Katie Medart:

I'm not trying to hide that.

Dan Huber-Kantola:

I promise you we had not after all the research.

Katie Medart:

Okay.

Dan Huber-Kantola:

I could do it after all the search.

Katie Medart:

Yeah.

Dan Huber-Kantola:

This transcript was exported on May 31, 2021 - view latest version here.

If you have some information I'm completely transparent with you. The reason that Chris came up for me is, I guess I would ask you about when students were there. Is it possible that you sent something regarding I Resolve to Rachel or Chris or something from Chris during school time when kids were there?

Katie Medart:

No, I do not... I have no recollection of any interaction like that.

Dan Huber-Kantola:

Okay. It would have been brief and it looks like it's the potentially that the resolution was shared on the evening of the 16th. That maybe Chris Jelderks sent it to you the morning of the 16th? And that maybe it was forwarded to Rachel on the morning of the 16th.

Katie Medart:

And I'm sorry, what is it? Can I look up what you're referencing?

Dan Huber-Kantola:

Yeah, it would have been the resolution. I believe it would've been... You mentioned maybe Swain sent something to Chris or you had sent something to Chris, Chris had forwarded that to you with some comments.

Katie Medart:

So you say, look up March 16th?

Dan Huber-Kantola:

Look up March 16th, the morning of March 16th.

Katie Medart:

And to Chris Jelderks?

Dan Huber-Kantola:

It might've been from Chris Jelderks and then forwarded to Rachel.

Katie Medart:

Okay. So there's one on March 15th. Is that what you're saying? That was received from Chris Jelderks and then March 16th, yep, that he highlighted a part on. Oh, he gave feedback, he read it. Is that what you're referencing?

Dan Huber-Kantola:

Yeah.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Okay. Yep. And then I forwarded it. Yeah, but there was no... It's just that FYI then I forwarded it to Rachel. Like are you asking me to confirm that I did that?

Dan Huber-Kantola:

Yeah.

Katie Medart:

Yeah, I did do that. I mean, it shows there. I did that. Yes.

Dan Huber-Kantola:

There were kids there at that time? So it's 9, 10, 9:00 in the morning, are kids in school?

Katie Medart:

At nine, they are. They had the potential they could have been in the classroom when I forwarded that email. Yes. There was no conversation. No talking about it. There was him giving me that and me forwarding it to her. Is there a chance that you're asking me if kids were sitting in the class? Are you asking me if I spoke about it with kids in the classroom?

Dan Huber-Kantola:

Is there a chance kids were there?

Katie Medart:

Okay. Then yes, there is a chance that kids are in by that time.

Dan Huber-Kantola:

But no speaking to kids, right?

Katie Medart:

No. Other than what I have disclosed to you with my interaction with Griffin Laskey.

Dan Huber-Kantola:

Great. So you did say you had conversations with some of the people, Jason Wright, Jordan Kessler, Mason Mahaffey, Leanne, and then forwarded to them. So when did those conversations take place? Was that during the school day?

Katie Medart:

At the end of the day.

Dan Huber-Kantola:

Like during the flex time or-

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Like when your students were on campus? Yes. After office hours.

Dan Huber-Kantola:

Okay. So would that have been still during the workday? In some cases prior to 3:30 in the afternoon?

Katie Medart:

Some yes, some after but on property.

Dan Huber-Kantola:

Okay.

Katie Medart:

You're taking really good notes. I'm focusing on answering so I have not been able to record this.

Dan Huber-Kantola:

It's recorded, so we'll make sure you get a copy. So Katie, with those conversations, did you go to them to have those conversations?

Katie Medart:

I did, yes.

Dan Huber-Kantola:

Okay. So you initiated the conversations with them about the I Resolve or was it something that they asked you about, but something that you approached them about?

Katie Medart:

And honestly, I did mention this Jason Wright but Mitch Mooney was another one because they were together. And so you'll see one email sent to him. Now I'm thinking about, I've had people ask me but most of them, I will say, I went and said, "I want to share about policy that we are hoping to have you consider and get your opinion and talk about it."

Speaker 2:

Okay. Appreciate that honesty.

Katie Medart:

Mm-hmm (affirmative).

Dan Huber-Kantola:

So just bluntly, that would be a concern for me that that's violating the policy there. And also probably violating our contract. I think if we looked at article nine in our contract, it talks about all time is teaching time. It's supposed to be just for the educational purposes of school. Might be an exception in there for lunch, but using the internet, using the email and stuff would also likely be a violation of policy.

This transcript was exported on May 31, 2021 - view latest version here.

But I won't think about it small, okay. But you can ask Mickey, I tend to be maybe too transparent sometimes.

Speaker 3:
Seems to work best.

Dan Huber-Kantola:
Yeah.

Katie Medart:
I am trying to be very transparent.

Dan Huber-Kantola:
I could tell.

Speaker 3:
So are we to assume you've already interviewed at least one other person regarding this issue?

Dan Huber-Kantola:
I have actually just looked at some of the email stuff.

Speaker 3:
And that would go for your administrator as well?

Dan Huber-Kantola:
In terms of looking at emails?

Speaker 3:
Interviewing regarding this particular issue? Yes, you have already interviewed her regarding this issue?

Dan Huber-Kantola:
I have not.

Speaker 3:
Okay.

Dan Huber-Kantola:
I have not.

Speaker 3:
She has been interviewed?

FER022

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

She has not?

Speaker 3:

Okay.

Dan Huber-Kantola:

No. I talked to Tommy some, talked to administrators did a little bit of research, not a lot of research, but just a little bit of research. And then really felt like, I'll just be blunt, I thought you'd be truthful. So I was really just going to ask you the questions. And so I was trying to a certain extent if I didn't have to involve a lot of people that maybe we wouldn't involve them.

Katie Medart:

Okay.

PART 1 OF 4 ENDS [00:35:04]

Dan Huber-Kantola:

You wouldn't involve [inaudible 00:35:00]

Katie Medart:

Okay. I was just curious about maybe, since we're talking about the document itself and where it was crafted and when it came in, was it... That would be a question, right? Where was it?

Dan Huber-Kantola:

Yeah. Who drafted the document? That's a good question.

Katie Medart:

So Rachel and her dad, I think he was one of the editors. And then she sent it to me and then I edited it and wrote one part of it, the original one.

Dan Huber-Kantola:

And then you guys sent it out for input?

Katie Medart:

Yes.

Dan Huber-Kantola:

And some [inaudible 00:35:54] you said some at least operating. I would have to ask Rachel if she sent it out.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Yeah, and I don't know her. I can't actually speak to it, who or that, that she may or may not have.

Dan Huber-Kantola:

But Rachel and her dad drafted the original, you added a piece to it and then it got edited from there?

Katie Medart:

Yes. You saw it, didn't you, before we put it out there?

Dan Huber-Kantola:

Yes, I did. And just bluntly, when it came to me, I said, "People need to talk to Kurt before anybody does anything with this."

Katie Medart:

I thought, and this is obviously third party, but I thought that you thought the anatomical bathrooms was a different view that you hadn't heard before, and that it was one that you would pass on to the other admin to get their views on it.

Dan Huber-Kantola:

I said we'd ask but I did not think that was a good idea. The conversation that I had would have been more about, there are some things and I blind since we're having a conversation that.

Katie Medart:

I wasn't there.

Dan Huber-Kantola:

No, I know.

Speaker 4:

Who was there?

Dan Huber-Kantola:

It was Rachel. How do I say this? So I think you have asked questions. You've asked questions of me. I think you stopped me in the hall outside one time. We had a brief conversation about, I know you have some strong feelings and I know you have some reservations, especially around children, being like the 11 year olds, potentially that we would change names without any kind of parent input and that kind of stuff. I think people we talked about was the biggest concern that you had. I know we talked about, but that is the guidance and we follow the guidance and so forth and so on. And I'm open like that. That one does concern me some too. It doesn't mean I won't do it, but is there some concern about an 11 year old, 10 year old making that thing? I would have to be honest that there's some concern. But that is what the guidance is and so that's what we have to do, and I think that was our conversation too.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

I want to counteract that because I don't feel like I ever received a clear directive that told me any which way informed that anything I was doing was in violation of anything. I even have followup emails with specific questions asking, "Is this guidance?" and clarification and no response. And both that's in email followups and in verbal followups with Tommy saying, "Have you heard back from the district office on these things?" With the answer being, honestly, him telling me, "No, I haven't." And then when I see him, him having to feel like I need to turn my back because I don't have an answer for you and being tired of not having an answer. Would you agree with that, Tommy?

Tommy Blanchard:

Yeah. I would agree with that and shared that as a result of some of the things that you were doing, that the recommendation was that the other individual, that there is a conversation that takes place at the district office because of how strongly worded and how opinionated this is. And that's what led to conversation down here. I know that there was a recommendation to talk here, not privy to that conversation, and that's where things were. And then I was made aware that [inaudible 00:39:56] came out.

Dan Huber-Kantola:

Yeah and maybe I'm out of the loop. Katie, I was under the impression... So we put some guidance together based on ODE guidance, ran through legal counsel. And I was under the impression that people had seen that guidance.

Tommy Blanchard:

That administrative memo?

Dan Huber-Kantola:

Yeah.

Speaker 4:

Can we talk about what the content would have been? Because I don't know what we're talking about.

Dan Huber-Kantola:

Sure. So the content would have been like the ODE stuff. But the content of the ODE... This is way off the top of my head. But the content of the guidance is, number one, is that you have a personal connection with the student, especially a counselor for the main part. And the counselor would try to work with the student to meet the student's needs. And ultimately, even where they're at, restroom things, how do we facilitate that as best as possible for both, make them feel safe, make other students feel as safe as possible as well. When it comes to names, they talk about the preferences that the student may have with names, pronouns. If they're not having shared that with their parents, they do have some conversations about, eventually we're going to have to be able to share with parents.

Dan Huber-Kantola:

And so they try to talk to kids about how to share. They're not going to force kids to share that information, but they do talk about how to, that they would be willing to sit with them and help them and do those types of things. And then it goes from there, and ultimately, it does say that we will follow

This transcript was exported on May 31, 2021 - view latest version here.

the names. We will use the preferred names. We will use the pronouns that students want us to use. Absolutely, I think, law supports, court cases have supported that if it gets down to the very final end and a student is a transgender, is a male transgender... Let's do the other way. Female transgendering to male, and they would like to use the restroom of the transgender choice, that they are allowed to do that.

Katie Medart:

So you're saying that is policy right now in the state of Oregon? That is our school district's policy currently?

Dan Huber-Kantola:

That is ODE guidance on the matter, which is what... And then supported by case law. And then we took the case law we took the ODE guidance from and sent it to Bill Ransom, who's our district attorney. And from that, made the guidance that we gave to administrators to work with.

Katie Medart:

Okay. So I just want to make sure I'm understanding because right now I'm in shock. Okay, so ODE has a guidance and that is the school district is following, that makes our policy and those things are to... And I think you're specifically talking about when you say a student, a transgender student.

Dan Huber-Kantola:

Yep.

Katie Medart:

Okay. So a transgender student and our policy is that they will have a counselor, that they will...

Dan Huber-Kantola:

That we'll meet with them.

Katie Medart:

That we'll meet with them.

Dan Huber-Kantola:

They'll try to develop a plan and they'll be with the family. We would prefer to meet with the family. And the family tries to make a plan for how to best meet the needs of the student.

Katie Medart:

Is it required to meet with the family if the student does not want to?

Dan Huber-Kantola:

It is not. At least not for the ODE guidance.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Parent permission is not required.

Dan Huber-Kantola:

It is not.

Katie Medart:

I guess the biggest part is I did not know that this is our current policy. Tommy, can you confirm that this has not been relayed to teachers that this is our policy that we are following?

Tommy Blanchard:

So no, I cannot confirm that. Our past practice has been what is shared shy of the very last part, which is that we will follow through with the kid's request in the event that we aren't able to have conversation and that we're going to honor the guidance that's sitting there. So I came to you when we had the administrative memo to share, because I knew there would be concerns that you had about that, that there will come a point in time where a student is not willing to have that conversation with parents, we have not been able to forge communication and a partnership, and that we will have to follow the guidance.

Katie Medart:

So it is your belief that our entire staff in our school district understands that that is our school district's policy?

Dan Huber-Kantola:

From my part, I know that we've shared that guidance with the administrative staff.

Katie Medart:

Okay. So you believe our administrators are aware of that, but do you believe our entire staff of our school district is aware of those policies?

Tommy Blanchard:

No. I can't say that. I don't know that I can say that for any policy that we have.

Katie Medart:

Okay. I was not aware. And I think there is even an email where I asked back, "Why doesn't our current policy work?" And this is in response to that conversation. And what are the current court cases the district is using to support decision? What are court cases to argue against the ODE guidance? Is a guidance just that, a recommendation? That clearly lets you know I did not know that this was the law, that this is what our school... What we are already doing. I thought this is what was coming. What will happen if a teacher makes a public issue to inform the community? What if a teacher does not honor the new procedure and tells a parent about a student request? These were all questions.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

I think we are being asked to lie to parents if we change to having to honor a minor's request to change gender and name without notifying parents. This policy teaches students to keep secrets and to lie to parents. What are the steps to fight this policy change? And that was sent on Tuesday, February 23rd, at 3:11 PM to Tommy. I will say, I am sorry. I did not know that this was our current policies, and I think that is evident from that email. And I believe that our teachers, students and parents are unaware.

Speaker 4:
Key the I Resolve resolution. The development of that understanding that you had of some kind of approval on the part of the district, right?

Katie Medart:
Yeah.

Speaker 4:
Can we explore that? Are you okay exploring that?

Katie Medart:
Yeah. So-

Speaker 4:
Because I'm getting very cleanly that-

Katie Medart:
That I'm going to get fired?

Speaker 4:
No, I'm not getting that. It's the misunderstanding in the process, that there's an administrator involved and that there's a process of trying to vet out what the existing policy is. The distance change resolution on the part of the school board becomes the model. Just to clarify your understanding of why you would think that that would be in line with district policy instead of out of line with district policy. Does that make sense?

Katie Medart:
Yeah.

Speaker 4:
As something to explore.

Katie Medart:
I sent emails right away. What it, when I joined the team, our desserts of a family, when I did not know what to do, and asking about our policies. I have not put together my timeline. I am working on it to be able to show that I talked with Tommy multiple times. I talked with Bill Gladbach multiple times. I talked with you. And then I worked with Rachel, an administrator, and I was relayed... I wasn't in on it. But that

This transcript was exported on May 31, 2021 - view latest version here.

she had talked to you, you had seen it before we ever went public, that Kirk Kolb had. And I was told right after the meeting, which I acknowledge this is third party. I was not in there. But I was told by Rachel that right after meeting with Kirk, and this is again the Friday before spring break, whatever that date is, that he would take it before legal counsel.

Katie Medart:

And then if there was not anything... Not this next one, because I think it was supposed to be a budget board meeting or something. But then at a later one that if that didn't come back with anything that he would present it to them to consider. And I brought up earlier, when Rachel showed me the format, that was for that recent equity policy where it says, "whereas, whereas, whereas," and then, "we resolve." And the format was the same. We were doing what the district... How do you do this. The title was even inspired because that title with it being a resolution and you see that on ours when we ask you to sign our resolution.

Speaker 4:

Just to flush that out a little bit more, when Katie and I met with Kirk, there was a discussion along those lines. Can you talk about your recollection of that meeting that we had when we were talking about that? About Kirk's reaction to that and then your reaction to that.

Katie Medart:

Yeah. He immediately went into no, how is policy done, that that's his job to decide what policies would go to and then he immediately said Rachel was mistaken in her understanding and that he will not be bringing that policy before the board. And that was last Friday, correct? I have to reference... My days are blurring together right now.

Speaker 4:

Can you talk about your reaction to that? What did you think about that?

Katie Medart:

I was in shock. What I just shared with you, the reason why he said that is because I said to him, I told him my understanding was that when Rachel met with you before spring break, that this is what you said. And she called me immediately after her meeting with you and told me that. And then that's when he shared how he felt, which was that she had mistaken what he was saying and that he will not be doing that.

Speaker 4:

Thank you.

Dan Huber-Kantola:

And Tommy and I said, we weren't in that meeting. I think that was the meeting with Rachel and Kirk.

Speaker 4:

This transcript was exported on May 31, 2021 - view latest version here.

We're not asking you to speak to that. I just thought that it was relevant to the understanding moving forward and some actions being taken in that context, that perceptual context.

Dan Huber-Kantola:

Appreciate that. So let me talk just briefly and give you a chance to take a breath anyway. How's that? I try, and I've done this for a few years now, to have an open door policy as an administrator and that people can come and talk and it's okay to talk to me about, "Hey, I disagree with this or that." I think that's healthy.

Katie Medart:

I agree.

Dan Huber-Kantola:

That doesn't mean we're going to act on it, but it's okay to have those conversations. I think it was the beginning of the year last year when you and I had that conversation, very open to hearing concerns. But we still have to go with what's been done. I think some of your questions helped push us to more clarity because, so what happens if?

Dan Huber-Kantola:

We had lived pretty well with the general policy. Policy is a bad word because it's not a policy. The board hasn't voted, seen it twice, read it twice, voted on it, that kind of stuff. It's an administrative guideline. The board's aware of the administrative guideline. They didn't have any questions about the administrative guideline, that kind of stuff. But that is something we follow. As a guideline, it is something that we follow. So that's what that is. So we did refine... We had lived for a long time in part one of that guideline. We have been very successful. Administrators, counselors have been very successful with having meetings with students. I would say 90% of the time having meetings with students and parents. Maybe it's 70% of the time. Tommy could probably reflect on that better than I can.

Tommy Blanchard:

I can't give you a percentage, but that has been our practice and that when we communicate out with teachers, that it has been after parents have been involved in the process, before their name changes or before a pronoun change.

Katie Medart:

When did that start? Because I know when I [inaudible 00:55:34] got there, that wasn't happening. I was getting them from our counselors before and then that led to conversations about, are parents in the know? And then they weren't, but it was being pushed out to the teachers ahead of time. So was that the idea or last year?

Tommy Blanchard:

Well, it was prior to last year. So it would have been... I don't know.

FER030

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

I think the name change guidance has been there since 2016. I would say that the name change guidance has been in place since before Kirk was the superintendent. It was back when John Higgins was the superintendent that we worked with.

Speaker 4:

The new ODE guidance came out during 2016. Basically said, "This is best practice."

Dan Huber-Kantola:

Yep. And so with that, we had Bill Ransom look at it and we developed some administrative guidelines around that. The things that changed, I think, in the administrative guidance was the final absolute changed because of court cases. You had a court case as close to us as Roseburg where the people who... They say, "Hey, it's not safe. My son is not transgender or my daughter's not transgender. And having somebody with the opposite anatomy come into the bathroom, that doesn't feel safe." And the court said, "We're going to go with persons that identify a gender that way, it is okay for them to come into to that bathroom." And so that's what changed for us was when those court cases came. So the very final, final part of the guidance did change, that said, "Yes. Ultimately if a student says, I feel the most comfortable... Anatomy of a male, but I gender identify as a female, I can use the female restroom." And so just bluntly, some of that's the conversation that I had with Rachel when she came to see to me and talk about that. That guidance was there. Rachel had that guidance.

Katie Medart:

And what did she say to that?

Dan Huber-Kantola:

Didn't think that was good. That's probably the anatomical piece of that. We even had a conversation just bluntly that said, but in Oregon, this is the rule. In Oregon, this is the guidance. The court cases are very close. Even if the federal law were to change, which it seems like it's going to change in a more friendly, probably change the civil rights part of it. But even if it changed the opposite way, Oregon law in education would likely still supersede even the federal law because states have control of education and that kind of stuff. So the guidance for Oregon wasn't going to change. But then you have a conversation, Katie, and I would have the same conversation with you.

Dan Huber-Kantola:

There's a place where you, as a person, have some freedom of speech and your ability to have some freedom of speech, I'm not going to tell you you can't have some freedom of speech. I can say, "I don't know if that's a great idea," but it's still your choice to make in terms of freedom of speech and that kind of stuff. And if it's something outside of work that somebody wants to pursue, as long as it doesn't cross a line and make it so that it feels like it's unsafe for kids based on having you as a teacher or having somebody as an administrator, they can do some things as a private citizen. I hope I'm making sense. And where that line is for education, I think is a little difficult, but to a certain extent, it's clear too; always be protecting all kids. Does that make sense?

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Yes and that is my heart.

Speaker 4:

I just want to follow up. So then Rachel has the guidance, Rachel crafts the resolution to match that resolution, experiment that was recently done by somebody presented to the school board, which I'd like to talk about if you're okay with that, where that came from, because I think it speaks to the intent. Is it purposeful to break the rule? Is it ignorance because I don't know the rule? Or is it, I have tacit approval and administrator input and I'm doing this thing. That's what it looks like. Which I'm sure it's perception at this point, but I think it's maybe... I don't know if this is the time to clear it up. You can decide. And it's off the rails a little bit. And I apologize for that, but it really does speak to... Katie's honestly answering the questions and the impression that I get is that she feels, in this entire process, that this has got a thumbs up by the district office.

Dan Huber-Kantola:

So is that true?

Katie Medart:

Yes. I've gotten feedback [inaudible 01:01:06], but no one said, "Do not do this," or, "This will reflect bad on this," or, "This will cause harm to kids." I have not heard that.

Speaker 4:

I think more specifically, the question is, did you feel like you were breaking some rule within the-

Katie Medart:

No.

Speaker 4:

Within the district guidelines? This wasn't secret. It was out in the open.

Katie Medart:

It was.

Speaker 4:

It was in the building.

Katie Medart:

It was. It was in the building. It was brought to... And obviously, I was trusting, but you confirmed that you had seen it before we went, when we would put it on there and-

Speaker 4:

Some version of a resolution.

This transcript was exported on May 31, 2021 - view latest version here.

**Katie Medart:**

And that Kirk Kolb had also seen it. And what we ended up putting out there was even less, and that was because I advocated for that. The why part, the whereas, I didn't think that was... It didn't matter what the why part was. The job was the proposed policies that were fair and form an implementation for all students.

**Speaker 4:**

But then that leads to the, it's a pushback to an existing policy. Right?

**Katie Medart:**

Mm-hmm (affirmative).

**Speaker 4:**

Not that you understood that, but somebody understood that.

**Dan Huber-Kantola:**

Yes.

**Speaker 4:**

Right? Okay.

**Dan Huber-Kantola:**

For my point, the second time that I met with Rachel and saw the resolution, she talked about you guys potentially doing a video, that as I said, "You know what? Time out. You need to meet with the superintendent as an administrator before you do anything."

**Katie Medart:**

I think everybody understands that.

**Dan Huber-Kantola:**

Because there's red flags.

**Katie Medart:**

So then you knew for sure that I was the other employee that was on it?

**Dan Huber-Kantola:**

I did. Now what you guys were going to say, exactly how the video of what you guys were going to do, I don't think any of us knew.

**Speaker 4:**

Well, and you have the right. We've talked before. You have first amendment rights to speech.

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

And that's where it gets tricky.

Speaker 4:

So I think what Danny is saying is he might've listened. That's what I think I hear you saying. And he certainly cannot tell you what to do in your personal life, particularly when it comes to speech.

Katie Medart:

But do you think it would have been... You could have sent an email saying, "Katie, I see this, I'm aware of this and this is not a directive, but advice to consider, if you thought it was reflect badly, be linked to the district or violate any of these policies, I'm concerned this will be in violation of these policies."

Dan Huber-Kantola:

I think what's in violation of the policies really is the work on it right now. And it could be that what was said was a violation of some of the biased policies and some of the other policies in it. That's a real fine line, Katie, where... Man, how do I advise you about free speech? I'm damned if you do and damned if you don't on that one to a certain extent. But I do know that there was a conversation that was going to be had with the superintendent before anything was going out. And I do believe that that conversation took place. What that conversation looked like, we'd have to ask Kirk, we'd have to ask Rachel. I do know that the administrators in the district had those guidelines, because talking about those guidelines, we've got those in the administrative meeting, I want to say in February. Maybe earlier.

Tommy Blanchard:

I'm not sure. I don't know.

Dan Huber-Kantola:

I would have to look.

Tommy Blanchard:

We had a conversation pretty much instantaneously. I don't remember the date.

Katie Medart:

Does the February date that I referenced on that email?

Dan Huber-Kantola:

It's possible. Obviously, we have minutes on that. Everything too, I would guess it was the second Tuesday of February would be y guess.

Speaker 4:

Are there other policies apart to the complaint?

Dan Huber-Kantola:

Yeah.

This transcript was exported on May 31, 2021 - view latest version here.

Tommy Blanchard:

So I'm going to just read a number of these that are basically lumped into the same thing. It's student rights and responsibilities. Do you need to hear exactly what policy it is? You see it in there. It's JAF, JFA, JM, ACB, and JBB. It's rights and responsibilities to staff-student relations. All students belong in the district educational equity piece. And so this is directly in response to those policies that were in Rochelle, Kate and bonds. Very similar complaints. So I'll read the pertinent parts. Among these, student rights and responsibilities are the following. And this one specifically for the civil rights, including the rights to equal educational opportunity and freedom from discrimination. The responsibility not to discriminate against others. Policy JM is the staff-student relations. The relationship between staff and students should be one of cooperation, understanding and mutual respect. The teacher has a responsibility to provide an atmosphere conducive to learning and to motivate each student to perform to his or her capacity.

Tommy Blanchard:

Under all students belong, there's actually a couple of things on here. But all students are entitled to a high quality educational experience free from discrimination or harassment based on perceived race, color, religion, sex, gender identity, sexual orientation, disability, or national origin. Under that, there's a bias incident. Means a person's hostile expression of animus towards another person or group of persons related to the other persons or groups distinguished or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability, or national origin of which criminal investigation, blah, blah. Not so much that part. Policy JBB is a district educational equity piece. Grants Pass School District is committed to the following foundational beliefs, every adult employed or volunteered in a district will act to eliminate disparities, to prepare all students for college career and life, and an inclusive, welcoming, supported, and safe environment plays a critical role in supporting a child's educational goal while supporting overall wellbeing.

Tommy Blanchard:

And the district will create and maintain schools with a welcoming, supported, safe, and inclusive culture, affirm the identity of each student, acknowledge and celebrate differences to create a sense of belonging for each student, identify and counteract bias practices that perpetuate achievement disparities and lead to disproportionate levels of student success. And then actively recruit, hire, promote, and retain staff that reflect student demographics at all organizational levels, support all employees to engage in culturally responsive practices and delivery of quality instruction and service. So those are all lumped together there. So I got a couple of questions on those. Those were the specific policies that were put in those three complaints there. Do you have a response to that information that was shared that came in the complaints? How you would address their concern about how that is a violation of work policy by what has been promoted in the I Resolve movement?

Katie Medart:

And so if I hear you, what you're saying is that their complaint is saying that I Resolve, my involvement in that is in violation of those things?

Tommy Blanchard:

Well, so the parties involved in the I Resolve movement, specifically being you because we're talking to you...

This transcript was exported on May 31, 2021 - view latest version here.

PART 2 OF 4 ENDS [01:10:04]

Tommy Blanchard:

Involved in the unresolved movement, specifically being you, because we're talking to you right now.

Katie Medart:

Yes.

Tommy Blanchard:

How that, and what is shared is in violation, the alleged violation of war policy, which I just shared with you.

Katie Medart:

It's just, I... I guess my response is I am trying to understand how it is that I don't feel that I have violated that.

Tommy Blanchard:

So do you feel that all students are welcome in your classroom?

Katie Medart:

I do. Absolutely. It's why Griffin can approach me and talk to me. I love all of my students.

Tommy Blanchard:

Do you believe that if your students are to see what's on the video and on the site that they have the belief that they're welcome. If a transgender student and sees the video and watches that, is there a concern on your part that they may feel unwelcome or concerned to enter that environment?

Katie Medart:

After considering my complaints? I would say yes. Did I think that when we published it? No, I genuinely believed that it is then to be inclusive policies for all students, whether you identified as transgender or non-transgender.

Katie Medart:

I even went so far as today to contact my brother. My brother is gay and we are very close and I sent it to him. And after reading these and not knowing how some people would be offended by it. I asked him if he would take a look, give me feedback and reach out to his LGBQT community. And I told him, I genuinely care. And asked for, if they had recommendations about how to better write or change that, so it would be inclusive. So that it wouldn't offend knowing if they identified that way, that they were direct someone giving that input.

Tommy Blanchard:

FER036

This transcript was exported on May 31, 2021 - view latest version here.

Did you at any point consider, or did you have conversations with anybody in the LGBTQ community to seek input from them to see what their thoughts were on the language that was there? Or what it was putting out or how it could be interpreted?

Katie Medart:

I did send it to my brother, but I didn't hear back from them until today. I was like, "Hey, I need some time." He is a store manager for a store, so he's super busy. But yes, I did send it to him and his partner.

Tommy Blanchard:

So how do you think the student from the LGBTQ community when they see what's out there, what message is trying to be communicated to them and how do you think that is to be received by the community?

Katie Medart:

And I have to state this, because I feel like some of the lineup question is almost like the title reads Transgender Policy, but it's not, it's gender policy, because we all have a gender that we identify with. And so it was really meant for all genders. If your question, Tommy, is for me to speculate if I was or how I think that someone in the LBGQ Tea Club or a member of that would feel if they watched that. So I'm putting myself in their shoes when I went through the bathroom policy and looked at that.

Katie Medart:

And we've added this too, because we worked with what was our current circumstances. Ultimately I am for gender neutral bathrooms for all, with hopefully funding to pay for that. But in there, the anatomical part we thought that it was removing the gender. And just looking at the biological anatomy, then it's not a question about, so was making bathrooms about function instead of being a part of how we identify. And then the third part in there, which was if there is another bathroom, is because that could apply to all students. It didn't just have to be, if you were a transgender student. It could be a policy that if you didn't feel comfortable using your restroom, no matter how you identify, you could make a request to use if there was another restroom available, as the third point. And so I thought that that gave everyone options, it didn't matter how you identified.

Katie Medart:

And the next one is with names and pronouns and the derivative of a name was because that could be fair for all students. Not just if you identified as transgender. No matter what, if you wanted to be able to change your name, it was a policy for all students to be able to go by. And so it generally was thinking about, not one group, not two groups, but could that apply for all students and not to discriminate against any group of student. And the last part, the freedom of speech, and requiring parent permission, because I believe when my nerves... That is so important, having parent involvement.

Unknown:

Katie, can I just clarify for you, right. You're talking about the bullet part.

Katie Medart:

Yes. Is that not what he's asking me? He's asking me about my video, those are on the video.

This transcript was exported on May 31, 2021 - view latest version here.

Unknown:

Good. Okay.

Katie Medart:

Yes.

Unknown:

So, I don't know.

Tommy Blanchard:

You kind of just went down the list of things that were on the resolve. It goes from kind of anatomical and bathroom stuff down to pronouns and names.

Unknown:

It might be relevant that you distinguish the first part from the second part.

Katie Medart:

I don't identify with the first part.

Unknown:

Okay.

Katie Medart:

The way that is. I don't, that is not on there because I told her. I was like, "We should remove that. That doesn't matter." That's like trying to convince someone of why we need these, verses are these fair. And so.

Unknown:

Thank you.

Katie Medart:

Yes.

Dan Huber-Kantola:

But they're all out there? Both parts are out there?

Katie Medart:

Yeah. I mean, if someone downloaded that, that was the original version. Yes. And I can't tell you when, but I could figure out when it was removed.

Dan Huber-Kantola:

This transcript was exported on May 31, 2021 - view latest version here.

So the first page of the Whereas could no longer be found. So the first time I ever went to I Resolved, and I went in there.

Katie Medart:

Yes.

Dan Huber-Kantola:

Right now?

Katie Medart:

That's the last time I checked, it was not. And I hit even pull it up right now.

Tommy Blanchard:

So.

Katie Medart:

I even... Can I share my interaction with you about how I became. The other day when we were talking, she brought up and she kept reading that. And I was like, "Nikki, that is an old version. We're not using that. Why are we talking about this?" And then she's like, "No, it's on the website." And I was like, "No, it's not." Click. And I was like, "You're not going to be signing if you click here, you have to do it. You can click here. And it doesn't automatically sign." And as like, "Click there on the homepage." And I sent her a screenshot even of it. And she's like, "No. No, Katie." I was like, " Go up. And the three little bars, the pull down tab, it said Home Resolution." She said to click on that one. And now it's fixed, because immediately after-

Unknown:

So things have changed?

Katie Medart:

Yeah. After I talked to her, she pointed out to me that it was on there, but that one wasn't able to be signed. All of them that have been signed have been... Even if you click any of our buttons and you check any of them, it only brings up the bullet points, the policies. None of the Whereas or any of the things that have been signed. And-

Unknown:

If I signed electronically, that's what I get?

Katie Medart:

Yes. And we haven't received any paper signatures. And then if you... Yeah, so I checked all of the buttons and then immediately when she brought that to my attention, I contacted Rachel and I said, "Rachel, I don't know if you know." Because I don't edit the website. I don't have access to editing the website. So I sent her a message saying, "These are still up there. Please pull those down." And then she

This transcript was exported on May 31, 2021 - view latest version here.

did. And they're not up there anymore. The Whereas just the ones with the, "Therefore be it resolved." And the five bullet points.

Katie Medart:
[inaudible 01:22:26].

Tommy Blanchard:
Thank you.

Unknown:
So, Tommy, are those the last questions that you had about those policies?

Tommy Blanchard:
Yeah.

Unknown:
Because I interrupted you again. And I apologize.

Tommy Blanchard:
I did. Yeah. We have a couple more questions unrelated to the... Dan, did you have anything in addition or anything to contribute to that last part? Are you ready to move on to the next?

Dan Huber-Kantola:
You know? Yeah, I was going to do this at the end, but we can do it now. How's that?

Tommy Blanchard:
Okay.

Dan Huber-Kantola:
And I'll say where he's going is there's a specific question for that's different for the one that Tanika wrote and a different one for what Tracy wrote that he wants to ask you about too. But since we're on this kind of general path piece, part of it I guess is just want to share some stuff with you. So the reaction that this generated in part is caused because of a lot of pain, that I think students over time and even past students have experienced. And I've been a minor part of it, Mickey's been a much bigger part of it than I have even at, but at the high school, they've had town halls where the students have shared with us their stories.

Dan Huber-Kantola:
And we started with racism, the way that they were treated in the halls and the things that were said, and that kind of stuff. And it did evolve until we wanted to talk about all kinds of issues. And so the LGBQT+1 did get discussed and powerful stories about how those students were treated at home. How the students were treated at school. How those students were treated in bathrooms? How those

This transcript was exported on May 31, 2021 - view latest version here.

students, some of them got to the point where, "I'm not going to drink water all day because I'm not going into a bathroom."

Katie Medart:

That's awful

Dan Huber-Kantola:

Just heinous things that were happening because of their gender identity. A student that got to go to an elementary school as a kind of a pre-teaching experience out of high school who was changing genders and just how that student got treated by some of the parents and things when that became known. Just the horrible stuff. They really made... And there was a board member, I think that was at one of those meetings as well.

Unknown:

Three.

Dan Huber-Kantola:

And came back and said that can't happen. And so this has got to be a safe place for all kids and that kind of stuff. And this is just our students that we're hearing from, and it's been going on probably for a much longer period of time. And people have been very quiet about it until they get out of high school to find their lives. So I think this triggered that. All of that. So I think it comes across from people who've experienced that as hateful. As, "They don't really like us." That you think there's something mentally ill with us. And I think that's what triggered with this? So I guess a couple of questions. So that would actually be a response maybe even-

Katie Medart:

Is that available? That town hall? Was it recorded? I don't know.

Unknown:

No.

Katie Medart:

Why I ask this, is because I would love to hear.

Unknown:

I mean, it's sort of like the LGBTQ club at North, right? In that the design is to create a safe space and then the participants, they decide who it is.

Katie Medart:

Yeah.

Unknown:

This transcript was exported on May 31, 2021 - view latest version here.

We make suggestions, they decide. Which I think is right under the circumstances. That it creates a safe space. Should there be an elaboration of that? Yeah. And some of our other staff asked about that as well. Was kind of a topic for our second year coming in, I think. And then likely moving forward we'll do something else, but pandemic and all best laid plans. So we did it for institutional racism. We did it for LGBTQ. And then we also had one plan for abilities.

Dan Huber-Kantola:

Right.

Unknown:

Ability differences. Again, to create those safe spaces for kids where they know they are a part of the greater whole, because that's what we do.

Katie Medart:

Yeah.

Unknown:

Yeah.

Dan Huber-Kantola:

Yeah. So, I mean, you know that those are the guidelines. You know the why I think behind why the board is so firmly adopted that all students belong and that kind of thing. So I guess knowing that those are the guidelines, would you be able to follow those guidelines?

Katie Medart:

Yes.

Unknown:

Can you elaborate? What do you mean?

Katie Medart:

I know.

Dan Huber-Kantola:

So if you get an email from a counselor that says, "You need to use students changing their name to Daniel and it used to be Jill. Right now the parents don't know, but for now it's Daniel and it's he, him. They're going to be the pronouns.". Are you able to follow them?

Katie Medart:

So my scenario is that the parents don't know.

Dan Huber-Kantola:

This transcript was exported on May 31, 2021 - view latest version here.

Yeah.

Katie Medart:

And then I have to be able to call the child at different name, without the parent's permission and change their pronoun?

Dan Huber-Kantola:

Yeah. That is the guidance. Knowing on the other end that they're working with somebody in an administrator or a counselor and they're having conversations and they're talking to students about when it's safe or how it's safe, or if it's about having those conversations. They may never get there in their time during middle school. They may not get there during their time during high school. I mean, just block them. It happens occasionally. But knowing what the work was at the beginning and what they're continuing to work and talk with the student, but ultimately the parents may not know.

Unknown:

So that's the question?

Dan Huber-Kantola:

That's the question.

Unknown:

Parents don't know. I have to call the child with a different name and use different pronouns.

Dan Huber-Kantola:

Yeah.

Rachel Damiano:

And then your question is?

Dan Huber-Kantola:

Can you do that? Would you be able to do that?

Katie Medart:

Can I have time to think about that?

Dan Huber-Kantola:

Absolutely.

Katie Medart:

Beyond today?

Dan Huber-Kantola:

This transcript was exported on May 31, 2021 - view latest version here.

Yeah.

Katie Medart:

Because it's...

Dan Huber-Kantola:

Yeah. We'll leave that. Now Tommy, I'll let you ask the questions about the other two complaints that had separate things.

Tommy Blanchard:

Okay, so in reference to Nika's complaint. One of her concerns is that you are sharing that it was her decision or somewhat blaming her for not allowing you to attend the meeting. And so my question is, did you have conversations with staff members about not being able to join the LGBTQ meeting and indicate that Tanika was responsible for that?

Katie Medart:

I had a conversation with Mason Mahaffey that I was not allowed and the reason why is did it come up that I was not allowed to attend? And that I had felt that I was discriminated against.

Tommy Blanchard:

But you didn't state that it was Nika? Did you state that to Mason that it was?

Katie Medart:

I did when I talked to Mason, I told him. I didn't document this after. So. I described what had happened. That's what I did, and then told him how it defaulted to, when there wasn't a policy that legal counsel said that it defaulted to the club members going up for a vote in that. My name was mentioned, and I was told that I would be able to attend.

Dan Huber-Kantola:

Any recollection with Mason about what you said about Tamika?

Katie Medart:

I think I would have said, and it wasn't just to Nika. I told him what had happened that morning, that I went in to Bob, because I had had prior conversations about wanting to attend the previous year and asked him if I could attend. And I had shared why I had felt that he had told me some of the things that had come up that... I don't actually know if I shared this Mason. So right now I'm speculating about a couple of weeks ago. So I don't want to say I did, when I'm not sure if I actually shared that with him.

Katie Medart:

I know for sure the message was relayed that I tried to go to the LBGTQ Tea Club. That Bob and Nika had problems with that or concerns. And those were then brought to Tommy, and then I was informed it went to the district office and legal counsel. And that I had felt discriminated against. That I can say that message was relayed and shared.

This transcript was exported on May 31, 2021 - view latest version here.

Tommy Blanchard:

Anything else on that one?

Dan Huber-Kantola:

I think Tanika's impression from talking to... Again, probably third hand information, was that she was the one blamed for you not being able to go to that particular meeting.

Rachel Damiano:

That's from Mason? Or just from the complaint?

Dan Huber-Kantola:

The complaint.

Rachel Damiano:

Okay. Thank you.

Tommy Blanchard:

And I think part of that is coming from, in your communication to her, which I think she has in the complaint, when you said, "So you can imagine how disheartening it was when Tommy told me I was not allowed to attend after you and Bob both advocated against it."

Katie Medart:

And that's obviously my words of how I felt that they both went, after they had said to me, to my face, "You could come." And after I answered a line of what I feel is very inappropriate questions that they asked me, but then I entertained them and answered them respectfully. And I came in, reported the interaction after, but they had already reported to you. And then you informed me that it was involved, but that they had expressed concerns about me attending, even though both of them had said to me, yes, I could attend. And I was welcome.

Tommy Blanchard:

Yeah. There are concerns were prior to Nika having a conversation with you. She came to have the conversation with you while we were having our conversation. And so-

Katie Medart:

I didn't know that. So you were saying, when she came into my class, then that she hadn't talked to you yet?

Tommy Blanchard:

Correct.

Katie Medart:

Okay.

This transcript was exported on May 31, 2021 - view latest version here.

Tommy Blanchard:

So I had then gone to her and said that in the absence of policy, that they don't get to make the decision on that. And so that's when I came to you and said that we would not be going.

Katie Medart:

Okay. So my understanding of that, so I talked to Bob about first, Bob went and talked to Nika. You agree with that?

Tommy Blanchard:

I heard that. I don't know for sure.

Katie Medart:

Okay. Then I was under the impression that when I talked to you that both of them had already talked to you, but by the time I had talked to you, you told me that, and that's why district and legal counsel were giving their opinion. And at that point she had just left my... I came to you after third period, she was in my classroom at the end of second period. So when I talked to Bob, Bob talked to Nika, by the time I saw you in the afternoon, to report to you both in my interactions, Nika had already been. I couldn't report to both of them until after she had come in.

Katie Medart:

So she came in at the end of second period. And then right after third period, I came, and once I didn't have students and reported the interactions to you. And that's when I was told, you were already aware by the time I had talked to both of them, had already talked to you, you were already aware of it.

Tommy Blanchard:

I was aware. I had never had a conversation with Bob.

Katie Medart:

So it was just Nika?

Tommy Blanchard:

So Nika had come in and shared that she and Bob had had a conversation. And there was some concern about guests coming into the club. And so she had not spoken to you at this point in time. I said that I was contacting the district office to seek some guidance on this, about who is the person that shouldn't be making the decisions about who comes into the club or not? Is it the kids? Is it the advisor? I did not have a conversation with anybody about going to speak with you. I didn't know until after the fact that she had come down to talk to you.

Katie Medart:

So you didn't tell her, "Go talk to Katie."

Tommy Blanchard:

No.

This transcript was exported on May 31, 2021 - view latest version here.

Katie Medart:

Okay.

Tommy Blanchard:

So in the meantime, there have been some kind of conversations.

Katie Medart:

Yes.

Tommy Blanchard:

And they had, they, her, I don't know, both of them or one of them, according to you, had said you could come to the club.

Katie Medart:

Yes.

Tommy Blanchard:

While we're having our conversations over here and our guidance is absent of policy, they're all going to defer to the kids. And so when Nika had come in for me to explain that to her, I had heard that she'd had the conversation. I said, "You don't have the ability to make that decision." So I went to you to share how that played out.

Katie Medart:

Yeah. I didn't hear that. The understanding I left with was that, I talked to Bob, Bob went to Nika. When I say this, I'm not saying... I hear you're saying now, you're saying that you had heard from Nika, but then Nika went on her own after. I talked to Bob, Nika came to me, then both of them went to you. That did not happen. Okay. I hear what you're saying. And we didn't go through that detail. We didn't talk about. So I see an error on my part of not knowing how the order of sequence of things that happened. But what I did hear was that there was concerns expressed about me tending and from them. So what you did was seek guidance from the district office and legal counsel, like you just explained about who makes that decision. Is it the advisors. And then what I got back from you, the directive was I could not attend because it defaults to the members of the club when there is no policy.

Katie Medart:

And so then they were going to have to go and ask the students how they felt about me because I was being identified as a visitor. Yes. And then I asked you questions about what made me a visitor when I'm already an approved district employee that works with these students in my classroom.

Tommy Blanchard:

Yeah. And that's kind of led to some other things we've talked about, about needing a policy in place for the role of the advisor and bylaws, and what's a club, and all that kind of stuff.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Yes.

Tommy Blanchard:

So there's work to be done there.

Katie Medart:

Yes. Okay.

Rachel Damiano:

What was the original question?

Dan Huber-Kantola:

The original question was, Nika really concerned that with a colleague at the school, that she was thrown under the bus so to speak, for a decision that she didn't really make.

Katie Medart:

Okay.

Dan Huber-Kantola:

And so she really felt like you were the one who said, this shared with other colleagues and kind of discouraged her. And that was part of her concern. Was, did you do that? She feels like you did. And some of how we answered that.

Katie Medart:

And I would say, did I share my experience of what happened to me? I did. Did I call Nika any names or Bob or. No, absolutely not. I did not do that. I stated my experience of what had happened to me and even the level of detail that I went in with Mason, I don't think that was, it's not as detailed as what I wrote about in my interactions.

Tommy Blanchard:

Okay. The last one is about, from Tracy Pablos and she makes a statement in there. And I just want to hear your response or thoughts on that. And it has to do with her statement that says, "There is a separation of church and state in which a public employee cannot encourage their religious beliefs onto others in a matter that impacts their ability to do their job." Can you tell me how you would respond to that statement?

Katie Medart:

I'm just trying to find it.

Danny Huber-Kantola:

It's on the third paragraph, on the first page.

Tommy Blanchard:

This transcript was exported on May 31, 2021 - view latest version here.

[inaudible 01:43:20]. I typed on my notes. I have to go back.

Mickey Jarvis

However the Supreme Court has indicated.

Tommy Blanchard:

Yes.

Mickey Jarvis

Do you find that right there? Third paragraph. "I'm unapologetically supportive." That's how it starts. And then it's about midway there, "That however the Supreme Court has indicated." It's about four sentences in.

Katie Medart:

Okay. Thank you.

Katie Medart:

I don't think that my faith interferes with my ability to do my job.

Mickey Jarvis:

So what's the question here again?

Tommy Blanchard:

Just your response to that statement there. And so part of it, there's a follow-up that you have made a statement that faith does not affect my ability to do the job. Mr. Kantola just asked you if this was what we're supposed to do. How we're supposed to handle that situation. Is that your faith telling you that... You can't answer that question right now.

Katie Medart:

I know.

Tommy Blanchard:

So it gives me a little bit of concern when you say that my faith does not affect my ability to do the job. That it may.

Katie Medart:

But remember, I stated earlier that I did not know that that is what I am supposed to be doing.

PART 3 OF 4 ENDS [01:45:04]

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

... oh, that that is what I am supposed to be doing. Right? I made that very clear earlier that I did not know that we're saying this is the policy already. This is what it has been. And so, for me, that, I think, is very clear. I felt like that was new information. And then I was asked that. And then, so I don't believe that it has interfered with my ability to do my job, but that I have asked for time to consider answering that other question.

Katie Medart:

(silence)

Dan Huber-Kantola:

Yeah. It's hard to get at that one. Let me ask that a different way. So were you to project your beliefs on the other teachers and students at District 7 schools?

Katie Medart:

By...

Dan Huber-Kantola:

By doing the I Resolve video. Was your faith beliefs part of was inspired that, I guess? I Resolve, was that part of an effort to have your beliefs expressed on and taken up by teachers, administrators, students, in the district?

Katie Medart:

So did my beliefs influence...

Dan Huber-Kantola:

Not did they influence, was that an attempt? Were you trying to do that?

Katie Medart:

Trying to push my beliefs on other people?

Dan Huber-Kantola:

Yeah. There you go.

Katie Medart:

No. They have a choice, rather they want to choose to sign that or not. And it was literally to look at this policy and consider this. Even if you didn't, I would still... Tommy didn't sign it, but I honor and respect him and treat him professionally. Even if we were to disagree, that is okay.

Dan Huber-Kantola:

Okay. Does that help?

Speaker 5:

This transcript was exported on May 31, 2021 - view latest version here.

Yeah.

Tommy Blanchard:

Yeah.

Dan Huber-Kantola:

Okay. Thank you.

Mickey:

So then, just to clarify that last piece.

Dan Huber-Kantola:

Yeah.

Mickey:

I just want to make sure I'm going to help versus hinder, or compound. So the reason that you are in the I Resolve movement that you created or co-created or participated in, the I Resolve movement is not to push your religious belief.

Katie Medart:

No. It is to write fair policies for all students. That was the intent.

Mickey:

What policy that exists is... or the understanding of the policy.

Katie Medart:

I said, we're going to put it this way. My-

Mickey:

Or the confusion in the policy.

Katie Medart:

Yeah. One, the confusion in the policy, the understanding of what I thought was coming. Our video even makes that clear that this is coming, not that... Our video says that. Not that it's here, not that this is our current policy. It says this is coming.

Mickey:

Thanks. Okay.

Dan Huber-Kantola:

Just to clarify that. The video does talk about the equity at the federal level. And the video does talk about Senate Bill 52? I believe, and so yeah, those are things that are coming.

This transcript was exported on May 31, 2021 - view latest version here.

Katie Medart:

That are open for public comment.

Dan Huber-Kantola:

Yes. But the district guidance, in the ODE guidance, has been there since 2016. And I guess I would ask you, have you seen the ODE guidance document?

Katie Medart:

I don't... Did I skim over it? I think I...

Mickey:

Which one are we talking about?

Katie Medart:

Yeah, which one are we talking about?

Dan Huber-Kantola:

It's not in our packet, but there is guidance from ODE, from 2016. And so I want to say that in some cases...

Katie Medart:

Yes.

Mickey:

This is guidance to school district creating a safe and supportive school environment for transgender students?

Dan Huber-Kantola:

Yep.

Mickey:

2016? That's only place I knew where to find it.

Katie Medart:

No. Yeah, well, that's the one. But I wanted to say... I want to bring that up. I don't know if I have it printed, because there's something I wanted to point out on it. Do you have a copy of it with you, Danny?

Dan Huber-Kantola:

I don't.

Mickey:

This transcript was exported on May 31, 2021 - view latest version here.

The guidance?

Katie Medart:
Yeah.

Dan Huber-Kantola:
I don't.

Mickey:
I don't either.

Katie Medart:
I don't think I have it either.

Dan Huber-Kantola:
But you have seen it then?

Katie Medart:
Yes.

Dan Huber-Kantola:
Okay.

Katie Medart:
And can I please pull it up?

Dan Huber-Kantola:
Sure.

Katie Medart:
Okay. So it's two...

Mickey:
And that's called... Well, I think that's what it's called, right? 2016 Guidance in School District: Creating a Safe and Supportive School Environment. Actually, it should be... That's probably down here, also, maybe? No. Don't see it down here. I need to [inaudible 01:51:07].

Katie Medart:
Okay, guidance given by ODE, Guidance-

Mickey:

This transcript was exported on May 31, 2021 - view latest version here.

Guidance to School District: Creating a Safe and Supportive School Environment for Transgender Students. Did I miss... Did we change the acronym, LGBTQ, LGBTQ. Why is the T at the end?

Dan Huber-Kantola:

Yeah, it's a little longer.

Katie Medart:

But, it is...

Dan Huber-Kantola:

LG-

Mickey:

No. So we always say, LGBTQ-

Dan Huber-Kantola:

... LGBTQ-

Mickey:

The name of the club is LGBTQ.

Dan Huber-Kantola:

... IA+.

Mickey:

But we keep talking about it, like the T at the end. Did I mischange someplace?

Dan Huber-Kantola:

In the club?

Mickey:

Just in how we're using the acronym.

Dan Huber-Kantola:

Yeah. It should LGBQ, LGBTQIA+

Mickey:

Right. Thank you.

Dan Huber-Kantola:

Yeah.

This transcript was exported on May 31, 2021 - view latest version here.

Mickey:

Just didn't know if there was a change that I missed.

Dan Huber-Kantola:

No I-

Mickey:

It was at the end somehow, for some reason.

Dan Huber-Kantola:

Because Danny can't remember.

Mickey:

But you're not the only one. Was just curious.

Dan Huber-Kantola:

Yeah. No, it's still...

Mickey:

Because it's April

Dan Huber-Kantola:

Yeah. Spring.

Katie Medart:

Look at right here on it, "These guidelines are not legal advice, nor should they be relied on as legal advice. If you require legal advice regarding the issues discussed in these guidelines, please consult an attorney."

Dan Huber-Kantola:

Which we did.

Katie Medart:

Okay. But that is why there is a belief that this is not law, that we are not violating any law. That's why it's presented that way on the video, that it is guidance, that it is a recommendation, that it is... They have it bolded on that document. These guidelines are not legal advice nor shall be relied on as legal advice. That is the part, I know I read.

Dan Huber-Kantola:

Okay.

Mickey:

This transcript was exported on May 31, 2021 - view latest version here.

Okay.

Dan Huber-Kantola:

Appreciate that.

Mickey:

Good.

Dan Huber-Kantola:

Yeah, that is good. How about a quick summary? And I don't know how quick it will be, but let me try. Okay? I mean, timeline wise, it's going to take us awhile. I'll probably be asking you for an extension because there's a lot here. So what we have to do is try to take what's... This is this a complaint, what we've talked about today, probably talk to some other people, interview some other folks as well, and say, were policies, were things violated? Okay?

Dan Huber-Kantola:

And so first one we have to look at was the GCAB violated with the social media posts? Did it cause a disruption? Is it significant or any disruption at school? So did it violate that particular policy? If so, then what? Same with the JOICBAR, the student confidentiality, did the post violate that? And if so, then what? The policy, GBG, about designating viewpoints and that kind of stuff, did that violate that or not? And if so, so forth. Did you violate the user agreement, the internet user agreement, and policy GBG about using school time and school equipment to do political action stuff?

Dan Huber-Kantola:

And if you did violate that, then are there consequences to that? I'm saying with that group of things that Tommy read there, with the ones that are in the complaint about the students and the students feeling welcoming and all of those types of different things. And then just down the line, trying to identify were things violated and that kind of stuff? And I heard what you said, that there was a part of this that you felt like people knew.

Katie Medart:

We really thought we were being respectful and honorable in how we were doing it before just going onto social media. I recognize, just as there's a process that we are going through with this, that there is a process and a respectful way to go about it, and before you go and launch something. And so we really thought that. I believe that, and I believe Rachel will say she believed that. We were not trying to be sneaky, we were not trying to do behind the district's back. It is why we approached people in the district.

Dan Huber-Kantola:

A lot of time, it seems like there was a significant amount of time spent on this, district time, with reaching out to people, with emailing people, with getting revisions to the policy or to the resolution, to those [inaudible 01:56:26], scratched loop policy to the resolution.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

But do you feel like I didn't do my job?

Dan Huber-Kantola:

I would have a hard time saying that that's within policy to do, to do those things during district time, to use district equipment to do those things.

Katie Medart:

I understand, and I hear what you're saying. And I have obviously confessed to the fact that I did that. I also know that there is so many other staff members that have done the same thing. Should I disclose the one that I sent a screenshot or should we wait?

Mickey:

You... I don't know that I could advise you rightly or wrongly here.

Katie Medart:

So...

Mickey:

Will this harm you in any way? No. That's what I'm going to say.

Katie Medart:

I know you've explained the process, but obviously, I don't have it memorized.

Mickey:

Yeah, would this harm your position in any way, shape or form?

Katie Medart:

Okay, so there is-

Mickey:

... I don't believe it would. That's still-

Katie Medart:

There is number of people who, on school property, during working hours, went, signed. We have way more people that work for the district who have signed the policies, than the number of complaints that are here. And even messaging opinions and views to IGP Resolve with their school email, during working hours, to voice their opinions and views. Yes. And I guess I would ask that if would I actually hear you saying that I've confessed, that is our policy. I did that, but that I would hope that there was consequences for everyone. If I'm going to receive a consequence because it is not, obviously... I don't know how I want to describe whatever that problem is, it's occurring, and it's not just by me.

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

I don't want to say, but Kirk Kolb, Michael Endicott gave a response, Kevin Bishop recently with, and a response to that, to the entire school district. I didn't send mine out to the entire school district. And that's not to compare or to blame someone or to just have you consider the fact that... I understand that there is a policy and I'm being told that I violated that policy, when I am saying is that there is so many district employees in violation of that very same policy. So to be disciplined for it would feel very unfair if it was investigated, if all employees that have violated that and not be disciplined.

Dan Huber-Kantola:

Okay.

Katie Medart:

And once I was told that I was in violation, I stopped. I stopped working on it and nothing on school property, nothing during working hours. And I have maintained that boundary.

Dan Huber-Kantola:

When was that, Katie?

Katie Medart:

With Kirk Kolb and Mickey, on Friday?

Mickey:

Friday. Kirk was pretty clear. We asked him to be clear with our notes. We certainly can offer those to you, that part of our version of the notes, that conversation. Moving forward, what is the advice that you have? What is it that Katie needs to do?

Dan Huber-Kantola:

What was his advice on social media?

Katie Medart:

He said, well, you clarified. Why are you shaking?

Mickey:

I don't remember, that's why.

Katie Medart:

His advice was if he could make a recommendation that we would take down the video and the website. And then she clarified, "That's not a directive, right?" And he said, "Yes, that's not a directive."

Mickey:

It was like, "Mm-mm (negative)." He asked questions that you asked. I mean, there's a little conversation about the club. We talked about what the... Because there was a language difference in resolution versus policy, about what was the intention of the resolution? Public employees in Oregon

This transcript was exported on May 31, 2021 - view latest version here.

prohibited from doing political work during work hours or on work property, on the job. And then a promotion of equity. Those are the two pieces of guidance.

Mickey:

But there wasn't anything about... I mean, the only thing for social media was the... It was my fault. I asked [inaudible 02:02:26], "If you had any advice, what would it be?" And he said, "Well, you could take down the video on the website." And I said, "But you're not saying that as a directive." And he said, "Nope, absolutely not." And then I apologized for putting him in that position because it could have been construed that way.

Dan Huber-Kantola:

And it's still up.

Katie Medart:

The video by link, and it's on our website. If you go there right now, it's not on there. The social media, I don't know, because I'm not on social media. The only way I know that it's on... I'm not on social media. I'm just not.

Mickey:

Who put those sites up or maintains them?

Katie Medart:

Rachel.

Mickey:

Okay.

Katie Medart:

I get screenshots every once in a while about a message. I'm not on there. I don't go check it. I don't... I'm not-

Mickey:

So Rachel Damiano would be the person to ask about that.

Katie Medart:

Yes. That's who you should ask.

Dan Huber-Kantola:

Okay. I could do that. Did Rachel know that you were spending this much time working on these things, talking to people during the school day?

Katie Medart:

This transcript was exported on May 31, 2021 - view latest version here.

Yes. I went and told her that I talked to so-and-so.

Dan Huber-Kantola:

So when you talked to Jason Wright and Mason Mahaffie and Jordan Kasler, Rachel knew that you'd talked to all those different people. She knew that you talked to them during flex hours?

Katie Medart:

Yes. She has reiterated to me over and over, this is not political issue. This is education policy. Over and over and over. And I believe she will do a much better job explaining the reason, being an administrator, than me trying to articulate. And I hear you clearly telling me that your views are, that is political policy, it's politics, anything to do with any policy is politics, is what I heard you say when I asked you for the definition of it.

Dan Huber-Kantola:

Yeah. Yeah. So she knew you were talking to people to try to gather support for the resolution during the flex time?

Katie Medart:

Yes. I believe she will say that she was aware of that. I would tell her after I did it, "Today, I went and talked to...," "I shared this information. I sent them the link." "This person said they would check it out," "This person said, 'Thank you. They're excited,'" "This person said, 'I signed it.'"

Dan Huber-Kantola:

Okay. Any other questions at the time? Any questions for us?

Katie Medart:

I feel like I will have some.

Mickey:

You can always reduce those to writing and provide them. Danny talked a little bit about the process moving forward, but do you want to just run that through again? Katie's currently on admin leave.

Katie Medart:

Can I understand why. I asked Tommy this when he handed me the letter, "Is it normal process to people on admin leave for complaints?" And he said, "No, not typically. But the district made this decision," and I wept.

Dan Huber-Kantola:

If-

Katie Medart:

And so-

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

I just be blunt with you? If there's potential-

Tommy Blanchard:

And I'm a part of that decision.

Katie Medart:

Okay.

Tommy Blanchard:

As part of the district. I'm not saying that that was his decision or his decision. I was a part of that decision.

Katie Medart:

Okay.

Dan Huber-Kantola:

A couple of things. If there's potential that discipline could come out of something, and even potential that major discipline could come out, a lot of times people will be placed on paid administrative leave. That doesn't mean it's going to happen. More than that, if there's a disruption, and we need to stop the disruption, we're charged with that.

Dan Huber-Kantola:

I'm also charged as the Title IX director, if there's feelings of discrimination and that kind of stuff, the very first thing that's supposed to take place is eliminate that, then you do your investigation. But you stop whatever it is, to the best of your ability, anything that may be discriminatory or that kind of stuff taking place. And that one's a legal obligation, too.

Katie Medart:

So anyone, if they write the words that, "I felt discriminated against," then that warrants a suspension of their job while the investigation takes place?

Dan Huber-Kantola:

Well, you're not suspended. You're on leave with paid administrative leave.

Katie Medart:

So I'm sorry. So I agree. I will restate that. I don't know that-

Dan Huber-Kantola:

It could. If I get a report that Tommy has made a derogatory comment, discriminatory comment, about an African American student, then yeah, I would put him on paid administrative leave till we investigated that and sorted it-

This transcript was exported on May 31, 2021 - view latest version here.

**Katie Medart:**

So I reported to you that I felt discriminated against by Nika and Bob, but neither one of them have been put on...

Dan Huber-Kantola:

But you'd also have to have a discriminated class, being... What's the-

**Katie Medart:**

So two, my sexual orientation and my religion. That is both ways that I feel I was discriminated against, when you look at the line of questioning that came. Wait, in these you're saying that they said how I discriminated against them? And what was that for?

Dan Huber-Kantola:

And the kids.

Katie Medart:

Okay, so-

Dan Huber-Kantola:

And that it's a threat to the kids.

Katie Medart:

I'm just trying to understand, Danny. The complaints are saying that... What is your interpretation? That I discriminated against the students?

Tommy Blanchard:

Four.

**Dan Huber-Kantola:**

For actions on that video are discriminatory against gender students. I mean, I think it says that pretty clearly in the complaint that's the... I'm not saying that's what happened, but I do certainly say that that's in the complaint-

Katie Medart:

Against students.

Dan Huber-Kantola:

... that there is a bias incident, that there's a bias against gender transition students.

Katie Medart:

And so I'm discriminated against gender identity?

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

Yep. Students who have a different gender identity.

Katie Medart:

And...

Dan Huber-Kantola:

And the disruption of the school.

Katie Medart:

But you're saying that, even though I said the word that I was discriminated against, because I did not say religion, and because I did not say my class, but these ones are describing their class of how it was discriminated against that. Because I did not say that in mine, that that's why it was not treated the same as my leave of absence?

Dan Huber-Kantola:

There's a certain a level-

Katie Medart:

Or my administrative leave?

Dan Huber-Kantola:

Two, I mean, one involved students. Right? I mean, I don't know, even if you'd had said, "I feel discriminated against, based on my religion," I don't know, honestly, if we would have put them on paid administrative leave. We might've, but I don't know.

Katie Medart:

But for my gender expression, that would have.

Dan Huber-Kantola:

Potentially, yeah.

Katie Medart:

Okay.

Dan Huber-Kantola:

If they would have said, "Hey, I feel like I'm being... They're saying things derogatory about my gender expression," or something like that, then, there's a good chance that that would have happened, too. Yeah. Yeah, any other questions?

Mickey:

So moving forward.

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:

So moving forward, we need to take the information today. If we have more questions, we'll call you guys back, set up another time to ask questions. You can submit questions to us, if you have any other questions, we're going to be thorough in the investigation. We're going to talk to the different people that are listed here to confirm things or find out things. I'm going to talk to Rachel, and I think that's part of this investigation as well.

Mickey:

During this investigation period, so Katie remains on administrative leave?

Dan Huber-Kantola:

Yeah.

Mickey:

Okay. We're thinking 10 days-ish.

Dan Huber-Kantola:

Yep.

Mickey:

We have 10-

Dan Huber-Kantola:

Yep.

Mickey:

And then, it's messy. So I heard you say earlier, it could be longer than that.

Dan Huber-Kantola:

It could.

Mickey:

In terms of support for... Katie has been working with these students in academic matters. What's the-

Katie Medart:

I have so many emails coming in. Want to talk about disruption, I felt like the district decision to pull me out was so disruptive. One, I was pulled out with a full classroom of students. Okay? When I was there at 7:30 in the morning. Two, was now I have all these emails coming in, and I was told that "You cannot help them." Okay? But I have volunteered as much to him to say, "I am more than willing to help. I want there to be as least disruption to them or not." And so...

Mickey:

This transcript was exported on May 31, 2021 - view latest version here.

So what do we do moving forward?

Katie Medart:

Yes.

Dan Huber-Kantola:

Yeah. So I did ask legal counsel. I haven't heard back. So my own decision here could change. How's that? If I hear something different would be respond to student emails about academic things. If it's their grades, if it's their assignments, those types of things.

Katie Medart:

That is what they're all asking about, because it's the end of the quarter, "Ms. Medart, what I do for my notebook?" Oh-

Mickey:

Like who's grading, who's doing that? Is another, right? Who's doing all of that work?

Dan Huber-Kantola:

If you could still do the grading and stuff. If we could get-

Mickey:

If you decided to do that.

Dan Huber-Kantola:

Yeah.

Mickey:

So then coordination with whoever it is that-

Dan Huber-Kantola:

Yeah, probably coordinate that with Tommy, in terms of how to get that information and that kind of stuff. If that changes, I will let you know, just ASAP, probably by email.

Mickey:

So then after this period of time, you'll render some report?

Dan Huber-Kantola:

A disposition of the claims, yeah. So would include what format typically, Katie, would be, "These are the things that were claimed. We had this investigation, we had this meeting, we also talked to blah, blah, blah." Maybe just staff member, staff member, staff member. It may not identify all the staff members that we talked to, by name. If we talk to a student, it certainly wouldn't identify the students

FER065

This transcript was exported on May 31, 2021 - view latest version here.

by name. And then, it'll say, "The findings were, this is what we found, and then the recommendations. What are the recommendations going forward?"

Katie Medart:

Okay.

Mickey:

Another, just follow-up. When Katie said, "Why paid administrative leave?" You said two things. Correct? Can you tell me what the first one was? The second one was bias as Title IX director. First one was...

Dan Huber-Kantola:

Disruption, the amount of disruptions, the stuff that was taking place.

Mickey:

You also mentioned something about level of...

Dan Huber-Kantola:

The potential level of concern. I mean the seriousness level. I mean, it's a pretty serious concern.

Mickey:

Okay. Surely, three things would be the reason for paid administrative...

Dan Huber-Kantola:

Yeah.

Mickey:

Thank you.

Katie Medart:

What you did you just say, Mickey? The last part?

Dan Huber-Kantola:

The level of concern, the level of seriousness of the alleged offense. How's that?

Mickey:

So the possible severity of the consequence. Does it feel like the conversation... I don't mean to feel like it was contributory part of your decision-making, is what I thought I heard you say. And I know that we focused on that for a while. I don't want to miss the other pieces, so that Katie understands exactly what the situation is.

Dan Huber-Kantola:

This transcript was exported on May 31, 2021 - view latest version here.

Yeah. I mean, and the district can... It's not disciplinary. All these questions... Just because there's allegations, we're not saying you did this. Okay? This process is finding out what in the heck happened? Okay? You've got five complaints here, that kind of stuff. So the whole process is to find out what really happened. Anyway, so that's where we're at. And we will work as expeditiously as possible. It won't seem like it, but we will. I promise.

Katie Medart:

And when can I get a copy of this recording?

Dan Huber-Kantola:

I will see if I can get that to you as soon as possible.

Katie Medart:

Oh, thank you.

Dan Huber-Kantola:

Okay? Let's see how long it takes them to download a disc. It'll probably be in a disc. That's how we do it.

Katie Medart:

Like a flash drive?

Dan Huber-Kantola:

I don't know if we can do flash drive. I'll see if we can do flash drive. I know they can do, it's like CD when we do other... I know.

Katie Medart:

Okay. I'm like-

Mickey:

[crosstalk 02:16:55] has to, right?

Katie Medart:

[crosstalk 02:16:56]... like SCP?

Mickey:

There's a legal piece to it. I think that you have to kind of like, you have rights and they want to safeguard those rights. You don't want to medium that's easy for anybody to grab and use.

Dan Huber-Kantola:

Yeah.

This transcript was exported on May 31, 2021 - view latest version here.

Mickey:

So like when you go to the docs and you ask for anything anymore, they could just send you a digital file, but they don't. They always burn a disc, and they're like, "This is your disc. You do with it what you will. We're done with it."

Katie Medart:

Okay.

Dan Huber-Kantola:

You have a CD player?

Katie Medart:

I think one of them in my desktop has a CD player. I know my car has a CD player in it. So yes.

Dan Huber-Kantola:

Yeah. Okay. So yes, we'll get that to you as soon as possible.

Katie Medart:

Okay, thank you.

Mickey:

Are there any other questions or things you want to bring up at this time? We will have other opportunities.

Katie Medart:

We will. That's what I want to make sure. This isn't my one opportunity, right?

Dan Huber-Kantola:

No.

Katie Medart:

Okay. So I hear you saying I can respond to my students. I will work with Tommy. And...

Mickey:

Okay.

Dan Huber-Kantola:

I do need to ask you just officially, do not talk to staff members. Don't talk to Rachel, don't talk to anybody else about this particular part of any of this.

Katie Medart:

About the complaints.

This transcript was exported on May 31, 2021 - view latest version here.

Dan Huber-Kantola:
About the complaints.

Katie Medart:
Yes. I saw your email about that.

Dan Huber-Kantola:
Yep. She's a good advisor, but limited to make the...

Katie Medart:
Okay.

Dan Huber-Kantola:
Or legal counsel if you [crosstalk 02:18:26].

Katie Medart:
Yep.

Dan Huber-Kantola:
Okay?

Katie Medart:
Yeah.

Dan Huber-Kantola:
Anything else Tommy?

Tommy Blanchard:
Yep.

Dan Huber-Kantola:
All right. Thank you, guys.

Mickey:
Thank you. Can I ask you for five other minutes to talk about something else that happened today?

Dan Huber-Kantola:
We have other things that happened today?

Mickey:
Well-

This transcript was exported on May 31, 2021 - view latest version here.

PART 4 OF 4 ENDS [02:18:41]